UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| THE SHANE GROUP, INC.,  BRADLEY A. VENEBERG, MICHIGAN REGIONAL COUNCIL OF CARPENTERS EMPLOYEE BENEFITS FUND, ABATEMENT WORKERS NATIONAL HEALTH AND WELFARE FUND, MONROE PLUMBERS & PIPEFITTER LOCAL 671 WELFARE FUND, and SCOTT STEELE, <br><br> Plaintiffs, on behalf of themselves and all others similarly situated, <br><br> v. <br><br> BLUE CROSS BLUE SHIELD OF MICHIGAN, <br><br> Defendant. | Case No. 2:10-cv-14360-DPH-MKM <br><br> Honorable Denise Page Hood |

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs The Shane Group, Inc., Bradley A. Veneberg, Michigan Regional Council of Carpenters Employee Benefits Fund, Abatement Workers National Health and Welfare Fund, Monroe Plumbers & Pipefitter Local 671 Welfare Fund, and Scott Steele, on behalf of themselves and all others similarly situated, allege as follows:

## NATURE OF THE CASE

1.      This class action seeks to recover overcharges paid by purchasers of Hospital Healthcare Services (as defined herein) directly to hospitals in Michigan that resulted from the

anticompetitive acts of Defendant Blue Cross Blue Shield of Michigan ("BCBSM" or "Defendant").

2.      Defendant BCBSM, a dominant health insurance company in Michigan, has engaged in an anticompetitive scheme in violation of Section 1 of the Sherman Act, involving at least 70 Michigan hospitals, including the execution and enforcement of "Most Favored Nation" ("MFN") agreements with the hospitals.

3.      The MFN agreements, sometimes called "most favored pricing," "most favored discount," or "parity" agreements, require the agreeing hospitals either to charge other commercial insurers for Hospital Healthcare Services at least as much as they charge BCBSM ("equal-to MFN" agreements), or to charge other commercial insurers more than they charge BCBSM, usually by some fixed percentage ("MFN-plus" agreements).

4.      In exchange for the MFNs, BCBSM agreed to pay higher hospital charges to many hospitals throughout Michigan.  Instead of using its market position as Michigan's largest commercial health insurer to negotiate against a hospital's proposed price increases, BCBSM accepted these increases as a means to secure the MFN provisions.  BCBSM benefitted from this scheme, even though this scheme resulted in BCBSM's costs going up, because it raised its rival insurers' costs even more, affording BCBSM a cost advantage vis-à-vis its competitors. Thus, BCBSM used a series of MFN agreements to impair its rivals, and maintain and enhance its position as the dominant commercial health insurer in Michigan.  As a result of this anticompetitive scheme, prices for Hospital Healthcare Services in Michigan rose, and members of the Class of direct purchasers including individual insureds, self-insureds, health insurers, and managed care organizations, have paid artificially inflated prices.

2

5.      Both types of MFN agreements inhibit competition:

(A) "MFN-plus" agreements.

BCBSM has signed MFN-plus agreements with at least 22 hospitals that require the hospitals to charge some or all other commercial insurers more than the hospitals charge BCBSM, typically by a specified percentage differential.

(B) "Equal-to MFN" agreements.

BCBSM has entered into equal-to MFN agreements with at least 46 hospitals, requiring those hospitals to charge other commercial health insurers at least as much as they charge BCBSM. Some are small, community hospitals while others are larger hospitals in metropolitan areas. A community hospital that declines to enter into these agreements would be paid approximately 16% less by BCBSM than if it accepts the MFN agreement.

6.      BCBSM has effectively purchased protection from competition by causing hospitals to raise the prices they charge to BCBSM's competitors. The suppression of competition caused by this scheme was so valuable to BCBSM that it was willing to pay higher prices for hospital services itself.

7.      Defendant's MFN agreements have caused Michigan hospitals to charge supracompetitive prices to BCBSM's competitors and other direct purchasers of hospital services throughout Michigan, in violation of Section 1 of the Sherman Act, 15 U.S.C. § l, and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

8.      BCBSM insures more than three times as many Michigan residents as its next largest commercial health insurance competitor. The market share of BCBSM in the sale of commercial health insurance in the state of Michigan exceeds 60%. Its share of sales in the different geographic areas within Michigan identified below varies, but in all instances BCBSM has substantial market power, including sufficient power to persuade multiple hospitals to enter

3

into MFN agreements that have artificially raised prices for Hospital Healthcare Services throughout Michigan.

9.      BCBSM is the largest non-governmental purchaser of Hospital Healthcare Services in Michigan.  As part of its provision of health insurance, BCBSM pays for hospital services on behalf of its insureds to all 131 general acute care hospitals in the State.  BCBSM purchased more than $4 billion in such hospital services in 2007.

10.     Plaintiffs seek to represent a Class of all individuals and entities (the "Class") that directly paid a hospital in Michigan, that had an MFN Agreement with BCBSM, for Hospital Healthcare Services at a rate contracted for by BCBSM or one of its competitors from January 1, 2007 to the present.

11.     Because of BCBSM's unlawful conduct as described herein, Plaintiffs and the Class paid artificially inflated prices for Hospital Healthcare Services and, as a result, have suffered antitrust injury.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

13.     Plaintiffs have been injured, and are likely to continue to be injured as a result of Defendant's unlawful conduct.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court also has supplemental jurisdiction over this action under Section 2 of the Michigan Antitrust Reform Act, MCL 445.772, pursuant to 28 U.S.C. § 1367.

15.     Defendant BCBSM maintains its principal place of business and transacts business in this District, and is subject to the personal jurisdiction of this Court. Venue is proper in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26. BCBSM has entered into contracts containing MFN clauses with hospitals in this District. BCBSM's conduct has artificially raised prices for Hospital Healthcare Services in this District. Venue in this District is also proper pursuant to 28 U.S.C. § 1391.

## DEFINITIONS

16.   As used herein:

a.   "Applicable Provider Agreement" means the provider agreement in effect between the hospital and: (1) the class member, if an insurer, (2) the class member's insurer if the class member is an insured or (3) the class member's administrative services provider if the class member is a self-insured entity.

b.   "BCBSM insureds" means (1) all members of individual and group health insurance plans provided by Blue Cross Blue Shield of Michigan, and (2) all self-insured entities with administrative services only contracts with Blue Cross Blue Shield of Michigan.

c.   "Class Period" means the period from January 1, 2007 to the present.

d.   "Commercial health insurance" means group and individual commercial health insurance, including the accompanying administrative services, and the administrative services provided to self-insured entities. Commercial health insurance excludes government programs such as Medicare and Medicaid, and alternative products offered by health insurers such as Medicare Advantage that are not available to individuals who do not qualify for Medicare or Medicaid.

e.   "Hospital Healthcare Services" means inpatient and hospital-based outpatient services that are provided by hospitals.

5

## INTERSTATE COMMERCE

17.     Defendant BCBSM is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Supracompetitive prices for hospital services caused by Defendant's MFN agreements are, in some cases, paid by health insurers, self-insured employer health plans, and other consumers across state lines. BCBSM and other insurers (1) provide commercial health insurance that covers Michigan residents when they travel across state lines, (2) purchase healthcare in interstate commerce when Michigan residents require healthcare out of state, and (3) receive payments from employers outside Michigan on behalf of Michigan residents.

## PARTIES

**A.      Defendant**

18.     Defendant BCBSM is a Michigan nonprofit healthcare corporation headquartered in Detroit, Michigan. Directly and through its subsidiaries, BCBSM provides health insurance and administrative services, including preferred provider organization ("PPO") health insurance products and health maintenance organization ("HMO") health insurance products.

**B.      Plaintiffs**

19.     The Shane Group, Inc. ("Shane Group"), is a business located in Hillsdale, Michigan. Shane Group is a member of the  Class defined herein.  During the Class Period, Shane Group directly paid a hospital in Michigan that had an MFN Agreement with BCBSM for Hospital Healthcare Services at the price contained in the Applicable Provider Agreement.

6

As a result of BCBSM's anticompetitive conduct, Shane Group paid artificially inflated prices for Hospital Healthcare Services and was therefore injured in its business or property by reason of the antitrust violations alleged herein.

20.    Bradley A. Veneberg is a resident of Munising, Michigan. Plaintiff Veneberg is a member of the Class defined herein.  During the Class Period, Veneberg directly paid a hospital in Michigan that had an MFN Agreement with BCBSM for Hospital Healthcare Services at the price contained in the Applicable Provider Agreement. As a result of BCBSM's anticompetitive conduct, Plaintiff Veneberg paid artificially inflated prices for Hospital Healthcare Services and was therefore injured in his business or property by reason of the antitrust violations alleged herein.

21.    Plaintiff Michigan Regional Council of Carpenters Employee Benefits Fund ("Michigan Regional Council") is a jointly-trusteed fund established pursuant to Section 302 of the Labor Management Relations Act and Section 515 of the Employee Retirement Income Security Act of 1974, located in Troy, Michigan.  Michigan Regional Council is a member of the Class defined herein.  During the Class Period, Michigan Regional Council directly paid a hospital in Michigan that had an MFN Agreement with BCBSM for Hospital Healthcare Services at the price contained in the Applicable Provider Agreement. As a result of BCBSM's anticompetitive conduct, Michigan Regional Council paid artificially inflated prices for Hospital Healthcare Services and was therefore injured in its business or property by reason of the antitrust violations alleged herein.

22.    Plaintiff Abatement Workers National Health and Welfare Fund ("Abatement Workers") is a jointly-trusteed fund established pursuant to Section 302 of the Labor

Management Relations Act and Section 515 of the Employee Retirement Income Security Act of 1974, located in Troy, Michigan.  Abatement Workers is a member of the Class defined herein.  During the Class Period, Abatement Workers directly paid a hospital in Michigan that had an MFN Agreement with BCBSM for Hospital Healthcare Services at the price contained in the Applicable Provider Agreement.  As a result of BCBSM's anticompetitive conduct, Abatement Workers paid artificially inflated prices for Hospital Healthcare Services and was therefore injured in its business or property by reason of the antitrust violations alleged herein.

23.     Plaintiff Monroe Plumbers & Pipefitters Local 671 Welfare Fund ("Monroe Plumbers") is a jointly-trusteed fund established pursuant to Section 302 of the Labor Management Relations Act and Section 515 of the Employee Retirement Income Security Act of 1974, located in Monroe, Michigan. Monroe Plumbers is a member of the Class defined herein.  Monroe Plumbers directly paid a hospital in Michigan that had an MFN Agreement with BCBSM for Hospital Healthcare Services at the price contained in the Applicable Provider Agreement. As a result of BCBSM's anticompetitive conduct, Monroe Plumbers paid artificially inflated prices for Hospital Healthcare Services and was therefore injured in its business or property by reason of the antitrust violations alleged herein.

24.     Plaintiff Scott Steele is a resident of West Bloomfield, Michigan. Plaintiff Steele is a member of the Class defined herein.  During the Class Period, Plaintiff Steele directly paid a hospital in Michigan that had an MFN Agreement with BCBSM for Hospital Healthcare Services at the price contained in the Applicable Provider Agreement. As a result of BCBSM's anticompetitive conduct, Plaintiff Steele paid artificially inflated prices for Hospital Healthcare

8

Services and was therefore injured in his business or property by reason of the antitrust violations alleged herein.

## CLASS ALLEGATIONS

25.     Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. All requirements of Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) are satisfied.

26.     The Class to be certified is defined as follows:

> All persons and entities that during the Class Period, alone or with a co-payor, directly paid a hospital in Michigan that had an MFN Agreement with BCBSM for Hospital Healthcare Services at the price contained in the Applicable Provider Agreement.

> Excluded from the Class are: (1) purchases of Hospital Healthcare Services made by BCBSM insureds before the hospital had an MFN Agreement with BCBSM; (2) purchases of Hospital Healthcare Services made by non-BCBSM insureds before the hospital both executed an MFN Agreement and had a subsequent increase in the Applicable Provider Agreement's reimbursement rates; (3) insureds' co-payments for Hospital Healthcare Services not set as a percentage of the hospital's charges; and (4) BCBSM, its officers and directors, and its present and former parents, predecessors, subsidiaries and affiliates.

27.     The Class includes, among others, commercial insurers; employers, unions and others providing self-insured health insurance plans; and insured individuals whose co-pays are set as a percentage of hospital charges.

28.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such entities and

individuals is currently unknown, Plaintiffs believe that Class members number in the thousands.

29.     There are multiple questions of law and fact common to the Class that predominate over any questions solely affecting individual members, including, but not limited to:

    a.   Whether BCBSM's practice of incorporating MFNs in its contracts with hospitals is anticompetitive;

    b.   Whether Defendant violated the Sherman Act through use of MFN contracts;

    c.   Whether Defendant violated the Michigan Antitrust Reform Act through use of MFN contracts;

    d.   Whether Defendant's actions alleged herein caused injury to Plaintiffs and the Class in the form of inflated prices for Hospital Healthcare Services; and

    e.   The appropriate measure of damages.

30.     Plaintiffs' claims are typical of those of the Class. Plaintiffs, like other members of the Class, were injured by Defendant's illegal agreements by paying inflated prices for Hospital Healthcare Services. The overcharges paid by Plaintiffs and the Class were the result of Blue Cross's overall scheme to restrict competition in the sale of commercial health insurance throughout Michigan, which artificially inflated prices Class members paid for Hospital Healthcare Services.  Defendant implemented its anticompetitive scheme through a series of MFN contract provisions. Plaintiffs challenge Defendant's scheme under the legal theory that the MFN agreements, individually and collectively, are anticompetitive and unlawful under Section 1 of the Sherman Act, and under the impact and damages theory that

10

such agreements artificially inflated prices for Hospital Healthcare Services throughout Michigan.

31.     Plaintiffs and the undersigned counsel are adequate representatives of the Class. Plaintiffs have the incentive, and are committed, to prosecute this action for the benefit of the Class. Plaintiffs have no interests that are antagonistic to those of the Class or that would cause them to act adversely to the best interests of the Class. Plaintiffs have retained counsel experienced in antitrust and class action litigation.

32.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendant has acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Class as a whole.

33.     This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as that asserted in this Complaint.  Plaintiffs are aware of no difficulties which would render the case unmanageable.

11

34.     Plaintiffs and members of the Class have all suffered, and will continue to suffer, antitrust injury and damages as a result of Defendant's equal-to and MFN-plus contracts and related unlawful conduct.

## HEALTH INSURANCE AND ADMINISTRATIVE SERVICES IN MICHIGAN

35.     In Michigan, as throughout the United States, individuals who are not eligible for Medicare or Medicaid (i.e., people who are not disabled, elderly, or indigent) typically obtain health insurance from commercial health insurance companies.  In 2008, approximately 53% of Michigan residents obtained employer-provided or other group health insurance. About 7% obtained individual health insurance directly from commercial insurance companies, including BCBSM.

36.     Employed individuals often obtain health insurance through their employers, which may pay a share of insurance premiums. Employed individuals may also obtain health insurance from union health and welfare funds such as Plaintiffs Michigan Regional Council, Abatement Workers, and Monroe Plumbers.

37.     Commercial health insurers compete to be chosen by employers, employees, self-insured plans and others based on the quality and breadth of their healthcare provider networks, the level of benefits provided (including insureds' out-of-pocket costs in the form of deductibles, co-payments, and co-insurance), price, customer service, reputation, and other factors.  Employers, unions and other groups typically select the insurance plan or plans they offer to their employees or group members. Employees or group members then choose whether to enroll in the group health insurance coverage offered to them and, if multiple health insurance plans are offered, choose among the plans offered.

12

38.     Employers and unions provide group health insurance on either a "fully insured" or a "self-insured" (sometimes called "self-funded") basis. Under fully insured health insurance policies, the insurer bears the risk that healthcare claims will exceed anticipated losses. Under self-insured health insurance policies, the employer pays its employees' insured medical costs itself, so a large portion of that risk is borne by the employer.  Sometimes, self-insured organizations purchase stop-loss insurance to limit the impact of individual catastrophic claims and/or numerous claims on financial reserves.  Self-insurance is a viable option primarily for large employers and large unions.

39.     Employers and unions that self-insure usually contract with a managed care company to obtain administrative services including: access to a health care provider network (including hospitals, physicians, and other health care providers) subject to negotiated fee schedules; utilization management tools and programs (such as case management to assist members in managing their illnesses, programs to provide members with access to effective care for difficult conditions, disease management services for members with chronic conditions, information hotlines with 24-hour access to registered nurses, review of certain services or courses of treatment, prenatal care programs, and other programs designed to promote members' health and reduce their need for less efficient forms of medical services); and other services (such as claims processing and payment, coordinating benefits with other sources of coverage, assisting employers and unions in the setup and design of a plan, and assisting them in the administration of a plan). These administrative services are provided to self-funded employers and unions by managed care companies through "administrative services only" (ASO) contracts. The health insurers that provide these services are generally the same insurers

13

that provide fully insured health insurance in the region where the self-insured's employees or members are located.

40.     BCBSM is the largest provider of ASO services in Michigan. BCBSM processed almost $11 billion in healthcare claims for self-insured plans in 2009.  Approximately half of BCBSM's commercial health insurance business is for administrative services only.  BCBSM earned more than $750 million in ASO fees in 2009.

41.     Most health insurance plans provide insureds with discounted access to a healthcare provider network including hospitals and physicians. Under these plans, insureds receive greater benefits when obtaining healthcare services from providers that participate in the insurer's provider network. When an insured receives service from a provider in the insurer's network, the insurer or self-insured employer or union pays the healthcare provider directly at prices and terms negotiated between the insurer and the provider - the patient often paying a co-pay, a deductible, or a portion of the cost as specified in the insurance policy. The portion paid by individual insureds is sometimes set as a percentage of the hospital's charges.  Michigan law mandates that members of HMO plans have access to a network of affiliated providers sufficient to assure that covered services are available without unreasonable delay and in reasonable proximity to the recipients of those services.

42.     Network contracts between insurers and providers typically prohibit the provider from "balance billing" (charging the patient more than the allowable amount agreed to between the insurer and the provider). In contrast, if there is no network or participation agreement between the insurer and the provider, the insurer typically provides a smaller "out-of-network" insurance benefit, or none at all, and the insured is often responsible for paying the balance of

14

the provider's full charges.  The costs of medical care are typically 80% or more of health insurers' costs, and hospital costs are a substantial portion of medical care costs. Accordingly, health insurers' hospital costs are an important element of insurers' ability to offer attractive prices for its insurance offerings.

43.     Hospitals and commercial health insurers generally negotiate a discount to be applied to a standardized hospital fee schedule. The standardized schedule is set forth as a master list of hospital fees for services (referred to in the industry as a "chargemaster"), a schedule of fees for treatment of specified illnesses (typically based on "diagnosis-related groups" or "DRGs" as defined by Medicare and Medicaid), or on another basis. BCBSM's equal-to MFN contracts typically require that hospitals not grant other commercial health insurers better discounts from the fee schedules than BCBSM receives. BCBSM's MFN-plus contracts typically require that hospitals not grant other commercial health insurers discounts within a specified percentage of BCBSM's discounts.

## BCBSM's MARKET POWER

44.     BCBSM has market power in the sale of commercial health insurance that includes access to Michigan-based provider networks.  BCBSM and other managed care companies compete to provide these services to self-funded health plans (through an administrative services contract).  BCBSM and its rivals also compete to provide these services in connection with fully insured health plans to groups as well as individuals. Commercial health insurance excludes government programs such as Medicare and Medicaid, and other products offered by health insurers such as Medicare Advantage that are not available to individuals who do not qualify for Medicare or Medicaid.

15

45.     Insurance and administrative services that include access to Michigan-based provider networks are not reasonably interchangeable with any other products or services.

46.     The sale of commercial health insurance, including access to a discounted provider network, is a relevant product market.  Commercial health insurance that does not include access to a network of providers is not a reasonable substitute for commercial health insurance that does include access to a provider network.  Under Michigan law, HMO plans are required to provide access to a network of contracted facilities that are capable of providing covered services in reasonable proximity to plan members.  Moreover, aside from these legal requirements, access to a provider network is an essential ingredient of commercial health insurance from the point of view of most health plans, because providers' non-discounted rates are, in most cases, prohibitively expensive.  It is only through access to a network that most plans can affordably cover the health care services procured by their members.

47.     The sale of commercial health insurance to groups, including access to a provider network, is a segment or sub-market within the relevant product market. There are no reasonable alternatives to group health insurance, including access to a provider network, for employers or most employees. Individual health insurance typically is significantly more expensive than group health insurance, in part because employer contributions to group health insurance premiums are not taxable to the employee and are tax-deductible by the employer. Virtually all individual health insurance is purchased by persons who do not have access to employer- or union-sponsored group health insurance.

48.     The sale of commercial health insurance to individuals, including access to a provider network, is also a segment or sub-market within the relevant product market. Some

16

Michigan residents without access to group health insurance purchase individual health insurance directly from commercial health insurers. Individual health insurance is the only product available to individuals without access to group coverage or government programs that allows them to reduce the financial risk of adverse health conditions and to have access to healthcare at the discounted prices negotiated by commercial health insurers. There are no reasonable alternatives to individual health insurance for individuals who lack access to group health insurance or government programs such as Medicare and Medicaid.

49.     With respect to the relevant geographic market, access to a provider network entirely outside the state of Michigan is not a reasonable substitute for access to a network within the state of Michigan.  In most cases, plan members in Michigan cannot practicably travel to other states to seek health care services from providers in networks in other states.

50.     Moreover, many individuals and entities with group health insurance require access to a provider network that covers many or all local areas throughout the state of Michigan.  This is because individuals in one local area (for example, Grand Rapids) cannot practicably travel to another local area (for example, Flint) if their health plan does not provide coverage in their local area.  Thus, employers that have employees in local areas spread across the state typically require access to a state-wide network.  In addition, employers with employees located in a narrower set of local areas may still view a state-wide network as essential because such a network provides coverage for employees wherever they travel in the state.  For these employers, a provider network that provides affordable coverage only in portions of the state is not a reasonable substitute for a network that includes all or nearly all local areas throughout the state.  Similarly, some Michigan purchasers of individual insurance

17

do not view networks limited to localized areas as substitutes for networks that grant access to providers in most or all local areas throughout the state. Such individuals desire access to affordable healthcare wherever they travel within the state and they prefer to have the option of continuing their existing insurance coverage if they move to another area in the state.

51.     Further, the ability of other commercial health insurers to compete with BCBSM is a function of not just the location of the hospitals with MFN agreements, but also of the number of hospitals with MFN agreements. If a significant number of hospitals in a rival's network have MFN agreements, its costs will be raised significantly, and its competitive vigor diminished considerably, even if in some areas of its network, no hospitals have MFN agreements. Thus, the numerous MFN agreements between Blue Cross and Michigan hospitals had the collective effect of weakening BCBSM's rivals and thereby lessening competition in the sale of commercial health insurance throughout Michigan regardless of the precise location within Michigan of the hospitals involved.

52.     There are, however, some individuals or employers that require access to a provider network only within a localized area. For example, an employer with only one facility may only be interested in procuring access to a network of providers in that local area. An employer in this situation may have a strong preference for access to the network in one area and may not be particularly concerned about the quality or rates of the network elsewhere. In light of the existence of such employers and individuals, there may be geographic sub-markets that are limited to local areas within the state of Michigan. Providers of insurance and administrative services that can offer access to localized healthcare provider networks can

18

compete for business within these sub-markets. Class members have purchased Hospital Healthcare Services in all relevant geographic sub-markets within Michigan.

53.     If an insurer cannot negotiate competitive rates with hospitals in one or more local areas, it is at a severe competitive disadvantage when offering its services to individuals and entities that desire a state-wide network.  For example, the MFN agreement between BCBSM and Edward W. Sparrow Hospital ("Sparrow"), in Lansing, affects all health plans desiring access to a network covering the Lansing Metropolitan Statistical Area ("MSA"), including health plans that desire state-wide coverage and health plans that desire local coverage in the Lansing area.  Such health plans cannot practicably turn to commercial health insurers that do not offer network access to hospitals in the Lansing MSA.  (MSAs are geographic areas defined by the U.S. Office of Management and Budget.)

54.     BCBSM's unlawful contracts have negatively impacted competition and harmed Class members throughout the state of Michigan and in a number of local areas within the state of Michigan.  The following are the local geographic areas (in addition to the entire state of Michigan) in which competition with BCBSM in the sale of commercial health insurance has been restrained, and in which prices paid by Class members for Hospital Healthcare Services have been artificially inflated, as a result of the individual and collective effect of BCBSM's MFN contracts:

   a.     The western and central Upper Peninsula (Alger, Baraga, Delta, Dickinson, Gogebic, Houghton, Iron, Keweenaw, Marquette, Ontonagon, and Schoolcraft Counties), where BCBSM has more than 65% of commercially insured lives;

19

b.      The Lansing MSA (Ingham, Clinton and Eaton Counties), where BCBSM has approximately 70% of commercially insured lives;

c.      The Alpena area (Alpena and Alcona Counties), where BCBSM has more than 80% of commercially insured lives;

d.      The Traverse City Metropolitan Statistical Area (Benzie, Grand Traverse, Kalkaska and Leelanau Counties), where BCBSM has more than 60% of commercially insured lives;

e.      The "Thumb" area (Huron, Sanilac and Tuscola Counties), where BCBSM has more than 75% of commercially insured lives;

f.      Each of the Detroit, Flint, Kalamazoo, and Saginaw MSAs, and the Alma and Midland Micropolitan Statistical Areas, in each of which BCBSM has more than 50% of commercially insured lives;

g.      The Grand Rapids MSA, where BCBSM has more than 45% of commercially insured lives; and

h.      Each of Allegan, Iosco, Montcalm, Osceola and St. Joseph Counties, in each or which BCBSM has more than 40% of commercially insured lives.

i.      On information and belief, there are additional local geographic areas in the State of Michigan, not yet identified by Plaintiffs, in which competition in the sale of commercial health insurance has been hampered, and reimbursement rates for Hospital Healthcare Services raised to supracompetitive levels, as a result of the individual and collective effect of BCBSM's MFN contracts.

20

55.     BCBSM has an MFN agreement with at least one significant hospital in each geographic area identified in the preceding paragraph. In the western and central Upper Peninsula, and in the Lansing, Detroit, Flint, Grand Rapids, Kalamazoo and Saginaw MSAs and the Alma and Midland Micropolitan Statistical Areas, BCBSM has MFN-plus agreements with at least one significant tertiary care hospital.  In the Thumb and in Allegan, Iosco, Montcalm, and Osceola counties, BCBSM has MFNs with all of the hospitals in the area - all of which are community hospitals.

56.     The geographic areas identified in paragraphs 54-55 above approximate the areas served by the hospitals currently subject to BCBSM's MFN agreements, and approximate the areas in which a commercial health insurer requires a provider network, including primary and tertiary care hospitals, in order to compete effectively for health plans that require network coverage in that area. Most employed residents of each of these areas work within the area. Residents of these areas generally use the tertiary care hospitals, if any, within these areas for tertiary care hospital services. Therefore, commercial health insurers believe they must include in their networks tertiary care hospitals in these areas in order to compete effectively in the sale of commercial health insurance to health plans that require coverage in these areas.

57.     Commercial health insurers believe they must include community hospitals within these areas in order to be able to compete effectively in the sale of commercial health insurance to health plans that require coverage in these areas. BCBSM's competitors have paid supracompetitive prices at community hospitals in these areas as a result of Defendant's MFN agreements, rather than drop the community hospitals from their networks.

21

58.     Commercial health insurers are required by Michigan law to include in their HMO networks nearby hospitals for any location in which an HMO product is offered. Those hospitals include community hospitals that are the only hospitals in certain of the specific geographic areas identified above.

59.     The residents of the local geographic areas identified above, and their employers, unions and insurers, are the purchasers of Hospital Healthcare Services currently identified as those likely to be most affected by Defendant BCBSM's MFN agreements, although residents, employers, unions and insurers throughout the state of Michigan likely were affected to some degree by the MFN provisions. Employers and individuals likely would not reduce purchases of commercial health insurance from commercial health insurers with provider networks in the specific geographic areas identified above in response to supracompetitive insurance premiums by a sufficient amount to make premiums above competitive levels over a sustained period of time unprofitable for BCBSM, a monopoly supplier of commercial health insurance in those areas.

60.     BCBSM has market power within the relevant product and geographic market (and all sub-markets that exist within the relevant market).   BCBSM's market power is indicated in the first place by its market share as a seller of commercial health insurance -- BCBSM is far and away the largest provider of commercial health insurance in Michigan, with more than 60% of commercially insured lives (including lives covered under self-insurance arrangements administered by BCBSM). Market shares of this magnitude create an inference of market power.

22

61.     BCBSM's market power in the commercial health insurance market is durable because there are high barriers to entry into the relevant market and segments or sub-markets. BCBSM has a large customer base that will not shift easily to a new competitor. Effective entry into, or expansion in, commercial health insurance markets requires that a health insurer contract with a broad provider network and obtain hospital prices and discounts at least comparable to the market's leading incumbents.

62.     There is substantial direct evidence of BCBSM's market power. For instance, BCBSM has a demonstrated ability to exercise market power by, among other things, profitably raising prices for its commercial health insurance substantially above competitive levels.  A small but significant, non-transitory price increase above competitive levels by BCBSM would not have caused BCBSM to lose enough sales for the price increase to be unprofitable.  BCBSM has also restricted output of health insurance by impairing rival insurers' ability to compete. BCBSM has also erected barriers to entry and impaired and excluded competitors, by, *e.g.*, raising rivals' costs, through its MFN scheme. Other direct evidence of BCBSM's market power in the sale of commercial health insurance includes its ability to successfully pressure hospitals into accepting MFN agreements that cause hospitals to charge BCBSM's competitors  and other purchasers of hospital services higher prices throughout the state of Michigan and in each of the local geographic areas identified above.  BCBSM is able to insist that hospitals agree to its demands because hospitals feel that they "just don't have a choice" except to placate BCBSM, which impairs the ability of rivals to develop a network that is capable of supporting meaningful competition with BCBSM.

63.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

64.   BCBSM's market power in the sale of health insurance translates into market power in the purchase of Hospital Health Care Services because its large share of lives covered becomes a large volume and share of the patients on which the hospitals depend.

65.   The hospitals with which BCBSM has MFN agreements have been able to impose substantial price increases on BCBSM's competitors ultimately because of BCBSM's market power in the sale of commercial health insurance.   BCBSM's competitors have understood that these hospitals consider BCBSM to be a must-carry insurer, and thus have further understood that these hospitals are willing to lose non-BCBSM business if necessary to comply with the MFNs and are not willing to incur the large financial consequences of breaching the MFN provision.   Realizing that they cannot negotiate prices below the MFN-mandated level (with a few, inconsequential exceptions), and that their only choice is to accept the MFN prices or drop the hospital from their network, BCBSM's competitors have accepted the price increases required by the MFN provisions.

66.   BCBSM's MFN agreements apply to hospitals located in most local areas throughout the state of Michigan, and they apply to services procured for both group plans and individual commercial health insurance plans.   Likewise, BCBSM's exclusionary contracts apply to both self-insured and fully insured group plans.   And BCBSM's MFN contracts have

24

impaired its competitors' ability to offer attractive services to all health plans and individuals that desire coverage for local areas throughout Michigan – including health plans that desire coverage only for particular local areas and for health plans that desire state-wide coverage. Accordingly, the anticompetitive effects produced by the MFN agreements have impacted competition in the sale of commercial health insurance in both product market segments and in local geographic areas throughout the state of Michigan.

## DEFENDANT'S MFN AGREEMENTS AND THEIR ANTICOMPETITIVE EFFECTS

### A.    The MFN Agreements and Their Terms

67.    As alleged above, BCBSM has been able to obtain MFN agreements in many of its agreements with Michigan hospitals.  In some contracts, BCBSM requires the hospital to contract with any other commercial insurer at rates at least as high as the hospital contracts with BCBSM – an equal-to MFN agreement. In others, BCBSM demands even more, and requires the hospital to contract with other insurers at rates higher than those paid by BCBSM, typically by a specified percentage differential – an MFN-plus agreement.  Some BCBSM MFNs contain very limited exceptions, most notably an exception for commercial health insurers with a *de minimis* presence, as discussed below.

68.    BCBSM currently has MFNs in its contracts with more than half (approximately 70) of Michigan's general acute care hospitals. Very few hospitals have refused BCBSM's demands for an MFN. Other hospitals' contracts have not been renegotiated in recent years, but (absent relief from this Court) there is a reasonable likelihood that BCBSM will seek MFNs when its contracts with those hospitals come up for renegotiation, especially if the hospital requests a price increase.

25

69.     BCBSM's contracts with MFN clauses typically include some arrangement with the contracting hospital that permits verification of compliance by BCBSM. Often, the contract will require the hospital to "attest" or "certify" annually to BCBSM that the hospital is complying with the MFN agreement, and give BCBSM the right to audit compliance.  Hospitals seeking to avoid a finding of noncompliance and a resulting payment reduction by BCBSM – generally its largest commercial payer – sometimes contract with BCBSM's competitors at prices even higher than the MFN agreement requires, to minimize the chance that the hospital will accidentally violate the MFN provision and then be penalized if BCBSM audits the hospital's compliance. An additional possible anticompetitive consequence of the MFN verification procedure is that it could afford BCBSM an otherwise unavailable insight into what its rivals are paying to the hospital.

70.     BCBSM's agreements with at least 22 Michigan hospitals contain MFN-plus clauses. These hospitals are among the most important providers of hospital services in their respective geographic areas. The following hospitals or hospital systems have agreements with BCBSM with MFN-plus clauses:

   a.   Marquette General Hospital, the largest hospital in the Upper Peninsula and the only Upper Peninsula hospital providing tertiary care, where BCBSM's contract requires the hospital to charge BCBSM competitors a payment rate at least 15 percentage points more than the hospital charges Michigan Blue Cross.

   b.   Sparrow Hospital, the largest hospital in Lansing, where BCBSM's contract requires the hospital to charge some of BCBSM's significant competitors a payment rate at least five percentage points more than the hospital charges BCBSM.

26

c.  Ascension Health, Michigan's largest hospital system, which owns nine general acute care hospitals subject to an MFN-plus agreement, including the St. John Providence Health System in the Detroit MSA (five hospitals), Borgess Health in the Kalamazoo MSA, Genesys Regional Medical Center in the Flint MSA, St. Mary's Medical Center in Saginaw, and St. Joseph Health System in Tawas City. BCBSM's contract with Ascension requires that Ascension's hospitals charge BCBSM's competitors, in the aggregate, at least 10% more than the hospitals charge BCBSM.

d.  Alpena Regional Medical Center in Alpena, Botsford Hospital in Farmington Hills, Dickinson Memorial Hospital in Iron Mountain, and Munson Medical Center in Traverse City.

e.  Metro Health Hospital in Grand Rapids, where Defendant's MFN agreement requires the differential between BCBSM and other payers to increase over time, where BCBSM's discount will reach 5% less than BCBSM's competitors for HMOs and 10% less than BCBSM's competitors for PPOs.

f.  Two Mid-Michigan Health Hospitals (Midland and Gratiot), where Defendant's MFN agreement requires the hospitals to charge BCBSM's competitors payment rates at least eight percentage points higher than the hospital charges BCBSM.

g.  Both hospitals in Saginaw – Covenant, where, in its contract with BCBSM, it attests that the discount (payment rate) provided to BCBSM is at least 15 percentage points better than the weighted average payment rate with respect to all other commercial insurers (where each insurer's payment rate is weighted by its volume, in charges) -- and St. Mary's, identified above.

h.  Three Beaumont Hospitals in the Detroit MSA (Royal Oak, Troy and Grosse Pointe), where Defendant's MFN agreement requires the hospital to charge BCBSM's significant competitors a payment rate at least ten percentage points higher than they charge BCBSM.

71.    In 2007, BCBSM entered into a "Participating Hospital Agreement" ("PHAs") containing an equal-to MFN agreement with each of more than 40 hospitals it classifies as "Peer

27

Group 5" hospitals: small, rural community hospitals, which are often the only hospital in their communities.  Under that agreement, BCBSM itself committed to pay higher prices, as an incentive to those community hospitals that agreed to charge all other commercial insurers rates that would be at least as high as those paid by BCBSM. Any community hospital that failed to attest to compliance with the MFN agreement would be penalized by payments from BCBSM at least 16% less than if it complied with the MFN provisions.

**B.    Anticompetitive Effects of Defendant's MFN Agreements**

72.    BCBSM's existing MFN agreements, and the additional MFN agreements that BCBSM is likely to seek to include in future agreements with Michigan hospitals, have unreasonably lessened competition and are likely to continue to lessen competition among commercial health insurers by:

a.    Maintaining a significant differential between BCBSM's hospital prices and its rivals' prices at important hospitals, which prevents those rivals from incurring lower hospital costs and thus hampers their ability to become more significant competitive constraints to BCBSM;

b.    Raising hospitals' charges to BCBSM's competitors, which reduces those competitors' ability to compete against Blue Cross;

c.    Establishing a price floor below which important hospitals would not be willing to sell hospital services to other commercial health insurers, self-insured employer health plans, or other purchasers of hospital services and thereby deterring price competition in the market for commercial health insurance, and artificially inflating the prices for hospital services;

d.    Raising the price floor for hospital services to all commercial health insurers and, as a result, raising the prices for

28

commercial health insurance charged by Blue Cross and its competitors; and

e.  Limiting the ability of other health insurers to compete with BCBSM by raising barriers to entry and expansion, discouraging entry, and preserving and enhancing BCBSM's dominant market position.

73.  BCBSM often receives substantially better discounts in the purchase of hospital services than other commercial health insurers. BCBSM knows that the discounts it receives provide a competitive advantage against other health insurers. BCBSM noted in April 2009 that its "medical cost advantage, delivered primarily through its facility (i.e., hospital) discounts, is its largest source of competitive advantage," and earlier stated that its advantages in hospital discounts "have been a major factor in its success in the marketplace."

74.  In recent years, BCBSM became concerned that competition from other insurers was eroding its hospital discount advantage. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████        ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

29

███████████████████████████████████████████████

███████████████████████████████████████████████

75.     Aetna Inc. posed a particular competitive threat after its 2005 acquisition of HMS Healthcare.  HMS's network of Michigan hospitals and doctors, which covered most local areas in the state, combined with Aetna's tools for managing healthcare utilization, positioned Aetna to challenge BCBSM's dominant position.  Rather than compete with Aetna and other rivals on the merits, BCBSM launched its anticompetitive scheme to preserve and enhance its market dominance.

76.     BCBSM sought to preserve its competitive advantage by obtaining MFN-plus agreements, with the "expectation . . . that we would not have any slippage in our differential from what we experience today."  In other words, rather than competing with rival health insurers by seeking lower prices from hospitals, BCBSM instead negotiated MFN-plus clauses to maintain its price advantage over rival health insurers by making sure that hospitals charged BCBSM's rivals *more*.  This practice blocked potential competitors from obtaining hospital services at prices close to BCBSM's prices and thereby becoming more significant competitive constraints on BCBSM. During negotiations in 2008 with one hospital in Grand Rapids, BCBSM wrote that "we need to make sure they [the hospital] get a price increase from Priority [a BCBSM rival] if we are going to increase their rates."

77.     ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████        ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

78.     In most cases, BCBSM obtained an MFN agreement from a hospital by agreeing to increase its payments to the hospital. BCBSM has sought and often obtained MFN-plus clauses when hospitals have sought significant rate increases. BCBSM also agreed to increase rates to Peer Group 5 hospitals as part of the Peer Group 5 PHA, which included an equal-to MFN agreement. Had a hospital not accepted an MFN agreement, BCBSM likely would not have agreed to pay the higher rates sought by the hospital. Thus, one effect of the MFN agreements has been to raise the prices of hospital services paid by both BCBSM and its competitors, as well as others paying for hospital services at the prices negotiated by their insurers, including BCBSM.

79.     Defendant's MFN agreements have resulted and are likely to continue to result in these anticompetitive effects in the relevant market because they create a large financial penalty for hospitals that do not accept them. BCBSM insureds are a significant part of these hospitals' business, and BCBSM insureds typically are more profitable than Medicare and Medicaid patients (given that these programs reimburse at lower levels), the hospitals' other most significant sources of business.  Hospitals are deterred from contracting with competing insurers at lower prices than they charge BCBSM because if they agreed to such prices to try

31

to do business with another insurer, those hospitals would be required to lower all of their prices to the market dominant BCBSM pursuant to the MFN agreements. The resulting financial penalties thus have discouraged hospitals with MFN agreements from lowering prices to health insurers competing with BCBSM or other purchasers of hospital services. Defendant's MFN agreements have therefore caused hospitals to raise prices charged to other commercial health insurers and purchasers, rather than lower prices to BCBSM.

80.    Prior to BCBSM's obtaining MFN agreements, some hospitals gave greater discounts to some other commercial health insurers than they gave to BCBSM. Without Defendant's MFN agreements, some hospitals had an incentive to offer lower prices to other insurers seeking to enter or expand in the hospital's service area and increase competition in the sale of commercial health insurance.

81.    Some of Defendant's MFN agreements allow for exceptions, but these exceptions are *de minimis.*  For example, Defendant's MFN agreement with Sparrow Hospital applies to a "significant non-governmental payor . . . whose charges exceed 1.0% of [Sparrow's] total gross patient service charges."  The hospital can charge lower prices to an insurer that does not cross the *de minimis* threshold. An increase in that insurer's business at the hospital, however, would trigger the MFN agreement and subject the prices the insurer pays Sparrow to the MFN agreement's threshold.  BCBSM's contract with Beaumont Hospitals has similar provisions. A clause of this type is likely to have the anticompetitive effect of limiting the growth of commercial health insurers with small shares and more favorable discounts than BCBSM.

32

82.     BCBSM's prevalent use of MFN agreements has caused anticompetitive effects in the market for commercial health insurance throughout Michigan and in the particular geographic areas specified in this Complaint, among others. Hospitals in Michigan have raised the contract prices with some commercial health insurers, and declined to contract with other commercial health insurers at competitive prices. As a result, commercial health insurers that likely would have entered local areas to compete with BCBSM have not done so, or have competed less effectively than they would have without the MFN agreements. Defendant's MFN agreements therefore have helped BCBSM maintain and enhance its market power in those areas. The actual anticompetitive effects alleged below, including the direct impact on insurers and their plan members through increased prices for hospital services, illustrate the types of competitive harm that have occurred and are likely to occur throughout Michigan.

### 1.     *Marquette and the Upper Peninsula*

83.     In 2008, BCBSM entered into a provider agreement with Marquette General Hospital that contained an MFN-plus clause requiring Marquette General to charge other insurers a payment rate at least 15 percentage points higher than it charges BCBSM – a cost differential that severely limits a competitor's ability to compete with BCBSM. BCBSM agreed to pay significantly higher prices for hospital services at Marquette General in exchange for the MFN-plus agreement.

84.     BCBSM is by far the largest commercial health insurer in the Marquette area and in the Upper Peninsula, with more than 65% of the commercially insured population of the eleven counties of the western and central Upper Peninsula (identified above). BCBSM views the Upper Peninsula as a strategically important region, and believes that "no

33

competitor of size exists in the UP as of today." BCBSM raised its health insurance premiums in the Upper Peninsula by 250% from 1999 to 2004, "well out of proportion to the rest of the state," according to a BCBSM document.

85.     Marquette General, a 315-bed tertiary care hospital, is the largest hospital and the only tertiary care hospital in Michigan's Upper Peninsula. Marquette General offers more complex surgeries (such as neurosurgery and cardiac surgery), trauma care, and other services that are not available at any other hospital in the Upper Peninsula. The closest tertiary care hospital to Marquette is in Green Bay, Wisconsin, 178 miles away; the closest tertiary care hospital in Michigan is in Petoskey, in the northern Lower Peninsula, 203 miles away.

86.     Because a commercial health insurer must provide its subscribers with reasonable access to tertiary hospital care to be able to market a competitive health insurance product, commercial health insurers that seek to market a competitive health insurance plan in the central and western Upper Peninsula must contract with Marquette General at prices that are competitive with BCBSM's prices. The MFN clause prevents Marquette General from contracting with other commercial health insurers at prices competitive with BCBSM's hospital prices.

87.     There are several small, community hospitals in the Upper Peninsula. These hospitals – particularly those in the central and western portions of the Upper Peninsula – generally refer their more complex cases to Marquette General.  Eleven of the thirteen smaller hospitals in the Upper Peninsula – Baraga County Memorial in L'Anse, Bell Memorial in Ishpeming, Grand View Health in Ironwood, Helen Newberry Joy in

34

Newberry, NORTHSTAR Health System in Iron River (formerly Iron County Community), Aspirus Keewenaw in Laurium, Mackinac Straits in St. Ignace, Munising Memorial in Munising, Ontonagon Memorial in Ontonagon, Portage Health in Hancock, and Schoolcraft Memorial in Manistique – are Peer Group 5 hospitals and are subject to the equal-to MFN agreements in BCBSM's Peer Group 5 PHA.

88.     The only hospitals in the Upper Peninsula that do not currently have MFN clauses in their contracts with BCBSM are Chippewa County War Memorial Hospital in Sault Ste. Marie, 165 miles from Marquette, and OSF St. Francis Hospital in Escanaba. Because of its relatively limited scope of services and distance from Marquette, Chippewa War Memorial is not a good alternative to Marquette General for residents of the western or central Upper Peninsula, where 84% of the Upper Peninsula's population resides. OSF St. Francis also is not a tertiary care hospital and does not offer the range of services offered by Marquette General. Insurers likely would not market a health plan with a network including Chippewa War Memorial and/or OSF St, Francis, but lacking Marquette General, to residents of the western or central Upper Peninsula.

89.     Priority Health, a Michigan nonprofit health insurer based in Grand Rapids, sought to sell commercial health insurance in the Upper Peninsula in competition with BCBSM. Without Defendant's MFN-plus arrangement, Marquette General could have given Priority a discount that would have allowed Priority to compete with BCBSM, and Priority could have marketed and provided commercial health insurance in the Upper Peninsula. However, Marquette General told Priority it would not offer Priority rates less than those required by

Defendant's MFN-plus agreement. Marquette General accordingly gave Priority a revised offer with significantly higher rates to comply with Defendant's MFN-plus requirement.

90.     Priority, which had believed it could compete with BCBSM and attract business if it contracted with Marquette General at rates comparable to those of BCBSM, concluded that it could not compete with rates at the Upper Peninsula's principal hospital at the level required by Defendant's MFN-plus arrangement. Priority therefore declined to contract with Marquette General at the rates required by the MFN agreement, and did not sell commercial health insurance in the Upper Peninsula. As a result, BCBSM maintained its leading market share of commercial health insurance sales in the central and western Upper Peninsula. Other commercial health insurers, including Assurant and Health Alliance Plan ("HAP"), also could have entered into agreements with Marquette General if they had been able to contract with Marquette General at prices comparable to the prices BCBSM pays to Marquette General.

91.     When BCBSM entered into the MFN-plus agreement with Marquette General, BCBSM knew that Marquette General was considering entering into contracts with other commercial health insurers. BCBSM demanded the MFN-plus agreement, which prevented competitors from obtaining competitive discounts at Marquette General. BCBSM believed that its contract with Marquette General would, in BCBSM's own words, "keep blue lock on U.P."

92.     BCBSM increased the prices it pays other hospitals in the Upper Peninsula to induce the hospitals to agree to MFN agreements. BCBSM increased the prices it paid to

Schoolcraft Memorial in exchange for accelerating by six months the hospital's commitment to charge all other payers at least as much as it charged BCBSM.

93.     Defendant's MFN arrangements with Peer Group 5 hospitals and with Dickinson County Hospital (a hospital that is also subject to an MFN agreement) prevent these smaller hospitals in the Upper Peninsula from agreeing to lower prices for BCBSM's competitors. Defendant's MFN agreements with Marquette General and other hospitals in the Upper Peninsula have unreasonably lessened competition in the sale of commercial health insurance in the central and western Upper Peninsula, and caused the prices for healthcare services charged by those hospitals to be artificially inflated.

### 2.     *The Lansing Area*

94.     In June 2009, BCBSM entered into a ten-year provider agreement with Sparrow Hospital, the largest hospital in the Lansing area. That contract includes an MFN-plus clause that requires Sparrow to charge other insurers a payment rate at least 5 percentage points higher than BCBSM pays.

95.     The two largest hospitals in the Lansing area, and the only ones that offer tertiary care, are Sparrow Hospital and McLaren–Greater Lansing Hospital ("MGLH") (formerly Ingham Regional Medical Center). Each of these two major hospitals has strengths in different fields. Lansing area employers and employees generally prefer health insurers that can provide network access to (and discounts at) both hospitals. Consequently, each of these hospitals is important to health insurers that seek to offer a provider network in the Lansing area. Without access to both hospitals at competitive rates, insurers cannot offer health

37

insurance plans to Lansing area employers or residents on terms or at premiums that would be competitive with BCBSM products.

96.     BCBSM is by far the largest commercial health insurer in the Lansing area, with approximately 70% of insured lives. The three largest commercial health insurers in the Lansing area, which in the aggregate insure 93% of residents with commercial group health insurance in the Lansing area, are BCBSM, Physicians' Health Plan ("PHP"), which is owned by Sparrow's parent, and McLaren Health Plan, which is owned by McLaren Healthcare Corporation, the owner of MGLH. Each of these three health insurers had competitive discounts at both Sparrow hospitals at least through 2010.

97.     Sparrow and MGLH agreed in 2006 to contract with each others' health plans at favorable, "mutual and equitable" rates, to obtain comparable rates for each of their own health plans at the competing hospital. Consequently, PHP and McLaren are the only health insurers that obtain hospital services in the Lansing area at rates comparable to the rates paid by BCBSM. Other insurers do not receive competitive prices.

98.     Defendant's MFN agreement with Sparrow provides that Sparrow's existing agreements with other insurers were grandfathered until January 1, 2011. Defendant's MFN agreement is intended to require Sparrow to raise prices to McLaren after that date. The resulting higher costs, if they occur, will reduce McLaren's effectiveness as a competitor to BCBSM, which will likely reduce competition and raise prices for commercial health insurance in the Lansing area. The MFN agreement with Sparrow also is intended to prevent other potential entrants into the Lansing area, such as Priority Health and Health Plus, from entering the market in a manner that would create effective price competition with BCBSM.

38

99.     BCBSM also has equal-to MFN agreements with the three smaller hospitals in the Lansing area:  Hayes Green Beach Memorial Hospital in Charlotte, Eaton Rapids Medical Center in Eaton Rapids, and Clinton Memorial Hospital in Saint Johns. Defendant's MFN agreements with these smaller hospitals in the Lansing area have also prevented BCBSM's competitors from obtaining better rates than BCBSM at these hospitals. Rather than providing a means to ensure that BCBSM would pay the lowest prices paid by its competitors, the MFN agreements had the opposite effect – raising the prices for Hospital Healthcare Services paid by BCBSM's competitors and their insureds.

100.    Defendant's MFN agreements with Sparrow and other hospitals in the Lansing MSA have unreasonably restrained trade and lessened competition, or will likely do so in the future, in the sale of commercial health insurance in the Lansing MSA, and have caused, or likely will cause, these hospitals to charge inflated prices for their healthcare services.

### 3.    *The Alpena Area*

101.    Alpena Regional Medical Center ("Alpena Regional") is the only tertiary care hospital in Alpena County and in the northeastern Lower Peninsula. The nearest tertiary care hospitals are in Petoskey, 100 miles west, and Bay City, 140 miles south. Alpena Regional is important to health insurers that seek to offer a provider network in the Alpena area. Without access to Alpena Regional at rates competitive with BCBSM's rates, other insurers cannot offer health insurance plans to Alpena area employers or residents at premiums competitive with BCBSM products. BCBSM has a market share of more than 80% in the Alpena area.

102.    In late 2009, BCBSM and Alpena Regional negotiated a new contract. BCBSM offered a substantial rate increase "contingent on the formalization of the most favored

discount." Alpena agreed to an MFN-plus provision with a 20 percentage point differential between BCBSM rates and BCBSM's competitors' rates. In addition, BCBSM sought and obtained a commitment by Alpena Regional that it would not improve the discount given to any other health insurer during the four-year life of the contract – a clause that, according to BCBSM, "prohibits allowing better discounts to be negotiated with payors."

103.    Alpena also negotiated a provision that allowed it to maintain the discounts in effect with any other insurer during the term of that insurer's existing contract with Alpena. Taking advantage of this provision, Alpena offered to renegotiate its discounts to Priority before signing the new BCBSM contract, so that the new Priority rates could remain in effect for an agreed-upon time period, regardless of the BCBSM MFN.  In return, Priority agreed to reduce the discounts it received during the term of Priority's new contract to the new BCBSM levels.   Thus, the impending MFN-plus agreement between BCBSM and Alpena induced Priority to accept smaller discounts from Alpena.   The MFN agreement therefore likely resulted in a substantial reduction in competition in the sale of commercial health insurance in the Alpena area, and increased the prices the Class paid to Alpena for Hospital Healthcare Services.

### 4.    *The Traverse City Area*

104.    Munson Healthcare owns Munson Medical Center ("Munson") in Traverse City, Paul Oliver Memorial Hospital ("Paul Oliver") in Frankfort, and Kalkaska Memorial Medical Center ("Kallaska") in Kalkaska, all of which are in the Traverse City Micropolitan Statistical Area. Munson is the only tertiary care hospital in this area, and Paul Oliver and Kalkaska are the only other hospitals in the area. The nearest tertiary care hospital other than Munson is in

Petoskey, 66 miles north of Traverse City, and is not a reasonable substitute for Munson for Traverse City residents or for insurers seeking to sell commercial health insurance to residents of the Traverse City area. Munson, Paul Oliver and Kalkaska are each vital to health insurers seeking to offer a provider network in the Traverse City area. Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Traverse City area employers or residents at premiums competitive with BCBSM products.

105.   BCBSM has entered into an agreement with Munson that requires Munson to charge other health insurers more than it charges BCBSM.  BCBSM has entered into the Peer Group 5 PHA arrangement with Paul Oliver and Kalkaska, causing them to charge other health insurers at least as much as they charge BCBSM. BCBSM has a market share of more than 60% in the Traverse City area.

106.   Paul Oliver and Kalkaska had previously agreed to grant greater discounts to Priority than they had granted to BCBSM. Defendant's MFN agreements caused Paul Oliver and Kalkaska to raise their prices significantly to these BCBSM's competitors. The price increases substantially reduced BCBSM's competitors' ability to compete against BCBSM, which reduced competition in the sale of health insurance in the Traverse City area, and caused Class members to pay artificially inflated prices for healthcare services at these hospitals.

### 5.   *The Thumb Area*

107.   There are eight Peer Group 5 hospitals in the three Thumb Counties (Huron, Sanilac and Tuscola): Caro Community Hospital, Hills and Dales General Hospital, Marlette Regional Hospital, McKenzie Memorial Hospital, Huron Medical Center, Scheurer Hospital,

41

Deckerville Community Hospital, and Harbor Beach Community Hospital. BCBSM is the largest provider of commercial health insurance, with a market share of more than 75%, in the Thumb area.

108.    Each of the hospitals in the Thumb area is important to health insurers seeking to offer a provider network to residents there. Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Thumb area employers at premiums that would be competitive with BCBSM products.

109.    Through the Peer Group 5 PHA arrangement, BCBSM sought and obtained MFN agreements with Thumb area hospitals with "the realization that some of the[m] are giving commercial carriers discounts that are on par with (or better than) what they give [BCBSM]." BCBSM sought and obtained the MFN clause with Thumb area hospitals over the concern expressed by one hospital that such a clause would "unquestionably . . . operate to drive up costs to other purchasers." Accordingly, when that hospital accepted the MFN agreement and BCBSM's higher payments, it raised another commercial health insurer's rates.

110.    As BCBSM had believed, other commercial health insurers had received discounts from Thumb area hospitals that were in some cases better than the discounts obtained by BCBSM. As a result of the Defendant's MFN agreement, Thumb area hospitals raised these insurers' rates for hospital services to levels equal to or greater than the BCBSM discount rate. The commercial health insurers affected by Defendant's MFN agreements in the Thumb area have paid and are paying higher prices to Thumb area hospitals as a result of the hospitals agreeing to the MFN arrangements, rather than removing any Thumb area hospitals from their

networks. As a result, Defendant's MFN agreements with hospitals in the Thumb area have increased costs to competing insurers, and reduced these insurers' ability to compete, thereby likely foreclosing or lessening competition in the sale of commercial health insurance in the Thumb area and causing prices charged to Class members by these hospitals for healthcare services to be artificially inflated.

### 6. *Community Hospitals*

111. As alleged above, BCBSM has offered community hospitals a participating hospital agreement, the Peer Group 5 PHA, under which the hospitals would be subject to an equal-to MFN agreement. Most community hospitals have accepted this offer and receive higher payments from BCBSM in exchange. These agreements between BCBSM and community hospitals have caused some hospitals to raise prices to other insurers by significant amounts – often by 100% or more. For example:

    a. Bronson LakeView Community Hospital, in Paw Paw, in the Kalamazoo MSA, raised prices to a BCBSM competitor to comply with Defendant's MFN requirements.

    b. At least one hospital in Montcalm County raised prices to BCBSM competitors to comply with Defendant's MFN requirements.

    c. Three Rivers Health Medical Center, in Three Rivers, St. Joseph County, raised prices to two BCBSM competitors to comply with the MFN agreement.

    d. Allegan General Hospital, in Allegan, Allegan County, raised prices to a BCBSM competitor to comply with Defendant's MFN requirements.

    e. Spectrum Health Reed City Hospital, in Reed City, Osceola County, raised prices to three BCBSM competitors to comply with the MFN requirements.

43

112.    In each case, the BCBSM competitor concluded that it needed the community hospital to be able to offer a network that would allow it to compete with BCBSM, and thus agreed to pay, and is paying, higher hospital prices.

113.    As a result, BCBSM's competitors' prices have increased, increasing the healthcare costs of those competitors and their insureds and self-insured customers, reducing competition in the sale of health insurance in those areas, and unreasonably restraining trade and lessening competition in the rural areas served by these hospitals.

114.    The anticompetitive effects alleged above illustrate the types of harm that have occurred, and are likely to occur, as a result of BCBSM's MFNs. These effects have occurred and are likely to occur at least in the local geographic areas discussed above, in the Detroit, Flint, Grand Rapids, Kalamazoo, and Saginaw MSAs, in the Alma and Midland Micropolitan Statistical Areas, and throughout the State of Michigan.

115.    There are no likely procompetitive or efficiency-enhancing effects of the MFN agreements that would outweigh the actual and likely anticompetitive effects alleged in this Complaint. The MFN agreements have not led, and likely will not lead, to lower hospital prices for BCBSM or other purchasers of Hospital Healthcare Services.

116.    If not enjoined, BCBSM's MFN agreements with Michigan hospitals are also likely to have anticompetitive effects in the future. BCBSM has entered into MFN agreements with hospitals that are essential components of a competitive provider network. The MFN agreements preserve a pricing regimen that is sufficient to limit or prevent effective competition. Absent an injunction, BCBSM will continue current MFN arrangements and

44

seek to enter into and enforce MFN clauses with other hospitals in Michigan, with the purpose and likely effect of foreclosing competition state-wide by preventing effective entry or expansion by its competitors and raising prices of Hospital Healthcare Services throughout the state.

## COUNT I

**(Unlawful Agreements in Violation of § 1 of the Sherman Act under the Rule of Reason)**

117.    Plaintiffs repeat and re-allege the allegations of the above paragraphs.

118.    Each of the provider agreements between BCBSM and one or more of the Michigan hospitals described in this Complaint and containing an equal-to MFN or MFN-plus provision is a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

119.    Each of the challenged MFN agreements with Michigan hospitals unreasonably restrains trade and has had, or is likely to have, substantial and unreasonable anticompetitive effects in the relevant market, including but not limited to:

    a.    Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurers in competition with BCBSM from obtaining competitive pricing from critical hospitals;

    b.    Unreasonably restricting the ability of hospitals to offer BCBSM's competitors, potential competitors or other purchasers reduced prices for hospital services that the hospitals and insurers consider to be in their mutual interest;

    c.    Unreasonably limiting entry or expansion by competitors or potential competitors of BCBSM in the Michigan commercial health insurance market;

45

    d.   Raising the prices of hospital services to commercial health insurers in competition with BCBSM, and to other purchasers of hospital services, including the Class;

    e.   Raising the prices of commercial health insurance; and

    f.   Depriving purchasers of hospital services and commercial health insurance of the benefits of free and open competition.

120.    The procompetitive benefits, if any, of these agreements do not outweigh the actual and likely anticompetitive effects of the agreements.

121.    Defendant's conduct was not intended to, nor did it have the effect of, reducing the cost of healthcare.

122.    Defendant's challenged conduct was not permitted by the Commissioner of the Office of Financial and Insurance Regulation.  Such conduct contravenes the intent of the Michigan Legislature to promote competition in the health insurance industry.

123.    By reason of Defendant's conduct in violation of Section 1 of the Sherman Act, Plaintiffs and the Class have been injured in their business or property and have sustained damages in amounts which are presently undetermined.

## COUNT II

**(Unlawful Agreements in Violation of Section 2 of the Michigan Antitrust Reform Act)**

124.    Plaintiffs repeat and re-allege the allegations of the above paragraphs.

125.    Defendant entered into equal-to or MFN-plus agreements with at least 70 Michigan hospitals that unreasonably restrain trade and commerce throughout the State of Michigan in violation of Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

46

126.    The procompetitive benefits, if any, of these provider agreements do not outweigh the actual and likely anticompetitive effects of the agreements.

127.    By reason of Defendant's conduct in violation of the Michigan Antitrust Reform Act, Plaintiffs and the Class have been injured in their business or property and have sustained damages in amounts which are presently undetermined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Honorable Court:

A.    Certify the action as a class action pursuant to Fed. R. Civ. P. 23 and appoint Plaintiffs and their attorneys as class representatives and class counsel, respectively;

B.    Adjudge and decree that the provider agreements between BCBSM and the Michigan hospitals that contain equal-to MFN or MFN-plus provisions are violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772;

C.    Reform Defendant's MFN contracts with providers to strike the illegal terms and enjoin Defendant from agreeing to, or enforcing, similar provisions in the future;

D.    Award Plaintiffs and the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees; and

E.    Enter judgment against Defendant BCBSM, holding Defendant liable for the antitrust violations alleged.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: June 12, 2012                          Respectfully submitted,


                                              /s/ E. Powell Miller
                                              E. Powell Miller
                                              **THE MILLER LAW FIRM, P.C.**
                                              950 West University Drive, Suite 300

47

Rochester, Michigan  48307
Telephone: (248) 841-2200
Email: epm@millerlawpc.com

/s/ Mary Jane Fait_____
Mary Jane Fait
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Tel: (312) 984-0000
Email: fait@whafh.com

/s/ Daniel A. Small_____
Daniel A. Small
Kit A. Pierson
Benjamin D. Brown
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Email:  dsmall@cohenmilstein.com

/s/ Daniel E. Gustafson_____
Daniel E. Gustafson
Daniel C. Hedlund
Ellen M. Ahrens
**GUSTAFSON GLUEK PLLC**
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone:  (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
eahrens@gustafsongluek.com

*Interim Class Counsel*

David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Rd, Suite 111

48

Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
Email: dfink@finkandassociateslaw.com

*Interim Liaison Counsel*

Eric L. Cramer
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000

Joseph C. Kohn
William E. Hoese
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
Telephone: (215) 238-1700

Richard N. LaFlamme
**LAFLAMME & MAULDIN, P.C.**
2540 Spring Arbor Road
Jackson, Michigan 49203
Telephone: (517) 784-9122

David Balto
**LAW OFFICES OF DAVID BALTO**
1350 I Street, NW
Suite 850
Washington, DC 20005
Telephone: (202) 789-5424

*Attorneys for Plaintiffs The Shane Group, Inc. and*
*Bradley A. Veneberg*

L. Kendall Satterfield
Michael G. McLellan
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000
dresnikoff@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com

49

John Tesija
Mike Novara
Bryan M. Beckerman
**NOVARA TESIJA, P.L.L.C.**
2000 Town Center, Suite 2370
Southfield, Michigan 48075
Telephone:  (248) 354-0380
tesija@novaratesija.com
man@novaratesija.com
bmb@novaratesija.com

*Attorneys for Plaintiffs Michigan Regional
Council of Carpenters Employee Benefits Fund,
Abatement Workers National Health and Welfare
Fund, and Monroe Plumbers & Pipefitter Local
671 Welfare Fund*

Alyson Oliver
Alyson Oliver (#55020)
**OLIVER LAW GROUP PC**
950 W. University, Suite 200
Rochester, MI 48307
Telephone:  (248) 327-6556
aoliver@oliverlg.com

Joseph Goldberg
**FREEDMAN BOYD HOLLANDER
GOLDBERG & IVES, P.A.**
20 First Plaza, Suite 700
Albuquerque, NM 87102
Telephone: (505)  842-9960
jg@fbdlaw.com

Dianne Nast
**RODANAST, P.C.**
801 Estelle Drive
Lancaster, PA 17601
Telephone:  (717) 892-3000
dnast@rodanast.com

W. Joseph Bruckner
Richard A. Lockridge
**LOCKRIDGE GRINDAL NAUEN P.L.L.P**

50

100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
wjbruckner@locklaw.com
ralockridge@locklaw.com

Charles Zimmerman
Anne T. Regan
**ZIMMERMAN REED, PLLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  (612) 341-0400
charles.zimmerman@zimmreed.com
anne.regan@zimmreed.com

*Attorneys for Plaintiff Scott Steele*

<u>**CERIFICATE OF SERVICE**</u>

I hereby certify that on June 12, 2012, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record registered for electronic filing.

<u>/s/ E. Powell Miller                    </u>
E. Powell Miller
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan  48307
Telephone: (248) 841-2200
Email: epm@millerlawpc.com