**should subtract $6000.00 a month and $2,900 .00 per month as described above, if and when any award is ever issued.**

**Counsel writes:** THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT:

Courts in the Sixth Circuit have often noted that the law favors the settlement of class action lawsuits. See In re Packaged Ice Antitrust Litig., No. 08-MDL-01952,2011 U.S. Dist. LEXIS 150427, at *42 (E.D. Mich. Dec. 13, 2011);IUE-CWA v. General Motors Corp.. 238 F.R.D. 583, 593 (E.D. Mich. 2006). At the preliminary approval stage, the role of the district court is limited to determining that the settlement (i) "appear s to fall within the range of possible approval," and (ii) "does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment to class representatives or of segments of the class, or excessive compensation for attorneys." Dallas v. Alcatel-Lucent USA, Inc., No. 09-cv-14596, 2013 WL 2197624,at *8 (E.D. Mich. May 20, 2013) (quoting In re Inter-Op Hip Prosthesis Liab. Litig., 204 F.R.D. 359, 379 (N.D. Ohio 2001)).

**Response:** After what the Court has read through so far the motion for certification should never been approved and the settlement can't be approved as is based on the fatal errors contained throughout and we are only a quarter way through the

objection with a lot more to come. In addition, the red carpet treatment of the named plaintiff's incentive awards to buy their approval alone (and the class does not even have declarations stating they understand and approve of the settlement) is enough to nix the settlement based on existing 6th circuit decisions made recently. All the other existing drama and baggage issues that have been mentioned so far and will continue further on into this objection are due to counsels sneakiness, greed and being a patsy in negotiations with defendant who agrees with whatever defendant wants, all for the promised $13.5 million. This observation offers further proof that **class counsel does not and never did have the experience, knowledge and resources to adequately represent the class in this case when they were appointed interim class counsel under Federal Rule of Civil Procedure 23(g) and should be dismissed.**

**To the detriment of the settlement class, lead counsel failed to plead disgorgement of ALL benefits the defendant has enjoyed to date, like interest the defendant made off the $120 million in alleged overcharges to the class!**

Why didn't Class Counsel insist that defendant pay the notice costs and administration costs since it was their illegal, unethical and immoral conduct that caused all this to begin with? This bug's the objectors to no end. Administrator firm's take the notice assignment on contingency because 95% of the cases

eventually settle at this stage. The cost in negotiating cost the class $1 million and should be subtracted from class counsels fee, if any is ever awarded which the objectors don't see happening in the end.

The preliminary approval order should not have included the approved $1,000,000.00 advance for the notice and class counsel should have never asked for it in the first place. As a business norm the defendant pays the costs or Plaintiffs Counsel front's the cost. The administrator is paid once an order and opinion issued and the invoices are submitted to the bank for payment. Counsel is smart enough to know they should have never asked the court for the advance to begin with. This should only be done if and when the settlement has been approved, entered into the docket which comes after the Fairness hearing and any appeals time has expired. This avoids even the appearance of bias by a court that this is going to be approved even if it has been shown to be unfair, inadequate, unreasonable, bias, usurious, violates court rules, public policy and common sense and to help clear the docket. It also creates unneeded pressure on the Court because now class damage money has been invested, not the defendant's money. The defendant and Plaintiffs' Counsel knows this and uses it as subtle pressure for approval. Since the class notice has to be redone that $1 million of the class money has been wasted and vaporized and now the Court has become part of the error and the lost $1 million. Who do the objectors see about that and for reimbursement of

that fee back into the settlement fund which the objectors demand? Who is going
to pay the second $1 million for the next mailing? What about the third mailing?
Not the class! That is a problem Plaintiffs' Counsel and named plaintiffs have
created for themselves, for the Court and the class by caving onto whatever
demands defendant wants in exchange for a thoroughly undeserved and promised
$13.5 million and $165,000.00 worth of incentive awards. This shows poor
judgment on class counsel's part or smart judgment if you want a curb high quality
settlement using trickery on the Court to obtain an unjust approval.

Since the notice has to be redone and remailed, does counsel get a second million
advanced from BCBSM that is really the class's money that now is paying for
mistakes of Plaintiffs' Counsel and the named plaintiffs, for a second time? What if
BCBSM says no, than what? Maybe the administrator can be forced to do a redo
for free based on their own errors as shown throughout this objection and
supplement? Plaintiffs' Counsel is responsible for this debacle and should be held
accountable. The Miller firm was awarded $6 million in June 2014 in this district
court so class counsel should not have been pleading poverty, if that's what they
did, to get the first $1 million advanced.

- Is it a policy of this administrator to bill and receive payment before notice
  is mailed to class members for ALL cases they have handled in the past? If

not, why was this case handled differently. Explanation in writing from the administrator is required.

- Did all of the cash get sent to the administrator and if not where else did it go and get used for? Need proof of expenditures.

- Does any class counsel in this case have any past or present personal or business relationship with the administrator in this case?

The class is required to be renoticed to ALL potential class members, not just those who have already submitted an original defective claim form to make up for this debacle, error strewn wannabe settlement. This will save the class $.36 per mailed piece multiplied by 3,000,000 pieces is $1,080,000.00 for a second mailing. Counsel should plan for a third mailing, there has to be more material screw-up's somewhere in all these papers. Counsel, any fee award is shrinking fast like Frosty the Snowman in warm spring weather. $5 million down to $0.

**Counsel writes:** The Settlement Is Well Within the Range of Possible Approval as Being Fair, Reasonable and Adequate:

The Settlement Agreement provides the Settlement Class with a substantial recovery – just shy of 30 million dollars. This amount represents over 25% of the overcharges that Dr. Leitzinger preliminarily estimated had been paid by members of the litigation class that Plaintiffs sought to certify.9

**Response:** No, it's not within the range of possible approval. Counsel is in a dream. Where is the proof of the $120 million in damages? What if the damages are much more? Where is the proof for the $2.5 million that was allegedly spent to come up with this number by the "experts" and the decision to give one class group most of the money and the rest of the two class's get scraps? How many settlement class members are in each Category 1, 2 and 3?

This $120 million appears is way too low as will be discussed further down in the objection. The "substantial recovery" broken down solely benefits class counsel and the named plaintiffs ahead of the class, the class comes in third. The class gets sacrificed at the Inca altar for the fees. There are three million plus class members not counting all the 1412 self insured's associations, LLC's Inc's est. who will be filing a claim and the objector sees little funds going to the class in the end.

**Counsel writes:** "In total, Plaintiffs currently have names and addresses for 2,394,079 BCBSM members; 1,134 BCBSM self-insured groups; 179 Aetna self-insured groups; and 99 commercial health insurers. In early July, Plaintiffs expect to receive names and addresses for 604,488 Priority insured individuals and 99 Priority self-funded groups."

**Response:** The above numbers total a minimum of 3 million individuals who were overcharged for health care services **over a seven and one half year period** and

1412 entities who overpaid for services on behalf of the same three million individual class members above cutting any refund in half!

The gross fund of $30 million divided by 3 million members would provide a payout of just $10.00 per claimant assuming they all filed a claim and there were no costs.  The 1412 entities get zero. Now subtract out costs:

 $10 million for counsel.

$3.5 million for their expenses.

$100,000 in interest counsel is claiming on their proposed high on meth $10 million fee from the date of the original complaint to date. (Objectors used the Fed Fund Rate of .25 %.)

$1 million has already been spent for notice and expenses.

$1 million more for a second notice. (Counsel should include the cost of a third mailing since the objectors will likely find additional material issues.)

$165,000 for incentive awards.

$500,000.00 minimum the objectors estimate to finish out the claims processing and mailing out checks.

Total costs incurred is $16,565,000.00. Subtract that amount from the $30 million and you have three million class members and 1412 entities (filing for reimbursement on behalf of the same three million individual class members) splitting up the remaining amount of $13,435,000.00 which is less than half the settlement fund!

Each class member is entitled to receive an average check of just........ $4.47 which assumes all file a claim and all 1412 entities like self insured groups, associations etc. don't file even a single claim for even a dollar. If the entities also represent 3 million of the same class members and file a claim, the average check will be $2.23. According to various Plaintiffs' Counsels that were quoted recently in Crain's Detroit Business Magazine on September 7, 2014 and the true number of claimants' is **7 million** class members (including businesses) so the gross check to each class member is **$4.28 and the net check is $1.95 each.** How come only three million people got noticed? Does that mean that the entities will be filing claims to recoup overcharges they incurred on behalf of four million individuals? Shouldn't the class have been made aware of how many total possible claims there could be so they can do some simple math to figure their gross check before fees and expenses are taken out and see if this is worth their time when deciding to stay in, opt out, or object? This is material information and should have been disclosed in the notice advertisement, the short and long form and mentioned on the web site. Something is

not right here, it's all a charade. Here is the article, talk about subterfuge on the class, wow. Since Plaintiffs' Counsel and defendant want to go on a PR campaign for approval, the objectors will do the same for a non approval starting the day this supplement is filed. Any sanctions should go to the class. In addition both parties to the settlement agreement that was approved under Plaintiff's Counsel's Motion for Preliminary Approval changed the settlement release after that motion was approved and violated paragraph 87. It's located on page 58 under the old agreement but not the new one! This is a PR campaign gone desperate wild for approval and it will fail.

Originally Published: September 07, 2014 8:00 AM  **Modified: September 10, 2014 12:03 PM Blues would pay $30M under proposed deal to resolve overbilling allegations**

By Chad Halcom

**Blue Cross Blue Shield of Michigan** will pay about $30 million to resolve allegations of overbilling for acute care services at Michigan hospitals, if a federal judge approves its proposed settlement later this year.

The insurer admits no wrongdoing in creating a $29.99 million settlement fund for competitor insurance companies, self-insured companies and employees with co-payments who were treated at any of about 130 hospitals between January 2006

and June of this year.

About $13.5 million of the funds could be set aside for contingency fees and litigation expenses for the various attorneys in the 2010 civil lawsuit, under a request before U.S. District Judge Denise Page Hood. A hearing is scheduled for November.

The lawsuit is a consolidation of several that surfaced after the Michigan attorney general and the **U.S. Department of Justice** filed a joint lawsuit of their own over the insurer's use of "most favored nation" and "most favored nation-plus" clauses in contracts with hospitals.

The more conventional most-favored-nation agreements allegedly required only that Blue Cross get a billing rate at least equal to any other insurer. The plus agreements allegedly caused hospitals to charge the competitors more.

Blue Cross and the government agencies agreed to dismiss the original DOJ case in March 2013, after Michigan Insurance Commissioner Kevin Clinton declared those clauses unenforceable and the Legislature passed two laws prohibiting such agreements with insurers.

But most of the related civil lawsuits — including one filed by the Hillsdale-based

**Shane Group Inc.** — were consolidated into one case, which the insurer now

hopes to settle.

"This settlement, the parties agree, is an amicable resolution reached before the

court or the jury had decided the merits of either party's legal position," the

company said in a statement about the resolution.

Hood gave the deal a preliminary approval over the summer but must still review it

for fairness and decide on the attorneys' share at a hearing Nov. 12, before final

approval.

Up to 7 million Michigan residents and businesses could be eligible for a share of

the settlement funds — anyone insured or uninsured who paid for hospital services

during that period, even those covered by Blue Cross, said partner Dan Small of

**Cohen Milstein Sellers & Toll PLLC** and Powell Miller of Rochester-based **The**

**Miller Law Firm PC**, who served on the executive committee of plaintiff

attorneys in the case.


Fred Isquith, partner at New York City-based **Wolf Haldenstein Adler Freeman**

**& Herz LLP** and co-counsel for the companies and individuals suing Blue Cross,

said the Justice and attorney general lawsuit agreement largely involved

regulations governing Blue Cross, while the Shane Group settlement proposal

involves financial reimbursement for companies for those who were affected.

2:10-cv-14360-DPH-MKM   Doc # 163-1   Filed 10/06/14   Pg 12 of 50   Pg ID 4833

Helen Stojic, director of corporate communications for Blue Cross, said the insurer has already distributed notices informing members of the class action about the settlement deal.

The class includes: competitor insurers that covered acute care hospital services during the eight-year period, self-insured companies that reimbursed hospitals for services, and employees or individuals who made co-payments or other hospital expenses that were affected by the most-favored-nation agreements.

Claims must be submitted with documentation by Nov. 16, and individual objections or requests to be excluded are due by Sept. 24.

*Chad Halcom: (313) 446-6796, chalcom@crain.com. Twitter: @chadhalcom*

**Response:** Wait a second. The settlement papers spelled out the three million class members and 1412 entities but not now there are 7 million total claimants that are going to file claims?  Plaintiffs' Counsel is untrustworthy. The class should have been told this. Telling half the truth is a well known method of deception. The settlement is for companies not all class members? What?  The possible fraud is on the class the objectors say.

Page **62** of **220**

Helen Stojic, director of corporate communications for Blue Cross, said the insurer has already distributed notices informing members of the class action about the settlement deal.

Blue Cross did NOT pay for and distribute the notices as the defendant implied, the class paid for it and they distributed it through the inadequate administrator. See how Plaintiffs' Counsel allows defendant to walk all over and dictate to them what they want. These guys are all in bed together. The rights of the class are being trampled at every turn, all for the $13.5 million and no one has ever looked out for the class. This is a joke. Plaintiffs' Counsel can't get their stupid story straight and should be dismissed and sanctioned. Any monetary penalties should go into the class fund! Bar complaints and copies of this objection will be going to others for review.

**The minimum amount to be distributed to all class members should be reduced from the $25.00 minimum for those in Category 1 class and $15.00 for those in Category 2 class to $10.00 for both classes so class members who won't receive anything now, will receive something instead.** The claims are going to overwhelm the net settlement fund and most will get nothing.

Because Plaintiffs Counsel could not force defendant to pay all fees and costs incurred in connection with the Notice Program and administration of the Settlement, and defendant did not voluntarily agree to pay the fees and costs, this

further decreases the recovery under the Settlement and reduces class members pro rata share.

**Counsel writes:** Category 3 plan of allocation:

"Purchases within Category 3 are those by Settlement Class Members at Michigan General Acute Care Hospitals during the period January 1, 2006 through June 23, 2014, excluding Category 1 and 2 purchases. Two percent (2%) of the Net Settlement Fund will be allocated for pro rata distribution based on Category 3 purchases. Specifically, the funds allocated to Category 3 will be allocated among Claimants under the following formula: total dollars spent on Category 3 purchases for each Claimant divided by total dollars spent by all Claimants on Category 3 purchases combined. However, no distribution will be made to a Claimant for Category 3 purchases unless at least one of the following conditions applies:(1) the Claimant also has Category 1 or 2 purchases; (2) the Claimant's pro rata share of Category 3 funds is $10 or more; or (3) the Claimant does not satisfy condition (1) or (2) but the total number of Category 3 Claimants that do not satisfy condition (1) or (2) is fewer than 100."

**Response:** Objectors can't figure this out and neither can the other three million (now 7 million) class members because there is not enough plain English information provided to the class to allow it to be understood and estimated. Why is the number fewer than 100? Are we talking class members? Why should class

members and the objectors need ......... to figure this out and explain it? Not acceptable.

Below is an example of some movie goer's who got more than three times as much per claimant in a Facta settlement then Plaintiffs' Counsel got for the class members in this settlement. Something isn't right with this class settlement and damage amount.

## Cinépolis Luxury Cinemas FACTA Class Action Settlement

Cinépolis Luxury Cinemas in California has reached a class action lawsuit settlement over allegations its credit/debit card receipts contained too much information in violation of federal law.

Typical

Settlement

$10.75

Deadline

07/19/2014

Objectors requests a copy of Econ One's reports justifying the $120 million damage estimate, or post it on the website and/or provide to the Court (in camera if necessary). Objector's agree to sign a confidentiality agreement and/or protective

order (if necessary) to be allowed to review, comment on (under seal) if applicable and return to the Court within two weeks from receipt to ensure the class is not being defrauded and shafted in what appears to be a quid pro quo settlement scheme. The Court would benefit from a second set of "devil advocate eyes" on this information to ensure the damage amount is correct for settlement approval purposes. Something is just not right here and might be hidden in that information. Objector's smell rats, eighteen of them.

The objectors have a problem with the claim made by counsel that the damages of $30 million represent 25% of the total damages of $120 million. For example in 2007 alone defendant purchased $4 billion in hospital services. If the defendant's scheme was to raise prices to 7-22 of the largest institutions by 20% that would logically raise prices 20% to the hospitals and end users in a trickledown effect as well. Defendant allegedly reimbursed those with MFN's but the paperwork does not say by how much for each institution. $120 million represents the total maximum damages caused to 3 million members and 1412 entities? $120 million divided by seven and one half years is $16 million a year that class members were overcharged and prices were raised to defendant's competitors in an attempt to keep them out of the marketplace or cause damages to their bottom line and enough to keep competitors out? This $120 million divided by 3 million people is a total overcharge $40 per class member over seven and a half year period or $5.33 a

year? The defendant's scheme does not seem likely enough to cause the type of damages Plaintiffs' Counsel alleges that would cause defendant's competition not to be able to compete in the State of Michigan for business, keep them from entering the market or damage their competitor's bottom line and help defendant's bottom line for such a small amount. Something is not right with the damage estimate or the class size. The court and objectors need to review the damage estimates by the class "expert" and the depositions of the "experts" taken by both sides to see if the damage number is accurate.

Let's look at this way. If the $4 billion that defendant spent in just one year includes all or part of that 20% or a significant part of 20% that the class members and the 1412 self-insured's incurred were overcharged, then maybe we are talking some hurting type numbers, but not $15 million a year. The numbers don't seem right and light that is why the formula and the reports need to be reviewed for accuracy. If objectors are right some people belong in jail.

What is Atna claiming their overcharge losses are? If we know that number and the number of affected Aetna clients we can extrapolate the numbers to come up with how much each of the Atena class members was overcharged and apply that as a baseline to all three categories to come up with a ball park figure to work with to attempt to justify the damage estimate and settlement amount to see if they are close. It's more information than the class has now.

The following comes from the Court in its dismissal of the suit brought by the City of Pontiac:

"Alternatively, the City of Pontiac claims that in response to Blue Cross' MFNs, the Hospital Defendants and other Hospitals concluded together, likely through discussions at industry Participating Hospital Agreement meetings, that no single Hospital could risk increasing prices to their non-Blue Cross customers without driving some business to nearby competitors, whereby a deal was struck in which each Hospital agreed to join the conspiracy and charge higher prices by fixed percentages ranging from 10% to 39% so long as each of their closest competitors also agreed to participate in the scheme. (Pontiac Resp., p. 8) However, this factual allegation is not found anywhere in the Complaint."

18

IT IS FURTHER ORDERED that the Motion to Dismiss (Doc. No. 99, filed 4/18/2011)

Is MOOT.

IT IS FURTHER ORDERED that the Motion to Dismiss (Doc. No. 100, filed 4/18/2011)

is MOOT.

S/Denise Page Hood

Denise Page Hood

United States District Judge  3-30-12

If the above numbers relating to the fixed percentage anti-trust costs are true (10% to 39%) for each hospital it applies to, is this speaking about just Category 1 where 78% of the funds go to or the other class categories as well? What areas of the state? This may indicate a much higher damage number than Plaintiffs' Counsel is claiming. Maybe we are talking hundreds of millions or billions in damages not $120 million. Maybe the settlement amount should be substantially more. The objectors and class needs more information disclosed from Plaintiffs' Counsel unless it's a state secret covered under the Patriot Act.

**Page 18 at bottom of page. Counsel writes:** In addition, Dr. Leitzinger has devised a single formula and compiled a single database that allow him to opine on which hospitals negotiated inflated reimbursement rates with Priority, HAP, Aetna and Blue Cross (the insurers from which plaintiffs obtained the necessary data) as a result of the MFN agreements, and to estimate how much the rate was inflated.

**Response:** Objectors want to know:

- How much was the rate inflated per dollar spent per class member for the institutions class members visited and were overcharged at in the Category 1 class category that 78% of the fund is going to?

- How much was the rate inflated for each of the three separate categories?

- Provide information that will allow class members to calculate their estimated recovery amount percentage per dollar spent for each Category, 1, 2, and 3 assuming they each file a claim.

- How many class members are in each category?

Not allowing class members to calculate or estimate the amount of potential individual recovery is a huge issue in this settlement. **The damages and relief for class members of $1.95 to $4.47 each is "illusory," "non-existent" a "token payment" and "tin cup change" to class members. It's really "de minimis" but not for the lawyers and named plaintiffs.** Since the class is allegedly incurred a $2.5 million "expert" bill plus another alleged $1 million in other costs, the answer to the above couple of questions should take no more than three minutes to come up with and three sentences in plain English to answer for the class and court. There is a simple answer, right? If those questions can't be answered than there should be no complaint because there are no damages, so no settlement is possible, the case should be dismissed without costs to any party.

**Counsel writes:** B. The Settlement Is the Result of Arm's-Length Negotiations

There is a presumption that parties act in good faith during settlement negotiations. UAW v. GMC, No. 05-cv-73991, 2006 U.S. Dist. LEXIS 14890, at *63 (E.D.

Mich. Mar. 31, 2006) ("Courts presume the absence of fraud or collusion [in settlement negotiations] unless there is evidence to the contrary."). There is no reason to challenge that presumption here, as the settlement negotiations have been conducted at arm's-length, with each side zealously advocating for the interests of its client (s) and wholeheartedly pursuing litigation throughout the process. Further, both parties are represented by highly competent counsel, who are experienced in antitrust class action cases like this one. Additionally, the Settlement Agreement does not reflect any preferential treatment for the class representatives or provide for excessive compensation for the attorneys. Indeed, the settlement provide s for no particular award of attorneys' fees, but requires Plaintiffs to petition the Court to approve their requested fees, and the Court will only approve such a request to the extent it is reasonable. The class representatives do not receive any special treatment under the settlement

**Response:** There is no declaration from the parties that they did **not** conduct negotiations concerning the amount of attorney's fees, incentivize awards and expenses until after the parties had reached agreement on the entirety of the settlement. Therefore the opposite is true, voiding this settlement. Evidence abounds in this settlement that possible fraud and collusion are deeply involved; the warning signs are all present. There are red flags, flashing police lights,

fireworks going off in the middle of the night and helicopters flying low overhead that beg for attention, explanation, investigation, response and correction, if possible. No mediator was involved in assisting and negotiating the settlement, attorney fee, expense fee and incentive awards which would have helped prove Plaintiffs' Counsels claim but the evidence so far and below shows the opposite to what the lawyers claim.

The attorney fees rates are clearly false on paper, appear fraudulently and unethically inflated, the hours claimed are clearly false and unethically inflated, the settlement amount and incentive awards some might say are inflated in a appears to be a quid pro quo possible fraud deal to sign off on the deal allowing the settlement to be approved. If the settlement is not approved there is no cash, the named plaintiffs know that and might reconsider their approval if no huge amounts of cash were not at stake for them. Do named plaintiffs know how much the class members are going to receive? If not, why not? The settlement has all the warning signs of collusion, a rushed through riddled settlement with misleading, missing and even basic information made unavailable to the class. If objectors engaged in this behavior at work the objectors surely would be sued and fired and possibly charged with a felony and put in jail but it's OK for the lawyers to do this with no penalty if caught?

Any settlement where the release being demanded as a condition of the settlement is extremely broad and may cover claims that weren't pursued in the lawsuit raises questions about the settlement.

- **Why does defendant want to be released specifically from claims under the Clayton Act when it was pled in the original complaint but not in the second? The release seems a bit overbroad.**

- **Why are vast numbers of class members receiving nothing? Should they even be included in the suit to begin with which decreases the funds to those truly injured?**

This Court should look for signs that a class action settlement resulted from a "reverse auction"—a defendant's collusive agreement with counsel who is willing to accept the lowest class recovery, often in exchange for generous attorney fees. By this tactic, the defendant hopes to preclude all other claims and limit their damages. This Court should have no problem rejecting this class settlement that appears to be a product of a reverse auction. Objectors believe this settlement has all the signs and that it is in fact a reverse auction based on the size of the class, the broad release, fees paid to the lawyers, the one sided release, low damage recovery and low damage estimate.

**A showing of explicit collusion is not required to demonstrate settlement unfairness.**

This objection argues that the settlement is unfair in all aspects and is also a product of explicit collusion based on the size of the attorney fees, incentive awards and low settlement amount in this "wink, wink" settlement that is fee driven first. The settlement is riddled with major unfair provisions; all in the defendant's favor that is why the settlement and release are one sided. This release and settlement is defendant produced and our counsel let them have their way, any way they chose, because of the $13.5 million undeserved fee promise. However, demonstrating that a settlement lacks collusion does not thereby demonstrate that the settlement passes muster. Lack of collusion is *necessary* for settlement approval, but it is not *sufficient*. Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth,* 654 F.3d at 947. An objector need not demonstrate collusion to demonstrate an unfair settlement, for all it takes to make a settlement unfair is a defendant's indifference to class counsel's self-dealing. *Staton,* 327 F.3d at 964. *Bluetooth's* distinction between collusion and impermissible self-dealing is at the heart of this objection: when the Rule 23(h) attorney award is too large

compared to the class's net award, this is evidence of self-dealing whether collusion is established or not.

**A class should not be certified when the primary beneficiaries are class counsel and named plaintiffs.**

Mathematically the number of claims will overwhelm the settlement fund and leave the vast majority of class members with no compensation. Class members are filing claims and being tricked into exercising their rights with misleading, incorrect, contradicting information and statements. They have been led to assume they are all on a level playing field when in reality there are three separate and distinct classes (fields of play) and three different money pots (end zones.) The class would be better off if they each opted out and brought a small-claims case action and they would get more than what most will receive, but we need some information from the "expert" first before that could even be considered by each class member. This is a *per se* breach of fiduciary duty and demonstrates the need for class decertification under Rules 23(a)(4) and (g).The problem is the class does not know about all the misleading error filled proposed settlement and claims details because of the of the actions of Plaintiffs' Counsel, class counsel, named plaintiffs' and defendant's counsel in their rush to make off with an undeserved Inca treasure weighing 260 plus pounds of $100 bills worth $10,000,000.00 plus interest and $3,500,000.00 in inflated expenses.

Excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion. See Staton v. Boeing Co., 327 F.3d 938, 975 (9th Cir. 2003). Indeed, "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co., 76 F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

The lead plaintiffs in this case appear to have taken potentially conflicting positions with absent class members as evidenced by the disparity in the requested "incentive awards." There are three million plus class members with a gross fund of $30 million which is $10.00 per claimant. After fees, expenses and incentive awards we have $13.7 million left or $4.57 net per claimant. The named plaintiffs are receiving $165,000 aggregate, an **average of $20,625.00 each vs $4.57 each!**

**The difference between what a typical class member can obtain is $4.57 each and the named plaintiffs receive an average of $20,625.00 each is** just too much of a difference not to have unduly influenced the named class members into

supporting such an obviously flawed proposed settlement with the interests of the unnamed class members an afterthought. Plaintiffs' Counsel has provided no justification for the differences among named plaintiffs awards or the amount to be received between named plaintiffs and the unnamed class. **In fact named plaintiffs have a dollar specific amount they are to receive and unnamed class members don't!** There is no credible legal and economic analysis performed except for some vague generalities. Clicking print and printing off lots of paper may not be enough to justify the fees requested. A clerk can do that.

Accordingly, this Court should carefully scrutinize whether the lead plaintiffs and their counsel are inadequate with respect to representing this class. (Objectors say yes, without a doubt.) They are all guilty of intentional poor judgement and should be ejected. The named plaintiffs are seeking to obtain windfalls that are grossly disproportionate to relief available to absent class members whom the named plaintiffs purport to represent. This type of approach is contrary to the protective requirements of Fed. R. Civ. P. 23, and well established public policy. In reviewing the requested "incentive awards," the Court should consider "the actions the named plaintiffs have taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 42 F.3d 1004, 1016 (7th Cir. 1998).

Other factors to be considered (Objectors state or when considering awards) include "the risk to the class representative in commencing suit, both financial and otherwise," (objectors state none) "the notoriety and personal difficulties encountered by the class representative," (objectors state none) the duration of the litigation, (short, the government led the way for the settlement) and "the personal benefit (or lack thereof) enjoyed *Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D. Cal. 1995).

In order for the lead plaintiffs or Plaintiffs' Counsel to be adequate, they must not have interests which conflict with the unnamed class members. A class representative's claims must not be inconsistent with those of the class. Global Materials v. Superior Court, 113 Cal. App. 4th 836, 851 (2003) ; see also Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978), citing Nat'l Assoc. of Reg'l Med. Programs, Inc. v. Mathews, 551F.2d 340 (D.C. Cir. 1976); Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3:23 (4th ed. 2002). By seeking such inflated incentive awards and padded attorneys' fees and padded expenses, lead plaintiffs and class counsel have put in writing their very own selfish interests ahead of the absent class members they purport to represent. Accordingly, the Court should apply heightened scrutiny to the entire negotiated settlement and nix it if dramatic changes are not made to it by the parties. **The**

trust has been broken and can't be repaired in this case and a divorce is required for all the actor participants.

**The Court should require Plaintiffs counsel to produce the retainer agreements** with each of the named plaintiffs as a condition for final approval in light of the disparity between the proposed incentive awards and the class benefit as a whole. This is warranted given the disconnect between the relief the named representatives are eligible to receive in contrast with that accorded to ordinary class members. This disparity is both unseemly and striking and should cause the Court to be suspicious of the motives of the settling plaintiffs (e.g., were they promised anything pursuant to a retainer agreement which caused an irreconcilable conflict of interest between the named representatives, class counsel, and the rest of the class). *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. Cal. 2009).

**The Court Has A Fiduciary Duty to The Unrepresented Members OF The Class.**

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of absent class members. In Mercury Interactive Corp., 618 F. 3rd 988, 994-95 (9th Cir. 2010) (quoting In re Washington Pub. Power Supply Systems Lit. 19 F. 3d 1291, 1302 (9th Cir 1994)). " Both the United States Supreme

Court and the Court of Appeals' have repeatedly emphasized the important duties

and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior

to final adjudication and settlement of a class action suit." In re Relafen Antitrust

Litigation, 360 F. Supp.2d 166, 192-94 (D.Mass. 2005), citing inter alia Amchem

Prods., Inc v Windsor, 521 U.S. 591, 617, 623 (1997) (Rule 239e) protects

unnamed class members from unjust or unfair settlements' agreed to by

"fainthearted" or self-interested class "representatives'"): Reynolds v. Beneficial

Nat't Bank, 288 F. 3d 277, 279-80 (7th Cir. 2002) (district judges /are/ to exercise

the highest degree of vigilance in scrutinizing proposed settlements of class

actions" prior to settlement).

"The court cannot accept a settlement that the proponents have not shown to be

fair, reasonable and adequate." In re General Motors Corp, Pick-Up Truck Fuel

Tank Prod. Liab. Litig., 55F. 3d 768, 785 (3d Cir 1995) (quoting Grunin v

International House of Pancakes, 513 f. 2d 114, 123 (8th Cir.1975)). A trial court

has a continuing duty in a class action case to scrutinize the class attorney to see

that he or she is adequately protecting the interests of the class."

The district court must ensure that the representative plaintiff fulfils his fiduciary

toward the absent class members". There should be no presumption in favor of

settlement approval: the proponents of a settlement bear the burden of proving its

fairness." True v American Honda co. 749 F. Supp. 2nd 1052, 1080 (C.D.Cal. 2010) ( citing 4 newberg on Class actions $ 11:42 (4th ed 2009)). Accord American Law Institute, Principles of the Law of Aggregate Litig. $3.05 © (2010) (Ali Principles").

Concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." Hanlon v. Chrysler Corp., 150F. 3d 1011, 1021 (9th Cir. 1998); In Bluetooth Handset Prods. Liability Litig., 654 F. 3d 935, 947 (9th Cir. 2011).

## Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval from a Low Number of Objectors

Any given class settlement no matter how much it betrays and cheats the interests of the class and unjustly makes millionaires of class counsel in this case at the expense of the class; will produce only a small percentage of objectors. Sometimes just one good objection can speak clearly for all the unnamed class members who don't have the knowledge, skill, time, patience or know how to spot an unfair settlement and deconstruct it to show the court how flawed it really is under its face. This objection is written on behalf of all three million (now seven million according to Plaintiffs' Counsel) unnamed class members who can't put together an objection that can actually make a difference. The predominating response will

always be apathy, because objectors- unless they can use pro bono counsel, or do it

themselves- must expend significant resources on an endeavor that may not benefit

themselves directly. Another common response from non-lawyers will be

avoidance whenever possible of anything related to lawyers and courtrooms. Class

counsel may argue that this understandable tendency to ignore notices or free ride

on the work of other objectors is best understood as acquiescence in or evidence of

support for the settlement  This is wrong  Silence is simply not consent. Grovev

Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447 (S.D. Iowa 2001) citing In re

Gen Motors Pick-Up Litig., 55 F. 3d at 789.). "Silence may be a function of

ignorance about the settlement terms or may reflect an insufficient of time to

object.

When class members have little at stake, the rate of response will be predictably

low as in this settlement, especially with the flawed notice, flawed website, flawed

claim from, flawed release, flawed everything!  As such, the response from class

members cannot be seen as something akin to an election or public opinion poll.

See In re Gen. Motors PickUp Litig,. 55 F. 3d at 813 (finding that "class reaction

factor" does not weigh in favor of approval, even when low numbers of objectors

in large class, when "those who did object did so quite vociferously') Thedore

Eisenberg & Emperical Issues, 57 VAND .L. Rev. 1529, 1532 (2004).

A low number of objections and opt-outs isn't unusual. People seldom object;
doing so is a complicated process that requires understanding complex technical
and legal issues and investing significant time and effort. Most class members have
no idea of the legal consequences of opting out and fear losing a valuable benefit.
Given the misrepresentation that the parties have engaged in regarding this
settlement, it is very likely that many more people would have objected or opted
out had they known the complete truth about the settlement and shenanigans and/or
had the knowledge and legal wherewithal to evaluate the settlement, as do the
objector's.

The class notice does direct class members seeking further information to the
Settlement Administrator's website but the site failed to include over one hundred
additional medical institutions until August 14, 2014 so clearly class members are
being cheated out of their right to fair, honest and straightforward information
about their right an options in this settlement. As stated previously the website is a
mess and contains invalid forms, missing and misleading information rendering it
unfit for accurate use when class members are deciding what the best course of
action is to take.

This from the 9th Circuit last year:

In (_Radcliffe v. Experian Information Solutions Inc._ (--- F.3d ----, C.A.9 (Cal.),
May 2, 2013) The court of appeals held that the "incentive awards here in this case

also have corrupted the settlement by undermining the adequacy of the class representatives and class counsel." The incentive awards changed the class representatives' motivations. "Instead of being solely concerned about the adequacy of the settlement for absent class members, the class representatives now had a $5000.00 incentive to support the settlement regardless of its fairness ...."

**The Sixth Circuit** recently reversed approval of two settlements where the disparity in relief to class representatives versus absent class members made the settlement unfair. **First,** in *Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013) consumers challenged robo-signing of affidavits in debt-collection actions. The settlement provided class representatives with exoneration of their debt (*e.g.*, forgiveness of a $4,516.57 debt owed by one class representative) to defendants as well as $2,000 each in incentive awards. In contrast, absent class members would be precluded from challenging the false affidavits in the debt collection action actions brought against them, in exchange for what amounted to "*de minimis*" payments of $17.38.

Courts also recognize intra-class conflicts as an indication that a settlement is not reasonable at the final approval stage. See In re GM , 55 F.3d at 808. A "disparity in the relief afforded under the settlement to the named plaintiffs, on the one hand, and the unnamed class members, on the other hand, [makes] the settlement unfair." Vassalle v. Midland Funding LLC , 708 F.3d 747, 755 (6th Cir. 2013) (reversing

district court's approval of a settlement). A court should reject a settlement where

such an intra-class conflict is present on the grounds that it does not represent

the "best possible recovery" for all putative class members.  In re Pet Food Prods. ,

629 F.3d 333, 355 (3d Cir. 2010).

**Second,** in *In re Dry Max Pampers Litigation*, No. 11-4156, 2013 WL 3957060

(6th Cir. Aug. 2, 2013). the **Sixth Circuit** followed its reasoning in *Vassalle* to

reverse approval of a consumer settlement involving diapers that allegedly tended

to cause severe diaper rash. Class members were to receive $1,000 per affected

child, while absent class members only benefited from the reinstatement of a one-

box refund program of "dubious" value, and "illusory" benefits from labeling and

website changes made by defendant. The Sixth Circuit held that the class

representatives were inadequate, reasoning that when the settlement makes class

representatives whole (or more than whole) while absent class members do not

obtain adequate relief, the representatives are encouraged to compromise the

interests of the class for personal gain. The opinion concludes that the settlement is

not fair because it "benefits class counsel vastly more than it does the consumers

who comprise the class." The two cases above are **mirror images of this case.**

**This case is much worse and the 6th Circuit would rule the same way in this**

**case.**

**Counsel writes:** V. NOAH AND BAYNARD SHOULD BE ADDED AS

ADDITIONAL NAMED PLAINTIFFS

**Response:** Why and what are the reasons for adding them on so late in the

program? Obviously they are poor representatives based on the debacle that is in

front of us. Doesn't seem like the named plaintiffs were in charge and counsel

hijacked the case and used the proposed and named plaintiffs as pawns and puppets

to attempt to obtain $13.5 million under false pretenses. Explain the reasons why to

the class. There is no declaration form from any of the named plaintiffs including

the proposed named plaintiffs above stating that they understand and agree with

counsels proposed settlement.

VI. THE SETTLEMENT CLASS SHOULD BE CERTIFIED AND CLASS

COUNSEL Appointed

**Counsel writes:** All Direct Purchasers of healthcare services from a Michigan

General Acute Care Hospital from January 1, 2006 until June 23, 2014. To

determine whether a proposed settlement class should be approved, a Court must

determine whether the class satisfies the requirements of Rule 23(a) and 23(b

**Response:** No, for all the reasons listed above and continue below in this objection

that proves appointing them in the first place was an error. They overpromised and

undelivered but want to be overpaid. It's a sense of entitlement without proof.

**Counsel writes:** D. The Settlement Class Satisfies the Adequacy Requirement Rule 23(a)(4)'s adequacy requirement raises two questions: "(1) whether the class counsel are qualified, experienced and generally able to conduct the litigation and (2) whether the class members have interests that are antagonistic to the other class members." Beattie v. CenturyTel, Inc., 234 F.R.D. 160, 169 (E.D. Mich. 2006) (quoting Stout v. J.D. Byrider , 228 F.3d 709, 717 (6thCir. 2000)). Here, both factors are satisfied. The Court previously concluded that The Miller Law Firm, Cohen Milstein, Gustafson Gluek, and Wolf Haldenstein have the experience, knowledge and resources to adequately represent a class in this case, in appointing them interim class counsel under Federal Rule of Civil Procedure 23(g). See Dkt. No. 69. Since that appointment, these four firms (together with their co-counsel) have vigorously and effectively litigated this case for nearly two years, defeating BCBSM's motion to dismiss, participating in extensive fact and expert discovery, working with Dr. Leitzinger to prepare class certification expert reports, filing a motion for class certification, and virtually completing a class certification reply brief (before the case settled). Interim class counsel's work in this case demonstrates that, in addition to having the experience, know ledge and resources to adequately represent the Settlement Class, they have in fact capably represented, and devoted a substantial amount of resources to, a proposed class in this case for an extended period of time.

**Response:** Class counsels are ··· ··· · ·· · ot qualified, experienced and generally able

to conduct the litigation and class members have interests that are antagonistic to the

other class members. The proof is throughout this objection. Federal Rule of Civil

Procedure 23(a): numerosity, commonality, typicality, and adequacy of

representation are required for settlement. The class representatives – and typically

their counsel must be able to represent the class adequately.

Adequacy of representation. The court must determine whether the representative

plaintiffs can "fairly and adequately protect the interests of the class." Fed. R. Civ. P.

23(a)(4). "This requirement encompasses two distinct inquiries designed to protect

the interests of absentee class members: [first,] it considers whether the named

plaintiffs' interests are sufficiently aligned with the absentees'[;] and [second] it tests

the qualifications of the counsel to represent the class." *In re Gen. Motors*, 55 F.3d at

800 (citations omitted). "Adequacy" is especially important in classes certified for

settlement purposes because "collusion, inadequate prosecution, and attorney

inexperience are the paramount concerns in precertification settlements." *In re Gen.*

*Motors*, 55 F.3d at 795 (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d

Cir. 1968)). The second factor asks the court to determine whether "the plaintiff's

attorney [is] qualified, experienced, and generally able to conduct the proposed

litigation." *Wetzel*, 508 F.2d at 247.  Does this proposed settlement look like it's the

result from experienced counsel. The experience in this case shows counsel and

named plaintiffs have sold the class a leaking canoe for a perilous trip down a rapids

filled river, all for the money. Fire them.

The absence of conflicts is a central tenet of adequacy, and it applies to both

representative plaintiffs and class counsel. *See, e.g., Amchem Prods. v. Windsor*, 521

U.S. 591, 625 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover

conflicts of interest between named parties and the class they seek to represent");

*McCrary v. Elations Co.*, 2014 U.S. Dist. LEXIS 8443, at *36 (C.D. Cal. Jan. 13,

2014) ("The adequacy inquiry turns on . . . whether the named plaintiff and class

counsel have any conflicts of interest with other class members[.]").

In this case the unnamed class members were informed they could share in a pot of

gold worth up to $240,000.00 if the deal closes. They would have known this since

the named plaintiffs read over the motion for certification which called for upwards

of $240,000.00 in incentive awards before approving them for counsel to file so they

would have seen those numbers in the document, right? Unless Plaintiffs Counsel is

claiming they never spoke about incentive awards to the named plaintiffs or named

plaintiffs never saw the documents before they were filed which would be evidence

that the named plaintiffs are inadequate and were not involved in this litigation so

they are inadequate making Plaintiffs' Counsel inadequate. It's one or the other and

if it's both they should be fired.

**Objectors seek retainer agreements between each law firm or lawyer and the**

**named plaintiffs.** These agreements bear directly on the adequacy of both parties

because they are discoverable. *See, e.g., Radcliffe v. Experian Info.*, 715 F.3d 1157,

1164–65 (9th Cir. 2013) (finding both class counsel and named plaintiffs inadequate

where fee agreement created conflict between the named plaintiffs, who would

receive incentive awards, and absent class members, who would not); *Porter v.*

*Nationscredit Consumer Disc. Co.*, 2004 U.S. Dist. LEXIS 13641, at *6–8 (E.D. Pa.

July 8, 2004) (compelling plaintiff to produce documents concerning fee

arrangements because "issues relating to the creation, maintenance, and management

of class action suits are discoverable"); *In re Sheffield*, 280 B.R. 719, 722 (Bankr.

S.D. Ala. 2001) (holding that defendant was entitled to fee agreements because they

might reveal "potential conflicts or biases"). Did Plaintiffs' Counsel settle this for the

fees because defendant would be happy to just get rid of the damages for pennies on

the dollar in exchange for millions? Yes.

**Does any counsel in this litigation ever had or have a personal or business**

**relationship with any named plaintiff? If so explain.**

A close personal relationship "creates a present conflict of interest—an incentive for

[the named plaintiff] to place the interests of [class counsel] above those of the

class." *London v. Wal-Mart Stores*, 340 F.3d 1246, 1255 (11th Cir. 2003); *see also*

*Sippper v. Capital One Bank*, 2002 U.S. Dist. LEXIS 3881, at *7–8 (C.D. Cal. Feb.

28, 2002) (denying certification where class couns , nd the named plaintiff were business partners and had previously been joint defendants in a lawsuit). Fee structures can also tell us something about adequacy. *SeeIn re Gen. Motors*, 55 F.3d at 801-03 (discussing impact of fees and award settlements on adequacy requirement). Attorneys' fees which are disproportionately large, or were negotiated at the same time as the agreement, or are contingent on the agreement, may suggest collusion or conflicts of interest *Id.* at 803. Objectors note that fees in this case were tied into the material terms of the settlement as were the incentive awards to win the named plaintiffs over even though it's clear to all the settlement is filled with missing, incomplete, false, contradictory information, due process violations, inflated fees and expenses, flawed notice plan, flawed claims plan, failed damage claims structure etc.

Based on the existing record, adequacy of representation by Plaintiffs' Counsel and the named class members prove there are conflicts. Both parties are not qualified and counsel is not competent as evidenced by the unwarranted fee request, failure to plead all applicable statutes for damages, error filled notices, claims forms, website failures, lack of disclosure regarding material information possible fraudulent attorney fee and expense fee request etc. The class does not know if the named plaintiffs were involved in representing the best interests of the absent class members vigorously, but based on the minuscule settlement fund and the numerous issues

raised in this objection it doesn't look like it. This indicates that plaintiffs did not

meet the applicable criteria and did not "fairly and adequately protect the interests of

the class." *See* Fed. R. Civ. P. 23(a)(4); *see also Amchem Products, Inc. v. Windsor*,

521 U.S. 591, 619-20 (1997) (the existence of a proposed settlement is relevant to

class certification, including whether absent class members' interests are being

adequately represented).

Two years of inflated alleged work incurring inflated 34,343 hours billed to the class

at an inflated usurious rate of $451 an hour for $15 million for this proposed

settlement it shocks the mind and this settlement should be investigated further by

others. Counsels appear to have a ATM machine in each office that they decide

when to run it and how much they want to make off the class regardless of their

actions and poor results, really.

**Counsel writes:** VII. THE CLASS NOTICES AND THE NOTICE PLAN SHOULD

BE APPROVED.

**Response:** The notice has **not** been well designed to meet Rule 23(c)(2)(B). The

Notice Plan will be realized as a failure when all is said and done. This rule is

intended to minimize confusion on the part of class members by requiring that

notices not contain complex language or legalistic jargon. This notice is not the best

means of providing notice to the Settlement Class Members because it was not

completed properly based on the missing, misleading, incomplete content and

information including the website. It therefore does not constitute due and **sufficient**
notice of the Settlement and the Fairness Hearing to all class members affected by or
entitled to participate in the Settlement, the hearing on the motion for fees, awards
and expenses, so it is not in full compliance with the requirements of due process and
the Federal Rules of Civil Procedure. This notice is a failure including the website
information because the class notice is incomplete and misleading.

Plaintiffs' Counsel Notice and Claims Plan has:

- omitted pertinent information

- didn't explain terms for laypeople

- caused class members out of participating, objecting, or opting out due to a
  flawed settlement, flawed notice and claim plan

- created hurdles for class member to exercise their rights

- limited class member response and participation by employing a failed
  notice and claim plan. Early in the claims process members had to send in
  invoices with proof of payment but that was rescinded. Many might have
  chose to say forget it and didn't file a claim. It's in the docket.

- failed to get defendant to put the publication notice on the first page of their
  own website since they overcharged 2.3 million of their own customers in
  this anti-competitive scheme!

- **Did defendant place an insert in each of the defendant's monthly or quarterly bills notifying them of this settlement?**

- created language barriers because there is no mention or version in Spanish and Arabic on the short notice or long notice or website. Since the Detroit area has the largest Arabic population in the entire U.S. and the defendant controls a huge part of the market, per the complaint and amended complaint, an Arabic version of the notice and/or website should have been made available. Two sentences like this should have been on the postcard notices and website:

Si desea recibir esta notificación en español, llámenos o visite nuestra página web. (To receive this notice in Spanish, call or visit our website.)

لتلقي هذا الإشعار باللغة الإسبانية ، الاتصال
أو زيارة موقعنا على الانترنت .

(To receive this notice in Arabic, call or visit our website.)


Exhibit E-1 CONSUMER CLAIM FORM

SECTION C: YOUR HOSPITAL HEALTHCARE PAYMENTS

To make a claim, you must provide two things: (1) a completed and signed copy of this form, stating all eligible hospital healthcare payments that you wish to be included in your claim; and (2) a copy of records documenting the hospital charges that you paid.

The following was an error that was created by Plaintiffs' Counsel and the administrator and applies to both individual class members and entities:

Exhibit E-1 and Exhibit E-2

CLAIM FORM FOR INSURERS OR SELF-INSURED ENTITIES

Section C-2 on both claim forms: Copy of Purchase Records You must also submit a copy of hospital bill(s) or other record(s) for all of your payments to the hospital that you wish to include in your claim. The records must show (a) the hospital providing the services, (b) the amount charged, and (c) the date(s) the services were provided. If you did not pay the hospital the full amount of the charges (because somebody else, such as your insured, paid part or for any other reason), the record must show the portion you paid. If you do not have these records, you may be able to obtain them from the relevant hospital.


**Response:** After reading this many class members would have thought to heck with this, the claims process is too burdensome it's not worth my time, it's intrusive sending in copies of private medical bills. stopped reading never filed a claim and closed out the browser.

Plaintiffs' Counsel faced with some pushback suddenly realized they should not have written the above  because it would scare off a lot of class members from filing claims or maybe that is what they intended to do to reduce the claims rate.

They then tried to correct an the error which they cannot, it's in the docket. Plaintiffs' Counsel has poisoned the well and the notice has to be remailed. Counsel falsely stated on the postcard that total incentive awards would be $150,000.00 when the settlement papers call for $165,000.00 and the motion for certification called for upwards of $240,000.00.

The short notice uses the worth "hospital" on the front and general acute care hospital on the reverse side. Nowhere on the short form does it mention "medical center" or "health care center." On the long notice the words used are "hospital" and "general acute care hospital" People don't think of a medical center as a "hospital" because of the different services available at each location, that's why they have different names. Many potential class members might not have even checked the website to see if they were a class member because they did not get treated at a "hospital" or "acute general hospital" but a "medical center" or a "health center" instead and so forfeit their rights and damages because of material mistakes Plaintiffs' Counsel made. Some medical centers and health centers can sometimes provide limited hospital type services but for not for acute issues and some may or may not have overnight facilities available. Maybe they are just outpatient.

The goal is for the notice to reach as many class members as possible, preferably by individual notification (see Rule 23(e)(1) and MCL 4th § 21.312), and **that the**

**recipients see it, recognize its connection to their lives and self-interests, read**

**it, and act on it.** A postcard does NOT get people's attention and they don't

recognize it as important, that's why it's called a post card! It's a note of

unimportance in the receiver's eyes like "look, here I am on vacation" a gag note

or a "selfe." It's not anywhere near as important as if the LEGAL message was

written on paper and placed in an envelope or an eight page detailed notice on 8.5

by 11 sheet of paper folded over and secured at both ends and placed in the

recipient's mailbox. Who receives a legal health care notice on a postcard? A

letter is the proper way to do this notice in this case. it's a health care issue

involving a partial return of their MONEY, it should be treated as such. Being

noticed is the essential purpose of a class action notice; therefore, a conscious

effort must be made to design an effective and "noticeable" notice. It must grab the

attention of class members, alert them that they may be affected, and provide them

a compelling reason to read on, for example, by highlighting a potential recovery.

This postcard did not do the job.

The parties' proposed notice plan is reasonably calculated to apprise interested

parties of the pendency of the proposed amended settlement and afford them an

opportunity to present objections. *See* Fed. R. Civ. P. 23(e) (requiring notice be

directed in a reasonable manner to class members); *Torrisi v. Tucson Elec. Power*

*Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (the relevant question when evaluating a

2:10-cv-14360-DPH-MKM   Doc # 163-1   Filed 10/06/14   Pg 48 of 50   Pg ID 4869

notice campaign is "whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement."). In this case no it does not flush out objections. The notice needs to be flushed along with Plaintiffs' Counsel who should go back to school and learn how to do this right. Obviously the class action and settlement is an experiment gone completely wrong, all done for the money.

**In this case both notices are failures in multiple material ways. How can one object if one does not understand due to Plaintiffs' Counsel's screwing up the stuff that has to be seen and understood in the first place?**

In this case the postcard and website are defective with updated information missing originally and currently is misleading and contains incorrect information. The best practical notice should have been mailing out the long notice (which should have more critical information in it) instead of a measly postcard directing class members to a defective website that did not contain critical and vital information members needed to evaluate this settlement and that extinguishes their rights unfairly. The cost to do it right is $.12 more postage per mailed piece for an eight page long notice v the junk mail looking post card price according the U.S Post Office Bulk Mailing Office.

- Why is the original complaint not on the website for the class to review?

Page 98 of 220

- Why are several of the documents included all together in 163 pages when they should have been broken down and each document posted separately to the website for easy review by the class?

- Why weren't class members advised and directed to PACER or to go in person to any of the court's locations for more information without charge?

- How come more information that is located on the docket was not included on the website?

What a pitiful joke on the class and Court this settlement is. This is an example of how not to run a class action lawsuit and settlement yet possibly still walk away and feel entitled to claim an undeserved gold mine of riches from the fleeced class members for doing level "C" law school work without anyone ever knowing. They were the recipient of a gift from the government. All they did was look over the government shoulder, like a shadow, go through the motions and wait for the defendant to settle. Yet they managed to mess it all up!

Document 148-2  DECLARATION OF SHANNON R. WHEATMAN, PH.D.

ON ADEQUACY OF NOTICE PLAN

**Counsel writes:** The notice representative (PH.D.) writes: BCBSM submitted names and addresses for 2,394,079 BCBSM insured individuals; 1,134 BCBSM

self -insured groups; 179 Aetna self insured groups; and 99 commercial health insurers.In early July, Counsel expects to receive names and addresses for 604,488 Priority insured individuals and 99 Priority self-funded groups.

18. Individual Notice consisting of a mailed Postcard Notice will provide Class Members with opportunities to see, read, and understand their rights, and act if they so choose.

c. Based on the FJC and the USPS studies, Postcard Notice is the recommended form for direct notice in this case.

37.The Summary Notices (Postcard and Publication Notices) are designed to capture the Class Member's attention with clear, concise, plain language.

CONCLUSION

It is my opinion that the reach of the target audience, number of exposure opportunities to the notice information , The Notice Plan ,as designed ,is fully compliant with Rule 23 of the Federal Rules of Civil Procedure.

**Response.** NO. The Ph.D. expert with her dozen page resume is wrong, completely wrong, based on the evidence in this objection. Everything has to be redone but not a penny additional cost to the class or fund. The Federal Rules of Civil Procedure require, upon certification of the class, that "the best notice that is practicable under the circumstances" be given, "including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c) (2) (B). The Federal