Rules of Civil Procedure further provide, upon the successful negotiation of a proposed settlement, that notice be given "in a reasonable manner to all class members who would be bound by the proposal." Fed.R.Civ.P. 23(e)(1). The Due Process Clause requires that notice be "reasonably calculated to reach potential class members." *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197, 203 (D.Me.2003); *see also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Again very little has been done by counsel to notice possible class members correctly with **ACCURATE INFORMATION WHEN NOTICED** especially when they are given inaccurate, missing and misleading information on the website. The website is entirely defective, as are both short and long notices and release and claim form for anyone who saw or received them. All 3,000,000 individuals and 1412 entities need to be renoticed, now 7,000,000.00 according to Plaintiffs' Counsel, and this settlement was made primarily for the entities and not the individual class member. If the administrator performs work for the class and Plaintiffs' Counsel at no cost or a discounted cost objectors are claiming credit for that. The objectors will explain that in the future if and when the settlement ever get approved, which we don't see happening.

**Counsel writes:** VIII. THIS COURT SHOULD PRELIMINARILY APPROVE THE PLAN OF ALLOCATION AND APPROVE THE CLAIM FORM

Plaintiffs propose to distribute the Net Settlement Fund to Settlement Class Members who submit timely and valid Claim Forms. Plaintiffs will disseminate a Claim Form, substantially in the form attached to the Settlement Agreement as Exhibit E, to Settlement Class Members. The Claim Form will be available on the settlement website and upon request. The class notices will advise class members of how they can obtain the Claim Form and the deadline for submitting a completed form. Completed forms may be mailed to the Settlement Administrator or submitted online, via the settlement website. Plaintiffs propose to allocate the Net Settlement Fund as provided in the Plan of Allocation attached to the Settlement Agreement as Exhibit F. The plan identifies three categories of relevant purchases. Class members may claim their purchases in any or all categories. Category 1 purchases are those that define the litigation class that Plaintiffs had moved to certify. These purchases occurred at thirteen Michigan General Acute Care Hospitals and involved insurance coverage provided by four insurers: BCBSM, HAP, Priority, and Aetna (at a single Michigan hospital). These are the purchases for which Plaintiffs had the best evidence of impact and for which Dr. Leitzinger had (preliminarily) measured damages.

There is a minimum distribution per claimant of $10 for Category 1 purchases and $15 for Category 2 purchases (subject to reduction in unlikely circumstances). These minimums will encourage claimants with small purchases to share in the recovery, will minimize their burden of filing a claim, and will facilitate efficient administration of the settlement. There is also a per-claimant cap for Category 1 and 2 purchases. The cap for Category 1 is 3.5% of the claimants' total purchases of healthcare services at Michigan General Acute Care Hospitals between January 1, 2006 and June 23, 2014. The cap for Category 2 is 1% of such purchases. These caps were the subject of intense negotiations between the Parties and were part of the give and take that led to this settlement. This carefully crafted plan of allocation reflects (1) Plaintiffs' reasonable judgment about the relative value of the different claims being settled, (2) a desire for an efficient and fair claims process, and (3) the arm's-length negotiations between the Parties.

**Response: NO, the Court should not approve the plan of allocation and claim form.** The plan of allocation and the two page release is in legalese, incomprehensible, flawed, defective and has not been adequately explained and can't be understood by the average class member.

Legalese definition:

the language used by lawyers that is difficult for most people to understand, specialized language of the legal profession. : legal jargon

http://www.merriam-webster.com/dictionary/legalese

**The two page release class members are agreeing to should have been attached to and made part of the printed or electronic claim form not separate and apart from it.** This is misleading and deceiving class members all in an effort to get this joke of a settlement through and to trick the class members into giving up their valuable rights for a possible fraudulent settlement for close to nothing.

**Plan of allocation should have been included in the detailed long notice not separate and apart from it.** The objectors can't figure out their own allocation on a dollar amount spent or on a percentage basis per dollar spent even with all this information reviewed. None of the other three million plus members in Category 1, 2 and 3 can either. The release, claim form and plan of allocation are not fairly and honestly negotiated, are collusive, full of legalese, defective, do not adequately protect the interests and rights of the unnamed class members and was clearly written by the defendant. That's more evidence that counsel and named plaintiffs should be dismissed.

**Counsel claims** for Category 1 class that "These are the purchases for which Plaintiffs had the best evidence of impact and for which Dr. Leitzinger had (preliminary) measured damages."

**Response: Stop right there.** The class damages are still **"preliminarily,"** after $2.5 million worth of alleged invoices was spent over twenty two months or less by Plaintiffs' Counsel on a so called "expert" and they don't know the correct and final answer and we have class members filing claims and a fairness hearing coming up? This is wrong and all backwards and the class was entitled to a firm answer long before this stage has been reached and before the website went live. The settlement was made with only preliminarily numbers **so it is invalid, per Plaintiffs' counsel's own written statement.** If the MFN's are in effect for Category 1 and 2 class's why is there is such a huge difference in what both those classes can recover, 78% to 20%? Category 1 only encompasses 9 hospitals or so and 9 counties out of 120 hospitals and 81 counties in the State of Michigan. Did the experts give up finding out the truth for Category 2 and 3 class members which may encompass a huge majority of the class because they believed they had enough evidence to get certified approval for just category 1 members?

Was the same amount of skill, devotion, motivation, effort and resources used to ensure category 2 and 3 members were obtaining the same benefits? It's hard to see how this is fair to all. Did the experts run out of time and money to perform more required work to obtain the same results as category 1 class members based on the need for counsel to borrow a one million dollars from the defendant? It

seems so.  Without more information from the "experts" this flawed settlement is unapprovable.  Plaintiffs' Counsel should be dismissed.

Category 2 class is only able to recover 20% of the fund. Plaintiffs' Counsel states it's because their "expert" claims, without any proof to the class that "there was weak or no evidence for Category 2 class members when the MFN was in affect" Uh? The plaintiff and defendant surely should know how much the impact is per dollar claimed or services paid for those in Category 1 why not for 2 and 3 classes. Why doesn't an equal percentage of recovery apply to Category 2 class as well? If the same evidence being used for both classes, right? Is Plaintiffs counsel claiming that this overcharge scheme was only directed to nine hospitals and four insurance firms? Regardless if there is one person or 100,000 people the formula should apply equally regardless of where they live. If area does make a difference, which it does, we have different sets of subclasses that have not and are not represented properly. **If the damages don't apply equally to everyone you have multiple classes and there should be separate lawyers representing each subclass, right?** If they can't answer that question how do they explain the alleged $120 million damage figure to the class and the Court?  In reality we do have three separate classes based on the facts, little as they are. It should take five minutes to come up with the answer after $2.5 million has been spent, right? Why don't class

counsel and the entire class know the answers before filing a claim and before a Fairness hearing?

**Does the formula apply equally if you are inpatient, outpatient, paid cash only or had insurance and paid just a deductible? If not explain?**

**Explain the rational for a maximum of 3.5% reimbursement?** If an insured class member in Catagory1 class spent say $200.00 in out of pocket expenses for a procedure because of insurance was in play and someone else was uninsured and paid $9000.00 out of pocket and was uninsured for the same procedure and both went to a hospital listed as Category 1 class, who actually incurred more of an overcharge and was damaged more out of pocket? The uninsured class member did but they would recoup less than the Class Category 1 member who had insurance assuming the way the claims are paid. This does not seem right and needs to be explained and reworked if necessary.

**Counsel writes:**

However, no distribution will be made to a Claimant for Category 3 purchases unless at least one of the following conditions applies: (1) the Claimant also has Category 1 or 2 purchases; (2) the Claimant's pro rata share of Category 3 funds is $10 or more; or (3) the Claimant does not satisfy condition (1) or (2) but the total

number of Category 3 Claimants that do not satisfy condition (1) or (2) is fewer than 100.

**Response:** Objectors and class members should not have to hire a lawyer to decipher and be able to understand what they are giving up in this settlement in return for an unknown amount of reimbursement without the slightest idea, even a ball park number.

**Adversity among subgroups:** There appear to be three main subclasses existing in this settlement.

- Category 1 class which 78% of the net settlement funds goes to with a $25 minimum reimbursement and a maximum 3.5% cap on reimbursement for those class members who paid for services at just 13 hospitals.

- Category 2 class where 20% of the net settlement fund with a 1% maximum cap goes to for those class members who paid for services at the next 57 hospitals with a minimum $15.00 reimbursement. (The hospital breakdown numbers are based on the website figures prior to August 14, 2014 when the list of hospitals was expanded to include not only "acute general hospitals" but now many, many more medical centers.)

- Category 3 class where 2% of the net settlements fund goes to for the remaining 51 hospitals. Objectors can't figure out the following: "However, no distribution will be made to a Claimant for Category 3 purchases unless

at least one of the following conditions applies: (1) the Claimant also has Category 1 or 2 purchases; (2) the Claimant's pro rata share of Category 3 funds is $10 or more; or (3) the Claimant does not satisfy condition (1) or (2) but the total number of Category 3 Claimants that do not satisfy condition (1) or (2) is fewer than 100."

There are also two distinct classes as far as 98% of the net fund goes to claimants who went to 76 hospitals listed in the plan of allocation in Exhibit A and B and 2% of the fund goes to those who went to the remaining hospitals who paid for inflated charges at the balance of unknown amount of hospitals left over that are NOT listed for Category 3 plan of allocation. That class gets zero, period.

## How many "institutions" are there in each Category 1, 2 and 3?

The settlement agreement attempts to bind all the three subgroups or classes to a single class consisting of all members who paid for healthcare services over a seven and one half year period. The different categories indicate that would be "adversity among subgroups." which means that all members of each subgroup cannot be bound to the settlement except by consents given by those named plaintiffs who understand that their role is to represent solely the members of whatever class they allegedly represent. **Does each subgroup or class have their own named plaintiff and/or law firm that has been representing them the**

**whole time?** Objectors don't believe so based on how the case and settlement has been handled so far. If Plaintiff Counsels claim they did, counsel should be forced to prove it at the hearing to the Court which objectors request be done. Plaintiffs Counsel in the Crain's article even confirmed different classes, businesses vs. individuals.

**Page 25 of long notice:**

This Notice summarizes the Settlement. More details are in the Settlement Agreement available at www.MichiganHospitalPaymentsLitigation.com. If you still have questions, call the Settlement Administrator at (877) 846-0588, send an email to info@MichiganHospitalPaymentsLitigation.com, or write to Settlement Administrator, PO Box 3240, Portland, OR 97208-3240. Please do not contact BCBSM, its counsel, the Court, or the Clerk's office. M4027 v.03 07.24.2014

- **Response:** There is no court address listed for those who might have considered objecting.

- There are no phone numbers listed for any of the Plaintiffs' Counsels' to contact with questions or concerns regarding the settlement.

- Only two of the four Plaintiffs' Counsel's are requesting a copy of the objection filed with the Court and they don't even have phone number or email listed to make themselves easily assessable to the class members they allegedly represent.

- Class members are not even advised about Pacer or visiting a federal courthouse to lookup the information for free from the docket etc.

Plaintiffs' Counsel does not want contact with the class. They have the perfect case, no clients and the ability to choose how much they want to earn. Nice gig if you can get it.

The claim form for insurers and self-insured entities was also updated on August 14, 2014. Although objectors did not check the site on August 6, 2014 and August 14, 2014 to see if the list was added to it's very possible that list was also updated with the same changes the objectors witnessed on the individual claim form tab. The 1412 entities need to be renoticed.

- **What is the actual number of claims submitted by class members for each Category 1, 2 and 3 class and for the 1412 entities?**

- **How many claim forms were received for individuals v. insurers and self-insured entities?**

- **How many entities are there in Class Category 1, 2, and 3?**

- **How many individuals do they represent in each category?**

**Counsel writes in the amended complaint bottom of page two:** "As a result of this anticompetitive scheme, prices for Hospital Healthcare Services in Michigan rose, and members of the Class of direct purchasers including individual insured's, self-insureds, health insurers, and managed care organizations, have paid artificially inflated prices."

From counsels' settlement papers:  In total, Plaintiffs currently have names and addresses for 2,394,079 BCBSM members; 1,134 BCBSM self-insured groups; 179 Aetna self-insured groups; and 99 commercial health insurers. In early July, Plaintiffs expect to receive names and addresses for 604,488 Priority insured individuals and 99 Priority self-funded groups

**Response:** How much did the prices rise and what were the damages to those class members in Category 1, 2 and 3 on a percentage basis per dollar spent for these services? The plan of allocation in document number 148-1 showing affected combinations which is for Category 1 claimants where 78% of the net settlement fund goes to but has not been made available on the consumer claim form pages 1-7 and it should have been. By looking at and filling out the claim form the three million class members would not know what category they are in or how much they might realistically receive back. Not including it was by design.  It's a wing and a prayer claim submission so not being informed lowers the opt out's and amount of objections filed that might not otherwise be made. It's pretty smart

providing only half the informat... of class members and the Court if you are Plaintiffs' Counsel and the defendant.

Not disclosing this information and intentionally leaving it separate and apart from the claim form is misleading and deceiving the class members. The claim form has to be redone by including the Exhibits A, B and Exhibit "C" which would describe the remaining hospitals for the Category 3 class.

**Here is material information that Plaintiffs' Counsel is attempting to withhold in an attempt to defraud the class members and Court into accepting and approving this pitiful, pathetic, awful settlement. Why weren't class members told this? That would be too honest.**

There are a minimum of 3 million individuals who were overcharged for health care services and 1412 self insured groups and insurers that overpaid on behalf of their clients.

$30 million divided by 3 million known individuals is a gross check before costs and expenses of $10.00 for each claimant. After expenses the net fund is $13.4 million divided by 3 million claimants is a check for each member of in the amount of $4.56. Each member submits a claim and the minimum distribution is $25 for those in Catageory1 where 78% of the net funds go to. $13.4 million multiplied by 78% is $10,452,000.00. If the minimum amount and maximum check is for $25.00 divided into the $10.4 million is 418,000 class members will receive a $25 check

and that does not include anyone who gets more based on the maximum of 3.5%. That does not count the 78% of the 1412 entities who overpaid on behalf of their insured's. **Is this certified class the only people who should receive a check?** Category 2 class splits 20% of the 13,400,000.000 settlement fund which is $2,680,000.00 with a minimum check and a maximum check of $15.00 is so only 179,000 class members can get a check.

**Total class members receiving checks for Category 1 is 418,000 and Category 2 are 179,000 class members for a grand total of 597,000 class members receiving checks out of 3 million class members! If this is in fact the sole certified class that has been damaged why are there two more classes receiving money? This reduces the fair amount owed to Category 1 class.** That leaves 2,403,000 class members and 1412 entities splitting up 2% of the remaining fund or $274,000.00? Those remaining will get zero or the minimum amounts in Category 1 and 2 will have to be reduced so some in Category 3 can get some recovery. The 1412 self insured groups and insurers don't get a penny and that is an unfair, inadequate and unreasonable settlement so the settlement cannot be approved. Something is not right here, need more information.

**The only way to increase the damage amount to the claimants is to have a notice plan that causes a low claims rate which would provide additional proof that the notice and claim program are failures.** The objectors are

claiming this will become known to the administrator and Plaintiffs counsel days before the settlement hearing. The administrator needs to file a sworn under penalty of perjury declaration stating accurately for the class and Court what the results are up to a few days before fairness hearing. In fact, bring the administrator to the hearing, the objectors have some questions. The court should order the administrator and named plaintiff's to appear at the fairness hearing, they may be needed by Plaintiffs' Counsel. Plus they can all hear themselves get dismissed and likely facing a huge malpractice claim from the entire class. That would be something to see.

The release is clearly written by the defendant against the best interests of the class because it is one sided, grossly unfair, it appears undue influence was used as bargaining power against the class (to obtain the $1,000,000.00 advance for just one example), it's poorly negotiated, class members are required to give up too many rights, it's lopsided, overbroad, wrong and is too legalese for the average class member to read and understand and agree to in good faith so it needs to be rejected and reworked.

In reality class members can't make an informed good faith decision due to the subterfuge engaged in by the parties in this settlement. By not including the critical information and having missing information in the notice counsel has violated Rule 23 that requires notice in clear, concise, accurate and easily understood language as

it relates to the issues. The notice and release are flawed, unacceptable and not approvable under Rule 23. This is material information and not including it is exactly what defendant did in this case, hiding material information that caused damages to the class, ironic. The missing and misleading material facts will affect class member's decision to object, opt-out, file a claim or not file a claim. The result is by withholding this vital information the class members will all have false expectations that the time they are going to spend valuable time attempting to obtain records and receipts from the institutions and insurance firms that they had/have an association with and will all be worth it. Knowing the truth would cause class members to more accurately decide what to do.

The plan of allocation failed in its most important task which is to explain to class members in a few easy to understand sentences or by table how to figure out their potential reimbursement amount on a percentage basis per dollar spent. This they failed to do intentionally, so members are intentionally kept in the dark so they don't realize why a fee driven settlement this really is.

Are named class representatives OK with all these errors and mistakes established in this objection? Has class counsel given each named plaintiff a copy of this objection and is it posted to the website for all to see and comment on? That's what I thought, no. Better keep everyone in a fog lest they find the truth. It's time to disqualify counsel and named plaintiffs since they clearly are not qualified to look

after the best interests of the class. Someone else has to look out for the class's best interests so the objectors have to play guardian of the guardians.

How can the Court even consider approving this proposed settlement with Plaintiffs' and Defense Counsel when clearly it does not meet Rule 23 requirements and due process and goes against public policy? Approval of this settlement will forever bar three million class members from asserting $120+ million in damages and multiplied by a factor of three for antitrust violation penalties totaling upwards of $360 million in this year's long overcharging fraud and money scheme. What if the experts have undercounted damages to get the settlement through as being fair, adequate and reasonable? This would cause total class damages to substantially rise so more damages to each class member should be forthcoming. Transparency is demanded and required. **Why shouldn't the settlement be $60 million or $600 million if the "expert" has defendant in his crosshairs and can prove it in writing? If what Plaintiffs' Counsel state is true the class, through the objectors say, we want substantially more money, period.**

**Defendant cannot respond to any objections received**

Based on objectors reading of the preliminary approval order referenced above, reviewing the settlement agreement and release, only the Plaintiffs have the right to respond to any objections received in this action, not the defendant. They did not

request it in the order and there is no mention of it in the release. Objectors object to allowing defendant to respond to any objections received. If a response is received the objectors request that the Court or its staff not even view it if it is submitted and or disregard it. They screwed up for the twelfth time, so it's their own fault. Defendant's counsel can argue this issue at the settlement hearing in front of the Court if they are allowed to. Objectors will still object and not agree to defendant's demands. See how easy it is counsel when you know how to negotiate from a position of strength? Something they don't know how to do.

Objectors will now "deconstruct" the CLASS COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PAYMENT OF INCENTIVE AWARDS TO CLASS REPRESENTATIVES which will also prove objectors position that the hourly rates sworn to under the penalty of perjury and the expenses claimed are intentionally and artificially inflated by material, misleading gouging amount that should be classified as attempted theft. The hourly rates falsely claimed are artificially and intentionally inflated by 34.5% or $157.00 per hour for the 34,343 bogus hours claimed using the 2014 Economics of Law Practice Attorney Income and Billing Rate Summary Report for Michigan. The 2010 rates should really be used since the suit was filed in 2010. The expenses are broken down and are also unbelievable as presented

based on the evidence the objectors have reviewed and performing simple math as the Court will read. This may be fraud on the court. Objectors incorporate all the pages above into the presentation below, all of it. The breakdown line by line is at the end of the objection, all of it. This may be evidence of fraud.

## STATEMENT OF ISSUES PRESENTED

**Counsel writes:** 1.Should the Court grant Class Counsel's request for award of attorneys' fees?

**Response:** NO, The hourly rates are artificially and materially inflated by a minimum of $157.00 an hour for the artificially inflated 34,343 claimed at $451 using the 2014 Michigan State Bar survey that proves an overcharge to the class of $5.4 million.

**Counsel writes:** 2.Should the Court grant Class Counsel's request for reimbursement of expenses?

**Response:** NO, they appear materially overstated based on deconstructing the numbers.

**Counsel writes:** 3.Should the Court grant Class Counsel's request for incentive awards to the class representatives?

**Response:** NO, based on what is in the previous pages above? They have caused fatal damage to the settlement. Objectors will expand on this further below.

**First let's review excerpts of the following document:**

DECLARATION OF DANIEL C. HEDLUND IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PAYMENT OF INCENTIVE AWARDS TO CLASS REPRESENTATIVES

3. The Compendium to this Declaration comprises 18 declarations of Class Counsel and other Plaintiffs' Counsel who are seeking to recover fees and expenses for work performed on this matter since its inception. These declarations and their exhibits attest to the number of hours each law firm's attorneys and paralegals have spent working on the case, each firm's lodestar calculated at the firm's current hourly rates, and each firm's expenses spent on the litigation of this case.

**Response:** Counsel fails to state what the inception date actually is meaning the hours claimed will probably go back further than they should. **What is the start date?** The number of attested hours worked is false, the firm's lodestar calculated at the firm's current hourly rates is false and the expenses appear to be highly

inflated which the Court will realize by the end of this objection. The firm's fees are broken down per attorney, or non attorney as the case may be, at the end of the objection. The fees are broken down to show something is not right here. The fee they want for this law school practice class action settlement is laughable.

**Counsel writes:** 4. Since the inception of this case, Plaintiffs' Counsel have collectively logged 34,343.96 hours, which generates a lodestar of $15,497,960.25 at current hourly rates, for which they have yet to recover any compensation. *See* Compendium. Each firm has submitted a declaration and exhibit attesting to that firm's actual number of hours reasonably expended on this litigation by the firm's attorneys and paralegals, as well as the lodestar for that firm calculated at the firm's current hourly rates. *See* Compendium.

**Response:** The declarations each firm has submitted except for one or two of them, are false and the hourly rates compared to what is supposed to be used here in Detroit don't come close to reality. The rates claimed do not even apply in the areas the firms are even located in! This appears to be a blatant theft of class funds and a possible fraud on the Court. Class Counsel is caught red handed. **All class counsel do not state what year they are billing the rate at.** Since the case was started in 2010 that would be the start. Plaintiffs' Counsel was appointed in 2012 that should be the rate year used so a 2013 rate should not be used. Plaintiffs don't

pay a lawyer at the rate at the end of the case but rather at the beginning of the case.

**Counsel writes:** 5. Other than work performed before the Court's appointment of Interim Lead Counsel, *see* Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to Class Representatives at 14 n.4, the work performed by Plaintiffs' Counsel other than Class Counsel represents time spent working at the direction and under the supervision of Class Counsel. This work involved essential communications with class representatives, assistance with briefing, reviewing documents, performing research, and participating in depositions.

**Response:** The work performed has been exaggerated to siphon funds away from the class and to have the Court unknowing and covertly approve it.

**Counsel writes:** 6. Except as noted above, Class Counsel reviewed the time of Plaintiffs' Counsel and excluded time which was not performed at the direction of Class Counsel, time that was insufficiently described to determine whether it provided a benefit to the class, duplicative time, and time spent on internal firm administrative tasks.

**Response:** The Court will get an eyeful below and will deem the above paragraph untrue.

**Counsel writes:** 9. All of the time and expenditures were reasonable and necessary to prosecute this litigation and to obtain the valuable settlement with Blue Cross Blue Shield of Michigan, and the time and expenditures were made for the direct benefit of the Settlement Class. Plaintiffs' Counsel's largest expense (over $2.5 million) is for expert fees that arose from the retention of Dr. Jeffrey J. Leitzinger and others at Econ One. Econ One analyzed the impact of Blue Cross's MFN clauses on prices of acute care hospital healthcare services in Michigan and addressed other issues such as market definition and market power. This work required complex statistical analysis of extraordinarily large amounts of data.

**Response:** All the time and expenses were NOT reasonably incurred and the class may have been taken advantage of not only by Plaintiffs' Counsel but also the group who claim to have figured out class damages but in reality have not done so for the class and Court to really understand enough to justify the $3.5 million in expenses. The $2.5 million for the "expert" seems to be inflated based on the results and there are no records to review.

**Counsel writes:** 10. The remaining expenses were incurred by individual firms for such things as travel, research services, and document reproduction, and are typical of expenses incurred by firms prosecuting an antitrust class action.

**Response: The expenses appear seriously artificially inflated based on simple math equations as will be shown below.** The comment about the expenses "are

typical of expenses incurred by those prosecuting an antitrust class action" doesn't cut it. The objectors are not concerned with "typical" they are concerned with **this** case and whether they are justified in what they seek in **this** case. The objectors say they are not justified in **this** case.

**Counsel wrote:** "I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct."

**Response:** The above statement is false for 80% of class counsel who signed their own declaration.


## INTRODUCTION

**Counsel writes:** Pursuant to Federal Rules of Civil Procedure 23(h) and 54(d)(2) and the Court's June 26, 2014, Order Granting Preliminary Approval to Proposed Class Settlement, Class Counsel respectfully submit this brief in support of their request for an award of attorney fees of one-third of the Settlement Fund, or $9,996,667 plus interest, and their litigation expenses of $3,499,893.02. The substantial recovery in this case, $29.99 million, was secured only through the focused and diligent advocacy and substantial investment of Plaintiffs' Counsel. Plaintiffs' Counsel have worked on behalf of Plaintiffs and the class for almost six years without compensation of any kind, and with the understanding that their fee

would be entirely contingent upon the result they achieved for Plaintiffs and the class.

As with other complex antitrust class actions, the prosecution and settlement of this litigation required great skill and extensive efforts by Plaintiffs' Counsel. This settlement was only achieved after significant efforts in prosecuting this action, including, but not limited to: (1) extensive work preparing the initial Complaints and the subsequent Consolidated Amended Complaint; (2) briefing and prevailing against Defendant's Motion to Dismiss; (3) extensive consultation and analysis with experts on antitrust issues, (4) participating in over 150 depositions; (5) briefing Plaintiffs' Motion for Class Certification; and (6) exhaustive, extensive, and protracted hard-fought settlement negotiations.

III.

ARGUMENT

**Counsel writes:** A.Plaintiffs' Counsel Should Be Awarded a Fee from the Settlement Fund 7 The Court Should Award Attorney Fees Using the Percentage of the Fund Approach The Requested Percentage Is Appropriate When Compared to the Range of Percentage-of-Fund Awards

3. Consideration of the Relevant Factors Justifies an Award of One-Third in this Case Courts in the Sixth Circuit evaluate the reasonableness of a requested fee percentage award using six factors: (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides. 10 In re Cardizem CD Antitrust Litig., 218 F.R.D. at 533.

**Response:** Since Plaintiffs' Counsel quoted out of the circuit cases in their settlement briefs, objectors will also do the same in the objection.

First though:

**Did any law firm in this litigation agree to percentage recovery amount or a fee cap for any work performed in this case or expenses incurred?**

**Was there anything "understood" that would cause the fee to be less than what is being requested? Let's hear/ see it.**

**Counsel is attempting to unethically double dip at the expense of the class.** What they should have requested was deduct the expenses first than the % amount of the fee is applied (if applicable).

Here is how they want to calculate the fee to keep some for themselves at the expense of the class in this awful settlement. $30 million fund x 33% fee = $9,900,000 for them, then add the $3,500,000 in inflated expenses for a total take from the fund of $13,500,00.00.

**Doing it the right way take the $30,000,000 minus the costs of $3,500,000 first, leaves $26,500,000 x 33% fee equals a fee of $8,745,000.**

**$9,900,000 v $8,745,000 is an overcharge of $1,155,000 to the class.** This overcharge amount should stay in the fund and not go to the lawyers. It's clear there is so much wrong with this proposed settlement the lawyers are not entitled to an unearned bonus of $1,155,000.00. This is "piggyback" and "free pass" class action arising out of the same set of facts and information the government's case was based on, so they face a reduced risk of loss and a reduced burden of discovery and trial so counsel should be entitled to far less than the 25% benchmark used in many circuits in a settlement that is riddled with many errors and is unapprovable in its present state. In fact this settlement is on life support and objectors request the Court pull the plug.

This court can and should opt to use the lodestar method instead of the percentage of fund in this flawed, messed up case. The Seventh Circuit recently issued a ruling had previously suggested to allow district courts to forego use of the percentage

method in circumstances that would result in an over compensation of counsel. *Id.* at *8, *citing Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991).

Significantly, the court acknowledged that the district court could rightfully have considered the actual amount recovered by the class in determining the attorney fee. *Id.* at *8-9, *citing Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007). The "percentage of the fund" calculation method, in which fees are typically limited to 25% of the overall value of a settlement fund. *See Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003). In a settlement class, the amount of attorney's fees to be requested appears on its face to be excessive, the fees were negotiated with the defendant, and the defendant agreed not to object to the fee request as part of the settlement. This type of arrangement is known as a "clear sailing" agreement. Such clear sailing agreements can create an appearance of class counsel putting his interest ahead of the class because of the incentive agreements with the named class members and the size of the attorney fees requested have clouded counsels' vision in this case based on everything that is wrong with it.

At the conclusion of a successful class action, class counsel may apply to the Court for an award of "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). While ordinarily a defendant would never agree to pay more than a fee-shifting claim is worth, in a class action setting there is a risk that class counsel negotiated a class settlement that

under-compensates class members in exchange for defendant's agreement to an inflated fee settlement. *See Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) ("If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the [class] merits provisions."). Furthermore, in the Second Circuit it decided in principle that, in class action cases, fees should be set at "the minimum necessary to litigate the case effectively." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Albany*, 484 F.3d 162 (2d Cir. 2007). In *Arbor Hill* (a case on which retired Justice Sandra Day O'Connor sat by designation), the Second Circuit emphasized that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively," *id.* at 169, and that "the district court unfortunately) bears the burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively." *Id.* at 164. Before *Arbor Hill*, district courts in the Second Circuit and elsewhere focused on the theoretical *upper limit* on attorney's fees, beyond which the fees would shock the conscience, violate the Rules of Professional Conduct, or otherwise be "absurd." *See In re Visa check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d at 522 (describing requested fee of $609 million, which was almost ten times hourly rate, as "absurd"). In light of *Arbor Hill*, however, it is clear that the entire procedure that a district court should follow in trying to ascertain a minimum reasonable fee has fundamentally changed. Rather than starting

with class counsel's requested amount of fees and (possibly) working down from

there, a district court should instead start at zero and move up incrementally until it

arrives at a number that is not unfair to class counsel or the class."The rationale for

the [common fund] doctrine is an equitable one; it prevents unjust enrichment of

those benefitting from a lawsuit without contributing to its costs." Goldberger v.

Integrated Resources , Inc. , 209 F.3d 43, 47 (2d Cir. 2000)(citing Mills v.*Electric*

*Auto-Lite Co.*, 396 U.S. 375, 392(1970)).

Therefore, a common fund attorney's fee award should be set at a level that just

eliminates the last bit of unjust enrichment to the class beneficiaries. To award even

one million dollars more to the attorneys would result in unjust enrichment of the

attorneys at their clients' expense, something that was never contemplated by the

common fund exception. When a district court is evaluating a request for attorney's

fees in a common fund case, it should endeavor to determine that point at which the

class is no longer being unjustly enriched, and the attorneys are not receiving a

windfall. In fulfilling its duty, the court must explain why an attorney's fee that is

less than the one requested by class counsel is inadequate to completely disgorge the

class of any unjust enrichment. Plaintiffs' Counsels has given the class and court no

evidence justifying their request for fees and expenses. Why this Court should

approve a fee of this magnitude other than the fact that they have asked for it, and

only providing half the proof, a well known method of deception, is an entirely

arbitrary and circular methodology is beyond the understanding of the objector's. Finally, the most practically significant reason for ensuring that the fee award is no more than the minimum necessary in this case is that there will likely be a *pro rata* reduction of claim amounts. Claimants like the objectors are highly likely to have their claims reduced if there are insufficient funds to pay all of the claims at their face values like in this case. **Awarding a reasonable fee of $5 million instead of the requested $10 million will go a long way toward minimizing any reductions that may be required, and maximizing the class members recoveries based on this awful pending settlement. The amount is explained in the end of the supplement.**

There is no declaration from Plaintiffs' Counsel that there were no discussions and negotiations of attorney fees, costs and incentive awards for the named plaintiffs and proposed named plaintiffs until after the consideration that class interests were fully resolved first. Objector's state since there was no voluntary denial the damages came last and that makes the settlement poisonous and unapprovable.

Here is another issue. **Why are there multiple firms claiming to represent each person or entity when one counsel is enough?** The first firm with an agreement is the representative of that client. These firms have no right to call their friends and invite them to join in and bill the class to obtain a free windfall. The court needs to look into this wasteful billing issue that is costing the class members millions in

undeserved charges. It is deceitful. Bar claims and an investigation by others more

may be filed and requested at any time.

- Which firms are representing which party in this case?

- How did each firm become a party, became involved or connected to this case?

- Why the involvement and why do they have a right to the settlement funds?

- What are the agreements or retainer spelling out the fee schedule with each client and class counsel? There are agreements, right?

   a. The Value of the Benefit Achieved

**Response: Doesn't seem enough, $60 million+ is better.**

b.The Risks of Litigation and the Contingent nature of the Fee

**Response:** Low risk, government led the way on point. It's a lay down settlement

c. Public Policy Considerations

**Response:** It would be a public policy and public relations failure and nightmare to

even consider approving this failure of a botched law school proposed settlement.

d. The Value of Services on an Hourly Basis.

**Response:** A suggestion is for the Court to begin a review of the possible fee

award by using a starting point should be to use lodestar as a cross check. Many

federal courts, do a "lodestar crosscheck" to determine whether the percentage of

the fund in a settlement is reasonable: does the reasonable hourly rate times the

number of hours spent times a "multiplier" correspond to the request for fees? No it does not.

**Counsel writes:** from Page 13 of motion for fees,

"Because the lodestar is being used merely as a cross-check, it is unnecessary for the Court to delve into each hour of work that was performed by counsel to as certain whether the number of hours reportedly expended was reasonable." In re IPO Sec. Litig., 671 F. Supp. 2d 467, 506 (S.D.N.Y. 2009).

**Response:** Of course they don't want the Court looking at the hourly rates and hours in detail, it's easier to rubber- stamp. The objectors will assist the court in deconstructing this hours and rates incurred by each of the 186 lawyers and non lawyers and expenses line by line that is located at the end of the objection to save the class and court time and expense so everyone can see how usurious, unjust, possibly fraudulent and ludicrous the requested fee and expense request really is compared to the result and rules that are supposed to be followed in this district but were not in this proposed settlement.

**There are no reasonable hourly rates, just usurious rates**

All 186 lawyers AND non-lawyers have billed the class at an average rate of $451.00 an hour for 34,343 hours which according to counsel in its document is

$15,497,960. According to the attached 2014 Economics of Law Practice Attorney Income and Billing Rate Summary Report this fee they claim is equal to all the people billing out as if they are ALL in the 75% percentile of all lawyers which clearly is not the case. At the end of the objection each person had their RATE revised to reflect what they should have charged the class using the applicable 2014 Michigan Bar rate survey status and rate for the Detroit city area based on the information they provided in their submission. This revised rate shows all counsels have billed the class for

34,343 hrs.) for $15,497,960  vs.  Bar rates of  $10,081,262  for an overcharge of $5,416,963  or 34.5%  too high. Somebody call the FBI!

Since they artificially inflated the rates in a coordinated attack on the class fund and the Court itself that 34.5% overcharge or $5,416,963 should be subtracted from their request of 33% of the fund or the $10,000,000. That would give a correct amount of $4,483,037 which is what the objectors claim is the true lodestar. That assumes the hours are all valid, which they are not and will prove it even though we don't have too.

The above amount is less than the 25% benchmark but this case is so far under the benchmark in terms of quality that a $4.4 million fee can easily be justified especially with the Government providing the extraordinary legal effort they put

in. Plaintiffs' counsel would be extremely pleased with 25% but do not qualify for such a rich percentage. Subtract out everything else objectors will show that should reduce the fee down further like minus a million for second mailing, maybe subtract the cost for the first mailing as well, lost interest etc.  Because of the lousy lawyering, lousy results, the US government provided the roadmap at taxpayer expenses, the complaint and amended complaint are exact duplicates of the governments work product, the defendant's motion for dismissal was going nowhere based on the government's win and evidence available on the docket and available on the internet, the poor amount recovered compared to the damages, the one-sided and invalid release agreement that Plaintiffs counsel rolled over and played dead for, the poor plan of allocation, the overbroad release defendant demands, intentionally missing, contradictory information unavailable to class members, and the attempted fraud on the court based on the fees and expenses show counsel is entitled to **no more than $4.4 million in fees and that is even a gift.** The settlement amount for the unnamed class members is really de minuses.

In this case the rates and hours are exaggerated to produce an exaggerated lodestar and get counsel where they want to be. and they should be dismissed with not a penny to them for their attempted fraud on the class and Court.

**Take this one step further. If the rates are intentionally inflated by 34.5% it's logical to assume they inflated the hours also? Logic and common sense say**

yes. If the hours are inflated by 2.5% that is equal 11,220 hours. That's a whole lot of hours and money the class has been ripped off for and the Court should not reward this ploy. The rates and numbers were back ended in to reach the result they wanted to get to. Maybe the Court should approve the settlement and give the lawyers $3 million or how about zero? The number of people includes paralegals, of counsels, associates, non equity partners, equity partners, contract lawyers, senior associates, admin staff and some people that don't even have a job description have bilked the class and to trick the Court into approval in a theft scheme!  All those hours were not needed to obtain this settlement and objectors will show some evidence to that effect.

Class Counsel has not claimed so therefore did not create a document review team whose task it should have been to review and analyze the documents in a economic and efficient manner by establishing coding procedures for electronic review of the documents which would not have allowed class counsel to needlessly run up the costs to the class. Class Counsel seems to have done it the expensive at an average $451.00 an hour with some partners providing document review at $900+ an hour to artificially pad the bill to the determinant of the class and walk away as millionaires in this "busy work" padded bill scheme.

**Each Class Counsel also writes in the "Time and Lodestar Summary" that the invoice is from "Inception through June 30, 2014" but failed to state what the inception date actually is.**

It bears noting that it's apparent that Lead Counsel, prior to its submission to this Court of lodestar information, did not undertake reviewing time records to ensure that work was performed by attorneys with the appropriate level of experience, in particular that junior-level work was performed by junior attorneys, that work was not needlessly duplicated, that billings did not increase post-settlement, that appropriate rates and sound billing judgment was exercised. They did manage to pad the bill by millions, but what are a few extra millions among friends? **What is the policy of each firm as far as rounding up to the nearest 1, 5, 10 or 20 minutes intervals?** That total amount should be deducted from each firm's inflated estimate.

As for the paralegals, they sometime bill for work which is partly secretarial in nature. Some firms in this case included admin hours and other job descriptions, (or those lacking job descriptions entirely), into the lodestar but they know not to do that so why did they include it in the first place? The time spent on clerical functions should not have been billed at a paralegal's rate, and the court should ask for a complete breakdown and disallow for those hours. Oops objectors have already done that work at the end of the objection.

By Ted Frank, Center for Class Action Fairness

Many federal courts, do a "lodestar crosscheck" to determine whether the percentage of the fund in a settlement is reasonable: does the reasonable hourly rate times the number of hours spent times a "multiplier" correspond to the request for fees?

In some cases like this the rates and hours are exaggerated to produce an exaggerated lodestar, like in this case. The idea of the crosscheck is to ensure that class counsel isn't worse off for bringing contingent litigation when they could have been billing paying clients by the hour. (Thus, it is particularly unfair to the class to be billing temporary attorneys doing low-level work and who can be dismissed at no expense as if they are highly-skilled associates on a partnership track. If a $32/hour attorney had the skills such that a law firm could sell his work for $550/hour to a paying client, he wouldn't be a $32/hour attorney; but, again, leave that aside.)

The theory of the multiplier is that the risk of non-payment requires a multiplier of the lodestar rate to incentivize class counsel to bring litigation. This contradicts the Supreme Court's holding in *Kenny A. v. Perdue* that unmultiplied lodestar by itself is a reasonable fee, but we'll leave that aside. (Objectors state the piggyback ride counsel received in this case should void any request for any multiplier and the fee

should be reduced to what counsel can actually prove not what they simply claim without any proof.)

Objector's also state that no bill paying customer would ever agree to pay these artificially inflated fees and expenses and hourly rates on a monthly basis even with a gun to his/her head without being able to see documentation and evidence.

Let's start at the bottom and come up with a figure that shows the lowest amount the class should be expected to spend for this lousy no result, riddled with unfixable errors settlement. Don't subtract the bill from the top down; rather have counsel prove and bill it from the bottom up. The class is being victimized a second time by counsel who should be dismissed along with the named class representatives who failed to do their jobs.

The "lodestar" approach is the proper method for determining the amount of reasonable attorney fees in this case and can be used as a cross check against the percentage of recovery method class counsel wants to use in this case. See *Hensley v. Eckerhart*, 461 U.S. 424 (1983); *see also United States v. Metro. Health Corp.*, No. 02-485, 2005 WL 3434830 (W.D. Mich. 2005) (applying the lodestar approach in determining the reasonableness of an attorneys' fee Award. In making the "lodestar" calculation, "[t]he most useful starting point . . . is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly

rate." *Hensley*, 461 U.S. at 433-434. "The party seeking an award of fees should

submit evidence supporting the hours worked and rates claimed." *Id*. Once the

lodestar is calculated, the fee may be adjusted in consideration of a number of

factors: (1) time and labor; (2) difficulty of the case; (3) skill necessary; (4) the

extent the attorney is precluded from working on other matters; (5) the customary

fee; (6) whether the fee is fixed or contingent; (7) the time limitations; (8) the

amount involved and results obtained; (9) the attorneys' experience, reputation,

and ability; (10) the undesirability of the case; (11) the nature and length of the

attorney-client relationship; and (12) awards in similar cases. *Id*. at 430

## A. Reasonable Hourly Rate

A reasonable hourly billing rate is not what the class is getting in this case. The

hourly rate is generally calculated according to the prevailing market rates in the

relevant community. *Blum v. Stenson*, 46 U.S. 886, 897 (1984). "[T]he burden is

on the fee applicant to produce satisfactory evidence–in addition to the attorney's

own affidavits–that the requested rates are in line with those prevailing in the

community for similar services by lawyers of reasonably comparable skill,

experience and reputation." *Id*. at 896 n.11. An attorneys' fee award must be

"adequate to attract competent counsel, but . . . not produce windfalls to attorneys."

*Id*. (internal quotations and citations omitted). In calculating a reasonable hourly

rate, the court considers "prevailing market rates in the relevant community" of

metro-Detroit, Michigan. *Id.* at 897; *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000) (citations omitted) ("[W]hen a counselor has voluntarily agreed to represent a plaintiff in an out-of-town lawsuit, thereby necessitating litigation by that lawyer primarily in the alien locale of the court in which the case is pending, the court should deem the 'relevant community' for fee purposes to constitute the legal community within that court's territorial jurisdiction."). District courts have relied on the State Bar of Michigan Economics of Law Practice survey to determine average billing rates in Michigan, and the Sixth Circuit has approved this practice. *See Lamar Adver. Co. v. Charter Twp. of Van Buren*, 178 F. App'x. 498, 501-02 (6th Cir. 2006).

The 2014 Michigan Bar Survey reports state-wide rates for associates, partners and attorneys specializing in defense work. Because Defendants' local counsel practice in the Detroit area, the court should find that the prevailing rates in Detroit, not Michigan generally, are the appropriate rates to apply to out-of-town counsel in this case, the court "has increased those rates by the percentage difference between the average rate for attorneys practicing in Detroit and the average rate for attorneys practicing state-wide (43%)." *Gratz v. Bollinger*, 353 F. Supp. 2d 929, 948 (E.D. Mich.

About Those Contract Lawyer Fee Markups

State Bar of Michigan

SBM BLOG 08/05/2013

A decision by a federal district judge in a $590M Citigroup shareholder settlement
(2013) has reduced requested attorneys fees by a cool $26 M (from about 16.5% of
the total award to about 12%). One basis for the reduction was the plaintiffs'
lawyers markup in costs between what they paid for contract lawyer work and
what they asked for in attorneys fees.  Here's the decision's summary of the
reductions:

1)   $4 million in time that one plaintiffs' firm expended in an unsuccessful
attempt to become Lead Counsel and now wants the class to pay for that
unsuccessful effort;

2)   $7.5 million for 16,292 hours of attorneys' time spent in pursuing discovery
after the parties reached an agreement to settle their dispute. That time was spent
largely on "document review" by contract attorneys, a full twenty of whom were
hired for the first time on or about the same day the parties notified the Court that
an agreement in principle had been reached;

3)   **A $12 million reduction by applying a reasonable blended hourly rate for
the large number of contract attorneys of $200— rather than the blended rate
submitted by Lead Counsel of $466 per hour—for the 45,300 hours worked by**

contract attorneys; and

4)    A 10% cut from the remaining balance to account for waste and inefficiency which, the Court concludes, a reasonable hypothetical client would not accept. One such unfortunate example is the 157.5 hours for $66,937.50 in requested time spent digesting a single day's deposition.

It is particularly unfair to the class to be billing temporary attorneys doing low-level work document review and who can be dismissed at no expense as if they are highly-skilled associates on a partnership track. **The Court in this case should reduce the hourly rate for the contract lawyers used down to the $200.00 an hour cited above since contract lawyers have no right to be reviewing documents and billing the class for $337 an hour average with the low being $260 and the high being $550 an hour in this case! Objectors revised the contract lawyer fee down in the new revised actual correct $200 an hour figure and is located at the end of the objection.**

 See more at: http://sbmblog.typepad.com/sbm-blog/2013/08/about-those-contract-lawyer-fee-markups.html#sthash.69s9mxOQ.dpuf

Plaintiffs' Counsel also intentionally failed to produce rate charts to the class or court to justify their grossly excessive request based on this poorly negotiated and executed proposed settlement that is full of errors, omissions and mistakes. That is

because they can't justify them in writing and is attempting to force the Court to rubber-stamp the percentage of fee method. The court is intentionally and unwittingly being used as a rubber stamp based on this settlement. In fact it's an insult to the class to say this is a fair, adequate and reasonable class action settlement, it's the total opposite, almost like some first year law student would put together at lunch break. Plaintiffs' counsel failed to provide any information what so ever like from National Law Journal survey, Wall Street Journal survey, the Laffey Matrix, The State Bar of Michigan, justifying the hourly rates for the Detroit area, experience of lawyers. We the class have nothing. Objectors believe that counsels will now use in their final motion for approval the numbers from the State of Bar of Michigan 2014 survey which is what the Court should use and the objectors have used. That will prove objectors claim that the hourly fees are at a minimum of $157.00 per hour too high. Objectors believe counsel will attempt to say "oops we forgot "but the damage is already done, no $10 million or even $7.5 million is not even on the board counsel. The class counsel "piggybacks" and gets a "free pass" on the United States Government's and State of Michigan's work, don't give them any credit for all the work and slyly attempts to bill as if they did everything and no one else was involved. **If there were no DOJ suit no Shane Group v. defendant, right?** Even with all that help they still managed to muck this thing up, possibly forever.

Hourly rates to be figured are based on the district court location for the largest and nearest city the firm(s) are located in. (Attached is the 2014 State Bar of Michigan Attorney Income and Billing Rate summary report.) Everyone knows this should be used as a guide, this is a given except these eighteen law firms? Ignorance is no excuse in a court of law for lawyers, a free pass with no consequences if attempted to overcharge? Why is and what would be the purpose of intentionally playing stupid? It's not about overcharging, is it?

With lodestar they can't use non lawyers and support staff in their calculations, but they did. They know that but are attempting to pull off a possible fraud on the Court and get a poor settlement approved using trickery and deceit. Some counsel even made math mistakes in their hours and rate calculations making the totals incorrect and misleading. Here some gems the objectors found when matching names of the alleged 186 attorneys and job descriptions on the on the sworn fee declarations to the website of each firm on October 3, 2014. This is why class counsels did not want to break it all down, but objectors have. What an enterprise that is going on against the class. It appears we may have "Ghost Lawyers" billing the class.

Examples of questionable billings:

One lawyer Eric Goldstein who appears to be no longer at a firm of Johnston, Sztykiel, Hunt, Goldstein, Fitzgibbons & Clifford appears to be billing the class personally and separately as a individual lawyer for work he did while there and using the old firms name plate in the fee submission. Who allowed him to do this in this way Plaintiffs Counsel?  He appears to be using a cell phone number and personal email address for contact. They don't pay him personally $595 an hour but he appears to be is billing as a individual lawyer. The lawyer has not claimed in the settlement papers he was wrongfully discharged by the firm so no lien for services so no money, period. Sanctions are in order.

Another lawyer who was employed at one of the Plaintiffs'Counsel's firm's, The Miller Law Firm racked up hours for them then  allegedly started his own firm and has obviously been given what appears to be a blank check by The Miller Firm to magically bill the class has the equity head of his own new three person firm at usurious rates! Who authorized this, named plaintiffs, Plaintiffs' Counsel take a vote? The Fink lawyer has not claimed in the settlement papers he was wrongfully discharged by the firm so no lien for services so no money, period. Does the Miller Firm and the other Plaintiffs' Counsel's have the right to hire friends or anyone they want to simply run up

a bill to the victimized class. Sanctions are in order and no fees for either firm, they should both be dismissed.

There is another Plaintiffs' firm Cohen Milstein where according to their website as of August 03, 2014 have billed out four attorneys at a higher job status  classification and so higher rates then the level they are at according to their own website. Three lawyers, D.B., B.S., and J.P. are all staff attorneys and are billed as associates. One employee A.G. appears to be a relatively new employee to the firm with a name, picture and bio and has a title of "Discovery Counsel" but is classified as a contract attorney being billed at $420 an hour! It appears fraud may be involved.

A large number of the lawyers that billed the class for six figure amounts appear not to be with many firms any longer, very strange. These missing lawyers that may have not existed have collectively billed the class for millions. One firm has approximately 33% of the lawyers billing the class are not on the website. Objectors are excluding CA's etc.

Another Plaintiffs' Firm, Wolf Haldenstein etc. claims to have had a partner named M.F. that billed the class for $628,000.00 who is not on the website.

Two other attorneys that alleg... belonged to Wolf Haldenstein have a job status of "O" billed the class for several hundred thousand dollars and are not listed on the firm's web site. What is "O"

The last Plaintiffs' Firm Gustafson Glueck PLLC included in the lodestar almost $10,000.00 for work done by an office manager, receptionist, and an executive assistant. Proof of untrustworthiness.

One firm rents office space from Plaintiffs's Counsel's own building and ends up on the same case? Maybe Plaintiffs' Counsel invited them in on the case so they could both get free money. Are they related somehow? Needs to be investigated.

Are there "Ghost Attorney's" billing the class?

They all need to be dismissed and not a penny for any of them.

Neither the firm that is part of Plaintiffs' Counsel nor the new hired firm disclosed a conflict of possible double billing issue in their sworn under penalty of perjury billing. Both firms involved should be dismissed as inadequate and all Plaintiffs Counsel should be removed. Rules of professional practice may have been violated and an investigation by the state bar should be initiated because of this possible fraud on the class and the Court. Sanctions including removal from this case are in order with not a penny going to any of the firms involved. Class counsel should all

be dismissed because they all read over each other's declarations and billings and said nothing regarding this possible fraud and the inflated rates and expenses they were using and see being used. As officers of the court they had a duty to disclose this to the court voluntary, to the class and the named plaintiffs. In fact they had a duty to report themselves to someone (the judge in this case) or some entity that they were going to try and attempt to defraud the class and commit possible fraud on the Court before attempting it! They are guilty while they were planning and guilty after they implemented their plan. Two other firm's have shared and billed the same attorney that has billed the class twice, one invoice for each firm.

Where are the cv;s for all the firms and all lawyers in this case that should have been attached to the settlement papers and filed on the website for the entire class to see and review? A first year associate gets to bill the same as a ten year associate or an equity partner? Don't tell the objectors they all feel like equity partners and fee ENTITLED to bill like one.

Objectors state the clearly the rates almost all but a handful of attorneys have charged the class are used car dealer, Ponzi scheme, greasy hair possibly fraudulent and clearly way over the Michigan State bar published rates for billing in this district. The lawyers all know this, still do it and there is no penalty for attempting to do this! The objectors would be fired and sued if this was done to a client. The lawyers are attempting to bill unjustified and unreasonable rates that do

not apply to this area. The padded hours and rates shock the conscience of anyone once the numbers are broken down and the applicable reasonable rates and hours test are applied. Counsels provide no resume per firm, per attorney, years experience etc. The burden is on counsel to justify it's fee not for the objectors to disprove it.

**If a firm does not have a signed retainer agreement they cannot bill the class for anything and the Court should delete all submissions from the final number, if any is ever awarded.**

The number of hours claimed is way too high. There is insufficient detail to determine if all hours are billed properly for the tasks claimed. "Block billing" is typically a reduction of 50% due to the extraordinary efforts of the U.S Justice Department and State of Michigan. Class counsel is exaggerating their efforts and attempting to inflate their hours worked and rates claimed. For example the Court should request that all counsel billing time sheets to be reviewed say by a Special Master under Rule 54. Counsel has provided on its own in sworn decelerations the reasons to question their own accuracy as it applies to the entire fee and expense. In Plaintiffs' Counsels' Motion Of Attorney Fees document #155 page 3 paragraph 7. Class counsel states under penalty of perjury that the following is true and correct: