## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THE SHANE GROUP, INC., *et al.*,<br><br>Plaintiffs, on behalf of themselves and all others similarly situated,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>Defendant. | Civil Action No. 2:10-cv-14360-DPH-MKM<br><br>Judge Denise Page Hood<br>Magistrate Judge Mona K. Majzoub |

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION

1

For the reasons set forth in the attached Memorandum of Law in support of this Motion, Plaintiffs The Shane Group, Inc., Bradley A. Veneberg, Michigan Regional Council of Carpenters Employee Benefits Fund, Abatement Workers National Health and Welfare Fund, Monroe Plumbers & Pipefitter Local 671 Welfare Fund, Scott Steele, Anne Patrice Noah, and Susan Baynard submit this Motion for Final Approval of Settlement and Plan of Allocation, and respectfully request that the Court enter the Proposed Final Approval Order attached as Exhibit A.

Dated: October 24, 2014                    Respectfully submitted,

                                           /s/ Daniel E. Gustafson
                                           Daniel E. Gustafson
                                           Daniel C. Hedlund
                                           Daniel J. Nordin
                                           **GUSTAFSON GLUEK PLLC**
                                           Canadian Pacific Plaza
                                           120 South Sixth Street, Suite 2600
                                           Minneapolis, MN 55402
                                           Telephone: (612) 333-8844
                                           dgustafson@gustafsongluek.com
                                           dhedlund@gustafsongluek.com
                                           dnordin@gustafsongluek.com

                                           Daniel A. Small
                                           Brent W. Johnson
                                           **COHEN MILSTEIN SELLERS**
                                           **    & TOLL PLLC**
                                           1100 New York Avenue, NW, Suite 500
                                           Washington, DC 20005
                                           Telephone: (202) 408-4600
                                           dsmall@cohenmilstein.com

bjohnson@cohenmilstein.com

E. Powell Miller
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan  48307
Telephone: (248) 841-2200
epm@millerlawpc.com

Fred T. Isquith
**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLC**
270 Madison Avenue
New York, New York, 10016
Telephone: (212) 545-4690
isquith@whafh.com

Theodore B. Bell
**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Telephone: (312) 984-0000
tbell@whafh.com

*Interim Class Counsel*

David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Rd, Suite 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com

*Interim Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2014, I electronically filed the *Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation* with the Clerk of the Court using the ECF, who in turn sent notice to counsel of record for all parties and for the Varnum Objectors. Additionally, I served a copy of that document by first-class mail on each of the following individuals who have not registered with ECF:

Christopher Andrews
P.O. Box 530394
Livonia, MI 48152-0394

Scott Mancinelli
P.O. Box 3266
Holland, MI 49422-3266

Nicholas and Coralin Davelaar
405 Turrentine Way
Russellville, AR 72801

Cynthia S. Rock
18357 Levan Rd.
Livonia, MI 48152

Ronald D. Diebel
19177 Cheshire Street
Detroit, MI 48236

David VanDaele
9812 Ferder Road
Maybee, MI 49815

John M. Kunitzer
4328 Lakecress Drive East
Saginaw, MI 48603

/s/ Daniel E. Gustafson
Daniel E. Gustafson

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| THE SHANE GROUP, INC., *et al.*,<br><br>Plaintiffs, on behalf of themselves and all others similarly situated,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>Defendant. | Civil Action No. 2:10-cv-14360-DPH-MKM<br><br><br>Judge Denise Page Hood<br>Magistrate Judge Mona K. Majzoub |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION

## TABLE OF CONTENTS

Page

STATEMENT OF ISSUES PRESENTED..................................................................... vi

CONTROLLING AUTHORITY .................................................................................. vii

I.   BACKGROUND ............................................................................................... 3
     A.   Litigation Prior to Settlement.................................................................. 3
     B.   Settlement Negotiations........................................................................... 5
     C.   Settlement Agreement.............................................................................. 6
     D.   Settlement Notice .................................................................................... 7

II.  LEGAL STANDARD......................................................................................... 9

III. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ......................... 11
     A.   The Likelihood of Success and the Potential Recovery........................ 11
     B.   The Risk of Fraud or Collusion ............................................................ 14
     C.   The Complexity, Expense, and Likely Duration of the Litigation ....... 16
     D.   The Amount of Discovery Engaged in by the Parties............................ 17
     E.   The Opinions of Class Counsel and Class Representatives................... 18
     F.   The Reaction of Absent Class Members................................................ 19
     G.   The Public Interest ................................................................................ 21
     H.   Whether the Settlement Gives Preferential Treatment to Named Plaintiffs
          but Only Perfunctory Relief to Unnamed Class Members ................... 21

IV.  THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE ......... 24

V.   THE OBJECTORS' ARGUMENTS ARE WITHOUT MERIT ................................. 27
     A.   John Kunitzer ........................................................................................ 27
     B.   Scott Mancinelli..................................................................................... 27
     C.   Varnum Objectors.................................................................................. 28
     D.   Christopher Andrews ............................................................................. 32

VI.  CONCLUSION................................................................................................ 37

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

Cases

*Baker v. Dolgencorp, Inc.*,
    818 F. Supp. 2d 940 (E.D. Va. 2011) ......................................................................31

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)...............................................................................................10, 11

*Churchill Vill., LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ............................................................................19, 20

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001).......................................................................................20

*Dennis v. Kellogg Co.*,
    697 F.3d 868 (9th Cir. 2012) ...................................................................................28

*Dick v. Sprint Commc'ns Co.*,
    297 F.R.D. 283 (W.D. Ky. 2014)...............................................................................9

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010)......................................................................................9

*Falkner v. United States*,
    No. 11-cv-2982, 2012 WL 2682789 (W.D. Tenn. July 6, 2012)..............................33

*Fidel v. Farley*,
    534 F.3d 508 (6th Cir. 2008) ...................................................................................28

*Garner v. State Farm Mut. Auto. Ins.*,
    No. 08-cv-1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)..............................19

*Gascho v. Global Fitness Holdings, LLC*,
    No. 11-cv-436, 2014 WL 1350509 (S.D. Ohio Apr. 4, 2014)..................................22

*Granada Inv., Inc. v. DWG Corp.*,
    962 F.2d 1203 (6th Cir. 1992) .................................................................................21

*Hadix v. Johnson*,
    322 F.3d 895 (6th Cir. 2003) .................................................................................. 22

*Health Alliance Plan of Mich. v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*,
    No. 14-cv-13788-LPZ (E.D. Mich.) ........................................................................20

# TABLE OF AUTHORITIES

Page

*In re Art Materials Antitrust Litig.*,
  100 F.R.D. 367 (N.D. Ohio 1983) ......................................................................12

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) .....................................................................21

*In re Cardizem CD Antitrust Litig.*,
  391 F.3d 812 (6th Cir. 2004) ..............................................................................37

*In re Domestic Air. Transp. Antitrust Litig.*,
  144 F.R.D. 421 (N.D. Ga. 1992) ........................................................................31

*In re Dry Max Pampers Litigation*,
  724 F.3d 713, 718, 721 (6th Cir. 2013) ..............................................................23

*In re Heritage Bond Litig.*,
  No. 02-md-1475, 2005 WL 1594403 (N.D. Cal. June 10, 2005) ........................25

*In re Linerboard Antitrust Litig.*,
  No. MDL 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) .........................12, 16

*In re Mut. Funds Inv. Litig.*,
  No. 04-md-15863, 2011 WL 1102999 (D. Md. Mar. 23, 2011)...........................26

*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................14

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y.1997) .........................................................................25

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
  986 F. Supp. 2d 207 (E.D.N.Y. 2013) ................................................................20

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ................................................................................4

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
  535 F. Supp. 2d 249 (D.N.H. 2007).....................................................................34

*In re Urethane Antitrust Litigation*,
  No. 04-md-1616 (D. Kan.)...................................................................................16

*In re Wal-Mart Wage & Hour Emp. Practices Litig.*,
  No. 06-cv-00225, 2010 WL 786513 (D. Nev. Mar. 8, 2010) .............................37

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*In re Wellbutrin XL Antitrust Litig.*,
   No. 08-2431, 2011 WL 3563385 (E.D. Pa. Aug. 11, 2011) ........................................4

*IUE-CWA v. Gen. Motors Corp.*,
   238 F.R.D. 583 (E.D. Mich. 2006) ......................................................................18

*Kinder v. Nw. Bank*,
   No. 10-cv-405, 2013 WL 1914519 (W.D. Mich. Apr. 15, 2013) ......................9, 10

*Laguna v. Coverall N. Am., Inc.*
   753 F.3d 918 (9th Cir. 2014) ...............................................................................15

*Liberte Capital Grp. v. Capwill*,
   No. 99-cv-818, 2007 WL 2492461 (N.D. Ohio Aug. 29, 2007)............................22

*Lindsey v. Memphis-Shelby Cnty. Airport Auth.*,
   229 F.3d 1150 (6th Cir. 2000) (unpub. op.)........................................................13

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ..............................................................................11

*Olden v. Gardner*,
   294 F. App'x 210 (6th Cir. 2008) (unpub. op.)..........................................11, 17, 18

*Olden v. LaFarge Corp.*,
   472 F. Supp. 2d 922 (E.D. Mich. 2007)................................................................9

*Rankin v. Rots*,
   No. 02-cv-71045, 2006 WL 1876538 (E.D. Mich. June 27, 2006) ......................10

*Robinson v. Shelby Cnty. Bd. of Educ.*,
   566 F.3d 642 (6th Cir. 2009) ................................................................................9

*Rodriguez v. West Pub'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ..............................................................................12

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) ..............................................................25, 28

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
   No. 03-cv-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005)..............................12

*Taft v. Ackermans*,
   No. 02-cv-7951, 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) ..............................24

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*Thacker v. Chesapeake Appalachia, L.L.C.*,
    695 F. Supp. 2d 521 (E.D. Ky. 2010) ................................................................24

*UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) ............................................................... *passim*

*United States v. Blue Cross Blue Shield of Mich.*,
    No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010) ("Gov't Case"), ECF No. 1 .........................3, 4

*Varacallo v. Mass. Mut. Life Ins. Co.*,
    226 F.R.D. 207 (D.N.J. 2005)................................................................35

*Vassalle v. Midland Funding LLC*,
    708 F.3d 747 (6th Cir. 2013) ................................................................10, 23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)................................................................15, 1

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ................................................................ 10, 18

**FEDERAL RULES**

Federal Rule of Civil Procedure 23 ................................................................ *passim*

**OTHER AUTHORITIES**

Alba Conte & Herbert Newberg, Newberg on Class Actions § 11.41 (4th ed. 2002)..................21

*Crain's Detroit Business*, Oct. 20, 2014, *available at*
    http://www.crainsdetroit.com/mobile/article/20141020/BLOG011/141029984....................28

Jim Croce, "Bad Bad Leroy Brown," *Life and Times* (1973).......................................35

## STATEMENT OF ISSUES PRESENTED

1.    Is the Settlement fair, reasonable, and adequate?

      Class Counsel's answer: **Yes.**

2.    Is the Plan of Allocation fair, reasonable, and adequate?

      Class Counsel's answer: **Yes.**

## **CONTROLLING AUTHORITY**

*Hadix v. Johnson*, 322 F.3d 895 (6th Cir. 2003)

*UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)

Plaintiffs[1] respectfully move for final approval of the Settlement preliminarily approved by the Court on June 26, 2014. *See* Dkt. No. 151.[2] For the reasons set forth below, the Settlement is fair, reasonable and adequate, and therefore should be approved under Federal Rule of Civil Procedure 23(e).

The Settlement creates a common fund of approximately $30,000,000. This is an excellent recovery for the class. It recovers more than 25 percent of the damages estimated for class certification by a highly qualified Ph.D. economist based on sophisticated statistical analysis of millions of purchases of hospital services. Recoveries of this magnitude—and much less—have been approved in countless antitrust class actions, including in many cases with far less challenging impact, damages, and class certification issues. Moreover, this settlement was reached after three and a half years of hard-fought litigation, production of millions of pages of documents, depositions of 169 witnesses, analysis of many terabytes of data, expert reports submitted by Plaintiffs and Defendant Blue Cross Blue Shield of Michigan ("BCBSM"), briefing of several motions, and well over a year of on-and-off settlement negotiations. Plaintiffs' counsel, who have litigated scores of

---

[1] "Plaintiffs" are The Shane Group, Inc., Michigan Regional Council of Carpenters Employee Benefits Fund, Abatement Workers National Health and Welfare Fund, Monroe Plumbers & Pipefitter Local 671 Welfare Fund, Susan Baynard, Anne Patrice Noah, Bradley Veneberg, and Scott Steele.

[2] All docket numbers are to the ECF docket in this case, No. 10-cv-14360, unless otherwise noted.

1

complex antitrust actions, had an unusually strong basis on which to evaluate the settlement.

There are *no* indicia of unfairness to class members. Plaintiffs' counsel invested $3.5 million of their own money and over $15 million of their time in this case with no guarantee—even as of today—that they will be paid a single penny. The Court—not Plaintiffs, their counsel, or BCBSM—decides what Class Counsel will get paid. Plaintiffs' counsel's *request* to be reimbursed for expenses and paid for a portion of their time when their efforts produced a class-wide recovery, far from demonstrating collusion with BCBSM, is authorized by abundant case law.

The Settlement Class is enormous. Plaintiffs estimate that it contains as many as 7 million members, roughly 3 million of whom received direct notice.[3] Only 1,511 potential class members opted out (about 0.02 percent of the class) and just four objections were filed, one of which was subsequently withdrawn. Only a *single* opt-out has filed an individual lawsuit in an attempt to obtain a better recovery; all of the others appear to have opted out because they do not want to participate in a class action. In contrast, thousands of individuals and some of the largest employers, unions, and insurance companies in Michigan are submitting claims to share in the recovery. The favorable class member response is another

---

[3] The exact number is unknown, because some of the approximately 7 million purchasers of hospital services either owed nothing (because another payor paid the entire amount) or did not pay their obligated amount.

factor strongly supporting settlement approval.

## I.   BACKGROUND

The procedural history of this case and the terms of the settlement were laid out in detail in the Memorandum in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, Certification of Settlement Class, and Related Relief ("PA Mot."). *See* Dkt. No. 148 at 3-7. Because the Court is well versed in the history of the litigation, Plaintiffs will discuss only certain salient details here.

### A.   Litigation Prior to Settlement

In October 2010, the Department of Justice ("DOJ") and the State of Michigan ("State") filed a complaint alleging that BCBSM had market power in the market for "the sale of commercial health insurance" in 17 geographic markets in Michigan and inserted Most Favored Nation ("MFN") provisions in its contracts with at least 70 Michigan hospitals, resulting in anticompetitive effects in those specific markets. Compl. ¶¶ 28, 33, 86, *United States v. Blue Cross Blue Shield of Mich.*, No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010) ("Gov't Case"), ECF No. 1. The Government Case did not seek damages or certification of a class.

That same month, the first class action lawsuit related to BCBSM's MFNs was filed. *See* Dkt. No. 1. Unlike the Government Case, this complaint (and all successive class action complaints) sought overcharge damages on purchases of hospital healthcare services and certification of a class of direct purchasers.

3

Thereafter, Plaintiffs participated in extensive fact discovery in coordination with the Government Case and a competitor suit brought by Aetna. This discovery comprised millions of pages of documents, 169 depositions, and years of hospital payment data. *See* PA Mot. at 4. While discovery was ongoing, the State passed a law banning any payors' use of MFNs in contracts with health care providers, leading the DOJ and the State to first stay their case and then dismiss it altogether. *See* Gov't Case, Dkt. No. 240, 245, 246. At this time, class-related fact discovery was incomplete, expert discovery had not begun, summary judgment had not been briefed, and the case had not been tried. *See* Gov't Case, ECF No. 120.

Plaintiffs continued to litigate after DOJ and the State dismissed their case, proceeding with discovery, expert analysis, and briefing for class certification. Plaintiffs worked closely with Ph.D. economist Jeffrey J. Leitzinger, an industrial organization expert with decades of experience analyzing antitrust claims, whose work has been found reliable by numerous federal and state courts, to develop and implement a damages model. *See, e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008) (affirming finding that Dr. Leitzinger's testimony was reliable); *In re Wellbutrin XL Antitrust Litig.*, No. 08- 2431, 2011 WL 3563385, at *2 n.1 (E.D. Pa. Aug. 11, 2011) (describing Dr. Leitzinger as "highly qualified"). Dr. Leitzinger's damages estimate was and is the *only* estimate of the amount hospital prices were inflated as a result of BCBSM's challenged conduct.

4

Dr. Leitzinger's substantial and sophisticated analysis provides more than a sufficient basis for determining the adequacy of this settlement. His analysis proceeded in three steps. First, he examined how reimbursement rates changed after the MFN went into effect, or when Priority, Health Alliance Plan ("HAP"), or Aetna negotiated new reimbursement rates thereafter. Expert Report of Jeffrey Leitzinger, Oct. 21, 2013, ¶¶ 47-50 & Ex. 6, Dkt. No. 133. Second, he compared those insurers' new, post-MFN reimbursement rates to BCBSM's reimbursement rates to see whether the new rates complied with the MFN. *Id.* Third, he used a difference-in-differences regression analysis to compare the change in actual reimbursement rates at affected hospitals with the change in actual reimbursement rates paid by the same insurers at similar hospitals in Michigan under contracts without an MFN provision. *Id.* ¶¶ 51-57. In his regression, he included variables to control for differences among hospitals such as complexity of care, costs, insurers' billed amounts, and location. *Id.* ¶ 55. His regression used terabytes of data from BCBSM, Priority, HAP, and Aetna that covered over 60 million claims.

After Plaintiffs filed their class certification brief and expert report, BCBSM opposed certification on numerous grounds, filed its own expert report, and moved to exclude Dr. Leitzinger's opinions. Both experts were deposed. *See* PA Mot. at 5.

## B.   Settlement Negotiations

While Plaintiffs were drafting their reply brief in support of their motion for

class certification, the parties reached a settlement in principle. As outlined in the October 24, 2014 Declaration of Daniel A. Small ("Small Decl."), settlement discussions had occurred intermittently for over a year, with BCBSM refusing even to make an offer for nearly a year and then making a "nuisance value" offer that was unworthy of consideration. *See* Ex. B, Small Decl. ¶¶ 11. At all times, the parties negotiated aggressively and at arm's length. *Id.* ¶ 15.

### C.   Settlement Agreement

The terms of the Settlement were laid out in detail in the motion for preliminary approval. *See* PA Mot. at 5-7. In brief, the Settlement creates a common fund of $29,990,000 for the benefit of the Settlement Class. The Settlement contains no guarantee of any attorneys' fees or incentive awards and is not conditioned on any particular award to either Class Counsel or the named Plaintiffs; rather, it provides only that Plaintiffs will petition the Court for such awards and BCBSM will not oppose Plaintiffs' request up to a certain threshold. Class Action Settlement Agreement ("Settlement"), June 23, 2014, Dkt. No. 148-1, at ¶ 71. After the Court determines the appropriate amount of attorneys' fees, expenses, and incentive awards, the fund will be distributed according to a Plan of Allocation that reflects Class Counsel's and Dr. Leitzinger's best estimate of the relative likelihood that purchasers of a given hospital's services would be able to prove damages at trial. *See* PA Mot. at 23-25. If enough of the pro rata awards in

6

the third category are too small to justify distribution, the amounts that would have gone to those class members will instead be distributed to the health care charity Free Clinics of Michigan. *See* PA Mot. at 24.

In return for this $29,990,000 relief, Settlement Class members release claims related to BCBSM's MFNs. They do not release any other claims against BCBSM or any unrelated entities. *See* Settlement ¶ 58.

The Court certified the Settlement Class, approved the Notice Plan and the Claim Form, and preliminarily approved the Settlement, including the Plan of Allocation, on June 26, 2014. Dkt. No. 151.

### D.   Settlement Notice

Pursuant to the Notice Plan approved by the Court, the nationally recognized settlement administrator Epiq mailed out nearly three million notices to individuals insured by Michigan health plans and third-party payors. Decl. of Charles Marr, Oct. 10, 2014, Dkt. No. 162-1, ¶ 4. To reach Settlement Class Members outside this group, the advertising and notification specialist Kinsella Media also ran advertisements in 24 print publications and websites providing 29 million impressions. *See* Decl. of Shannon R. Wheatman, Ph.D., June 23, 2014, Dkt. No. 148-2, ¶¶ 26-27; Decl. of Shannon R. Wheatman, Ph.D., Sept. 9, 2014, Dkt. No. 162-2, ¶ 10. This distribution likely reached 82.9% of adults in Michigan an average of 2.2 times per person. *See* Dkt. No. 162-2, ¶ 12.

The notices directed Settlement Class members to a website and toll-free phone number for additional information and claims forms. As of October 17, over 100,000 individuals had visited the website and nearly 85,000 calls were made to the information hotline, leading to more than 380,000 minutes of call time— including over 200,000 minutes with a live operator trained specifically to respond to inquiries commonly asked by members of this particular Settlement Class. *See* Ex C, Oct. 24, 2014 Decl. of Charles Marr ("Marr Decl."), ¶ 22. Based on class member and other input, Epiq and Class Counsel worked to improve responses and, if necessary, adjust the information on the website and the claims forms, with notice to or input from BCBSM and/or the Court where appropriate.

As of October 17, nearly 50,000 individuals had requested claim forms, 8,275 of whom have filed claims. *Id.* ¶ 8. An additional 17,717 individuals had submitted claims electronically. Similarly, insurers and self-insured entities had filed 76 claims. *Id.* ¶ 9. Only 1,518 class members requested exclusion,[4] and just four objections[5] were filed with the Court, one of which was withdrawn. *Id.* ¶ 17.

---

[4] As discussed below, many of these requests were made by members of one corporate family, such as Aetna. *See infra* p. 19. Of the 1,518 opt-out requests, only 1,103 were complete and timely filed as required by the Court's Preliminary Approval Order. *See* Marr Decl. ¶ 17; Dkt. 151 ¶ 11.

[5] The objectors are John Kunitzer; Christopher Andrews (purporting to represent himself, Michael Andrews, Cathy Waltz, and Ronald Waltz); Scott Mancinelli; and 26 entities represented by Varnum LLP (the "Varnum Objectors"). *See* Dkt. Nos. 158-61. As discussed below, Mr. Kunitzer has asked to withdraw his objection. Additionally, Class Counsel received four letters about the Settlement.

## II.   LEGAL STANDARD

"Before approving a settlement, a district court must conclude that it is 'fair, reasonable, and adequate.'" *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting Fed. R. Civ. P. 23(e)(1)(C)). In applying this test, courts must be mindful of "the federal policy favoring settlement of class actions." *UAW*, 497 F.3d at 632. There is a "strong presumption in favor of voluntary settlements, which is especially strong in class action cases." *Kinder v. Nw. Bank*, No. 10-cv-405, 2013 WL 1914519, at *3 (W.D. Mich. Apr. 15, 2013) (citing *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010)). "[P]ublic policy strongly favors settlement of disputes without litigation. . . . Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." *Robinson v. Shelby Cnty. Bd. of Educ.*, 566 F.3d 642, 648 (6th Cir. 2009).

Thus, while the Court acts as a fiduciary for absent class members, it has a "restricted, tightly focused role," *Dick v. Sprint Commc'ns Co.*, 297 F.R.D. 283, 294 (W.D. Ky. 2014) (quoting *Kinder*, 2013 WL 1914519, at *3), and should not

---

*See* Exs. D-G. Even if these were properly filed, none provides a basis for rejecting the Settlement. One, Cynthia S. Rock, expressly supported the Settlement (but argued for smaller attorneys' fee and incentive awards). A second, Ronald Diebel, made the same objection as Mr. Kunitzer, which is moot for the reasons discussed below. The other two lack standing: David VanDaele is not a class member and Nicholas and Coralin Davelaar unambiguously opted out of the Settlement. *See, e.g.*, *Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 930 (E.D. Mich. 2007). Even if the Court were to consider these letters, they add nothing to the objections discussed below.

9

"substitute its business judgment for that of the parties," *Rankin v. Rots*, No. 02-cv-71045, 2006 WL 1876538, at \*3 (E.D. Mich. June 27, 2006). The Court's main considerations are "the existence of serious questions of law and fact which place the ultimate outcome of the litigation in doubt" and "the vagaries of litigation," comparing "the significance of the immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Id.* Overall, "[c]ourts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also UAW*, 497 F.3d at 631.

The Sixth Circuit has identified seven factors that should be considered in assessing a settlement's propriety: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013) (quoting *UAW*, 497 F.3d at 631). It also asks "whether the settlement 'gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members.'" *Id.* at 755 (quoting *Williams v. Vukovich*, 720 F.2d 909, 925 n.11 (6th Cir. 1983)).

10

## III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

Every one of the relevant factors weighs strongly on the side of approval.

### A.   The Likelihood of Success and the Potential Recovery

The overarching question before the Court is whether the Settlement is fair in light of "plaintiff's likelihood of success on the merits." *UAW*, 497 F.3d at 631 (quoting *Carson*, 450 U.S. at 88 n.14). On this front, the Settlement provides a substantial recovery given the realities of the litigation and the Settlement Class's possible recovery, easily surpassing the "fair, reasonable, and adequate" threshold.

Many class action settlements have been approved before plaintiffs' expert had even analyzed damages. *See, e.g.*, *Olden v. Gardner*, 294 F. App'x 210, 218 (6th Cir. 2008) (unpub. op.) (affirming final approval even though "class counsel negotiated the settlement agreement without first obtaining any expert opinions or engaging in formal discovery"). In contrast, here, Dr. Leitzinger performed a detailed and labor-intensive analysis of damages using very large databases and a well-accepted methodology.[6] Although Plaintiffs had every incentive to prove as high damages as possible and engaged in extensive discovery and analysis in an attempt to do so, Dr. Leitzinger and Plaintiffs determined that damages could be reliably and manageably measured only for purchasers covered by 23 provider

---

[6] Courts have repeatedly approved the use of difference-in-differences regression analyses to assess antitrust impact and damages. *See*, *e.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 810 (7th Cir. 2012).

agreements (out of hundreds of provider agreements with MFN hospitals) at 13 hospitals (out of 70 MFN hospitals), and measured their damages at $118 million. This is far from the multi-billion dollar case hypothesized by the Varnum Objectors, who did *no* damages study at all.

This damages estimate provides a strong basis on which to evaluate the Settlement's adequacy. The Settlement recovers more than 25 percent of this estimate—an excellent result for the class that compares favorably to many other settlements approved in antitrust class actions. *See, e.g.*, *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005) (recovery of 11.4% of damages "compares favorably with the settlements reached in other complex class action lawsuits"); *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004) (collecting antitrust cases in which courts have approved settlements of 5.35% to 28% of estimated damages).[7]

The many hours Class Counsel and their expert studied damages in this case suggest that it would be difficult if not impossible to develop a reliable economic model that would prove more than de minimis damages under other provider

---

[7] In determining the adequacy of an antitrust settlement, "courts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value." *Rodriguez v. West Pub'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009); *see also, e.g.*, *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367 (N.D. Ohio 1983).

agreements. And even if they could marshal such evidence, purchasers under other provider agreements would have no incentive to undertake the very substantial burden and financial cost of attempting to prove a marginal claim.[8]

Furthermore, the many risks of continued litigation cast significant doubt on whether class members would receive *any* recovery. Objectors claim that the Government Case made success a foregone conclusion, but of course the DOJ and the State did not need to obtain class certification, prove that class members paid an overcharge for hospital services, or measure the amount of the overcharge—the most challenging issues in this case. Had BCBSM successfully defeated Plaintiffs' class certification motion (either in the district court or on a Rule 23(f) appeal), excluded Dr. Leitzinger's testimony, or moved for summary judgment, the case may never have reached a jury. While Plaintiffs believed that they would have ultimately won each of these disputes, that outcome was by no means certain.

---

[8] Plaintiffs originally defined a class that included purchasers of healthcare services at all MFN hospitals in Michigan during a five-and-a-half-year period. *See* Consol. Am. Compl. ¶ 26, Dkt. No. 78. This class encompassed all Category 1 and most Category 2 purchases in the Plan of Allocation during this time period. Based on their review of the discovery record and Dr. Leitzinger's analysis, Plaintiffs, when they moved for class certification, narrowed the proposed class to just purchasers covered by the 23 provider agreements. For settlement purposes, BCBSM insisted on a broader class that gives them litigation peace as to any purchaser of healthcare services from a Michigan general acute care hospital, even those with the most tenuous of claims. The Sixth Circuit has expressly affirmed approval orders which, like the Preliminary Approval Order here, "redefin[ed] the class in connection with the settlement . . . result[ing] in the addition of class members." *Lindsey v. Memphis-Shelby Cnty. Airport Auth.*, 229 F.3d 1150, *7 (6th Cir. 2000) (unpub. op.).

13

Moreover, given the complex economic issues in the case, a jury may not have credited Plaintiffs' evidence or may have awarded less than Plaintiffs sought. And even if a jury agreed with Plaintiffs, a single error could undo the entire trial or decertify the class on appeal. As one district court has observed, "the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeed at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998). All told, there was a significant risk that class members would receive *nothing* without a settlement—and that Plaintiffs would be in a weaker settlement position at a later stage, rather than a stronger one. Thus, the recovery of nearly $30 million reflects a substantial victory for Settlement Class members.

### B.    The Risk of Fraud or Collusion

Courts "presum[e] that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands" absent "evidence of improper incentives." *UAW*, 497 F.3d at 628. The history of this hard-fought litigation and the negotiations that produced the Settlement show that the presumption applies fully here.

This Court has had ample opportunity to observe the intensely adversarial nature of this litigation during the nearly four years the parties have been before the Court. BCBSM fought the class action at every turn, and Class Counsel fought

14

back vigorously. The drawn-out settlement negotiations similarly demonstrate the arm's-length, adversarial nature of the parties' relations. *See supra* p. 5-6 & Small Decl. ¶ 11.

The terms of the Settlement themselves refute the idea that this Settlement was the product of fraud or collusion. The Settlement guarantees *nothing at all* to Class Counsel or any of the named Plaintiffs; all awards are placed in the sole discretion of the District Court, as they must be. *See* Settlement ¶ 71. Indeed, Class Counsel had every incentive to obtain (and vigorously pursued) as large a settlement as possible for the Settlement Class, because a larger common fund would mean a larger award to Class Counsel. Class Counsel's interests are thus fully aligned with the Settlement Class's interests, and there is no reason to fear self-dealing, let alone fraud or collusion. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (percentage method "directly aligns the interests of the class and its counsel") (internal quotation marks omitted). The terms of the settlement lack any of the hallmarks of a potentially collusive deal such as "*a promise* of excessive attorney fees," *UAW*, 497 F.3d at 628 (emphasis added) or an agreement to pay attorneys' fees separate from class funds or return unclaimed amounts of a settlement fund to defendant. *See, e.g.*, *Laguna v. Coverall N. Am., Inc.* 753 F.3d 918, 924-25 (9th Cir. 2014).

Finally, Class Counsel include highly competent antitrust class action

15

experts, whose record of zealous and successful representation belies any claim that they would sell out their clients for a quick deal. To take just one example, Class Counsel Cohen Milstein Sellers & Toll PLLC recently won a billion-dollar judgment against Dow Chemical Company after ten years of litigation and a six-week trial in *In re Urethane Antitrust Litigation*, No. 04-md-1616 (D. Kan.); *see also, e.g.*, Dkt. No. 13 at 6-15 (summarizing biographies of Class Counsel). Class Counsel's wealth of experience shows both their aptitude at assessing antitrust cases' value and their commitment to vigorously advancing their clients' interests. In this case in particular, Class Counsel's commitment cannot be seriously questioned. They invested $3.5 million of their money and over $15 million of their time, despite facing substantial risks and a formidable opponent.

## C.    The Complexity, Expense, and Likely Duration of the Litigation

Courts widely recognize that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *10 (E.D. Pa. 2004) (internal quotation marks omitted). As even the Varnum Objectors recognize, "[t]here is no question that antitrust litigation of this size and scope is a complex and expensive process that can take several years to resolve." Varnum Obj., Dkt. No. 161, at 17. This case exemplifies that complexity. It involved discovery from nearly every hospital in Michigan and analysis of seven years of hospital payments. BCBSM contested virtually every

16

possible issue, from the definition of the relevant markets to the mechanics of its MFNs. *See* Dkt. No. 112, ¶¶ 44-53, 76-81. It has been clear throughout the case that BCBSM would defend the litigation vigorously at every turn. And as discussed above, Plaintiffs had several difficult and costly steps to complete before any litigated recovery could be obtained: not only the unfinished class certification briefing and expert discovery, but summary judgment, a likely petition for interlocutory appeal under Rule 23(f), pretrial preparation and motions, the trial itself, and the inevitable post-judgment motions, appeals, and certiorari petition. Given the sizable hurdles in front of Plaintiffs, any recovery outside of this Settlement likely would be years in the offing and highly uncertain.

### D.    The Amount of Discovery Engaged in by the Parties

As the Varnum Objectors state, "Plaintiffs engaged in a very significant amount of discovery in this case." Varnum Obj. at 18. Indeed, millions of pages of documents and multiple terabytes of data were produced, 169 depositions were taken, and competing expert reports were prepared. It is hard to imagine parties in a better position to understand the strengths and weaknesses of this case.

The Varnum Objectors describe this as a "minor factor," without citation, but in fact it is one of the most important. *See, e.g.*, *Olden*, 294 F. App'x at 218 ("The factor that weighs against the settlement most heavily is the limited amount of discovery engaged in by the parties."). Discovery is "essential" to enable "class

17

counsel to develop the merits of their case" and assess "the propriety and fair value of a settlement." *Id.* Because "the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered," *Williams*, 720 F.2d at 922, the "very significant amount of discovery in this case," Varnum Obj. at 18, counsels a "very significant amount" of deference. This factor thus weighs heavily in favor of approval.

### E.    The Opinions of Class Counsel and Class Representatives

In deciding whether a proposed settlement warrants approval, "[t]he judgment of the parties' counsel that the settlement is in the best interest of the settling parties is entitled to significant weight." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 597 (E.D. Mich. 2006) (internal quotation marks omitted). As previously discussed, counsel include national leaders in complex class action litigation, particularly in the field of antitrust, who have a record of zealously advocating for their clients, astutely judging the prospects of a given case, and obtaining the best possible recovery. Their considered judgment after voluminous discovery, expert analysis, and extensive motions practice that the Settlement is the class's best course of action is entitled to considerable deference. *See Williams*, 720 F.2d at 922-23 ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs.").

Similarly, the named Plaintiffs have participated in this case for years. All

18

produced documents, responded to BCBSM's interrogatories, and discussed the case with Class Counsel, and half of them testified in deposition. The named Plaintiffs come from all segments of the Settlement Class: some are individual purchasers, some institutional payors; some made purchases in Category 1, some in Category 2, and some in Category 3. *See* Dkt. No. 124 at 4-5. Each named Plaintiff believes the Settlement serves the class well, and each named Plaintiff has filed or will be filing a claim to be considered along with the rest of the Settlement Class.

### F.     The Reaction of Absent Class Members

The reaction of absent class members similarly weighs heavily in favor of approval. As outlined above, more than 26,000 class members had filed claims as of October 17—and the filing rate is likely to accelerate in the month remaining for submission. *See* Marr Decl. ¶¶ 8-9. This includes many of the largest purchasers of hospital services in Michigan. By contrast, just 1,518 potential class members opted out, approximately 0.02% of the class and 0.05% of those directly notified. Notably, many of these opt-out requests were filed by divisions or subsidiaries of other opt-out class members. For example, 179 requests were filed by Aetna entities. Marr Decl. ¶ 18a. Courts routinely approve cases with a far higher opt-out rate. *See, e.g.*, *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) (opt-out rate of 0.55%); *Garner v. State Farm Mut. Auto. Ins.*, No. 08-cv-1365, 2010 WL 1687832, at *15 (N.D. Cal. Apr. 22, 2010) (0.4%). Moreover, these

19

limited opt outs likely do not reflect dissatisfaction with the amount of the settlement. Only one, HAP, filed an individual action to try to recover more. *See Health Alliance Plan of Mich. v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*, No. 14-cv-13788-LPZ (E.D. Mich.).[9] All of the others appear to have excluded themselves not to try to recover more, but to avoid being part of a class action.

This overwhelming support dwarfs the criticisms of the few objectors. Only four objections were filed, purporting to represent 32 class members; one of these objections was later withdrawn. This too compares favorably to other approved cases. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (where 27,883 notices were sent and 18 objections received, "[t]he District Court properly concluded that this small number of objections weighed in favor of the settlement"); *Churchill Vill.*, 361 F.3d at 577 (90,000 notices and 45 objections); *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 212 (E.D.N.Y. 2013) (approving settlement where "objectors in the aggregate represent 19% of the total transaction volume" and "[m]any of the named plaintiffs in the case are objectors").[10] As discussed below, the objections

---

[9] The exclusion of HAP, one of the largest class members, significantly benefits remaining members of the Settlement Class by increasing the share each claimant will receive. This highlights one of Class Counsel's many negotiating achievements: while many settlement agreements provide defendant a pro rata reduction to account for opt-outs, this Settlement gives BCBSM no discount.

[10] *See generally* Alba Conte & Herbert Newberg, Newberg on Class Actions § 11.41, at 108 (4th ed. 2002) ("[A] certain number of objections are to be expected

themselves lack merit. Accordingly, this factor points strongly toward approval.

### G.  The Public Interest

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 580 (E.D. Mich. 2003) (quoting *Granada Inv., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)). The public interest particularly supports settlement in this case because of the likelihood that personnel from many Michigan hospitals and other third parties would be called to testify at trial. The 169 depositions taken in this case included depositions of over 100 third parties, including employees from dozens of hospitals. BCBSM or Plaintiffs would presumably call many of these witnesses at trial, placing a not insignificant burden on Michigan healthcare providers.

### H.  Whether the Settlement Gives Preferential Treatment to Named Plaintiffs but Only Perfunctory Relief to Unnamed Class Members

Finally, the Settlement neither gives preferential treatment to named Plaintiffs nor perfunctory relief to unnamed class members. Named Plaintiffs have applied for Court-awarded compensation for their service to class members in pursuing this litigation. "Numerous courts have authorized incentive awards. These

---

in a class action with an extensive notice campaign and a potentially large number of class members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

21

courts have stressed that incentive awards are efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) (citations omitted). Although the Sixth Circuit "has never explicitly passed judgment on the appropriateness of incentive awards," it "think[s] there may be circumstances where incentive awards are appropriate." *Id.* at 897-98. Indeed, the Sixth Circuit has approvingly cited cases in which named plaintiffs were awarded as much as $55,000. *Id.*; *see also Liberte Capital Grp. v. Capwill*, No. 99-cv-818, 2007 WL 2492461, at *1 (N.D. Ohio Aug. 29, 2007) ("Incentive awards, where appropriate, generally range from a few thousand dollars to $85,000.").

As explained in Plaintiffs' motion for attorneys' fees, expenses, and service awards, the requested awards are reasonable given the time and resources that named Plaintiffs have devoted to the case, including sizable document productions, responses to written discovery requests, and deposition testimony. Dkt. No. 155 at 19-23. Moreover, "the awards have been tailored to compensate each Class Representative in proportion to his or her actions, time, and effort in prosecuting this action." *Gascho v. Global Fitness Holdings, LLC*, No. 11-cv-436, 2014 WL 1350509, at *27 (S.D. Ohio Apr. 4, 2014), *adopted*, 2014 WL 3543819.

Nor do absent class members receive merely "perfunctory" relief. The Sixth Circuit has expressed concern about perfunctory relief where absent class members

22

received only illusory injunctive relief or were put in a worse position in other litigation. For example, in *In re Dry Max Pampers Litigation*, class members received zero monetary relief and only "illusory" injunctive relief while counsel received $2.73 million without "tak[ing] a single deposition, serv[ing] a single request for written discovery, or even fil[ing] a response to [defendant's] motion to dismiss." 724 F.3d 713, 718, 721 (6th Cir. 2013). In *Vassalle*, the named plaintiffs were exonerated from all debts owed to the defendant while absent class members were instead *forbidden* from opposing collection of their debts with the false affidavits at issue in the suit, putting them in a substantially worse position than if a class action had never been filed. 708 F.3d at 755. Here, a recovery of over 25 percent of the $118 million in estimated damages, especially in light of the risks, burdens, and delay of continued litigation, can hardly be called "perfunctory."

Moreover, as with attorneys' fees, the Settlement is not contingent upon the award of any particular amount to named Plaintiffs, or the award of any amount at all. Named Plaintiffs are guaranteed nothing; rather, the award is wholly in the District Court's discretion. *See* Settlement ¶¶ 11, 71. Thus, even if the requested awards were in any way excessive, the correct remedy would be to reduce the awards, not reject the settlement.[11]

---

[11] Mr. Andrews objects because the short-form notices said Plaintiffs would seek incentive awards of up to $150,000, while they actually sought $165,000. Andrews Supp., Dkt. No. 163 at 95. But the Detailed Notice and Settlement

## IV.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

The Court must also find the method of distributing the settlement fund to be "fair and reasonable." *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 534 (E.D. Ky. 2010). "If the plan of allocation is formulated by competent and experienced class counsel, an allocation plan need only have a reasonable, rational basis." *Taft v. Ackermans*, No. 02-cv-7951, 2007 WL 414493, at *9 (S.D.N.Y. Jan. 31, 2007) (internal quotation marks omitted).

As discussed above, Plaintiffs' and their expert's careful analysis of impact and damages shows that the MFN agreements impacted only a small subset of MFN hospitals—and even then only a limited number of those hospitals' provider agreements. Class members who paid for services for which Plaintiffs were able to measure damages reliably have stronger claims than those who purchased at other hospitals, or under other provider agreements, or in other time periods.

Where all class members were subject to a similar course of conduct, but suffered differing amounts of damages or have differing likelihoods of recovery, settlements need not "offer a pro rata distribution to class members" or "fragment[]

_____

correctly stated that counsel would request "awards of up to $50,000 for each Plaintiff organization and up to $10,000 for each Plaintiff individual, for their services on behalf of the class," consistent with the request. Detailed Notice ¶ 19; *see also* Settlement ¶ 71. As both of these documents and the actual award request were available on the Settlement website, any error in the short-form notices is harmless. In any event, the proper modification would be to reduce the total awards by $15,000, not reject the Settlement or eliminate the awards altogether.

24

the class" into many subclasses. *UAW*, 497 F.3d at 629. Rather, "when real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill. 2011) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.1997)); *see also, e.g.*, *In re Heritage Bond Litig.*, No. 02-md-1475, 2005 WL 1594403, at *11 (N.D. Cal. June 10, 2005) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable. It is also reasonable to allocate more of the settlement to class members with stronger claims on the merits.") (internal quotation marks omitted).

The Plan of Allocation reflects the different values of different claims by placing them in one of three categories. Category 1 purchases are those covered by the 23 provider agreements for which Plaintiffs were able to measure damages; they generated the $118 million in damages estimated by Dr. Leitzinger. Accordingly, most of the Net Settlement Fund (78 percent) will be distributed to class members based on their Category 1 purchases. Category 2 includes purchases at hospitals when an MFN agreement was in effect, but for which Plaintiffs had no reliable evidence of harm or evidence of only de minimis damages. The Plan of Allocation assigns 20 percent of the Net Settlement Fund to these purchases.

25

Category 3 purchases were made when no MFN agreement was in effect. Although BCBSM's conduct conceivably could have had some spillover effect on these purchases, such a damages theory raises difficult legal and factual issues, including whether the harm was too attenuated and whether an appropriate benchmark could be identified. Thus, just two percent of the Net Settlement Fund is allocated to these purchases. Simply stated, the purpose and effect of the Plan of Allocation is to pay more for stronger claims. This is entirely appropriate. *See UAW*, 497 F.3d at 629.

For Category 3 purchases (giving rise to the weakest damages claims), a minimum distribution threshold has been put in place for the purpose of administrative efficiency. It applies only to claimants with Category 3 claims below $10 who do not have any Category 1 or Category 2 purchases—and then only if there are 100 or more such claimants. Their Category 3 payments are too small to distribute and will be made instead to the non-profit organization Free Clinics of Michigan, a charity providing free health care services throughout Michigan. Minimum payment thresholds such as this have repeatedly been approved by courts, often at far larger minimums. *See, e.g.*, *In re Mut. Funds Inv. Litig.*, No. 04-md-15863, 2011 WL 1102999, at *3 (D. Md. Mar. 23, 2011) (collecting cases with minimums as high as $50).

## V.   THE OBJECTORS' ARGUMENTS ARE WITHOUT MERIT

None of the four objections have any merit.

## A.    John Kunitzer

Mr. Kunitzer objected because "most individuals would not have the documents going back to 2006 to support their claims." Dkt. No. 158. As explained by the Settlement Administrator, the requirement that individuals provide a "record" with their claim form showing their purchases was intended to reduce fraud and duplicative awards, but was eliminated early in the claims period. Marr Decl. ¶ 12. When Class Counsel explained the actual requirements to Mr. Kunitzer, he withdrew his objection. Ex. H.[12]

## B.    Scott Mancinelli

Mr. Mancinelli makes three arguments, none of which support rejection. *First*, he criticizes the Settlement for failing to include injunctive relief. Mancinelli Obj., Dkt. No. 160, at 2-3. Injunctive relief was mooted by the State's enactment of a law banning MFNs in contracts between payors and healthcare providers. *Second*, he criticizes the inclusion of a *cy pres* recipient. *Id.* at 3-6. But as discussed above, a *cy pres* recipient was named only to deal with the possibility that some Category 3 payments will be too small and numerous to justify the administrative costs. As Mr. Mancinelli's own authorities note, this is wholly

---

[12] Under Federal Rule of Civil Procedure 23(e)(5), an "objection may be withdrawn only with the court's approval." Accordingly, Plaintiffs respectfully request that the Court grant Mr. Kunitzer's request to withdraw his objection. In any event, Mr. Kunitzer's objection is moot.

2:10-cv-14360-DPH-MKM   Doc # 169   Filed 10/24/14   Pg 40 of 95   Pg ID 5340

permissible "where the proof of individual claims would be burdensome or distribution of damages costly." *Dennis v. Kellogg Co.*, 697 F.3d 868, 865 (9th Cir. 2012). *Third*, he states that he did not receive direct notice (though his daughter did). Mancinelli Obj. at 6-7. However, "[d]ue process does not . . . require *actual* notice to each" absent class member. *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008) (emphasis in original). Mr. Mancinelli makes no argument that the Notice Plan—which was designed by a notice expert and approved by the Court—was insufficient, nor does he suggest any way of improving its reach. And, of course, Mr. Mancinelli himself did not "suffer[] prejudice as a result," *id.* at 515, given that he received and reviewed a notice mailed to a family member.[13]

## C.  Varnum Objectors

A group of 26 companies represented by Varnum LLP filed a single objection, claiming the settlement was not fair, reasonable, and adequate. Each of the Varnum Objectors is suing BCBSM in unrelated litigation, all represented by Varnum. *See* Chad Halcom*,* "U.S. high court declines BCBSM's appeal," *Crain's Detroit Business*, Oct. 20, 2014, *available at* http://www.crainsdetroit.com/mobile/article/20141020/BLOG011/141029984 (noting that Varnum has filed more than 50 suits against BCBSM). The fact that the Varnum Objectors consist solely of

---

[13] Mr. Mancinelli also joins Mr. Kunitzer's objection to the claims process, which, as noted above, is based on a misunderstanding of the claim requirements, was withdrawn by Mr. Kunitzer, and is moot.

companies embroiled in litigation against BCBSM suggests they seek advantage in their other litigation—and, at a minimum, that their views are not representative of the Settlement Class's.

In any event, the Varnum Objection is meritless. Its main argument is that the settlement fund is inadequate in light of the overall amount spent on hospital services in all of Michigan. Varnum Obj. at 1, 4-7. The relevant comparison, however, is against the total *overcharges* attributable to BCBSM's conduct, not total payments for hospital services, especially when there is no evidence that most of the payments generated damages. The $850 million figure bandied about by the Varnum Objectors is over *seven times* greater than the damages that Plaintiffs would hope to prove at trial, and provides no insight into the adequacy of this settlement. The Varnum Objectors similarly point to Aetna's estimate of damages in its competitor case, *id.* at 8-9, 22, but ignore that that damage estimate is based entirely on lost profits for Aetna's sales in the market for commercial group health insurance and diminution of business value, not overcharges for purchases of hospital services. Varnum Obj. Ex. 3 at 2-3. Aetna's lost profits in the sale of commercial health insurance say nothing about the amount of overcharges in the sale of hospital services—which is the only measure of damages Plaintiffs ever

sought in this case.[14]

Based largely on their mistaken assumption that this is "a billion dollar case," the Varnum Objectors claim to see a "risk of fraud and collusion." Varnum Obj. at 9. The Varnum Objectors' basic (if unstated) premise is that Class Counsel simply fabricated their conclusion that $30 million "represents over 25% of the overcharges that Dr. Leitzinger preliminarily estimated." PA Mot. at 9. For the Varnum Objectors' argument to have any shred of merit, Class Counsel and Dr. Leitzinger would have to be crooked enough to cook up a rigged expert report just to give BCBSM an easy settlement—in a case where Class Counsel were supposedly in line for a landmark payday at trial. This suggestion—that Class Counsel and Dr. Leitzinger would jeopardize reputations they have spent decades building while simultaneously hurting their own financial interests, all to benefit their litigation adversary—is as illogical as it is insulting.

The other grounds for this insinuation are equally baseless. The Varnum Objectors complain that much of the material underlying Plaintiffs' assessment of the potential damages and the likelihood of success is under seal. Varnum Obj. at 15-17. But they point to no authority suggesting that the fact that documents or

---

[14] The Varnum Objectors similarly misunderstand the caps in the Plan of Allocation to be an estimate of damages attributable to the MFNs. They were insisted on by BCBSM as a means of limiting the amount of the settlement money any one class member could receive. (In practice, they are unlikely to have any impact on the allocation among claimants.)

expert reports were filed under seal pursuant to a protective order and sealing orders supports an inference of fraud or collusion or justifies second-guessing Plaintiffs' assessment of the value of the case. Their cases are wholly inapposite; the only ones dealing with settlements at all deal with discovery into the *terms* of a settlement, not the evidence informing Plaintiffs' evaluation of the case's merits. *See In re Domestic Air. Transp. Antitrust Litig.*, 144 F.R.D. 421, 425 (N.D. Ga. 1992) (allowing discovery into terms governing certificates awarded as part of the recovery); *Baker v. Dolgencorp, Inc.*, 818 F. Supp. 2d 940, 943 (E.D. Va. 2011) (refusing to seal settlement agreement). The Settlement should not be disturbed just because the Court and parties took steps to protect confidential information.[15]

The Varnum Objectors' final basis for suspecting fraud or collusion is the requested amount of attorneys' fees and service awards. But as discussed previously, the Settlement guaranteed nothing and thus does not suggest fraud or collusion. Quite to the contrary, Class Counsel was incentivized to seek as large a settlement as possible—and did so—because the dollar amount of their attorneys' fees would be correspondingly larger. *See Wal-Mart*, 396 F.3d at 121.

---

[15] Notably, none of the Varnum Objectors contacted Class Counsel before the deadline to opt-out or object, ensuring that their demands for confidential information (even had they any right to it) could not be met before the Fairness Hearing—and undermining their claim that they want information to decide whether to stay in the class. The Varnum Objectors *already chose* to stay in the class, and did not request *any* information before the Court-ordered deadline to make that decision. Class Counsel will respond to the Varnum Objectors' eleventh-hour motion to unseal in a separate brief in due course.

31

The Varnum Objectors also argue that the claims process is unnecessarily burdensome, but misunderstand its requirements. Initially, both claim forms (for individuals and for insurers, self-insured entities, and third-party payors) called for documentation such as "hospital bill(s) or other record(s)" in claims submissions to minimize fraud and duplicative payments.[16] *See* Marr Decl. ¶ 12. After inquiries from several class members, this requirement was determined to be too onerous for individuals, and, within two weeks of the first notices being mailed (and before notice was even completed), eliminated as to individuals, except in cases of suspected fraud. For insurers, self-insured entities, and third-party payors, the documentation requirement can be satisfied by an excerpt from their claims database (an "other record"). Class Counsel, the Settlement Administrator, and the help line operators have worked with many such class members to help them file a claim with the minimum work necessary. The Varnum Objectors never reached out to any of those resources.

### D.    Christopher Andrews

The final objection was filed by a serial objector named Christopher Andrews, who has objected to at least three other class action settlements. *See*

---

[16] Because many hospital purchases are paid in part by those receiving services and in part by third-party payors, duplicative recoveries would occur if claims were made for the entire charge rather than the amount paid by the claimant.

Exs. I-K.[17] In this case, Mr. Andrews timely filed an eight-page objection that conclusorily asserted a "grocery store list of issues" without discussing the actual case or Settlement in any detail. Dkt. No. 159 at 5. He subsequently filed an untimely 220-page "supplement" to his objection two weeks later, and has warned that he may "supplement this objection at any time." Dkt. 163 ("Andrews Supp.") at 19. In the existing supplement, he asserts that Class Counsel's "sneakiness, greed and being a patsy" and lack of "experience, knowledge and resources to adequately represent the class" led them to collude with BCBSM, and accuses Class Counsel of "intentionally inflated" and "high on meth" billing, "malpractice," "[f]raud on the class and court," and "attempted theft." *Id.* at 25, 27, 36, 52, 57. Andrews even asserts that "some people [i.e., Class Counsel] belong in jail" and requests that Class Counsel be sanctioned. *Id.* at 27, 63, 67. As support, he launches often unintelligible attacks on every aspect of the case, concluding that "the best interests of the class have been abused and broken and can't be put back together again." *Id.* at 193.

Despite Mr. Andrews' supposed belief that the Settlement Class could recover "many multiples of $30 million in a better negotiated settlement," *id.* at 23,

---

[17] Mr. Andrews purports to represent three family members, one of whom is the executor of an estate. However, a pro se individual can only represent himself. *See, e.g.*, *Falkner v. United States*, No. 11-cv-2982, 2012 WL 2682789, at *2 (W.D. Tenn. July 6, 2012). Mr. Andrews repeatedly references a "power of attorney," which has no effect here. *See id.*

Mr. Andrews told Class Counsel before filing that he would drop his entire objection if Class Counsel merely reduced their fee request by $990,000—and paid $153,450 to Mr. Andrews. *See* Ex. L at 8. Otherwise, Mr. Andrews would "send a letter to all judges in this district," file "BAR complaints," and otherwise attempt to damage Class Counsel. Ex. M. More recently, he has promised that the fairness hearing will be "full of fireworks." Ex. N.

This appears to be a pattern for Mr. Andrews. In at least two of his recent settlement objections, he has tried to leverage a nuisance objection into a fee for himself. *See* Ex. M at 5-6 (Andrews "submitted a 95-page rambling objection" along with "a surreply and request for fees" the day before a fairness hearing); *id.* at 33 ("He tried to extort a fee from us."); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 262 (D.N.H. 2007) ("Some objectors agreed to withdraw their objections after Co-Lead Counsel offered to compensate them for their services to the class from any attorneys' fee award. . . . Andrews has since resolved this dispute with Co-Lead Counsel and has stipulated to the withdrawal of his objection."); *see also* Ex. L at 5 ("Do not take what was written as personal, it's all business.").[18]

---

[18] Mr. Andrews's previous objections similarly described the case at issue as a "slam dunk," posited an astronomical potential recovery, considered the claims process burdensome and the notice process inadequate, protested the plan of allocation, and accused class counsel of inflated, fraudulent, or "high on drugs" billing. *See, e.g.*, Ex. I at 12-15, 21, 24-28, 30, 35; Ex. J at 10, 24, 36, 44; Ex. K at

Leaving aside Mr. Andrews's apparent motives, his objection is wholly meritless. As demonstrated above, the Settlement easily exceeds the "fair, reasonable, and adequate" standard. Because there is little in Mr. Andrews's abusive 220-page supplement[19] that requires response, Plaintiffs will spare the Court a line-by-line rebuttal and focus on a few key points.

All of Mr. Andrews's main arguments were refuted above. Mr. Andrews claims that the Government Case provided a "'road map' and 'free pass'" to this class action damages suit, Andrews Supp. at 42, but the Government never needed to certify a class or show damages to class members. He declares that damages "seem way underestimated for settlement purposes," but he pulls his numbers from thin air. *Id.* at 41, 66-67. He attacks the Plan of Allocation, claiming that subclasses are needed instead, *id.* at 106-109, but the Sixth Circuit has made it clear that subclasses are unnecessary where a settlement can be equitably apportioned among class members in different positions. *See UAW*, 497 F.3d at 629. And he falsely

---

1, 7-8, 13-15. To Mr. Andrews, every settlement "look[s] like a jigsaw puzzle with a couple of pieces gone." *Compare* Andrews Supp. at 21 *with* Ex. I at 9 (quoting Jim Croce, "Bad Bad Leroy Brown," *Life and Times* (1973)).

[19] Because Mr. Andrews's supplement was untimely, it need not be considered at all. *See, e.g.*, *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 246 (D.N.J. 2005) (collecting cases). Mr. Andrews's belated submission is particularly inexcusable because he was perfectly aware of the Court's deadline, as his timely filing of a generic placeholder objection shows. If the Court requests additional information about any of Mr. Andrews's claims, Class Counsel will be happy to provide it at the Fairness Hearing or in a short supplemental filing.

claims that "fees in this case were tied into the material terms of the settlement as were the incentive awards," Andrews Supp. at 91, when, as discussed above, the Settlement is in no way contingent on the Court's determination of attorneys' fees, expenses, and service awards.[20]

Mr. Andrews also questions the adequacy of the notice and claims process, largely on the basis of incorrect assertions about the website's content. Many of his allegations are simply wrong. For example, he asserts that "[c]y pres was not mentioned in the detailed notice, short or long form," *id.* at 25, when in fact it was discussed in all three. *See* Postcard Notice ("The Settlement Fund will also be used to pay . . . potentially a small payment to Free Clinics of Michigan."); Publication Notice (same); Detailed Notice ¶ 6 ("This money, plus interest, will be paid to . . . [t]he non-profit organization Free Clinics of Michigan, in certain circumstances."). He asserts that the claim forms do not mention the release, Andrews Supp. at 30-31, when each has an explicit section entitled "RELEASE." *See* Consumer Claim Form § F; Claim Form for Insurers or Self-Insured Entities § G. He claims that the list of hospitals on the claims form misleadingly omitted many hospitals for the first month of the claims period, Andrews Supp. at 30-32, when in fact the version he cites included an option for other hospitals and was on the website for just one weekend. Marr Decl. ¶ 16. Even if Mr. Andrews's claims were accurate, none

---

[20] Mr. Andrews's arguments about attorneys' fees and incentive awards are dealt with further in Plaintiffs' concurrently filed brief regarding those awards.

would be significant enough (separately or together) to have any effect on the adequacy of the notice and claims process.[21, 22]

## VI.    CONCLUSION

For the foregoing reasons, the Settlement and Plan of Allocation should be approved.

---

[21] Mr. Andrews does point out two actual errors. First, the version of the Settlement Agreement posted on the website inadvertently omitted a paragraph prohibiting the parties from initiating media coverage. Settlement ¶ 87; *see* Marr Decl. ¶ 21 (explaining mistake). This minor difference had no conceivable impact on the adequacy of notice or on any class member's evaluation of the settlement. Second, Class Counsel filed declarations confirming successful effectuation of the Notice Plan after the deadline established by the preliminary approval order. *See* Dkt. No. 162. Here again, Mr. Andrews does not even hypothesize a way this could harm the Settlement Class. Only the filing of the affidavits—not the notice itself—was delayed. Because the notice was timely effectuated, there is no damage to the Settlement Class. *See* Andrews Supp. at 35.

[22] In attempting to obtain a fee from Class Counsel, Mr. Andrews repeatedly indicated an intent to appeal from an approval order. If he does, Class Counsel will request that the Court require him to post a bond and pay any additional escrow fees, distribution costs, or other expenses necessitated by an unsuccessful appeal. *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812, 813-14 (6th Cir. 2004) (affirming objector's appeal bond of $174,429); *In re Wal-Mart Wage & Hour Emp. Practices Litig.*, No. 06-cv-00225, 2010 WL 786513, at *1-2 (D. Nev. Mar. 8, 2010) (imposing bond where "Objectors' counsel have a documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class").

Dated: October 24, 2014                Respectfully submitted,

/s/ Daniel E. Gustafson
Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

Daniel A. Small
Brent W. Johnson
**COHEN MILSTEIN SELLERS**
    **& TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
dsmall@cohenmilstein.com
bjohnson@cohenmilstein.com

E. Powell Miller
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan  48307
Telephone: (248) 841-2200
epm@millerlawpc.com

Fred T. Isquith
**WOLF HALDENSTEIN ADLER**
    **FREEMAN & HERZ LLC**
270 Madison Avenue
New York, New York, 10016
Telephone: (212) 545-4690
isquith@whafh.com

38

Theodore B. Bell
**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
Telephone: (312) 984-0000
tbell@whafh.com

*Interim Class Counsel*

David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Rd, Suite 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com

*Interim Liaison Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2014, I electronically filed the *Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation* with the Clerk of the Court using the ECF, who in turn sent notice to counsel of record for all parties and for the Varnum Objectors. Additionally, I served a copy of that document by first-class mail on each of the following individuals who have not registered with ECF:

Christopher Andrews
P.O. Box 530394
Livonia, MI 48152-0394

Nicholas and Coralin Davelaar
405 Turrentine Way
Russellville, AR 72801

Ronald D. Diebel
19177 Cheshire Street
Detroit, MI 48236

John M. Kunitzer
4328 Lakecress Drive East
Saginaw, MI 48603

Scott Mancinelli
P.O. Box 3266
Holland, MI 49422-3266

Cynthia S. Rock
18357 Levan Rd.
Livonia, MI 48152

David VanDaele
9812 Ferder Road
Maybee, MI 49815

/s/ Daniel E. Gustafson
Daniel E. Gustafson

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| THE SHANE GROUP, INC., *et al.*,<br><br>Plaintiffs, on behalf of themselves and all others similarly situated,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>Defendant. | Civil Action No. 2:10-cv-14360-DPH-MKM<br><br><br>Judge Denise Page Hood<br>Magistrate Judge Mona K. Majzoub |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION

## STATEMENT OF ISSUES PRESENTED

1.    Is the Settlement fair, reasonable, and adequate?

Class Counsel's answer: **Yes.**

2.    Is the Plan of Allocation fair, reasonable, and adequate?

Class Counsel's answer: **Yes.**

## <u>CONTROLLING AUTHORITY</u>

*Hadix v. Johnson*, 322 F.3d 895 (6th Cir. 2003)

*UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)

Plaintiffs[1] respectfully move for final approval of the Settlement preliminarily approved by the Court on June 26, 2014. *See* Dkt. No. 151.[2] For the reasons set forth below, the Settlement is fair, reasonable and adequate, and therefore should be approved under Federal Rule of Civil Procedure 23(e).

The Settlement creates a common fund of approximately $30,000,000. This is an excellent recovery for the class. It recovers more than 25 percent of the damages estimated for class certification by a highly qualified Ph.D. economist based on sophisticated statistical analysis of millions of purchases of hospital services. Recoveries of this magnitude—and much less—have been approved in countless antitrust class actions, including in many cases with far less challenging impact, damages, and class certification issues. Moreover, this settlement was reached after three and a half years of hard-fought litigation, production of millions of pages of documents, depositions of 169 witnesses, analysis of many terabytes of data, expert reports submitted by Plaintiffs and Defendant Blue Cross Blue Shield of Michigan ("BCBSM"), briefing of several motions, and well over a year of on-and-off settlement negotiations. Plaintiffs' counsel, who have litigated scores of

---

[1] "Plaintiffs" are The Shane Group, Inc., Michigan Regional Council of Carpenters Employee Benefits Fund, Abatement Workers National Health and Welfare Fund, Monroe Plumbers & Pipefitter Local 671 Welfare Fund, Susan Baynard, Anne Patrice Noah, Bradley Veneberg, and Scott Steele.

[2] All docket numbers are to the ECF docket in this case, No. 10-cv-14360, unless otherwise noted.

1

complex antitrust actions, had an unusually strong basis on which to evaluate the settlement.

There are *no* indicia of unfairness to class members. Plaintiffs' counsel invested $3.5 million of their own money and over $15 million of their time in this case with no guarantee—even as of today—that they will be paid a single penny. The Court—not Plaintiffs, their counsel, or BCBSM—decides what Class Counsel will get paid. Plaintiffs' counsel's *request* to be reimbursed for expenses and paid for a portion of their time when their efforts produced a class-wide recovery, far from demonstrating collusion with BCBSM, is authorized by abundant case law.

The Settlement Class is enormous. Plaintiffs estimate that it contains as many as 7 million members, roughly 3 million of whom received direct notice.[3] Only 1,511 potential class members opted out (about 0.02 percent of the class) and just four objections were filed, one of which was subsequently withdrawn. Only a *single* opt-out has filed an individual lawsuit in an attempt to obtain a better recovery; all of the others appear to have opted out because they do not want to participate in a class action. In contrast, thousands of individuals and some of the largest employers, unions, and insurance companies in Michigan are submitting claims to share in the recovery. The favorable class member response is another

---

[3] The exact number is unknown, because some of the approximately 7 million purchasers of hospital services either owed nothing (because another payor paid the entire amount) or did not pay their obligated amount.

factor strongly supporting settlement approval.

## I.   BACKGROUND

The procedural history of this case and the terms of the settlement were laid out in detail in the Memorandum in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, Certification of Settlement Class, and Related Relief ("PA Mot."). *See* Dkt. No. 148 at 3-7. Because the Court is well versed in the history of the litigation, Plaintiffs will discuss only certain salient details here.

### A.   Litigation Prior to Settlement

In October 2010, the Department of Justice ("DOJ") and the State of Michigan ("State") filed a complaint alleging that BCBSM had market power in the market for "the sale of commercial health insurance" in 17 geographic markets in Michigan and inserted Most Favored Nation ("MFN") provisions in its contracts with at least 70 Michigan hospitals, resulting in anticompetitive effects in those specific markets. Compl. ¶¶ 28, 33, 86, *United States v. Blue Cross Blue Shield of Mich.*, No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010) ("Gov't Case"), ECF No. 1. The Government Case did not seek damages or certification of a class.

That same month, the first class action lawsuit related to BCBSM's MFNs was filed. *See* Dkt. No. 1. Unlike the Government Case, this complaint (and all successive class action complaints) sought overcharge damages on purchases of hospital healthcare services and certification of a class of direct purchasers.

3

Thereafter, Plaintiffs participated in extensive fact discovery in coordination with the Government Case and a competitor suit brought by Aetna. This discovery comprised millions of pages of documents, 169 depositions, and years of hospital payment data. *See* PA Mot. at 4. While discovery was ongoing, the State passed a law banning any payors' use of MFNs in contracts with health care providers, leading the DOJ and the State to first stay their case and then dismiss it altogether. *See* Gov't Case, Dkt. No. 240, 245, 246. At this time, class-related fact discovery was incomplete, expert discovery had not begun, summary judgment had not been briefed, and the case had not been tried. *See* Gov't Case, ECF No. 120.

Plaintiffs continued to litigate after DOJ and the State dismissed their case, proceeding with discovery, expert analysis, and briefing for class certification. Plaintiffs worked closely with Ph.D. economist Jeffrey J. Leitzinger, an industrial organization expert with decades of experience analyzing antitrust claims, whose work has been found reliable by numerous federal and state courts, to develop and implement a damages model. *See, e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008) (affirming finding that Dr. Leitzinger's testimony was reliable); *In re Wellbutrin XL Antitrust Litig.*, No. 08- 2431, 2011 WL 3563385, at *2 n.1 (E.D. Pa. Aug. 11, 2011) (describing Dr. Leitzinger as "highly qualified"). Dr. Leitzinger's damages estimate was and is the *only* estimate of the amount hospital prices were inflated as a result of BCBSM's challenged conduct.

4

Dr. Leitzinger's substantial and sophisticated analysis provides more than a sufficient basis for determining the adequacy of this settlement. His analysis proceeded in three steps. First, he examined how reimbursement rates changed after the MFN went into effect, or when Priority, Health Alliance Plan ("HAP"), or Aetna negotiated new reimbursement rates thereafter. Expert Report of Jeffrey Leitzinger, Oct. 21, 2013, ¶¶ 47-50 & Ex. 6, Dkt. No. 133. Second, he compared those insurers' new, post-MFN reimbursement rates to BCBSM's reimbursement rates to see whether the new rates complied with the MFN. *Id.* Third, he used a difference-in-differences regression analysis to compare the change in actual reimbursement rates at affected hospitals with the change in actual reimbursement rates paid by the same insurers at similar hospitals in Michigan under contracts without an MFN provision. *Id.* ¶¶ 51-57. In his regression, he included variables to control for differences among hospitals such as complexity of care, costs, insurers' billed amounts, and location. *Id.* ¶ 55. His regression used terabytes of data from BCBSM, Priority, HAP, and Aetna that covered over 60 million claims.

After Plaintiffs filed their class certification brief and expert report, BCBSM opposed certification on numerous grounds, filed its own expert report, and moved to exclude Dr. Leitzinger's opinions. Both experts were deposed. *See* PA Mot. at 5.

**B.    Settlement Negotiations**

While Plaintiffs were drafting their reply brief in support of their motion for

class certification, the parties reached a settlement in principle. As outlined in the October 24, 2014 Declaration of Daniel A. Small ("Small Decl."), settlement discussions had occurred intermittently for over a year, with BCBSM refusing even to make an offer for nearly a year and then making a "nuisance value" offer that was unworthy of consideration. *See* Ex. B, Small Decl. ¶¶ 11. At all times, the parties negotiated aggressively and at arm's length. *Id.* ¶ 15.

###   C.   Settlement Agreement

The terms of the Settlement were laid out in detail in the motion for preliminary approval. *See* PA Mot. at 5-7. In brief, the Settlement creates a common fund of $29,990,000 for the benefit of the Settlement Class. The Settlement contains no guarantee of any attorneys' fees or incentive awards and is not conditioned on any particular award to either Class Counsel or the named Plaintiffs; rather, it provides only that Plaintiffs will petition the Court for such awards and BCBSM will not oppose Plaintiffs' request up to a certain threshold. Class Action Settlement Agreement ("Settlement"), June 23, 2014, Dkt. No. 148-1, at ¶ 71. After the Court determines the appropriate amount of attorneys' fees, expenses, and incentive awards, the fund will be distributed according to a Plan of Allocation that reflects Class Counsel's and Dr. Leitzinger's best estimate of the relative likelihood that purchasers of a given hospital's services would be able to prove damages at trial. *See* PA Mot. at 23-25. If enough of the pro rata awards in

the third category are too small to justify distribution, the amounts that would have gone to those class members will instead be distributed to the health care charity Free Clinics of Michigan. *See* PA Mot. at 24.

In return for this $29,990,000 relief, Settlement Class members release claims related to BCBSM's MFNs. They do not release any other claims against BCBSM or any unrelated entities. *See* Settlement ¶ 58.

The Court certified the Settlement Class, approved the Notice Plan and the Claim Form, and preliminarily approved the Settlement, including the Plan of Allocation, on June 26, 2014. Dkt. No. 151.

### D.    Settlement Notice

Pursuant to the Notice Plan approved by the Court, the nationally recognized settlement administrator Epiq mailed out nearly three million notices to individuals insured by Michigan health plans and third-party payors. Decl. of Charles Marr, Oct. 10, 2014, Dkt. No. 162-1, ¶ 4. To reach Settlement Class Members outside this group, the advertising and notification specialist Kinsella Media also ran advertisements in 24 print publications and websites providing 29 million impressions. *See* Decl. of Shannon R. Wheatman, Ph.D., June 23, 2014, Dkt. No. 148-2, ¶¶ 26-27; Decl. of Shannon R. Wheatman, Ph.D., Sept. 9, 2014, Dkt. No. 162-2, ¶ 10. This distribution likely reached 82.9% of adults in Michigan an average of 2.2 times per person. *See* Dkt. No. 162-2, ¶ 12.

The notices directed Settlement Class members to a website and toll-free phone number for additional information and claims forms. As of October 17, over 100,000 individuals had visited the website and nearly 85,000 calls were made to the information hotline, leading to more than 380,000 minutes of call time—including over 200,000 minutes with a live operator trained specifically to respond to inquiries commonly asked by members of this particular Settlement Class. *See* Ex C, Oct. 24, 2014 Decl. of Charles Marr ("Marr Decl."), ¶ 22. Based on class member and other input, Epiq and Class Counsel worked to improve responses and, if necessary, adjust the information on the website and the claims forms, with notice to or input from BCBSM and/or the Court where appropriate.

As of October 17, nearly 50,000 individuals had requested claim forms, 8,275 of whom have filed claims. *Id.* ¶ 8. An additional 17,717 individuals had submitted claims electronically. Similarly, insurers and self-insured entities had filed 76 claims. *Id.* ¶ 9. Only 1,518 class members requested exclusion,[4] and just four objections[5] were filed with the Court, one of which was withdrawn. *Id.* ¶ 17.

---

[4] As discussed below, many of these requests were made by members of one corporate family, such as Aetna. *See infra* p. 19. Of the 1,518 opt-out requests, only 1,103 were complete and timely filed as required by the Court's Preliminary Approval Order. *See* Marr Decl. ¶ 17; Dkt. 151 ¶ 11.

[5] The objectors are John Kunitzer; Christopher Andrews (purporting to represent himself, Michael Andrews, Cathy Waltz, and Ronald Waltz); Scott Mancinelli; and 26 entities represented by Varnum LLP (the "Varnum Objectors"). *See* Dkt. Nos. 158-61. As discussed below, Mr. Kunitzer has asked to withdraw his objection. Additionally, Class Counsel received four letters about the Settlement.

## II.    LEGAL STANDARD

"Before approving a settlement, a district court must conclude that it is 'fair, reasonable, and adequate.'" *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting Fed. R. Civ. P. 23(e)(1)(C)). In applying this test, courts must be mindful of "the federal policy favoring settlement of class actions." *UAW*, 497 F.3d at 632. There is a "strong presumption in favor of voluntary settlements, which is especially strong in class action cases." *Kinder v. Nw. Bank*, No. 10-cv-405, 2013 WL 1914519, at *3 (W.D. Mich. Apr. 15, 2013) (citing *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010)). "[P]ublic policy strongly favors settlement of disputes without litigation. . . . Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." *Robinson v. Shelby Cnty. Bd. of Educ.*, 566 F.3d 642, 648 (6th Cir. 2009).

Thus, while the Court acts as a fiduciary for absent class members, it has a "restricted, tightly focused role," *Dick v. Sprint Commc'ns Co.*, 297 F.R.D. 283, 294 (W.D. Ky. 2014) (quoting *Kinder*, 2013 WL 1914519, at *3), and should not

---

*See* Exs. D-G. Even if these were properly filed, none provides a basis for rejecting the Settlement. One, Cynthia S. Rock, expressly supported the Settlement (but argued for smaller attorneys' fee and incentive awards). A second, Ronald Diebel, made the same objection as Mr. Kunitzer, which is moot for the reasons discussed below. The other two lack standing: David VanDaele is not a class member and Nicholas and Coralin Davelaar unambiguously opted out of the Settlement. *See, e.g.*, *Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 930 (E.D. Mich. 2007). Even if the Court were to consider these letters, they add nothing to the objections discussed below.

"substitute its business judgment for that of the parties," *Rankin v. Rots*, No. 02-cv-71045, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006). The Court's main considerations are "the existence of serious questions of law and fact which place the ultimate outcome of the litigation in doubt" and "the vagaries of litigation," comparing "the significance of the immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Id.* Overall, "[c]ourts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also UAW*, 497 F.3d at 631.

The Sixth Circuit has identified seven factors that should be considered in assessing a settlement's propriety: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013) (quoting *UAW*, 497 F.3d at 631). It also asks "whether the settlement 'gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members.'" *Id.* at 755 (quoting *Williams v. Vukovich*, 720 F.2d 909, 925 n.11 (6th Cir. 1983)).

10

## III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

Every one of the relevant factors weighs strongly on the side of approval.

### A.   The Likelihood of Success and the Potential Recovery

The overarching question before the Court is whether the Settlement is fair in light of "plaintiff's likelihood of success on the merits." *UAW*, 497 F.3d at 631 (quoting *Carson*, 450 U.S. at 88 n.14). On this front, the Settlement provides a substantial recovery given the realities of the litigation and the Settlement Class's possible recovery, easily surpassing the "fair, reasonable, and adequate" threshold.

Many class action settlements have been approved before plaintiffs' expert had even analyzed damages. *See, e.g.*, *Olden v. Gardner*, 294 F. App'x 210, 218 (6th Cir. 2008) (unpub. op.) (affirming final approval even though "class counsel negotiated the settlement agreement without first obtaining any expert opinions or engaging in formal discovery"). In contrast, here, Dr. Leitzinger performed a detailed and labor-intensive analysis of damages using very large databases and a well-accepted methodology.[6] Although Plaintiffs had every incentive to prove as high damages as possible and engaged in extensive discovery and analysis in an attempt to do so, Dr. Leitzinger and Plaintiffs determined that damages could be reliably and manageably measured only for purchasers covered by 23 provider

---

[6] Courts have repeatedly approved the use of difference-in-differences regression analyses to assess antitrust impact and damages. *See*, *e.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 810 (7th Cir. 2012).

agreements (out of hundreds of provider agreements with MFN hospitals) at 13 hospitals (out of 70 MFN hospitals), and measured their damages at $118 million. This is far from the multi-billion dollar case hypothesized by the Varnum Objectors, who did *no* damages study at all.

This damages estimate provides a strong basis on which to evaluate the Settlement's adequacy. The Settlement recovers more than 25 percent of this estimate—an excellent result for the class that compares favorably to many other settlements approved in antitrust class actions. *See, e.g.*, *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005) (recovery of 11.4% of damages "compares favorably with the settlements reached in other complex class action lawsuits"); *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004) (collecting antitrust cases in which courts have approved settlements of 5.35% to 28% of estimated damages).[7]

The many hours Class Counsel and their expert studied damages in this case suggest that it would be difficult if not impossible to develop a reliable economic model that would prove more than de minimis damages under other provider

---

[7] In determining the adequacy of an antitrust settlement, "courts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value." *Rodriguez v. West Pub'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009); *see also, e.g.*, *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367 (N.D. Ohio 1983).

agreements. And even if they could marshal such evidence, purchasers under other provider agreements would have no incentive to undertake the very substantial burden and financial cost of attempting to prove a marginal claim.[8]

Furthermore, the many risks of continued litigation cast significant doubt on whether class members would receive *any* recovery. Objectors claim that the Government Case made success a foregone conclusion, but of course the DOJ and the State did not need to obtain class certification, prove that class members paid an overcharge for hospital services, or measure the amount of the overcharge—the most challenging issues in this case. Had BCBSM successfully defeated Plaintiffs' class certification motion (either in the district court or on a Rule 23(f) appeal), excluded Dr. Leitzinger's testimony, or moved for summary judgment, the case may never have reached a jury. While Plaintiffs believed that they would have ultimately won each of these disputes, that outcome was by no means certain.

---

[8] Plaintiffs originally defined a class that included purchasers of healthcare services at all MFN hospitals in Michigan during a five-and-a-half-year period. *See* Consol. Am. Compl. ¶ 26, Dkt. No. 78. This class encompassed all Category 1 and most Category 2 purchases in the Plan of Allocation during this time period. Based on their review of the discovery record and Dr. Leitzinger's analysis, Plaintiffs, when they moved for class certification, narrowed the proposed class to just purchasers covered by the 23 provider agreements. For settlement purposes, BCBSM insisted on a broader class that gives them litigation peace as to any purchaser of healthcare services from a Michigan general acute care hospital, even those with the most tenuous of claims. The Sixth Circuit has expressly affirmed approval orders which, like the Preliminary Approval Order here, "redefin[ed] the class in connection with the settlement . . . result[ing] in the addition of class members." *Lindsey v. Memphis-Shelby Cnty. Airport Auth.*, 229 F.3d 1150, *7 (6th Cir. 2000) (unpub. op.).

Moreover, given the complex economic issues in the case, a jury may not have credited Plaintiffs' evidence or may have awarded less than Plaintiffs sought. And even if a jury agreed with Plaintiffs, a single error could undo the entire trial or decertify the class on appeal. As one district court has observed, "the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeed at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998). All told, there was a significant risk that class members would receive *nothing* without a settlement—and that Plaintiffs would be in a weaker settlement position at a later stage, rather than a stronger one. Thus, the recovery of nearly $30 million reflects a substantial victory for Settlement Class members.

### B.    The Risk of Fraud or Collusion

Courts "presum[e] that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands" absent "evidence of improper incentives." *UAW*, 497 F.3d at 628. The history of this hard-fought litigation and the negotiations that produced the Settlement show that the presumption applies fully here.

This Court has had ample opportunity to observe the intensely adversarial nature of this litigation during the nearly four years the parties have been before the Court. BCBSM fought the class action at every turn, and Class Counsel fought

14

back vigorously. The drawn-out settlement negotiations similarly demonstrate the arm's-length, adversarial nature of the parties' relations. *See supra* p. 5-6 & Small Decl. ¶ 11.

The terms of the Settlement themselves refute the idea that this Settlement was the product of fraud or collusion. The Settlement guarantees *nothing at all* to Class Counsel or any of the named Plaintiffs; all awards are placed in the sole discretion of the District Court, as they must be. *See* Settlement ¶ 71. Indeed, Class Counsel had every incentive to obtain (and vigorously pursued) as large a settlement as possible for the Settlement Class, because a larger common fund would mean a larger award to Class Counsel. Class Counsel's interests are thus fully aligned with the Settlement Class's interests, and there is no reason to fear self-dealing, let alone fraud or collusion. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (percentage method "directly aligns the interests of the class and its counsel") (internal quotation marks omitted). The terms of the settlement lack any of the hallmarks of a potentially collusive deal such as "*a promise* of excessive attorney fees," *UAW*, 497 F.3d at 628 (emphasis added) or an agreement to pay attorneys' fees separate from class funds or return unclaimed amounts of a settlement fund to defendant. *See, e.g.*, *Laguna v. Coverall N. Am., Inc.* 753 F.3d 918, 924-25 (9th Cir. 2014).

Finally, Class Counsel include highly competent antitrust class action

experts, whose record of zealous and successful representation belies any claim that they would sell out their clients for a quick deal. To take just one example, Class Counsel Cohen Milstein Sellers & Toll PLLC recently won a billion-dollar judgment against Dow Chemical Company after ten years of litigation and a six-week trial in *In re Urethane Antitrust Litigation*, No. 04-md-1616 (D. Kan.); *see also, e.g.*, Dkt. No. 13 at 6-15 (summarizing biographies of Class Counsel). Class Counsel's wealth of experience shows both their aptitude at assessing antitrust cases' value and their commitment to vigorously advancing their clients' interests. In this case in particular, Class Counsel's commitment cannot be seriously questioned. They invested $3.5 million of their money and over $15 million of their time, despite facing substantial risks and a formidable opponent.

## C.    The Complexity, Expense, and Likely Duration of the Litigation

Courts widely recognize that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *10 (E.D. Pa. 2004) (internal quotation marks omitted). As even the Varnum Objectors recognize, "[t]here is no question that antitrust litigation of this size and scope is a complex and expensive process that can take several years to resolve." Varnum Obj., Dkt. No. 161, at 17. This case exemplifies that complexity. It involved discovery from nearly every hospital in Michigan and analysis of seven years of hospital payments. BCBSM contested virtually every

16

possible issue, from the definition of the relevant markets to the mechanics of its MFNs. *See* Dkt. No. 112, ¶¶ 44-53, 76-81. It has been clear throughout the case that BCBSM would defend the litigation vigorously at every turn. And as discussed above, Plaintiffs had several difficult and costly steps to complete before any litigated recovery could be obtained: not only the unfinished class certification briefing and expert discovery, but summary judgment, a likely petition for interlocutory appeal under Rule 23(f), pretrial preparation and motions, the trial itself, and the inevitable post-judgment motions, appeals, and certiorari petition. Given the sizable hurdles in front of Plaintiffs, any recovery outside of this Settlement likely would be years in the offing and highly uncertain.

### D.      The Amount of Discovery Engaged in by the Parties

As the Varnum Objectors state, "Plaintiffs engaged in a very significant amount of discovery in this case." Varnum Obj. at 18. Indeed, millions of pages of documents and multiple terabytes of data were produced, 169 depositions were taken, and competing expert reports were prepared. It is hard to imagine parties in a better position to understand the strengths and weaknesses of this case.

The Varnum Objectors describe this as a "minor factor," without citation, but in fact it is one of the most important. *See, e.g.*, *Olden*, 294 F. App'x at 218 ("The factor that weighs against the settlement most heavily is the limited amount of discovery engaged in by the parties."). Discovery is "essential" to enable "class

counsel to develop the merits of their case" and assess "the propriety and fair value of a settlement." *Id.* Because "the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered," *Williams*, 720 F.2d at 922, the "very significant amount of discovery in this case," Varnum Obj. at 18, counsels a "very significant amount" of deference. This factor thus weighs heavily in favor of approval.

### E.    The Opinions of Class Counsel and Class Representatives

In deciding whether a proposed settlement warrants approval, "[t]he judgment of the parties' counsel that the settlement is in the best interest of the settling parties is entitled to significant weight." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 597 (E.D. Mich. 2006) (internal quotation marks omitted). As previously discussed, counsel include national leaders in complex class action litigation, particularly in the field of antitrust, who have a record of zealously advocating for their clients, astutely judging the prospects of a given case, and obtaining the best possible recovery. Their considered judgment after voluminous discovery, expert analysis, and extensive motions practice that the Settlement is the class's best course of action is entitled to considerable deference. *See Williams*, 720 F.2d at 922-23 ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs.").

Similarly, the named Plaintiffs have participated in this case for years. All

18

produced documents, responded to BCBSM's interrogatories, and discussed the case with Class Counsel, and half of them testified in deposition. The named Plaintiffs come from all segments of the Settlement Class: some are individual purchasers, some institutional payors; some made purchases in Category 1, some in Category 2, and some in Category 3. *See* Dkt. No. 124 at 4-5. Each named Plaintiff believes the Settlement serves the class well, and each named Plaintiff has filed or will be filing a claim to be considered along with the rest of the Settlement Class.

### F.    The Reaction of Absent Class Members

The reaction of absent class members similarly weighs heavily in favor of approval. As outlined above, more than 26,000 class members had filed claims as of October 17—and the filing rate is likely to accelerate in the month remaining for submission. *See* Marr Decl. ¶¶ 8-9. This includes many of the largest purchasers of hospital services in Michigan. By contrast, just 1,518 potential class members opted out, approximately 0.02% of the class and 0.05% of those directly notified. Notably, many of these opt-out requests were filed by divisions or subsidiaries of other opt-out class members. For example, 179 requests were filed by Aetna entities. Marr Decl. ¶ 18a. Courts routinely approve cases with a far higher opt-out rate. *See, e.g.*, *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) (opt-out rate of 0.55%); *Garner v. State Farm Mut. Auto. Ins.*, No. 08-cv-1365, 2010 WL 1687832, at *15 (N.D. Cal. Apr. 22, 2010) (0.4%). Moreover, these

19

limited opt outs likely do not reflect dissatisfaction with the amount of the settlement. Only one, HAP, filed an individual action to try to recover more. *See Health Alliance Plan of Mich. v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*, No. 14-cv-13788-LPZ (E.D. Mich.).[9] All of the others appear to have excluded themselves not to try to recover more, but to avoid being part of a class action.

This overwhelming support dwarfs the criticisms of the few objectors. Only four objections were filed, purporting to represent 32 class members; one of these objections was later withdrawn. This too compares favorably to other approved cases. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (where 27,883 notices were sent and 18 objections received, "[t]he District Court properly concluded that this small number of objections weighed in favor of the settlement"); *Churchill Vill.*, 361 F.3d at 577 (90,000 notices and 45 objections); *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 212 (E.D.N.Y. 2013) (approving settlement where "objectors in the aggregate represent 19% of the total transaction volume" and "[m]any of the named plaintiffs in the case are objectors").[10] As discussed below, the objections

---

[9] The exclusion of HAP, one of the largest class members, significantly benefits remaining members of the Settlement Class by increasing the share each claimant will receive. This highlights one of Class Counsel's many negotiating achievements: while many settlement agreements provide defendant a pro rata reduction to account for opt-outs, this Settlement gives BCBSM no discount.

[10] *See generally* Alba Conte & Herbert Newberg, Newberg on Class Actions § 11.41, at 108 (4th ed. 2002) ("[A] certain number of objections are to be expected

themselves lack merit. Accordingly, this factor points strongly toward approval.

### G.     The Public Interest

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 580 (E.D. Mich. 2003) (quoting *Granada Inv., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)). The public interest particularly supports settlement in this case because of the likelihood that personnel from many Michigan hospitals and other third parties would be called to testify at trial. The 169 depositions taken in this case included depositions of over 100 third parties, including employees from dozens of hospitals. BCBSM or Plaintiffs would presumably call many of these witnesses at trial, placing a not insignificant burden on Michigan healthcare providers.

### H.     Whether the Settlement Gives Preferential Treatment to Named Plaintiffs but Only Perfunctory Relief to Unnamed Class Members

Finally, the Settlement neither gives preferential treatment to named Plaintiffs nor perfunctory relief to unnamed class members. Named Plaintiffs have applied for Court-awarded compensation for their service to class members in pursuing this litigation. "Numerous courts have authorized incentive awards. These

---

in a class action with an extensive notice campaign and a potentially large number of class members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

courts have stressed that incentive awards are efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) (citations omitted). Although the Sixth Circuit "has never explicitly passed judgment on the appropriateness of incentive awards," it "think[s] there may be circumstances where incentive awards are appropriate." *Id.* at 897-98. Indeed, the Sixth Circuit has approvingly cited cases in which named plaintiffs were awarded as much as $55,000. *Id.*; *see also Liberte Capital Grp. v. Capwill*, No. 99-cv-818, 2007 WL 2492461, at *1 (N.D. Ohio Aug. 29, 2007) ("Incentive awards, where appropriate, generally range from a few thousand dollars to $85,000.").

As explained in Plaintiffs' motion for attorneys' fees, expenses, and service awards, the requested awards are reasonable given the time and resources that named Plaintiffs have devoted to the case, including sizable document productions, responses to written discovery requests, and deposition testimony. Dkt. No. 155 at 19-23. Moreover, "the awards have been tailored to compensate each Class Representative in proportion to his or her actions, time, and effort in prosecuting this action." *Gascho v. Global Fitness Holdings, LLC*, No. 11-cv-436, 2014 WL 1350509, at *27 (S.D. Ohio Apr. 4, 2014), *adopted*, 2014 WL 3543819.

Nor do absent class members receive merely "perfunctory" relief. The Sixth Circuit has expressed concern about perfunctory relief where absent class members

22

received only illusory injunctive relief or were put in a worse position in other litigation. For example, in *In re Dry Max Pampers Litigation*, class members received zero monetary relief and only "illusory" injunctive relief while counsel received $2.73 million without "tak[ing] a single deposition, serv[ing] a single request for written discovery, or even fil[ing] a response to [defendant's] motion to dismiss." 724 F.3d 713, 718, 721 (6th Cir. 2013). In *Vassalle*, the named plaintiffs were exonerated from all debts owed to the defendant while absent class members were instead *forbidden* from opposing collection of their debts with the false affidavits at issue in the suit, putting them in a substantially worse position than if a class action had never been filed. 708 F.3d at 755. Here, a recovery of over 25 percent of the $118 million in estimated damages, especially in light of the risks, burdens, and delay of continued litigation, can hardly be called "perfunctory."

Moreover, as with attorneys' fees, the Settlement is not contingent upon the award of any particular amount to named Plaintiffs, or the award of any amount at all. Named Plaintiffs are guaranteed nothing; rather, the award is wholly in the District Court's discretion. *See* Settlement ¶¶ 11, 71. Thus, even if the requested awards were in any way excessive, the correct remedy would be to reduce the awards, not reject the settlement.[11]

---

[11] Mr. Andrews objects because the short-form notices said Plaintiffs would seek incentive awards of up to $150,000, while they actually sought $165,000. Andrews Supp., Dkt. No. 163 at 95. But the Detailed Notice and Settlement

## IV.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

The Court must also find the method of distributing the settlement fund to be "fair and reasonable." *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 534 (E.D. Ky. 2010). "If the plan of allocation is formulated by competent and experienced class counsel, an allocation plan need only have a reasonable, rational basis." *Taft v. Ackermans*, No. 02-cv-7951, 2007 WL 414493, at *9 (S.D.N.Y. Jan. 31, 2007) (internal quotation marks omitted).

As discussed above, Plaintiffs' and their expert's careful analysis of impact and damages shows that the MFN agreements impacted only a small subset of MFN hospitals—and even then only a limited number of those hospitals' provider agreements. Class members who paid for services for which Plaintiffs were able to measure damages reliably have stronger claims than those who purchased at other hospitals, or under other provider agreements, or in other time periods.

Where all class members were subject to a similar course of conduct, but suffered differing amounts of damages or have differing likelihoods of recovery, settlements need not "offer a pro rata distribution to class members" or "fragment[]

---

correctly stated that counsel would request "awards of up to $50,000 for each Plaintiff organization and up to $10,000 for each Plaintiff individual, for their services on behalf of the class," consistent with the request. Detailed Notice ¶ 19; *see also* Settlement ¶ 71. As both of these documents and the actual award request were available on the Settlement website, any error in the short-form notices is harmless. In any event, the proper modification would be to reduce the total awards by $15,000, not reject the Settlement or eliminate the awards altogether.

24

the class" into many subclasses. *UAW*, 497 F.3d at 629. Rather, "when real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill. 2011) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.1997)); *see also, e.g.*, *In re Heritage Bond Litig.*, No. 02-md-1475, 2005 WL 1594403, at *11 (N.D. Cal. June 10, 2005) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable. It is also reasonable to allocate more of the settlement to class members with stronger claims on the merits.") (internal quotation marks omitted).

The Plan of Allocation reflects the different values of different claims by placing them in one of three categories. Category 1 purchases are those covered by the 23 provider agreements for which Plaintiffs were able to measure damages; they generated the $118 million in damages estimated by Dr. Leitzinger. Accordingly, most of the Net Settlement Fund (78 percent) will be distributed to class members based on their Category 1 purchases. Category 2 includes purchases at hospitals when an MFN agreement was in effect, but for which Plaintiffs had no reliable evidence of harm or evidence of only de minimis damages. The Plan of Allocation assigns 20 percent of the Net Settlement Fund to these purchases.

Category 3 purchases were made when no MFN agreement was in effect. Although BCBSM's conduct conceivably could have had some spillover effect on these purchases, such a damages theory raises difficult legal and factual issues, including whether the harm was too attenuated and whether an appropriate benchmark could be identified. Thus, just two percent of the Net Settlement Fund is allocated to these purchases. Simply stated, the purpose and effect of the Plan of Allocation is to pay more for stronger claims. This is entirely appropriate. *See UAW*, 497 F.3d at 629.

For Category 3 purchases (giving rise to the weakest damages claims), a minimum distribution threshold has been put in place for the purpose of administrative efficiency. It applies only to claimants with Category 3 claims below $10 who do not have any Category 1 or Category 2 purchases—and then only if there are 100 or more such claimants. Their Category 3 payments are too small to distribute and will be made instead to the non-profit organization Free Clinics of Michigan, a charity providing free health care services throughout Michigan. Minimum payment thresholds such as this have repeatedly been approved by courts, often at far larger minimums. *See, e.g.*, *In re Mut. Funds Inv. Litig.*, No. 04-md-15863, 2011 WL 1102999, at *3 (D. Md. Mar. 23, 2011) (collecting cases with minimums as high as $50).

## V.   THE OBJECTORS' ARGUMENTS ARE WITHOUT MERIT

26

None of the four objections have any merit.

### A.    John Kunitzer

Mr. Kunitzer objected because "most individuals would not have the documents going back to 2006 to support their claims." Dkt. No. 158. As explained by the Settlement Administrator, the requirement that individuals provide a "record" with their claim form showing their purchases was intended to reduce fraud and duplicative awards, but was eliminated early in the claims period. Marr Decl. ¶ 12. When Class Counsel explained the actual requirements to Mr. Kunitzer, he withdrew his objection. Ex. H.[12]

### B.    Scott Mancinelli

Mr. Mancinelli makes three arguments, none of which support rejection. *First*, he criticizes the Settlement for failing to include injunctive relief. Mancinelli Obj., Dkt. No. 160, at 2-3. Injunctive relief was mooted by the State's enactment of a law banning MFNs in contracts between payors and healthcare providers. *Second*, he criticizes the inclusion of a *cy pres* recipient. *Id.* at 3-6. But as discussed above, a *cy pres* recipient was named only to deal with the possibility that some Category 3 payments will be too small and numerous to justify the administrative costs. As Mr. Mancinelli's own authorities note, this is wholly

---

[12] Under Federal Rule of Civil Procedure 23(e)(5), an "objection may be withdrawn only with the court's approval." Accordingly, Plaintiffs respectfully request that the Court grant Mr. Kunitzer's request to withdraw his objection. In any event, Mr. Kunitzer's objection is moot.

permissible "where the proof of individual claims would be burdensome or distribution of damages costly." *Dennis v. Kellogg Co.*, 697 F.3d 868, 865 (9th Cir. 2012). *Third*, he states that he did not receive direct notice (though his daughter did). Mancinelli Obj. at 6-7. However, "[d]ue process does not . . . require *actual* notice to each" absent class member. *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008) (emphasis in original). Mr. Mancinelli makes no argument that the Notice Plan—which was designed by a notice expert and approved by the Court—was insufficient, nor does he suggest any way of improving its reach. And, of course, Mr. Mancinelli himself did not "suffer[] prejudice as a result," *id.* at 515, given that he received and reviewed a notice mailed to a family member.[13]

## C.    Varnum Objectors

A group of 26 companies represented by Varnum LLP filed a single objection, claiming the settlement was not fair, reasonable, and adequate. Each of the Varnum Objectors is suing BCBSM in unrelated litigation, all represented by Varnum. *See* Chad Halcom*,* "U.S. high court declines BCBSM's appeal," *Crain's Detroit Business*, Oct. 20, 2014, *available at* http://www.crainsdetroit.com/mobile/article/20141020/BLOG011/141029984 (noting that Varnum has filed more than 50 suits against BCBSM). The fact that the Varnum Objectors consist solely of

---

[13] Mr. Mancinelli also joins Mr. Kunitzer's objection to the claims process, which, as noted above, is based on a misunderstanding of the claim requirements, was withdrawn by Mr. Kunitzer, and is moot.

companies embroiled in litigation against BCBSM suggests they seek advantage in their other litigation—and, at a minimum, that their views are not representative of the Settlement Class's.

In any event, the Varnum Objection is meritless. Its main argument is that the settlement fund is inadequate in light of the overall amount spent on hospital services in all of Michigan. Varnum Obj. at 1, 4-7. The relevant comparison, however, is against the total *overcharges* attributable to BCBSM's conduct, not total payments for hospital services, especially when there is no evidence that most of the payments generated damages. The $850 million figure bandied about by the Varnum Objectors is over *seven times* greater than the damages that Plaintiffs would hope to prove at trial, and provides no insight into the adequacy of this settlement. The Varnum Objectors similarly point to Aetna's estimate of damages in its competitor case, *id.* at 8-9, 22, but ignore that that damage estimate is based entirely on lost profits for Aetna's sales in the market for commercial group health insurance and diminution of business value, not overcharges for purchases of hospital services. Varnum Obj. Ex. 3 at 2-3. Aetna's lost profits in the sale of commercial health insurance say nothing about the amount of overcharges in the sale of hospital services—which is the only measure of damages Plaintiffs ever

sought in this case.[14]

Based largely on their mistaken assumption that this is "a billion dollar case," the Varnum Objectors claim to see a "risk of fraud and collusion." Varnum Obj. at 9. The Varnum Objectors' basic (if unstated) premise is that Class Counsel simply fabricated their conclusion that $30 million "represents over 25% of the overcharges that Dr. Leitzinger preliminarily estimated." PA Mot. at 9. For the Varnum Objectors' argument to have any shred of merit, Class Counsel and Dr. Leitzinger would have to be crooked enough to cook up a rigged expert report just to give BCBSM an easy settlement—in a case where Class Counsel were supposedly in line for a landmark payday at trial. This suggestion—that Class Counsel and Dr. Leitzinger would jeopardize reputations they have spent decades building while simultaneously hurting their own financial interests, all to benefit their litigation adversary—is as illogical as it is insulting.

The other grounds for this insinuation are equally baseless. The Varnum Objectors complain that much of the material underlying Plaintiffs' assessment of the potential damages and the likelihood of success is under seal. Varnum Obj. at 15-17. But they point to no authority suggesting that the fact that documents or

---

[14] The Varnum Objectors similarly misunderstand the caps in the Plan of Allocation to be an estimate of damages attributable to the MFNs. They were insisted on by BCBSM as a means of limiting the amount of the settlement money any one class member could receive. (In practice, they are unlikely to have any impact on the allocation among claimants.)

expert reports were filed under seal pursuant to a protective order and sealing orders supports an inference of fraud or collusion or justifies second-guessing Plaintiffs' assessment of the value of the case. Their cases are wholly inapposite; the only ones dealing with settlements at all deal with discovery into the *terms* of a settlement, not the evidence informing Plaintiffs' evaluation of the case's merits. *See In re Domestic Air. Transp. Antitrust Litig.*, 144 F.R.D. 421, 425 (N.D. Ga. 1992) (allowing discovery into terms governing certificates awarded as part of the recovery); *Baker v. Dolgencorp, Inc.*, 818 F. Supp. 2d 940, 943 (E.D. Va. 2011) (refusing to seal settlement agreement). The Settlement should not be disturbed just because the Court and parties took steps to protect confidential information.[15]

The Varnum Objectors' final basis for suspecting fraud or collusion is the requested amount of attorneys' fees and service awards. But as discussed previously, the Settlement guaranteed nothing and thus does not suggest fraud or collusion. Quite to the contrary, Class Counsel was incentivized to seek as large a settlement as possible—and did so—because the dollar amount of their attorneys' fees would be correspondingly larger. *See Wal-Mart*, 396 F.3d at 121.

---

[15] Notably, none of the Varnum Objectors contacted Class Counsel before the deadline to opt-out or object, ensuring that their demands for confidential information (even had they any right to it) could not be met before the Fairness Hearing—and undermining their claim that they want information to decide whether to stay in the class. The Varnum Objectors *already chose* to stay in the class, and did not request *any* information before the Court-ordered deadline to make that decision. Class Counsel will respond to the Varnum Objectors' eleventh-hour motion to unseal in a separate brief in due course.

The Varnum Objectors also argue that the claims process is unnecessarily burdensome, but misunderstand its requirements. Initially, both claim forms (for individuals and for insurers, self-insured entities, and third-party payors) called for documentation such as "hospital bill(s) or other record(s)" in claims submissions to minimize fraud and duplicative payments.[16] *See* Marr Decl. ¶ 12. After inquiries from several class members, this requirement was determined to be too onerous for individuals, and, within two weeks of the first notices being mailed (and before notice was even completed), eliminated as to individuals, except in cases of suspected fraud. For insurers, self-insured entities, and third-party payors, the documentation requirement can be satisfied by an excerpt from their claims database (an "other record"). Class Counsel, the Settlement Administrator, and the help line operators have worked with many such class members to help them file a claim with the minimum work necessary. The Varnum Objectors never reached out to any of those resources.

### D.   Christopher Andrews

The final objection was filed by a serial objector named Christopher Andrews, who has objected to at least three other class action settlements. *See*

---

[16] Because many hospital purchases are paid in part by those receiving services and in part by third-party payors, duplicative recoveries would occur if claims were made for the entire charge rather than the amount paid by the claimant.

Exs. I-K.[17] In this case, Mr. Andrews timely filed an eight-page objection that conclusorily asserted a "grocery store list of issues" without discussing the actual case or Settlement in any detail. Dkt. No. 159 at 5. He subsequently filed an untimely 220-page "supplement" to his objection two weeks later, and has warned that he may "supplement this objection at any time." Dkt. 163 ("Andrews Supp.") at 19. In the existing supplement, he asserts that Class Counsel's "sneakiness, greed and being a patsy" and lack of "experience, knowledge and resources to adequately represent the class" led them to collude with BCBSM, and accuses Class Counsel of "intentionally inflated" and "high on meth" billing, "malpractice," "[f]raud on the class and court," and "attempted theft." *Id.* at 25, 27, 36, 52, 57. Andrews even asserts that "some people [i.e., Class Counsel] belong in jail" and requests that Class Counsel be sanctioned. *Id.* at 27, 63, 67. As support, he launches often unintelligible attacks on every aspect of the case, concluding that "the best interests of the class have been abused and broken and can't be put back together again." *Id.* at 193.

Despite Mr. Andrews' supposed belief that the Settlement Class could recover "many multiples of $30 million in a better negotiated settlement," *id.* at 23,

---

[17] Mr. Andrews purports to represent three family members, one of whom is the executor of an estate. However, a pro se individual can only represent himself. *See, e.g.*, *Falkner v. United States*, No. 11-cv-2982, 2012 WL 2682789, at *2 (W.D. Tenn. July 6, 2012). Mr. Andrews repeatedly references a "power of attorney," which has no effect here. *See id.*

33

Mr. Andrews told Class Counsel before filing that he would drop his entire objection if Class Counsel merely reduced their fee request by $990,000—and paid $153,450 to Mr. Andrews. *See* Ex. L at 8. Otherwise, Mr. Andrews would "send a letter to all judges in this district," file "BAR complaints," and otherwise attempt to damage Class Counsel. Ex. M. More recently, he has promised that the fairness hearing will be "full of fireworks." Ex. N.

This appears to be a pattern for Mr. Andrews. In at least two of his recent settlement objections, he has tried to leverage a nuisance objection into a fee for himself. *See* Ex. M at 5-6 (Andrews "submitted a 95-page rambling objection" along with "a surreply and request for fees" the day before a fairness hearing); *id.* at 33 ("He tried to extort a fee from us."); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 262 (D.N.H. 2007) ("Some objectors agreed to withdraw their objections after Co-Lead Counsel offered to compensate them for their services to the class from any attorneys' fee award. . . . Andrews has since resolved this dispute with Co-Lead Counsel and has stipulated to the withdrawal of his objection."); *see also* Ex. L at 5 ("Do not take what was written as personal, it's all business.").[18]

---

[18] Mr. Andrews's previous objections similarly described the case at issue as a "slam dunk," posited an astronomical potential recovery, considered the claims process burdensome and the notice process inadequate, protested the plan of allocation, and accused class counsel of inflated, fraudulent, or "high on drugs" billing. *See, e.g.*, Ex. I at 12-15, 21, 24-28, 30, 35; Ex. J at 10, 24, 36, 44; Ex. K at

Leaving aside Mr. Andrews's apparent motives, his objection is wholly meritless. As demonstrated above, the Settlement easily exceeds the "fair, reasonable, and adequate" standard. Because there is little in Mr. Andrews's abusive 220-page supplement[19] that requires response, Plaintiffs will spare the Court a line-by-line rebuttal and focus on a few key points.

All of Mr. Andrews's main arguments were refuted above. Mr. Andrews claims that the Government Case provided a "'road map' and 'free pass'" to this class action damages suit, Andrews Supp. at 42, but the Government never needed to certify a class or show damages to class members. He declares that damages "seem way underestimated for settlement purposes," but he pulls his numbers from thin air. *Id.* at 41, 66-67. He attacks the Plan of Allocation, claiming that subclasses are needed instead, *id.* at 106-109, but the Sixth Circuit has made it clear that subclasses are unnecessary where a settlement can be equitably apportioned among class members in different positions. *See UAW*, 497 F.3d at 629. And he falsely

---

1, 7-8, 13-15. To Mr. Andrews, every settlement "look[s] like a jigsaw puzzle with a couple of pieces gone." *Compare* Andrews Supp. at 21 *with* Ex. I at 9 (quoting Jim Croce, "Bad Bad Leroy Brown," *Life and Times* (1973)).

[19] Because Mr. Andrews's supplement was untimely, it need not be considered at all. *See, e.g.*, *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 246 (D.N.J. 2005) (collecting cases). Mr. Andrews's belated submission is particularly inexcusable because he was perfectly aware of the Court's deadline, as his timely filing of a generic placeholder objection shows. If the Court requests additional information about any of Mr. Andrews's claims, Class Counsel will be happy to provide it at the Fairness Hearing or in a short supplemental filing.

claims that "fees in this case were tied into the material terms of the settlement as were the incentive awards," Andrews Supp. at 91, when, as discussed above, the Settlement is in no way contingent on the Court's determination of attorneys' fees, expenses, and service awards.[20]

Mr. Andrews also questions the adequacy of the notice and claims process, largely on the basis of incorrect assertions about the website's content. Many of his allegations are simply wrong. For example, he asserts that "[c]y pres was not mentioned in the detailed notice, short or long form," *id.* at 25, when in fact it was discussed in all three. *See* Postcard Notice ("The Settlement Fund will also be used to pay . . . potentially a small payment to Free Clinics of Michigan."); Publication Notice (same); Detailed Notice ¶ 6 ("This money, plus interest, will be paid to . . . [t]he non-profit organization Free Clinics of Michigan, in certain circumstances."). He asserts that the claim forms do not mention the release, Andrews Supp. at 30-31, when each has an explicit section entitled "RELEASE." *See* Consumer Claim Form § F; Claim Form for Insurers or Self-Insured Entities § G. He claims that the list of hospitals on the claims form misleadingly omitted many hospitals for the first month of the claims period, Andrews Supp. at 30-32, when in fact the version he cites included an option for other hospitals and was on the website for just one weekend. Marr Decl. ¶ 16. Even if Mr. Andrews's claims were accurate, none

---

[20] Mr. Andrews's arguments about attorneys' fees and incentive awards are dealt with further in Plaintiffs' concurrently filed brief regarding those awards.

would be significant enough (separately or together) to have any effect on the adequacy of the notice and claims process.[21, 22]

## VI.   CONCLUSION

For the foregoing reasons, the Settlement and Plan of Allocation should be approved.

---

[21] Mr. Andrews does point out two actual errors. First, the version of the Settlement Agreement posted on the website inadvertently omitted a paragraph prohibiting the parties from initiating media coverage. Settlement ¶ 87; *see* Marr Decl. ¶ 21 (explaining mistake). This minor difference had no conceivable impact on the adequacy of notice or on any class member's evaluation of the settlement. Second, Class Counsel filed declarations confirming successful effectuation of the Notice Plan after the deadline established by the preliminary approval order. *See* Dkt. No. 162. Here again, Mr. Andrews does not even hypothesize a way this could harm the Settlement Class. Only the filing of the affidavits—not the notice itself—was delayed. Because the notice was timely effectuated, there is no damage to the Settlement Class. *See* Andrews Supp. at 35.

[22] In attempting to obtain a fee from Class Counsel, Mr. Andrews repeatedly indicated an intent to appeal from an approval order. If he does, Class Counsel will request that the Court require him to post a bond and pay any additional escrow fees, distribution costs, or other expenses necessitated by an unsuccessful appeal. *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812, 813-14 (6th Cir. 2004) (affirming objector's appeal bond of $174,429); *In re Wal-Mart Wage & Hour Emp. Practices Litig.*, No. 06-cv-00225, 2010 WL 786513, at *1-2 (D. Nev. Mar. 8, 2010) (imposing bond where "Objectors' counsel have a documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class").

Dated: October 24, 2014        Respectfully submitted,

/s/ Daniel E. Gustafson
Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

Daniel A. Small
Brent W. Johnson
**COHEN MILSTEIN SELLERS**
   **& TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
dsmall@cohenmilstein.com
bjohnson@cohenmilstein.com

E. Powell Miller
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan  48307
Telephone: (248) 841-2200
epm@millerlawpc.com

Fred T. Isquith
**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLC**
270 Madison Avenue
New York, New York, 10016
Telephone: (212) 545-4690
isquith@whafh.com

38

Theodore B. Bell
**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Telephone: (312) 984-0000
tbell@whafh.com

*Interim Class Counsel*

David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Rd, Suite 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com

*Interim Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2014, I electronically filed the *Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation* with the Clerk of the Court using the ECF, who in turn sent notice to counsel of record for all parties and for the Varnum Objectors. Additionally, I served a copy of that document by first-class mail or electronic mail on each of the following individuals who have not registered with ECF:

Christopher Andrews
P.O. Box 530394
Livonia, MI 48152-0394

Scott Mancinelli
P.O. Box 3266
Holland, MI 49422-3266

Nicholas and Coralin Davelaar
405 Turrentine Way
Russellville, AR 72801

Cynthia S. Rock
18357 Levan Rd.
Livonia, MI 48152

Ronald D. Diebel
19177 Cheshire Street
Detroit, MI 48236

David VanDaele
9812 Ferder Road
Maybee, MI 49815

John M. Kunitzer
4328 Lakecress Drive East
Saginaw, MI 48603

/s/ Daniel E. Gustafson
Daniel E. Gustafson