# EXHIBIT I

March 16, 2014

Clerk of Court

500 Pearl Street

New York, New York 10007

RE: LEHMAN BROTHERS Debt/Equity

SECURITIES LITIGATION 08-CV-5523-LAK,

Chris Andrews,

Objector, Pro Se

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3/24/14

Case No. 09-MD-2017 (LAK)

**OBJECTION TO PROPOSED E&Y**

**SETTLEMENT**

Date: April 15, 2014

Time: 4:30 pm EST

Courtroom 12D of Judge Lewis Kaplan

**Class Action Lawsuit**

Tables of Authorities.................................................................................................1
Table Of Contents.....................................................................................................5
Introduction...............................................................................................................7
Preliminary Statement...............................................................................................9
Argument..................................................................................................................13

TABLE OF AUTHORITIES

Cases:

re Vioxx Prods. Liab. Litig., 802 F. Supp. 2d 740 (E.D. La. 2011)...........…..……..26

National Association of Attorneys General, Master Settlement Agreement (1998)

(multi-state tobacco litigation);……………………………….……………..………26

Matthew T. Lee, The Ford Pinto Case and the Development of Auto Safety Regulations, 1893–

1978, 22 Bus. & Econ. Hist. 390, 399–400 (1998) (Ford Pinto exploding gas tank);.......26

Erin Brockovich (Universal Studios 2000) (polluted groundwater in Hinkley,

California).............................................................................................................26

_Auriga Capital Corp. v. Gatz Properties, LLC_, No. C.A. 4390-CS, 2012 WL 361677 (Del. Ch. Jan. 27, 2012) (slip op.),

In Mercury Interactive Corp., 618 F. 3rd 988, 994-95 (9th Cir. 2010),..................... 34

re Washington Pub. Power Supply Systems Lit. 19 F. 3d 1291, 1302 (9th Cir 1994))... ..34

Rule 23(e), ................................................................................................34

In re Relafen Antitrust Litigation, 360 F. Supp.2d 166, 192-94 (D.Mass. 2005),citing inter alia Amchem Prods. Inc v Windsor, 521 U.S. 591, 617, 623 (1997)Rule 239e)................34

Reynolds v. Beneficial Nat't Bank, 288 F. 3d 277, 279-80 (7th Cir. 2002),...................34

In re General Motors Corp, Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55F. 3d 768, 785 (3d Cir. 1995), (quoting Grunin v International House of Pancakes, 513 f. 2d 114, 123 (8th Cir.1975)). ................................................................................34

" True v American Honda co. 749 F. Supp. 2nd 1052, 1080 (C.D.Cal. 2010) ( citing 4 newberg on Class actions $ 11:42 (4th ed 2009)). Accord American Law Institute, Principles of the Law of Aggregate Litig. $3.05 © (2010) (Ali Principles"),.................................... 35

Hanlon v. Chrysler Corp., 150F. 3d 1011, 1021 (9th Cir. 1998); In Bluetooth Handset Prods. Liability Litig., 654 F. 3d 935, 947 (9th Cir. 2011,23 9e), .....................................35

Bluetooth, 654 F. 3d at 948 (quoting Staton v Boeing Co., 327 F. 3d 938 , 960 (9th Cir 2003)),................................................................................35

Stanton, 327F,3d A 964............ ..............................................35

Torrisi v Tucson Elec. Co. 8 F. 3d 1370, 1376 (9th Cir 1993),...............................35

Report of the Third Circuit Task Force, Court Awarded attorney Fees, 108 F.R. D. 237, 266 (1985),................................................................................31

Grovev Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447 (S.D. Iowa 2001) citing In re Gen

Motors Pick-Up Litig., 55 F. 3d at 789.),....................................................36

In re Gen. Motors PickUp Litig,. 55 F. 3d at 813,.........................................36

Thedore Eisenberg & Emperical Issues, 57 VAND .L. Rev. 1529, 1532 (2004).,...........37

Summary Judgment should be filed.......................................................34

Rule 23(a)(4), ..........................................................................34

23(g), .................................................................................34

See VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP 348 F. Supp 2d 255, 262 (S.D.N.Y.

2004),.................................................................................59

Works, Inc. v. Turner, 179 F. Supp. 2d 177, 215 (S.D.N.Y. 2001),........................59

VTech Holdings , 348 F. Supp. 2d at 262 (quoting Parrott v. Coopers & Lybrand, L.L.P. 741

N.E.2d 506, 508 (N.Y. App. Div. 2000)),...............................................59

Cumis Ins. Soc'y v. Tooke , 739 N.Y.S.2d 489, 493 (App. Div. 2002),....................60

William Iselin & Co. v. Landau , 522 N.E.2d 21, 23 (N.Y. 1988),........................60

Collins v. Esserman & Pelter , 681 N.Y.S.2d 399, 401 (App. Div. 1998),.................60

Kantor, Geisler & Oppenheimer, P.A. , PCAOB Release No. 105 - 2007 - 009 (Dec. 14, 2007).

Silverman v. KPMG LLP (In re Allou Distribs., Inc.), 395 B.R. 246, 272 - 73 (Bankr. E.D.N.Y.

2008),................................................................................60

Springer Exchange Act Release No. 44858, 75 S.E.C. Docket 2095 (Sept. 27, 2001)...........

Stanley L. Bloch, Inc. v. Klein , 258 N.Y.S.2d 501, 508 (Sup. Ct.

1965)..................................................................................60

Crowley v. Chait, Civ. No. 85 -2441 (HAA), 2004 WL 5434953, at *12 (D.N.J. Aug. 25,

2004);.................................................................................61

World Radio Labs., Inc. v. Coopers & Lybrand, 557 N.W.2d 1, 15 (Neb. 1996)803 N E.2d 460 (Ill. 2003); see also Plan Comm. v. PricewaterhouseCoopers, LLP , 335 B.R. 234, 249 .... 51 (D.D.C. 2005),...............................................................................................62

**Statutes, rules and regulations**

Delaware General Corporation Law's principles of fiduciary law...............................17

Regulation S-K.................................................................................................18

AU 380.............................................................................................................18

Sarbanes-Oxley Law.........................................................................................19

PSLRA.............................................................................................................24

Rule 23............................................................................................................24

Due Process.....................................................................................................24

54(D)(2)(D).......................................................................................................30

Rules 23(a)(4) and (g).......................................................................................30

Commission's Rule of Practice 102(e) and PCAOB (Public Company

Accounting Oversight Board) *Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5*............37

Management Discussion and Analysis ("MD&A"),.................................................55

GAAP accounting..............................................................................................55

Regulation S-K.................................................................................................56

Generally Accepted Auditing Standards ("GAAS")................................................57

Auditor Malpractice...................................................................................57

SFAS 140............................................................................................61

23(e).................................................................................................80


**Table of Contents**

INTRODUCTION.......................................................................................4

Preliminary Statement...............................................................................6

Insufficient Evidence for Approval Due to Missing Expert Reports...........................6

Argument............................................................................................10

Proposed settlement fails the following two sets of tests......................................10

Reason to reject or modify settlement to obtain more money...................................14

$6.6 billion to $30 billion in damages calculation.............................................18

Defendant is guilty of the following allegations in the complaint and a jury would agree.....20

The Notice to the Settlement Class does not satisfy the requirements of the PSLRA, Rule 23 and

Due Process..........................................................................................25

Plan of Allocation is flawed......................................................................26

The "Few Objectors" Issue.........................................................................26

The high on drugs attorney fee and expense issue..............................................28

A class should not be certified when the primary beneficiaries are class counsel..................29

The Court Has A Fiduciary Duty to The Unrepresented Members OF The Class.................30

A showing of explicit collusion is not required to demonstrate settlement unfairness............32

Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval from a Low

Number of Objectors................................................................................33

Lead Counsel stated "$90 million is a drop in the bucket for what we lost

here"...............................................................................................34

The real recoverable damage amount from defendant exposed.................................35

EY reports 2013 global revenues of US$25.8 billion...........................................36

Defendant violated Commission's Rule of Practice 102(e) and PCAOB (Public Company

Accounting Oversight Board) *Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5)*............36

Examples of defendant's typical business practices..............................................37


$99 Million Buys EY Ticket Out Of Private Lehman Litigation (Objector says not yet) ..........45

Evidence from the Examiner's Report that $99 million doesn't cut it.............................49

Meet Ms. Hillary Hansen..........................................................................51

Statement by Anton R. Valukas Examiner, Lehman Brothers Bankruptcy before the Committee

on Financial Services United States House of Representatives....................................52

Ernst & Young's Knowledge of Lehman's Repo 105 Program During several Rule 30(b)(6)

interviews.........................................................................................60

Big Lehman Brothers Troubles For Ernst & Young...............................................61

Ernst & Young failed to follow professional standards of care with respect to

communications with Lehman's Audit Committee...............................................63

Ernst & Young failed to follow professional standards of care with respect to an investigation of a whistleblower claim.................................................................................................63

Ernst & Young failed to follow professional standards of care with respect to audits and reviews of Lehman's public filings...................................................................................65,66

Historical Prices Lehman Brothers Holdings Inc.................................................................70

*State of New York's complaint snippets*...........................................................................75

Summary Judgment Standard........................................................................................77

Objector Fee Award.......................................................................................................78

Suggested attorney fee..................................................................................................78

CONCLUSION..............................................................................................................78

Deny motion to certify..................................................................................................79

## INTRODUCTION

- Objector was a purchaser of Lehman common stock during the class period and is a member of the settlement class, therefore has standing to object to the settlement. See attached three page document (labeled A) as proof. Objector's mailing address is P.O. Box 530394 Livonia, MI 48158. The telephone number is 1-248-635-3810. E-mail is caaloa@gmail.com. Objector does intend at the present time, based on work schedule, to appear at the fairness hearing on April 15, 2014. Per counsel's request, objector has filed objections in approximately five cases over the past six year period. The cases were ??? Vs. Tyco International, Friedman vs. Penson

Worldwide, Inc., Freudenberg vs. E-Trade Financial Corp., ??????? Vs. Nutella, and this case. There could be one more in there somewhere, maybe. Counsel should perform an electronic search using a data base check since this objector does not have the ability to do so. Objector has also attached at the end of the objection a 16 page document of defendant's current Global Code of Conduct (labeled B) and a 41 page NERA report dated January 21, 2014 (labeled C) showing the average attorney fee in a settlement this size for the latest reporting period ending in 2013 is 25% vs. the 30% located on page 34 that counsel is essentially requesting for their fee

Objector requests the following:

- Plaintiff Counsels are to list the hundreds of class action suits they have filed over the past five year period in their response to this objection.

- An opportunity to speak to the Court and the option to cross-examine any witnesses who may testify at the hearing in support of settlement approval.

- A list of any witness to be called with their cv and the specific scope of their testimony and copies of any evidence they may or will introduce at the hearing.

- The option to perform discovery on certain issues that are described below per Rule 23, 4 paragraph 2, if necessary.

- Objector reserves the right to file a sur-reply if it's necessary and there is time available before the nearing.

- Objector reserves the right to supplement this objection at any time if the parties introduce new facts, evidence, arguments or valuation after Counsels' settlement filing made on March 14, 2014.

- Objector does not intend to call any witnesses at the fairness hearing but reserves

the right to make use of all documents entered on to the docket by any settling

party/objector/witness or any visual items used at the fairness hearing like a display.

- Objector adopts all of counsel's Table of Abbreviations as described in their latest settlement filing papers dated March 11, 2014.


On November 12, 2013 objector sent an email to Co-lead counsel requesting copies of any

filings to be made from that date forward relating to the proposed settlement be sent to the

objector via email for review "to determine if everything is OK." Well, it's not, as evidenced

by this objection which started taking shape the end of November 2013. The missing,

neglected, overlooked issues and facts in this proposed settlement "…… look(s) like a jigsaw

puzzle with a couple of pieces gone." (Jim Croce- Bad Bad Leroy Brown-1973)


**Preliminary Statement**


**Insufficient Evidence for Approval Due to Missing Expert Reports**

Plaintiffs' Counsel wrote in document 1340 "Plaintiffs Memo in Support of Motion for

Authorization to Notify the Settlement Class of Proposed Settlement with Ernst and Young LLP

and to schedule a Settlement Hearing" filed on 11-27-13 page 1 of 12 specifically page 5 (but not

in the settlement notice for all 916,000 class members to see) "Following the substantial

completion of fact discovery and just prior to the deadline for exchanging expert reports, the

parties reached an agreement in principle to settle the Action against E&Y for $99 million."

Wait, hold it, stop right there. What?

First, why was this crucial fact not in the settlement notice? By not including this critical information in the notice counsel has violated Rule 23 that requires notice in clear, concise, accurate and easily understood language as it relates to the issues. In this case failing to mention the expert reports creates inaccuracy, the missing reports are a material "issue" to the class and so is clearly a failure in the "accurate" department. The notice is flawed and unacceptable. This is material information and not including it is exactly what defendant did in this case, hiding material information that caused billions in damages to the class, ironic.

Second, why did lead counsel NOT demand that the reports be exchanged prior to agreeing to a settlement figure? Counsel may be leaving tens, hundreds of millions or even billions on the table. The class paid for all that work which is included in their proposed outrageous, high on meth attorney fee and expense request. Objector strenuously requests copies of both reports be provided to the Court (in camera if necessary) and to the objector for review. Objector agrees to sign a confidentiality agreement and/or protective order (if necessary) to be allowed to review, comment on both reports, (under seal if applicable) and return to The Court within two weeks from receipt to ensure the class is not getting defrauded and shafted in what appears to be a quid pro quo settlement scheme. The Court would benefit from a second set of "devil advocate eyes" on these reports. Something is not right and being hidden here.

Third, the class representative is OK with this? It's time to disqualify them and acquire some new named plaintiffs since they clearly are not qualified to look after the best interests of the class and are being used as a rubber stamp. Someone has to look out for the class beside the Court so the objector plays guardian on behalf of the class, again. Where is the declaration form from the class representative that they approve of this proposed settlement? Missing in all the settlement papers. Was the class representative aware the reports are missing? If so what did they

have to say about this? A sworn statement is needed from them explaining the reasoning for allowing this to happen and how is the class supposed to read, comment on and object if necessary?

Fourth, why did Plaintiff's Counsel believe they could get this proposed settlement by the Court without the reports to begin with after what happened in the D&O hearing? Do they not learn?

Fifth, how can the Court even consider approving this proposed settlement with Plaintiffs' and Defense Counsel intentionally failing to provide this missing, critical and key information? It will not cause a major delay or incur costs for counsels to exchange the reports and provide them to the court and the objector. This ruling will forever bar 916,000 class members from asserting up to $30 billion dollars in claims against the defendant E&Y for their participation in this year's long accounting manipulation, balance sheet misrepresentation and cover up scheme so transparency is demanded and required.

The concrete, undeniable truth and irrefutable facts in this case known as "E&Y Gate" as shown in the publically available evidence, such as but not limited to the court files, the Examiner's Report, the Court's issued opinion related to defendant's request for dismissal, and evidence throughout this objection prove defendant Ernest & Young, the gatekeeper, is guilty of the following and should pay more than a token $99 million for the billions of damages it caused by being a willing enabler in this accounting manipulation, balance sheet, financial fraud and cover up scheme.

This proposed $99 million settlement does not fit approval guidelines under Rule 23 of the Federal Rules of Civil Procedure as more fully described in this objection because:

- Substantial recovery of more than $99 million based on the evidence in this case as shown below against the Defendant is a slam dunk and is an unacceptable fraction of damages caused by defendant.

- Not fair, reasonable and adequate in all respects.

- Not in the best interests of the class members, including lead plaintiffs.

- Not in the public interest.

- Does not satisfy the Grinnell factors for settlement approval.

- The notice and notice packet are flawed and failed for settlement purposes.

- Lead counsel has breached it's fiduciary duty of the class by putting it's own interest ahead of the class by accepting this proposed settlement without demanding the reports first, a clear conflict of interest. No explanation in the settlement papers had been given for NOT exchanging the reports, unacceptable.

- This proposed settlement only creates an illusion of relief for the class.

- Continued litigation does not pose substantial risks of reducing defendants' ability to fund a settlement or judgment, rather it is more likely the settlement will rise by many, many multiples. This first settlement offer is a trial balloon offer that is punctured and useless.

- The Settlement does not appropriately balance the risks of litigation and the benefit to the settlement class victims of a far superior recovery.

- Continued litigation does not pose substantial risks in establishing liability.

- Continued litigation does not pose substantial risks in establishing damages.

- Balancing the certainty of a curb high immediate recovery against the recovery of many, many multiples of $99 million in a future summary judgment filing, logically an increased offer the closer to trial or trial verdict dictates and favors the continuation of the suit and rejecting the cheap shell game settlement offer.

- Approving this settlement would be a failure of due process for the class.

**Argument**

**Proposed settlement fails the following two sets of tests:**

If the Court faithfully applies the first six-factor test below in determining the appropriateness of the proposed settlement, there is no way this should be ever approved as is. Those six factors are:

(1) evidence that the settlement was obtained by fraud or collusion. Where are the missing reports? Some might say that is a form of fraud and/or collusion, (2) the complexity, expense, and likely duration of the litigation, there is enough evidence today to file for summary judgment or go to trial tomorrow and win more than $99 million. The jury's jaws would hit the ground after knowing all the facts in this objection, (3) the stage of the litigation and available discovery, The Examiner's $50 million dollar two thousand two hundred page report, the Examiner's depositions, Plaintiffs counsels 50 depositions, 40 million pages of available documents produced by the Examiner is all the discovery that is needed. (4) the probability of plaintiffs' prevailing on the merits, 95% range, no reason to settle for a token $99 million today. (5) the range of possible recovery and certainty of damages, $6.6 billion to $30.00 billion in damages based on the artificial inflation and stock price dropping to zero as will be explained below, $50 million refund for the

Examiner's Report from E&Y and a refund of the applicable portion of the $160 million paid to defendant by Lehman over seven years for what turned out to be dishonest and fraudulent services, certainly of damages, slam dunk (6) the opinions of class counsel, class representatives, and absent class members. This objection will clearly prove why the settlement should be rejected based on the merits contained above and below.

This Court used the following nine factor Grinnell test criteria below in deciding whether or not to approve the D&O settlement. Using the same criteria against defendant E&Y, the evidence above and continued below clearly calls for outright rejection, more money or no approval from this Court. Defendant HAS the means to pay for the billions in damages it helped cause contrary to counsels' claims in their brief and the class has the same if not a greater amount of evidence to use against E&Y.

Those nine factors are: (1) the complexity, expense and likely duration of the litigation, The trial could start in three months based on the proof that is out there that is in the Examiner's report, the evidence in the hands of both counsels, the testimony that is already on the record and depositions completed. Just a few subpoenas for testimony on the stand at trial are needed. (2) The reaction of the class to the settlement, the class as a whole have a don't care attitude relating to class action lawsuits, lawyers and courts. (Nothing personal Judge Kaplan.) 99.9% of class members don't have the skill, knowledge or wish to throw good money after bad to compose an objection that they believe would make an impact and help improve it. (3) The stage of the proceedings and the amount discovery completed, a two thousand two hundred page, $50 million discovery road map is all that is needed today that proves without a doubt the defendant is guilty of the grocery store misconduct list described below. Those missing expert's reports might also come in handy here, (4) the risks of

establishing liability, piece of cake, it's all here in the objection, Plaintiffs' files and
Examiner's Report. (5) the risks of establishing damages, piece of cake, billions, so admit
Plaintiffs' Counsel at the D&O Fairness hearing not counting punitive damages, interest etc.
just look at the stock price drops, the Examiner says it's $30 billion in damages, (6) the risks
of maintaining the class action through the trial, walk in the park. (7) The ability of the
defendant to withstand a greater judgment, the $99 million represents one and a half days
worth of $25 billion in revenue for the defendant based on a seven day, 365 day a year
schedule in their 2013 fiscal year for just the minimum $6.6 billion in damages. The damages
represent a maximum of just 1.7% of the minimum $6.6 billion minimum in damages caused
from July 8, 2008 all the way down to .37 the day of the filing. (8) the range of
reasonableness of the settlement fund in light of the best possible recovery, an unreasonable
$99 million fund vs. $6.6 to $30.0 billion in damages, interest, attorney fees, costs, punitive
damages, no contest, (9) the range of reasonableness of the settlement fund to a possible
recovery in light of all attendant risks of litigation, very unreasonable to approve, makes no
sense, $99 million vs. billions. Seems counsel knows the price of everything in this
settlement concerning their costs and fees, hours spent copying costs etc. but knows the value
of nothing as it pertains to the class's losses and their fair recovery of damages in this
proposed useless settlement.

Counsel has not produced sufficient evidence to obtain approval of the settlement.

Counsel never focused in it's TAC or settlement papers on any of the non security related
issues that the objector addresses below that directly relate to and are also separate from the
security violation in question and reasons why we should forge ahead. Issues that involve the
colorable claims mentioned in the Examiner's report which translate into issues like

professional malpractice, bad faith conduct, wrongful misconduct all of these and more come into play that are more than enough with the one security claim to obtain hundreds of millions in a settlement or billions from the defendant on the court room steps or at trial even taking into account proportionate fault defenses. Objector will address the colorable claims issues below and the resulting violations that come after that. A jury will not let E&Y off the hook without a nine or ten figure verdict when they see the evidence, what they did and how much money was lost by stakeholders. Unfortunately our counsel is focused on all the wrong reasons to quit rather than on the right reasons to march on except for that darn $30 million fee is clouding their thought process and vision.

**Reasons to reject or modify settlement**

Specific reasons based on the evidence as to why the settlement should be rejected and allowing a jury to find the defendant guilty of many of the following actions and awarding a Tyco size settlement amount for damages none of which were addressed in Plaintiffs' Counsel's regional telephone book size final settlement papers are listed below: Should and does counsel need to file a fourth amended complaint or is it too late?

- intentionally failing to inform Lehman's Audit Committee over numerous meetings of the whistleblower allegations, specifically the existence of Repo 105 and Repo 108 fraud making the Quarter 2 2008 results misleading and fraudulent in violation of various securities law. The risks taken by Lehman due to the concealment of Repo 105 and 108 directly contributed to the liquidly crisis later on down the line when Lehman could not afford to correctly address it. Defendant is therefore responsible in part for the bankruptcy and the damages and expenses incurred. Defendant additionally and

intentionally failed for 26 days to interview the whistleblower after receiving the letter! Gross negligence at the least, cover up at the most with Lehman's only valuable option, time, running out. Therefore defendant is now guilty of the following:

- E&Y is guilty of tortuous interference with Lehman's audit board and stakeholders.

- E&Y is guilty of breach of duty to Lehman Brothers and stakeholders.

- E&Y is guilty of aiding and abetting breaches of fiduciary duties in collusion with Lehman officers against the best interests of the company and stakeholders. Defendant intentionally hid Repo 105 transactions from the audit committee and stakeholders for the entire class period and through the use of what this objector calls fraud by silence making the applicable SEC filing intentionally false and misleading.

- Guilty of willful dishonesty.

- Guilty of willfully violating its duty of care during the course of its work to Lehman's Board and Audit Committee and the company for years by not disclosing the Repo scheme.

- Guilty of violating its duty to monitor its employees in the discharge of their duties.

- Guilty of participating in Lehman's balance sheet manipulation scheme while not withdrawing from the Lehman engagement if necessary to alert the stakeholders.

- Guilty of fraud by omission.

- Guilty of allowing accounting manipulation, a mortal sin in defendant's profession.

- Guilty of fraud by misrepresentation.

- Guilty of allowing accounting gimmicks and false statements to be used in the applicable SEC filing, in Lehman conference calls and in written disclosures, which means it is...

- Guilty of enabling a wire fraud through the use of the phone system for those specific conference calls and use of the computer systems crossing state lines because defendant knew the statements were false before, while and after they were made and told no one making them a co-conspirator and liable for any and all damages caused by their actions and inactions.

- Guilty of enabling mail fraud if any of the paperwork back and forth from Lehman to defendant went through the mail system.

- Guilty of unjust enrichment by overcharging Lehman for services that were overpriced, delivered improperly and substandard compared to the standards expected of a Big 4 accounting firm while assisting in an accounting manipulation scheme unbeknownst to the victimized class.

- Guilty of violations of Delaware General Corporation Law's principles of fiduciary law and also allowing Lehman officers to intentionally breach those very same principles and duties to stakeholders for years by remaining silent. Since Lehman and defendant are both incorporated there, defendant can't claim they didn't know about these principles. (Ernst & Young Americas LLC is a Delaware limited liability company that coordinates the activities of the Americas Area Firms.)

- Guilty of willful gross negligence and more so the business judgment rule.

- Guilty of willful misconduct.

- Guilty of wrongful conduct.

- Guilty of reckless conduct.

- Guilty of willful misrepresentation.

- Guilty of auditor malpractice.

- Guilty of willful breach of legal duty.

- Guilty of willful bad faith.

- Guilty of willful bad faith fiduciary conduct.

- Guilty of violating Regulation S-K

- Guilty of willfully violating AU 380, auditor communications.

- Guilty of obstruction in the Lehman bankruptcy case by willfully lying to the Examiner in his investigation with the evidence shown further below.

- Guilty of willfully violating the Sarbanes-Oxley Law by essentially doing internal audit work, a prohibited service under Sarbanes-Oxley as described further below.

- E&Y is guilty of willfully violating its own internal conduct guidelines. Attached is the 2013 version. I assume Plaintiff's counsel has reviewed a copy of the 2007-2008 versions during the discovery process, right? They are pretty close, right? The objectors requests a copy and please include it in the reply to this objection for the objector and Court to review.

- E&Y is guilty of intentional improper professional conduct and professional malpractice so is liable for $6.6 billion to $30 billion in share price damages as shown further below.

- E&Y should be liable to stakeholders for the entire $50 million cost of the Examiner's Report since it's took that amount to obtain the evidence of E&Y's remaining security violation and intentional, improper malpractice conduct in propping up Lehman's strength perception, remaining silent for the entire class period and more crucially the last 120 days or 2880 hours leading up to the bankruptcy filing in what turned out to be an enabling, in concert, dishonest, accounting, conspiracy, and wire fraud scheme.

- E&Y should refund to the class the entire $160 million paid to Lehman over the previous seven year period for the accounting manipulation scheme it allowed to be created and the damages it intentionally helped cause by keeping Repo 105 hidden from everyone and which helped allow Lehman executives to start overextending themselves in the first place.

- E&Y by its actions or lack thereof, helped cause, in part, the Lehman bankruptcy and up to $30 billion in damages and expenses that occurred due to its bankruptcy filing.

Plaintiff's Counsel has the burden of proof in obtaining approval, not for the objector to disprove the fairness of it, a huge difference. Based on the above, defendant has caused billions in damages and is required to pay more than curb high token $99 million in damages.

**$6.6 billion to $30 billion in damages calculation**

Let's figure out the how the minimum $6.6 billion to $30.0 in losses to the class was calculated before going any further. The Examiner in his report used the date of 2-29-2008 and found there were 554 million shares outstanding and the average price of Lehman shares was $50 a share down from a high of $65.73 a share in January 2008. 554 million shares multiplied by $50.00 a share equals a market cap of $30 billion dollars. This $30 billion wipeout in equity over the next eight months which is part of the class period, ended at .37 a share is the maximum that defendant E&Y is on the hook for minus the offset arguments, the objector gets it. $99 million is just partial interest on the final settlement and/or verdict after offsets. For example take $30 billion and divide the damages between the Lehman officers and the defendant now apply offsets. Take even half that number and $99 million is still a grain of sand compared to the

amount of grains of sand on the entire beach, which represent stakeholder's losses.

***Objector states that the minimum loss defendant is on the hook for rides from $13.00 a share all the way down to zero starting on July 10, 2008 to the date of bankruptcy just using the one securities violation claim alone***

The stock loss from just 07-10-08 forward ($13.49 a share) to .37 the day of the bankruptcy filing we have a maximum loss of $13.00 a share multiplied by 509 million shares equals a $6.6 billion in stakeholder losses plus punitive damages, costs and interest. Had defendant forced Lehman management to disclose Repo 105 and 108 or not allowed Lehman to ever use it the bankruptcy may not have ever occurred and the sooner had it been disclosed the less risk Lehman would have been forced NOT to take which ultimately, in part caused it's demise

That $99 million offer is a joke and lead counsel knows it when looking at the guilty actions of the defendant above and will most likely be just a fraction of the interest on a judgment that is awarded to the class at trial. $99 million is pocket change and Plaintiff's counsel wants $30 million of it and $4 million in expenses for all the evidence the Examiner produced? Counsel, pass me your crack pipe. In addition as this Court noted at the last fairness hearing, if not for the Examiner's Report this case would most likely have been dismissed. The Court also noted in defendant's motion to dismiss opinion, Plaintiffs' counsel did not plead well enough resulting in part of the complaint being dismissed. Who pays for that counsel? Care to throw in a few tens of millions or reduce the fee to a dollar to make up for the errors?

Does The Court really believe that anyone with more than a two digit IQ would have invested even a penny with Lehman had any investor been informed there was a cooked leverage, balance sheet, accounting manipulation scheme going on that the defendant and it's client were engaged in, not disclosing and were remaining silent about from the start of the class period forward? No, and this objector like many others would not have invested even a penny. This fraud artificially made the strength of Lehman appear better than it really was all during the class period. E&Y could have forced Lehman, at any time during the class period to disclose the truth about Repo 105 and leverage accounting fraud scheme to the Lehman audit committee especially when asked, but defendant did nothing and as a result allowed billions of stakeholder's money from unsuspecting investors during the class period to simply evaporate, especially in the final few months of Lehman's life.

The audit committee might have been able to take extremely drastic and possible creative actions to avoid the bankruptcy filing starting at the beginning of the class period forward had it been told the truth by E&Y especially when asked instead of covering it up which is a well-known method of deception. Since the problems were bigger than the board thought, they were unaware of the scheme so dramatic actions could not and were not planned and executed in an attempt to save the firm until it was way too late. Defendant is responsible and now on the hook for big damages.

**Defendant is guilty of the following allegations in the complaint and a jury would agree:**

The first set allegations come right out of Plaintiffs Counsels Document 1340 page 6. The objector has added the word "guilty" in front of each allegation, (now proven based on the publically available evidence) in Plaintiffs' Counsels amended complaint making the $99 million offer too little:

- Guilty of knowingly allowing Lehman's financial statements during the relevant period to be misrepresented and/or omitting material facts about the business and financial condition of Lehman; (Objector plucked the following gem of a quote from the Examiner's report page 744. For example, "four days prior to the close of fiscal Year 2007, Jerry Rizzieri was in search of a way to meet his balance sheet target and wrote to Mitchell King: "Can you imagine what this would be like without 105?" 2888n  Objector says yes, the stock price would have plummeted many dollars  causing half a billion dollars in damages per dollar drop to stakeholders but defendant E&Y says that's OK we will put ourselves on the hook if this should ever get out. Time to pay up E&Y. Lehman employees could easily see the artificial benefit derived by using Repo 105 and 108 and so could the defendant who allowed it to continue to be used all for the fees it was receiving from Lehman, a quid pro quo if you will.

- Guilty of allowing the market price of Lehman's securities during the class period to be artificially inflated due to its material misrepresentations and failures to disclose full material facts. Duh. Who would buy anything from Lehman, at any price if they knew a balance sheet, accounting manipulation scheme was in progress that was NOT being fully disclosed? No one would. Just look at the price drop whenever bad news came out.

- Guilty of allowing class members to suffer huge damages which deserve compensation. (Objector says it's $6.6 billion to $30.0 billion plus punitive damages and all expenses incurred in this case. (The objector's damage calculation estimate is in writing, something that is missing in all of counsels' settlement papers.)

Plaintiffs' Counsel as usual applaud themselves heartily for the brilliant settlement they supposedly extracted from E&Y based entirely on the fact that defendant strenuously denied any liability of any kind in the face of a Mount Everest amount size of evidence accumulated by the Examiner. But defendants always deny liability when faced with a meritorious lawsuit. Merck didn't roll over and play dead when it was first sued over the people it killed while raking in billions selling Vioxx. Merck was brought to heel only when counsel obtained—through discovery—internal documents making it clear that Merck continued hawking a drug that it knew induced heart attacks in unsuspecting patients. See generally In re Vioxx Prods. Liab. Litig., 802 F. Supp. 2d 740 (E.D. La. 2011) (discussing "extensive discovery" undertaken by various law firms). There are countless other cases where companies have played possum until they were confronted with internal documents and/or expert reports proving them liable. See, e.g.,National Association of Attorneys General, Master Settlement Agreement (1998) (multi-state tobacco litigation); Matthew T. Lee, The Ford Pinto Case and the Development of Auto Safety Regulations, 1893–1978, 22 Bus. & Econ. Hist. 390, 399–400 (1998) (Ford Pinto exploding gas tank); Erin Brockovich (Universal Studios 2000) (polluted groundwater in Hinkley, California) and this case based on the Examiner's report! The simple fact is, Plaintiffs' Counsel has overlooked their basic responsibility to discover and address the facts pro and con from the defendant. This Court should not approve the settlement unless and until Plaintiffs' Counsel exchange expert's reports and this objector can review and comment on both of them.

Finally, Plaintiffs' Counsel has locked the class into a settlement that our counsel requests 30% or $30 million of plus $4 million in expenses in what this objector calls the equivalent of a get

out of jail free "wink, wink" cheap settlement for the defendant. Plaintiff's Counsel no longer has an incentive to look for evidence establishing the amount of real liability and real damages; their incentive was to get the settlement finalized so they could cash in their Inca size bounty. Finding a smoking gun in that expert report is the last thing counsel wanted, as it could call into question their judgment in having settled the case without exchanging expert's reports. The Court should heavily ding counsel's fee for this Three Card Monte game they just played. Would counsel have settled if they knew their fee was going to be 5%, No.

Plaintiffs' Counsel claim the settlement is a great deal, but this is just a guess, and a poor guess at that based on the evidence. They have a strong financial incentive to guess that way. This Court has no basis for making an approval decision for the simple reason that the parties have not provided sufficient information to do so.

Plaintiffs' Counsel wrote in document 1380 page 21 of 34. "Defendant argued it only had limited responsibility when conducting a quarterly interim review". How about the responsibility to reveal the Repo scam to the audit committee anytime during the class period? Had that been done Lehman would not have had the cushion to overextend itself and maybe no bankruptcy would have occurred. Defendant allowed Lehman to use it, become comfortable and rely on it to obscure the true numbers for many years and couldn't take the crack away from the addict. Allowing the Repo scam to exist contributed to the liquidly crisis that doomed Lehman so logically E&Y is equally responsible for the bankruptcy as are the Lehman officers as we all know. We can let the jury pick the damage amount.


**The Notice to the Settlement Class does not satisfy the requirements of the PSLRA, Rule 23 and Due Process**

The failure in the notice is that of a failure in the substance in that the notice fails to fairly inform the 916,000 class members, large and small, that the expert reports were not swapped before the settlement amount was reached, a clear material and critical fact that class members should have been told about as this objector wrote about many pages above in more detail.

**Plan of Allocation is flawed**

Under Appendix D, Plan of Allocation for the net settlement fund A. Preliminary Matters. There seems to be an indication that our counsel has thrown in the towel to get this approved. Under the first paragraph counsel wrote to the class, "In accordance with the requirements established by the District Court, an which are approved for payment from the Net Settlement Fund (collectectively "Authorized Claimants"), and whose payment from the Net Settlement fund equals or exceeds ten dollars.($10.00). Why is the dollar amount ten dollars when the D&O amount started at $50.00, $25.00 then eventually $10.00? Is that because counsel knows now that hardly anyone got anything even at $10.00? Reduce the minimum to $5.00. Something is better than nothing. In fact why not take the token amount left over for the class to divide up after Lead Counsel's extortionist type fees and expenses are and divide it evenly among the 916,000 class members? That would give each class member regardless of size of loss just an average check of $70.00. It seems a bit low vs the billions in damages that are being left on the table. It appears the class is being shafted.

Counsel wrote in the Notice to the class Appendix D page 17,. "At this time, it is not possible to make any determination as to how much a Settlement Class Member may receive from the Settlement." That is not true. Have counsel bring to the hearing a computerized statement from

the claims administrator showing how much each claimant received in the D&O and the underwriter settlement than do something math. Fair?

Paragraph two, "The objective of the proposed plan of allocation set forth below (the Plan of allocation") is to equitably distribute the Net Settlement Fund to those Authorized Claimants who suffered losses as a result of the misstatements alleged in the action". Stop right there. MISSTATEMENTS? No, the proper term is an intentional, ongoing accounting manipulation balance sheet and misrepresentation scheme. Now that it's fee time counsel forgot that defendant actively engaged in and covered up for years a scheme that cost stakeholders billions as a result of the scheme maxing itself out when the liquidly run for Lehman came calling, just like a Ponzi scheme. It's now all about obtaining their fee and to heck with the class. Objector will now be forced to expand on that glossing over of the fraudulent actions by defendant in greater detail below since counsel has forgotten what it is fighting for. Counsel is attempting to downplay the seriousness of E&Y's actions and resulting damages solely to make the class position look weaker than it really is, just like what defendant did to make Lehman's position appear stronger! Counsel is clearly acting in the best interests' of the defendant not the class so this settlement should be rejected.


Page 21 Objection. Objector states that three lawyers from the NY bar should not be judge and jury with the class's money. This is a fraud on the class. It's not their money to decide what to do with and who gets it. The list of who gets any remaining distributed funds should have been made available in the notice sent to the class for them to comment on. Objector says that one nonprofit should receive any class money that is left over. The Center for Class Action Fairness is a non-profit public interest law firm that represents consumers and shareholders in the class-

action settlement process. http://centerforclassactionfairness.blogspot.com/. Isn't everyone interested in making sure class action settlements are made with the best interests of the class at heart? The Center has cut $260 million in attorney fees from lawyer's demands that were deemed excessive by numerous federal courts around the country that flowed back into the hands of victimized class members around the country. They have won seven appeals in just four years using only $1.5 million and they just hired their fourth lawyer! A great return for past and future victimized class members everywhere. Place them on the list to show good faith and a sense of fairness. The figures come from the director Ted Frank shortly after he starts speaking. http://www.c-span.org/video/?317417-1/manhattan-institute-forum-class-action-suits

Same page, last sentence. "Co-Lead Counsel's motion will include a declaration detailing the means by which the proposed recipients were selected". Objection. Why is that done right now in the settlement notice? Will the class have a chance to review this and object in the future? No. Fix this as described above.

## The "Few Objectors" Issue.

Plaintiffs' Counsel makes much of the fact that only three class members have objected so far. So what? Before objecting you should see the final settlement papers, right? But a low number of objections and opt-outs isn't unusual. People seldom object; doing so is a complicated process that requires understanding complex technical and legal issues and investing significant time and effort. Most class members have no idea of the legal consequences of opting out and fear losing a valuable benefit. The Class notice helped bolster this fact by not stating in the notice sent to the class that the expert reports were not exchanged prior to the settlement figure being negotiated. Given the misrepresentation that the parties have engaged in, it is very likely that many more

people would have objected had they known of the fact above and/or had the knowledge and legal wherewithal to evaluate the settlement, as does this objector. Plaintiffs' Counsel did nothing to bring the hidden expert reports to the attention of the class in the notice, their own clients!

The Class Notice does direct class members seeking further information to the Settlement Administrator's website. Counsel filed their settlement papers on March 11, 2014 but the 500+ pages of that filing did not appear on the site until March 18, 2014, a bit late don't you think? Those three objectors never saw the filing documents. Anyone of the 916,000 class members ranging from individuals to hedge funds, to institutional investors, etc. who were looking at the site from March 11, 2014 to March 18, 2014 would assume that these are all relevant court documents were visible and they would be given no hint that objections have been filed, the fees sought and reasons sought for the settlement. Counsel and the Settlement Administrator has seen fit to stock the website only with only the proposed order and not any of the 500+ filing papers made on March 11, 2014 with the Court and reviewed by this objector like The Preliminary Approval Order, the Settlement Agreement, the Motion for Attorneys' Fees etc. More important any class member who was considering filing an objection might have decided not to file because there was nothing worth objecting to except what was included in the failed notice packet. Is it very likely that if these final papers had been filed on the website along with the objections, others might have objected as well (maybe even some institutions) and made even a better objection than this one. Anyone considering objecting now has only have seven days to read the entire 500+ pages, compose an objection and send it next day air to all parties.

At the very least, the class was misled as to the consequences of counsels negotiating a settlement before the expert's reports were exchanged. This is grounds to require Plaintiffs'

Counsel to issue a new notice, post the missing filing papers for the class to see and disclose that the reports were being hidden in a black hole for no one to see. One can reasonably expect that this would result in a substantial increase in the number who choose to opt out or object. Better yet post the reports on the website for the class to see and comment on.

**The high on drugs attorney fee and expense issue**

The Examiner's $50,000,000.00 report collected five million documents that comprised forty million pages converted to electronic form which were stored in three separate databases for easy search and retrieval, all reviewed by attorneys. All the work has already been done for our counsel. Counsel claims to have "obtained and analyzed over twenty six million pages of documents". This objector asks, so how many of those twenty six million pages of documents counsel analyzed out of the forty million pages the Examiner collected, reviewed and analyzed did counsel re-review for a second time which is simply duplicating the Examiners work that got charged to the class? The class should not have to pay for duplicative work product. They all were computerized and tagged making search very easy for anyone to see but our counsel seems to have done it the hard and expensive way, page by page for the class.

If counsel reviewed and analyzed 26,000,000 pages as they claim at 1 minute each that is 150,000 hours of work billed to the class. This is a naked greedy money grab and a substantial portion of hours may not and were not needed by the class for this $99 million settlement. All they needed was the Report itself! Since all counsels combined are billing at an alleged reduced rate of $349 an hour, multiplied by 150,000 billable hours means counsel wants the class to pay them $52,350,000.00? Excuse me while I head to the rest room. ................They are all under the influence of illegal narcotics.. If they only spent 30 seconds on each document that is

$26,175,000.00 billed to the class. Not believable, no way, no how, period end of story. This work was done to pad the bill and no client paying this bill monthly would ever agree to pay for all this duplicate work even with a gun to his head. Something is not right here, mathematically speaking. So the 50 depositions ate up $4,000,000.00? How many of those same 50 depositions did the Examiner perform, all of them? There is no substantial difference between the paper review and fifty depositions that each side performed so why should the class pay for duplicate work with the same results? It's all duplicate work product and the attorney fee and expenses should be reduced substantially as a result. Objector requests that a special master review the time sheets and records for overbilling and compare what work was duplicated by counsel that was already performed by the Examiner under 54(D)(2)(D). Incredible, these people have no shame and could care less about the class members and their losses come second.

As the Court noted in the D&O hearing if not for the Examiner's report Plaintiffs' Counsel might not have a case at all. All the evidence and the case itself was handed to anyone including Plaintiffs' Counsel on a silver platter by the Examiner to who ever wanted to see it. Their TAC is taken word for word right out of the report but counsel screwed up and did not include enough detail to get it all the claims past defendant's motion to dismiss. Counsel does not deserve 30% or $30,000,000.00 just 12% or $12,000,000.00. That is even a bonus for letting someone else do all the heavy lifting and unfairly taking credit for it themselves by duplicating the Examiner's work product for a report that cost $50,000,000.00! Can the Court see this clearly now?

**A class should not be certified when the primary beneficiaries are class counsel.**

Odds are that the number of claims will overwhelm the settlement fund and leave class members with no compensation, just like in the D&O settlement did. This objector did not receive a penny. Class counsel's papers preliminary approval brief mentions the risk of class certification

denial. Without informing class members that the experts reports were not swapped but intentionally withheld, the class would be better off if they each opted out and each brings a small-claims case instead for the average maximum of $5,000.00 each, is a *per se* breach of fiduciary duty and demonstrates the need for class decertification under Rules 23(a)(4) and (g).The problem is the class does not know about the missing reports so they can't take action like opting out or objecting. This is exactly like what happened to Lehman's Audit Committee. They were never informed at the beginning from the beginning and could not object to the balance sheet manipulation, not act accordingly to save the firm and as a result stakeholders lost billions. See the irony in that?

**The Court Has A Fiduciary Duty to The Unrepresented Members OF The Class.**

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of absent class members. In Mercury Interactive Corp., 618 F. 3rd 988, 994-95 (9th Cir. 2010) (quoting In re Washington Pub. Power Supply Systems Lit. 19 F. 3d 1291, 1302 (9th Cir 1994)). " Both the United States Supreme Court and the Court of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." In re Relafen Antitrust Litigation, 360 F. Supp.2d 166, 192-94 (D.Mass. 2005), citing inter alia Amchem Prods., Inc v Windsor, 521 U.S. 591, 617, 623 (1997) (Rule 239e) protects unnamed class members from unjust or unfair settlements' agreed to by "fainthearted" or self-interested class "representatives'"): Reynolds v. Beneficial Nat't Bank, 288 F. 3d 277, 279-80 (7th Cir. 2002) (district judges /are/ to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"The court cannot accept a settlement that the proponents have not shown to be fair, reasonable

and adequate." In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F. 3d

768, 785 (3d Cir. 1995) (quoting Grunin v International House of Pancakes, 513 f. 2d 114, 123

(8th Cir.1975)). A trial court has a continuing duty in a class action case to scrutinize the class

attorney to see that he or she is adequately protecting the interests of the class."

The district court must ensure that the representative plaintiff fulfils his fiduciary toward the

absent class members"). There should be no presumption in favor of settlement approval: the

proponents of a settlement bear the burden of proving its fairness." True v American Honda co.

749 F. Supp. 2nd 1052, 1080 (C.D.Cal. 2010) ( citing 4 newberg on Class actions $ 11:42 (4th ed

2009)). Accord American Law Institute, Principles of the Law of Aggregate Litig. $3:05 ©

(2010) (Ali Principles").

Concerns warrant special attention when the record suggests that settlement is driven by fees;

that is, when counsel receive a disproportionate distribution of the settlement>" Hanlon v.

Chrysler Corp., 150F. 3d 1011, 1021 (9th Cir. 1998); In Bluetooth Handset Prods. Liability Litig.,

654 F. 3d 935, 947 (9th Cir. 2011

**A showing of explicit collusion is not required to demonstrate settlement unfairness.**

This objection also does not argue that the settlement is a product of explicit collusion. However,

demonstrating that a settlement lacks collusion does not thereby demonstrate that the settlement

passes muster. Lack of collusion is *necessary* for settlement approval, but it is not *sufficient*.

Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle

signs that class counsel have allowed pursuit of their own self-interests and that of certain class

members to infect the negotiations." *Bluetooth*, 654 F.3d at 947. An objector need not

demonstrate collusion to demonstrate an unfair settlement, for all it takes to make a settlement unfair is a defendant's indifference to class counsel's self-dealing. *Staton,* 327 F.3d at 964. *Bluetooth's* distinction between collusion and impermissible self-dealing is at the heart of this objection: when the Rule 23(h) attorney award is too large, this is evidence of self-dealing whether collusion is established or not.

**Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval from a Low Number of Objectors**

Any given class settlement no matter how much it betrays and cheats the interests of the class and unjustly makes millionaires of class counsel in this case at the expense of the class, will produce only a small percentage of objectors. Sometimes just one good objection can speak clearly for all the unnamed class members who don't have the knowledge, skill, time, patience or know how to spot an unfair settlement and deconstruct it to show the court how flawed it really is under its face. This objection is written on behalf of all unnamed class members who can't put together an objection that can actually make a difference. The predominating response will always be apathy, because objectors- unless they can use pro bono counsel, or do it themselves- must expend significant resources on an endeavor that may not benefit themselves directly. Another common response from non-lawyers will be avoidance whenever possible of anything related to lawyers and courtrooms. Class counsel may argue that this understandable tendency to ignore notices or free ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply not consent. Grove v Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447 (S.D. Iowa 2001) citing In re Gen Motors

Pick-Up Litig., 55 F. 3d at 789.). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient of time to object."

When class members have little at stake, the rate of response will be predictably low as in this settlement. As such, the response from class members cannot be seen as something akin to an election or public opinion poll. See In re Gen. Motors PickUp Litig,. 55 F. 3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even when low numbers of objectors in large class, when "those who did object did so quite vociferously') Thedore Eisenberg & Emperical Issues, 57 VAND .L. Rev. 1529, 1532 (2004).

**At the D&O hearing Lead Counsel stated "$99 million is a drop in the bucket for what we lost here" and "damages are in the many billions of dollars" so why take just $99 million?**

As Plaintiffs counsel stated above and was also quoted by this Court below in its Memo and Order approving the D&O settlement:

"Lead Plaintiffs state they potentially could recover a judgment of "many billions of dollars" from the directors and officers at trial." The same judgment recovery amount ("many billions of dollars") also applies against the defendant E&Y since they both engaged in and helped cover up the very same fraud, like conjoined twins, all the way through the bankruptcy itself. The difference with this enabl. r is we have even more evidence of liability from the Examiner against E&Y but we are not limited to a maxed out $90 million insurance policy, right?

This is slam dunk for the class against E&Y in establishing liability and damages right now that is far in excess of the pan handler $99 million being dangled offered today in front of the class based on the evidence available. More evidence below shows a Tyco size settlement or verdict

awaits the class. The class can and should also go after the 2000+ partner's personal wealth at the proper time. Like the Tyco settlement, E&Y can very easily take out a loan to pay for the multiple billion dollar settlement or verdict with the revenues they are generating. How about $99 million a year for ten years? Get creative counsels.

**The real recoverable damage amount from defendant exposed**

Document 551 page 20 bottom of page paragraph 70 states "Lead Counsel engaged a consultant to assist in estimating potentially recoverable damages for purchases of Lehman securities. This estimate before taking into account defenses to causation, proportionate fault or other defenses, amounts to billions of dollars in the aggregate. Not only does E&Y lack the ability to satisfy such an enormous judgment was obtained at trial and upheld through appeals, but E&Y vigorously challenged Plaintiffs' theory of damages, the "disaggregation" of amounts attributable to E&Y's review opinion and causation. E&Y also assigned a high degree of fault to others". That is an untrue statement as shown below made to make the defendant seem uncollectable just like the Lehman officers, all to get this settlement approved and their fee wired into their bank account.

Document 551 page 21 at the bottom paragraph 74 counsel writes:

"Moreover, even in the event Plaintiffs obtainment a judgment (Objector states or even a larger settlement amount) E&Y's ability to pay a hypothetical judgment for billions of dollars (after a trial and inevitable appeals) is improbable". That is false as shown below.

Press release

**EY reports 2013 global revenues of US$25.8 billion**

**London, 8 October 2013**

**Newsroom**

EY today announced combined global revenues of US$25.8 billion for its financial year ended 30 June 2013. This represents 7.7% growth over the previous financial year in local-currency terms, EY's fastest growth since 2008. Revenues grew 5.8% in US dollar terms. All EY's service lines and geographies continued to grow revenues and headcount despite uneven market conditions in many parts of the world.

- Fastest growth in five years of 7.7%
- Revenues improve across all service lines and geographies
- Emerging-market practices see combined revenue growth of 12%
- Headcount reaches all-time high of 175,000
- *In FY14 we are demonstrating our confidence in the future of the global economy and our profession by investing heavily in new markets and new services as well as planning to add 55,000 new recruits and interns over the next 12 months."*

http://www.ey.com/US/en/Newsroom/News-releases/EY-reports-2013-global-revenues-of-US-25-8-billion-dollars#.UyKvjoX8uoM

Should defendant have held off starting to hire 55,000 new employees and reimburse the class for damages it caused in the billions first? If defendant hires all 55,000 new employees at just $30,000.00 each (a very low average in that profession) that would cost defendant um, let's do the math. 55,000 employees x $30,000.00 a year equals $1,650,000,000.00 a year plus FICA match and benefits. At $60,000 a year that is $3.2 billion a year plus FICA match and benefits which are all ongoing expenditures. Who is conning who here? Objector thinks

the settlement papers were written by counsel for the defense and Lead Counsel for the
Plaintiffs' slapped it's name on it on behalf of both counsels'. Did they? Defendant is not
serious about settling this case with a $99 million tip offer. It's tin cup change, pan handler
change for them but not for counsel as it concerns their $30 million undeserved Fort Knox
fee.

Based on it's revenues, E&Y can very easily pay a lump sum in the eight or nine figure range
and/or take out a loan like Tyco did to pay for a low single, ten digit larger settlement or
judgment. This Court knows how this objector feels about allowing the guilty to get off scot-free
paying nothing or next to nothing for the damages they caused.

This objector left out the additional eight pages in that release but The Court and counsels
should get the point, defendant can afford more. Who offers the most on the first offer if they
really want to "put this behind us" as the defendant publically stated when the proposed
settlement was announced? They will offer more based on the evidence and damages in this
case the closer we get to trial. Objector requests that defendant admit to wrongful conduct in
the settlement papers before settlement approval just like the SEC is now starting to require
after all these decades, finally. An example of defendant pleading guilty and admitting fault
is below in their recent $123 million criminal tax fraud settlement with the government
recently is summarized below. It's all about the money in this case but not for the Lehman
stakeholder victims.

When examined under the applicable criteria above, and continuing below, this proposed
settlement is a Gold Medal winner for rejection.

**Defendant violated Commission's Rule of Practice 102(e) and PCAOB (Public Company Accounting Oversight Board)** *Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5),*

The evidence above and continuing below shows numerous E&Y partners (there are only 2000ish out of 175,000 employees worldwide, not the rank and file employees) engaging in conduct similar to what they did at Lehman on a regular basis and these partners admitted guilt or were found guilty of improper professional conduct. The defendant's partner's were found in violation of the Commission's Rule of Practice 102(e) and PCAOB (Public Company Accounting Oversight Board) *Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5),which* are sanctionable conduct violations  Examples of E&Y engaging in serial improper conduct actions follow further below:

This objector states that the named partners) in the Examiner's Report (and other more senior unnamed partners higher up the food chain) engaged in improper professional conduct as defined in the Securities and Exchange Commission's Rule of Practice 102(e) "in that their conduct constituted (A) intentional or knowing conduct, including reckless conduct, that resulted in a violation of the applicable professional standards, or in the alternative, (B) negligent conduct, consisting of a single instance of highly unreasonable conduct that resulted in a violation of applicable professional standards in circumstances in which the partners knew, or should have known, that heightened scrutiny was warranted." Objector states they and others are responsible for the damages to the class, period, $99 million is not reality.

*PACOB definition of sanctionable conduct:*

*Section 105(c)(5)(A) of the Act, 15 U.S.C. § 7215(c)(5), which provides that certain sanctions may be imposed in the event of (A) intentional or knowing conduct, including reckless conduct, that results in a violation of the applicable statutory, regulatory, or professional standard; or (B)*

*repeated instances of negligent conduct, each resulting in a violation of the applicable statutory,*

*regulatory, or professional standard.*

**Defendant's typical business practices**

*Examples of defendant getting caught engaging in intentional and unethical bad faith fiduciary*

*conduct, breaches of duty, fraud and/or malpractice conduct.*

**Ernst & Young to Pay $123 Million to End Tax-Fraud Probe**
By Bob Van Voris Mar 2, 2013 12:01 AM

Ernst & Young LLP will pay $123 million to resolve a U.S. tax-fraud probe as part of a non-prosecution agreement, according to a statement by the <u>Manhattan</u> U.S. Attorney's Office.

The accounting firm "admitted wrongful conduct" by its partners and employees in connection with four tax shelters from 1999 to 2004, according to yesterday's statement. About 200 Ernst & Young clients used the shelters to try to avoid more than $2 billion in taxes, prosecutors said.

In addition to the money and the admissions, Ernst & Young agreed to a series of permanent restrictions on its tax practice and will continue to cooperate with the government's tax-shelter investigation. The firm's cooperation began in 2003, according to the statement.

In exchange, prosecutors agreed not to charge the firm in connection with the case. The non-prosecution agreement doesn't cover individual Ernst & Young partners and employees, according to the statement.

"Ernst & Young is pleased to put this matter from a decade ago behind us," spokeswoman Amy Call Well said in an e-mailed statement. "As the settlement with the U.S. Attorney's office recognizes, these activities represent an isolated period in the firm's long history of providing ethical and professional tax services."

**Earlier Settlement**

Ernst & Young settled an IRS examination in 2003, paying $15 million and agreeing to improve its internal quality monitoring system, according to the firm.

Last year, BDO Seidman LLP agreed to pay $50 million in a deferred prosecution deal. In 2010, Deutsche Bank AG reached a $553.6 million non-prosecution agreement with the U.S. KPMG LLP settled a tax shelter investigation for $456 million in 2005.

Donna Guerin, a former partner with the law firm Jenkens & Gilchrist, pleaded guilty in September to one count of conspiracy and one count of tax evasion for her part in what prosecutors have called the biggest tax-fraud prosecution in history.

Prosecutors claimed Guerin helped run a 10-year tax shelter scheme that cost the U.S. $92 million in lost taxes. She was sentenced yesterday to eight years in prison and ordered to pay $190 million in restitution by U.S. District Judge William Pauley in Manhattan.

http://www.bloomberg.com/news/2013-03-01/ernst-young-to-pay-123-million-to-end-tax-fraud-probe.html

1. *OPINION OF THE COMMISSION 102(e) PROCEEDING Grounds for Remedial Action Improper Professional Conduct Certified public accountant acting as audit manager engaged in improper professional conduct in the audit of the financial statements of a private company and a related fund. Held, it is in the public interest to deny the accountant the privilege of appearing or practicing before the Commission for six months.*
   *http://www.sec.gov/litigation/opinions/2012/34-68431.pdf*

2. **Office of the Chief Accountant:**
   **Regarding the Initial Decision**
   **In the Matter of Ernst & Young LLP, April 16, 2004**
   *http://www.sec.gov/info/accountants/staffletters/eandy04272004.htm*

3. **US Attorney's Office and FBI Announce Guilty Plea of Former Ernst & Young Auditor to Obstruction Charges and SEC Charges Former Ernst & Young Employees for Alleged Role in Destruction of Audit Working Papers**
   **http://www.sec.gov/news/press/2003-123.htm**

4. *SECURITIES EXCHANGE ACT OF 1934*
*Release No. 55523 / March 26, 2007*
*ACCOUNTING AND AUDITING ENFORCEMENT*
*Release No. 2580 / March 26, 2007*
*ADMINISTRATIVE*
*PROCEEDING*
*File No. 3-12600*
*Vs.*
*Ernest and Young*
*http://www.sec.gov/litigation/admin/2007/34-55523.pdf*

5. *SEC Institutes Proceedings Against Ernst & Young to Resolve Auditor*
*Independence Allegations*

*Division of Enforcement and Office of Chief Accountant Charge Firm with*
*Violations Stemming from Joint Business Relationships with Audit Client*

On May 20, 2002, the Commission instituted public administrative proceedings

against Ernst & Young LLP ("E&Y") in an auditor independence case arising from

E&Y's joint business relationships with one of its audit clients. As reflected in the

order instituting the proceedings, the Commission's Division of Enforcement (the

"Division") and Office of Chief Accountant ("OCA") have alleged that E&Y violated

the auditor independence requirements imposed by the Commission's rules and by

generally accepted auditing standards in connection with E&Y's audits of the

financial statements of PeopleSoft Inc. from 1994 through 2000, which occurred

during . . . ame period as the joint business relationships. According to the

allegations made by the Division and OCA, E&Y violated Rule 2-02(b) of

Commission Regulation S-X and caused PeopleSoft to file reports with the

Commission throughout the relevant period that failed to include independently

audited financial statements as required. The Division and OCA are seeking an order

*requiring E&Y to cease and desist from committing or causing such violations,*

*requiring E&Y to disgorge the audit fees it was paid for the audits in question, and*

*sanctioning E&Y pursuant to Commission Rule 102(e) for engaging in improper*

*professional conduct.* ***http://www.sec.gov/litigation/admin/34-45964.htm***


6.  *UNITED STATES OF AMERICA*
    *Before the*
    *SECURITIES AND EXCHANGE COMMISSION*


*SECURITIES EXCHANGE ACT OF 1934*
*Release No. 46130 / June 27, 2002*

*ACCOUNTING AND AUDITING ENFORCEMENT*
*Release No. 1584 / June 27, 2002*

*ADMINISTRATIVE PROCEEDING*
*File No. 3-10815*


| | |
|---|---|
| *In the Matter of* | *ORDER INSTITUTING PUBLIC* |
| | : *ADMINISTRATIVE PROCEEDINGS* |
| *MORET ERNST & YOUNG* | : *AND ORDER PURSUANT TO RULE* |
| *ACCOUNTANTS, n/k/a* | : *102(e) OF THE COMMISSION'S* |
| *ERNST & YOUNG ACCOUNTANTS,* | : *RULES OF PRACTICE* |
| | : |
| *Respondent.* | : |
| | : |
| | : *http://www.sec.gov/litigation/admin/34-* |
| | *46130.htm* |


*SEC Charges Ernst & Young and Six Partners for Roles in Accounting Violations*
*at Bally Total Fitness*

7. From "Accounting Web"
   http://www.uic.edu/classes/actg/actg593/Readings/Sarbanes-Oxley/Has-Sox-Been-Successful.pdf
   Has SOX Been Successful?

Posted by Terri Eyden on Sep 5 2012

Part of the article: Summary of PACOB news release:

In an unrelated case of audit failure, on February 8, 2012, the PCAOB announced the censure of E&Y and imposed a $2 million penalty for faulty audits of Medici Pharmaceutical Corporation for 2005, 2006, and 2007 financial statements, its largest civil money settlement to date. It also assessed censure sanctions on four E&Y partners for varying time periods. The respondents neither admitted nor denied the PCAOB findings and didn't consent to make the case public.

An analysis of firm performance reported in PCAOB firm inspections appearing in "Between the Numbers" showed a 20 percent rate of audit failure at E&Y for 2010, more than double the rate in the 2009 inspections.

Actual PACOB release

http://pcaobus.org/News/Releases/Pages/02082012_DisciplinaryOrderEY.aspx

8. PCAOB Announces Settled Disciplinary Orders
   Against Former Ernst & Young Partner and Senior Manager
   For Providing Misleading Documents to PCAOB Inspectors
   And Altering Working Papers
Washington, D.C., Aug. 1, 2011

Equitable Life (2004)

In April 2004, Equitable Life, a UK life assurance company, sued EY after nearly

*collapsing but abandoned the case in September 2005. EY described the case as "a*
*scandalous waste of time, money and resources for all concerned."[39]*

**Bally Total Fitness (2008)**

*Following allegations by the* <u>Securities and Exchange Commission</u> *that EY had*
*committed accounting fraud in its work auditing the books of* <u>Bally Total Fitness</u>, *EY*
*reached two settlements in 2008, including a fine of $8.5million.[40]*

**Anglo Irish Bank (2009)**

*In 2009, in the* <u>Anglo Irish Bank hidden loans controversy</u>, *EY was criticised by*
*politicians[41] and the shareholders of Anglo Irish Bank for failing to detect large*
*loans to* <u>Sean FitzPatrick</u>, *its Chairman, during its audits. The Irish Government had*
*to subsequently take full ownership of the Bank at a cost of €28 billion.[42][43] The*
*Irish Chartered Accountants Regulatory Board appointed John Purcell to*
*investigate.[44] EY said it "fundamentally disagrees with the decision to initiate a*
*formal disciplinary process" and that "there has been no adverse finding made*
*against EY in respect of the audit of Anglo Irish Bank."[45]*

**Sons of Gwalia (2009)**

*In 2009, EY, the former auditors of* <u>Sons of Gwalia</u>, *agreed to a $125m settlement*
*over their role in the gold miner's collapse in 2004.* <u>Ferrier Hodgson</u>, *the company's*
*administrator, had claimed EY was negligent over the accounting of gold and dollar*
*hedging contracts. However, EY said that the proposed settlement was not an*

*admission of any liability.*[46]

**Akai Holdings (2009)**

*In 2009, EY reached a legal settlement where they agreed to pay US$200m to the liquidators of Akai Holdings. It was alleged that EY falsified court documents to avoid negligence charges which led to police raiding the Hong Kong office.*[47]

**Lehman Brothers (2010)**

*The Valukas Report issued in 2010*[48] *charged that Lehman Brothers engaged in a practice known as repo 105 and that EY, Lehman's auditor, was aware of it. New York prosecutors announced in 2010*[49] *that they have sued the firm. EY said that its last audit of Lehman Brothers was for the fiscal year ending 30 November 2007 and that, Lehman's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles.*[50][51][52]

*http://en.wikipedia.org/wiki/Ernst_%26_Young*

*The objector has proven the point that a clear pattern exists and the Lehman case was not the exception but the rule as to how defendant really operates and that defendant actions are worth more than $99 million. Defendant's actions constitute a serial fraudster designation and were not an oversight but a cold calculating enabling fraud done because of the $160 million in fees paid to it by Lehman over a multi year period and not wanting to rock the boat. .*

*The article below describes E&Y's bad conduct above which shows that the $99 million offer should be rejected.* Among other things, The Examiner' Report detailed the company's use of a device known as Repo 105 to manage its balance sheet. The bankruptcy examiner found that the company's auditors were aware of but did not question the company's use of Repo 105. His report also concluded that there were "colorable claims" against E&Y on the grounds that it "did not meet professional standards" for its "failure to question and challenge improper or inadequate disclosure."The paragraph above is broken down in finer detail below. *She is well qualified to write about this case and for the Court to consider this information in its consideration of this settlement. In fact the Court is even mentioned in the article.*

Francine McKenna (@retheauditors on Twitter) is a CPA, writer, speaker and subject matter expert with more than twenty-five years of experience in consulting and professional services including tenure at two Big 4 firms, both in the US and abroad. She is a two-time Gerald Loeb Award finalist and a frequently quoted freelance journalist.

**$99 Million Buys EY Ticket Out Of Private Lehman Litigation,**

**10-21-2013 | 03:06 PM**

- Author Francine McKenna

Last defendant standing. Not an enviable place for EY in the case, *In re Lehman Brothers Securities and ERISA Litigation.*

Everyone else had folded their tent, paid the price to cross this dog off the list. Lehman underwriters agreed in 2011 to a $426.2 million settlement. UBS, one of the underwriters, held

out and settled last August for another $120 million. Even before the UBS and EY settlements, Bernstein Litowitz Berger & Grossmann, attorneys for the plaintiffs, claimed the combined recovery of $516,218,000 is the third largest recovery to date in a case arising from the financial crisis.

The $99 million E&Y is to pay is more than Lehman's officers and directors, who settled for $90 million. That's a big deal considering the executives typically say, "The auditors said it was ok," and the auditors say, "Management duped us." But it's not that much considering that EY agreed to pay C$117 million ($117.6 million) last December to settle claims in a Canadian class action suit against bankrupt Sino-Forest Corp, a Chinese reverse merger fraud. That settlement is the largest by an auditor in Canadian history, according to the law firms.

(The objector states that this Court should note that the Sino-Forest fraud cost shareholders $3.2 billion in damages far less than defendant did in this case.

http://www.bloomberg.com/news/2012-05-22/sino-forest-disclosure-grossly-misleading-osc-says.html

And it's not as much as some thought EY would pay for Lehman. In fact, many thought Lehman would finish off EY for good.

John Carney, now of CNBC, writing for Business Insider at the time

> The Examiner concludes that sufficient evidence exists to support colorable claims against Ernst & Young LLP ("Ernst & Young") for professional malpractice arising from Ernst & Young's failure to follow professional standards of care with respect to

communications with Lehman's Audit Committee, investigation of a whistleblower claim, and audits and reviews of Lehman's public filings.

(Those claims are explained several pages down in the second article.)

That may not sound like a mortal threat against Ernst & Young. But the damages here could be enormous. A successful lawsuit against E&Y could result in a court finding that the failure to properly advise the audit committee prevented Lehman from taking genuine steps to substantially reduce its leverage, which may have saved the firm from bankruptcy. Which is to say, E&Y could find itself blamed for all the losses to Lehman shareholders. That would be a stretch--such a claim would be speculative--but it still should be scaring the heck out of the partners.

When the bankruptcy examiner's report on Enron came out, the language about Arthur Andersen was quite mild. It merely noted there was "sufficient evidence from which a fact-finder could conclude that Andersen: (1) committed professional negligence in the rendering of accounting services to Enron…" It went on to note that Andersen likely had a strong defense against liability since so many Enron executives were implicated.

"Enron brought down Arthur Andersen," Felix Salmon notes. "Will Lehman do the same for E&Y?"

In July of 2011, New York Federal Court Judge Lewis Kaplan decided to allow substantially all of the allegations against Lehman executives and at least one of the allegations against Ernst & Young to move forward to discovery and trial. One month later Lehman Brothers executives,

including its former chief executive Richard S. Fuld Jr., agreed to pay $90 million to settle.
Insurance proceeds paid for their settlement.

What was the remaining allegation against Ernst & Young? That the auditor had reason to know
Lehman's 2Q 2008 financial statements could be materially misstated because of the extensive
use of Repo 105 transactions. (By the way $50 billion is material to reported results for any filing
made by Lehman.)

How could EY know this? Here's what the Lehman Bankruptcy Examiner, Anton Valukas's,
Report says: 945

(The first sentence below was part of the beginning of the paragraph but for some reason
was left out by the author. The pages are 945-947 of the Examiners report.)

Without exception former Lehman directors were unaware of Lehman's Repo 105 program and
transactions. 3642 *Lehman's own Corporate Audit group led by Beth Rudofker, together with
Ernst & Young, investigated allegations about balance sheet substantiation problems made in a
May 16, 2008 "whistleblower" letter sent to senior management by Matthew Lee. On June 12,
2008, during the investigation, Lee informed Ernst & Young about Lehman's use of $50 billion
of Repo 105 transactions in the second quarter of 2008. At a June 13, 2008 meeting, Ernst &
Young failed to disclose that allegation to the Board's Audit Committee. (Bankruptcy Examiner's
Report V3 page 945)*

(More follow through from above taken from pages 945-946 of the Examiners Report that was
not included in the article.)

Former Lehman director Cruikshank recalled that he made very clear he wanted a full and through investigation into each allegation made by Lee, whether the allegation was contained in Lee's May 16, 2008 letter or raised by Lee in the course of the investigation, 3646 Another Lehman director, Berlind similarly stated that the Audit Committee explicitly instructed Lehman's Corporate audit group and Ernst & Young to keep the Audit Committee informed of all of Lee's allegations. 3647 Berlind also said he wanted to know about Lehman's Repo 105 program and that if he had known about Lehman's Repo 105 transactions he would have asked Lehman's auditors to test the transactions to ensure they were appropriate. 3647

(This objector says that obviously those transactions would not have passed the legal and ethical test at the time or today but given a blessing by defendant for Lehman to use in their scheme.)

Here is more detail from the Auditor's report that this objector is including that shows more detail about what the defendant E&Y knew and how they have attempted to blame it all on a misunderstanding. Counsel seems to have forgotten about this evidence when negotiating this $99 million to low ball offer which is clearly not enough.

**Evidence from the Examiner's Report that $99 million doesn't cut it**

On May 16, 2008, Matthew Lee, then Senior Vice President in the Finance Division responsible for Lehman's Global Balance Sheet and Legal Entity Accounting, sent a letter to certain members of Lehman's senior management identifying possible violations of Lehman's Ethics Code related to accounting/balance sheet issues. **Lehman involved Ernst & Young in its investigation of the concerns raised in Lee's May 16, 2008 letter.**

Subsequently, less than a month later, on June 12, 2008, to Ernst & Young – Schlich (Partner) and Hillary Hansen – (Partner, and co-head of the Lehman account), interviewed Lee. **Hansen's notes of the interview reveal that Lee made certain statements to Ernst & Young about Lehman's Repo 105 practice, including, most notably, the volume of Repo 105 activity that Lehman engaged in the quarter ending (May 31, 2008).** Hansen's notes specifically recount Lee's allegation that Lehman moved $50 billion of inventory off its balance sheet at quarter's end through Repo 105 transactions and that these assets returned to the balance sheet approximately a week later. (Objector states they had been doing this for years beforehand.)

**Hansen's notes indicate that Lehman's "Rates [and] Liquid Markets" businesses engaged in "Repo 105/Repo 108 [to] reduce[] assets by 50B [by] moving off B/S [i.e., balance sheet] in Europe & back in 5 days later."** Hillary Hansen, Ernst & Young, Handwritten Notes (June 12, 2008), at p. 1 [EY?LE?LBHIKEYPERS 5826869]. This is consistent with the Examiner's conclusions that at quarter ending in second quarter 2008, Lehman reduced its balance sheet by slightly more than $50 billion through Repo 105 transactions. (The partner's notes are the smoking gun against E&Y in this case and worth more than $99 million.)

When interviewed by the Examiner, **Schlich did not recall Lee saying anything about Repo 105 transactions during that interview, although he did not dispute the authenticity of Hansen's notes from the Lee interview.** In spite of Hansen's notes, Schlich maintained that Ernst & Young did not know that Lehman engaged in the following Repo 105 activity during the listed time periods: $49.1 billion at first quarter 2008 (Feb. 29, 2008); and $50.38 billion at second quarter 2008 (May 31, 2008). (Mr. Schlich should be charged with perjury and

obstruction if he were put under oath by The Examiner in this objector's opinion. I wonder what a jury would say upon hearing all this?)

During the Examiner's interview of Hansen, Hansen recalled that while Ernst & Young questioned Lee about his May 16, 2008 letter, Lee "rattled off" a list of additional issues and concerns he held, one of which was Lehman's use of Repo 105 transactions. Ernst & Young had no further conversations with Lee about Repo 105 transactions. Prior to her interview of Lee in June 2008, Hansen had heard the term Repo 105 "thrown around" **but she did not know its meaning;** according to Hansen, Schlich described Repo 105 transactions to her shortly after they met with Lee. (Objector states that maybe if Ms. Hansen had been at the office five days a week instead of home playing with the kids she might know the answer, (which she probably does but is playing the dumb blonde,) the bankruptcy might not have occurred and stakeholders would not be out billions of dollars, just a thought.)

From the internet:

**Meet Ms. Hillary Hansen.**

The weakest link is surely E&Y partner, and co-head of the Lehman account, Hillary Hansen. For all of you who would like to get a glimpse of this presumably tireless workhorse which was supposed to be working 24/7 figuring out what the h*** was going on with Lehman's books, you may be in for a disappointment. In a TV presentation on the topic of "Women's Networks Help Level the Playing Field" from January, 2009, we get a glimpse into Ms. Hansen's busy lifestyle "I am a woman raising three small children, I commute from far away, I work home two days,

usually I am not in on Fridays (laughter), I telecommute and often times I get asked how I fit it all together." Hansen discloses at the end of the interview that "We audit Lehman Brothers, **UNFORTUNATELY."** It appears she 'laughsa bit. Once again prophetic.

The link showing Hansen's no big deal comments and a chip on the shoulder attitude is below. It should be seen to be believed. It's all a joke to these clowns because it's not their money! This is an example of what Lehman paid $160 million in fees for over a seven year period? No wonder the books were cooked. $99 million for this partner's and her 50 member auditing team's "work" and the damages caused in this case is despicable. Imagine this piece of work in front of a jury! To view this mid six figure partner in all her glory start watching at the 13:33 mark to 17:20 mark.

http://fora.tv/2009/01/26/Womens_Networks_Help_Level_the_Playing_Field

Objector is considering sending a copy of this objection to the SEC and PACOB to have both partners actions reviewed for possible violations and sanctions of the standards cited above depending on how this all turns out.

Here is a several page summary of evidence of the applicable bullet points and the Examiner's conclusions that ties in defendant E&Y bad faith malpractice conduct to this fscheme, and puts it on the hook for billions of damages it caused as a result, not just $99 million. Counsels seem to have forgotten all of this in their rush to settle.

**Statement by Anton R. Valukas Examiner, Lehman Brothers Bankruptcy before the Committee on Financial Services United States House of Representatives regarding "Public Policy Issues Raised by the Report of the Lehman Bankruptcy Examiner" April 20, 2010**

Page 13

Bullet four: The appropriateness of a accounting practices such as Repo 105. I devote 320 pages
of my Report (pages 732-1127, objectors note) to Lehman's Repo 105 practices, detailing
Lehman's use of an accounting technicality to temporarily remove significant amounts of assets
off balance sheet for no apparent reason other than to artificially and deceptively reduce
Lehman's reported net leverage and, therefore, the market perception of Lehman's viability.

I express no view on whether, as a technical matter of GAAP accounting, it is permissible to
treat transactions as sales which are by all other measures financings. But I have a definite view
that it is not appropriate to engage in significant amounts of such transactions without disclosure.


Page 14

Lehman did not disclose that it used $50 billion of these transactions. To the contrary, it
affirmatively and erroneously stated in its public filings that it used repo transactions solely as
financings. The effect of these transactions was to reduce its net leverage by nearly two full
points – when Lehman itself defined a material transaction as one which affected net leverage by
one tenth of one point. The failure to disclose the facts was not appropriate.

(This is the reverse engineering that The Examiner wrote about on the top of page 739 but
defendant E&Y ignored this fact for the last 120 days of Lehman's life after the whistleblower
letter was given to them to investigate. E&Y, you will need a tractor trailer truck full of cash to
settle this not the compact car you are now using.)


Bullet five: The quality of Lehman's Management Discussion and And Analysis Disclosures.

I found that there are colorable claims that the Management Discussion and Analysis ("MD&A")
sections of Lehman's Form 10-K for 2007 and Form 10-Q filings in 2008 were misleading.
Lehman emphasized to the investing public that it had worked to lower its net leverage ratio, and
stated in its MD&A that net leverage is "more meaningful" than a simple leverage ratio. But
Lehman did not disclose that it had only temporarily reduced its net leverage ratio through Repo
105 transactions. Consequently, Lehman's statement that the net leverage ratio was a "more
meaningful" measurement of leverage was rendered misleading because that ratio – as reported
by Lehman – was not an accurate indicator of Lehman's actual leverage, and in fact, understated
Lehman's leverage significantly. In light of the market's focus on the leverage of investment
banks in late 2007 and 2008, I found that sufficient evidence exists for a judge or jury to find that
Lehman's reported net leverage ratio was materially misleading during that period.

An MD&A should include an "analysis " of known material trends, events, demands,
commitments, and uncertainties – not simply a restatement of financial statement information.
For example, an MD&A should provide information about the quality of, and potential
realabbility y of, a company's earnings and cash flow so that investors can ascertain the
likelihood that past performance is indicative of future performance. Regulation S-K requires a
registrant to discuss known trends involving its capital resources, specifically including off-
balance sheet financing arrangements . The same regulation specifies that a registrant should
discuss, among other things, the "nature  and business purpose to the registrant of such off-
balance sheet arrangements" an d "[t]he importance to the registrant of such off- balance sheet
arrangements in respect of its liquidity, capital resources, market risk support, credit risk support

or other benefits." My report details statements, in both interviews an d in contemporaneous e-

mails, by senior

Page 15

Lehman employees that the Repo 105 transactions had no business purpose at all, but did have a

marked effect on Lehman's reported net leverage ratio. SEC guidance also states that an MD&A

should describe "unusual events and transactions" to help identify apparent trends. (Objector

says how about disclosing the receipt of the whistleblower letter?) Lehman did not disclose the

unusual nature of the Repo 105 transactions or the trend of the temporary reduction of Lehman's

reported net leverage ratio at the end of reporting periods. Lehman's obligation to repurchase

$50 billion of Repo 105 transactions should have been disclosed in its MD&A. That obligation

was a known event that was reasonably likely to occur and would have had a material effect on

the company's financial condition or results of operations. In addition, in the Liquidity and

Capital Resources section of Lehman's MD&A's, Lehman should have included a discussion of

the timing and/or amounts of the cash flow created by the repayment of the Repo 105 cash

borrowing in the first seven to ten days after the end of the reporting period.

The following is more evidence of wrongdoing and guilt of E&Y and is from page 174 of

Valukulas Report that counsel forgot about when negotiating the $99 million bogus settlement.

Yes its N.Y. state law but federal law and good faith conduct also parallel federal law, rules,

regulations and standards.

195.

O. Auditor Malpractice: To state a claim of auditor malpractice under New York law, a client

must allege (1) "a departure from accepted standards of practice," and (2) "that the departure

was the proximate cause of an injury." See VTech Holdings, Ltd. v. Pricewaterhouse Coopers,

LLP 348 F. Supp. 2d 255, 262 (S.D.N.Y. 2004); Hous. Works, Inc. v. Turner, 179 F. Supp.

2d 177, 215 (S.D.N.Y. 2001). The plaintiff must also allege that the plaintiff was in privity

with the accountant or had "'a bond so close as to approach that of privity.'" VTech Holdings

, 348 F. Supp. 2d at 262 (quoting Parrott v. Coopers & Lybrand, L.L.P. 741 N.E.2d 506, 508

(N.Y App. Div. 2000)).

In determining whether an auditor has deviated from accepted standards, courts and tribunals

routinely look to the recognized and accepted professional standards for accountants and

auditors, generally measured by Generally Accepted Accounting Principles ("GAAP")

and Generally Accepted Auditing Standards ("GAAS"). See , e.g. ,Cumis Ins. Soc'y v. Tooke

, 739 N.Y.S.2d 489, 493 (App. Div. 2002)

Below is from Page 175 of the Valuaukas Report

Auditors can be liable for violating professional standards in connection with the preparation

Of interim financial reports. William Iselin & Co. v. Landau , 522 N.E.2d 21, 23 (N.Y. 1988)

(regardless of whether the activity is characterized as an "audit" or a "review," accountant owes

client a duty to exercise due care in the performance of professional accounting services); Collins

v. Esserman & Pelter , 681 N.Y.S.2d 399, 401 (App. Div. 1998) ("Even with respect

to a review . . . the accountant is obligated to exercise due care in the performance of the

engagement."); see also In re Kantor, Geisler & Oppenheimer, P.A. , PCAOB Release

No. 105 - 2007 - 009 (Dec. 14, 2007) (accounting firm violated Section 10A(b) of the Exchange

Act and PCAOB standards in quarterly review when, upon learning information indicating that

an illegal act may have occurred, the firm failed to address appropriately the threshold question

of whether it was likely that an illegal act had occurred). Auditors also may face liability if they

fail to disclose suspicious information to corporate audit committees. Silverman v. KPMG LLP

(In re Allou Distribs., Inc.), 395 B.R. 246, 272 - 73 (Bankr. E.D.N.Y. 2008) (plaintiff sufficiently

pled that auditing firm committed malpractice by failing to report suspicious circumstances and

material discrepancies to the audit committee); In re Springer Exchange Act Release No. 44858,

75 S.E.C. Docket 2095 (Sept. 27, 2001) (accountant who violated Section 10A of the Securities

Exchange Act engaged in professional misconduct by failing to notify client'

Page 176 of Valukus Report

audit committee that he had detected information indicating that the client had reported $1.3

million in false revenues in its quarterly report). Under New York law, clients generally may

recover

fees paid to negligent auditors. Stanley L. Bloch, Inc. v. Klein , 258 N.Y.S.2d 501, 508 (Sup. Ct.

1965)

(measure of damages for professional negligence of accountant in issuing balance sheet

containing substantial errors was accounting and auditing fees paid to accountant for year of

service immediately prior to issuance of balance sheet and accounting and auditing fees

necessitated by review thereof). In addition to fees, other jurisdictions have recognized that a

plaintiff is entitled to "actual out - of pocket costs" that "flow as a natural and continuous

consequence" from or are otherwise "proximately caused" by the defendant's breach of its legal

duties. Crowley v. Chait, Civ. No. 85 - 2441 (HAA), 2004 WL 5434953, at *12 (D.N.J. Aug. 25,

2004); Baker Hughes Oilfield Operation, Inc. v. Seabulk Tankers, Inc., No. Civ. A. 03 - 1230,

2004 WL 1290576, at *2 (E.D. La. June 8, 2004); Keywell Corp. v. Piper & Marbury L.L.P.,

No. 96 - CV - 0660E (SC), 1999 WL 66700, at *5 (W.D.N.Y. Feb. 11, 1999). Among the

expenses that may be considered to flow from a breach of a legal duty are those incurred to

repair harm to the plaintiff caused by the defendant's breach. See, e.g., World Radio

Labs., Inc. v. Coopers & Lybrand, 557 N.W.2d 1, 15 (Neb. 1996) (client was entitled to recover

damages For accounting fees paid to second auditing firm as a result of defendant auditing firm's

negligence). (Objector says like the cost of the Examiners Report).

Page 177 of Valuakus Report

Some jurisdictions permit a bankrupt client to seek damages based on allegations that its

auditor's negligence proximately caused its bankruptcy. See, e.g., Bd. Of Trs. Of Cmty.

Coll. Dist. No. 508 v. Coopers & Lybrand LLP, 775 N.E.2d 55, 63 (Ill. App. 2002) (under

Illinois law, auditor's failure to detect treasurer's violation of investment policy during

audits could be the proximate cause of damages caused by investments made after the

audit, where members of the board testified that they would have ended those investment

practices had auditor detected them), rev'd on other grounds, 803 N.E.2d 460 (Ill. 2003);

see also Plan Comm. v. PricewaterhouseCoopers, LLP, 335 B.R. 234, 249 - 51 (D.D.C.

2005) (creditors committee adequately alleged damages against debtor's auditing firm under

District of Columbia law, where committee asserted that malpractice proximately caused

debtor's insolvency and bankruptcy and specifically alleged that the board would have taken

Actions to avoid insolvency if it had been "timely alerted by appropriately audited financial

Statements to the fact that [company] was performing significantly worse than was presented

In the negligently audited financial statements"), dismissed on other grounds, No. 02 - 01487

(TFH), 2007 WL 1191917 (D.D.C. Apr. 20, 2007)

Page 948

948 i) Ernst & Young's Knowledge of Lehman's Repo 105 Program During several Rule 30(b)(6) - type 3654 interview sessions, the Examiner interviewed members of Ernst & Young's Lehman audit team regarding Ernst & Young's knowledge of and involvement in Lehman's Repo 105 program. (1) Ernst & Young's Comfort with Lehman's Repo 105 Accounting Policy The Examiner interviewed Ernst & Young's lead partner on the Lehman audit team, William Schlich, regarding Lehman's Repo 105 program. According to Schlich, Ernst & Young had been aware of Lehman's Repo 105 policy and transactions for many years.3655 Consistent with the statements of Lehman's John Feraca (Secured Funding Desk),Schlich stated that Lehman introduced its Repo105 Accounting Policy on the heels of the FASB's promulgation of SFAS140.3656

The key contacts list below was added by the objector to show just how high up the knowledge of this scheme went. Regarding Schlich, the chart shows his title, he is not some flunky. He is in charge of 16,000 employees, a poor role model if you ask this objector. Who knew what when counsel, the class would like to know before settlement approval.

**Key contacts**

| Carmine DiSibio | Kurt Neidhardt | Susan Cote | Ed Pisani | Joanne Dunbar |
|---|---|---|---|---|
| | | | | |

| Arthur Tully | Bill Schlich | Chris Scudellari | Susan Frieden |
|---|---|---|---|
| | | | |



ERNST & YOUNG
Quality In Everything We Do

During that time, Ernst&Young discussed the Repo 105 Accounting Policy (including Lehman's

Structure for Repo 105 transactions) and Ernst&Young's audit team had a number of additional

conversations with Lehman about Repo105 over the years.3657

However, according to Schlich ,Ernst Young

Page 949

had no role in the  drafting or preparation of Lehman's Repo 105 Accounting Policy.

3658  Schlich stated definitively that Ernst & Young had no advisory role with respect to

Lehman's use of Repo 105 transactions and that Ernst & Young did not "approve" the

Accounting Policy. 3659   Rather, according to Schlich, Ernst & Young "bec[a]me comfortable

with the Policy for purposes of auditing financial statements." 3660 Following "consultation

and dialogue" about the proper interpretation and application of SFAS 140, Ernst

& Young "clearly. . .concurred with Lehman's approach" to SFAS 140 and subsequent

literature by FASB on the issue of "control" of assets involved in a repo transactions.

3661 Ernst & Young's view, however, was not based upon an analysis of whether actual Repo

105 transactions complied with SFAS 140. 3662 Rather, Ernst & Young's review of Lehman's

Repo 105 Accounting Policy was purely "theoretical." 3663

In other words, Ernst & Young solely assessed Lehman's understanding of the requirements of

SFAS 140 in the abstract and as reflected in its Accounting Policy; Ernst & Young did not opine

on the propriety of the transactions as

Page 950

a balance sheet management tool. 3664  Ernst & Young did not review the Linklaters letter,

referenced in the Accounting Policy Manual. 3665

*Below is one last brilliant article that took a while to find. It includes a couple of additional gems of evidence out of the Examiners Report that presents additional damning evidence in a clear concise, readable manner, all backed up by the Examiner's Report, files located in this building and in all counsels files. After reading and understanding the articles and analysis, and understanding that defendant telling only half the truth to stakeholders representatives (the audit committee) is a well known method of deception, rejection is the hands down winner. The Mount Everest high evidence against E&Y unquestionably demands more than a token $99 million in damages, period, no legal pleading or explanation can change that*

*The author's information is below. She is well qualified to write about this case and for the Court to consider this information in its consideration of this proposed ill conceived settlement.*

Francine McKenna (@retheauditors on Twitter) is a CPA, writer, speaker and subject matter expert with more than twenty-five years of experience in consulting and professional services including tenure at two Big 4 firms, both in the US and abroad. She is a two-time Gerald Loeb Award finalist and a frequently quoted freelance journalist. For more info, click the "About" link at the bottom of this page.

# re: The Auditors

**Liberté, Egalité, Fraternité: Big Lehman Brothers Troubles For Ernst & Young**

By Francine • Mar 15th, 2010 • Category: Latest, Pure Content, The Case Against The Auditors

I'm not going to repeat Anton Valukas' superb Bankruptcy Examiner Report, public on March 11, in detail here. I'll offer my opinion and analysis on the "colorable claims," Ernst & Young's (EY) potential defenses, and any details or issues I believe may not have been covered or any questions left unanswered in other reporting.

EY's relationship with Lehman continued until the bitter end. So it comes as no surprise to me that EY had a hard time acting independently with their "sticky" client. Lehman Bankruptcy Examiner Anton Valukas, Chairman of Chicago law firm Jenner & Block, sums it up nicely:

The Examiner concludes that sufficient evidence exists to support colorable claims against Ernst & Young LLP for professional malpractice arising from Ernst & Young's failure to follow professional standards of care with respect to communications with Lehman's Audit Committee, investigation of a whistleblower claim, and audits and reviews of Lehman's public filings. (Bankruptcy Examiner's Report V3, Pg 1027)

Ernst & Young, the audit firm, had a long and lucrative relationship with Richard Fuld and Lehman Brothers. Lehman Brothers has paid EY more than $160 million in audit and other fees since fiscal year 2001. Although this isn't nearly as much as Goldman Sachs and AIG pay PwC – almost $230 million a year combined in 2008 – it was still a huge amount and represented a significant client relationship for Ernst & Young.

For my first installment in this series, let's take each "colorable claim" individually and give them a Red (toast) , Yellow  (may be vulnerable), or Green (not likely to be too damaging) rating.

**Ernst & Young failed to follow professional standards of care with respect to communications with Lehman's Audit Committee.**

**Ernst & Young failed to follow professional standards of care with respect to an investigation of a whistleblower claim**

*Lehman's own Corporate Audit group led by Beth Rudofker, together with Ernst & Young, investigated allegations about balance sheet substantiation problems made in a May 16, 2008 "whistleblower" letter sent to senior management by Matthew Lee. On June 12 2008, during the investigation, Lee informed Ernst & Young about Lehman's use of $50 billion of Repo 105 transactions in the second quarter of 2008. At a June 13, 2008 meeting, Ernst & Young failed to disclose that allegation to the Board's Audit Committee. (Bankruptcy Examiner's Report V3 page 945)*

As the lawyers would say, the *optics* are bad here. The Audit Committee asks EY to support Lehman's internal auditor in investigating a "whistleblower's" allegations of balance sheet improprieties. The auditors interview the "whistleblower" and then don't say anything at any of the Audit Committee meetings. Turns out what Mr. Lee, the "whistleblower", was alleging is what the examiner believes is the fundamental problem and grounds for "colorable claims" against top officers and EY.

The word "whistleblower" is tainted with tons of emotion post-Enron. We now look at those called "whistleblowers" and see heroes. But let's look at what I think may have actually happened. Lehman's Internal Audit department "naturally" asked their trusted, all-things-to-all-

people advisor, EY, to help with the investigation of the "whistleblower's" claims. The Internal

Audit Department, not EY, was in charge of the investigation.

That was their first mistake. If I've said it once, I've said it a thousand times: The external

auditor should not be conducting or assisting with internal investigations of potential fraud or

illegal acts by top executives. I wrote about it at Siemens, subject of the largest ever FCPA

settlement in history. KPMG, their auditor, got sued.

The external auditor should stay the hell away from internal investigations because they may get

caught up in something they would rather not know. They may want to claim plausible

deniability. And a company should not engage the external auditor to support internal

investigations especially involving fraud or illegal acts by top management. Do they do it to be

cheap or to keep dirty laundry inside? The external auditor is too often part of the problem, an

enabler, instead of part of the solution.

If Lehman had hired another firm – a law firm or anyone except their external auditor – to

perform the investigation, the investigation would have been covered end to end in privilege, the

external auditor may or may not (in this case EY would have been better not to) have been

included in the "circle of privilege," and the investigation would have been completed

professionally.

However, by supporting this investigation, EY was essentially doing internal audit work,

a prohibited service under Sarbanes-Oxley for independence reasons. It's shocking to me that the

EY audit partners did not at least turn over the investigation to EY's Forensic Accounting and

Investigations Practice in order to provide some semblance of independence and professionalism.

Even though EY may have been an unwilling party to knowledge of an ugly situation right before an audit committee meeting, they got stuck. They had an obligation under AU 380, as the external auditor - not as an investigator – to inform the Audit Committee. They could have been on the other side being informed – or not – instead of being the one supposed to be doing the informing.

AU 380, the rules for auditor communication with the Audit Committee, are very clear. But they relate to the *auditors' role as an auditor* not the role of an auditor who is lent as muscle to an internal investigation. By playing the "trusted advisor" they screwed themselves.

Stoplight? Yellow. Looks bad, but EY may be able to talk their way out of this one once it gets to court. They need to explain how they were still looking into the issue, doing their "auditor" work and make sure their full but limited role and responsibilities for the process are explained. If they lose on this chalk it up to another case of audit partners wanting to be supermen to their clients, the corporation's executives, rather than looking out for their own best interests. Unfortunately in this situation, the shareholders were probably going to lose either way.

**Ernst & Young failed to follow professional standards of care with respect to audits and reviews of Lehman's public filings.**

*"The Examiner finds that sufficient evidence exists to support the finding of colorable claims against Richard Fuld, Christopher O'Meara, Erin Callan, and Ian Lowitt in connection with their actions in causing or allowing Lehman to file periodic reports that did not disclose Lehman's use of Repo 105 transactions and against Ernst & Young for its failure to meet professional standards in connection with that lack of disclosure…While there were credible facts and arguments presented by each that may form the basis for a successful defense, the*

*Examiner concluded that these possible defenses do not change the now final conclusion that there is sufficient evidence to support a finding that claims of breach of fiduciary duty exist against Fuld, O'Meara [CFO 2004-2007], Callan [CFO 12/07 to 6/2008], and Lowitt [CFO 6/2008 to Chapter 11 9/08] and a colorable claim of professional malpractice exists against Ernst & Young." (Bankruptcy Examiner's Report V3, pages 999-991)*

This one is about mandated disclosure and, unfortunately for EY and these Lehman executives, it looks like a *prima facie* case of securities laws violation for the executives and malpractice for EY.

Color this stoplight Red for "EY is burnt toast."

EY's only hope is, perhaps, an *"in pari delicto"* defense. The Lehman executives will surely be subject to civil and criminal fraud charges. In that case, given the challenges for a Bankruptcy Trustee who, strictly speaking, stands in the shoes of felons whose actions may be imputed to Lehman, the corporation, EY may be able to try what PwC and Grant Thornton/PwC/EY have tried in the <u>AIG and Refco cases coming before the New York Court of Appeals</u>. But if those questions are resolved in favor of the plaintiffs, EY will not be able to count on Fuld, O'Meara, Callan and Lowitt to shield them from accountability.

Why did this happen? Well, any obfuscation, if intentional, was meant to fool investors, ratings agencies, <u>short sellers</u>, counterparties and anyone else whose confidence the Lehman executives required. They wanted to *appear to be* in better financial shape than they really were – for as long as possible.

They may have been prolonging the inevitable, but at some point they knew the inevitable would occur. Liquidity crises are rarely sudden. But they are often suddenly acknowledged. In Lehman's case, the Bear Stearns failure was probably the bell that tolled hollow, loud and clear.

So why did EY "fail to meet professional standards" in connection with that lack of disclosure? Brad Hintz, Lehman's CFO in the late 1990's told Bloomberg on March 12, "over ten years, a lot of venial sins add up…" I'm assuming Hintz means the mortal sin of accounting manipulation. I think, over the last ten years, EY may have ignored a lot of venial sins until "the drug we're on," as Lehman's McDade calls the now notorious Repo 105 transactions, added up to the mortal sin of accounting manipulation that was hidden from investors by lack of disclosure.

Brad Hintz told me that the average CFO tenure post-Lehman IPO 1994 was 540 days. The Examiners's Report refers to three CFOs during the period under examination alone. I've already told you what was wrong with the last two, Callan and Lowitt. You can sense their boredom and disdain for accounting details when you read their testimony.

The Examiner spent a lot of time trying to ascertain if, when and to what extent EY knew of and had been instrumental in designing and approving the Repo 105 transactions. The evidence he gathered says EY was very involved and very knowledgeable, up to and until the "whistleblower's" report of the abuses of the Repo 105 accounting treatment at 2007-2008 quarter ends. But the spin that lead partner William Schlich puts on the Repo 105 treatment is different. EY defends the transactions as proper GAAP.

*"According to Schlich, Ernst & Young had been aware of Lehman's Repo 105 policy and transactions for many years…Schlich stated that Lehman introduced its Repo 105 Accounting*

*Policy on the heels of the FASB's promulgation of SFAS 140. During that time, Ernst & Young "discussed" the Repo 105 Accounting Policy (including Lehman's structure for Repo 105 transactions) and Ernst & Young's team had a number of additional conversations with Lehman about Repo 105 over the years. However, according to Schlich, Ernst & Young had no role in the drafting or preparation of Lehman's Repo 105 Accounting Policy. Schlich stated definitively that Ernst & Young had no advisory role with respect to Lehman's use of Repo 105 transactions and that Ernst & Young did not "approve" the Accounting Policy.*

*Rather, according to Schlich, Ernst & Young "bec[a]me comfortable with the Policy for purposes of auditing financial statements." Following "consultation and dialogue" about the proper interpretation and application of SFAS 140, Ernst & Young "clearly ...concurred with Lehman's approach" to SFAS 140...not based upon an analysis of whether actual Repo 105 transactions complied with SFAS 140. Rather, Ernst & Young's review of Lehman's Repo 105 Accounting Policy was purely "theoretical." In other words, Ernst & Young solely assessed Lehman's understanding of the requirements of SFAS 140 in the abstract and as reflected in its Accounting Policy; Ernst & Young did not opine on the propriety of the transactions as a balance sheet management tool." (Bankruptcy Examiner's Report <u>v3, pages 948-950</u>)*

*Lehman initiated its Repo 105 program sometime in 2001, soon after SFAS 140 took effect in September 2000 Lehman's outside auditors and lawyers participated in the firm's review of SFAS 140. Indeed, Lehman vetted the concept of a SFAS 140 repo transaction with its outside auditor, before the firm formalized a Repo 105 accounting policy and approved Repo 105 transactions for use by firm personnel. (Bankruptcy Examiner's Report <u>V3, page 765</u>)*

That kind of comfort and confidence in your client and their technical competence comes from a long, lucrative relationship. But it must have been more than that. It could not have possibly come from confidence in the Lehman CFO suite, given its revolving door and the lack of accounting interest and aptitude in later years.

Ernst and Young's confidence in Lehman's CFO leadership was rooted in *fraternity*. Both Christopher O'Meara and David Goldfarb, his predecessor who was CFO from 2000 to 2004, are Ernst and Young alumni. Prior to joining Lehman Brothers in 1994, Mr. O'Meara worked as a senior manager in Ernst & Young's Financial Services practice. Prior to joining Lehman Brothers in 1993, Mr. Goldfarb served as the Senior Partner of the Ernst & Young's Financial Services practice, where he worked from 1979 to 1993.

http://retheauditors.com/2010/03/15/liberte-egalite-fraternite-lehman-brothers-troubles-for-ernst-young-threaten-the-big-4-fraternity/

Bottom of page 961 of Valukas Report

961

Ernst& Young did not follow - up on either Lee's allegations regarding Lehman's Repo 105 activity or Reilly's claim that he had no knowledge of Lehman's alleged $50 billion Repo 105 Usage figure. 3720 Ernst & Young signed a Report of Independent Registered Public Accounting

Firm for Lehman's second quarter 2008 Form10 -Q on July 10, 2008, less than four weeks After Schlich and Hansen interviewed Lee.

37

*Below are Lehman's stock prices from January 2008 to the date of bankruptcy in reverse.*

**Historical Prices Lehman Brothers Holdings Inc.**

**http://www.nasdaq.com/symbol/lehlq/historical**

| Date | Open | Closing Price | Daily High | Daily Low | Volume (Pcs.) |
|------|------|---------------|------------|-----------|---------------|
| 9/16/2008 | 0.18 | 0.15 | 0.24 | 0.15 | 419,226 |
| 9/15/2008 | 0.50 | 0.16 | 0.53 | 0.14 | 138,025 |
| 9/12/2008 | 3.01 | 2.55 | 3.83 | 2.44 | 49,890 |
| 9/11/2008 | 5.10 | 3.32 | 5.30 | 2.93 | 20,934 |
| 9/10/2008 | 7.20 | 5.75 | 7.60 | 5.15 | 18,775 |
| 9/9/2008 | 10.06 | 6.35 | 10.06 | 6.35 | 4,733 |
| 9/8/2008 | 11.98 | 10.07 | 12.15 | 9.36 | 3,326 |
| 9/5/2008 | 10.59 | 11.21 | 11.21 | 10.50 | 585 |
| 9/4/2008 | 11.72 | 10.59 | 11.72 | 10.59 | 85 |
| 9/3/2008 | 10.80 | 11.12 | 11.40 | 10.80 | 2,400 |
| 9/2/2008 | 11.28 | 10.84 | 11.92 | 10.84 | 4,150 |
| 9/1/2008 | 10.85 | 10.95 | 10.95 | 10.70 | 1,000 |
| 8/29/2008 | 10.70 | 11.07 | 11.07 | 10.56 | 3,070 |
| 8/28/2008 | 10.03 | 10.42 | 10.42 | 10.03 | 2,500 |
| 8/27/2008 | 9.50 | 10.03 | 10.03 | 9.50 | |
| 8/26/2008 | 9.23 | 9.37 | 9.46 | 9.23 | 1,260 |
| 8/25/2008 | 9.67 | 9.33 | 9.75 | 9.33 | 1,315 |
| 8/22/2008 | 9.09 | 10.37 | 10.70 | 9.09 | 1,252 |
| 8/21/2008 | 9.22 | 9.09 | 9.22 | 9.09 | |
| 8/20/2008 | 8.96 | 8.82 | 8.96 | 8.82 | |
| 8/19/2008 | 10.23 | 10.23 | 10.23 | 10.23 | |
| 8/18/2008 | 10.88 | 10.42 | 10.88 | 10.42 | 140 |
| 8/15/2008 | 11.40 | 11.13 | 11.40 | 11.13 | |
| 8/14/2008 | 10.45 | 10.92 | 10.92 | 10.45 | |
| 8/13/2008 | 10.94 | 10.44 | 11.03 | 10.44 | |
| 8/12/2008 | 12.30 | 11.33 | 12.50 | 11.33 | 1,150 |
| 8/11/2008 | 12.55 | 12.83 | 12.83 | 12.55 | 2,500 |
| 8/8/2008 | 11.76 | 12.55 | 12.55 | 11.76 | |
| 8/7/2008 | 13.24 | 12.15 | 13.24 | 12.15 | 200 |
| 8/6/2008 | 12.97 | 13.30 | 13.30 | 12.97 | 300 |

| | | | | |
|---|---|---|---|---|
| 8/5/2008 | 11.63 | 12.30 | 12.30 | 11.63 | |
| 8/4/2008 | 11.88 | 11.70 | 11.88 | 11.45 | 200 |
| 8/1/2008 | 11.07 | 11.30 | 11.30 | 11.07 | |
| 7/31/2008 | 11.45 | 10.90 | 11.45 | 10.90 | |
| 7/30/2008 | 10.75 | 11.20 | 11.20 | 10.75 | 1,000 |
| 7/29/2008 | 9.65 | 10.22 | 10.22 | 9.65 | 1,000 |
| 7/28/2008 | 10.93 | 10.19 | 10.93 | 10.19 | 80 |
| 7/25/2008 | 11.75 | 11.04 | 12.00 | 11.04 | 500 |
| 7/24/2008 | 13.55 | 12.32 | 13.55 | 12.32 | 360 |
| 7/23/2008 | 12.71 | 13.55 | 13.55 | 12.71 | 400 |
| 7/22/2008 | 11.15 | 12.09 | 12.09 | 11.15 | |
| 7/21/2008 | 12.27 | 11.76 | 13.04 | 11.76 | 2,145 |
| 7/18/2008 | 11.30 | 12.27 | 12.44 | 11.30 | 2,200 |
| 7/17/2008 | 10.15 | 11.61 | 11.61 | 10.15 | 640 |
| 7/16/2008 | 8.45 | 8.63 | 8.63 | 8.45 | 110 |
| 7/15/2008 | 7.94 | 8.76 | 8.76 | 7.94 | 950 |
| 7/14/2008 | 9.48 | 8.83 | 10.40 | 8.82 | 2,030 |
| 7/11/2008 | 11.20 | 8.74 | 11.20 | 8.73 | 1,433 |
| 7/10/2008 | 12.64 | 10.80 | 12.75 | 10.80 | 740 |
| 7/9/2008 | 14.09 | 13.49 | 14.09 | 13.49 | |
| 7/8/2008 | 13.26 | 13.05 | 13.26 | 13.05 | 200 |
| 7/7/2008 | 14.58 | 13.26 | 14.58 | 13.26 | |
| 7/4/2008 | 14.59 | 14.58 | 14.59 | 14.58 | |
| 7/3/2008 | 14.19 | 14.59 | 14.59 | 14.19 | |
| 7/2/2008 | 13.34 | 14.34 | 14.34 | 13.34 | 75 |
| 7/1/2008 | 13.00 | 13.41 | 13.41 | 12.39 | 310 |
| 6/30/2008 | 14.00 | 12.96 | 14.00 | 12.96 | |
| 6/27/2008 | 14.47 | 13.84 | 14.47 | 13.84 | |
| 6/26/2008 | 15.80 | 14.68 | 15.80 | 14.68 | |
| 6/25/2008 | 15.60 | 15.98 | 15.98 | 15.60 | |
| 6/24/2008 | 14.79 | 15.42 | 15.42 | 14.79 | |
| 6/23/2008 | 15.41 | 15.07 | 15.41 | 15.07 | |
| 6/20/2008 | 15.75 | 15.05 | 15.75 | 15.05 | |
| 6/19/2008 | 15.79 | 15.39 | 15.79 | 15.39 | |
| 6/18/2008 | 16.36 | 15.53 | 16.36 | 15.53 | |
| 6/17/2008 | 17.62 | 16.62 | 18.00 | 16.62 | 100 |
| 6/16/2008 | 16.66 | 17.62 | 18.00 | 16.66 | 200 |
| 6/13/2008 | 15.00 | 16.52 | 16.52 | 15.00 | 1,070 |

| | | | | |
|---|---|---|---|---|
| 6/12/2008 | 15.53 | 14.97 | 15.85 | 14.97 | 1,730 |
| 6/11/2008 | 17.65 | 16.22 | 17.90 | 16.22 | 930 |
| 6/10/2008 | 18.75 | 17.65 | 18.75 | 17.65 | 120 |
| 6/9/2008 | 20.70 | 17.95 | 20.70 | 17.95 | 70    559 million shares outstanding |
| 6/6/2008 | 21.50 | 21.16 | 21.95 | 21.16 | 400 |
| 6/5/2008 | 20.51 | 21.27 | 21.27 | 20.10 | 290 |
| 6/4/2008 | 20.09 | 20.51 | 20.93 | 18.88 | 1,080 |
| 6/3/2008 | 21.90 | 19.75 | 21.90 | 19.75 | 200 |
| 6/2/2008 | 23.64 | 22.11 | 23.64 | 22.11 | |
| 5/30/2008 | 24.49 | 23.64 | 24.65 | 23.64 | 1,200 |
| 5/29/2008 | 23.26 | 24.57 | 24.57 | 23.26 | |
| 5/28/2008 | 23.33 | 22.66 | 23.33 | 22.65 | |
| 5/27/2008 | 22.91 | 23.33 | 23.33 | 22.65 | 343 |
| 5/26/2008 | 22.98 | 22.91 | 22.98 | 22.91 | |
| 5/23/2008 | 24.19 | 22.98 | 24.19 | 22.87 | 470 |
| 5/22/2008 | 25.33 | 24.19 | 25.33 | 24.19 | |
| 5/21/2008 | 26.61 | 25.38 | 26.61 | 25.38 | |
| 5/20/2008 | 27.84 | 26.61 | 27.84 | 26.61 | |
| 5/19/2008 | 28.06 | 27.99 | 28.06 | 27.99 | |
| 5/16/2008 | 28.55 | 28.06 | 28.55 | 28.06 | |
| 5/15/2008 | 27.54 | 28.36 | 28.36 | 27.54 | |
| 5/14/2008 | 27.83 | 27.99 | 27.99 | 27.83 | |
| 5/13/2008 | 28.48 | 27.83 | 28.48 | 27.83 | |
| 5/12/2008 | 28.08 | 28.45 | 28.45 | 28.08 | |
| 5/9/2008 | 28.03 | 28.08 | 28.08 | 28.03 | |
| 5/8/2008 | 28.73 | 28.03 | 28.73 | 28.03 | |
| 5/7/2008 | 29.60 | 29.42 | 29.60 | 29.42 | |
| 5/6/2008 | 29.65 | 29.11 | 29.65 | 29.11 | 100 |
| 5/5/2008 | 30.54 | 29.65 | 30.54 | 29.65 | |
| 5/2/2008 | 30.05 | 30.54 | 30.54 | 30.05 | |
| 4/30/2008 | 30.09 | 29.69 | 30.09 | 29.69 | |
| 4/29/2008 | 30.71 | 30.09 | 30.71 | 30.09 | |
| 4/28/2008 | 30.03 | 30.73 | 30.73 | 30.03 | |
| 4/25/2008 | 29.79 | 30.03 | 30.03 | 29.79 | |
| 4/24/2008 | 27.65 | 30.18 | 30.18 | 27.65 | |
| 4/23/2008 | 27.96 | 27.65 | 27.96 | 27.65 | |
| 4/22/2008 | 28.23 | 27.96 | 28.23 | 27.96 | |

| | | | | | |
|---|---|---|---|---|---|
| 4/21/2008 | 28.94 | 28.14 | 28.94 | 28.14 | |
| 4/18/2008 | 27.25 | 29.61 | 29.61 | 27.25 | |
| 4/17/2008 | 26.02 | 26.97 | 26.97 | 26.02 | |
| 4/16/2008 | 25.02 | 25.69 | 25.69 | 25.02 | 200 |
| 4/15/2008 | 24.93 | 25.02 | 25.02 | 24.93 | |
| 4/14/2008 | 25.18 | 24.93 | 25.18 | 24.93 | |
| 4/11/2008 | 25.66 | 25.18 | 25.70 | 25.18 | 43 |
| 4/10/2008 | 25.85 | 25.66 | 25.85 | 25.66 | |
| 4/9/2008 | 27.96 | 26.09 | 27.96 | 26.09 | |
| 4/8/2008 | 28.42 | 27.96 | 28.42 | 27.96 | |
| 4/7/2008 | 28.18 | 28.42 | 28.42 | 28.18 | |
| 4/4/2008 | 27.91 | 28.18 | 28.18 | 27.91 | |
| 4/3/2008 | 28.09 | 28.37 | 28.58 | 28.09 | 95 |
| 4/2/2008 | 28.00 | 28.44 | 28.99 | 28.00 | 100 |
| 4/1/2008 | 23.50 | 27.70 | 27.70 | 23.50 | 600 |
| 3/31/2008 | 24.11 | 24.77 | 24.77 | 24.11 | |
| 3/28/2008 | 25.00 | 24.11 | 25.00 | 24.11 | |
| 3/27/2008 | 27.01 | 24.66 | 27.01 | 24.66 | |
| 3/26/2008 | 29.11 | 27.01 | 29.11 | 27.01 | |
| 3/25/2008 | 29.63 | 29.11 | 29.63 | 29.11 | |
| 3/20/2008 | 27.11 | 27.11 | 27.11 | 27.11 | |
| 3/19/2008 | 29.10 | 27.11 | 29.61 | 27.11 | 160 |
| 3/18/2008 | 19.40 | 28.71 | 28.71 | 19.40 | 3,266 |
| 3/17/2008 | 20.50 | 17.73 | 21.19 | 13.11 | 4,525 |
| 3/14/2008 | 29.80 | 25.68 | 29.80 | 25.45 | 75 |
| 3/13/2008 | 29.25 | 29.68 | 29.68 | 29.25 | |
| 3/12/2008 | 29.77 | 29.82 | 29.82 | 29.77 | |
| 3/11/2008 | 28.13 | 29.47 | 29.47 | 28.13 | |
| 3/10/2008 | 29.90 | 28.13 | 29.90 | 28.13 | |
| 3/7/2008 | 29.90 | 29.90 | 29.90 | 29.90 | |
| 3/6/2008 | 31.52 | 29.90 | 31.52 | 29.90 | |
| 3/5/2008 | 31.44 | 31.52 | 31.52 | 31.44 | |
| 3/4/2008 | 32.31 | 31.07 | 32.31 | 31.07 | |
| 3/3/2008 | 33.92 | 32.31 | 33.92 | 32.31 | |
| 2/29/2008 | 36.34 | 33.94 | 36.34 | 33.94 | 155 |
| 2/28/2008 | 37.75 | 36.38 | 37.75 | 36.38 | |
| 2/27/2008 | 38.26 | 37.75 | 38.26 | 37.75 | |
| 2/26/2008 | 37.05 | 38.38 | 38.38 | 37.05 | |

| | | | | | |
|---|---|---|---|---|---|
| 2/25/2008 | 36.13 | 36.20 | 36.20 | 36.13 | |
| 2/22/2008 | 36.59 | 35.49 | 36.92 | 35.49 | 14 |
| 2/21/2008 | 37.86 | 36.59 | 37.86 | 36.59 | |
| 2/20/2008 | 36.50 | 37.86 | 37.86 | 36.50 | |
| 2/19/2008 | 37.46 | 36.50 | 37.46 | 36.50 | |
| 2/18/2008 | 36.91 | 37.46 | 37.46 | 36.91 | |
| 2/15/2008 | 37.42 | 36.91 | 37.42 | 36.91 | |
| 2/14/2008 | 37.93 | 37.42 | 37.93 | 37.42 | |
| 2/13/2008 | 39.17 | 37.93 | 39.17 | 37.93 | |
| 2/12/2008 | 40.45 | 39.36 | 40.45 | 39.36 | |
| 2/11/2008 | 41.00 | 40.71 | 41.00 | 40.71 | |
| 2/8/2008 | 42.16 | 40.58 | 42.16 | 40.58 | |
| 2/7/2008 | 39.66 | 42.16 | 42.16 | 39.66 | |
| 2/6/2008 | 41.19 | 39.66 | 41.19 | 39.66 | |
| 2/5/2008 | 42.74 | 41.19 | 42.74 | 41.19 | |
| 2/4/2008 | 43.98 | 42.74 | 43.98 | 42.74 | |
| 2/1/2008 | 43.08 | 43.83 | 43.83 | 43.08 | |
| 1/31/2008 | 42.67 | 43.08 | 43.08 | 40.55 | 510 |
| 1/30/2008 | 43.10 | 42.97 | 43.10 | 42.97 | |
| 1/29/2008 | 40.51 | 41.84 | 41.84 | 40.51 | |
| 1/28/2008 | 39.45 | 40.14 | 40.14 | 39.45 | |
| 1/25/2008 | 40.55 | 39.45 | 40.55 | 39.45 | 50 |
| 1/24/2008 | 40.00 | 40.55 | 40.55 | 40.00 | 100 |
| 1/23/2008 | 37.07 | 37.59 | 37.59 | 37.07 | 100 |
| 1/22/2008 | 36.00 | 36.89 | 36.89 | 36.00 | 345 |
| 1/21/2008 | 36.23 | 36.89 | 36.89 | 36.00 | 28 |
| 1/18/2008 | 37.61 | 36.23 | 37.61 | 36.23 | 80 |
| 1/17/2008 | 39.93 | 37.61 | 39.93 | 37.61 | |
| 1/16/2008 | 37.75 | 39.93 | 39.93 | 37.75 | 100 |
| 1/15/2008 | 39.45 | 37.73 | 39.45 | 37.73 | |
| 1/14/2008 | 39.49 | 39.45 | 39.49 | 39.45 | |
| 1/11/2008 | 38.57 | 39.49 | 39.49 | 38.57 | |
| 1/10/2008 | 36.98 | 37.58 | 37.58 | 36.98 | 70 |
| 1/9/2008 | 38.26 | 36.22 | 38.26 | 36.22 | |
| 1/8/2008 | 39.32 | 38.94 | 39.32 | 38.94 | |
| 1/7/2008 | 39.54 | 39.32 | 39.54 | 39.32 | |
| 1/4/2008 | 41.67 | 39.54 | 41.67 | 39.54 | |
| 1/3/2008 | 42.80 | 41.67 | 42.80 | 41.67 | |

| 1/2/2008 | 44.15 | 42.89 | 44.15 | 42.89 |

*The following snippet continues on page 23 #51-53 from the State of New York's complaint against the defendant explains the additional chain of events involving the whistleblower from E&Y and defendant intentionally and calculating deceiving the Lehman directors by remaining silent which as we all know is a well known method of deception that have not been fully described above. Defendant is just as responsible for damages as the Lehman Officers are but fortunately for the class E&Y is not bankrupt and can afford more, much more.*

VIII. E&Y Failed To Disclose Whistleblower Allegations Regarding Repo 105

51

In May 2008, E&Y was given a copy of a letter to senior financial executives at Lehman from Matthew Lee, a Senior Vice President in Lehman's Finance Division responsible for Lehman's Global Balance Sheet and Legal Entity Accounting, which raised serious questions concerning Lehman's financial statements. E&Y was directed by Lehman's Audit Committee to meet with Lee and to report back the results of its investigation of Lee's allegations. (Defendant waited a month to even interview the whistleblower! Guess they were circling the wagons and delaying for as long as possible hoping something else would occur and get them off the hook.)

52.

On June 12, 2008, Schlich, and another E&Y partner, Hillary Hansen, interviewed Lee. As demonstrated by contemporaneous notes made by Hansen, and Lee's own testimony, Lee told Schlich and Hansen of E&Y that (as E&Y already knew), Lehman was removing $50 billion in fixed income securities from its balance sheet each quarter by purporting to "sell them"

to European counterparties for a short time. Hansen's notes thus state that Lee told them: "Repo

105/Repo 108 reduced assets to 50B – moving off b/

s in Europe & back in 5 days later off balance sheet..."

53.

Immediately following the meeting with Lee, Hansen raised concerns about the Repo 105

transactions with Schlich, who casually dismissed the concerns by telling Hansen that the Repo

105 transactions were being properly recorded as sales. Schlich and Hansen then met with

Lehman's Global Product Controller, Gerard Reilly, to review Lee's allegations. In a brief

meeting, they FAILED (objectors CAPS) to even mention Repo 105. Further, at a meeting of

Lehman's Audit Committee on June 13, 2008, Schlich failed to mention the Repo 105 concerns

that Lee had conveyed – even though E&Y had been specifically instructed to inform Lehman's

Audit Committee of all concerns raised by Lee

Again slam dunk evidence that defendant intentionally kept the audit Committee in the dark and

is liable for much more than $99 million in damages at trial.

**Summary Judgment Standard:**

Courts apply a different procedural mechanism –summary judgment –

To assess the sufficiency of allegations in light of a more developed factual record. Federal Rule

Of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings,

depositions, the discovery and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." Page 12 Volume 6 of the Examiner's Report

Objector states there is no issue for trial here, just the damage amount!

**Summary Judgment should be filed for in a motion**

Based on all the evidence and violations above why hasn't counsel filed for summary judgment rather than a bogus settlement offer as defined below when it appears that's what should be occurring.

This current offer is the equivalent of being hit by a drunk driver at a stop light, (you were wearing your seat belt) incurring $100,000.00+ in ongoing medical bills and the insurance company for the defendant offers the same 1.6% of the total damages or just $1,600.00 to settle based on the minimum $6.6 billion in damages estimate. Who would take that offer? No one would and neither should the class. Defendant has the means, motive and opportunity to pay more based on the malpractice fraud they engaged in and covered up by remaining silent. Their first trial balloon offer is not good enough. The defendant should be begging to settle, not the other way around.

**Objector Fee Award**

This objector may eventually apply for an objector award under N.Y law which applies if the approval is granted to a proposed settlement only if the settlement amount is raised or the attorney fee and/or expenses are reduced with any monies flowing back into the fund for distribution to the class victims.

**Suggested attorney fee**

If the Court does approve the settlement, the fee request should be reduced to 12% to reflect the fact that the Examiner provided all the evidence in this case, counsel just reread it and put its

own spin on it and then billed the class a second time for reviewing the same evidence! In fact

reading the Court's opinion dated July 07, 2011 it's obvious to this objector that the TAC was

not done properly and therefore negligent in certain aspects as the Court wrote about. That's

another reason to lower the undeserved fee request to 10%. The settlement amount is largely

illusory compared to the total maximum damages defendants face on the court steps the day of

the trial. We should proceed on.

CONCLUSION

The ultimate question to be resolved is this:

Has Plaintiff's Counsel proved that the $99 million is fair, reasonable and adequate based on the

evidence and the $6.6 billion to $30 billion in damages caused by E&Y's actions, inactions and

cover-up of this accounting manipulation scheme?  Objector says no they have not. This objector

and many others certainly would not have purchased ANY shares during the class period had

they known the whole truth, not half the truth which is a well known method of deception.

Instead E&Y got into a self-induced coma, a silent cover up mode and the class suffered billions

in losses as a result which defendant is now responsible for.

**Deny motion to certify**

Wherefore, this objector respectfully requests that the Court withdraw its conditional approval of

the proposed settlement and enter orders requiring further proceedings so as to affect substantial

justice in this cause between the parties and the absent class members. The Court should rule that

the class cannot be certified pursuant to Rule 23(a)(4),  23(e) and sustain these objections

because the proposed settlement at this time  is unfair, unreasonable, inadequate and not in the

public interest because the offer is immensely underfunded compared to the size of shareholder losses which all the evidence backs up and is irrefutable. The overwhelming amount of gigantic evidence available in the Plaintiff's and Court's files, in the Examiners report and this objection easily prove that this proposed settlement is a slam dunk for huge liability and money damages, so modification or outright rejection is required. To approve this settlement based on the damages incurred by the defendant's deliberate actions and damages caused, along with all the evidence would be, in this objector's opinion, **a mistake of law and clearly erroneous factual finding**.

Objector incorporates the two thousand two hundred page $50,000,000.00 Examiner's Report into this objection. A copy has not been attached due to its size but can be found at jenner.com.

Objector requests directly through Plaintiffs Counsel and to the Court directly in this objection that per Federal Rule Of Civil Procedure 56(c) a summary judgment motion/ruling be made/ordered/filed/suggested starting today through the next thirty days. A collectible Tyco size settlement or verdict awaits the class.

Objector incorporates any other objections received in this matter into this objection that are not inconsistent with his own and reserves the right to amend and expand on those objections especially since counsel chose not to include three objections in its filing papers and chose not to post them on the website for the class and objector to comment on until March 18, 2014.

Unless this objector has missed or is unaware of something, this proposed settlement may now be the equivalent of what happened when Dorothy in the "Wizard of Oz" threw a bucket of water on the "Wicked Witch of the West".

Thank you for your attention and consideration.

Case No. 08-cv-5523-lak, 09-MD-2017(LAK

Dated: March 20, 2014

*Chris Andrews, Pro Se*
P.O. Box 530394
*Livonia, MI 48152-0394*
*E-mail caaloa@gmail.com*
*Phone 1-248-535-3810*

Chris Andrews
*I certify that the above information is true and accurate to the best of my knowledge.*

I hereby certify that on this day I mailed the foregoing to the Clerk of the Court, and served true

and correct copies upon class counsel and defendants' counsel via US Post Office Priority Mail

(two- three day delivery) at the addresses below, per the instructions of the Settlement Notice to:

Clerk of the Court United States District Court for the Southern District of New York, Clerk of

the Court 500 Pearl Street, New York, New York 10007

Bernstein Litowitz Berger & Grossmann LLP attention David Stickey, 12481 High Bluff Drive,

Suite *300,* San Diego CA 92130-3582

Kessler Topaz Meltzer & Check, LLP, Attention David Kessler 280 King of Prussia Road,

Radnor, PA 19087

Latham & Watkins, Attention Miles Ruthberg 885 Third Avenue, New York, N.Y. 10022



Chris Andrews

*I certify that the above information is true and accurate to the best of my knowledge.*

Case No. 08-cv-5523-lak,09-MD-2017(LAK)

Case 2:10-cv-14360-DPH-MKM ECF No. 169-10, PageID.5547 Filed 10/24/14 Page 85 of 101
Case 1:09-md-02017-LAK-GWG Document 894-2 Filed 03/24/14 Page 2 of 40
Case 1:09-md-02017-LAK Document 874-6 Filed 04/05/12 Page 63 of 96

# AMERITRADE
Apex

Statement Reporting Period:
09/01/08 - 09/30/08

10-669-3900
) AMERITRADE
VISION OF TD AMERITRADE INC
D BOX 2209
MAHA, NE 68103-2209

**Statement for Account #**
CHRIS ANDREWS
23610 HAZEN DRIVE
SOUTHFIELD, MI 48034-2507

**Announcements:**
EFFECTIVE 11/28/2008, NO-TRANS-
ACTION-FEE FUNDS (EXCEPT PROFUNDS &
RYDEX MUTUAL FUNDS) HELD 180 DAYS
OR LESS ARE SUBJECT TO A $49.99
SHORT-TERM REDEMPTION FEE, PLUS ANY
FEES DESCRIBED IN THE PROSPECTUS.

## Investment

Cash
MMDA
Money Market
Short Balance
Stocks
Short Stocks
Fixed Income
Options
Short Options
Mutual Funds
Other

**Total**

## Cash Activity Summary

Opening Balance
Securities Purchased
Securities Sold
Funds Deposited
Funds Disbursed
Income                                  39
Expense                                 39
Other                                   0

Closing Balance

page 1 of 12

Case 2:10-cv-14360-DPH-MKM ECF No. 169-10, PageID.5548 Filed 10/24/14 Page 86 of 101
Case 1:08-cv-05523-LAK-GWG Document 594-2 Filed 03/24/14 Page 5 of 46
Case 1:09-md-02017-LAK Document 874-6 Filed 04/05/12 Page 64 of 96

**Statement for Account #** ▓▓▓▓▓
09/01/08 - 09/30/08

## Account Activity

| Trade Date | Settle Date | Acct Type | Transaction/ Cash Activity* | Description | Symbol/ CUSIP | Quantity | Price | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 09/12/08 | 09/17/08 | Margin | Buy - Securities Purchased | WASHINGTON MUTUAL COM | | 1,000 | | | 2,418.08 |
| 09/12/08 | 09/17/08 | Margin | Sell - Securities Sold | WASHINGTON MUTUAL COM | WAMU | 1,000 | 2.81 | 2,800.03 | 2,418.08 |
| 09/12/08 | 09/17/08 | Margin | Buy - Securities Purchased | LEHMAN BROS HLDGS INC COM | LEHMQ | 200 | 3.67 | (743.95) | 1,674.13 |

Case 1:09-md-02017-LAK Document 874-6 Filed 04/05/12 Page 65 of 96

Statement for Account #

09/01/08 - 09/30/08

## Account Activity

| Trade Date | Settle Date | Acct Type | Transaction/ Cash Activity* | Description | Symbol/ CUSIP | Quantity | Price | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 09/15/08 | 09/18/08 | Margin | Sell - Securities Sold | LEHMAN BROS HLDGS INC COM | LEHMQ | 200- | 0.321 | 54.24 | 594.31 |



# Global Code
# of Conduct





Building a better
working world

**The Global Code of Conduct
draws on our shared values.**

*Who we are*
## Our values

People who demonstrate
integrity, respect and teaming.

People with energy, enthusiasm
and the courage to lead.

People who build relationships
based on doing the right thing.

**To the people of EY**

EY is committed to doing its part in building a better
working world.

Our Global Code of Conduct and our values underpin this
purpose. They represent our commitment to all our
stakeholders that we understand the confidence that they
place in us to deliver quality and excellence in everything we do.

Every day each one of us could be faced with challenging and
difficult choices; it's simply a part of living and working in a
demanding, complex and increasingly globalized business
environment. But it's the integrity and professionalism that
we bring to these challenges that defines our reputation.

We are each accountable for our own decisions. And we
are accountable to all our EY colleagues across the world.
The Code provides a clear set of standards for our business
conduct. It presents each of us with an ethical and
behavioral framework to guide our response to the
challenging and sometimes difficult choices we face.
It also reflects our values.

Whenever we encounter an ethical issue, each of us has the
responsibility to respond in a manner that reflects our values
in action. While most issues can be resolved locally, you will
find information within this Code about additional support
and resources available globally.

It's essential that everyone at EY fully complies with the
Code. By doing so, we send a clear message to those we
work with about the strength of our commitment to ethical
behavior and quality.

In this way we protect and enhance the reputation of EY,
and play a key role in building a better working world for our
people, for our clients and for our communities.


Sincerely,

*Mark Weinberger*

**Mark A. Weinberger**
Global Chairman and CEO

## EY Global Code of Conduct

The EY Global Code of Conduct provides the ethical framework on which we base our decisions – as individuals and as members of our global organization. The Code is anchored in our values and beliefs, and underpins all that we do.

Our Global Code of Conduct is organized into five categories containing guiding principles that should be used by everyone within EY to guide our behavior across all areas of our activity:

1. Working with one another

2. Working with clients and others

3. Acting with professional integrity

4. Maintaining our objectivity and independence

5. Respecting intellectual capital

We expect everyone who works at EY to behave in accordance with the principles contained in the Global Code of Conduct. If you do not understand the principles contained within the Code, or are not sure how to apply them, you should consult with an appropriately qualified colleague to get your questions answered.

## Our commitment

The Global Code of Conduct applies to everyone at EY, regardless of their individual role, position or practice.

▸ We promote and support the Global Code of Conduct in our day-to-day business activities, through both personal leadership and business practice.

▸ Each of us is expected to behave according to the principles contained in the Global Code of Conduct. We encourage consultation and the seeking of advice, as appropriate, from the resources available to assist in application of the Code.

▸ We understand that deviations from or violations of the Global Code of Conduct are unacceptable and that we should feel able to raise them, without fear of retaliation, with an appropriate colleague or to the relevant ethics hotline. **EY does not permit discrimination or retaliation of any kind for good faith reports of illegal or unethical behavior.**

▸ We acknowledge that breaches of the Global Code of Conduct may result in our practices taking disciplinary action, up to and including termination of employment.

▸ We affirm in writing our understanding of the principles contained in the Global Code of Conduct and our commitment to abide by them.

## 1. Working with one another

- We build relationships with each other based on a shared trust and confidence that each of us has a personal and professional commitment to do the right thing.

- We are committed to communicating openly and honestly

- We are committed to working in diverse teams and are personally accountable to other team members for the contribution we make.

- We rely upon each other to deliver quality service to our clients and for our individual development.

- We nurture integrity, respect and teaming.

- We consult with each other and value the perspectives of those who are different from us, as well as those who challenge our own point of view.

- We embrace multicultural experience and diversity as strengths of our global organization. As such, we respect one another and strive for an inclusive environment free from discrimination, intimidation and harassment.

- We encourage and support the professional development of our colleagues and promote individual achievement and continuous learning.

- We expect and deliver feedback regularly, candidly and constructively, and positively recognize success.

## 2. Working with clients and others

No client or external relationship is more important than
the ethics, integrity and reputation of EY.

*Working with clients ...*

▸ We commit ourselves, as professionals, to uphold
the trust placed in us by others.

▸ We are committed to delivering quality services that
reflect our professional capabilities and are appropriate
to the specific issues and needs of our clients.

▸ We are robust and courageous in our challenge to clients
and are not afraid to deliver unwelcome information
to them.

▸ We support our people and will withdraw from working
for any clients that put our people under undue pressure
or threaten them in exercising their professional duties.

*Working with regulators ...*

▸ We uphold the professional standards and rules applicable
to us, and our member firms actively work with the
regulators who oversee our professional conduct
to ensure that these rules and standards meet the
continuously changing needs of the market.

*Working with others ...*

▸ We reject unethical or illegal business practices in
all circumstances.

▸ We avoid working with clients and others whose standards
are incompatible with our Global Code of Conduct.

▸ We coordinate, as appropriate, with other members
of our profession in matters of public interest.

▸ We recognize our responsibility as an organization
in playing an active and positive role in supporting
a successful and sustainable society.

### 3. Acting with professional integrity

*Our professional integrity ...*

‣ We comply with laws, regulations and standards that apply to us in our professional conduct.

‣ We uphold the EY name. We do not misrepresent the position that EY takes in professional and other matters.

‣ We promote a culture of consultation. We address questions of ethics and consult appropriately to help resolve them. We do not hide from or ignore issues.

‣ We provide ethics hotlines to deal with sensitive ethical issues.

‣ We understand and comply with EY policies and procedures.

*Our competitive approach ...*

‣ We recognize that our competitive advantage is achieved through the excellence of our professional advice and the quality of our service delivery.

‣ We compete energetically and vigorously, and recognize the need to be honest in our competitive behavior.

‣ We do not offer personal inducement to secure work.

*Documenting our work ...*

‣ We properly document our client engagements and business operations in accordance with EY policies and relevant legal and professional requirements.

‣ We never destroy or alter documents, or recommend their destruction or alteration, for any illegal or improper reason.

*Our fees ...*

‣ We charge appropriate fees for our services in accordance with our engagement terms and our professional rules.

*Time and expenses ...*

‣ We require actual hours worked and expenses incurred to be reported.

‣ We incur expenses in accordance with EY policies or, where agreed, our clients' expense policies.

## 4. Maintaining our objectivity and independence

*Our objectivity ...*

▸ We maintain and affirm our objectivity and independence, recognizing that these are critical to our professional responsibilities.

▸ We employ professional skepticism.

▸ We reject inappropriate pressure from clients or others.

▸ We are alert for personal and professional conflicts of interest and take immediate and appropriate steps to resolve or manage any that may arise.

▸ We do not accept payments or items of value if this could reasonably be viewed as influencing our conclusions or advice.

*Our independence ..*

▸ We comply with EY's independence rules, including the restrictions applicable to our families. We understand that these may sometimes be more rigorous than applicable professional and legal requirements.

▸ We avoid relationships that impair – or may appear to impair – our objectivity and independence.

▸ We continuously monitor our independence.

## 5. Respecting intellectual capital

▸ We respect and protect confidential information obtained from, or relating to, our clients or third parties, as well as personal information about our people, in accordance with local law and professional standards.

▸ We take proactive measures to safeguard our documents, computers and other data devices that contain personal or confidential information.

▸ We do not use confidential information for personal gain.

▸ We obtain, develop and protect intellectual property in an appropriate manner. We respect the restrictions on its use and reproduction.

▸ We use and share internal and external knowledge in accordance with EY policies and our legal and professional obligations.

▸ We acknowledge that each of us is responsible for keeping our professional knowledge up to date and for sharing best practices.

## Where to find support

In developing this Global Code of Conduct, the leadership of EY recognizes that no code can cover every eventuality — and that from time to time we may require the advice and support of others in addressing some of the situations that arise during the normal course of daily business life.

We have long promoted a consultative culture at EY. In addition to established internal relationships, we have created a support network that is available for consultation and advice, to help each of us live up to our commitments under the Code.

*Here are some of the places where you can go for advice and guidance:*

- ▸ Risk Management and Quality Leaders, who have been appointed at the Global, Service Line, Area and local level

- ▸ The Talent team at all levels within the global organization

- ▸ The Office of the General Counsel or Legal Counsel in your Area or locally

- ▸ Professional Practice Directors

- ▸ Global, Area, and local policies and procedures, including online resources and databases

- ▸ Ethics hotlines and ethics oversight teams

## Putting it into action

This Global Code of Conduct gives everyone at EY an ethical framework to help make the right decisions. The principles contained in the Code provide us with a clear set of standards, grounded in our values, on which to base our behavior across all areas of our professional activity.

How do we put the Code into action? How can each of us make sure that we are living up to our commitments under the Code?

If you are unsure of the right course of action, or are faced with a difficult issue, asking yourself the following questions may help you determine the appropriate way to act.

1. Have I consulted appropriately
   with colleagues?

2. Are my actions legal and in
   compliance with the standards
   of our profession?

3. Am I compromising my integrity or
   the integrity of EY or our clients?

4. Am I upholding the values of EY?

5. Am I treating others the way I expect
   others to treat me?

6. Is my choice of action the most
   ethical among the possible
   alternatives?  Do I feel good
   about my choice?

7. If I document my decision, would
   a reviewer agree with the action
   I have taken?

8. Would my actions damage the
   reputation of EY?

Global Code of Conduct  13

Case 1:08-cv-05523-LAK-GWG Document 354-2 Filed 03/24/14 Page 20 of 40

**Notes**