# EXHIBIT J

Chris Andrews- In Pro Per

Email: ███████████████

███████████████████████

**Southfield, MI 48033**

█████████████████

UNITED STATES DISTRICT COURT

Southern District Of New York

Clerk of Court

500 Pearl Street

New York, New York 10007

| | |
|---|---|
| RE: LEHMAN BROTHERS EQUITY/DEBT | Case No. 08-CV-5523-LAK, 09-MD-2017 (LAK) |
| SECURITIES LITIGATION 08-CV-5523-LAK,09-MD- | **OBJECTION TO PROPOSED SETTLEMENT** |
| 2017 (LAK) | Date: April  12, 2012 |
| Chris Andrews, | Time: 4:00 p.m. |
| Objector. | Courtroom 12D |
| | Judge: Lewis Kaplan |
| | **CLASS ACTION** |

TABLE OF CONTENTS TABLE OF AUTHORITIES

INTRODUCTION Sixty one pages in this brief, three pages proving class membership

and  twenty nine pages of the Harvard study of Lehman's officers wealth.

    1. The Objector is a member of the class.

2. The Court has a fiduciary duty to the unrepresented members of the class.

3. The Claims Process Is Unduly Burdensome.

4. The Settlement Contains Every *Bluetooth* Indicia of Impermissible Self-Dealing.

5. The Court should apply the Ali Principles in determining the fairness of this settlement.

6. The ALI Principles Are Consistent With *Churchill Village.*

7. Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval From a Low number of Objectors.

8. This objection is brought in good faith.

Conclusion

**TABLE OF AUTHORITIES**

**Cases**

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.,* 52 F.R.D. 373 (D. Kan. 1971)

*Boeing v. Van Gemert,* 444 U.S. 572 (1980);

*Buchet v. ITT Consumer Fin. Corp.,* 845 F. Supp. 684 (D. Minn. 1994)

*Churchill Village v. General Elec.,* 361 F.3d 566 (9th Cir. 2004) *Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401 (9th Cir. 1989).

*Ellis v. Edward D. Jones & Co.,* 527 F. Supp. 2d 439 (W.D. Pa. 2007)

*Fears v. Wilhelmina Model Agency,* 2009 U.S. Dist. LEXIS 85252 (S.D.N.Y. Sept. 15, 2009)

*Grove v. Principal Mut. Life Ins. Co.,* 200 F.R.D. 434 (S.D. Iowa 2001) *In re Classmates.com Consolidated Litig.,* No. 09-cv-0045-RAJ (W.D. Wash 2011)

*In re Compact Disc Minimum Advertised Price Antitrust Litig.* 370 F.Supp.2d 320 (D. Me. 2005)

*In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979)

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F. 3d 768 (3d. Cir. 1995)

*In re HP Inkjet Printer Litig*., No. 5:05-cv-3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011)

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010)

*In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166 (D. Mass. 2005)

*In re Veritas Software Corp. Sec. Litig.,* 496 F.3d 962 (9th Cir. 20

*In re Wal-Mart Stores, Inc.*, No. 06-02069, 2008 U.S. Dist. LEXIS 109446 (N.D. Cal. May 2, 2008) *In re Wells Fargo Loan Processor Overtime Pay Litig.,* 2011 U.S. Dist. LEXIS 84541 (N.D. Cal. Aug. 2, 2011)

*International Precious Metals Corp v. Waters,* 530 U.S. 1223 (2000)

*Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289 (E.D. Cal. Sept. 1, 2011)

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987)

*Mueller v. CBS, Inc.*, 200 F.R.D. 227 (W.D. Pa. 2001)

*Nilsen v. York County,* 400 F.Supp.2d 266 (D. Me. 2005)

*Parker v. Time Warner Entm't* Co., L.P., 631 F. Supp. 2d 242 (E.D.N.Y. 2009) *Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292 (M.D. Pa. 1995)

*Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277 (7th Cir. 2002)

*Saur v. Snappy Apple Farms, Inc.*, 203 F.R.D. 281 (W.D. Mich. 2001) *Silber v. Mabon,* 957 F.2d 697 (9th Cir. 1992)

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003).

*Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34 (D. Me. 2005)

*Tarlecki v. Bebe Stores, Inc.*, 2009 U.S. Dist. LEXIS 102531 (N.D. Cal. Nov. 3, 2009)

*True v. American Honda Co.*, 749 F. Supp. 1052 (C.D. Cal. 2010)

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)

*Wike v. Vertrue, Inc.*, 2010 U.S. Dist. LEXIS 96700 (M.D. Tenn. Sept. 15, 2010)

*Williams v. MGM-Pathe Communs. Co.*, 129 F.3d 1026 (9th Cir. 1997)

*Yeagley v. Wells Fargo & Co.*, 2008 WL 171083 at *1 (N.D. Cal.)

Tyco MDL Case no. 02-md-1335-PB 12-19-07


**Rules and Statutes**

Fed. R. Civ. P. 23(a)(4) 18

Fed. R. Civ. P. 23(c)(2)(B)

Fed. R. Civ. P. 23(e)(1)

Fed. R. Civ. P. 23(e)(5) N.D. Cal. LR 23-2

**Other Authorities**

2 Newberg on Class Actions, § 8.04

7B Charles Alan Wright et al., *Federal Practice and Procedure,* § 1787 (2d ed.1986)

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(a) (2010)

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(b) (2010)

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010)

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.13 (2010)

Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarnators*, 2003

Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529 (2004

Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71(2004

Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010

Ashby Jones, "A Litigator Fights Class-Action Suits," WALL ST. J. (Oct. 31, 2011).

Paul Karlsgodt & Raj Chohan, "Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval," BUREAU OF NAT. AFFAIRS: CLASS ACTION LITIG. REPORT (Aug. 12, 2011).

Robert H. Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet,* 69 U. PITT.

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71 (2007

Pamela A. MacLean, "Dealing for Dollars," CALIFORNIA LAWYER (June 2011)

Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2002).

Notes of Advisory Committee on 2003 Amendments to Rule 23(h)

Charles Silver, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809 (2000)

Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010)

C 09-01911 JW vii OBJECTION TO PROPOSED SETTLEMENT

ION TO PROPOSED SETTLEMENT

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71 (2007

Pamela A. MacLean, "Dealing for Dollars," CALIFORNIA LAWYER (June 2011)

Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2002).

Notes of Advisory Committee on 2003 Amendments to Rule 23(h

Charles Silver, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809 (2000)

Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010)

1. Objector Chris Andrews was a purchaser of Lehman common stock during the class period, see attached proof. Andrews is a member of the D&O settlement class; I therefore have standing to object to the settlement. I intend to appear at the fairness hearing on April 12, 2012 and I have objected to the Tyco Class action settlement four years ago but withdrew the objection which was granted by the Court. I was a consultant for Lead Counsel in that case. I request the opportunity to cross-examine any witnesses who testify at the hearing in support of settlement approval. I also request the ability to perform discovery on certain issues that are described below per Rule 23, 4 paragraphs 2. I am not an attorney.

2. Andrews's mailing address is 23610 Hazen Street Southfield MI 48033. His telephone number is 1-248-635-3810.

3. On 2-21-12 I received in the mail the notice of the settlement and claim form. I noted the attorney fees request was 17.5% and expense request was $2.5 million. Having known that the Examiner's report dug up the proof that proved the fraud and then sensing the

the strong possibility that the lawyers might be overbilling at outer space rates I emailed Mr. Kessler one of the co-lead counsel notifying him that I was going to file an objection. I had objected to the request and expense in the famous Tyco settlement of five years ago so based on past experience plaintiff's counsel knew they were in for some scrutiny in at least the fee department. Plaintiff's lawyers have hijacked this case from the beginning based on the total disregard of court rules and procedures while a majority of the named plaintiffs have disregarded their duties and obligation to the entire class. There seems to much focus on the $14 million in attorney fees instead of looking out for the best interests of the class all along. Attorney fees first the class's best interests last. On 03-08-12 the settlement briefs were filed with the court. The attorney fee request dropped 8% to 16% and the expense reimbursement dropped a whopping 36%, coincidence? Were the first figures sent to the class as certified as this one is in plaintiff's lawyers briefs? Where these cuts did comes from? There is still a huge amount of overbilled hours equal to 30% of the total hours billed and overly inflated hourly rates billed to the class that need to be removed. Be on the lookout for additional submissions by plaintiffs in a desperate effort to back engineer this failed settlement on behalf of the class. Seems the unnamed class members got screwed twice, once by the Lehman thieves and now the lawyers.

**Preliminary Points of Concern and failures which give this class member cause to pause.**

- This settlement suffers from multiple material concerns and failures and needs to be rejected. Here are a list of some of the failures of this proposed settlement that clearly

show it is NOT fair, reasonable, adequate, in the public interest, does not satisfy the

Grinnell and Goldberg factors for settlement and clearly needs to be investigated by the

court and possibly outside entities. It also creates a conflict between class members by

treating some of them better than others. Why not put us all in the same fund? Since

Plaintiffs counsel did not breakdown fees and expenses between the classes, the D&O

class is paying a disproportional share of the hours and artificially inflated fees yet

receiving only 20% of the benefit. It also unfairly treats class counsel best of all by

providing them with an Inca size fortune in overly inflated fees and hours that are not

justified as you will see. In the present form these problems are not reparable.

- More than half of all class members failed to properly perform their fiduciary duties to
  the unnamed class members like me. Why were only 52% of them according to their
  "Certification of Plaintiff Pursuant To the Federal Securities Laws" they signed unwilling to
  help direct the litigation like the others that were willing to do? Yet some of the others it
  appears did nothing either.

What were named class representatives who have acknowledged signing their "Certification

of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee

and the other twelve law firms all doing that caused them to **blatantly** disregard their duties

and obligations to the entire class while disregarding court rules and procedures when

litigating and settling this case? They were trying to max out the attorney fee.

- Hiring a law firm to assess the Lehman officer's net worth without informing the class
  even today of how it was selected, how they were paid, was a success kicker included
  when this settlement is approved, etc. Here are some of the unanswered questions

that need to be addressed. Where is a declaration from the law firm attesting to it
arrangement? They were supposed to conduct a fair reasonable and adequate asset
valuation test on the officers of Lehman that ultimately and substantially undervalued
the defendant's assets by not starting the asset test back in 2001 when Repo 105 was
created and the fraud was born. Instead they used a start date of 2008 which
undervalued the officer's assets by hundreds of millions of dollars. This undervaluation
by the outside law firm got plaintiffs to their goal which was to be "substantially
under" the $90 million D&O settlement amount which is the main reason counsel
states it must settle this claim. Even the Examiners report stated they were materially
heavily using Repo 105 in mid 2007 when the market was starting to show stress. The
officers may have more assets the class can collect on that are over the $90 million
mark but a failed test moots this point. A new test needs to be run. What were named
class representatives who have acknowledged signing their "Certification of Plaintiff
Pursuant To the Federal Securities Laws" declarations, the Executive Committee and
the other twelve law firms all doing that caused them to **blatantly** disregard their
duties and obligations to the entire class while disregarding court rules and
procedures when litigating and settling this case? They were trying to max out the
attorney fee.

- The bar order is mentioned in barely readable print. There is no valid reason why this
  document, that allows Lehman officers to keep all their alleged known and unknown
  wealth once this flawed settlement is approved, should not have been posted to the

website for the entire class to view and comment on even if it was only nine business days before the submission deadline. Why is it being hidden? Was there not enough time to prepare the proposed document and attach it to the other briefs that were filed on 03-08-12? What's to hide or don't they want the class outrage to be heard and the settlement to be disrupted? This is another example of plaintiff counsels focus on their fee and not the best interests of the class. How much did each of the five officers contribute individually to the settlement fund? $1 million each, $500K, $50K, $1,000, anything? Nothing, right? The email evidence is right in the Examiner's report about Repo 105 and 108 and the officer's knowledge of these misrepresentations yet plaintiff's counsel failed to negotiate even a penny form the officers who caused tens of billions of losses to the class. Plaintiffs' counsel calls this a success and wants $14 million for it! Why weren't more defendants added since they knew and benefited by using this scam to obtain salary, perks, and other benefits? What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- The Examiners report, 2,200 pages of it, came out on 03-11-10. The repo 105 and 108 evidence is right there to click on all located in 100 or pages with the proof to click on like emails. The case for the D&O class was a slam dunk made lock, stock and delivered eleven

days later when they filed the third amended complaint. The examiner had access to 350 billion pages; he cut that down to reviewing 5 million documents that equaled 40 million pages. Since the proof is right in the report without having to review all those pages, out of the 10 million pages the lawyers viewed how many were reviewed after the amended complaint was filed that added no real value and substance for the D&O class? According to plaintiffs counsel's own briefs during the first four phases they all on average billed enough hours to keep two attorneys busy full time for a year.

Here is there breakdown using their charts.

Phase 1-3 23,000 hours from the start of litigation to 03-11-10, the day after the Examiners Report came out.

Phase 4   03-12-12- 07-27-12   6,422 hours for 4.5 months of work. This included reading the report and filing the amended complaint on 03-23-12 when the case was a slam dunk for the D&O class. The only thing needed was for the D&O insurers to decide to settle. No more research was needed, certainly not reading and reviewing some portion of ten million pages of documents.

Phase 5  07-28-12-2-15-12    41,725 hours over the last seven months which is seven times more the average for the first four phases! Several insurers' vs. sixty underwriter defendants mean less work so less fees, right? Why did the D&O class need this?

During phase five, AFTER the Examiners Report came out and AFTER they filed the third amended complaint they claimed they needed 20 full time lawyers working full time for the last seven months? Were depositions of the officers even taken? What about interrogatives etc? What were the named class representatives that were supposed to be directing this litigation doing? How did this help the class? Where is the breakdown showing the work that benefited the class? What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- In total there are six plaintiffs in the class that each has two law firms representing them and each firm has billed the class independently for what appears to be an inflated amount based on the work performed. The Loweistein firm represented five plaintiffs in the bankruptcy action for a total of 4665K. Yet there is plaintiff's counsel who billed over one million for representing one individual, another firm represents twelve people yet claimed $250K Two firms billed for the same client for $2 million! This potential overbilling to the class in the millions is wrong! Why should the class have to pay for overbilling? Who holds the original "Certification of Plaintiff Pursuant To the Federal Securities Laws" declaration that is missing for many of these firms and for the two firms that billed one client separately? What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities

Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- Billing the class for useless hours from $400 to $662 an hour is wrong and class members should not have to pay for it. It's a standard game they play; I have seen it before up close and personal. What work did the lawyers do for it as it pertains to the D&O class? The settlement of $90 million is only 21% of the total underwriter settlement. Was there only $90 million left to accept for this settlement or was there more counsel asked for but got out negotiated? The lawyers claim $37 million in total hours for both settlements yet want $14 million for this settlement? What??? What part of the $37 million is attributed to the D&O Class? The lawyers should be giving part of their fee to the Examiner for doing all the heavy lifting and providing the proof. The 16% figure they claim for in fees is overkill and robbery. The evidence was given to plaintiffs lawyers on a silver platter by the Examiner for FREE! There entire third amended complaint regarding the smoking gun Repo 105 and 108 is lifted word for word from the report! The D&O class is being charged for time that should have only been billed to the underwriting settlement since there are but just a few insurance firms unlike the 60 underwriting defendants. Since each firm has certified that their time but NOT there outrageously high hourly rates like office support @300 an hour, investigators at $400 an hour, copy clerks at $200 an hour etc. they should have no trouble breaking down the amount of hours spent on the D&O settlement AFTER the Examiners' report came out. In fact it can be argued that the plaintiff firms were

negligent for waiting way to long after seeing the insurance fund start at $250 million and drop all the way to $90 million before deciding to settle if that was the scenario. Or the defendants insurers drew it down intentionally as to not allow the plaintiffs lawyers a bigger unfair piece of the settlement. Where were the class representatives who were acting in the classes best interests directing this litigation? Maybe it's their fault as well as the plaintiffs counsel's and that should be addressed in a suit against them. Below is some information that indicates the whole fee should be based on "market rates" not some blank check, no one is looking, unreasonable non market usury, we are specialists in class actions rates etc... These overinflated rates have been done by seven of the twelve non co-counsels in this case.

Here is a good question I would like answered. What directions did Co-counsels provide to the other counsel of record in work hours and hourly rate per hour? Was it a blank check and could the other firms simply duplicate the work performed by the co lead counsel already because they had already done it on top and then sub counsel uses their client as justification to bill the same work once again? Here are more examples over total disregard of court rules and procedures and questionable billings:

- Plaintiffs billed for internal copying expenses that equal out to 880,000 copies using the .10 per page EXTERNAL market rate at Staples. Is this accurate or is the class being billed at an inflated market rates for these services? The copy clerks who made these copies are being billed to the class at $200 an hour. If one copy a second is produced meaning 880,000 seconds into $200 an hour with the clerk watching the machine it cost the class $47,000 in clerk time! What were named class representatives who have acknowledged

signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- 40% of the non co-counsels billed the class at a combined average rate 40% higher than co-lead counsel's overinflated billing rate is $402 an hour. One five attorney firm billed at $662 an hour. For example two attorneys' in a law practice does not have the right to bill the class @$595 an hour. In a certified declarations two attorneys justify part of their fee with "Keeping up with the Emails" and "Training on the system" is evidence that the fee total is inflated by millions. Everything was billed to class. Would a reasonable person pay these overinflated hourly fees monthly? No, that is because no one is paying them, no one is writing a check, no clients, what a great way to overcharge at the expense of someone else's loss. Who is guarding the guardian? It seems no one. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- 48% or 20 of all the plaintiffs do not have "Certification of Plaintiff Pursuant To the Federal Securities Laws" on file yet the class firms are billing the class for representing them and billing for work done on the class's behalf! What were the named class

representatives and Plaintiff's Executive Committee members that were supposed to be directing this litigation doing when they were supposed to be looking out for the best interests of the class? Trying to max out the attorney fee at the expense of the class!

- Class Certification for Settlement Purposes is NOT Appropriate and here is why: Plaintiffs failed to include other culpable individuals based on the Examiners report, email evidence and interviews which may have increased the asset value totals of the individuals charged in the suit. We could have had a bigger settlement; the class is cheated once again. They also should have set the start date of the class period further back. The Repo 105 scam was created in 2001 and has been ongoing and included in all of Lehman's SEC filings since then. In mid-2007 according to the Examiners report Repo 105 was being used more and more. Lehman even stated the ratio moving just 0.1 was material yet moves of over a point were common so clearly the class period was negligently set if the statute allows it to go further back. Had it been set further back this might have allowed hundreds of millions more of D&O coverage to be made available and the officer's wealth would not be artificially reduced. The potential for a bigger settlement was there but not now. Plaintiff's firms did not do their jobs adequately and they should be disqualified. They also failed to plead against the officers in their amended complaint:
  - Inapplicability of Statutory Safe Harbor
  - Applicability of Presumption Reliance: Fraud on the Market Doctrine
  - Violation of Section 14a of the 1934 act and Rule 14a-9

- What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- Cy pres funds. Why are the plaintiff firms allowed to spend the class's money on their favorite charities? Should not charity start at home with the class even though it's pennies on the dollar for our losses? Why wasn't a list already drawn up and posted on the website. Who are these charities and how will they will be selected? The class has a right to input. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- Why is the minimum claim check that will be sent out only $50 and not say $20? Surely the cost of sending out a check for $50 is the same as $20. Who would not accept $20? Hiring a law firm to assess the Lehman officer's net worth without informing the class even today of how it was selected, how they were paid, was a success kicker included etc. Who selected the firm of Martin/Obermaier, what criteria was used, how much were they paid and how? Is the agreement in writing? Is there a success kicker included verbally or in writing

once this case settles? They were supposed to conduct a fair reasonable and adequate wealth asset valuation test on the officers of Lehman fraud that ultimately substantially undervalued the defendant's assets to get them under the D&O settlement amount which is the main reason counsel claims it must settle this claim. From reading plaintiff counsel's statements regarding the investigation of the by Martin/Obermaier firm and Guidepost Solutions investigations LLC in their pleadings, they may have not asked all the right questions when trying to verify the wealth of the five officers which is the crux of Plaintiffs Counsel's argument for this settlement and putting $14 million in their pockets. They also intentionally chose to start the asset inquiry in year 2008 but the useless no economic substance value Repo 105 transfer scam started in 2001. By intentionally doing this you have guaranteed an artificially low asset value number from the start. It's like they are looking for a reason to keep it low. (The D&O settlement fee of $14 million might be a good reason). They know the time value of money of 14 million now vs. two years from now. This is just another example of interference to obscure the truth from the class and maybe protect someone big.

Outrageous! How was Guidepost selected and what were they paid and how? Maybe the failure was because the proper questions were not written into the questioner. There are simple ways to reduce their assets that would not have shown up on a standard Asset questioner besides shortening the exam period to the officer's benefit. You have to know how high wealth individuals do this. For example there should have been a question asking whether the officers had ever transferred to any person or into any type of non-revocable trusts any assets since 2001 when the con was created not just from 2008 forward. They asked about any "marketable securities worldwide". They should have also asked about any

"nonmarketable (meaning sticky, temporary or permanent) securities or assets worldwide". Were the questions designed to help shield the defendant's assets so as to make it easier to obtain the D&O settlement? What were the questions asked? Did the class representatives see just the questions and if not why not? Fraud by omission and telling half the truth is a well known method of deception which may have taken place in this proposed settlement. Is there a possible malpractice claim against some of these law firms and some of the class members who did not do their jobs causing a low recovery of class member's losses? The question is where did all their money go? What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- Here is some information that indicates more wealth may be hidden just waiting to be discovered just by conducting a proper asset questioner. According to the twenty nine page attached Harvard University study from December 2009 titled, "The Wages of Failure: Expectative compensation at Bear Sterns and Lehman 2000-2008. Lehman's top five officers took home in gross over ONE billion dollars in net equity sales and cash bonuses but now the five named officers have "substantially less than $100 million"? The current CEO took home alone a gross of $530 million. Even if some of the officers have been replaced mathematically the numbers don't add up with the law firms and Guidepost Solutions findings. See

attachment at end of brief for the study. By starting the investigation in 2008 you INTENTIONALLY missed all this.

http://www.law.harvard.edu/programs/olin_center/papers/pdf/Bebchuk_657.pdf

I have found $70 mil in property for just three out of five officers spending just twenty minutes on Google. Granted there may be mortgages attached but if I had more time I could find more assets. Something is wrong with Martin/Obermaier and Lightpost Solutions Inc's findings, something really stinky big. Is someone running interference for someone big? I have spoken with a few individuals. According to them the law firm and or Guidepost either did not ask the right questions on paper, did not dig deep enough because of the lack of proper written questions or they know the whereabouts of more legally transferred assets that don't count in the test and don't want to disclose it for fear of dooming approval of the D&O settlement and possibly the Underwriter settlement as well. For example the law firm may not have obtained asset statements from the officers family members. The reason you do this is to uncover whether the officers transferred assets into one or more irrevocable trusts that they can access when the coast is clear with a wink and a nod from that other person. This makes them no longer part of their reportable assets on a standard asset questioner. Cash could also be located in say a child's cash value life insurance policy(s). Homes could also be transferred publicly to spouses (didn't the Lehman CEO do this)? This could include everything in the home as well traceless assets like gold, diamonds etc. that may be in a safe. Smart people and their advisors know how to do this without leaving anything traceable. Based on the twenty none page attached Harvard study as described above the settlement should be voided or put on hold while a more expanded, qualified, and in depth search is performed. A

hearing should be held and the officers questioned by experienced asset seekers for the whole truth to come out. If it were found that the defendants had transferred, legally, say $200 million what would be the resulting reaction of the class be? It might be rejection of the D&O settlement offer and make the defendants spend down their own traceable assets in their own defense even if it's means giving up our 3% recovery on our losses. From the Examiner's report the directors might not have known and only those who knew should remain in the lawsuit. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- There are lead plaintiffs and named plaintiffs where the "Certification Of Plaintiff Pursuant To The Federal Securities Laws" are missing and have not been filed with counsel's Memorandum of law in support of lead plaintiff's motion for "Final approval of class action settlement with D&O defendants and settling underwriter defendants and settling underwriters defendants and approval of plans of allocation" brief, and the other briefs filed on 03-08-12 which would prohibit them from billing the class for their services. If they do not have a valid client with a valid date and/or that is applicable to the third amended complaint billing the class is prohibited. Fake clients don't count either. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee

and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee. There are named plaintiffs (62%) who signed the "Certification of Plaintiff Pursuant To the Federal Securities Laws" where they do not acknowledge they are representing the class. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To The Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- 40% of the Plaintiffs Executive Committee that give permission for the sub counsel's work relating to hours that can be worked and hourly fees rates to be charged to the class are NOT counsels of record in this case. Those firms being Gainey & McKenna, as well as Wolf, Haldsenstein. How can law firms that are not involved in this case determine how to give orders, grant permission to work and charge what hourly rate, run the case effectively, run up the class's legal bill and expenses as well as look out for our best interests? What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To The Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

Three of the named plaintiffs in plaintiff's sub counsels that are supposed to be class members have no "Certification of Plaintiff Pursuant To the Federal Securities Laws" which is not surprising based on the shenanigans going on but they don't have a law firm representing them either! Who and how much is being billed for representing these 'phantom' class members? They are City of Detroit, A. Lee and S. Oyler. Are they being represented by the two mystery firms on the Executive Committee that appear nowhere in this case? How are they being paid and how? What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- There are a couple of "Certification of Plaintiff Pursuant To the Federal Securities Laws" decelerations that an alleged client signed but has no firm representing them. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- Are there some firms that have been billing the class for members that are not in the class? Yes. Are some of these class members fake, dead, dropped out etc. The class has a right to know. What were the named class representatives and Plaintiff's Executive Committee members that were supposed to be directing this litigation doing when they were supposed to be looking out for the best interests of the class? Trying to max out the attorney fee at the expense of the class!

- Another firm billed $665,000.00 and the other billed $1,000,000.00 for the same one client and these are the small firms. One firm had thirteen clients yet billed $247,000.00. All the sub-counsel firms are doing much of the same work as the lead plaintiff's counsel and billing separately for it. Here is how the double billing takes place among firms. The two lead co-counsels read everything so as to not miss anything. They then authorize the smaller firms to do much of the same work as them for their own client thus enabling them to double bill for useless work that has already been performed at highly inflated hourly rates. For example each of these firms most likely read through the entire Examiners Report and billed the class. We have fourteen double billings. This goes on throughout the entire case just look at the outrageous invoices prepared by each firm. This is clearly a blank check money grab. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- I and the class would like to know what directions co-counsel gave to the other firms as to what work as to be done, how they were to bill hourly rates? Sounds like this is a blank check to rip off the class sheep. What were the named class representatives and Plaintiff's Executive Committee members that were supposed to be directing this litigation doing when they were supposed to be looking out for the best interests of the class? Trying to max out the attorney fee at the expense of the class!

- There is a "Certification of Plaintiff Pursuant To the Federal Securities Laws" declaration where a date and name have been changed. What were the named class representatives and Plaintiff's Executive Committee members that were supposed to be directing this litigation doing when they were supposed to be looking out for the best interests of the class? Trying to max out the attorney fee at the expense of the class!

There are five alleged class members that are named in Doc.807-1 Appendix A and B where no "Certification of Plaintiff Pursuant To the Federal Securities Laws" is found among the briefs. Are these people real? Who is billing for them, at what rate etc? What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- Exhibit 4A in the same document set. Were these declarations giving class counsel some from some class members cheerleading approval signed before or after they read the big set of approval documents filed with the court on 03-08-12? I would not put any stock in

them. The named parties all signed those three or less days before they were filed and I believe one was faxed in. What were the named class representatives and Plaintiff's Executive Committee members that were supposed to be directing this litigation doing when they were supposed to be looking out for the best interests of the class? Trying to max out the attorney fee at the expense of the class!

- Most of one firm's class members are not legal class members for the third amended complaint. What were the named class representatives and Plaintiff's Executive Committee members that were supposed to be directing this litigation doing when they were supposed to be looking out for the best interests of the class? Trying to max out the attorney fee at the expense of the class!

Double billing is unethical, not fair, in adequate, unreasonable to the class and may be criminal. Greed always gets them in the end. The firms have all sworn to the accuracy of these briefs now they are stuck back engineering the answers to the above issues. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- $791,000 for experts? Does this include the examiner? What were they paid, why were they selected, are they related to any of the law firms in this investigation, is there a success bonus when and if this settlement is approved above a certain amount of attorney fees awarded. Was a written agreement made up spelling out the contract?

Counsels should list all the information just like they did in the Tyco settlement or are they
hiding something and why?  What were the named class representatives and Plaintiff's
Executive Committee members that were supposed to be directing this litigation doing
when they were supposed to be looking out for the best interests of the class? Trying to
max out the attorney fee at the expense of the class!

- $320,000 for two mediators? Again there is no breakdown for the class to review to see
  what we are paying for, what relationship if any do they have to the plaintiff's counsel,
  how are they charging, is there a bonus for them after this settle etc. Where are some
  declarations form them attesting to all above? If the named plaintiffs should sign why not
  people making hundreds of thousands of dollars? What were the named class
  representatives and Plaintiff's Executive Committee members that were supposed to be
  directing this litigation doing when they were supposed to be looking out for the best
  interests of the class? Trying to max out the attorney fee at the expense of the class!

- One firm billed the class $600,000.00 for "Of Counsel" work! Did the Executive
  committees approve this? This is not even a full time employee of the law firm?  What is
  this a free court sanctioned, blank check, ATM malfunction machine spitting out $100 bills
  a second money grab for anyone that is a friend, frat brother related, anyone who can fog
  glass or just knows the plaintiffs firms somehow? What were the named class
  representatives and Plaintiff's Executive Committee members that were supposed to be
  directing this litigation doing when they were supposed to be looking out for the best
  interests of the class? Trying to max out the attorney fee at the expense of the class!

- Did any law firm in this litigation agree to a fee cap for any work performed in this case?

Why wasn't a mediator brought in to arrive at unbiased percentage fee recommendation? I don't think any mediator on earth would now be able to come up with a figure now based on the overstated billing hours and hourly rates in this case. What were named class representatives who have acknowledged signing their "Certification of Plaintiff Pursuant To the Federal Securities Laws" declarations, the Executive Committee and the other twelve law firms all doing that caused them to **blatantly** disregard their duties and obligations to the entire class while disregarding court rules and procedures when litigating and settling this case? They were trying to max out the attorney fee.

- Each of the firms has used the same boiler plate for their own attorney fee request. Paragraph four states that the fees they charged have been awarded in many other class action settlements. So, this goes on in all class settlements? Because fraud goes by undetected once, twice ten or a hundred times before it's caught does not allow it to go through again once it is clearly now in the spotlight. Here is some information about attorney fees that plaintiffs firms need to read over as to how it relates to "market rates" not "wish rates" and not "we are specialists rates " **The economy and market does not support the rates class counsel is praying and wishing for. Christmas has already come and gone.**

**[§55] Attorney Fee Awards**

The Supreme Court has recognized that a "litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole . . . Jurisdiction over the fund involved in the litigation allows a Court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees

proportionately among those benefited by the suit." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478,

62 L. Ed. 2d 676, 100 S. Ct. 745 (1980). The common fund doctrine rests on the assumption that

individuals who profit from a lawsuit "without contributing to its costs are unjustly enriched at

the successful litigant's expense." Id. at 478. The common fund approach arises in a class action

where an attorney fee may be based on a reasonable percentage of the fund created for the

benefit of the class members by the efforts of the lawyer involved. The second method used to

determine fees is commonly called a "lodestar" method and is derived from a review of the hours

spent by the attorney involved and a decision as to what a reasonable hourly fee is for the work

performed. Any fees to be awarded in a class action must be approved by the court. Because of

the district court's familiarity with the quality of the representation and the extent of the

litigation, the decision whether to award fees and the amount of fees awarded are issues

generally confined to the sound discretion of the court. *Gierlinger v. Gleason*, 160 F.3d 858, 876

(2d Cir. 1998).

For general information on class action attorney fee awards, the following sources may be

helpful: See e.g., Macey & Miller, The Plaintiffs' Attorney Role in Class Action and Derivative

Litigation: Economic Analysis and Recommendations for Reform, 58 U Chi L Rev 1, 4, 59-61 (1991)

(identifying problems associated with applying the lodestar and recognizing the percentage of

recovery method as superior); Coffee, Understanding the Plaintiff's Attorney: The Implications of

Economic Theory For Private Enforcement of Law Through Class and Derivative Actions, 86 Colum

L Rev 669, 691, 724-25 (1986); Miller, Attorneys Fees in Class Actions, (Federal Judicial Center

1980); Coffee, Rescuing the Private Attorney General: Why the Model of Lawyer As Bounty

---

Hunter is Not Working, 42 Md L Rev 215 (1983); Court Awarded Attorney Fees, Report of the

Third Circuit Task Force, Oct 8, 1985 (Arthur R. Miller, Reporter), 108 F.R.D. 237.

In determining the propriety and foundation for an award on a lodestar basis, *Lindy Bros. Builders*

*Inc. v Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973), is the leading case on

the issue and should be reviewed by counsel. *See also, Pennsylvania v. Delaware Valley Citizens'*

*Council for Clean Air*, 478 U.S. 546, 565, 92 L. Ed. 2d 439, 106 S. Ct. 3088 (1986). The party seeking

attorney fees has the burden to prove their request for attorney's fees is reasonable." *Rode v.*

*Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir. 1990). Counsel "must 'submit evidence supporting the

hours worked and rates claimed'" to meet this burden. *Id.* (*citing Hensley v. Eckerhart,* 461 U.S.

424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983)). The Supreme Court has held that "the most

useful starting point for determining the amount of a reasonable fee is the number of hours

reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S.

at 433. The product of this calculation is the lodestar, and it "is strongly presumed to yield a

reasonable fee." *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031 (3d Cir.

1996)(citing *City of Burlington v. Dague*, 505 U.S. 557, 120 L. Ed. 2d 449, 112 S. Ct. 2638 (1992)).

The "starting point" in determining the appropriate hourly fee is the attorneys' usual billing rate

for handling a case themselves not as a sub counsel. *Public Interest Research Group of N.J., Inc. v.*

*Windall,* 51 F.3d 1179, 1185 (3d Cir. 1995). The Supreme Court has directed that the district court

should then consider the "prevailing market rates" in the relevant community. *Washington*, 89

F.3d at 1035 (citing *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 79 L. Ed. 2d 891, 104 S. Ct. 1541

(1984)); *see also Student P.I.R.G. v. AT & T Bell Laboratories,* 842 F.2d 1436 (3d Cir.

1988)(adopting this rule); *Pennsylvania Environmental Defense Foundation v. Canoln-McMillian*

*School,* 152 F.3d 228, 231-32 (3d Cir. 1998). As the Court explained in *Blum*, to inform and assist

the court in the exercise of its discretion, the burden is on the fee applicant to produce

satisfactory evidence-- in addition to the attorney's own affidavits-- that the requested rates are

in line with those prevailing in the community for similar services by lawyers of reasonably

comparable skill. *Id.*

The percentage of the fund method has been endorsed or utilized for fee awards in several

circuits. *See e.g., Edmonds v United States*, 658 F. Supp. 1126, 1144 (DSC 1987) (noting the

percentage-of-the-fund method is the preferable approach to determine a reasonable fee in a

common fund case); *In re Ross Cosmetics Sec. Litig.*, Case No. 7-92-1706-3 (DSC) (Spartanburg

Division) (30% award in securities law violations class action); *Elmore v Cone Mills Corp., et al.*, CA

No. 6:88-3258-17 (DSC) (Greenville Division) (common fund percentage fee award of 25%).

Although no strict rule dictates the reasonable percentage a court should award class counsel, *In*

*re Smithkline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990), noted that Courts

have allowed attorney compensation ranging from 19 to 45% of the settlement fund. In general,

to avoid windfalls, the percentage of recovery should "decrease as the size of the fund increases."

Court Awarded Attorney Fees: Report of the Third Circuit Task Force (1985), reprinted 108

No second opt out period is available:


Based on what I have discovered a second opt out period should be added for those class

members who wish to get out.

New Rule 23(e) (3) permits a court to withhold settlement approval of a previously

certified Rule 23(b)(3) class if the settlement does not allow a second opt-out opportunity for

class members. While the language is permissive, counsel should assume that the district

Court will want to explore this issue in every case.

It is an essential prerequisite to the right to maintain a class action under Rule 23 that the court

be certain the representatives will fairly and adequately protect the interests of the class. *Hill v*

*Western Electric Co.,* 672 F.2d 381, 388 (4th Cir.), *cert denied,* 459 U.S. 981, 103 S.Ct 318, 74 L.Ed

2d 294 (1982). Adequacy of representation by a plaintiff is ultimately a question of fact with

respect to which the plaintiff must bear the burden of proof. Adequacy of representation is not

dictated by the number of plaintiffs named in the complaint, but the quality of the representation

the named plaintiff or plaintiffs provide which in this case amounts to malpractice. As the number

of named plaintiffs increases, so does the burden on counsel in the discovery phase of the case


In *Haywood v Barnes,* 109 F.R.D. 568, 579 (EDNC 1986*),* the following elements demonstrated

their adequacy as class representatives. Based on my findings more than half of our class

representatives do not into even half of these categories.

- They shared a common interest with the putative class members. Yes
- Each named plaintiff had a personal financial stake in the suit. Don't know
- The named plaintiffs regularly consulted with their counsel. Doesn't look like it
- The named plaintiffs responded to discovery demands. Don't know
- The named plaintiffs appeared for deposition. Don't know
- All named plaintiffs supported the certification motion. No
- There was no showing of inability of named plaintiffs to make decisions required to protect the class. Yes

- All of the named plaintiffs indicated familiarity with the practices challenged. No
- There was no showing the named plaintiffs were unwilling to pursue the action or that they would disregard their obligation or duties as class representatives. Yes

The premise of a class action is that litigation by representative parties adjudicates the rights of the class members, so due process requires that named plaintiffs possess undivided loyalties to absent class members. The named plaintiffs should understand that they have fiduciary responsibilities to the class. - From Rule 23e.3 few paragraphs down the page. Clearly many named plaintiffs, if they are still qualified members and existed to begin with, were not and did not become involved in representing the class's best interests so this needs to be investigated. Law firms representing these non class members should not be paid a dime of their request. Are there any existing agreement verbally or in writing capping the attorney fees with any class member or named class member past or present?

The class, court and I need to see valid picture ID"s and original dated (not back dated) "Certification of Plaintiff Pursuant To the Federal Securities Laws" of all named plaintiffs and lead plaintiffs to validate they exist and/or are applicable to the third amended complaint. We also need original documents proving these named plaintiffs and representatives are actually are in the class. It would be very easy to make up a class member name, make a simple blank sheet of paper with some numbers on it like several did and have the firm grab several hundred thousand dollars or million without anyone knowing a client never existed! If there are no valid forms or people giving these firms legal authorization to work on this case on behalf of the class no attorney fees or expenses should be awarded obviously.

Here is a list of the named representatives that need to be validated that come from counsel's just filed brief:

"The proposed Settlement Class Representatives for the D&O Settlement Class are all of the Lead Plaintiffs and additional named plaintiffs Brockton Contributory Retirement System; Inter-Local Pension, Fund of the Graphic Communications Conference of the International Brotherhood of Teamsters; Police and Fire Retirement System of the City of Detroit; American European Insurance Company; Belmont Holdings Corp.; Marsha Kosseff; Stacey Oyler; Montgomery County Retirement Board; Fred Telling;Stuart Bregman; Irwin and Phyllis Ingwer; Carla LaGrassa; Teamsters Allied Benefit Funds; FranciscoPerez; Island Medical Group PC Retirement Trust f/b/o Irwin Ingwer; Robert Feinerman; John Buzanowski; Steven Ratnow; Ann Lee; Sydney Ratnow; Michael Karfunkel; Mohan Ananda; Fred Mandell; Roy Wiegert; Lawrence Rose; Ronald Profili; Grace Wang; Stephen Gott; Juan Tolosa; NeelDuncan; Nick Fotinos; Arthur Simons; Richard Barrett; Shea-Edwards Limited Partnership; MiriamWolf; Harry Pickle (trustee of Charles Brooks); Barbara Moskowitz; Rick Fleischman; Karim Kano;David Kotz; Ed Davis; and Joe Rottman. *See* Pretrial Order No. 27 at ¶4. The proposed Settlement Class Representatives for the UW Settlement Class are: Lead Plaintiffs ACERA and GGRF, and additional named plaintiffs Brockton Contributory Retirement System; Inter-Local Pension Fund of the GraphicCommunications Conference of the International Brotherhood of Teamsters; Police and Fire Retirement System of the City of Detroit; American European Insurance Company; Belmont Holdings Corp.; Marsha Kosseff; Montgomery County Retirement Board; Teamsters Allied Benefit Funds; John Buzanowski; and Ann Lee. *See* Pretrial Order No. 28 at ¶3".

Beyond these concerns and failures the settlement class attorneys are compensated on the basis of the benefits they bring to the class. The burdensome structure of the claims process creates a significant possibility of a disproportionate attorneys' fee award that would be unworthy of approval. Normally, a judge could approve the settlement and wait until the expiration of the claims period to award attorneys' fees; in this case, however, the plaintiffs lawyers want to be paid immediately even before the short period of the appeals window expires, outrageous. If this settlement is not changed and the asset test rerun and the outrageous hourly rates charged reduced I will immediately file an appeal. How can the court justify$200-$350 an hour for office support and these are the people making those 880,000 copies in the office! Nobody in their right mind could charge and expect someone to pay for those rates. Let's do a test. Have plaintiffs provide the salaries without the names but provide their job titles of all the people listed and see how much higher they are charging the class for the markup. It's usury!!!!!!!!!!!There are questions of law and fairness here that are not addressed or ever will be at this level. Plaintiff lawyers are rushing this deal through as evidenced by the fact the class has only nine business days to respond to the court about this settlement proposal in writing and it's hundreds of pages of briefs yet plaintiffs have had months to prepare their submissions. I spoke to one attorney and he spoke to another. Both could not assist me because of the short window to respond which was designed into by plaintiffs which actually keep class members from objecting. I have read through the briefs submitted to the court on 03-08-12, read over a major applicable portion of the Examiner's Report and I am familiar how the settlements occur in class litigation as well as having reviewed twenty class action settlements decisions and applicable objections where entered and reviewed published studies by people who study this matter full time.  I am very

familiar how the system is supposed to work and it isn't working in this D&O proposed settlement. This is the most obvious flawed settlement, overinflated hourly rate, overly billed hours and expense case I have come across. I was a consultant on the Tyco case for Milberg Weiss so I have seen how the system is gamed unethically and sometimes illegally by the players with little chance of being caught.

Some or all of the plaintiffs firms may be engaged in a fraud on the court. By knowingly using the courts power to approve overly inflated hourly rates, hours billed for, double billing, inflated expenses and then they want do get paid a two multiple on the fees, doubling the size of the fraud and ripping off the class for twice as much! All this does is defraud the class of its rightful, fair, reasonable and adequate amounts of reimbursed damages. I request that the D&O settlement NOT be approved without a thorough investigation of the issues stated above. If not an appeal will be filed and does fit the criteria set for the appeals court to hear my arguments as described in Rule 23 below.

**ACTIONS §23.8**

§ 13-20-901.3 The Court of Appeals has applied a five-factor test to determine whether appeal of class certification orders should be heard, while emphasizing that the factors are non-exclusive:4
1. Whether the court's ruling is "likely dispositive" either because the plaintiff's interest is too small to pursue the case or because the defendant would face "irresistible pressure to settle."
2. Whether the trial court's decision is so weak that it probably constitutes an abuse of discretion.
3. Whether the appeal will likely permit resolution of an important and unsettled legal issue.

4. The "nature and status of the litigation before the trial court," including the status of discovery in the case and the likelihood of n w information coming to light, the sufficiency of the record to remit an appellate court to evaluate properly the decision on certification, the pendency of dispositive motions that may impact e class, and the length of time the case has been pending.

5. The likely impact of future events upon the appropriateness of immediate review including whether settlement negotiations are pending, where a party's financial status may change (for example, as a result of a bankruptcy), and whether resolution of the issue of certification may make easier the resolution of other claims.

Class members who are not named plaintiffs may appeal an order approving a settlement or allocating settlement proceeds if they intervene for that purpose. Intervention of right is determined in accordance with Rule 24(a) and related case law. An unnamed class member may also have standing to file an appeal of a settlement order if his or her motion to intervene is denied but should have been noted.

This could also be fraud on the court as described below based on the actions described above and with all the documents and declarations the plaintiffs firms have filed swearing to the accuracy of the information they submitted which appears now to be untrue.


"Fraud on the Court by an Officer of the Court" And

"Disqualification of Judges, State and Federal"

Who is an "officer of the court"?

A judge is an officer of the court, as well as is all attorneys. A state judge is a state judicial officer, paid by the State to act impartially and lawfully. A federal judge is a federal

judicial officer, paid by the federal government to act impartially and lawfully. State and federal attorneys fall into the same general category and must meet the same requirements. *A judge is not the court.* People v. Zajic, 88 Ill.App.3d 477, 410 N.E.2d 626 (1980).

2. What is "fraud on the court"?

Whenever any officer of the court commits fraud during a proceeding in the court, he/she is engaged in "fraud upon the court". In Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted."

"Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23. The 7th Circuit further stated "a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final."

3. What effect does an act of "fraud upon the court" have upon the court proceeding?

"Fraud upon the court" makes void the orders and judgments of that court.

It is also clear and well-settled law that any attempt to commit "fraud upon the

court" vitiates the entire proceeding. Ie The People of the State of Illinois v. Fred E.

Sterling, 357 Ill. 354; 192 N.E. 229 (1934) ("The maxim that fraud vitiates every transaction

into which it enters applies to judgments as well as to contracts and other transactions.");

Allen F. Moore v. Stanley F. Sievers, 336 Ill. 316; 168 N.E. 259 (1929) ("The maxim that

fraud vitiates every transaction into which it enters ..."); In re Village of Willowbrook, 37

Ill.App.2d 393 (1962) ("It is axiomatic that fraud vitiates everything."); Dunham v.

Dunham, 57 Ill.App. 475 (1894), affirmed 162 Ill. 589 (1896); Skelly Oil Co. v. Universal Oil

Products Co., 338 Ill.App. 79, 86 N.E.2d 875, 883-4 (1949); Thomas Stasel v. The American

Home Security Corporation, 362 Ill. 350; 199 N.E. 798 (1935).

Under many state and Federal laws, when any officer of the court has committed

"fraud upon the court", the orders and judgment of that court are void, of no legal force

or effect.

4. What causes the "Disqualification of Judges?"

Federal law requires the automatic disqualification of a Federal judge under certain

circumstances.

In 1994, the U.S. Supreme Court held that "Disqualification is required if an objective

observer would entertain reasonable questions about the judge's impartiality. If a judge's

attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing

is unlikely, the judge must be disqualified." [Emphasis added]. Liteky v. U.S., 114 S.Ct. 1147, 1162

(1994).

Courts have repeatedly held that positive proof of the partiality of a judge is not a

requirement, only the appearance of partiality. Liljeberg v. Health Services Acquisition Corp., 486

U.S. 847, 108 S.Ct. 2194 (1988) (what matters is not the reality of bias or prejudice but its appearance); United States v. Balistrieri, 779 F.2d 1191 (7th Cir. 1985) (Section 455(a) "is directed against the appearance of partiality, whether or not the judge is actually biased.") ("Section 455(a) of the Judicial Code, 28 U.S.C. §455(a), is not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process.").

That Court also stated that Section 455(a) "requires a judge to recues himself in any proceeding in which her impartiality might reasonably be questioned." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989). In Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972), the Court stated that "It is important that the litigant not only actually receive justice, but that he believes that he has received justice."

The Supreme Court has ruled and has reaffirmed the principle that "justice must satisfy the appearance of justice", Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038 (1960), citing Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13 (1954). A judge receiving a bribe from an interested party over which he is presiding, does not give the appearance of justice.

"Recusal under Section 455 is self-executing; a party need not file affidavits in support of recusal and the judge is obligated to recuse herself sua sponte under the stated circumstances." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989).

Further, the judge has a legal duty to disqualify himself even if there is no motion asking for his disqualification. The Seventh Circuit Court of Appeals further stated that "We think that this language [455(a)] imposes a duty on the judge to act sua sponte, even if no motion or affidavit is filed." Balistrieri, at 1202.

Judges do not have discretion not to disqualify themselves. By law, they are bound to follow the law. Should a judge not disqualify himself as required by law, and then the judge has given another example of his "appearance of partiality" which, possibly, further disqualifies the judge. Should another judge not accept the disqualification of the judge, then the second judge has evidenced an "appearance of partiality" and has possibly disqualified himself/herself. None of the orders issued by any judge who has been disqualified by law would appear to be valid. It would appear that they are void as a matter of law, and are of no legal force or effect.

Should a judge not disqualify himself, then the judge is violation of the Due Process Clause of the U.S. Constitution. United States v. Sciuto, 521 F.2d 842, 845 (7th Cir. 1996) ("The right to a tribunal free from bias or prejudice is based, not on section 144, but on the Due Process Clause.").

Should a judge issue any order after he has been disqualified by law, and if the party has been denied of any of his / her property, then the judge may have been engaged in the Federal Crime of "interference with interstate commerce". The judge has acted in the judge's personal capacity and not in the judge's judicial capacity. It has been said that this judge, acting in this manner, has no more lawful authority than someone's next-door neighbor (provided that he is not a judge). However some judges may not follow the law.

If you were a non-represented litigant, and should the court not follow the law as to non-represented litigants, then the judge has expressed an "appearance of partiality" and, under the law, it would seem that he/she has disqualified him/herself.

However, since not all judges keep up to date in the law, and since not all judges follow the law, it is possible that a judge may not know the ruling of the U.S. Supreme Court and the other

courts on this subject. Notice that it states "disqualification is required" and that a judge "must be disqualified" under certain circumstances.

Courts have repeatedly ruled that judges and attorneys that come before them have no immunity for their criminal acts.

Based on the information as set forth above the judge is duty bound to disqualify himself if even considers approving this settlement and granting attorney fees and costs based on these material misrepresentations and lack of proper procedures in handling this case. I will file an appeal and forward copies to the US Attorney's Office and the state bar associations where these firms are based for investigation along with a huge number of other parties that will be interested in this case. This case appears to me to be reversed engineered to allow plaintiff counsel to commit a crime by obtaining fees under false pretenses and laughing all the way to to bank at the sheep's expense. They got tagged because of greed, as usual. Just because they haven't been paid yet doesn't mean they should have to answer for their attempted thievery.

## 2. THE COURT HAS A FIDUCIARY DUTY TO THE UNREPRESENTED MEMBERS OF THE CLASS.

A district court must act as a "fiduciary for the class," "with 'a jealous regard' " for the rights and interests of absent class members. *In re Mercury Interactive Corp.*, 618 F.3d 988, 994–95 (9th Cir. 2010) (quoting *In re Washington Pub. Power Supply Sys. Lit.,* 19 F.3d 1291, 1302 (9th Cir. 1994)). "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166, 192–94 (D. Mass. 2005), citing *inter alia Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair

settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'"); *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F. 3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975)). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon,* 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members"). There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.,* 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th ed. 2009)). *Accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ("*ALI Principles*").

Concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon v.*

*Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). It should also apply when the hourly fee amounts among a large percentage of the named class representatives are outrageously high. It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." *Bluetooth*, 654 F.3d at 948 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)).

### 3. The Claims Process Is Unduly Burdensome.

The parties have created obstacles to class recovery that increase the expense of administration. *See* Notes of Advisory Committee on 2003 Amendments to Rule 23(h) ("Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure.") Their design enables class counsel and defendants to reduce class recovery so as to benefit themselves, an arrangement that can be made at arm's length without any explicit collusion, so long as class counsel looks the other way when defendants insist upon conditions on class recovery.

*First*, there is no reason to require that most class-member recovery could not occur through a direct-check-mailing opt-out process, rather than the opt-in claims process. There is no reason why a direct compensation check-mailing method was not used as the primary means of directing

benefits to class members. This goes back to who selected the administrator, how are they paid, are there any relationships between plaintiffs firms and the administrator?

The settlement has an arrangement that provides for the payment of attorneys' fees from class funds without challenge from the defendants. Did the defendants agreed to this before seeing these attorney fee requests? Why shouldn't defendants class firms been be given the opportunity to point out to the class and court potential overcharges they themselves don't see until after briefs like this are filed? SA § V.A; *Bluetooth*, 654 F.3d at 947. This provision stipulates that attorney awards will not be contested by opposing parties. "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id*. The provision lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id*. at 524; accord *Bluetooth,* 654 F.3d at 947. Here, class counsel put its own fees ahead of the interests of the class by negotiating a provision that insulates those fees from challenge by the defendant who might have come up with more instances of overbillings than I did and I am not a lawyer.

The claims-made process alone maximizes the perception of class benefit; in reality, the beneficiaries are class counsel and the defendant. This is not a hypothetical concern. The history of American class action law is littered with examples of parties agreeing to settlements where the claims process resulted in the class recovering a small fraction of what the attorneys collected like in this case. *See e.g., Ford Explorer Cases*, J.C.C.P Nos 4266 & 4270, (Cal. Sup. Ct., Sacramento County 2008) (approximately $37,500 class recovery versus $20 million in attorneys' fees); *In re*

---

*Grand Theft Auto Video Game Consumer Litig.,* 251 F.R.D. 139 (S.D. N.Y. 2008) ($26,000 class recovery versus $1 million fee request) (class decertified on other grounds); *Moody v. Sears, Roebuck & Co.,* 2007 NCBC 13 (Cook County settlement resulted in $2,402 benefit to class and $1 million in attorneys' fees).

This settlement's failure to tailor the claims process to the class, is a glaring structural deficiency. In the year 2012, electronic communication is the norm; claims-made settlements routinely allow class members the option of submitting claims online, even when eligibility calculations are far more complex than those involving this settlement. *E.g., In re Mattel, Inc.,* MDL No. 1897 (C.D. Cal. 2010), *available at* http://www.mattelsettlement.com/prod/. Moreover, in settlements involving internet-savvy classes, it is doubtful that the settling parties can even point to one recent claims-made settlement that did not permit the submission of claim forms online. *See contra e.g., The NVIDIA GPU Litig.,* No. C 08-04312 JW (N.D. Cal. 2011), *available at* http://nvidiasettlement.com/index.html; *Ferrington v. McAfee, Inc.,* No. 10-cv-01455-LHK (N.D. Cal 2011), *available at* http://www.arpumcafeepopupad.info; *Brazil v. Dell,* No. 07-cv-01700-RMW (N.D. Cal. 2011), *available at* http://www.discountsettlement.com; *In re Classmates.com Consolidated Litig.,* No. 09-cv-0045-RAJ (W.D. Wash 2011), *available at* http://www.cmemailsettlement.com; *In re Online DVD Rental Antitrust Litig.;* No 09-md-2029-PJH (N.D. Cal. 2011), *available at* https://onlinedvdclass.com/Home.aspx; *Johnson v. Apple Inc.,* No 09-CV-146501 (Sup. Ct. Cal. Santa Clara County 2011), *available at* https://www.johnsonitunessettlement.com; *In re HP Inkjet Litig.,* No 05-3580 JF (N.D. Cal 2011), *available at* https://www.hpinkjetprintersettlement.com.

There is no apparent reason for the settling parties' failure to establish a direct-compensation method of relief or an online claims submission procedure. As Judge Conti recently wrote when rejecting a settlement with a postal-mail-only claims process, "There are many ways the parties could improve the claim submission procedure, such as by allowing class members to make claims using an online form or by mailing settlement checks to each class member who... satisfies the requirements for such a claim. For unknown reasons, the parties have opted for an unnecessarily taxing claims procedure over these alternatives." *Walter v. Hughes Communs., Inc.*, No. 09-2136 SC, 2011 U.S. Dist. LEXIS 72290, 40–41 (N.D. Cal. July 6, 2011). Given the size of the electronic footprint that the settling parties have created as part of the settlement process, it is hard to see any reason that claims couldn't have been made electronically, except for a desire to artificially lower the number of claims made. A very important fact concerning how to submit the claim properly to insure the claim is properly handled is not in the claim form sent to the class members but is on the website. How do we inform the class members of this?

The rate of response to any claims-made settlement cannot be predicted precisely, but in general a very low rate is reasonably certain. One settlement administrator who had been involved in over 175 class action settlements nationwide reported that response rates are "10 percent or less in the vast majority of settlements that require filing a notice of claim." *Sylvester v. Cigna Corp.,* 369 F. Supp. 2d 34, 44 (D. Me. 2005). In a recent federal case, a response rate below 1% led the San Francisco court to label the outcome "a virtually worthless settlement of a meritless case," *Yeagley v. Wells Fargo & Co.,* No. C 05-03403 CRB, 2008 U.S. Dist. LEXIS 5040 at *1 (N.D. Cal. Jan. 18, 2008), *rev'd on other grounds*, 365 Fed.Appx. 886 (9th Cir. 2010). Response

rates under 5% are routine: *see, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F.Supp.2d 320, 321 (D. Me. 2005) (2% response rate); *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 695 (D. Minn. 1994), *as amended* 858 F. Supp. 944 (rejecting settlement after related settlement produced response rates between one-tenth of 1% and 3.2%); *Strong v. Bellsouth Telecomm., Inc.*, 173 F.R.D. 167, 169 (W.D.La. 1997), *aff'd*, 137 F.3d 844 (5th Cir. 1998) (4.3% response rate); *Union Life Fidelity Ins. Co. v. McCurdy*, 781 So. 2d 186, 188 (Ala. 2000) (one-tenth of 1% response rate). *See generally* Pamela A. MacLean, "Dealing for Dollars," CALIFORNIA LAWYER (June 2011), at 12, 50.

It has been recognized for more than a decade that employing an electronic claims process ameliorates this problem. *In re Nasdaq Market-Makers Antitrust Litig.*, 2000 U.S. Dist. LEXIS 304, at *14 (S.D.N.Y. Jan. 18, 2000) (recognizing that using "electronic claim forms is likely to contribute to a far larger number of claims"). Because online claims processes increase class response rates, they are becoming pervasive. Robert H. Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet,* 69 U. PITT. L. REV. 727, 751 (2008). Class counsel cannot feign ignorance of the fact that people are "unhappy with mail-in forms and prefer online submissions" and that if given an online option, "more absent class members will choose to participate in the settlements to which they are entitled." *Id.* at 751, 752. Instead, by relying on paper communication rather than incorporating electronic means, the parties actually *increased* administrative costs. The only reason for Plaintiff's counsel to agree to that is because they believe that the increase in administration costs is outweighed by the number of claims deterred.

**4. The Settlement Contains Every *Bluetooth* Indicia of Impermissible Self-Dealing and Collusion**

This settlement carries all of the indicia of self-dealing that caused the Ninth Circuit warned about in *Bluetooth*, 654 F.3d at 947. Just look at everything I have written so far. Is this the norm? That decision's dishonor roll of "warning signs" of self-dealing is controlling. Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests ... to infect the negotiations." *Id.* at 947. The *Bluetooth* decision suggests a non-exclusive list of three possible signs of self-dealing. I have provided more than that based on the information above. As in *Bluetooth*, all three of these "multiple indicia" of unfairness are present in this settlement. *Id.* but also for more subtle signs that class counsel has allowed pursuit of their own self-interests ... to infect the negotiations." *Id.* at 947. The *Bluetooth* decision suggests a non-exclusive list of three possible signs of self-dealing and we have more than that in this case. As in *Bluetooth*, all three of these "multiple indicia" of unfairness are present in this settlement. *Id.* A proportionate distribution is one in line with the Ninth Circuit's 25% benchmark. *See, e.g., Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). For example to produce a $3 million fee request that complies with the benchmark, class members will need to submit $9 million worth of claims — an extremely improbable outcome, given the obstacles the claims process has established. Second, the settlement has an arrangement that provides for the payment of attorneys' fees without challenge from the defendants. SA § V.A; *Bluetooth*, 654 F.3d at 947. This "clear sailing" clause stipulates that attorney awards will not be contested by opposing parties. "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id.* The clear

sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 524; accord *Bluetooth,* 654 F.3d at 947. Here, class counsel put its own fees ahead of the interests of the class by negotiating a provision that insulates those fees from challenge by the D&O defendants and their insurers

Normally, the best practice for a Court confronting an onerous claim process that is burdensome is to hold any evaluation of the reasonableness of fees in abeyance until after claims intake is complete. Notes of Advisory Committee on 2003 Amendments to Rule 23(h) ("[I]t may be appropriate to defer some portion of the fee award until actual payouts to class members are known."); *In re Giant Interactive Group, Inc.*, 2011 U.S. Dist. LEXIS 127634, at *32 (S.D.N.Y. Nov. 2, 2011); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F.

In the Ninth Circuit, the fairness of the attorneys' fees in a common fund settlement is measured against a 25% benchmark. *Torrisi v. Tucson Elec. Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). It appears likely that the settling parties decided to construct a settlement that sets aside an overlarge share Therefore the agreed attorneys' fees must be scrutinized when evaluating whether the settlement is fair, reasonable, and adequate. "There is no exception in Rule 23(e) for fee provisions contained in proposed class action settlement agreements. Thus, to avoid abdicating its responsibility to review the agreement for the protection of the class, a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003). Provisions for attorneys' fees are contained in the settlement agreement, so this Court has a responsibility to review them

rather than "sever" these disproportionate fees from consideration. There is good reason for this: "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Id.* at 964. The fee counsel wants is clearly inaccurate and can't in good conscience be awarded with so many questions left unanswered.

The Ninth Circuit has recognized that "such an agreement has the potential to enable a defendant to pay class counsel excessive fees and costs, in exchange for counsel accepting an unfair settlement on behalf of the class." *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2002). Even where, as here, there is no explicit collusion against the class, "[e]ven if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985).

Is the court willing to condone the act of attorneys putting their own interests ahead of their putative clients? Moreover, if "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.,* 222 F.3d 1142, 1147 (9th Cir. 2000). When class counsel brings class litigation to benefit themselves, rather than their putative class clients, they cannot meet the adequacy requirements of Rule 23(a)(4), and the class should not be certified. *In re Aqua Dots Prods. Liab. Litig.,* 654 F.3d 748 (7th Cir. 2011).

**5. THE COURT SHOULD APPLY THE *ALI PRINCIPLES* IN DETERMINING THE FAIRNESS OF THIS SETTLEMENT**

Standards for reviewing settlements differ from circuit to circuit: the "current case law on the criteria for evaluating settlements is in disarray." *ALI Principles* § 3.05, cmt. a at 205. The Ninth Circuit has asked courts to follow an eight-factor test. *E.g.*, *Churchill Village v. General Elec.*, 361 F.3d 566, 575–76 (9th Cir. 2004). But the Ninth Circuit has also reversed settlement approvals without reference to the eight-factor test. *Molski,* 318 F.3d 937 (reversing settlement approval without reference to eight-factor test).

Some of the *Churchill Village* factors are not helpful in evaluating a settlement, not least because the cases give no guidance to how to weigh the various factors. One possible method of resolving this concern and rationalizing the law would be for courts to follow § 3.05 of the American Law Institute's *Principles of the Law of Aggregate Litigation*. The ALI *Principles* provide more than an indeterminate balancing test of multiple factors; rather, they suggest that courts should examine settlements to see if they pass several specific tests of fairness. Under § 3.05(a), there is an initial four-part test that all settlements must meet: the court must consider whether

(1) the class representatives and class counsel have been and currently are adequately representing the class; Not true since some named class members have dropped out, been replaced and some may not have may not even existed.

(2) The relief offered to the class... is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal; Not at all true, not even close.

3) Class members are treated equitably (relative to each other) based on their facts and circumstances and are not disadvantaged by the settlement considered as a whole; False, and

(4) The settlement was negotiated at arm's length and was not the product of collusion.

In addition to these four requirements, a "settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case." *Id.* § 3.05(b). False the asset test of the officers is inaccurate based on the start date. More assets are available but a rerun of the test is requires.

**6. The ALI Principles Are Consistent With *Churchill Village*.**

It is within this court's discretion to use the § 3.05 standards as a consistent complement to the *Churchill Village* eight-factor test — which also asks courts to examine the risks of the case and the reasonableness of the settlement fund in relation to those risks — and to *Molski v. Gleich*, which supplied more general standards of fairness. Ninth Circuit precedent on the question is compatible with the use of ALI's *Principles* § 3.05 in evaluating this settlement; furthermore, appropriate use of the *Principles* could rationalize the somewhat untethered *Churchill Village* factors, thus solving the problem of a multi-factor test that provides little guidance in distinguishing good settlements from bad ones. (*Cf.* the discussion of judicial fee-setting in *Nilsen v. York County,* 400 F.Supp.2d 266, 277 (D. Me. 2005) (a multi-factor approach "offers little predictability" to lawyers and judges. and its "highly subjective approach" "allows uncabined discretion").) That said, this settlement demands even more heightened scrutiny than the typical settlement requires because of its "clear sailing" clause.

**7. Public Policy Reasons Mean That the Court Should Not Infer Settlement Approval From a Low Number of Objectors.**

Any given class action settlement, no matter how much it betrays and cheats the interests of the class and unjustly makes millionaires of class counsel in this case, will produce only a small

percentage of objectors. Sometimes just one good objection can clearly speak for all the unnamed class members who don't have the knowledge, skill or know how of how the game is rigged. My objection is written on behalf of all unnamed plaintiffs and should be treated as being drawn up and signed by hundreds of thousands of class members whom cannot see the facts I pointed out before they make their decision to object or opt out. The predominating response will always be apathy, because objectors—unless they can use *pro bono* counsel, or do it themselves, —must expend significant resources on an enterprise that will create little direct benefit for themselves. Another common response from non-lawyers will be the affirmative avoidance, whenever----possible, of anything involving a courtroom. Class counsel may argue that this understandable tendency to ignore notices or free-ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001) (*citing In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 789.). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007).

Without *pro bono* counsel to look out for the interests of the class, filing an objection is economically irrational for any individual. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about

inferring support from a small number of objectors to a sophisticated settlement." *In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)); *cf. Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995) ("'[T]he silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement . . . . '"). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli.*" *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680–681 (7th Cir. 1987). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement).

When class members have little at stake, the rate of response will be predictably low as in this settlement. As such, the response from class members cannot be seen as something akin to an election or a public opinion poll. *See In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even when low number of objectors in large class, when "those who did object did so quite vociferously"); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1532 (2004). It is typically not worth the average citizen's time or money to object: the slight likelihood that one additional objection will be decisive, when

multiplied by the slight increase in an individual class member's payout that such an objection would produce, makes individually-funded objections a losing proposition.

The Court must act as a guardian for *all* class members—whether or not they have formally entered the case by registering an objection. "[T]he absence or silence of class parties does not relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971). The Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors. *In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 812–13; *ALI Principles* § 3.05, *comment a* at 206.

Even if class members manage to inform themselves, the process of objection and opting out is unnecessarily burdensome. The requirement that objectors print and mail multiple copies of their objection is both expensive and outdated in 2012. Other courts permit the relatively efficient (indeed, close to costless) method of transmitting objections by email; *see In re Motor Fuel Temperature Sales Practices Litig.*, No 2:07-md-01840-KHV-JPO, Order (Dkt. No. 3019), at 2 (D. Kan. Nov. 10, 2011) ("If Costco plans to proceed with email notification, it must allow class members to opt out of the class and object to the settlement electronically"); Class Notice, *In re Classmates.com Consolidated Litig.*, No. 09-cv-0045-RAJ (W.D. Wash 2011), *available at* http://www.cmemailsettlement.com/docs/notice.pdf. Notably, the settlement administrator provides an email contact form on its own website for its own customers; for some reason, the settlement administrator never made this method of communication available to class members. Furthermore, the settlement requires objectors who have objected any time in the past five years to list all the cases in which they have filed an objection. SA § IV.F; Notice, para. 20. In a now-

vacated federal district court opinion, the judge once noted that the plaintiff before him had participated in multiple class action lawsuits; according to the judge, this indicated that the plaintiff was "merely seeking the 'quick buck'" and was "not truly interested in vindicating any of the rights of the proposed class members." *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 954 (7th Cir. 2006). But this judgment was vacated: as the appellate court noted, "The district judge did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders." *Id.*

If the settlement agreement required the disclosure of past judicial sanctions (for, e.g., vexatious litigation or other abuse of the legal process), requiring such disclosure could be reasonable. But simply requiring objectors to list all the circumstances in which they have been so victimized by flawed settlements that they have chosen to pursue legal remedies seems to serve no legitimate purpose. Rather, this requirement seems unduly burdensome and impermissibly designed to deter legitimate objections.

Of course, the settling parties are free to compile their own research dossiers on objectors who have demonstrated the temerity to object to other settlements in the past. Mine is right there on Google. Such information is a matter of public record. If the settling parties' curiosity about an objector must be indulged, this avenue is superior, at least in part because the settling parties are the entities who should bear the cost of discovering this essentially irrelevant information.

Put together, these hurdles can and should be viewed by the Court as a systematic effort to impede class members' Fed. R. Civ. P. 23(e)(5) right to object to the settlement. If they do not constitute an independent reason to reject the settlement in this case, at the very least they

provide an added reason to discredit any argument that the lack of objectors in any way signals the class' approval of the settlement.

## 8. THIS OBJECTION IS BROUGHT IN GOOD FAITH

All the information described in the brief comes right from plaintiffs own documents, court files, public records etc. You can't make this stuff up! It is perhaps relevant to distinguish this objection from the agenda of those who are often styled "professional objectors." It is understood that "professional objectors" are for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U.--------- CHI. LEGAL F. 403, 437 n. 150 (2003) . *See* Paul Karlsgodt & Raj Chohan, "Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval," BUREAU OF NAT. AFFAIRS: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) I have brought just one objection ever and that was the Tyco settlement.

## CONCLUSION

The Plaintiffs' lawyers are requesting to be paid 16% of the $90,000,000.00 or a $14,000,000.00 pay day for this obviously proposed settlement. For doing what I have described above? Are you kidding me, where is the punch line? Plaintiffs have intentionally neglected their responsibilities to the class by treating this case as their own golden goose at the expense of the class. Some or all of the plaintiffs firms are using the court's power to rush through what they know to be a flawed settlement with a lot of unanswered questions as to how it was handled from the start to the conclusion. In grade school this settlement and treatment of the class by plaintiff's lawyers and many named class members would get an "F"

which is how the class members are being treated so to speak in this focus on attorney fee

case. Approval in this D&O case means the court says it is OK to:

- overly inflate hourly rates

-  bill unnecessary hours

-  double bill in the millions

-  inflate expenses

- No concern about mysterious new named plaintiffs who may not be class members when

  the fee briefs are filed

- Law firms bill the class for non class members

-  Named plaintiffs and representatives where no "Certification of Plaintiff Pursuant To the

  Federal Securities Laws" is found for almost all the firms involved.

- Dates and names crossed out on a declaration form declarations without a law firm

  representing them etc.

- Law firms directing the case but are not law firms of record

- And the list goes on and on.

 I guess court rules and procedures don't mean anything in certain cases based on certain

circumstances.  These issues should void any attorney fee request from them and a rejection

of the settlement is in order.  The court, class and I want to see picture ID"s of all named

plaintiffs and representatives to validate they exist and that these firms have legal

authorization to perform and claim the right to work and bill the class for.  Despite all these

red flags and sirens blaring plaintiff's firms also demand a two multiple on the fees, doubling

the size of the overbilling and overinflated rates. A $14 million money grab at the expense of

the D&O class for almost no work that needed to be performed after the Examiner's report gave them all the proof they needed to settle. Counsel states in one of its documents it wants compensation for a total of 91,000 hours? Crazy or better yet 16% or $14 million! I am surprised the lawyers didn't bill the class for toilet paper which is what this proposed settlement is only good for. All this does is defraud the class of its rightful, fair, reasonable and adequate amounts of reimbursed damages.   This proposed settlement clearly shows it is not fair, unreasonable, inadequate, not in the public interest, does not satisfy the Grinnell and Goldberg factors for settlement and clearly needs to be investigated by the court and possibly outside entities. It does the class no good to approve the settlement disburse the funds temporarily and then attempt to get the funds back later. Clearly based on the above, the suit got hijacked by the plaintiffs lawyer's primarily for their own benefit, for the legal fees first and justice for the class second.  In the Tyco case plaintiff's lawyers did not seek reimbursement for computer research charges, overtime, secretarial services, rental space related to document review, supplies, press releases, or certain other miscellaneous expenses. The same thing should be done here and the court should delete the above items from the lawyer's demands. A good faith appeal will be filed if this settlement is approved. My concerns do fit the criteria set forth by the appeals court to consider hearing my arguments and request for my relief. The truth needs to come out. Copies of this objection and attachments are being sent to other entities for their review, investigation and intervention before the money disappears in an attempt to stop this ongoing legal thievery. Thank you for your attention.

Dated: March 19, 2012

Respectfully submitted,

*Chris Andrews, In Pro Per* ███████████████

*Southfield, MI 48033* ███████████████████

 I hereby certify that on this day I mailed the foregoing to the Clerk of the Court, and served true

and correct copies upon class counsel and defendants' counsel via US Post Office Next Day Air at

the addresses below, per the instructions of the Settlement Notice to:

Clerk of the Court United States District Court for the Southern District of New York, Clerk of the

Court 500 Pearl Street, New York, New York 10007

Bernstein Litowitz Berger & Grossmann LLP attention David Stickey, 12481 High Bluff Drive, Suite

300, SanDiego CA 92130-3582

Kessler Topaz Meltzer & Check, LLP, Attention David Kessler 280 King of Prussia Road, Radnor, PA

19087

Cleary Gottlieb Steen and Hamilton LLP att. Mitchell Lowenthal, One Liberty Plaza, New York,

New York 10006

Howard Rice Nemerovski Canady Falk & Rabkin PC Three Embarcadero Center, Seventh Floor, San

Francisco, CA 94111-4024

DATED this 19h day of March, 2012.

*Chris Andrews*

*I certify that the above information is true and accurate to the best of my knowledge.*

Case No. 08-cv-5523-lak,09-MD-2017(LAK)                                                    Page 61



## Statement Reporting Period:
### 09/01/08 - 09/30/08

00-669-3900
D AMERITRADE
VISION OF TD AMERITRADE INC
O BOX 2209
MAHA, NE 68103-2209

**Statement for Account #** ▓▓▓▓▓▓
CHRIS ANDREWS
23610 HAZEN DRIVE
SOUTHFIELD, MI 48034-2507

**Announcements:**
EFFECTIVE 11/28/2008, NO-TRANS-
ACTION-FEE FUNDS (EXCEPT PROFUNDS &
RYDEX MUTUAL FUNDS) HELD 180 DAYS
OR LESS ARE SUBJECT TO A $49.99
SHORT-TERM REDEMPTION FEE, PLUS ANY
FEES DESCRIBED IN THE PROSPECTUS.

**Investment**

Cash
MMDA
Money Market
Short Balance
Stocks
Short Stocks
Fixed Income
Options
Short Options
Mutual Funds
Other

**Total**

**Cash Activity Summar**

**Opening Balance**
Securities Purchased
Securities Sold
Funds Deposited
Funds Disbursed
Income
Expense
Other

**Closing Balance**



**Statement for Account #**▐�▐▐▐▐▐▐▐▐▐▐
09/01/08 - 09/30/08

| Account Activity | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Trade Date | Settle Date | Acct Type | Transaction/ Cash Activity* | Description | Symbol/ CUSIP | Quantity | Price | Amount | Balance |
| 09/12/08 | 09/17/08 | Margin | Buy - Securities Purchased | WASHINGTON MUTUAL COM | WAMUQ | 1,000 | 2.81 | (2,800.03) | (2,418.08) |
| 09/12/08 | 09/17/08 | Margin | Sell - Securities Sold | WASHINGTON MUTUAL COM | WAMUQ | 1,000 | 2.81 | 2,800.03 | 2,418.08 |
| 09/12/08 | 09/17/08 | Margin | Buy - Securities Purchased | LEHMAN BROS HLDGS INC COM | LEHMQ | 200 | 3.67 | (743.95) | 1,674.13 |

**Statement for Account #** ▮▮▮▮▮▮▮▮▮▮

09/01/08 – 09/30/08

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Account Activity** | | | | | | | | | |
| **Trade Date** | **Settle Date** | **Acct Type** | **Transaction/ Cash Activity*** | **Description** | **Symbol/ CUSIP** | **Quantity** | **Price** | **Amount** | **Balance** |
| 09/15/08 | 09/18/08 | Margin | Sell - Securities Sold | LEHMAN BROS HLDGS INC COM | LEHMQ | 200- | 0.321 | 54.24 | 594.31 |

Working draft, November 22, 2009

Comments welcome

# The Wages of Failure:

## Executive Compensation at Bear Stearns and Lehman 2000-2008

*Lucian A. Bebchuk,* [*] *Alma Cohen,* [**] *and Holger Spamann* [***]

[*] William J. Friedman and Alicia Townsend Friedman Professor of Law, Economics, and Finance, and Director of the Program on Corporate Governance, Harvard Law School.

[**] William K. Jacobs Visiting Professor of Law and Economics, Harvard Law School; Senior Lecturer, Tel-Aviv University Eitan Berglass School of Economics.

[***] Lecturer and Executive Director of the Program on Corporate Governance, Harvard Law School.

For helpful suggestions and discussions, we would like to thank Allen Ferrell, Jesse Fried, Yaniv Grinstein, and Alan Jagolinzer. We also wish to express our thanks for the financial support of the IRRC Institute for Corporate Governance and the Harvard Law School Program on Corporate Governance. Spamann gratefully acknowledges financial support provided by a Terence M. Considine Fellowship through the John M. Olin Center for Law, Economics, and Business. Although Bebchuk serves as a consultant to the Department of the Treasury Office of the Special Master for TARP Executive Compensation, the views expressed in this paper do not necessarily reflect the views of the Office of the Special Master or any other individual affiliated with it.

Abstract

The standard narrative of the meltdown of Bear Stearns and Lehman Brothers assumes that the wealth of the top executives of these firms was largely wiped out along with their firms. In the ongoing debate about regulatory responses to the financial crisis, commentators have used this assumed fact as a basis for dismissing both the role of compensation structures in inducing risk-taking and the potential value of reforming such structures. This paper provides a case study of compensation at Bear Stearns and Lehman during 2000-2008 and concludes that this assumed fact is incorrect.

We find that the top-five executive teams of these firms cashed out large amounts of performance-based compensation during the 2000-2008 period. During this period, they were able to cash out large amounts of bonus compensation that was not clawed back when the firms collapsed, as well as to pocket large amounts from selling shares. Overall, we estimate that the top executive teams of Bear Stearns and Lehman Brothers derived cash flows of about $1.4 billion and $1 billion respectively from cash bonuses and equity sales during 2000-2008. These cash flows substantially exceeded the value of the executives' initial holdings in the beginning of the period, and the executives' net payoffs for the period were thus decidedly positive. The divergence between how the top executives and their shareholders fared implies that it is not possible to rule out, as standard narratives suggest, that the executives' pay arrangements provided them with excessive risk-taking incentives. We discuss the implications of our analysis for understanding the possible role that pay arrangements have played in the run-up to the financial crisis and how they should be reformed going forward.

Key words: Lehman Brothers, Bear Stearns, the financial crisis, banks, executive compensation, risk-taking, compensation structures, bonus compensation, stock options, restricted shares, moral hazard.

JEL Classification: G28, K23

## I. INTRODUCTION

In the aftermath of the financial crisis of 2008–2009, there are widespread beliefs that executive pay arrangements could have encouraged excessive risk-taking and that fixing those arrangements will be important in preventing similar excesses in the future. These beliefs have led firms and public officials to seek compensation reforms that would eliminate excessive incentives to take risks. For those companies receiving government aid, the Troubled Asset Relief Program (TARP) bill, subsequent U.S. legislation,[1] and regulations implementing such legislation[2] require the elimination of compensation structures that provide excessive risk-taking incentives. Furthermore, legislators and regulators have moved toward regulating compensation structures in all financial firms to eliminate such incentives. The U.S. House of Representatives voted in favor of a bill (now to be taken up by the Senate) authorizing such regulations,[3] and the Federal Reserve Board requested comments on a proposed guidance contemplating scrutiny of pay arrangements by banking supervisors.[4] The importance of such reforms was stressed by the G-20 leaders, who made a commitment in their September 2009 meeting "to act together to . . . implement strong international compensation standards aimed at ending practices that lead to excessive risk-taking . . . ."[5]

At the same time, many commentators have taken opposing views: They have dismissed the possibility that incentives generated by pay arrangements played a significant role in the risk-taking decisions financial firms made in the years preceding the financial crisis; and they have dismissed as well the potential payoffs from reforming

---

[1] *See* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 7001, 123 Stat. 115, 516–20 (2009) (codified as amended at 12 U.S.C. § 5221).

[2] *See, e.g.,* Press Release, U.S. Dep't of the Treasury, Treasury Announces New Restrictions on Executive Compensation (Feb. 4, 2009), *available at* http://www.ustreas.gov/press/releases/tg15.htm.

[3] *See* Corporate and Financial Institution Compensation Fairness Act of 2009, H.R. 3269, 111th Cong. (as passed by House, July 31, 2009).

[4] Board of Governors of the Federal Reserve System, Proposed Guidance on Sound Incentive Compensation Practices, Docket No. OP-1374.

[5] *See* BASEL COMM. ON BANKING SUPERVISION, ENHANCEMENTS TO THE BASEL II FRAMEWORK 25–27 (2009); LEADERS' STATEMENT: THE PITTSBURGH SUMMIT 2 (2008), *available at* http://www.pittsburghsummit.gov/mediacenter/129639.htm.

1

such pay arrangements. These commentators stress that financial firms' executives suffered significant losses when the stock prices of their firms fell sharply.[6] In these commentators' view, these losses imply that, to the extent executives took excessive risks, such risk-taking resulted fully from mistakes – excessive optimism, failure to perceive risks, or even hubris – rather than from incentives. The losses suffered by financial executives during the crisis, so the argument goes, indicate that "incentives cannot be blamed for the credit crisis or for the performance of banks…," and that executives "managed their banks in a manner they authentically believed would benefit their shareholders."[7]

Commentators dismissing the role of incentives and the potential value of fixing them have made substantial use of the examples of Bear Stearns and Lehman Brothers.[8] Bear Stearns sold itself in a fire-sale to JP Morgan in March 2008, and half a year later Lehman Brothers ("Lehman") filed for bankruptcy, triggering a worldwide panic. According to the standard narrative of these financial disasters, the wealth of the two companies' top executives was largely wiped out with their firms. This narrative has led observers to infer that risk-taking decisions made by the firms' top executives and ultimately leading to the firms' demise must have been due to failure to perceive risks.

This paper presents an analysis of executive compensation at Bear Stearns and Lehman during the period 2000-2008. Using data from SEC filings, we find that the standard narrative's assumed fact is incorrect. During the examined period, the companies' top executives were able to pocket large amounts of performance-based compensation. Overall, we estimate that the top executive teams of Bear Stearns and Lehman Brothers derived cash flows of about $1.4 billion and $1 billion respectively from cash bonuses and equity sales during 2000-2008. These cash flows substantially exceeded the value of the executives' initial holdings in the beginning of the period. As a

---

[6] See Rudiger Fahlenbrach and Rene Stulz, Bank CEO Incentives and the Credit Crisis, Charles A. Dice Center Working Paper 2009-13, July 2009; Testimony of Kevin Murphy, United States House of representatives, Hearing on Compensation Structure and Systemic Risk, June 11, 2009, at 4-6.

[7] Joseph Grundfest, "What's Needed is Uncommon Wisdom," New York Times online, October 6, 2009.

[8] See e.g., sources cited in infra notes 20 & 22.

2

result, the bottom-line payoffs of these executives during 2000-2008 were not negative but decidedly positive. Our analysis has implications for the continuing debates on whether financial executives had incentives to take excessive risks and whether pay arrangements need to be restructured.

Section II introduces the teams of top executives on which our analysis focuses. During 2000-2008, the composition of the top-five-executives team remained largely stable at both Bear Stearns and Lehman. The shareholder payoffs these teams produced were indisputably poor; shareholders who held their shares throughout the period lost most of their initial investment.

Section III discusses the large paper losses on shares held that the top teams suffered when their firms melted down – the losses on which the standard narrative focuses. We observe, however, that these losses do not tell the full picture of the executives' payoffs. To get a better picture of how the executives fared as a result of their 2000-2008 management of their firms, and the incentives they had during this period, it is necessary to calculate what they cashed out during these years, as well as what they had to begin with.

Section IV examines the cash bonus compensation the top executives took out during 2000-2008. Although the financial deterioration in 2007 led Bear Stearns to stop paying bonuses and Lehman to reduce them, the executives had already pocketed in prior years large amounts of cash bonus compensation. In the aggregate, during 2000-2008, the top-five teams of Bear Stearns and Lehman accumulated cash bonus payments exceeding $300 million and $150 million respectively (all dollar figures in this paper are in January 2009 dollars). Although the financial results on which bonus payments were based were sharply reversed at the end of the 2000-2008 period, the firms' pay arrangements allowed the executives to keep all paid bonus compensation; no amounts were clawed back.

Section V examines what the executives obtained from cashing out shares and options during 2000-2008. During this period, in contrast to some accounts of the

standard narrative,[9] the executives regularly took large amounts of money off the table by unloading shares and options. Overall, based on information contained in executives' filings of their trades, we estimate that during 2000-2008 the top-five executive teams at Bear Stearns and Lehman cashed out total amounts of about $1.1 billion and $860 million respectively. Indeed, we find that during the years preceding the firms' collapse, each of the teams sold more shares than they held when the music stopped in 2008.

Section VI focuses on the bottom line. Altogether, the firms' performance-based compensation structures provided the teams of top executives at Bear Stearns and Lehman with cash flows of about $1.4 billion and $1 billion, respectively, during 2000-2008. We observe that these amounts substantially exceed the value of the top executives' positions at the beginning of 2000, which we estimate to be in the order of $800 million and $600 million respectively. To be sure, the executives would have made much more had the firms not blown up. By contrast to shareholders who held their shares throughout 2000-2008, however, the executives' bottom-line payoffs during the same period were significantly positive.

Section VII discusses the implications that our analysis has for the ongoing debate on the potential role that pay incentives played in risk-taking decisions. Our analysis does not support the view that the executives' losses from the firms' collapse imply that they could not have had incentives to take excessive risks. The fact that the executives chose not to sell all of their holdings indicates that they did not anticipate the firms' 2008 collapse. But the executives' taking large amounts of performance-based compensation off the table based on short-term results did provide them with undesirable incentives – incentives to seek improvements in short-term results even at the cost of an excessive elevation of the risk of large losses at some (uncertain) point in the future. To be sure, even though the executives had incentives to take excessive risks, their decisions might have been driven by a failure to recognize risks and thus might have not been affected by those incentives. But given the structure of executives' payoffs, the possibility that risk-

---

[9] Floyd Norris, It May be Outrageous, but Wall Street Pay Didn't Cause this Crisis," New York Times, July 31, 2009.

taking decisions were influenced by incentives should not be dismissed but rather taken seriously.

Section VIII also discusses the implications of our analysis for the reform of compensation structures. Even if the excessive risk-taking incentives that executives of Bear Stearns and Lehman had (and the similar incentives that executives of other financial firms had) were not a major driver of risk-taking in the years preceding the financial crisis, such incentives could become so in the future if retained. Our analysis highlights the potential value of reforms that tie executive payoffs to long-term results more effectively and eliminate or curtail executives' ability to benefit from short-term results that are subsequently sharply reversed.

## II. THE EXECUTIVE TEAMS AND THEIR PERFORMANCE

For both Bear Stearns and Lehman, we focus on the five "named executive officers" in 2007, i.e., those executive officers for whom, in 2007, compensation needed to be disclosed in the annual proxy statement under U.S. securities law: the CEO, the CFO, and the three other most highly paid executive officers.[10] As it turns out, all of these executives held key managerial or board positions with their firms throughout all or most of the 2000-2008 period.

Some members of these teams as we define them were not technically "named executive officers" for each of the years 2000-2008, which means their compensation was not disclosed for the entire 2000-2008 period.[11] To be conservative, we generally

---

[10] *See* Schedule 14A, Item 8, and Regulation S-K, Item 402(a)(3).

[11] At Bear Stearns, the team includes: James Cayne, CEO from 1993 through January 2008 and chairman of the board from June 2001 through 2008; Alan Greenberg, chairman of the executive committee from 2001 through 2008 and previously chairman of the board; Samuel Molinaro, CFO from 1996 through 2008 and COO from August 2007 through 2008; Alan D. Schwartz, co-COO from June 2001 until August 2007, CEO from January 2008 until the merger with Bank of America, and a director since 1987 (except 1996-1999); and Warren Spector, co-COO from June 2001 until August 2007. For the membership of these persons in the group of "named executive officers," see The Bear Stearns Companies Inc., Proxy Statement 2007, 19; for the first four's positions within the companies, see *id.* and *id.*,, form 10-K/A (amendment no. 1) pt. 3, item 10, available at http://www.sec.gov/Archives/edgar/data/777001/000091412108000290/be12425681-

count compensation during years of missing information as zero, which biases our aggregate compensation numbers downwards.[12] We could have avoided these problems by looking at all the "named executive officers" in any given year, but incentives operate at the level of individuals, so looking at a group with changing membership might produce misleading conclusions. We therefore chose to look at the incentives of five individuals who served as top executives during all or most of the relevant period.

As Figure 1 shows, the two top executive teams initially produced stellar returns, quadrupling their firms' stock price from January 2000 to January 2007. As is well known, however, in the next 15 to 21 months both stocks collapsed. Bear Stearns was forced to sell itself to JPMorgan in March 2008 for a per share price equal to about a quarter of the January 2000 stock price. Lehman filed for bankruptcy in September 2008. Shareholders holding the companies' shares from 2000 to 2008 lost most of the value of their 2000 position.

---

10ka.txt, and for Spector's position, see *id.*, form 10-K for 2007, p. 32, available at http://www.sec.gov/Archives/edgar/data/777001/000091412107000335/be7368933-10k.txt, and *id.*, form 8-K, dated 11/15/2007.

At Lehman, the team includes Richard Fuld, CEO from 1993 through 2008 and chairman of the board from 1994 through 2008; David Goldfarb, CFO from 2000 through 2004 and CAO from 2004 through 2006; Joseph Gregory, (Co-)COO from 2002 through 2008 and CAO from 2000 through 2002; Christopher O'Meara, CFO from 2004 through 2007 and previously in various management positions at the firm (since 1994); Thomas Russo, CLO from 1993 through 2008. Fuld and Gregory were "named executive officers" throughout the 2000-2008 period, Russo from 2003 through 2008, Goldfarb from 2004 through 2007, and O'Meara in 2007 and 2008. For the membership of these persons in the group of "named executive officers," see Lehman Brothers Holding Inc., Proxy Statement 2007, 21; for the positions of these individuals within the firm, see *id.* and the 2006 and 2008 proxy statements.

[12] As we discuss in Section VI, for some executives we do not have information about their holdings in 2000, and we make conservative assumptions also in this case.

FIGURE I. 2000-2008 PERFORMANCE



Source: Authors' calculations from CRSP data

III. EXECUTIVES' LOSSES FROM THE FALL OF THEIR BANKS

The top executives of Bear Stearns and Lehman held substantial numbers of their companies' shares. Relative to what those shares were worth at the peak stock prices both firms reached in early 2007, the executives suffered very substantial paper losses when their companies collapsed.

For example, the chairman of the board and, until January 2008, CEO of Bear Stearns held 5.6 million shares in his bank at the time of its emergency sale to JPMorgan in March, 2008. At the then-current price of $10.84, he obtained $61 million for these

shares.[13] By contrast, at the peak stock price of $171.51 on January 12, 2007, the same shares were worth $963 million.[14] This amounts to a paper loss of over $900 million.[15]

Similarly, the chairman of the board and CEO of Lehman held, directly or indirectly, 10.8 million shares as of January 31, 2008.[16] When Lehman filed for bankruptcy on September 15, 2008, those shares became worthless.[17] Compared to the peak stock price of $85.80 on February 2, 2007,[18] this amounted to a paper loss of $931 million.

As noted in the introduction, commentators have pointed to these paper losses as evidence that bank executives' pay incentives could not have played a role in the earlier risk-taking incentives that resulted in the firms' demise. Executives ending up with such losses must have failed to perceive the risks their firms faced, so the argument goes, and their risk-taking must have been driven entirely by excessive optimism or even hubris, not by perverse incentives. Indeed, an examination of the fate of Lehman's CEO was a primary basis for the conclusion reached by *New York Times* columnist Floyd Norris that

---

[13] *See* Form 4 – Statement of Changes in Beneficial Ownership filed on 3/27/2008, available at http://www.sec.gov/Archives/edgar/data/777001/000077700108000033/xslF345X02/cay557.xml.

[14] Source: CRSP.

[15] Bear Stearns' former CEO may have incurred additional losses on restricted and phantom stock of Bear Stearns that he still held at the time of the sale, but, based on Bear Stearns' proxy statement 2007, such losses would presumably have been less than 20% of the losses he incurred on his holdings of common stock. *Cf.* The Bear Stearns Companies Inc., Proxy Statement 2007, 10 (reporting that the CEO's phantom and restricted stock holdings amounted to about 10% of his common stock holdings), 20 (reporting that the value of unexercised in-the-money options was about $60m).

[16] *See* Lehman Brothers Holding Inc., Proxy Statement 2008, 18. This number includes restricted and phantom stock, *see id.* At least 4.6m of these shares were vested as of January 31, 2008, *see id.* 34. According to his SEC filings available at http://www.sec.gov/cgi-bin/browse-edgar?CIK=0001227421&action=getcompany, none of these shares were sold prior to Lehman's bankruptcy filings.

[17] On the day of Lehman's bankruptcy filing, he sold 2.98m of those shares for prices of around 20c per share, or approximately $600,000 total. *See* Form 4 – Statement of Changes in Beneficial Ownership, filed 09/17/2008, available at http://www.sec.gov/Archives/edgar/data/806085/000080608508000155/xslF345X03/doc.xml. Three days later, he sold another 287,415 shares for 7c per share, or $ 21,125 total. *See* Form 4 – Statement of Changes in Beneficial Ownership, filed 09/22/2008, available at http://www.sec.gov/Archives/edgar/data/806085/000080608508000159/xslF345X03/doc.xml.

[18] Source: CRSP.

"Wall Street pay didn't cause this crisis."[19] Norris stressed that the paper losses of Lehman's CEO stood out among those of financial executives.[20] Similarly, in a *Wall Street Journal* editorial, Jeffrey Friedman relied on the Lehman CEO's large paper losses as a basis for his view that financial firms' compensation structure were not at fault for banks' risk-taking.[21]

There can be little doubt that the banks' executives had strong reasons to prefer that their companies survive. Furthermore, the executives' holding so many shares at the time of the collapse indicates that they had not foreseen in 2007 or early 2008 that such a collapse was around the corner. The important question, however, is whether the executives had an incentive to make decisions that created an excessive risk – though by no means certainty – of massive losses at some (uncertain) time down the road.

In particular, excessive incentives to take risks might have been generated by executives' ability to cash out compensation based on the firms' short-term results. To the extent that executives did cash out large amounts of such compensation, their decisions might have been distorted by an excessive focus on short-term results. This problem, first highlighted several years ago in a book and accompanying articles co-authored by one of us,[22] has received much attention in the wake of the crisis from both public officials and business leaders.[23]

---

[19] Floyd Norris, "It May be Outrageous, but Wall Street Pay Didn't Cause this Crisis," New York Times, July 31, 2009.

[20] Norris, supra note 19 (relying on data from Fahlenbrach and Stulz, supra note _).

[21] Jeffrey Friedman, "Bank Pay and the Financial Crisis," Wall Street Journal, September 28, 2009.

[22] *See, e.g.*, LUCIAN BEBCHUK & JESSE FRIED, PAY WITHOUT PERFORMANCE (2004); Lucian Arye Bebchuk & Jesse M. Fried, *Executive Compensation as an Agency Problem*, 17 J. ECON. PERSP. 71 (2003); Lucian Arye Bebchuk & Jesse M. Fried, *Pay Without Performance: Overview of the Issues*, 17 J. APPLIED CORP. FIN. 8 (2005); Lucian Arye Bebchuk et al., *Managerial Power and Rent Extraction in the Design of Executive Compensation*, 69 U. CHI. L. REV. 751 (2002).

[23] *See, e.g.*, *See, e.g.*, Press Release, U.S. Dep't of the Treasury, Statement by Treasury Secretary Tim Geithner on Compensation (June 10, 2009), *available at* http://www.ustreas.gov/press/releases/tg163.htm (stating that "compensation should be structured to account for the time horizon of risks"); Lloyd Blankfein, *Do Not Destroy the Essential Catalyst of Risk*, FIN. TIMES, Feb. 2009, at 7 ("An individual's performance should be evaluated over time so as to avoid excessive risk-taking. To ensure this, all equity awards need to be subject to future delivery and/or deferred exercise. Senior executive officers should be required to retain most of

Properly examining this issue requires examining not only the losses Bear Stearns' and Lehman's top executives suffered as their firms collapsed, but also the compensation they derived in preceding years. Many of the decisions that ultimately led to the failure of the companies, such as the decisions to get heavily involved in the securitized assets markets, were made a substantial period of time before the final collapse. To assess the executives' incentives when they made decisions that determined the future risks facing their banks, one needs to look at their compensation over a longer period of time. [24]

Some commentators who suggest that incentives did not play a role have assumed that the top executives of Bear Stearns and Lehman did not draw much cash out of their firms in the years preceding the crisis. Norris, for example, wrote in his New York Times column:

> "[Lehman's CEO] was later raked over the coals in Congressional hearings about his huge compensation. That most of it was in stock and options that he never cashed in seemed to be something most legislators could not comprehend."[25]

As will be discussed below, however, the top executives of both companies did in fact draw large cash flows during the years preceding the firms' demise. Lehman's CEO alone obtained cash flows of about $470 million from equity sales during 2000-2007. More generally, as we shall see, the performance-based compensation drawn by the firms' top teams during 2000-2007 was sufficiently large that the total payoffs of these executives during 2000-2008, factoring in the value of their initial holdings in the firms, were decidedly positive.

---

the equity they receive at least until they retire, while equity delivery schedules should continue to apply after the individual has left the firm."). For a detailed analysis of how pay arrangements should be designed to address the short-horizons problem, see Lucian A. Bebchuk & Jesse Fried, *Paying for Long-Term Performance*, Working Paper, Harvard Law School 2009 (on file with the authors).

[24] While most observers have focused on the executives' paper losses at the time of the firms' collapse, the fact that one has to look earlier has been noticed by some. Those observing that one has to look also at the amounts taken home by the executives of Bear Stearns and Lehman in the years preceding the firms' collapse include Congressman Waxman (in the House Oversight Committee Hearing in October 2008) and former Wall Street analyst Henry Blodget (writing in his Clusterstock blog on November 12, 2009).

[25] Norris, supra note _.

## IV. CASH BONUSES DURING 2000-2008

Because our focus throughout is on performance-based compensation, we put aside the cash flows to the top executives from their salaries. During the period 2000-2008, the top executive teams of Bear Stearns and Lehman received aggregate cash salaries of $9 million and $17.5 million, respectively (all dollar figures are in 2009 dollars).[26] Because these salaries were independent of performance, we do not take them into account in our further analysis.

On top of their cash salaries, however, these top executives received sizeable amounts of performance-based cash bonuses in the years 2000-2008, as shown in Table 1. The Bear Stearns and Lehman CEOs alone took home about $87 million and $70 million respectively (in 2009 dollars). As explained in section II above, the numbers for executives 2 through 5 are biased downwards because some of them were not "named executive officers" for each year 2000-2008; hence their bonuses were not disclosed in the firms' proxy statements in every single year during this period.

---

[26] We obtain these and the following numbers directly from the banks' annual proxy statements and, in the case of Bear Stearns for 2007, its amended form 10-K/A, *supra* note 11. These numbers are identical to those reported in the ExecuComp database, with two exceptions. First, ExecuComp reports higher compensation for Bear Stearns executives in 2000 because it adds payments relating to a transition period in 1999 when Bear was changing fiscal years to payments reported for 2000. Second, ExecuComp does not report any bonus payments for Lehman executives in 2007, presumably because Lehman extraordinarily reported these "cash bonuses" as "Non-Equity Incentive Plan Compensation" in the "Summary Compensation Table." *Cf.* Lehman Brothers Holding Inc., Proxy Statement 2008, 26-28

## TABLE 1: CASH BONUSES

|  | Bear Stearns | | Lehman | |
|---|---|---|---|---|
|  | CEO | Executives 2-5* | CEO | Executives 2-5* |
| 2000 | $14,303,249 | $15,256,715 | $10,728,811 | $9,870,506 |
| 2001 | $5,927,920 | $17,952,389 | $4,768,899 | $5,186,178 |
| 2002 | $11,744,609 | $34,457,261 | $10,269,601 | $3,695,883 |
| 2003 | $12,633,503 | $37,562,958 | $7,630,983 | $11,647,290 |
| 2004 | $11,268,364 | $34,460,116 | $11,456,939 | $18,275,215 |
| 2005 | $13,753,111 | $42,674,147 | $14,865,419 | $26,109,081 |
| 2006 | $17,878,812 | $56,974,132 | $6,545,852 | $15,657,678 |
| 2007 | $- | $- | $4,327,911 | $11,965,401 |
| 2008 | $- | $- | $- | $- |
| TOTAL | $87,509,569 | 239,337,718 | $70,594,415 | $102,407,231 |
| Total Top-5 | $326,847,286 | | $173,001,646 | |

Source: Annual proxy statements and, for Bear Stearns in 2007, the amended 10-K. All amounts are inflation-adjusted to January 2009 dollars using the CPI, and relate to fiscal years, not calendar years.

- Executives 2-5 are the other "named executive officers" in the 2007 proxy statement of the respective bank. We treat as zero lacking information for two Bear executives and two Lehman executives in 2000, for two Lehman executives in 2001, for one Lehman executive in 2002-04, and for one Lehman executive in 2007.

- For Lehman executives in 2007, the numbers given also include "Non-Equity Incentive Plan Compensation," *see supra* note 26.

Bear Stearns and Lehman chose to provide their top executives with large bonuses during the years 2000-2007 on the basis of the banks' high earnings and stock price increases during those years. Based on such short-terms results, the firms awarded especially large bonuses during the 2004-2006 period. For example, in its decision to

award bonuses for fiscal year 2006, Bear Stearns' compensation committee considered in particular "record" earnings per share, net income, net revenues, large increases in book value per share, and the fact that "[t]he market price of the Common Stock increased by approximately 37%" during the fiscal year.[27] Similarly, Lehman's compensation committee cited "record" net revenues, pretax income, net income, and earnings per share, as well as "[a]n increase in the Firm's stock price of 17% during fiscal 2006, and 123% over the last five years" in its decision to award bonuses for fiscal year 2006.[28]

For the year 2007, the compensation committee of Bear Stearns "determined not to award any bonuses to the members of the Executive Committee related to fiscal 2007 in recognition of the significant decline in our overall financial results from the prior year."[29] Lehman did continue to award cash bonuses (though at lower levels than in 2006), again citing "record" earnings per share, net income, and net revenues, as well as "[s]uccessfully navigating the difficult credit and mortgage market environments and maintaining the Firm's strong risk controls."[30] What is most important for our purposes, however, is that neither bank's pay arrangements required its executives to repay cash bonuses for previous years when the banks collapsed in 2008. Accordingly, no part of the cash bonus compensation was clawed back even though the "record" financial results that served as a basis for the bonuses largely evaporated.

## V. CASH FROM UNLOADING SHARES AND OPTIONS 2000-2008

During 2000-2008, the executives also took home large amounts of money from selling shares of their companies. Indeed, such sales were the most important source of cash outflows to the executives during this period.

In our analysis of the executives' benefits from equity-based compensation, we focus on the actual sales of shares of stock rather than the grant of such shares or options thereon. This is because any shares and options not yet sold became almost (Bear) or

---

[27] The Bear Stearns Companies Inc., Proxy Statement 2007, 15.
[28] See Lehman Brothers Holdings Inc., Proxy Statement 2007, 19-20.
[29] See The Bear Stearns Companies Inc., form 10-K/A, supra note 11, at 9.
[30] See Lehman Brothers Holding Inc., Proxy Statement 2008, 25.

totally (Lehman) worthless when the companies collapsed. Hence the mere granting of shares and options during this period does not determine how executives fared financially over the 2000-2008 period. By contrast, any cash received for selling shares was unaffected by the subsequent crash of the banks. Of course, some of that cash income can be seen as merely executives' liquidation of wealth they already had in 2000, and we take this into account in Section VI.

We use for our analysis the Thomson Financial's Insiders database, which builds on SEC filings on forms 3, 4, and 5. Table 2 shows for each executive and year the amount received from trading in the companies' shares. The amounts shown are net amounts: We substract from the dollar amounts received any amounts invested in shares during that year – either in the exercise of stock options or the purchase of shares in the market. As we do throughout, we inflation-adjust all dollar amounts to 2009 dollars.

## TABLE 2: NET INFLOWS FROM EQUITY SALES

| | Bear Stearns | | Lehman | |
|---|---|---|---|---|
| | CEO | Executives 2-5* | CEO | Executives 2-5* |
| 2000 | $9,087,527 | $51,578,460 | $57,136,184 | $16,137,797 |
| 2001 | $37,351,800 | $119,906,819 | $38,444,264 | $43,949,470 |
| 2002 | $30,062,992 | $81,730,689 | $31,088,599 | $34,432,387 |
| 2003 | $67,400,196 | $250,500,032 | $52,770,933 | $39,981,325 |
| 2004 | $32,252,654 | $130,232,064 | $20,329,963 | $62,903,572 |
| 2005 | $25,128,912 | $106,092,404 | $98,565,178 | $71,694,762 |
| 2006 | $11,704,049 | $34,306,482 | $108,651,865 | $57,873,403 |
| 2007 | $15,445,977 | $32,667,188 | $53,544,175 | $62,332,550 |
| 2008 | $60,653,974 | $10,223,482 | $10,164,621 | $10,630 |
| **TOTAL** | **$289,088,081** | **$817,237,620** | **$470,695,782** | **$389,315,896** |
| **Total Top-5** | **$1,106,325,701** | | **$860,011,678** | |

Source: Authors' calculations based on Thomson Financial Insiders database, counting both direct and indirect holdings. All amounts are inflation-adjusted to January 2009 dollars using the CPI.

* Executives 2-5 are the other "named executive officers" in the 2007 proxy statement of the respective bank. We treat as zero lacking information for two Lehman executives in 2000-2001, for one Lehman executive in 2002-2004, for one Lehman executive in 2007, and for three Lehman executives in 2007.

As Table 2 shows, during the years 2000-2008, the banks' top executives received substantial net cash proceeds from sales of their companies' shares, including from the exercise of options. Lehman's CEO took home about $471 million (in 2009

15

dollars),[31] and Bear Stearns' CEO took home $289 million. Looking at the top executive teams as a whole, their net cash proceeds from share sales exceed $1.1 billion in the case of the Bear Stearns team and $850 million in the case of the Lehman team. Indeed, the large sales of shares throughout the period 2000-2008 are a key reason why the banks' executives were able to make net gains in the period as a whole, even though the value of their holdings took a considerable hit when the banks crashed in 2008.

A noteworthy feature of the pattern displayed in Table 2 is the regularity with which the members of the top executive teams were unloading equity positions. At both Bear Stearns and Lehman, both the CEO and the 2-5 executive group obtained net cash flows from unloading shares and options in *each* of the years 2000-2008. This pattern, of course, meant that executives had incentives to place some weight on short-term stock market prices throughout the period.

It is also interesting to note that most executives were able to sell more shares during the period 2000-2007 than they held at the end in 2008. Table 3 shows shares sold over the period 2000-2007 (adjusted for stock splits) in comparison to the amount of shares held in 2008. Each of the two top executive teams had one executive who left before 2008 and for whom holdings were not reported in 2008, so we omit these individuals' sales and positions from the table; assuming they sold off their shares at least as quickly as did other executives before 2008, our numbers understate the extent to which the number of shares sold during 2000-2007 exceeded the shares held by the executives at the time of the firms' collapse.[32]

---

[31] If sales of indirect holdings are excluded, the number is $469m.

[32] Finally, it is worth noting that many of the above sales relate to shares that the executives had previously received as compensation from their banks but that they were allowed to sell during the considered period. For example, Lehman's CEO could have obtained at most $103 million (in 2009 dollars) from selling the shares he already held at the IPO in 1994 or subsequently acquired through open-market purchases. He held 515,232 shares at the time of Lehman's IPO in 1994 and purchased an additional 645,440 shares in open-market transactions in the subsequent two years (both numbers are adjusted for subsequent stock splits). We calculated the maximum possible price of these shares using Lehman's peak stock price of $85.80 on February 2, 2007. On Lehman's CEO's stock holdings at the IPO, see Lehman Brothers Holding Inc., Form S-1 – Registration Statement under the Securities Act of 1933, filed on 4/5/1994, 72 (reporting Richard Fuld's holdings of Lehman stock on the IPO date). We calculated the number of open-market

**TABLE 3: SHARES SOLD DURING 2000-2007 vs SHARES HELD IN 2008**

| | Bear Stearns | | | Lehman | | |
|---|---|---|---|---|---|---|
| | CEO | Executives 2-5* | Total Top -5 | CEO | Executives 2-5* | Total Top -5 |
| Shares sold, 2000-2007 | 2,720,845 | 5,392,414 | **8,113,259** | 12,422,277 | 11,148,734 | **23,571,011** |
| Shares held, 2008 | 5,658,591 | 1,124,363 | **6,782,954** | 10,851,590 | 7,903,508 | **18,755,098** |
| Difference | -2,937,746 | 4,268,051 | **1,330,305** | 1,570,687 | 3,245,226 | **4,815,913** |

Source: Shares sold: authors' calculations based on Thomson Financial Insiders database, omitting transactions without a reported transaction price (such as gifts). Shares held: holdings before sale reported on respective individual's first SEC filing (form 4) in 2008 (Bear Stearns); 2008 proxy statement (Lehman). All numbers include indirect holdings and are adjusted for stock splits.

* Executives 2-5 are the other "named executive officers" in the 2007 proxy statement, except that data for Spector (Bear Stearns) and Goldfarb (Lehman) are excluded because they did not report holdings in 2008.

It should be noted that both Bear Stearns and Lehman limited how quickly executives were able to unload equity awards, allowing such unloading to take place only five years after the making of the award.[33] Lehman, however, also granted stock options

---

purchases from Thomson Financial's Insiders data, adding shares from all reported transactions in Lehman stock for Richard Fuld with transaction code "P," all of which occurred in the period 1994-1996. It is possible that some of the earliest reported transactions relate to shares that are already counted in Fuld's initial holdings of the IPO date. To the extent this is the case, we are overstating the number of shares that Fuld acquired by ways other than executive compensation.

[33] *Cf.*, *e.g.*, Lehman Brothers Holding Inc., Proxy Statement 2008, 29 (noting that restricted stock units awarded for fiscal 2007 "cannot be sold or transferred until they convert to Common Stock at the end of five years"); *id.*, Proxy Statement 2001, 14, note a (noting that restricted stock units awarded for fiscal 2000 "cannot be sold or transferred until they convert to Common Stock on November 30, 2005"); Bear Stearns Companies Inc., Proxy Statement 2007, 17 (stating that "[i]t is the Company's policy that executive officers are required to hold a minimum of 5,000 shares of

that could be exercised as soon as the stock price crossed certain thresholds, which it usually did within a year of the option grant.[34] In any event, the members of the top teams were all long-serving executives who became free each year to unload the equity incentives awarded them five years earlier, and the patterns displayed in the preceding table indicate that they made regular and substantial use of this freedom, unloading previously granted incentives as they were receiving new ones. The companies' top executives clearly had ample reason to pay close attention to, and place considerable weight on, their companies' short-term stock market prices.

## VI. THE BOTTOM LINE

Table 4 puts together the total cash payouts, over and above baseline salaries, that the firms' top executives received during the period 2000-2008. We add to the cash flows from bonuses and from equity sales the value of the executives' remaining holdings after the crash. (We shall proceed to substract the value of their initial holdings in 2000 later on.)

The value of the remaining holdings is essentially zero for Lehman because common shareholders are unlikely to receive anything from the bankruptcy estate, as reflected in the near-zero stock price of Lehman when it was delisted.[35] As to Bear

---

Common Stock or Common Stock Equivalents") and 16 (noting that equity-based components of bonus awards "are not freely transferable into shares of Common Stock ... for five years from the original grant date"); *id.*, Proxy Statement 2001, 9 (explaining that executives' restricted stock awards received as part of their annual compensation will entitle the executives to receive freely transferable shares after five years).

[34] *See, e.g.*, Lehman Proxy Statement 2001, 12-13 (explaining that options granted in fiscal 2000 were exercisable in 4.5 years, but that "[v]esting was designed to accelerate as the market price of the Common Stock increased to levels well above the market price on the date of the grant. The price of the Common Stock increased significantly during Fiscal 2000, meeting these price targets, and such options became fully exercisable in accordance with their terms.") and 15 (explaining that "Five-year nonqualified stock options were granted on February 18, 2000 with terms providing for exercisability in four and one-half years and for accelerated exercisability in one-third increments if the closing price of the Common Stock on the NYSE reached $42.50, $47.50 and $52.50, respectively, for 15 out of 20 consecutive trading days. These price targets were met during Fiscal 2000.").

[35] When it was delisted on 09/17/2009, Lehman traded at 13c a share.

18

Stearns, we need to distinguish different types of holdings. Common stock held by executives was sold back to the company or converted into JPMorgan stock before or during the merger with JPMorgan; these transactions are in the Thomson Financial Insiders database and already counted in the numbers we presented in tables 2 and 3 above (using a monetary equivalent for JPMorgan stock, where applicable).[36] Options on Bear Stearns stock became essentially worthless because of the steep decline of Bear Stearns' stock price.[37] Vested phantom stock units, however, were to be exchanged for JPMorgan stock in two tranches around 11/30/2008 and 1/15/2009 under the terms of the merger and hence retained some value.[38] Using JPMorgan's stock price on the respective distribution date, we estimate this value to be $11.7 million for Bear Stearns' former CEO and $17.5 million for the other "named executive officers."[39]

---

[36] For the sales information including the zero remaining holdings, *see* the respective Forms 4 – Statements of Change in Beneficial Ownership, for Cayne (*supra* note 13), Greenberg (filed 5/23/2008, available at http://www.sec.gov/Archives/edgar/data/777001/000077700108000037/xslF345X02/gre578.xml) , Molinaro (filed 6/2/2008, available at http://www.sec.gov/Archives/edgar/data/777001/000077700108000055/xslF345X02/mol563.xml ), and Schwartz (filed 6/2/2008, available at http://www.sec.gov/Archives/edgar/data/777001/000077700108000057/xslF345X02/sch564.xml) . Warren Spector left the firm in the end of 2007, *see* form 8-K, *supra* note 11, and hence was not subject to SEC holdings reporting requirements anymore in 2008; to the extent that we are missing amounts he received for remaining shares (or for phantom stock discussed below), we will understate the amounts that Bear Stearns' executives received during 2000-2008.

[37] Bear Stearns options were converted into JPMorgan options at strike prices several times above the JPMorgan stock price then and. *See*, *e.g.*, Form 4 – Statements of Change in Beneficial Ownership, filed 6/2/2009, available at http://www.sec.gov/Archives/edgar/data/777001/000077700108000061/xslF345X02/cay566.xml (Cayne received JPMorgan options with exercise prices over $178).

[38] Bear Stearns' executives also had unvested units of phantom stock, but the monetary value of these was relatively low, totalling only $3m for Greenberg, Molinaro, and Schwartz. *See* The Bear Stearns Companies Inc., Definitive (Merger) Proxy Statement, 6.

[39] JPMorgan's closing stock price was $26.12 on 12/1/2008 and $24.34 on 1/15/2009. *See* http://investor.shareholder.com/jpmorganchase/stocklookup.cfm. For consistency with our previous calculations, we inflation-adjust the November/December numbers to January 2009 dollars using the CPI, although the effect of this is obviously minimal. For the number and distribution date of JPMorgan shares to be distributed to each of the former Bear Stearns executives in replacement of their Bear Stearns phantom stock, see Forms 4 – Statements of Change in Beneficial Ownership for Cayne (*supra* note 37), Molinaro (*supra* note 36), Schwartz (*supra* note 36), and Greenberg (filed on 6/2/2008 and available at

The value of the remaining shares is thus relatively modest (for Bear Stearns' executives) or non-existent (for Lehman's executives). As Table 4 indicates, however, the aggregate cash benefits from performance-based compensation obtained by the executives are quite sizable. This is due to the considerable values derived from cash bonuses and from sales of shares and options. All in all, we estimate that, during 2000-2008, the CEOs of Bear Stearns and Lehman received cash flows from bonuses and equity sales of about $388 million and $541 million respectively; and the top executive teams obtained aggregate cash flows of about $1,462 million and $1,033 million, respectively.

## TABLE 4: TOTAL CASH FLOWS FROM BONUSES

## AND EQUITY SALES 2000-2008

| | Bear Stearns | | Lehman | |
|---|---|---|---|---|
| | CEO | Executives 2-5* | CEO | Executives 2-5* |
| Bonus | $87,509,569 | $239,337,718 | $70,594,415 | $102,407,231 |
| Sales of stock | $289,088,081 | $817,237,620 | $470,695,782 | $389,315,896 |
| Stock remaining | $11,656,420 | $17,494,360 | $0 | $0 |
| **TOTAL** | **$388,254,069** | **$1,074,069,697** | **$541,290,197** | **$491,723,127** |
| **Total Top-5** | **$1,462,323,766** | | **$1,033,013,324** | |

Sources: Bonus: table 1. Sales of stock: table 2. Post-crash holdings: authors' calculations from holdings reported on SEC filings (form 4) and stock prices reported on JPMorgan's website. All amounts shown are inflation-adjusted to January 2009 dollars.

\* Executives 2-5 are the other "named executive officers" in the 2007 proxy statement of the respective bank. Missing information for individual executive officers in any given year is treated as zero (see tables 1 and 2 above).

http://www.sec.gov/Archives/edgar/data/777001/000077700108000049/xslF345X02/gre559.xml)

Before concluding, it would be worth comparing the cash flows derived by the executives with the value of the executives' holdings in their banks at the beginning of the period 2000-2008. Such comparison would provide us with the executives' net payoffs for this period.

To estimate the value of these initial holdings, we obtain most information directly from the companies' 2000 proxy statements, which report holdings as of 9/8/1999 in the case of Bear Stearns and as of 1/25/2000 in the case of Lehman.[40] In Lehman's case, some of those securities might not yet have vested by 1/1/2000 and hence might wholly or partly be compensation for services rendered to the bank during 2000-2008.[41] This distinction is not clear-cut, however, and so we count all securities, whether vested or unvested, so that our estimates of initial investments will be biased upwards (and that our subsequent estimates of the executives' net gains during 2000-2008 will be biased downwards). We value all stock and phantom stock using the stock price as of 12/31/1999.[42]

As Table 5 below indicates, the banks' executives had substantial initial investments in their companies' stock. For example, we estimate the value of the holdings of stock and phantom stock that the CEOs of Bear Stearns and Lehman held at the beginning of the year 2000 at $360 million and $195 million respectively (in 2009 dollars). In addition, Lehman's CEO held options valued at $106m according to Lehman's proxy statement, which based this valuation on the excess of the 11/30/1999 stock price over the exercise price, if any.[43] We inflation-adjust all numbers to January 2009 dollars.

---

[40] Bear Stearns changed its fiscal year between 1999 and 2000, so that the next proxy statement does not appear until 2001.

[41] In the case of Bear Stearns, all securities awards seem to have vested immediately; *cf.* The Bear Stearns Companies Inc., Proxy Statement 1999, 13 n.2 (reporting that all restricted stock awards vest immediately).

[42] Bear Stearns' stock price was $42.75 on 12/31/1999, Lehman's was $84.6875. The respective prices on the first trading day of 2000, January 3, were lower. On 9/8/1999, Bear Stearns' stock price was 18.75c higher. On 1/25/2000, Lehman's stock price was $14.125 lower. Source: CRSP.

[43] For options holdings of Lehman executives and Lehman's valuation method, see Lehman Brothers Holding Inc., Proxy Statement 2000, 18.

In the case of Lehman, assembling the initial holdings information is complicated by the fact that three of the "named executive officers" of 2007 on whom we focus in this paper were not yet part of that group in 2000, and hence their holdings were not yet disclosed in the proxy statement.[44] For these three individuals, we value their holdings instead at the point when they were first disclosed in Lehman's proxy.[45] This procedure is likely to produce an overestimate of the value of their holdings in 2000 (and thus result in our underestimating the executives' net gains during 2000-2008): this is because (i) the number of shares the executives had in 2000 was likely lower than the number of shares they had when they first appeared in the proxy statements as named executives, and (ii) the stock price of their company rose steeply during this period. In this sense, the numbers we give below are conservative in that they likely work against the possibility of finding significant net positive payoffs in the period 2000-2008.

Table 5 summarizes our estimates of the value of executives' initial holdings.

---

[44] These three executives are Goldfarb, O'Meara, and Russo.
[45] For Goldfarb, O'Meara, and Russo, the relevant proxy statements are those of 2004, 2007, and 2003, respectively. We value the stock at the stock price on the day for which the numbers are given in the proxy statement, i.e., January 31 of the year in which the proxy statement was distributed.

### TABLE 5: ESTIMATED VALUE OF INITIAL HOLDINGS

|  | Bear Stearns | | Lehman | |
|---|---|---|---|---|
|  | CEO | Executives 2-5* | CEO | Executives 2-5* |
| Initial stock | $360,277,489 | $437,934,567 | $194,570,847 | $194,778,981 |
| Initial options | - | - | $106,197,280 | $105,654,222 |
| **TOTAL** | **$360,277,489** | **$437,934,567** | **$300,768,127** | **$300,433,203** |
| **Total Top-5** | **$798,212,056** | | **$601,201,330** | |

Source: authors' calculations from CRSP stock prices and holdings reported in Bear Stearns 1999 proxy statement and Lehman's 2000 (Fuld, Gregory), 2003 (Russo), 2004 (Goldfarb), and 2007 (O'Meara) proxy statements; stock includes phantom stock and is valued at the 12/31/1999 stock price (except that the holdings of Goldfarb, O'Meara, and Russo are valued at the January 31 stock price of the year when their holdings were first disclosed); option values are "naïve" calculations of max{0,(exercise price minus current stock price)} as reported in the respective proxy statements. All amounts shown are inflation-adjusted to January 2009 dollars.

* Executives 2-5 are the other "named executive officers" in the 2007 proxy statement.

A comparison of Tables 4 and Table 5 shows the significance of the large amounts that the executives cashed from bonuses and equity sales during 2000-2008. Despite the large losses the banks' executives suffered on their holdings when their banks crashed, and after accounting for the value of the executives' initial positions in their companies, the net payoffs for the top executive teams during the 2000-2008 period were decidedly positive.

We estimate that Bear Stearns' top executive team made an aggregate net non-salary payoff exceeding $650 million. Lehman's top executive team, in turn, made an aggregate net non-salary payoff estimated to exceed $400 million. For the reasons we explained earlier, our estimates might be conservative. Looking at individual members of the teams, our estimates indicate that, with one exception, each of the members of the two

23

teams ended up with a positive net non-salary payoff during the 2000-2008 period.[46] In sum, the top executives of Bear Stearns and Lehman, both collectively as teams and individually, benefitted from large amounts of performance-based compensation, that made up for the decline in the value of their initial holdings and enabled them to fare much better than their long-term shareholders.

## VII. IMPLICATIONS

We now turn to the implications of our findings. We have seen that, during 2000-2008, the top executive teams received large amounts of performance-based compensation, which were large enough to provide them with net positive payoffs for the period after accounting for the losses they suffered on their holdings at the beginning of this period. This conclusion might lead some to wonder whether the teams received excessive amounts of performance-based compensation. Given that overall performance during the period under consideration was indisputably disastrous for the company's shareholders, some might view the executives' performance-based compensation levels as excessive. In response, others might argue that, even though this compensation was labeled performance-based, significant parts of it were in fact salaries. In Wall Street firms, so the argument goes, significant portions of an executive's performance-based compensation are, in fact, salary and are expected to be paid even if performance is abysmal.[47]

In this paper, however, we would like to put aside the question of pay levels and whether they were appropriate or excessive. Our focus is instead on the issue of

---

[46] The exception is Lehman's O'Meara, for whom we calculate a net loss of $20m. O'Meara, however, only joined Lehman's NEO team in 2007, so that earnings and trades are disclosed for few years and the initial holdings are valued at almost the peak stock price of early 2007. It is likely that a positive net benefit would obtain in a full review of O'Meara's undisclosed compensation and initial holdings as of 2000.

[47] What incentives do firms have to label salary as performance-based compensation? They might try to camouflage the nature of compensation to hide it either from Uncle Sam (for top executives, compensation in excess of $1 million is deductible only if it is performance-based) or from shareholders (who might be more resistant to high pay levels when they are not performance-based).

24

incentives. In particular, our chief interest is in whether the companies' pay arrangements provided their executives with excessive incentives to take risks.

In particular, we are now able to assess the positions of those commentators who use the Bear Stearns and Lehman examples as a basis for dismissing the possibility that incentives played a role in the firms' risk-taking decisions. Recall that, in their view, the large losses executives suffered when their firms collapsed indicate that their earlier risk-taking decisions were largely due to failure to perceive risks and could not have been a response to excessive risk-taking incentives. Our analysis does not provide support for this view.

To the contrary, our analysis indicates that the cases of Bear Stearns and Lehman if anything provide a basis for concerns about the incentives executive their had, not for dismissing such concerns. The analysis indicates that the design of the firms' performance-based compensation did not produce a tight alignment of executives' interests with long-term shareholder value. Rather, the design provided executives with substantial opportunities (of which they made considerable use) to take large amounts of compensation based on short-term gains off the table and retain it even after the drastic reversal of the two companies' fortunes. Such a design provides executives with incentives to seek improvements in short-term results even at the cost of maintaining an excessively elevated risk of an implosion at some point down the road.

Consider the structure of the firms' bonus compensation. The executives were able to obtain large amounts of bonus compensation based on high earnings in the years preceding the financial crisis, but did not have to return any of those bonuses when the earnings subsequently evaporated and turned into massive losses. Such a design of bonus compensation provides executives with incentives to seek improvements in short-term earnings figures even at the cost of maintaining an excessively high risk of large losses down the road.

Similarly, the cashing out of large amounts of shares and options by executives throughout the period provided those executives with incentives to place significant weight on the effect of their decisions on short-term stock prices. Such a design again gives executives an incentive to seek improved short-term results, which can lift short-

term prices or prevent short-term price declines, even when doing so has the potential for adverse effects on long-term value.

We would like to emphasize that the question is not whether the firms' top executives fully anticipated such a collapse. Surely, the fact that the executives did not sell in 2007 all the shares they were free to sell indicates that they did not anticipate that a collapse of their firms was around the corner. The question is whether the executives – and executives in similar circumstances in other firms – had incentives to run the firms in a way that involved an excessive probability – though by no means a certainty – of massive losses at some uncertain date down the road. Our analysis indicates that the pay arrangements at the firms – and similar pay arrangements elsewhere – *did* provide some such incentives.

That the firms' executives had incentives to take excessive risks, it should be stressed, does not imply that their decisions were in fact affected by such incentives. To begin, many individuals may be influenced by non-monetary motivations. Moreover, to the extent that the top executives of Bear Stearns and Lehman were "excessively optimistic" and did not, say, perceive any risks to their firms, their behavior would have been the same whether or not they had incentives to take excessive risks. Our analysis indicates that the executives' payoffs provided them with excessive risk-taking incentives, but it does not establish that these incentives in fact had an impact on the executives' decisions. Yet even though our analysis does not show these incentives in fact had an effect, it does show that concerns that this might have happened should not be dismissed, but rather taken seriously.

In any event, whether the risk-taking that took place in the past resulted from executives' misperceptions or executives' incentives need not be resolved for the important purposes of deciding what should be done going forward. Even if misperceptions and excessive optimism drove risk-taking during this decade, there is a good reason to get rid of incentives for excessive risk-taking going forward, lest they produce excessive risk-taking in the future.

One of the powerful lessons of economics is that incentives matter. When agents have interests that diverge from those of their principals, economists worry that the agents' incentives may lead them to act in a way that does not best serve the principals.

The logic of incentives has led institutional investors and others to support pay packages that are quite large in order to enable the provision of strong incentives. Such packages come to address the widely accepted concern that, absent equity-based and bonus compensation, executives' interests will not be sufficiently aligned with shareholder interests. This logic, however, makes it essential as well to ensure that the design of performance-based compensation does not create perverse incentives.

Thus, firms and regulators would do well to devote considerable attention to examining how the design of performance based compensation can better link the payoffs of executives with long-term results. As to bonus plans, the adoption of clawback provisions and bonus bank provisions should be considered. Such arrangements would prevent executives from pocketing in their entirety bonuses based on results in a given year when the results do not hold afterwards.

As to equity-based compensation, consideration should be given to refining its design to induce executives to place lower weight on short-term stock prices and greater weight on long-term stock prices. As we have seen, the top executives of Bear Stearns and Lehman were able to sell more shares during 2000-2008 than they were left with at the time of the firms' collapse. The executives' regular cashing out of equity incentives provided them with incentives to attach weight to short-term results.

Whereas Lehman's executives were in many cases free to unload options shortly after their vesting, companies would do well to place meaningful constraints on such unloading. As to shares, Bear Stearns and Lehman did have substantial limitations on unloading, which was permitted only five years after vesting. With such limitations, executives who are in their first or second year of their service would not attach any weight to short-term prices. However, when a firm's top executives serve for many years, as was largely the case with Bear Stearns and Lehman's executives, such arrangements will not prevent executives who have served the company for a long time (and who consequently have some awarded shares they are free to unload) from placing a significant weight on short-tem prices.

One way to ensure that executives place more weight on long-term stock prices is to require them to retain a substantial fraction of the shares and options awarded to them until retirement. This approach has been long followed by Goldman Sachs, which

requires executives to hold 75% of awarded shares until they retire. As one of us stressed in recent work with Jesse Fried, however, hold-till-retirement requirements provide executives with a counterproductive incentive to depart, and this incentive would be especially strong in the case of executives who have been successful and have amassed a large equity portfolio. An alternative approach put forward in this work is to allow executives in any given year to cash out only a rather limited fraction, say 10%, of the portfolio of shares and options that they hold. A comprehensive discussion of the optimal design of limits on the unloading of options and shares is, of course, beyond the scope of this paper.[48] But the analysis of this paper indicates that the importance of such reforms should not be dismissed.

VIII. CONCLUSION

The stories of Lehman and Bear Stearns will undoubtedly remain in the annals of financial disaster for many years to come. To understand what has happened, and what lessons should be drawn, it is important to get the facts right. In contrast to what has been commonly assumed thus far, the top executives of those two firms were not financially devastated by their management of the firms during 2000-2008. They were able to cash out rather large amounts of performance-based compensation, both from bonuses and from share sale, during the years preceding the firms' collapse. This cashed-out performance-based compensation was large enough to make up the losses on the executives' initial holdings in the beginning of the period. As a result, the executives' net payoffs from their leadership of the firm during 2000-2008 were decidedly positive.

Thus, the large paper losses that the executives suffered when their companies collapsed should not provide a basis for dismissing either the possibility that executives' choices have been influenced by excessive risk-taking incentives or the importance of improving compensation structures going forward. Legislators and regulators seeking to

---

[48] For a detailed examination of this subject, see Lucian Bebchuk and Jesse Fried, Equity Compensation for Long-Term Performance, Working Paper, September 2009; Alex Edmans, Xavier Gabaix, Research, Tomasz Sadzik, and Yuliy Sannikov, Dynamic Incentive Accounts, Working Paper, August 2009.

prevent future crises would do well to consider seriously the role of incentives in the financial crisis of 2008-2009 and the fixing of such incentives in the future.