# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THE SHANE GROUP, INC., *et al*.,<br><br>Plaintiffs, on behalf of themselves and all others similarly situated,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>Defendant. | Civil Action No. 2:10-cv-14360-DPH-MKM<br><br><br>Judge Denise Page Hood<br>Magistrate Judge Mona K. Majzoub |

## DECLARATION OF DANIEL C. HEDLUND IN SUPPORT OF REPLY TO OBJECTORS' OPPOSITION TO CLASS COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PAYMENT OF INCENTIVE AWARDS TO CLASS REPRESENTATIVES

I, Daniel C. Hedlund declare as follows:

1.     I am a member in the law firm Gustafson Gluek PLLC, one of the four firms appointed Class Counsel by the Court.

2.     I am submitting this Declaration in support of Class Counsel's Reply to Objectors' Opposition to Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to Class Representatives.

3.     Under the terms of the Settlement with Blue Cross Blue Shield of Michigan ("Blue Cross"), Blue Cross pre-paid $1,000,000 into the Settlement Fund earmarked to pay for class notice costs.

4.     On July 16, 2014, Class Counsel directed EagleBank, the holder of the Settlement Fund, to pay $297,913.90 to Kinsella Media for published notice costs, including magazine, newspaper, and online advertisements.

5.     On July 23, 2014, Class Counsel directed EagleBank to pay the remaining $702,115.40 to Epiq Systems, the Settlement Administrator, to cover a portion of the cost of the direct notice mailings.

6.     These amounts add up to $1,000,029.30 due to the interest the funds accrued while held in the Settlement Fund.

7.     Due to these two payments to Kinsella Media and Epiq Systems, there is presently a balance of zero dollars in the Settlement fund.

8.     Since Class Counsel submitted the proposed notice plan to the Court, Class Counsel gained access to approximately 500,000 additional names and addresses for the purposes of providing direct notice.

9.     The cost of this additional notice is approximately $146,000, an expense for which Class Counsel will not be seeking reimbursement.

10.     Attached hereto as Exhibit A is a copy of the Declaration of Andrew J. McGuinness.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated:          October 24, 2014          Respectfully submitted,

                                          /s/ Daniel C. Hedlund
                                          Daniel C. Hedlund
                                          GUSTAFSON GLUEK PLLC
                                          120 South Sixth Street, Suite 2600
                                          Minneapolis, MN 55402
                                          Telephone: (612) 333-8844
                                          dhedlund@gustafsongluek.com

# Exhibit A

# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| THE SHANE GROUP, INC., *et al.*, Plaintiffs, on behalf of themselves and all others similarly situated, v. BLUE CROSS BLUE SHIELD OF MICHIGAN, Defendant. | Civil Action No. 2:10-cv-14360 <br><br> Judge Denise Page Hood <br><br> Magistrate Judge Mona K. Majzoub |

## DECLARATION OF ANDREW J. McGUINNESS

I, Andrew J. McGuinness, hereby declare as follows:

1.      I have been asked to submit this Declaration in support of the Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to Class Representatives, Docket # 155, in the above-referenced case ("Petition"). Specifically, I have been asked to opine on the reasonableness of the hourly rates reflected in the lodestar calculations of the plaintiffs' class counsel, as reflected in the compendium of declarations attached to the Declaration of Daniel C. Hedlund in Support of the Petition, docket # 155-1.

Background and Experience

2.      I am an attorney licensed in Michigan for 26 years, and a member of the bar of this Court. I concentrate my practice in complex commercial litigation, with an emphasis on class actions, including antitrust, securities, consumer, and other individual and class actions.

3.      I am a 1988 graduate of the University of Michigan Law School, *magna cum laude*, where I was appointed Order of the Coif, elected an Articles Editor of the Michigan Law Review, and was a finalist in the Campbell Moot Court Competition.

4.      After law school, I served as law clerk for the Hon. Frank M. Coffin of the United States Court of Appeals for the First Circuit, after which I joined the Chicago office of Skadden,

1

Arps, Slate, Meagher & Flom, a firm based in New York City. While at Skadden, Arps, I began working on antitrust and securities class actions in 1989, including time spent on antitrust matters in the New York office of the firm.

5.       In 1993 I joined the law firm of Dykema Gossett PLLC in their Ann Arbor, Michigan, office. At Dykema I represented many clients in class actions involving antitrust, securities, and consumer claims, including Abbott Laboratories, Honeywell, Ford Motor Company, Comshare, Inc., T-Mobile, Federal Mogul, Champion Industries, ProQuest Corp., Lincoln Financial Group, ClubCorp, and many other clients. Before leaving Dykema in 2010 to form my own practice, I headed Dykema's Class Action Defense practice for approximately five years.

6.       Presently and for the past four-plus years, I have been engaged as a solo practitioner in the complex litigation arena. After leaving Dykema I continued to serve as Ford Motor Company's lead counsel in what is believed to be the largest recall case in history by number of vehicles, MDL-1718, comprised of more than 150 class and individual actions filed in and transferred to the Eastern District of Michigan (Hon. Bernard A. Friedman, J.). Other recent clients have included W.B. Donner & Co. (advertising complex commercial litigation) and Zaremba Family Farms, Inc. (mineral rights antitrust).

7.       I have been recognized by U.S. News & World Report's "Best Lawyers" publication in Michigan for antitrust litigation for several years, and was recently named a Michigan "SuperLawyer." Each of these publications bases their selections on peer reviews. I have never been sanctioned, and have a Martindale-Hubbell AV® Preeminent™ rating of 5/5.0 for legal ethics and ability. More on my background is available at: http://topclasslaw.com/andrew-j-mcguinness-esq/

8.       For the past five years I have served on the planning committee for the ABA National Institute on Class Actions. This two-day seminar gathers upwards of 200 prominent class

2

action practitioners, academics, and judges to explore in detail issues of moment to the class action bar, including the antitrust class action bar.

9.      In conjunction with the 2012 Institute I designed and co-taught at ABA headquarters in Chicago "Class Actions 101," a two-hour course for lawyers beginning a class action practice, for which I wrote the course materials. I will be teaching Class Actions 101 for the third year at this year's Institute on October 23, 2014. In addition to this course, I also moderate a panel discussion at each year's Institute. The brochure for this year's Institute can be found at: http://shop.americanbar.org/PersonifyImages/ProductFiles/211246/CEN4CAC_WebBrochure.pdf.

10.     I write and publish regularly in the area of class actions and antitrust litigation. For example, I authored an article published on the ABA Litigation Section's Class Action and Derivative Suits (CADS) Subcommittee website on the Supreme Court's decision in *In re. Comcast*, an antitrust class action. An article on class actions that I co-authored is also featured in the October 2014 edition of GP/SOLO Magazine, published by the American Bar Association. I am active in CADS, where I have co-chaired the antitrust subcommittee for approximately eight years, and in the Federal Bar Association for the Eastern District of Michigan.

Organization of this Declaration

11.     I have chosen to organize this Declaration as follows:

- Discussion of the reasonableness of the hourly rates reflected in the lodestar calculations of attorneys based in Southeastern Michigan, many of whom I know—personally or by reputation—and have encountered in my class action practice here in the past 20+ years. Class counsel/firms are discussed in descending order of their total lodestar as reflected in Docket #155-1; followed by

- Discussion of the reasonableness of the hourly rates reflected in the lodestar calculations of attorneys not based in Southeastern Michigan, several of whom I know—personally or by reputation—and have encountered in my class action practice in the past 25 years. Once again, these class counsel/firms are discussed in descending order of their total lodestar.

3

- A number of my observations, analyses, and opinions discussed in detail with respect to the first firm, The Miller Law Firm, will have application to my opinions regarding the remaining class counsel and will be incorporated by brief reference, to avoid redundancy.

12.     While I have not been provided detailed time records or asked to review in the reasonableness of the hours reflected in the Petition, I have reviewed the balance of hours expended insofar as it relates to the reasonableness of the hourly rates (e.g., to ascertain that the pattern of hours billed by more experienced attorneys are appropriately balanced by hours charged by more junior attorneys, for tasks more appropriately assigned their level of experience). In the course of this review I did not note any instance where the number of hours charged for a case of this complexity by any individual attorney or firm on appeared unreasonable or out of line.

Opinions Regarding Class Counsel's Hourly Rates

**The Miller Law Firm and Fink + Associates**

13.     I have reviewed the lodestar calculation of The Miller Law firm, as reflected in the July 22, 2014, declaration of E. Powell Miller, Docket # 155-5 (Exhibit 4 to the Hedlund Declaration) (Lodestar = $ 941,393.75); and of Fink + Associates, as reflected in the July 21, 2014, declaration of David Fink (*id*. Exh. 6) (Lodestar = $208,688)[1].

14.     Over the years I have represented defendants in several class actions in which E. Powell Miller served as opposing counsel. I estimate that we have served on opposing sides of complex commercial class actions approximately six times, more or less. Through these engagements, I have become very familiar with the efforts, abilities, skill level, and reputation of Mr. Miller and several of his partners and associates, including without limitation Mr. Marc L. Newman and Mr. David H. Fink.

---

[1] I include Fink + Associates out of order to their relative lodestar per the organizational scheme outlined above because Messrs. Fink and Bressack are included in the loadstar calculations of both The Miller Law Firm (where they used to work) and Fink + Associates.

15. Over my 25 years as a complex commercial class action litigator, I have worked with (and less frequently, opposed) several very experienced complex commercial class action attorneys in the Southeast Michigan whom I consider to be comparable in experience and expertise in the areas of complex litigation, antitrust, class actions, and securities litigation to Mr. Miller. In addition to myself, these individuals include David Ettinger of the Honigman firm (Detroit office); Gregory Curtner of the Schiff, Hardin firm (Ann Arbor office), and Paul Novak of the Milberg firm (Detroit office).

16. In my experience, it is common practice in the profession for law firms to set hourly rates based on the experience, skill level, reputation and degree of case responsibility of their partners, of counsel, and associates. These rates take into account the rates charged by competing law firms and attorneys in the relevant practice area and geographic market.

17. Typically, rates at a given law firm reflect a descending hourly charge with the most experienced, skilled, and regarded attorneys' rates set at a given level, and less experienced attorneys' rates reflecting a cascading discount to the more senior attorneys' rates.

18. In my professional opinion, the incremental value of an experienced complex commercial litigator declines at or about 20 years of experience, and there is little or no incremental market increase in the perceived value of such litigators' experience after approximately 25 years of experience. This is not to say that all such litigators at a given level of experience can command the same hourly rate, as other factors such as reputation and perceived skill level also influence the rate.

19. In my experience, there is substantial resistance to significant discounting of a given attorneys' hourly rate at most law firms. Such discounting (along with any failure by clients to pay the firm's bills for an attorney's work) is reflected in the "realization rate" – a closely monitored metric in law firms. A given attorney's ultimate compensation—including items such as

5

base salary, "draw," and bonuses—is in part determined by that attorney's realization rate. All else being equal, a lower realization rate translates into lower compensation. Moreover, the firm's overall financial performance is evaluated by its overall realization rate, and firm financial management focuses considerable energy on maintaining or raising realization rates.

20.     In part because defense lawyers' billable rates are those charged to and paid by their clients, I have placed substantial weight in rendering the opinions reflected in this Declaration on the rates charged by defense counsel in the class action and complex litigation area—and in particular on rates paid for antitrust expertise. In addition, I have taken into account rates charged by other defense and plaintiffs' counsel in the Detroit metropolitan area and elsewhere.

21.     As reflected in Exhibit A to the Miller Declaration, The Miller Law Firm has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column based upon my own research (including licensing data available online at www.michbar.org ) and supplied by the firm:

| Name | Status | Hourly Rate | Experience |
|---|---|---|---|
| E. Powell Miller | (P) | $725 | 25+ |
| Marc L. Newman | (P) | $695 | 20 |
| David H. Fink | (P) | $725 | 25+ |
| Ann L. Miller | (P) | $680 | 25 |
| Jayson E. Blake | (P) | $590 | 17 |
| Brian E. Etzel | (P) | $535 | 18 |
| Casey E. Fry | (A) | $525 | 9 |
| Daryl G. Bressack | (A) | $525 | 10 |
| Christopher D. Kaye | (A) | $450 | 14 |
| Melissa Wojnar-Raycraft | (A) | $425 | 11 |
| Adam T. Schnatz | (A) | $465 | 9 |
| Devon P. Allard | (A) | $325 | 7 |

| Jennifer E. Bean | (A) | $340 | 6 |
|---|---|---|---|
| Evan M. Chall | (A) | $325 | 7 |
| Courtney B. Ciullo | (A) | $425 | 7 |
| Jane Gazman | (A) | $325 | 6 |
| Steven M. Zehnder | (A) | $340 | 4 |

22.     In my opinion, the hourly rates reflected in the above table are reasonable.

23.     In forming this opinion, I have taken into account a declaration recently submitted by David Ettinger of the Honigman firm in *Saint Alphonsus Medical Center--Nampa, Inc., et al. v. St. Luke's Health System, Ltd.*, Case No. 1:12-CV-00560 (D. Idaho). I consider this information to be both reliable and of the sort generally relied upon by experts evaluating the reasonableness of attorneys' hourly rates.

24.     In the *St. Alphonsus* case Mr. Ettinger represented plaintiffs who prevailed, and in support of plaintiffs' petition for an award of attorney's fees under the federal antitrust statute, Mr. Ettinger set forth his hourly rates for the years 2012-2014 as follows:

- 2014:  $780 /hour
- 2013:  $770/hour
- 2012:  $740/hour

(*See* Declaration of David A. Ettinger;,Exhibit A, attached.) From the content and context of the Ettinger Declaration, it is clear that he actually charged his client these rates for his services.

25.     As previously mentioned, I have collaborated with Mr. Ettinger in the defense of antitrust cases, including class actions. I am aware of his general reputation in the community and believe it to be comparable to that of E. Powell Miller.

26.     In particular, I note that Mr. Ettinger's $780/hr. rate for 2014 compares to Mr. Miller's $725/hr. rate for this year. In my opinion, this comparison illustrates the reasonableness of Mr. Miller's more modest hourly rate.

27.     While I have based my opinions regarding The Miller Law Firm's rates primarily on rates charged by practitioners in Southeast Michigan, in my opinion the relative scarcity of prominent attorneys who a focus in the fields of antitrust class actions and comparable complex litigation indicates that the relevant market for comparison is not strictly geographic. Especially given the increased prominence of international and nationwide complex antitrust cases, the prominence of electronic filing in federal courts, and other technological and market factors, in my opinion the physical location of an attorney practicing in these areas is of less and less importance. In light of this, I have taken into account (though to a lesser degree) the rates for comparable work frequently charged by attorneys practicing in these fields in other geographic areas, including Chicago, Illinois; Washington, D.C.; Cleveland, Ohio; and New York, New York.

28.     In paragraph 20 of his declaration in the *St. Alphonsus* antitrust case, Mr. Ettinger states:

> I regularly set my personal standard rate at a level slightly below the rates charged by the most senior partners at Chicago-area firms. These rates are significantly below the top rates charged by senior partners in New York and Washington, D.C. These are the cities whose data I examine because most leading antitrust lawyers (especially health antitrust lawyers) are located in these venues.

(Exh. A, attached.) I generally agree with Mr. Ettinger's observation regarding the market rates for complex antitrust litigation work as reflected in Paragraph 20 of his declaration.

29.     I have reviewed the data contained in paragraphs 21-23 of the *St. Alphonsus* declaration of Mr. Ettinger, and the accompanying exhibits (available via PACER) in which he provides detailed data regarding the hourly rates charged by senior antitrust litigators in Chicago, Washington, D.C., and elsewhere. As reflected in the data included in Mr. Ettinger's declaration, such counsel regularly charge in excess of $1,000 per hour—and upwards of $1,200 per hour—for their services.

30.     I note that Mr. Miller, before he established his own law firm, was a partner at the Honigman law firm at which Mr. Ettinger practices, and he is only a few years Mr. Ettinger's junior in terms of experience.

31.      In reaching my opinion regarding the reasonableness of rates reflected in The Miller Law Firm lodestar calculation, I have taken into account the hourly fees charged by Gregory Curtner at the Schiff, Harden firm (Ann Arbor, MI, Office), as reflected in a recent declaration submitted by one of his partners in *Zaremba, et al. v. Encana Corporation*, Case No. 1:12-cv-00369 (W.D. Mich.) (Exhibit B, attached). I consider this information to be both reliable and of the sort generally relied upon by experts evaluating the reasonableness of attorneys' hourly rates.

32.     Mr. Curtner's houly rate in 2014 is $780/hr. (identical to Mr. Ettinger's rate).

33.     I am familiar with the work, experience, and reputation of Mr. Curtner, and served as his opposing counsel in the *Zaremba* case for a time (drafting the antitrust counterclaim and successfully opposing defendant's motion to dismiss that claim). Like Mr. Ettinger and Mr. Miller, Mr. Curtner—who used to head the antitrust litigation practice at the Miller Canfield firm before joining Schiff, Hardin several years ago, has more than 25 years' experience and is considered a top practitioner in this area. In my opinion Mr. Curtner's $780/hr. rate illustrates the reasonableness of Mr. Miller's more modest hourly rate.

34.     I note that in his declaration attesting to Mr. Curtner's hourly rates, his partner, Mr. Juckniess of the Schiff, Hardin firm, states that this rate is actually billed to the firm's client, as reflected in an attached  "true and correct copy of an invoice to Encana reflecting time entries for the attorneys and paralegal" who worked on that antitrust matter. (*Id.* ¶ 3.) Mr. Curtner's $780 billing rate is thus clearly a rate actually billed to his firm's clients, and not merely a starting point for determination of a net, discounted rate actually paid.

9

35.     In reaching my opinion regarding the reasonableness of rates in The Miller Law Firm fee petition, I have taken into account the hourly fees charged by Paul Novak of Detroit, Michigan, who heads the antitrust practice of Milberg LLP, and manages their Detroit Office, as reflected in a fee petition filed in *In re Korean Air Lines Co., Ltd., Antitrust Litigation*, MDL No. 1891 (C.D. CA. October 4, 1013) (Exh. C, attached). I consider this information to be both reliable and of the sort generally relied upon by experts evaluating the reasonableness of attorneys' hourly rates.

36.     As reflected in his *In re Korean Air Lines Co., Ltd., Antitrust Litigation* declaration, Mr. Novak's hourly rate in 2013 was $775/hr. I am further informed directly by Mr. Novak that his 2014 hourly rate is $800/hr.

37.     I am familiar with the work, experience, and reputation of Mr. Novak. For approximately seven years he was in charge of antitrust enforcement in the State of Michigan Attorney General's office, where he served as Assistant Attorney General. I was opposing counsel to Mr. Novak in the *In. Re. Cardizem CD Antirust Litigation*, No. 99-md-1278, MDL No. 1278 (Edmunds, J.), where I defended the principal defendant, Aventis Pharmaceuticals. In my opinion, Mr. Novak's hourly rates as set forth in the preceding paragraph of this Declaration provide support for the reasonableness of Mr. Miller's more modest hourly rate.

38.     In addition to the foregoing, I have taken into account my own hourly rate for antitrust and other complex commercial class actions in 2014, which is currently $625/hr. While this rate is $100/hr. below the Mr. Miller's rate, in my opinion it provides further support for the reasonableness of Mr. Miller's hourly rate of $725. I have organized my practice as a solo practitioner in order to lower overhead as a way of attracting clients. My business model frequently requires that I "partner" with a client's outside law firm (defense cases) or other, typically larger firms (plaintiffs' cases) for complex litigation work. Attorneys in smaller firms (in

my case a solo practice) are frequently able to charge less for their services due to lower overhead. I am informed that The Miller Law firm is presently a firm of over 20 attorneys (including of counsel), plus staff. In my opinion, a $100/hr. billing premium to my own rate is reasonable in light of the size and structure of The Miller Firm.

39.     The above analysis supports my opinion that Mr. Powell's hourly rate is reasonable. As previously stated, I am also familiar with the work, experience, and reputation of David H. Fink, who has more than 30 years' experience. As defense counsel I have opposed Mr. Fink in class cases, and am personally aware that he frequently appears in class actions in the Eastern District of Michigan. He has gained a reputation commensurate with that of Mr. Miller, with whom he used to practice at The Miller Law Firm. Based upon the above analysis, in my opinion his $725/hr. hourly rate is reasonable.

40.     As previously stated, I am also familiar with the work, experience, and reputation of Marc L. Newman, who has 20 years' experience. As defense counsel I have opposed Mr. Newman in class cases, and am personally aware that he frequently appears in class actions in the Eastern District of Michigan. Based upon my personal knowledge of his work, experience, and reputation—and upon the above analysis—in my opinion his $695/hr. rate is reasonable.

41.     I have reviewed the hourly rates of the more junior partners and the associates as reflected in lodestar calculation of The Miller Law Firm. In my opinion, these rates are reasonable based on two primary factors:

- A review of the hourly rates reflected in Exhibits B-D, attached, for more junior partners and associates at the Honigman, Schiff, Hardin, and Milberg firms, respectively; and, separately

- A review of these rates in comparison with the rates charged by Messrs. Miller, Fink (while at The Miller Firm), Newman, and Novak. As stated previously, it is common practice for law firms to based rates for less experienced partners and for associates as a fraction of the rates charged by the most senior attorneys in the same practice areas at those firms.

11

I also base my opinion that these rates are reasonable on my own experience in the class action field practicing at large law firms for over 20 years.

42.     I have reviewed the hourly rates charged by the paralegals at The Miller Firm as reflected in the Petition. In my opinion, based on the data reflected in Exhibits B-D, attached, and on my general experience, these rates are reasonable.

43.     I have reviewed the separate lodestar submitted by Fink + Associates, Hedlund Declaration Exhibit 6, which reflects separately the hours charged at that firm by two attorneys who previously were associated with The Miller Firm—David Fink and Darryl Bressack and a single paralegal. As the Fink + Associates lodestar reflects the same hourly rates for these two attorneys as does The Miller Law Firm lodestar, in my opinion the rates of Fink + Associates are reasonable for the same reasons set forth above.

**Sommer Schwartz and The Law Offices of Lance C. Young**

44.     I have reviewed the lodestar calculation submitted by Sommer Schwartz P.C., as reflected in the Declaration of Jason J. Thompson, Docket # 155-5 (Exhibit 16 to the Hedlund Declaration,) (Lodestar = $672,965.00).

45.     As reflected in Exhibit A to the Thompson Declaration, Sommer Schwartz has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column based upon my own research (including licensing data available online at www.michbar.org ) and supplied by the firm:

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|------|--------|-------------|-------------|----------------|------------|
| Jason J. Thompson | (P) | $565.00 | 580.35 | $ 327,898.00 | 22 |
| Lance C. Young | (P) | $565.00 | 541.60 | $ 306,004.00 | 20 |
| Lisa Mikalonis | (P) | $530.00 | 36.10 | $ 19,133.00 | 18 |

| Andrew Kochanowski | (P) | $550.00 | 5.00 | $ | 4,125.00 | 30 |
| Jesse Young | (A) | $265.00 | 1.30 | $ | 347.50 | 5 |
| Krista Taylor | (A) | $315.00 | 4.50 | $ | 1,125.00 | 9 |

46.     In my opinion, the rates reflected in this table are reasonable.

47.     The bulk of the Sommer Schwartz lodestar reflects the work of Messrs. Thompson and Lance C. Young. I do not know Mr. Thompson personally, but know of him by reputation (and have referred clients to him). I know Mr. Young personally, and have appeared in cases with him over the years (as opposing counsel). I am also familiar with his professional standing by virtue of work he had done over the years with the ABA CADS committee, including authoring a widely regarded compendium of state class action rules. In my opinion, the $565/hr. rates for each of these attorneys is reasonable.

48.     For the same reasons, in my opinion the identical hourly rate of $565/hr. reflected in the separate lodestar submitted by The Law Office of Lance C. Young, Hedlund Declaration Exhibit 18, is reasonable.

49.     For the reasons outlined above with respect to The Miller Law Firm, in my opinion the hourly rates for the other professionals reflected in the Sommer Schwartz lodestar calculation are reasonable as well.

50.     I have reviewed the lodestar calculation submitted by Oliver Law Group PC, as reflected in the July 16, 2014, declaration of Alyson L. Oliver, Docket # Doc # 155-5 (Exhibit 10 to the Hedlund Declaration) (Lodestar = $196,325.50).

51.     As reflected in Exhibit A to the Oliver Declaration, Oliver Law Group PC has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column based upon my own research (including licensing data available online at www.michbar.org ) and supplied by the firm:

13

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|---|---|---|---|---|---|
| Alyson Oliver | (P) | $ 595.00 | 166.70 | $99,186.50 | 14 |
| Nick Suciu | (P) | $ 595.00 | 3.20 | $1,904.00 | 6 |
| Matthew Barsenas | (A) | $ 300.00 | 258.90 | $77,670.00 | 7 |
| Reed Eriksson | (A) | $ 300.00 | 8.70 | $2,610.00 | 1 |
| Lisa Gray | (A) | $ 300.00 | 27.20 | $8,160.00 | 3 |
| Robert Armstrong | (A) | $ 300.00 | 0.30 | $90.00 | 4 |
| Christina Kovacs | (A) | $ 300.00 | 17.10 | $5,130.00 | 3 |

52.     The bulk of the Oliver Law Group PC lodestar reflects the work of Ms. Oliver and of Mr. Barsenas. I do not know Ms. Oliver personally, but know of her by reputation. I do not know of Mr. Barsenas (personally or by reputation). In my opinion, the $595/hr. rate for Ms. Oliver and the $300/hr. rate for Mr. Matthew Barsenas—and the rates of the other professionals reflected in the Oliver Law Group lodestar—are reasonable for the reasons outlined above with regard to The Miller Law Firm.

53.     I have reviewed the lodestar calculation submitted by Johnston, Sztykiel, Hunt, Goldstein, Fitzgibbons & Clifford, as reflected in the July 27, 2014, declaration of Eric S. Goldstein, Docket # 155-5 (Exhibit 17 to the Hedlund Declaration) (Lodestar = $49,900.00).

54.     In my opinion, the $500/hr. rate reflected in the lodestar table attached to the Goldstein Declaration is reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, Mr. Goldstein's Southeast Michigan location and his 22 years' experience.

**Class Counsel Outside of Michigan**

55.     I have reviewed the lodestar calculation submitted by Cohen Milstein Sellers & Toll PLLC, of Washington, D.C., as reflected in the July 21, 2014, declaration of Daniel A. Small, Docket # Doc # 155-5 (Exhibit 2 to the Hedlund Declaration) (Lodestar = $4,007,513.75).

56.     As reflected in Exhibit A to the Small Declaration, Cohen Milstein has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm:

| Name | Status | Hours | Rate | Total Lodestar | Experience |
|------|--------|-------|------|---------------|------------|
| Small, Daniel | P | 1,246.00 | $795 | $   922,252.50 | 25+ |
| Dominguez John | P | 1.25 | $675 | $       762.50 | 19 |
| Brown, Benjamin, D. | P | 64.75 | $665 | $    34,672.50 | 17 |
| Konopka, Kathleen | OC | 5.00 | $560 | $     2,525.00 | 17 |
| Cormier, Christopher, J. | P | 0.25 | $605 | $       118.75 | 12 |
| Johnson, Brent | P | 1,460.75 | $595 | $   774,396.25 | 11 |
| Alicia Gutierrez | CA | 84.50 | $420 | $    35,490.00 | 12 |
| Ossakow, Ian | CA | 382.50 | $415 | $   158,737.50 | 16 |
| Alexander, Laura | A | 26.00 | $475 | $    10,340.00 | 7 |
| Levens, Emmy | A | 1.00 | $475 | $       395.00 | 7 |
| Dubner, Jeff | A | 39.50 | $440 | $    17,380.00 | 5 |
| Clarke, Suzanne | I | 1.50 | $420 | $       615.00 |  |
| Gebrewold, Besrat | A | 90.25 | $395 | $    38,325.00 | 7 |
| Benner, David | A | 358.50 | $390 | $   136,230.00 | 9 |
| Tran, Ngan | CA | 754.75 | $350 | $   264,162.50 | 8 |
| Boone, Meghan | A | 1,787.25 | $415 | $   633,586.25 | 4 |
| Cacace, Robert | A | 525.25 | $370 | $   183,193.75 | 6 |
| Bush Veltre, Brenna | A | 901.00 | $310 | $   271,170.00 | 4 |
| Prince, Joshua | A | 2.00 | $330 | $       617.50 | 5 |
| Schmitz, Aaron | A | 82.25 | $335 | $    26,731.25 | 6 |
| Oak, Lindsay | CA | 336.00 | $260 | $    87,360.00 | 3 |
| Ayyagari, Srinivas | CA | 154.25 | $290 | $    44,732.50 | 5 |
| Pavesner, Seth | CA | 507.00 | $290 | $   147,030.00 | 5 |

57.     Over the years I have represented defendants in antitrust class actions in which Mr. Small served as opposing counsel. In particular, I represented Abbott Laboratories as lead counsel in defense of an antitrust class action brought in Michigan alleging that Abbot Laboratories and two other defendants (one of whom was represented by Mr. Ettinger) conspired to fix prices of

15

infant formula. I dealt frequently with Mr. Small in that case, and with his partner at the time, Michael Hausfeld—a nationally prominent plaintiffs' antitrust class action attorney. I am personally aware that over the years Mr. Small has established a national reputation in this field as well. I familiar with the efforts, abilities, skill level, and reputation of Mr. Small.

58.    In my opinion the hourly rates reflected in the loasdstar table submitted by Cohen Milstein are reasonable. In particular, Mr. Small's rate of $795/hr.—only $15/hr. above that of Messrs. Ettinger and Cutner, and just below that of Mr. Novak—is reasonable in my view.

59.    Based on the years of experience of the other attorneys reflected in the Cohen Milstein lodestar, the relationship of their rates to that of Mr. Small, the reputation of the firm in the field of antitrust class actions, the location of the firm's offices in Washington, D.C., and my 25 years of experience in the field, in my opinion the rates reflected for the other professionals listed in the Cohen Milstein lodestar are reasonable as well, with one relatively minor caveat.[2]

60.    I have reviewed the lodestar calculation submitted by Wolf Haldenstien Adler Freeman & Herz LLP, as reflected in the July 22, 2014, declaration of Fred Taylor Isquith, Docket # 155-5 (Exhibit 3 to the Hedlund Declaration) (Lodestar = $3,785,840.50).

61.    As reflected in Exhibit A to the Isquith Declaration, Wolf Haldenstein has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm:

---

[2] The Cohen Milstein lodestar table lists 1,787.25 hours at $415/hr. for Meghan Boone, an Associate who my research indicates is a 2010 graduate of American University, Washington College of Law, and that she clerked for the United States Court of Appeals before joining the firm. The resulting lodestar for Ms. Boone's work is $633,586.25. While $415/hr. may be a reasonable rate for Ms. Boone's work, I lack sufficient information to draw this conclusion at present. Based on the information presently available—including a detailed review of the backgrounds, rates, and experience of the other Cohen, Milstein attorneys reflected in the lodestar table submitted by Mr. Small, I am comfortable concluding that at $385/hr., Ms. Boone's rate would be reasonable. If this rate were applied to her hours, the resulting calculation would result in a $53,617.50 reduction in the firm's overall lodestar (a 1.34% reduction).

| Name | Status | Rate | Total Hours | Total Lodestar | Experience |
|------|--------|------|-------------|----------------|------------|
| Daniel W. Krasner | (P) | $910.0 | 32. | $ 29,484.00 | 25+ |
| Fred T. Isquith | (P) | $860.0 | 478. | $ 411,252.00 | 25+ |
| Mary Jane Fait | (P) | $835.0 | 752. | $ 628,003.50 | 25+ |
| Adam J. Levitt | (P) | $825.0 | 0.60 | $ 495.00 | 21 |
| Peter C. Harrar | (P) | $785.0 | 1.00 | $ 785.00 | 25+ |
| Alexander H. | (P) | $730.0 | 19. | $ 14,235.00 | 25+ |
| Theodore B. Bell | (M) | $565.0 | 1933 | $ 1,092,427.50 | 22 |
| Julie A. Swanson | (OC) | $635.0 | 110. | $ 69,913.50 | 25+ |
| Alicia R. Gutierrez | (CA) | $250.0 | 174. | $ 43,500.00 | 12 |
| John E. Tangren | (A) | $550.0 | 447. | $ 245,960.00 | 11 |
| Carl V. Malmstrom | (A) | $470.0 | 30. | $ 14,429.00 | 7 |
| Beth A. Landes | (A) | $375.0 | 1239 | $ 464,775.00 | 4 |
| Patrick H. Moran | (A) | $470.0 | 32. | $ 15,040.00 | 11 |
| Edmund S. | (A) | $450.0 | 7.50 | $ 3,375.00 | 9 |

62.     As reflected in the above table, the two largest contributors to the Wolf Haldenstein lodestar were Mary Jane Fait and Theodore Bell, both of the Chicago office. Their hour rates are listed as $865 and $565, respectively.

63.     I personally know Ms. Fait by work experience and by reputation. In 2012 I invited her to sit on a panel at the ABA National Institute on Class Actions exploring the applicability of the Supreme Court's *Daubert* decision regarding the admissibility of expert opinion testimony as applied to economists who testify at class certification hearings in antitrust cases. I have also studied in my practice important class action decisions in cases in which Ms. Fait has served as lead counsel.

64.     Based on my knowledge of her experience, work, and reputation—and on the material discussed in connection with The Miller Law Firm, *supra*—in my opinion the hourly rate of $835/hr. for Ms. Fait is reasonable. In my opinion, the lower hourly rate of $565 for Mr. Bell in the same office is reasonable as well.

65.     I know Mr. Krasner of the New York office of Wolf Haldenstein only by reputation, and do not personally know Mr. Isquith. Based on a review of their backgrounds and experience as reflected on their firm website, and on their location in New York City, in my opinion the hourly rates reflected in the lodestar table for these attorneys is reasonable.

66.     I have reviewed the hourly rates listed for the other Wolf Haldenstein professionals listed in the above table and, based on the same analysis as reflected in my discussion of The Miller Law Firm and the experience of the attorneys involved, it is my opinion that those rates are reasonable.

67.     I have reviewed the lodestar calculation submitted by Gustafson Gluek PLLC, as reflected in the July 22, 2014, declaration of Daniel C. Hedlund, Docket # 155-5 (Exhibit 1 to the main Hedlund Declaration) (Lodestar = $2,386,137.50).

68.     As reflected in Exhibit A to the aforementioned Hedlund Declaration, Gustafson Gluek has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm:

| Name | Status | Hourly | Total | Total Lodestar | Experience |
|------|--------|--------|-------|----------------|------------|
| Daniel Gustafson | (P) | $ 900.00 | 335.00 | $ 301,500.00 | 25 |
| Karla Gluek | (P) | $ 775.00 | 0.50 | $ 387.50 | 21 |
| Daniel Hedlund | (P) | $ 700.00 | 819.25 | $ 573,475.00 | 19 |
| Jason Kilene | (P) | $ 700.00 | 18.25 | $ 12,775.00 | 20 |
| Amanda Williams | (P) | $ 500.00 | 194.75 | $ 97,375.00 | 10 |
| Cathy Smith | (P) | $ 500.00 | 1.00 | $ 500.00 | 9 |
| David Goodwin | (A) | $ 425.00 | 0.25 | $ 106.25 | 8 |
| Michelle Looby | (A) | $ 425.00 | 99.00 | $ 42,075.00 | 7 |
| Sara Payne | (A) | $ 400.00 | 8.25 | $ 3,300.00 | 6 |
| Joe Bourne | (A) | $ 385.00 | 256.00 | $ 98,560.00 | 5 |
| Josh Rissman | (A) | $ 375.00 | 44.50 | $ 16,687.50 | 4 |
| Ellen Ahrens | (A) | $ 375.00 | 1775.75 | $ 665,906.25 | 4 |
| Raina Borrelli | (A) | $ 350.00 | 3.25 | $ 1,137.50 | 3 |
| Dan Nordin | (A) | $ 350.00 | 689.25 | $ 241,237.50 | 3 |
| Lucy Massopust | (A) | $ 335.00 | 18.50 | $ 6,197.50 | 2 |
| Cory Carpenter | (CA | $ 315.00 | 549.75 | $ 173,171.25 | 2 |

69.     I do not personally know the attorneys at Gustafson Gluek, but have reviewed their background and experience from publically available sources, and obtained additional background information on Ms. Ahrens' background and experience. In my opinion, with one relatively minor exception, the hourly rates reflected in the lodestar table submitted by Gustafson Gluek are reasonable.[3]

70.     I have reviewed the lodestar calculation submitted by Berger & Montague, as reflected in the July 16, 2014, declaration of Eric L. Cramer, Docket # 155-5 (Exhibit 5 to the Hedlund Declaration) (Lodestar = $644,987.50).

---

[3] The Gustafson Gluek lodestar table lists 335 hours at $900/hr. for Daniel Gustafson, the managing partner of the firm and an accomplished class action antitrust litigator who has practiced law since 1989. The resulting lodestar for Mr. Gustafson's work is $301,500. While $900/hr. may be a reasonable rate for Mr. Gustafson's work, I lack sufficient information to draw this conclusion at present. Based on the information presently available—including a detailed review of the backgrounds, rates, and experience of the other class counsel and the information discussed *supra* with respect to The Miller Law Firm, I am comfortable concluding that at $775/hr., Mr. Gustafson's rate would be reasonable. If this rate were applied to his hours, the resulting calculation would result in a $41,875 reduction in the firm's overall lodestar (a 1.75% reduction).

71.     As reflected in Exhibit A to the Cramer Declaration, Berger & Montague has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm:

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|------|--------|-------------|-------------|----------------|------------|
| Eric L. Cramer | (P) | $  875.00 | 206.30 | $180,512.50 | 21 |
| Ellen T. Noteware | (SC) | $  550.00 | 844.50 | $464,475.00 | 21 |

72.     I have work experience with Mr. Cramer, who was a member of the plaintiffs' steering committee in *In re Cardizem CD*. I have also litigated other complex class action cases brought by his firm, Berger & Montague, including *In re Comshare Inc.*, *Securities Litigation* (Zatkoff, J.)*,* and have been familiar with their reputation for many years. I do not personally know Ms. Noteware, but have reviewed data on her background and experience available through the firm website and PACER.

73.     The blended rate of the Berger & Montague lodestar is $614/hr. Based on the Philadelphia, PA, location and on the experience and experience of Mr. Cramer and Ms. Noteware, in my opinion their hourly rates—individually and viewed as a blended rate—are reasonable.

74.     I have reviewed the lodestar calculation submitted by Zimmerman Reed, as reflected in the July 22, 2014, declaration of Anne E. Regan, Docket # Doc # 155-5 (Exhibit 14 to the Hedlund Declaration) (Lodestar = $620,498.00).

75.     As reflected in Exhibit A to the aforementioned Regan Declaration, Zimmerman Reed has submitted a lodestar calculation based on the hourly rates reflected in the following table supplemented by the "experience" column supplied by the firm:

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|---|---|---|---|---|---|
| David Cialkowski | (P) | $ 595.00 | 192.40 | $114,478.00 | 16 |
| Brian Gudmundson | (P) | $ 550.00 | 112.70 | $61,985.00 | 10 |
| Anne Regan | (P) | $ 550.00 | 403.45 | $221,897.50 | 11 |
| Aditya (Adi) Bharadwaj | (A) | $ 250.00 | 271.35 | $67,837.50 | 3 |
| June Hoidal | (A) | $ 450.00 | 202.65 | $91,192.50 | 11 |
| Michael Divine | (A) | $ 250.00 | 10.25 | $2,562.50 | 2 |

76.     In my opinion, the rates reflected in the above table are reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, the firm's Minneapolis, MN, location and the experience of the attorneys.

77.     I have reviewed the lodestar calculation submitted by Kohn, Swift & Graft, P.C., as reflected in the July 17, 2014, declaration of William E. Hoese, Docket # 155-5 (Exhibit 9 to the Hedlund Declaration) (Lodestar = $ 439,093.00).

78.     As reflected in Exhibit A to the Hoese Declaration, Kohn Swift has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm:

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|---|---|---|---|---|---|
| DOUGLAS A. ABRAHAMS | (SH) | $ 635.00 | 0.50 | $317.50 | 25+ |
| WILLIAM E. HOESE | (SH) | $ 635.00 | 35.80 | $22,733.00 | 25+ |
| CRAIG W. HILLWIG | (SH) | $ 550.00 | 254.80 | $140,140.00 | 21 |
| DAVID BENNER | (A) | $ 350.00 | 264.75 | $92,662.50 | 9 |
| IAN OSSAKOW | (A) | $ 350.00 | 230.75 | $80,762.50 | 16 |
| LINDSAY OAK | (A) | $ 350.00 | 285.25 | $99,837.50 | 3 |

79.      In my opinion, the rates reflected in the above table are reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, the firm's Philadelphia, PA, location and the experience of the attorneys.

80.      I have reviewed the lodestar calculation submitted by the Law Offices of David Balto, as reflected in the July 15, 2014, declaration of David A. Balto, Docket # 155-5 (Exhibit 11 to the Hedlund Declaration) (Lodestar = $317,915.00).

81.      As reflected in Exhibit A to the Balto Declaration, The Law Offices of David Balto have submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm:

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|------|--------|-------------|-------------|----------------|------------|
| David Balto | (P) | $    600.00 | 67.40 | $       40,440.00 | 20 |
| Spencer Baldwin | (A) | $    300.00 | 848.00 | $     254,400.00 | 3 |
| Bradley Wasser | (A) | $    250.00 | 92.30 | $       23,075.00 | 4 |

82.      In my opinion, the rates reflected in the above table are reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, the firm's Washington, D.C., location and the experience of the attorneys.

83.      I have reviewed the lodestar calculation submitted by NastLaw LLC, as reflected in the July 16, 2014, declaration of Dianne M. Nast, Docket # 155-5 (Exhibit 13 to the Hedlund Declaration) (Lodestar = $302,406.00).

84.      As reflected in Exhibit A to the Nast Declaration, NastLaw LLC has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm:

22

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|------|--------|-------------|-------------|----------------|------------|
| Dianne M. Nast | (P) | $  750.00 | 16.30 | $ 12,225.00 | 25+ |
| Erin C. Burns | (A) | $  510.00 | 524.30 | $ 267,393.00 | 12 |
| Matthew A. Reid | (A) | $  395.00 | 53.00 | $ 20,935.00 | 3 |

85.     In my opinion, the rates reflected in the above table are reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, the firm's Philadelphia, PA, location and the experience of the attorneys.

86.     I have reviewed the lodestar calculation submitted by Lockridge Grindal Nauen PLLP, as reflected in the July 16, 2014, declaration of Richard A. Lockridge, Docket # 155-5 (Exhibit 12 to the Hedlund Declaration) (Lodestar = $302,406.00).

87.     As reflected in Exhibit A to the Lockridge Declaration, Lockridge Grinda has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm:

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|------|--------|-------------|-------------|----------------|------------|
| Richard A. Lockridge | (P) | $  775.00 | 73.00 | $ 56,575.00 | 25+ |
| W. Joseph Bruckner | (P) | $  750.00 | 16.50 | $ 12,375.00 | 25+ |
| Chris K. Sandberg | (P) | $  625.00 | 361.25 | $ 225,781.25 | 25+ |

88.     In my opinion, the rates reflected in the above table are reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, the firm's Minneapolis, MN, location and the experience of the attorneys.

89.     I have reviewed the lodestar calculation submitted by Finkelstein Thompson LLP, as reflected in the July 18, 2014, declaration of Michael G. McLellan, Docket # Doc # 155-5 (Exhibit 7 to the Hedlund Declaration) (Lodestar = $254,431.00).

90.    As reflected in Exhibit A to the McLellan Declaration, Finklestein Thompson has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm

| Name | Status | Rate | Hours | Total Lodestar | Experience |
|------|--------|------|-------|----------------|------------|
| Douglas G. Thompson, Jr. | (P) | $ 830.00 | 0.30 | $ 255.00 | 25+ |
| L. Kendall Satterfield | (P) | $ 750.00 | 25.00 | $ 18,750.00 | 25+ |
| Michael G. Mclellan | (P) | $ 575.00 | 195.60 | $ 112,470.00 | 11 |
| Donald A. Resnikoff | (OC) | $ 660.00 | 93.00 | $ 61,380.00 | 25+ |
| Stan M. Doerrer | (A) | $ 450.00 | 130.40 | $ 58,680.00 | 9 |

91.    In my opinion, the rates reflected in the above table are reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, the firm's Washington, D.C., location and the experience of the attorneys.

92.    I have reviewed the lodestar calculation submitted by Wexler Wallace LLP, as reflected in the July 22, 2014, declaration of Mark R. Miller, Docket # 155-5 (Exhibit 15 to the Hedlund Declaration) (Lodestar = $125,512.50).

93.    As reflected in Exhibit A to the Mark Miller Declaration, Wexler Wallace has submitted a lodestar calculation based on the hourly rates reflected in the following table, supplemented by the "experience" column supplied by the firm

| Name | Status | Hourly Rate | Total Hours | Total Lodestar | Experience |
|------|--------|-------------|-------------|----------------|------------|
| Kenneth A. Wexler | (P) | $ 725.00 | 10.30 | $ 7,467.50 | 25+ |
| Edward A. Wallace | (P) | $ 650.00 | 32.50 | $ 21,125.00 | 19 |
| Amy E. Keller | (A) | $ 475.00 | 80.30 | $ 38,142.50 | 9 |
| Kara A. Elgersma | (A) | $ 575.00 | 1.00 | $ 575.00 | 14 |
| Mark R. Miller | (A) | $ 575.00 | 95.10 | $ 54,682.50 | 10 |

94.     In my opinion, the rates reflected in the above table are reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, the firm's Chicago, IL, location and the experience of the attorneys.

95.     I have reviewed the lodestar calculation submitted by Freedman Boyd Hollander Goldbeg Urias and Ward P.A., as reflected in the July 21, 2014, declaration of Joseph Goldberg, Docket # 155-5 (Exhibit 8 to the Hedlund Declaration) (Lodestar = $72,311.75).

96.     In my opinion, the rates reflected in the lodestar table attached to the Goldberg Declaration are reasonable, taking into account the factors identified in connection with my review of The Miller Law Firm rates, *supra*, the firm's Albuquerque, NM, location and the experience of the attorneys.

*     *     *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 21, 2014, in Ann Arbor, Michigan.

/s/ *Andrew J. McGuinness*
Andrew J. McGuinness

25

# AJM DECL. EXHIBIT A

Keely E. Duke
ISB 6044; ked@dukescanlan.com
Kevin J. Scanlan
ISB 5521; kjs@dukescanlan.com
Duke Scanlan & Hall, PLLC
1087 W. River Street, Suite 300
Boise, ID 83707
Telephone: (208) 342-3310
Facsimile:(208) 342-3299

David Ettinger
dettinger@honigman.com
Lara Fetsco Phillip
lara.phillip@honigman.com
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone (313) 465-7368
Facsimile (313) 465-7397

*Attorneys for Saint Alphonsus Medical Center-Nampa, Inc., Saint Alphonsus Health System, Inc., and Saint Alphonsus Regional Medical Center, Inc.*

UNITED STATES DISTRICT COURT

IN THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS MEDICAL CENTER - NAMPA, INC., TREASURE VALLEY HOSPITAL LIMITED PARTNERSHIP, SAINT ALPHONSUS HEALTH SYSTEM, INC., AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.<br><br>Plaintiffs,<br><br>v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD.<br><br>Defendant. | Case No. 1:12-CV-00560-REB<br><br>**DECLARATION OF DAVID A. ETTINGER** |

STATE OF IDAHO          )
                                          ) ss.
County of Ada              )

<u>**DECLARATION OF DAVID ETTINGER**</u>

David Ettinger states as follows:

1.      I am lead counsel for Saint Alphonsus Health System and its wholly owned subsidiaries, Saint Alphonsus Medical Center-Nampa, Inc. and Saint Alphonsus Regional

**DECLARATION OF DAVID A. ETTINGER - 1**

Medical Center, Inc. ("Saint Alphonsus") in the captioned matter, and head the Antitrust and Trade Regulation Practice Group at Honigman Miller Schwartz & Cohn LLP. I have knowledge of the facts set forth in this declaration from my personal experience and work at Honigman. This declaration is filed in support of Saint Alphonsus' Motion for Attorneys' Fees and Costs.

2.     This declaration is intended to address (a) the overall work performed by counsel on behalf of Saint Alphonsus, and (b) the specific efforts of my law firm, Honigman, and the document review lawyers we engaged. Keely Duke of Duke Scanlan LLC, who also represents Saint Alphonsus, is submitting a declaration relating to the specific efforts of her firm.

**Background and Experience**

3.     I and my firm have extensive experience in health care antitrust matters. I have been litigating health care antitrust cases for my entire legal career, more than 35 years. My work has included more than 20 litigated health care antitrust cases, including two prior cases involving health care mergers. I have also been extensively involved in the defense of government investigations of health care transactions and advice to clients on the antitrust implications of contemplated transactions. I've worked on health care antitrust matters in more than 25 states. I've also spoken on health care antitrust matters at programs of the American Health Lawyers Association, National Health Lawyers Association, American Bar Association, Texas Bar Association, Indiana Bar Association, Michigan Bar Association, New Jersey Bar Association, and numerous private groups. I've written numerous articles and monographs on health antitrust issues. I have been recognized by the National Law Journal as one of the top 40 health care lawyers in the United States. Materials describing my and Honigman's relevant experience are attached hereto as Exhibit 1.

4.     The lawyers from Honigman supporting me in this case are also very experienced antitrust lawyers:

**DECLARATION OF DAVID A. ETTINGER - 2**

     a.     Lara Phillip has worked with me on antitrust matters for seven years and previously was a litigator who worked on numerous major antitrust cases at Clifford Chance, and its predecessor firm Rogers & Wells, in New York since 1995. A copy of Ms. Phillip's bio is attached hereto as Exhibit 2.

     b.     Peter Boivin has spent his entire 13 year career working on antitrust issues. He began at Cleary Gottlieb in Washington, DC and Brussels. He focused on health antitrust matters while working with me from 2006 to 2013. Recently Pete left Honigman and is now in-house antitrust counsel at General Motors.

     c.     Brock Swartzle and Paul Fabien have each worked with me on antitrust matters for at least 8 years.

5.     Honigman (under my leadership) also has substantial prior experience in the specific issues that have arisen in this case:

     a.     We've litigated relevant market issues in health care matters on at least eight occasions.

     b.     Honigman has successfully defended government antitrust investigations of physician mergers and acquisitions in Pennsylvania and Indiana, and we have advised clients on such acquisitions and mergers in a variety of states. Additionally, we've litigated at least five antitrust cases brought by physicians which involved relevant physician markets, including primary care physician markets.

     c.     We've litigated two antitrust cases involving hospital mergers and have defended numerous FTC and Department of Justice investigations of hospital mergers.

     d.     Honigman has analyzed and developed efficiencies defenses in a number of merger cases and investigations, both in health care and in other industries.

**DECLARATION OF DAVID A. ETTINGER - 3**

e. We've also brought a number of plaintiff's antitrust cases both in and outside of the health care area, against such defendants as a number of Blue Cross Blue Shield plans and IBM.

f. We also have specific experience in cases involving preliminary injunctions on antitrust matters, including the defense of two cases (one private and one brought by the government) which sought preliminary injunctions against health care mergers.

6. This case was highly complex, and involved a number of novel issues. It was only the second litigated antitrust case of which I'm aware involving acquisition of physician practices. It's the only litigated antitrust case of which I'm aware addressing a hospital acquisition of a physician practice or the impact of such an acquisition on physician referrals of patients. It was also the first case of which I'm aware of in which a defendant argued that the needs of health care reform justify hospital acquisition of physician practices.

7. I believe that our extensive health care antitrust experience has equipped us to effectively represent Saint Alphonsus in this novel case. The effective conduct of this case required a detailed knowledge of antitrust economics, of the complex markets in health care and the manner in which health care markets are currently changing. I don't believe that a firm without deep experience in health care antitrust could have litigated this case effectively, given its numerous complex issues and the rapid pace with which it has been conducted.

8. I've also had significant prior experience for Saint Alphonsus in Idaho. In 2005, I analyzed the Treasure Valley and Magic Valley area markets and St. Luke's activity in those markets for Saint Alphonsus. Additionally, in 2009, I performed an antitrust analysis of what became Saint Alphonsus' acquisition of Mercy Medical Center and two other Catholic Health

**DECLARATION OF DAVID A. ETTINGER - 4**

Initiative hospitals, and responded to FTC questions relating to the Hart Scott Rodino Act filing for that transaction. Therefore, at the time that my efforts in this case began, I already had substantial knowledge of the area, its history and many of the major players.

9. Because of this experience, we were able to proceed with this case without the need for the time and expense of substantial legal research or education in the relevant markets. This saved substantial expense for Saint Alphonsus, and significantly reduced the legal fees involved in the case.

10. In my efforts over 30 years in practicing health antitrust law, I have become quite familiar with the identity and locations of other attorneys who specialize in this work across the United States. I have worked with them on other merger matters and other litigation, and have encountered them at seminars and other educational programs. In my experience, there are no lawyers who specialize in health antitrust matters (or antitrust matters generally) in the Boise area or in Idaho. While there are certainly many fine litigators in this area (my co-counsel Keely Duke among them), none have the experience in health antitrust that would allow them to practice as an efficient and effective "first chair" in a major health antitrust case such as this one.

**Legal Work Involved in the Case – Rates And Hours**

11. Saint Alphonsus has been represented by Honigman Miller Schwartz & Cohn LLP as lead counsel, Duke Scanlan as local counsel, and Gnoesis, providing attorneys engaged in review of the hundreds of thousands of documents produced in this case.

12. Honigman's agreement with Saint Alphonsus is that Saint Alphonsus will pay our reasonably incurred legal fees on projects assigned by Saint Alphonsus at rates agreed upon by Saint Alphonsus, plus costs incurred, when properly documented. All the attorneys' fees for which Saint Alphonsus is seeking reimbursement from Honigman were paid by Saint Alphonsus pursuant to this agreement.

**DECLARATION OF DAVID A. ETTINGER - 5**

13.  Total legal fees for which Saint Alphonsus requests recovery from Honigman and Gnoesis are as follows:

Honigman Miller Schwartz & Cohn LLP:                          $5,314,593

Gnoesis:                                                      $1,171,608

14.  The average hourly rates for these firms are as follows:

Gnoesis:                                                         $35[1]

Honigman Miller Schwartz & Cohn LLP:                            $377

Honigman's hourly rates ranged from $ 150 to $ 770[2] (for my

work)

15.  The number of hours for which Saint Alphonsus seeks recovery for these firms are as follows:

Honigman Miller Schwartz & Cohn LLP:                      14,109.00 hours

Gnoesis:                                                  33,129.85 hours

16.  The fees for which Saint Alphonsus seeks to be reimbursed only relate to this litigation, and do not relate to the FTC/Idaho Attorney General investigation which preceded it.

17.  Spreadsheets describing the efforts, hours and legal fees of Honigman and Gnoesis are attached hereto as Exhibits 3 and 4 respectively. A small number of Honigman's time entries regarding communications with prospective third party witnesses and other privileged matters have been generalized so as not to reveal privileged information. Other

---

[1] All Gnoesis attorneys were billed at $35 per hour, except for Jeffrey Roush, an attorney who managed the effort, who was billed at $45.

[2] My rate increased to $780 in January, 2014. My time in January for which reimbursement is being sought is under 10 hours.

**DECLARATION OF DAVID A. ETTINGER - 6**

entries have been revised to provide context and more detail in order to assist the Court in assessing the reasonableness of the time expended.

18.     I believe that the fees involved have been reasonable, both as to the rates, and the number of hours.  We have worked hard to represent our clients as economically as possible, given the extraordinary demands of this case.  We have avoided duplication whenever possible and used the professionals with the lowest rates available who could effectively perform the work.  Our rates on this matter have been discounted from our standard rate levels.

19.     My annual responsibilities as head of the Antitrust Practice Group at Honigman include recommendations for my hourly rate and the hourly rates of other Honigman personnel practicing in the antitrust area.   In order to perform these responsibilities, I annually study extensive data provided to us relating to attorney rates around the United States in a variety of practice areas.   This information comes from public surveys such as those performed by the National Law Journal, described further below, and bankruptcy court filings that list hourly rates in connection with fee applications.

20.     I regularly set my personal standard rate at a level slightly below the rates charged by the most senior partners at Chicago-area firms.   These rates are significantly below the top rates charged by senior partners in New York and Washington, D.C.  These are the cities whose data I examine because most leading antitrust lawyers (especially health antitrust lawyers) are located in these venues.   This approach was taken for each of at least the last several years, including each year in which work was done for this case.

21.     The National Law Journal's 2012 survey of hourly billing rates at AmLaw 250 firms confirms that the hourly billing rates of the most senior partners at AmLaw 250 firms in Chicago, New York, and Washington D.C. are significantly higher than my hourly billing rate.

**DECLARATION OF DAVID A. ETTINGER - 7**

(Ex. 5 hereto). The National Law Journal 2012 AmLaw 250 Annual Billing Survey reported hourly rates of $835 for senior partners at two of the three participating Chicago firms (Brinks Hofer and Vedder Price); hourly senior partner rates ranging from $960 - $1,200 at Washington DC firms; and hourly senior partner rates as high as $1,200 per hour at New York firms.

22. A review of fee applications and orders approving fees of antitrust lawyers in a number of recent bankruptcy cases supports the conclusion that Honigman's hourly rates are indeed below that of leading antitrust lawyers in markets like Chicago, New York and Washington DC. Indeed, my hourly rates are well below those of senior antitrust attorneys at Sidley Austin, St. Luke's counsel. *See e.g.* Order Approving Final Fee Applications and corresponding Fee Applications in *In re Dynegy Holdings, LLC*, Case No. 11-38111 (S.D.N.Y) (approving attorney fees for Sidley Austin, including fees for John Lavelle, an antitrust lawyer with approximately 18 years experience, at an hourly rate of $850) (Ex. 6 hereto); *In re Tribune Company*, Case No. 08-131141 (U.S. Bank Ct. D. Del) (approving attorney fees for debtor's counsel, Sidley Austin, including fees for John Treece, a Chicago-based antitrust lawyer, at an hourly rate of $850) (Ex. 7 hereto).

23. A review of fee applications and orders from additional bankruptcy matters demonstrate that my hourly rate is significantly below antitrust lawyers in New York and Washington D.C. *In re AMR Corporation*, Case No. 11-15463 (approving attorney fees for Skadden Arps, including fees for James Keyte, a New York based antitrust lawyer at an hourly rate of $1,135) (U.S. Bank. Ct. S.D.N.Y.) (Ex. 8 hereto); and *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (approving attorney fees for Weil Gotshal & Manges LLP, including fees for Ralph Miller, a Washington based antitrust lawyer at a rate of $1,000 per hour) (U.S. Bank. Ct. S.D.N.Y.) (Ex. 9 hereto); *In re Tribune Company,* Case No. 08-13141 (U.S. Bank Ct.

**DECLARATION OF DAVID A. ETTINGER - 8**

D. Del) (approving attorney fees for Jones Day, including fees for Phillip Proger, a Washington based antitrust lawyer with whom I have participated as co-defense counsel in a number of matters, at a rate of $900 per hour) (Ex. 10 hereto). My hourly rate is comparable to the $750 (2010) hourly rate of Phillip Proger's partner, Thomas Demitrack, who is based in Jones Day's Cleveland office and with whom I have also worked as co-defense counsel. See Omnibus Order Awarding Interim Allowance of Compensation for Services Rendered (Dkt. 1759) *In re Qimonda Richmond, LLC,* Case No. 09-10589 (U.S. Bank Ct. D. Del) at Exhibit B. Ex. 11 hereto. Of course, this rate is likely higher today.

### **Work Performed**

24.     We commenced our direct work on this litigation in August of 2012, at a point at which it appeared that St. Luke's and Saltzer could well go forward with their transaction before the Federal Trade Commission and Idaho Attorney General had finished their investigation. We have not requested fees for work done prior to that time. In August, we were authorized by the Saint Alphonsus Health System Board to begin preparing for possible litigation, under the supervision of Saint Alphonsus' General Counsel, Stephanie Westermeier. We were instructed to take these steps though the decision to litigate had not yet been made. The work commencing in August included selection of an expert economist and supporting firm, the beginning of drafting of the initial pleadings seeking a preliminary injunction, and the accumulation and evaluation of evidence to support that request. We continued to work on these pleadings, including our complaint, preliminary injunction brief and declarations in support, until the case was filed in mid-November.

25.     Our extensive work in providing information to the Federal Trade Commission and Idaho Attorney General in connection with their investigations provided a substantial factual, economic and legal foundation for the development of pleadings for this litigation.

**DECLARATION OF DAVID A. ETTINGER - 9**

Nevertheless, because that work was undertaken primarily for a different purpose, we have not sought to obtain reimbursement for the legal fees associated with that work.

26.     Honigman worked with a variety of law firms on this matter.  We took the lead on behalf of Saint Alphonsus, working with our local counsel, Duke Scanlan & Hall.  Until the Federal Trade Commission and Idaho Attorney General filed their case in March, 2013, the case brought by Saint Alphonsus and Treasure Valley Hospital (the "Private Plaintiffs") was the only antitrust case challenging the St. Luke's/Saltzer transaction, and Honigman took the lead in pursuing that case in these early stages.  This involved the gathering of evidence and preparation of pleadings in connection with our Complaint and Motion for Preliminary Injunction, attendance at court hearings, negotiations and argument regarding a case management order, development of deposition schedules, initial requests for production of documents, the review of documents produced by St. Luke's, and the review and production of documents by the Saint Alphonsus entities.  Our work also involved significant interaction with our expert economist Deborah Haas-Wilson and Analysis Group, supporting her, as well as our own extensive market and antitrust analysis of the relevant issues.

27.     Once the FTC and Idaho Attorney General filed their complaint, and their case was consolidated with the Private Plaintiffs' case, our role changed, but was still extensive.  While the two cases contain very significant common elements, there are substantial claims in the Private Plaintiffs' cases that relate to markets not addressed in the government case, including the pediatric primary care, inpatient hospital services, and outpatient surgical facility services markets.  Our efforts involved substantial work on both the common claims as well as the claims that were pursued only by the Private Plaintiffs.

**DECLARATION OF DAVID A. ETTINGER - 10**

28.     We worked extensively with the government enforcement agencies in pursuing the common claims, and in responding to St. Luke's and Saltzer's defenses to those claims, while avoiding duplicative work:

a.     Our efforts included our presentation of the testimony of Saint Alphonsus personnel on the common issues. For example, Nancy Powell's testimony, as former CFO of Saltzer, almost entirely concerned the common elements of both cases.  Karl Keeler's testimony in part concerned entry barriers, also relevant to the common issues of both cases.  Blaine Petersen's testimony concerned provider negotiations with managed care, relevant to market definition as part of the common issues.  Dr. Robert Polk's testimony concerned quality issues and how they are treated at Saint Alphonsus without the need to employ physicians.  Of course, the "quality defense" was offered by St. Luke's in response to all the issues raised by all plaintiffs.

b.     On a number of issues, Honigman was especially able to contribute to the joint efforts of the Plaintiffs because of the fact that our lawsuit had started earlier, and we had already proceeded into beginning discovery at the point in which the Government Plaintiffs became involved.  For example, we deposed Patricia Butterbaugh of Imagine Health three days after the Government Plaintiffs filed their Complaint and before the two cases were consolidated.  That deposition related to the Micron-St. Luke's relationship, and St. Luke's activities with regard to pulling physicians from the Micron network.  We were therefore able to contribute our early thinking and work on this issue to the depositions and testimony going forward.

c.     Honigman learned a great deal about managed care competition in the Treasure Valley through our discussions with Saint Alphonsus personnel.  This provided

DECLARATION OF DAVID A. ETTINGER - 11

us with information that allowed us to contribute significantly to discovery on the managed care issue, and resulted in our taking the lead in some of the early managed care depositions of St. Luke's personnel, including Steve Drake and Randy Billings.

       d.    Similarly, our discussions with Saint Alphonsus on the actions of its primary care physicians gave us insights into the primary care physician market that allowed us to contribute to the Plaintiffs' joint efforts in developing evidence to define the relevant product and geographic markets.

       e.    Honigman's discussions with Saint Alphonsus regarding its relationship with Saltzer Medical Group gave us information concerning the operations of Saltzer, which also allowed us to contribute to Plaintiffs' discovery of Saltzer.

       f.    I have extensive experience in deposing and cross examining experts, particularly economic experts, in part due to my graduate school training in economics and econometrics (statistical analysis as applied to economics). I utilized this experience in cross examining St. Luke's experts, Drs. Argue and Enthoven and Ms. Ahern, all of whom relied in significant part on statistical work and/or statistical academic studies. I also addressed both the common and unique issues in closing argument.

       g.    At trial, I cross examined key defense trial witnesses on the "quality" defense (Enthoven, Pate, Priest, Kee and Souza), the claims regarding the alleged harm to Saltzer from divestiture (Ahern, Kaiser, Kunz and Savage) and the likely competitive harm from the acquisition (Page).

29.    This case involved very substantial deposition discovery, with 82 depositions being taken. (Saint Alphonsus requested an overall limit of 40 depositions, but the number expanded greatly because St. Luke's prevailed in its argument that the deposition limit should be

30 per side and then added substantial numbers of witnesses who plaintiffs needed to depose in order to be adequately prepared for trial.)  Counsel for all plaintiffs divided up lead responsibility for each deposition in order to avoid duplication.

30.    Honigman took the lead in either taking or defending more than 40 of these depositions.    Many of these concerned issues, such as referrals or the defense of Saint Alphonsus' witnesses, which were the exclusive issues of the Private Plaintiffs.    Honigman played a substantial role in taking or defending another 20 depositions.    In order to reduce costs, counsel for Saint Alphonsus did not attend six depositions.    We did not play a major role in the remaining depositions, but needed to attend them, given, among other things, the potential for an impact on the portion of the case applicable to the Private Plaintiffs.[3]

31.    The depositions we took played a very substantial role in the final trial.    At least 21 of the depositions where we took the lead were a source of significant testimony played into the record at trial.    In addition to the defense of depositions of the Saint Alphonsus witnesses, several of whose testimony played a direct role in the Court's Findings of Fact and Conclusions of Law, as described below, I contributed to the preparation of direct examination of other witnesses whose testimony was relied upon by the Court, including Jeff Crouch and Kenneth Kizer.

32.    Our depositions used at trial and our cross and direct examination at trial played a direct role in a wide variety of evidence utilized by the Court in its Memorandum Decision and Order and Findings of Fact and Conclusions of Law.    For example:

---

[3]  15 depositions were taken of Saint Alphonsus personnel.    At least 20 St. Luke's witnesses (who were deposed) were described by St. Luke's in its Revised Provisional Witness List (Dkt 238) dated  May 14, 2013, as offering testimony on Saint Alphonsus, referrals or the issues specifically raised by the Private Plaintiffs.

**DECLARATION OF DAVID A. ETTINGER - 13**

a.     Trial and deposition testimony from Steve Drake and Dr. Mark Johnson elicited by Honigman were used in the Court's findings on geographic market.  *See* Findings of Fact and Conclusions of Law at ¶¶ 63, 68.

b.     Testimony by Chris Roth from my cross examination was utilized by the Court in its conclusions on the market strength of Saltzer and St. Luke's leverage as a result of the transaction.  *Id.* at ¶ 112.

c.     My cross examination of Alain Enthoven regarding the findings of the Berkeley Forum and the Casalino study were utilized in the Court's conclusions on market leverage.  *Id.* at ¶¶ 97, 115.

d.     My examination in the deposition of Peter LaFleur was utilized in the Court's findings on anticompetitive effects.  *Id.* at ¶ 128.

e.     My presentation of testimony from Dr. Deborah Haas-Wilson was utilized in the Court's findings on referrals.  *Id.* at ¶¶ 132, 136, 139.  Saint Alphonsus' lawyers developed essentially all the evidence on the referral issue.

f.     The testimony of Nancy Powell I elicited was utilized in the Court's findings on recruitment and entry.  *Id.* at ¶¶ 211-213.

g.     My cross examination of Dr. Kaiser supported the Court's conclusion that divestiture was appropriate here in light, among other things, of the $9 million payment that Saltzer would retain in the event of divestiture.  Conclusions of Law at ¶ 58.

h.     The Court's references to St. Luke's efforts as experimental was supported by Dr. Pate's and Dr. Enthoven's admissions during my cross-examination.  *Id*. at ¶¶ 69-70.

**DECLARATION OF DAVID A. ETTINGER - 14**

i.  My cross examination of Dr. Argue was referenced by the Court in support of its Findings on referrals.  Findings of Fact at ¶ 132.

j.  I examined Dr. Page on documents relied on by the Court related to Saltzer's expected "clout" after the acquisition.  *Id.* at ¶ 114.

33.  We undertook a number of steps to limit duplication.  We and the government attorneys divided up our work on the briefing, including the Trial Brief and the Proposed Findings of Fact and Conclusions of Law.  In those areas, the FTC and Idaho Attorney General took the lead on the common issues, while Honigman took the lead on the non-overlapping portions.

34.  We also avoided duplication because there was never more than one Saint Alphonsus lawyer present at any given deposition.  We limited Honigman's staffing of the depositions in total to two attorneys, myself and my partner Lara Phillip.  Lara focused on physician depositions, the defense of some of the Saint Alphonsus depositions, and most of the depositions that we needed to cover but in which we did not play a substantial role.  I staffed most of the others that Honigman covered.  A few physician depositions were covered by Keely Duke, who has substantial experience in representing physicians.

35.  Our approach to depositions also reflected our efficient, lean approach to this case.  For example, because of my knowledge of the area and this case, I relied on our support staff to provide potentially relevant documents to me for use in depositions, but did not obtain any assistance in preparing deposition questions.  Nor did I ever draft (or have drafted for me), a full deposition outline.  In some cases, I drafted in advance some of the questions I would utilize.  In other cases, I relied entirely on handwritten notes and identification of the documents I would use.  Given my experience and my intensive involvement in this case, this was sufficient to

conduct what I believe were highly effective depositions, which elicited significant testimony, without the time and expense of writing deposition outlines.

36.     We also worked to avoid duplication at trial. Only two lawyers (Keely Duke and I) attended trial on behalf of Saint Alphonsus.  I was the only Honigman lawyer who came to Boise for the trial.  Only a single lawyer handled the direct examination of each witness.

37.     More generally, the lawyers on the Honigman team performed different, complementary tasks, and thereby avoided duplication.  For example, Peter Boivin (and later Brock Swartzle) focused on supervising the document review and production process.  Mr. Boivin was also involved in working with the experts.  Paul Fabien conducted searches for, and reviewed and analyzed, documents and supervised the end of the document review process (after Boivin and Swartzle each left the firm during the course of this case).  Paul also supervised two lawyers (Nick Weier and Robert Roberts) who reviewed documents and then prepared initial cross examination outlines and initial selections of deposition segments for presentation at trial.[4] In addition to her work in connection with taking and defending depositions, Lara Phillip also did substantial work on the pretrial order, including deposition designations, counter-designations and objections to exhibits and Defendants' deposition designations; worked on revisions to deposition designations, counter-designations and objections to defendants' deposition designations as the designations changed over the course of the trial; prepared draft cross-examination outlines for the witnesses that she deposed; and was responsible for making recommendations regarding confidentiality determinations at trial and in response to the Court's order dated October 18, 2013 (Dkt 499).  Numerous lawyers worked on major pleadings (such as the complaint and preliminary injunction brief), but each undertook different tasks, involving

---

[4] Paul, Pete and/or Brock worked together on some document review issues, but in every case reviewed different documents, so that their work did not overlap.

**DECLARATION OF DAVID A. ETTINGER - 16**

different issues addressed in those documents such as relevant market, applicable law, remedy, and antitrust injury.

38.    St. Luke's, Saltzer and third parties produced more than 600,000 documents in the case, which we needed to review.  In order to reduce the expense of this review, we retained an outside document review firm, Gnoesis, which utilizes attorneys at very low rates ($35 per hour) to review documents and has experience in addressing complex antitrust cases.  Gnoesis is highly qualified for this work. The Gnoesis Group has extensive experience in conducting large scale document reviews and have conducted more than 100 document reviews in the past two years alone.  The Gnoesis Group has significant experience with conducting document review project in antitrust cases specifically, having conducted document reviews in more than 20 antitrust matters.

39.    The document review process was undertaken in a way so as to minimize duplication, while delegating as much of the work as possible to the attorneys with the lowest hourly rates:

       a.    Saint Alphonsus' documents were reviewed for responsiveness by Gnoesis reviewers, with a partial (quality control) review and feedback by Honigman lawyers.

       b.    Gnoesis attorneys also identified potentially privileged documents, with the final decisions being made by Honigman lawyers.

       c.    Documents were identified by Gnoesis lawyers initially as "hot" (i.e. of substantive interest).  Because this yielded a very large number of documents, the documents in this category were further reviewed, and winnowed down, by the (more experienced) Honigman lawyers.  The "winnowed down" group of documents was then provided to the person taking or defending the deposition to which the documents related.

**DECLARATION OF DAVID A. ETTINGER - 17**

Potentially significant documents that did not relate to any deposition, but were of potential relevance for trial, were subject to a final review by me.

40.     Because Honigman supervised a comprehensive team of Gnoesis document review attorneys, we were able to significantly help in the document review for witnesses and depositions even where the Government Plaintiffs took the lead.  Our additional staffing on the document review effort contributed significantly to the joint effort of the plaintiffs with regard to a number of such depositions.

41.     Saint Alphonsus produced more than 230,000 documents in response to St. Luke's discovery requests.  This production required an extensive review of the documents of to determine which of their documents were responsive to St. Luke's requests, which might be relevant to the issues in the case and which were privileged.  Again, we used Gnoesis outside document review lawyers (supervised and trained by Honigman lawyers) to undertake the bulk of this document review work.

42.     In order to assure that the document review lawyers did a careful and cost effective job, Honigman lawyers engaged in significant training and quality control efforts to prepare these attorneys to address the issues in this case, and to assure that the work they performed was of the requisite quality and efficiency.

43.     Our supervision of the document review attorneys encompassed both the quality of their work and their efficiency.  The Gnoesis document review attorneys each performed a single function at a given point in time.  We kept track of metrics such as documents reviewed per hour in order to assure that the document reviewers were proceeding at a reasonable and efficient pace.  Based on our experience in utilizing document review attorneys in the past, we were able to determine that the Gnoesis reviewers were proceeding at efficient rates of speed.

DECLARATION OF DAVID A. ETTINGER - 18

The hours and hourly rates of the document review attorneys, are attached hereto as Exhibit 4. Overall, Gnoesis incurred legal fees of $1,171,608 on 33,129.85 hours of work, at $35 per hour. The combined average hourly rate of Honigman and Gnoesis was $137.31 per hour. The Gnoesis document reviewers reviewed at least 849,400 documents, which reviewed included a review for responsiveness, issue spotting and coding, and privilege. Gnoesis' costs averaged out to less than $1.40 per document.

44.     We took a number of other steps in order to reduce total attorneys' fees in this complex and expensive case. We did not bill for intra-firm communications of any kind, even where those were productive and necessary to the conduct of the case. Our litigation plans, our fees, and our work in the litigation, were carefully reviewed by Saint Alphonsus' General Counsel, Stephanie Westermeier. I frequently consulted with Stephanie regarding the resources to be applied to particular tasks, and she made decisions intended to keep our efforts as cost effective as possible.

45.     We have included in our request for attorneys' fees only fees relating to our efforts directly involved in prosecuting the case. Thus, for example, any consultation with our client on press or public relations issues have not been included in our request. Nor have we included in our petition the fees expended in preparing our fee request, though there is case law providing that such fees are recoverable.

**Non-Taxable Costs Incurred**

46.     In connection with this matter, Honigman incurred and charged to Saint Alphonsus the following non-taxable costs from the period August 1, 2012 through January 31, 2014:

**DECLARATION OF DAVID A. ETTINGER - 19**

| | |
|---|---:|
| Airfare | $60,366.06 |
| Computer Research | $51,866.15 |
| Electronic Discovery | $571,178.54 |
| FedEx - Courier Service | $6,441.13 |
| Outside Document Production | $3,103.26 |
| Other Document Production | $16,048.10 |
| Public Access to Court Electronic Records | $410.76 |
| Secretary Overtime Charges | $28,502.73 |
| Telephone Charges | $1,385.12 |
| Other Travel Expenses | $50,133.09 |
| **Grand Total** | **$789,434.94** |

Additional non-taxable costs were incurred by Duke Scanlan, and are addressed in the Declaration of Keely Duke.

47.     Attached hereto as Exhibit 12 is a spreadsheet that provides, for each cost incurred by Saint Alphonsus and included in the amounts set forth above (with the exclusion of electronic discovery) the: (a) corresponding invoice number; (b) invoice date; (c) timekeeper; (d) timekeeper position; (d) date the cost was incurred; (e) the dollar amount of the expense; (f) Honigman's internal numerical cost code; (g) cost code category; and (h) a detailed description of the nature of the expense.

48.     Each of the foregoing costs listed in Paragraph 46 above and itemized in Exhibits 12 and 13 hereto were reasonably and necessarily incurred during the course of this action.

**DECLARATION OF DAVID A. ETTINGER - 20**

Honigman endeavored, wherever feasible, to keep Saint Alphonsus' costs to a minimum. For example:

      a.    Only two Honigman attorneys travelled for depositions in this case, myself and my partner, Lara Phillip. This reduced travel expenses. Because I was the only attorney from Honigman that attended the trial, Saint Alphonsus only incurred travel expenses for one person throughout the course of the trial. I further minimized Saint Alphonsus' airfare expense by travelling outside of Idaho on only one instance throughout the pendency of the trial. Honigman attorneys utilized hotels in Boise, Idaho with whom Saint Alphonsus has negotiated discounted rates, which further minimized travel expenses.

      b.    Computer research was performed when it was most efficient to do so, thereby cutting down on lawyer time. Computer research was utilized to conduct fact research regarding prior testimony and writing of experts in preparation for their depositions. It was also utilized to research very specific legal issues relevant to Saint Alphonsus' Motion for Preliminary Injunction, Saint Alphonsus' opposition to St. Luke's Motion for Summary Judgment; Motions in Limine; Daubert Motions; and various issues regarding admissibility of evidence that arose during the trial. However, because of Honigman's significant antitrust experience, it was able to avoid costly research on issues where it could quickly and easily identify the relevant case law, thus reducing what could have been significantly higher computer research expenses.

**DECLARATION OF DAVID A. ETTINGER - 21**

    c.    Secretarial overtime was only used where it was necessary, because of night and weekend work required to address short deadlines on this truncated schedule involving, e.g. almost daily depositions for several months.

    d.    Honigman charged Saint Alphonsus for copying costs at the reasonable and prevailing rate of ten cents per copy.

49.    Attached hereto as Exhibit 13 is a spreadsheet that itemizes Saint Alphonsus' electronic discovery costs that were charged to Saint Alphonsus by its electronic discovery vendor D-4. Information included in this spreadsheet includes: (a) invoice date; (b) invoice number; (c) category of electronic discovery service; (d) service category; (e) quantity; (f) unit price and (g) invoice amount.

50.    Electronic discovery was a necessary and reasonable expense in this case given the complexity of the matter, volume of the documents produced, and accelerated schedule for both discovery and trial. In order for Saint Alphonsus to timely and efficiently produce documents under the accelerated schedule in this case, it was necessary to store the documents electronically in a searchable format where they could then be reviewed and coded for responsiveness, confidentiality and privilege. Electronic discovery was also necessary to efficiently search and code (and later retrieve) documents provided by St. Luke's, Saltzer and third parties on the basis of such categories as responsiveness, importance, issue and witness. This significantly cut down on lawyer time in preparing for depositions and trial.

51.    Saint Alphonsus' electronic discovery vendor, D-4, provided several necessary services during the litigation. First, they processed all of the electronic discovery collected by Saint Alphonsus. This processing involved ingesting large volumes of electronic documents into

**DECLARATION OF DAVID A. ETTINGER - 22**

an ESI processing software tool that (1) removed redundant electronic data: (2) allowed paper documents to be scanned and converted to searchable electronic format based on keywords, date ranges, custodians, file types and other criteria; and (3) exported the final electronic evidence set in a format suitable for loading to a software review platform, Relativity. D-4 also maintained the Relativity software and hosted the evidence on its computer servers during the document review and production phases. Lastly, D4 provided project management services, including facilitating the processing, review and production process and managing access to the review platform.

52. As the head of Honigman's Antitrust Practice Group and as the billing partner for a number of clients, I am familiar with Honigman's billing practices. It is Honigman's standard practice as a firm to charge clients for airfare, computer research, courier and delivery service, copying, secretarial overtime, telephone, and travel expenses.

53. I declare under penalty of perjury that the foregoing is true and correct.

This 14th day of March, 2014.

/s/ David A. Ettinger
David A. Ettinger

**DECLARATION OF DAVID A. ETTINGER - 23**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of March, 2014, I electronically filed the foregoing document with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System.

Ben J Keith     bkeith@sidley.com, krockwell@sidley.com
Brett T DeLange     brett.delange@ag.idaho.gov, teresa.taylor@ag.idaho.gov
Brian K Julian     bjulian@ajhlaw.com, lgrantham@ajhlaw.com, pgrossman@ajhlaw.com
Bryan A Nickels     ban@dukescanlan.com, klb@dukescanlan.com, klm@dukescanlan.com, sls@dukescanlan.com
Carl J Withroe     carl.withroe@ag.idaho.gov, colleen.funk@ag.idaho.gov
Charles K Schafer     cschafer@sidley.com
Colleen D Zahn     colleen.zahn@ag.idaho.gov, reta.massano@ag.idaho.gov
Danica Noble     dnoble@ftc.gov
David A Ettinger     dettinger@honigman.com, nroberts@honigman.com, shakim@honigman.com
Douglas Eugene Litvack     dlitvack@ftc.gov, abeilein@ftc.gov
Eric J Wilson     ewilson@gklaw.com
Henry Chao-Lon Su     hsu@ftc.gov, lrine@ftc.gov, ssajewski@ftc.gov
J Walter Sinclair     JWSinclair@hollandhart.com njhammond@hollandhart.com
Jack R Bierig     jbierig@sidley.com
Keely E. Duke     ked@dukescanlan.com, klb@dukescanlan.com, sls@dukescanlan.com
Kevin J O'Connor     koconnor@gklaw.com
Kevin J Scanlan     kjs@dukescanlan.com, klb@dukescanlan.com, klm@dukescanlan.com
Lara Fetsco Phillip     lara.phillip@honigman.com
Matthew Paul Accornero     maccornero@ftc.gov
Michael James Perry     mperry@ftc.gov
Peter C Herrick     pherrick@ftc.gov
Portia L Rauer     plr@powerstolman.com, jsm@powerstolman.com
Raymond D Powers     rdp@powerstolman.com, crb@powerstolman.com, jls@powerstolman.com
Robert J Schroeder     rschroeder@ftc.gov
Scott D Stein     sstein@sidley.com, efilingnotice@sidley.com, jfitzpat@sidley.com, jfitzpatrick@sidley.com
Syrena Case Hargrove     Syrena.Hargrove@usdoj.gov, angela.nyland@usdoj.gov, becky.early@usdoj.gov, pamela.bearg@usdoj.gov, USAID.ECFNOTICE@USDOJ.GOV
Tacy F Flint     tflint@sidley.com
Wendy K Arends     warends@gklaw.com, jschwartz@gklaw.com, swilson@gklaw.com
Thomas Greene     tgreene2@ftc.gov

/s/ Keely E. Duke
Keely E. Duke

**DECLARATION OF DAVID A. ETTINGER - 24**

# AJM DECL. EXHIBIT B

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---

ENCANA OIL & GAS (USA) Inc., a
Delaware corporation,

        Plaintiff/Counter-Defendant,

v

ZAREMBA FAMILY FARMS, INC., a
Michigan corporation, ZAREMBA GROUP,
L.L.C., a Michigan limited liability company,
and WALTER ZAREMBA, an individual,

        Defendants/Counter-Plaintiffs.

_____/

Case No. 1:12-cv-00369-PLM

Chief Judge Paul L. Maloney

Mag. Judge Joseph G. Scoville

**BILL OF COSTS REGARDING ORDER
ON MOTION FOR RULE 37 SANCTIONS
DUE TO DEFENDANTS' VIOLATION OF
THE FEBRUARY 3, 2014, ORDER
REGARDING SRW COMPUTER**

Gregory L. Curtner (P12414)
Frederick R. Juckniess (P64032)
Jessica Sprovtsoff (P70218)
Schiff Hardin LLP
350 S. Main Street, Suite 210
Ann Arbor, MI 48104
(734) 222-1500
gcurtner@schiffhardin.com
rjuckniess@schiffhardin.com
jsprovtsoff@schiffhardin.com

Counsel for Plaintiff/Counter-Defendant

Michael F. Wais (P45482)
Michelle M. Wezner (P58671)
Howard & Howard Attorneys PLLC
450 West Fourth Street
Royal Oak, MI 48067
(248) 723-0361
mwais@howardandhoward.com
mwezner@howardandhoward.com

Counsel for Defendants/Counter-Plaintiffs

_____/

Plaintiff and Counterclaim Defendant Encana Oil & Gas (USA) Inc. ("Encana") respectfully submit this bill of costs regarding costs and attorney's fees incurred in connection with the Motion for Rule 37 Sanctions Due to Defendants' Violation of the February 3, 2014 Court Order, pursuant to the Court's Order Imposing Sanctions (Dkt. #260) dated February 14, 2014.  In support of this bill of costs, Encana submits the Declaration of Frederick Juckniess and exhibits thereto, including the billing entries and records relating to the motion and activities due to Defendants' violation of the Court Order, and states:

1.      The costs and fees reflected in the Declaration of Frederick Juckniess, and exhibits attached thereto, contain billing entries that reflect work directly caused by the decision of Defendants' counsel to violate the February 3, 2014, Order.  The billing rates are reasonable for practitioners with the qualifications and experience described in the Declaration.

2.      Encana has proposed to Mr. Wais that he and Encana agree on the amount to be paid as a sanction, in order to resolve this matter without the need for further motion practice. Those talks are ongoing, but Encana and Mr. Wais were not able to reach agreement before the instant bill of costs was due to be filed.[1]  In the spirit of cooperation and in the hopes that this matter will be resolved without the need for further intervention by the Court, Encana has applied a 30% discount to its pertinent fees and costs:

| ATTORNEY FEES | $26,481.50 |
|---|---|
| **30% Reduction** (- $7,944.45) | **$18,537.05** |
| COSTS:  Mileage | $154.56 |
| Spectrum Computer Forensics Invoice re: February 4th | $ 357.00 |
| **TOTAL** | **$19,048.61** |

---

[1]      Encana will, of course, notify the Court if an agreement is reached next week.

3.      In addition to actual preparation and arguing of motion for contempt, the violation of the Court order occasioned a significant amount of correspondence, conferences and activity to deal with Defendants' changing positions.  On February 3, 2014, Defendants' counsel agreed to hand over the computer to SRW by 1:00 p.m. on Tuesday, February 4, at SRW's counsel's offices.  On February 4, 2014, Stott Matthews arrived at SRW's offices to image the computer as agreed, and as provided in the February 3, 2014, Order, and waited for 45 minutes before Defendants' counsel advised that they were instructing Mr. Dzierwa (who had arrived in Royal Oak from Traverse City) to withhold the computer.

4.      During this time, Defendants' counsel made various demands for concessions and modifications regarding what they would have to produce and review.  Eventually, Defendants' counsel refused to obey the order or deliver the computer unless Encana's counsel agreed.  Encana's counsel attempted to accommodate those demands and engaged in various correspondence with SRW, Michael Wais, and Michelle Wezner to obtain compliance prior to filing the motion for sanctions.  These exchanges are reflected in several detailed emails and draft proposed orders.

5.      Unable to obtain compliance, even after notification of violation of the Court Order, Encana's counsel was forced to prepare and file the motion for sanctions.  Encana also reviewed and prepared responses to the opposition, including preparation of exhibits and information for presentation to the Court at the hearing if necessary.

5.      The billing records for February 3 through 21 for work occasioned by the violation of the February 3, 2014, Order are reflected in Exhibit A to the Declaration of Frederick Juckniess.  The entries include time for the preparation of the Motion for Sanctions

and Memorandum in Support, preparation for the hearing, and attendance at the hearing for one of Plaintiffs' counsel (Greg Curtner), as well as the simultaneous efforts to obtain compliance, and coordination with SRW and Stott Matthews, which was caused by Defendants' violation of the February 3, 2014, Order.  The billings also contain two entries for preparation of this bill of costs and fees.  The entries include billing detail.

      6.    The invoice for the time and expenses of Spectrum Computer Forensics and Mr. Matthews, that were expended directly as a result of the last minute decision by Defendants' counsel to withhold the computer, are attached as Exhibit B to the Declaration of Frederick Juckniess.

<div style="margin-left:40%">

Respectfully submitted,

SCHIFF HARDIN LLP
Attorneys for Plaintiff/Counter-Defendant

By: /s Frederick R. Juckniess
Gregory L. Curtner (P12414)
Frederick R. Juckniess (P64032)
Jessica Sprovtsoff (P70218)
350 S. Main Street, Suite 210
Ann Arbor, MI 48104
Telephone:  (734) 222-1500
gcurtner@schiffhardin.com

</div>

Dated:  February 21, 2013

40996-0005

AA\200083958 1

4

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ENCANA OIL & GAS (USA) Inc., a
Delaware corporation,

               Plaintiff/Counter-Defendant,

v

ZAREMBA FAMILY FARMS, INC., a
Michigan corporation, ZAREMBA GROUP,
L.L.C., a Michigan limited liability company,
and WALTER ZAREMBA, an individual,

               Defendants/Counter-Plaintiffs.

_____/

Case No. 1:12-cv-00369-PLM

Chief Judge Paul L. Maloney

Mag. Judge Joseph G. Scoville

**DECLARATION OF FREDERICK
JUCKNIESS IN SUPPORT OF BILL OF
COSTS AND FEES REGARDING ORDER
ON MOTION FOR RULE 37 SANCTIONS
DUE TO DEFENDANTS' VIOLATION OF
THE FEBRUARY 3, 2014 ORDER**

Gregory L. Curtner (P12414)
Frederick R. Juckniess (P64032)
Jessica Sprovtsoff (P70218)
Schiff Hardin LLP
350 S. Main Street, Suite 210
Ann Arbor, MI 48104
(734) 222-1500
gcurtner@schiffhardin.com
rjuckniess@schiffhardin.com
jsprovtsoff@schiffhardin.com

Counsel for Plaintiff/Counter-Defendant

Michael F. Wais (P45482)
Michelle M. Wezner (P58671)
Howard & Howard Attorneys PLLC
450 West Fourth Street
Royal Oak, MI 48067
(248) 723-0361
mwais@howardandhoward.com
mwezner@howardandhoward.com

Counsel for Defendants/Counter-Plaintiffs

_____/

Frederick R. Juckniess and swears and affirms under penalty of perjury as follows:

1.      I am a partner with the law firm of Schiff Hardin LLP, and counsel for the Plaintiff Encana Oil & Gas (USA) Inc. ("Encana") in the above-captioned matter. Unless otherwise stated, I have personal knowledge of all the facts contained herein.

2.      I submit this declaration in support of Encana's Bill of Costs and Fees, submitted herewith pursuant to the Court's Order Imposing Sanctions (Dkt. #260).

3.      Exhibit A is a true and correct copy of an invoice to Encana reflecting time entries for the attorneys and paralegals that performed work in connection with the Motion for Rule 37 Sanctions Due to Defendants' Violation of February 3, 2014, Order. It also reflects costs incurred in connection with that work.

4.      All billing entries for the work identified in the invoice has been reviewed by myself and the attorneys and paralegals that performed the work, and all work was reasonably incurred as a result of the violation of the February 3, 2014, Order, and includes attorney time for one lawyer on behalf of Encana to attend the February 14, 2014, hearing. In addition, the invoice contains two entries in connection with the drafting and submission of the bill of costs, declaration and exhibits. Entries have been reviewed to ensure that no duplicative or unreasonable time has been included.

5.      The billing rates for each attorney and legal assistant at Schiff Hardin are listed in the chart below, and are reflected on the invoice. The attorneys and legal assistants staffed on the case were selected for their experience and expertise in antitrust litigation, complex commercial litigation, and electronic discovery, as described in greater detail below:

| Attorney/Paralegal | Rate |
|---|---|
| Gregory Curtner | $780 |
| Frederick Juckniess | $570 |
| Jessica Sprovtsoff | $375 |
| Jacob Danzinger | $385 |
| Dan Banda | $235 |

6.    The rates for the attorneys and paralegal identified above are reasonable in my experience, and as in comparison with rates of other firms that handle complex and significant antitrust claims and commercial litigation. Furthermore the qualifications and background of the individuals likewise supports the reasonableness of the rates, and the information I have been provided is contained below.

7.    Gregory Curtner is the leader of Schiff Hardin's Antitrust and Trade Regulation Group. He graduated from University of Michigan Law School in 1970, and is admitted to practice in the States of Michigan and New York, as well as the United States Supreme Court, the United States Court of Appeals for the Second, Sixth, Seventh, Eighth, Ninth and Tenth Circuits, the United States District Court for the Western District of Michigan, Eastern District of Michigan, District of Columbia, Southern District of New York and the United States Court of International Trade. He was a primary drafter of the Michigan Antitrust Reform Act, and is a former chair of the Antitrust Section of the State Bar of Michigan. He has several decades of experience in representing parties in connection with antitrust claims, including at trial and on appeal.

8.    I, Frederick Juckniess, am a partner at Schiff Hardin in the Antitrust and Trade Regulation Group. I graduated from University of Michigan Law School *cum laude* in 1995, and I am admitted to practice in the States of California, Colorado, Michigan and Minnesota, as well

3

as the United States Court of Appeals for the Second and Sixth Circuits, the United States District Court for the Western District of Michigan, Eastern District of Michigan, District of Colorado, Northern District of California, Central District of California, and the District of Minnesota. I am an Adjunct Professor of Antitrust Law at the Michigan State College of Law, a former Chair of the Antitrust and Trade Regulation Section of the State Bar of Michigan, and have represented parties in connection with antitrust claims for nearly twenty years, and have had significant experience in connection with complex electronic discovery issues.

9.    Jessica Sprovtsoff is an associate at Schiff Hardin in the Antitrust and Trade Regulation Group. She graduated from the American University Washington College of Law, *cum laude*, in 2006 and is admitted to practice in the State of Michigan and in the United States District Court for the Western District and Eastern District of Michigan. Ms. Sprovtsoff clerked in the United States District Court for the Eastern District of Michigan for the Honorable Patrick J. Duggan (2008), the Honorable Paul D. Borman (2008-2009) and the Honorable Virginia M. Morgan (2009-2011). Her practice has focused on complex commercial and antitrust litigation, as well as specializing in electronic discovery issues.

10.    Jacob Danzinger is an associate at Schiff Hardin in the Antitrust and Trade Regulation Group. Mr. Danzinger graduated from the University of Michigan Law School, *magna cum laude*, in 2011. Mr. Danzinger's practice is primarily in connection with complex litigation and antitrust.

11.    Daniel Banda is a paralegal at Schiff Hardin in the Antitrust and Trade Regulation Group. Mr. Banda has over a decade of experience in providing paralegal services on complex litigation matters, including in connection with electronic discovery.

12.     Exhibit B to this declaration is a true and correct copy of an invoice from Spectrum Computer Forensics regarding time spent on February 4th in connection with the original scheduled imaging of the computer, and the time spent waiting for the computer to be delivered. The invoice totals $357.00.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of February, 2014, at Ann Arbor, Michigan.

Frederick R. Juckniess

23004-3497
AA\200083885.1

5

# EXHIBIT A

**SCHIFF HARDIN** LLP
**150 YEARS**

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS
350 South Main Street, Suite 210, Ann Arbor, MI 48104
Telephone: (734) 222-1500 Fax (734) 222-1501

Encana Corporation
1800-855 2nd St. S.W.
Calgary, Alberta T2P 2S5

February 20, 2014
Matter # 41983-0001

---

FOR PROFESSIONAL SERVICES RENDERED
THROUGH February 17, 2014 in connection with
**Motion for Rule 37 Sanctions**
**Encana Oil & Gas (USA) Inc. v. Zaremba Family Farms Inc;**
**In the US District Court, Western District of Michigan;**

Total Fees          $26,481.50

Total Disbursements/Charges      $154.56

Total Current Invoice      $26,636.06

SCHIFF HARDIN LLP
150 YEARS

Encana Corporation                                          February 20, 2014
Encana Oil & Gas (USA) Inc. v. Zaremba Family Farms
Inc;


**TO OUR PROFESSIONAL SERVICES RENDERED THROUGH**
February 17, 2014 in connection with Motion for Rule 37 Sanctions:  Encana Oil & Gas (USA)
Inc. v. Zaremba Family Farms Inc;
In the US District Court, Western District of Michigan;


| Date | | Description | Hours | Amount |
|------|------|-------------|-------|--------|
| 2/3/14 | GLC | Correspondence regarding SRW order, computer, documents; conference R. Juckniess regarding Wais call. | 1.10 | 858.00 |
| 2/3/14 | FRJ | Draft multiple discovery correspondence to M. Wais regarding Court Order and production of computer; Draft proposed stipulated order and compromise orders for review by Wais; Draft and revise stipulated SRW order to reflect Wais Demands and for review by E. Johnson; TC with E. Johnson regarding order and production issues; Draft correspondence regarding case scheduling and suggested compromise on issues; TC with M. Wais; Schedule 1:00 computer pickup and imaging and correspondence regarding same;  Multiple TCs with S. Matthews regarding computer forensics, scheduling and work to be performed, as well as demands by Wais and possible ways to meet demands for revisions to Order prior to production of computer; | 4.40 | 2,508.00 |
| 2/4/14 | JAS | Multiple email communications regarding Dzierwa computer, Order on production and the collection of documents from the computer; | .50 | 187.50 |
| 2/4/14 | JKD | Review and revise motion for sanctions regarding violation of Court order regarding SRW computer; legal research regarding same; correspondence with various team members including J. Sprovtsoff and F. Juckniess regarding same; telephone conference with F. Juckniess regarding same. | 2.10 | 808.50 |

Encana Corporation                                                February 20, 2014
Encana Oil & Gas (USA) Inc. v. Zaremba Family Farms
Inc;

| Date | | Description | Hours | Amount |
|------|---|-------------|-------|--------|
| 2/4/14 | FRJ | TCs with E. Johnson regarding court order of February 3, 2014, production of computer, SRW conferences with Wais and Johnson conversation with Dzierwa on production of computer; Draft and review communications regarding scheduling and appointment for computer imaging; Draft and revise proposed order and additional language based on demands by Wais; TCs with Wais regarding defendants' demands and proposed orde, scheduling and meeting to image computer "immediately"; Review and revise proposed order with Stott Matthews computer forensic expert; TCs with SRW, S. Matthews and Howard and Howard regarding failure of computer to arrive as scheduled, and TCs to track down Wais and SRW counsel; TCs with computer forensic expert regarding failure to produce computer and release; Draft emails regarding violation of court order and release of computer forensic expert; TC with M. Wezner regarding scheduling, discovery deadlines, and proposed order including demands for deletion and non-copying of privileged documents, additional review, additional time etc; TCs with S. Matthews regarding rescheduling and computer production;  Review correspondence on decision by counsel to withhold computer and instruction to Dzierwa;  Draft additional correspondence; Research and preparation regarding potential motion for contempt sanctions;  Begin drafting motion for sanctions | 6.40 | 3,648.00 |
| 2/5/14 | GLC | Review and edit motions; correspondence regarding computer inspection. | .40 | 312.00 |



SCHIFF HARDIN LLP
150 YEARS

Encana Corporation                                                          February 20, 2014
Encana Oil & Gas (USA) Inc. v. Zaremba Family Farms
Inc;

| Date | | Description | Hours | Amount |
|------|--|-------------|-------|--------|
| 2/5/14 | FRJ | Draft and revise memorandum and motion for sanctions for violation of Court Order; Review correspondence and record regarding history on order and computer and selection of exhibits; TC with Zaremba counsel regarding failure to produce; Attention to third party discovery isssues; Correspondence on violation of court order;  TC with computer forensic expert regarding scheduling; | 3.30 | 1,881.00 |
| 2/6/14 | GLC | Review draft motions regarding sanctions and conference regarding same | .60 | 468.00 |
| 2/6/14 | JKD | Review and revise memorandum in support of motion for sanctions regarding violation of Court order regarding SRW computer and legal standard; correspondence with various team members including J. Sprovtsoff and F. Juckniess regarding same; telephone conference with F. Juckniess regarding same; conference with F. Juckniess regarding same; prepare same for court filing. | 1.80 | 693.00 |
| 2/6/14 | JAS | Edited motion for discovery sanctions; prepared for filing. | 3.50 | 1,312.50 |
| 2/6/14 | FRJ | Draft and revise motion and memorandum in support of motion due to violation of February 3, 2014 order and refusal to turn over the SRW laptop; TC with S. Matthews regarding Court Orders, motion, scheduling and timing; Review correspondence with Defendants' counsel regarding refusal to deliver laptop, and draft exhibit citations; Finalize motion and memorandum for filing; Draft correspondence to E. Johnson regarding Court Order and violation; Review Order on motion; Review correspondence from E. Johnson regarding SRW demand to Dzierwa for computer, and proposed production in response to Order; Draft correspondence to counsel regarding order and status | 3.80 | 2,166.00 |
| 2/10/14 | DB | Responded to counsel requests for documents and information needed for pending motion (2.5 hrs.). | 2.50 | 587.50 |



Encana Corporation                                              February 20, 2014
Encana Oil & Gas (USA) Inc. v. Zaremba Family Farms
Inc;

| Date | | Description | Hours | Amount |
|------|--|-------------|-------|--------|
| 2/12/14 | GLC | Correspondence and on upcoming hearing on motion for sanctions; | .30 | 234.00 |
| 2/13/14 | JKD | Review and analysis of Defendants' opposition to Encana's motion for sanctions; conference with F. Juckniess, G. Curtner, R. Wierenga and J. Sprovtsoff regarding strategy for hearing before Judge Scoville regarding same. | 1.30 | 500.50 |
| 2/13/14 | GLC | Correspondence regarding motion for sanctions; preparation and review for hearing on motion for sanctions. | 2.0 | 1,560.00 |
| 2/13/14 | FRJ | Preparation for hearing on motion for sanctions due to violation of Court Order dated February 3, 2014; Review response to motion for sanctions by Defendants' counsel; Prepare timeline and collection of correspondence and exhibits for potential use at hearing to rebut arguments concerning order, timing and objections raised by Defendants' counsel in response to motion; preparation of outline and materials for hearing; Exchange correspondence with Earl Johnson regarding appearance of SRW at hearing and status; | 4.20 | 2,394.00 |
| 2/14/14 | GLC | Preparation for, travel to and from hearing; preparation with R. Juckniess; argue motion for sanctions, for entry of order. | 5.60 | 4,368.00 |



Encana Corporation                                                    February 20, 2014
Encana Oil & Gas (USA) Inc. v. Zaremba Family Farms
Inc;

| 2/20/14 | FRJ | Draft submission on Bill of Costs, Prepare and review billing entries for invoice; Review Invoice from Spectrum on Costs; Draft Declaration of F. Juckniess with exhibits in support of bill of costs and fees pursuant to February 14, 2014 Order. | 2.8 | 1,596.00 |
|---|---|---|---|---|
| 2/21/14 | FRJ | Review and revise memorandum on Bill of Costs and Fees; Review and finalize Declaration of F. Juckniess and exhibits thereto; Prepare for filing. | .7 | 399.00 |

**TOTAL FEES**                                                                    **$26,481.50**

**DISBURSEMENTS/CHARGES:**                                              **$154.56**

| DATE | DESCRIPTION | QUANTITY | AMOUNT |
|---|---|---|---|
| 02/14/14 | Mileage; Travel to Grand Rapids, MI for hearing on Motion | 276 | 154.56 |
| **TOTAL** | DISBURSEMENTS/CHARGES | | $154.56 |

**TOTAL INVOICE**                                                               **$26,636.50**

**SUMMARY OF RATES**

| TIMEKEEPER | TITLE | RATES |
|---|---|---|
| Gregory L. Curtner | Equity Partner | 780.00 |
| Frederick Juckniess | Income Partner | 570.00 |
| Jacob K. Danziger | Associate | 385.00 |
| Jessica A. Sprovtsoff | Associate | 375.00 |
| Daniel Banda | Paralegal | 235.00 |

# AJM DECL. EXHIBIT C

1 | MILBERG LLP
  | DAVID E. AZAR (SBN 218319)
2 | dazar@milberg.com
  | One California Plaza
3 | 300 South Grand Ave., Suite 3900
  | Los Angeles, CA 90071
4 | Telephone: (213) 617-1200
  | Facsimile: (213) 617-1975
5 |
  | MILBERG LLP
6 | PAUL F. NOVAK
  | pnovak@milberg.com
7 | One Kennedy Square
  | 777 Woodward Avenue, Suite 890
8 | Detroit, MI 48226
  | Telephone: (313) 309-1760
9 | Facsimile: (313) 447-2038

10 | Interim Co-Lead Counsel for Plaintiffs
11 |
12 | UNITED STATES DISTRICT COURT
13 | CENTRAL DISTRICT OF CALIFORNIA
14 | WESTERN DIVISION
15 |

In re KOREAN AIR LINES CO., LTD. ) MDL No. 1891
16 ANTITRUST LITIGATION )
                                  ) Master File No. CV 07-05107 SJO
17 This Document Relates To:      ) (AGRx)
                                  )
18       All Actions             )
                                  ) DECLARATION OF PAUL F.
19                                ) NOVAK IN SUPPORT OF
                                  ) PLAINTIFFS' MOTION FOR AN
20                                ) AWARD OF ATTORNEYS' FEES
                                  ) AND REIMBURSEMENT OF
21                                ) EXPENSES

22
23 _____
24
25
26
27
28

DOCS\671469v1

1    I, PAUL F. NOVAK, being first duly sworn, deposes and says:

2    1.    I am a partner at the law firm of Milberg LLP and Head of the firm's
3    Antitrust Practice Group.   I submit this declaration in support of my firm's
4    application for an award of attorneys' fees in connection with services rendered in
5    this case, as well as the reimbursement of expenses incurred by my firm in
6    connection with this litigation.

7    2.    For the majority of this litigation, my firm acted as Interim Co-Lead
8    Counsel for the Plaintiffs in this class action under the leadership of Jeff
9    Westerman.    In early 2013, Mr. Westerman left the Milberg firm to start
10   Westerman Law Corp. and has continued to serve as Co-Lead Counsel.

11   3.    The schedule attached hereto as Exhibit 1 is a detailed summary
12   indicating the amount of time spent by the partners, attorneys and professional
13   support staff of my firm who were involved in this litigation under Mr.
14   Westerman's direction, and the lodestar calculation based on my firm's current
15   billing rates[1]. For personnel who are no longer employed by my firm, the lodestar
16   calculation is based upon the billing rates for such personnel in their final year of
17   employment at the firm.   The schedule was prepared from contemporaneous, daily
18   time records regularly prepared and maintained by my firm, which are available at
19   the request of the Court.   Time expended in preparing this application for fees and
20   reimbursement of expenses has not been included in this request.

21   4.    The hourly rates for the partners, attorneys and professional support
22   staff in my firm included in Exhibit 1 are the same as the regular current rates
23   charged for their services in non-contingent matters and/or which have been
24   accepted and approved in other class litigation.

25   5.    The total number of hours expended on this litigation by my firm is
26   10,632.75 hours. The total lodestar for my firm is $4,681,212.50.

27   ---
[1] This application does not include time for anyone who spent fewer than 10 hours
28   on this litigation.

6.    My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

7.    Milberg LLP has referral fee agreements with Anthony S, Park, Esq., who has not appeared in the case, and Krause, Kalfayan, Benink & Slavens, LLP., who has appeared in the case and performed work in the matter. Payment of referral fees, if any, made by Milberg LLP under these fee agreements would be from Milberg LLP's fee and would not increase the overall fees requested by Plaintiffs' Counsel and would not reduce the amount recovered by the Class. The details of the fee agreements can be provided to the Court at the Court's request.

8.    As detailed in Exhibit 2, my firm has incurred a total of $220,011.04 in un-reimbursed expenses in connection with the prosecution of this litigation.

9.    The expenses incurred in this action are reflected on the books and records of my firm. These books and records are prepared from expense vouchers, check records and other source materials and represent an accurate recordation of the expenses incurred.

10.    With respect to the standing of counsel in this case, attached hereto as Exhibit 3 is a brief biography of my firm and attorneys in my firm who were principally involved in this litigation. Additionally, the firm utilized the services of Ms. Jennifer Lee as an attorney on a contract basis, primarily due to Ms. Lee's legal expertise and ability to review and translate Korean language documents and testimony.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of October, 2013, at Detroit, Michigan.

_____
PAUL F. NOVAK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 1

## Milberg LLP
## Lodestar Report
## Korean Airlines

### Period: Inception to to October 3, 2013

| Name | Title | Hours Worked | Billing Rate | Lodestar |
|------|-------|--------------|--------------|----------|
| Andrejkovics, Paul J. | Partner | 99.00 | $625 | $61,875.00 |
| Azar, David | Partner | 1,641.75 | $550 | $902,962.50 |
| Dover, Anna | Partner | 182.00 | $550 | $100,100.00 |
| Messinger, Jeffrey R. | Partner | 110.00 | $750 | $82,500.00 |
| Novak, Paul F. | Partner | 603.00 | $775 | $467,325.00 |
| Safirstein, Peter | Partner | 125.50 | $750 | $94,125.00 |
| Westerman, Jeff S. | Partner | 807.75 | $825 | $666,393.75 |
| Furukawa, Michelle | Associate | 1,110.75 | $450 | $499,837.50 |
| Sokolowski, Andrew | Associate | 102.00 | $475 | $48,450.00 |
| Morganti, Andrew | Of Counsel | 235.50 | $500 | $117,750.00 |
| Scoville, William | Senior Counsel | 96.00 | $550 | $52,800.00 |
| Lee, Jennifer | Contract Attorney | 4,350.50 | $275 | $1,196,387.50 |
| Bodenstein, Linda | Paralegal | 44.50 | $245 | $10,902.50 |
| Chaffins, Cecille | Paralegal | 681.00 | $325 | $221,325.00 |
| Chang, Sharon | Paralegal | 27.50 | $285 | $7,837.50 |
| Choi, Kyung-Rok | Paralegal | 71.00 | $300 | $21,300.00 |
| Diponio, Livia | Paralegal | 14.50 | $275 | $3,987.50 |
| Laratro, Lisa | Paralegal | 12.50 | $220 | $2,750.00 |
| Maher, Meghan | Paralegal | 104.25 | $270 | $28,147.50 |
| Brown, James M. | Forensic Acct. | 45.75 | $475 | $21,731.25 |
| Lomonaco, Kristi | Forensic Acct. | 21.00 | $475 | $9,975.00 |
| Muir, Michelle | Forensic Acct. | 62.00 | $500 | $31,000.00 |
| Bursey, W. S. | Investigator | 25.00 | $550 | $13,750.00 |
| Ortiz, Jessica | Document Clerk | 60.00 | $300 | $18,000.00 |
| **Totals** | | **10,632.75** | | **$4,681,212.50** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 2

**Milberg LLP**

**Expense Report**

**Korean Airlines**

|  | Amount |
|---|---|
| Meals, Hotels & Transportation | $3,188.88 |
| Filing/Court Fees | 219.50 |
| Postage, Telephone, Fascimile | 2,180.98 |
| Court Transcript | 542.40 |
| Reproduction | 351.35 |
| Courier Service | 29.46 |
| Online Legal Research | 7,404.87 |
| Secretarial/Support Staff Overtime | 20.90 |
| Data Hosting | 13,480.00 |
| Non-Expert/Vendor Services | 125.70 |
| Assessments (Litigation Fund Contribution) | 64,667.00 |
| Electronic Document Litigation Support | 127,800.00 |
| **Total Expenses** | **$220,011.04** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 3

 **MILBERG** LLP

<div align="right">NEW YORK<br>LOS ANGELES<br>DETROIT</div>

## THE FIRM'S PRACTICE AND ACHIEVEMENTS

Milberg LLP, founded in 1965, was one of the first law firms to prosecute class actions in federal courts on behalf of investors and consumers. The Firm pioneered this type of litigation and is widely recognized as a leader in defending the rights of victims of corporate and other large-scale wrongdoing. The Firm's practice focuses on the prosecution of class and complex actions in many fields, including securities, corporate fiduciary, ERISA, consumer, False Claims Act, antitrust, bankruptcy, mass tort, and human rights litigation. The Firm has offices in New York City, Los Angeles, and Detroit.

In its early years, the Firm built a new area of legal practice in representing shareholder interests under the then recently amended Rule 23 of the Federal Rules of Civil Procedure, which allowed securities fraud cases, among others, to proceed as class actions. In the following decades, the Firm obtained decisions establishing important legal precedents in many of its areas of practice and prosecuted cases that set benchmarks in terms of case theories, organization, discovery, trial results, methods of settlement, and amounts recovered and distributed to clients and class members.

Important milestones in the Firm's early years include the Firm's involvement in the *U.S. Financial* litigation in the early 1970s, one of the earliest large class actions, which resulted in a $50 million recovery for purchasers of the securities of a failed real estate development company; the Ninth Circuit decision in *Blackie v. Barrack* in 1975, which established the fraud-on-the-market doctrine for securities fraud actions; the Firm's co-lead counsel position in the *In re Washington Public Power Supply System Securities Litigation*, a seminal securities fraud action in the 1980s in terms of complexity and amounts recovered; the representation of the Federal Deposit Insurance Corporation in a year-long trial to recover banking losses from a major accounting firm, leading to a precedent-setting global settlement; attacking the Drexel-Milken "daisy chain" of illicit junk-bond financing arrangements with numerous cases that resulted in substantial recoveries for investors; representing life insurance policyholders defrauded by "vanishing premium" and other improper sales tactics and obtaining large recoveries from industry participants; and ground-breaking roles in the multi-front attack on deception and other improper activities in the tobacco industry.

Milberg remains at the forefront in its areas of practice. Significant litigation results include: *In re Vivendi Universal, S.A. Securities Litigation* (post-verdict proceedings pending with claims valued at over $1 billion); *In re Tyco International, Ltd. Securities Litigation* ($3.2 billion settlement); *In re Nortel Networks Corp. Securities Litigation* (settlement for cash and stock valued at $1.142 billion); *In re Lucent Technologies, Inc. Securities Litigation* ($600 million recovery); *In re Raytheon Co. Securities Litigation* ($460 million recovery); *In re Managed Care Litigation* (recoveries over $1 billion and major changes in HMO practices); the *In re Washington Public Power Supply System Securities Litigation* (settlements totaling $775 million), and the *In re NASDAQ Market-Makers Antitrust Litigation* ($1 billion in recoveries). Milberg has been responsible for recoveries valued at approximately $55 billion during the life of the Firm.

The Firm's lawyers come from many different professional backgrounds. They include professors, prosecutors, private defense attorneys, and government lawyers. The Firm's ability to pursue claims against defendants is augmented by its team of investigators, headed by a 27-year veteran of the Federal Bureau of Investigation, as well as in-house staff with expertise in forensic accounting and financial analysis. In addition, Milberg offers in-house e-discovery specialists and data hosting capabilities. The Firm is regularly recognized as one of the nation's leading plaintiffs' law firms by the *National Law Journal*, *Legal 500*, *Chambers USA*, and *Super Lawyers,* among others.

For more information, please visit www.milberg.com.

 **MILBERG**LLP

NEW YORK
LOS ANGELES
DETROIT

## JUDICIAL COMMENDATIONS

Milberg has been commended by countless judges throughout the country for the quality of its representation.

Milberg partners played leading roles in representing class plaintiffs in a nearly four-month jury trial in *In re Vivendi Universal, S.A. Securities Litigation*, No. 02-5571 (S.D.N.Y.), which in January 2010 resulted in a jury verdict for an international class of defrauded investors (with claims valued at over $1 billion; claims procedure pending). At the close of the trial, Judge Richard Holwell commented:

> I can only say that this is by far the best tried case that I have had in my time on the bench. I don't think either side could have tried the case better than these counsel have.

In approving a $3.2 billion securities fraud settlement, one of the largest in history, in *In re Tyco International, Ltd. Securities Litigation*, 535 F. Supp. 2d 249, 270 (D.N.H. 2007), Judge Barbadoro lauded Milberg's efforts as co-lead counsel:

> This was an extraordinarily complex and hard-fought case. Co-Lead Counsel put massive resources and effort into the case for five long years, accumulating [millions of dollars in expenses] and expending [hundreds of thousands of hours] on a wholly contingent basis. But for Co-Lead Counsel's enormous expenditure of time, money, and effort, they would not have been able to negotiate an end result so favorable for the class. . . . Lead Counsel's continued, dogged effort over the past five years is a major reason for the magnitude of the recovery. . . .

In *Simon v. KPMG LLP*, No. 05-3189, 2006 U.S. Dist. LEXIS 35943, at *18, 30-31 (D.N.J. June 2, 2006), a case in which Milberg served as class counsel, Judge Cavanaugh, in approving the $153 million settlement, found that "Plaintiffs . . . retained highly competent and qualified attorneys" and that "[t]he Initial Complaint . . . demonstrates that [Milberg] expended considerable time and effort with the underlying factual and legal issues in this case before even filing this lawsuit. . . . Settlement discussions were conducted over a period of some fourteen months with the supervision and guidance of Judges Politan and Weinstein, and are evidence of [Milberg's] appreciation of the merits and complexity of this litigation."

In *In re Lucent Technologies, Inc. Securities Litigation*, 307 F. Supp. 2d 633, 641-47 (D.N.J. 2004), Judge Pisano issued an opinion approving the $600 million settlement and complimenting Milberg's work as co-lead counsel for the class as follows:

> [T]he attorneys representing the Plaintiffs are highly experienced in securities class action litigation and have successfully prosecuted numerous class actions throughout the United States. They are more than competent to conduct this action. Co-Lead Counsel diligently and aggressively represented the Plaintiffs before this Court and in the negotiations that resulted in the Settlement. . . . [T]he efforts and ingenuity of Lead Plaintiffs and Lead Counsel resulted in an extremely valuable Settlement for the Benefit of the Class.

In *In re Rite Aid Corp. Securities Litigation*, 269 F. Supp. 2d 603, 611 (E.D. Pa. 2003), Judge Dalzell commented on the skill and efficiency of the Milberg attorneys litigating this complex case:

> At the risk of belaboring the obvious, we pause to say a specific word about . . . the skill and efficiency of the attorneys involved. [Milberg was] extraordinarily deft and efficient in handling this most complex matter. [T]hey were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings. . . . In short, it would be hard to equal the skill class counsel demonstrated here.

 **MILBERG**LLP

In *In re IKON Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 195 (E.D. Pa. 2000), Judge Katz commented on Milberg's skill and professionalism as one of plaintiffs' co-lead counsel:

> First, class counsel is of high caliber and has extensive experience in similar class action litigation. . . . Each of the co-lead counsel firms has a national reputation for advocacy in securities class actions, and there is no doubt that this standing enhanced their ability both to prosecute the case effectively and to negotiate credibly. . . .
>
> Of particular note in assessing the quality of representation is the professionalism with which all parties comported themselves. The submissions were of consistently high quality, and class counsel has been notably diligent in preparing filings in a timely manner even when under tight deadlines. This professionalism was also displayed in class counsel's willingness to cooperate with other counsel when appropriate. . . . This cooperation enabled the parties to focus their disputes on the issues that mattered most and to avoid pointless bickering over more minor matters.

In *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998), in an opinion approving settlements totaling over $1.027 billion, Judge Sweet commented:

> Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

Judicial recognition of Milberg's excellence is not limited to courts within the United States. In *In re Flag Telecom Holdings, Ltd. Securities Litigation*, No. 02-3400 (S.D.N.Y. 2009), Milberg litigated a discovery dispute before the English Royal High Court of Justice, Queens Bench Division, which recognized the Milberg attorney handling the matter as a "Grade A" lawyer and a "vital cog in the machine." Likewise, in *Sharma v. Timminco Ltd.*, 09-378701 (Can. Ont. Sup. Ct. 2009), Canada's Ontario Superior Court of Justice recognized Milberg's "fine reputation and excellent credentials" in connection with Milberg's representation in a securities case pending in Canada.

Milberg has also been recognized for its commitment to public service. In lauding Milberg's work representing victims of the September 11th attack on the World Trade Center in connection with the September 11 Victims Compensation Fund, Special Master Kenneth R. Feinberg stated the following:

> Once again, as I have learned over the years here in New York, the [Milberg] firm steps up to the plate in the public interest time and time again. The social conscience of the [Milberg] firm, acting through its excellent associates and partners, help deal with crises that confront the American people and others, and I am personally in the debt of Milberg . . . for the work that it is doing . . . . [T]hey are second among none in terms of the public interest, and I'm very, very grateful, not only to you guys for doing this, but . . . for the firm's willingness to help out. I wanted to let everybody know that.

*In re September 11 Victim Compensation Fund*, Preliminary Hearing, Claim No. 212-003658 (Dec. 9, 2003).



## NOTEWORTHY RESULTS

The quality of Milberg's representation is further evidenced by the Firm's numerous significant recoveries, some of which are described below.

- ***In re Chase Bank USA, N.A. "Check Loan" Contract Litig.***, No. 09-2032 (N.D. Cal.). Milberg served on the Executive Committee representing the class in this action against JP Morgan Chase & Co. The complaint alleged that Chase improperly increased by 150% the minimum monthly payment requirement for customers who entered into balance transfer loans with "fixed" interest rates that were guaranteed to remain so for the "life of the loan." Milberg and its co-counsel, achieved a $100 million settlement for the class.

- In ***In re Vivendi Universal, S.A. Securities Litigation***, No. 02-5571 (S.D.N.Y.), Milberg lawyers were instrumental in obtaining a jury verdict for an international class of defrauded investors after a trial lasting nearly four months. The jury found Vivendi liable for 57 false or misleading class period statements. The case is now in post-verdict proceedings. Even with claimants who made foreign purchases removed from the class after the Supreme Court's *Morrison* decision, total damage claims exceed $1 billion.

- ***Mason v. Medline***, No. 07-05615 (N.D. Ill.). Milberg successfully represented a healthcare worker in a False Claims Act case against his former employer, Medline Industries, Inc., one of the nation's largest suppliers of medical and surgical products, along with its charitable arm, The Medline Foundation. The suit alleged that Medline engaged in a widespread illegal kickback scheme targeting hospitals and other healthcare providers that purchase medical products paid for by federal healthcare programs. Although a party to the settlement agreement, the U.S. Department of Justice chose not to intervene in the lawsuit. Milberg pursued the case on a non-intervened basis and recovered $85 million on behalf of the federal government -- one of the largest settlements of a False Claims Act case in which the government declined to intervene. The whistleblower was awarded 27.5% of the proceeds.

- ***Blessing v. Sirius XM Radio, Inc.***, No. 09-10035 (S.D.N.Y.). This antitrust case stemmed from the 2008 merger of Sirius Satellite Radio, Inc. and XM Satellite Holdings, Inc. that created Sirius XM, the nation's only satellite radio company. The plaintiffs alleged that the merger of the only two U.S. satellite radio providers was an illegal move to eliminate competition and monopolize the satellite radio market. Before the merger, Sirius CEO Mel Karmazin convinced regulators not to block the deal by promising that "the combined company will not raise prices" and that the merger would actually result in "lower prices and more choice for the consumer." After the merger, Sirius quickly reversed course, raised prices by 15-40%, and eliminated multiple radio stations. Milberg achieved a settlement for the class valued at $180 million.

- ***In re Initial Public Offering Securities Litigation***, No. 21-92 (S.D.N.Y.). Milberg represented investors in 310 consolidated securities actions arising from an alleged market manipulation scheme. Plaintiffs alleged, among other things, that approximately 55 defendant investment banks, in dealing with certain of their clients, conditioned certain allocations of shares in initial public offerings on the subsequent purchase of more shares in the aftermarket, thus artificially boosting the prices of the subject securities. This fraudulent scheme, plaintiffs alleged, was a major contributing factor in the now infamous technology "bubble" of the late 1990s and early 2000s. As a member of the court-appointed Plaintiffs' Executive Committee, and with certain partners appointed by the court as liaison counsel, Milberg oversaw the efforts of approximately 60 plaintiffs' firms in combating some of the most well-respected defense firms in the nation. In granting final approval to a $586 million settlement on October 5, 2009, the court described the law firms comprising the

 **MILBERG** LLP

Plaintiffs' Executive Committee as the "cream of the crop."

- *Carlson v. Xerox*, No. 00-1621 (D. Conn). Milberg served as co-lead counsel in this lawsuit, which consolidated 21 related cases alleging violations of the federal securities laws. Plaintiffs alleged that Xerox and several of its top officers reported false financial results during the class period and failed to adhere to the standard accounting practices the company claimed to have followed. In the course of litigating plaintiffs' claims, Milberg engaged in arduous and exhaustive factual discovery, including review and analysis of more than four million pages of complex accounting and auditing documents and thousands of pages of SEC deposition transcripts. Plaintiffs' claims survived three motions to dismiss and a motion for summary judgment, ultimately resulting in a $750 million settlement, which received final approval on January 14, 2009.

- *In re Tyco International Ltd., Securities Litigation*, MDL 1335 (D.N.H.). Milberg served as co-lead counsel in this litigation, which involved claims under the Securities Act of 1933 and the Securities Exchange Act of 1934 against Tyco and its former CEO, CFO, general counsel, and certain former directors arising out of allegations of Tyco's $5.8 billion overstatement of income and $900 million in insider trading, plus hundreds of millions of dollars looted by insiders motivated to commit the fraud. Plaintiffs also asserted claims under the 1933 and 1934 Acts against PricewaterhouseCoopers LLP for allegedly publishing false audit opinions on Tyco's financial statements during the class period and failing to audit Tyco properly, despite knowledge of the fraud. On December 19, 2007, the court approved a $3.2 billion settlement of the plaintiffs' claims and praised the work of co-lead counsel.

- *In re Sears, Roebuck & Co. Securities Litigation*, No. 02-7527 (N.D. Ill.). This case involved allegations that Sears concealed material adverse information concerning the financial condition, performance, and prospects of Sears' credit card operations, resulting in an artificially inflated stock price. The approved settlement provided $215 million to compensate class members.

- *In re General Electric Co. ERISA Litigation*, No. 04-1398 (N.D.N.Y.). This ERISA class action was brought on behalf of current and former participants and beneficiaries of the General Electric ("G.E.") 401(k) Plan. Milberg, serving as co-lead counsel, achieved a $40 million settlement on behalf of current and former G.E. employees who claimed that the company's 401(k) Plan fiduciaries imprudently invested more than two-thirds of the Plan's assets in company stock. The settlement included important structural changes to G.E.'s 401(k) plan valued at more than $100 million.

- *In re Biovail Corp. Securities Litigation*, No. 03-8917 (S.D.N.Y.). Milberg, representing Local 282 Welfare Trust Fund and serving as co-lead counsel, litigated this complex securities class action brought on behalf of a class of defrauded investors, alleging that defendants made a series of materially false and misleading statements concerning Canadian company Biovail's publicly reported financial results and the company's then new hypertension/blood pressure drug, Cardizem LA. This was a highly complex case in which counsel took numerous depositions across the U.S. and Canada and obtained documents from defendants and several third-parties, including, among others, UBS, McKinsey & Co., and Merrill Lynch. Milberg obtained a $138 million settlement for the class, and Biovail agreed to institute significant corporate governance changes.

- *In re Nortel Networks Corp. Securities Litigation*, No. 01-1855 (S.D.N.Y.). In this federal securities fraud class action, Milberg served as lead counsel for the class and the court-appointed lead plaintiff, the Trustees of the Ontario Public Service Employees' Union Pension Plan Trust Fund. In certifying the class, the court specifically rejected the defendants' argument that those who traded in Nortel securities on the Toronto Stock Exchange (and not the New York Stock Exchange) should be excluded from the class. The Second Circuit denied the defendants' attempted appeal. On January 29, 2007, the court approved a settlement valued at $1.142 billion.



- *In re American Express Financial Advisors Securities Litigation*, No. 04-1773 (S.D.N.Y.). This case involved allegations that American Express Financial Advisors violated securities laws by representing to class members that the company would provide tailored financial advice, when the company actually provided "canned" financial plans and advice designed to steer clients into American Express and certain nonproprietary mutual funds. The case settled for $100 million, with the settlement agreement requiring that the company institute remedial measures.

- *In re Lucent Technologies, Inc. Securities Litigation*, No. 00-621 (D.N.J.). In this federal securities fraud action in which Milberg served as co-lead counsel, plaintiffs alleged, *inter alia*, that Lucent and its senior officers misrepresented the demand for Lucent's optical networking products and improperly recognized hundreds of millions of dollars in revenues. The settlement provided compensation of $600 million to aggrieved shareholders who purchased Lucent stock between October 1999 and December 2000.

- *In re Raytheon Co. Securities Litigation*, No. 99-12142 (D. Mass.). This case, in which Milberg served as lead counsel, concerned claims that a major defense contractor failed to write down assets adequately on long term construction contracts. In May 2004, Raytheon and its auditor, PricewaterhouseCoopers LLP, settled for a total of $460 million.

- In *In re Rite Aid Corp. Securities Litigation*, No. 99-1349 (E.D. Pa.), in which Milberg served as co-lead counsel, the plaintiffs asserted federal securities fraud claims arising out of allegations that Rite Aid failed to disclose material problems with its store expansion and modernization program, resulting in artificially inflated earnings. Judge Dalzell approved class action settlements totaling $334 million against Rite Aid ($207 million), KPMG ($125 million), and certain former executives of Rite Aid ($1.6 million).

- In *In re CMS Energy Corp. Securities Litigation*, No. 02-72004 (E.D. Mich.), a federal securities fraud case arising out of alleged round-trip trading practices by CMS Energy Corporation, Judge Steeh approved a cash settlement of more than $200 million. Milberg served as co-lead counsel in this litigation.

- *In re Deutsche Telekom AG Securities Litigation*, No. 00-9475 (S.D.N.Y.). Milberg served as co-lead counsel in this securities class action alleging that Deutsche Telekom issued a false and misleading registration statement, which improperly failed to disclose its plans to acquire VoiceStream Wireless Corporation and materially overstated the value of the company's real estate assets. On June 14, 2005, Judge Buchwald approved a $120 million cash settlement.

- *In re CVS Corp. Securities Litigation*, No. 01-11464 (D. Mass.). Milberg served as co-lead counsel in this class action alleging that defendants engaged in a series of accounting improprieties and issued false and misleading statements which artificially inflated the price of CVS stock. On September 7, 2005, Judge Tauro approved a $110 million cash settlement for shareholders who acquired CVS stock between February 6, 2001, and October 30, 2001.

- *Scheiner v. i2 Technologies, Inc.*, No. 01-418 (N.D. Tex.). Milberg served as lead counsel in this securities fraud case, filed on behalf of certain purchasers of i2 common stock. The plaintiffs alleged that certain of the company's senior executives made materially false and misleading statements and omissions in i2's public statements and other public documents regarding i2's software, thereby artificially inflating the price of i2's common stock. In May 2004, Milberg recovered a settlement of $84.85 million.

- *In re Royal Dutch/Shell Transport ERISA Litigation*, No. 04-1398 (D.N.J.). This was an ERISA breach of fiduciary duty class action against the Royal Dutch/Shell Oil Group of Companies on behalf of certain of the companies' U.S. employee investment plan participants. Notably, the $90 million settlement included important provisions regarding the monitoring and training of individuals appointed to be ERISA fiduciaries.

- Milberg served as co-lead counsel in *Irvine v. ImClone Systems, Inc.*, No. 02-0109



(S.D.N.Y.), in which a $75 million cash settlement was approved by the court in July 2005. Plaintiffs alleged that ImClone issued a number of misrepresentations and fraudulent statements to the market regarding the likelihood of approval of the drug Erbitux, thereby artificially inflating the price of ImClone stock.

- In *In re W.R. Grace & Co. (Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp. and Official Committee of Asbestos Personal Injury Claimants v. Fresenius Medical Care Holdings, Inc.)*, Nos. 02-2210 and 02-2211 (D. Del.), Milberg acted as lead counsel for the asbestos personal injury and property damage committees in two separate fraudulent conveyance actions within the W.R. Grace bankruptcy. The actions sought to return the assets of Sealed Air Corporation and Fresenius Medical Care Holdings (each of which had been Grace subsidiaries pre-bankruptcy) to the W.R. Grace bankruptcy estate. Complaints in both cases were filed in mid-March 2002, and agreements in principle in both cases were reached on November 27, 2002, the last business day before trial was set to begin in the Sealed Air matter. The two settlements, which consisted of both cash and stock, were valued at approximately $1 billion.

- *Nelson v. Pacific Life Insurance Co.*, No. 03-131 (S.D. Ga.). Milberg served as lead counsel in this securities fraud class action arising from allegations of deceptive sales of deferred annuity tax shelters to investors for placement in retirement plans that are already tax-qualified. The court approved a $60 million settlement of claims arising from such deception.

- The Firm was lead counsel in *In re Prudential Insurance Co. Sales Practice Litigation*, No. 95-4704 (D.N.J.), a landmark case challenging Prudential's sales practices that resulted in a recovery exceeding $4 billion for certain policyholders. The settlement was approved in a comprehensive Third Circuit decision.

- In *In re NASDAQ Market-Makers Antitrust Litigation*, MDL 1023 (S.D.N.Y.), Milberg served as co-lead counsel for a class of investors. The class alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry-wide conspiracy in one of the largest and most important antitrust cases in recent history. After more than three years of intense litigation, the case settled for a total of $1.027 billion, one of the largest antitrust settlements at that time.

- *In re Washington Public Power Supply System Securities Litigation*, MDL 551 (D. Ariz.) was a massive securities fraud litigation in which Milberg served as co-lead counsel for a class that obtained settlements totaling $775 million, the largest-ever securities fraud settlement at that time, after several months of trial.

- *In re Exxon Valdez*, No. 89-095 (D. Alaska) and *In re Exxon Valdez Oil Spill Litigation*, 3 AN-89-2533 (Alaska Sup. Ct. 3d Jud. Dist.). Milberg was a member of the Plaintiffs' Coordinating Committee and co-chair of the Plaintiffs' Law Committee in the massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. Plaintiffs obtained a jury verdict of $5 billion, which, after years of appeals by Exxon, was reduced to approximately $500 million by the United States Supreme Court. Recently the United States Court of Appeals for the Ninth Circuit held that plaintiffs are entitled to post judgment interest on the award in the amount of approximately $470 million.

- In *In re Managed Care Litigation*, MDL 1334 (S.D. Fla.). Final approval of a settlement between a nationwide class of physicians and defendant CIGNA Healthcare, valued in excess of $500 million, was granted on April 22, 2004. A similar settlement valued in excess of $400 million involving a nationwide class of physicians and Aetna was approved by the court on November 6, 2003. The settlements stem from a series of lawsuits filed in both state and federal courts by physicians and medical associations against many of the nation's largest health insurers arising from allegations that the insurers engaged in a fraudulent scheme to systematically obstruct, reduce, delay, and deny payments and reimbursements to health care providers. These settlements brought sweeping changes to the health care industry and significant improvements to physician-related business practices.



- ***In re Sunbeam Securities Litigation***, No. 98-8258 (S.D. Fla). Milberg acted as co-lead counsel for the class. Plaintiffs alleged that Sunbeam, its auditor, and its management engaged in a massive accounting fraud which led to a restatement of over three years of previously reported financial results. The court approved a combined settlement of more than $140 million, including a $110 million settlement with Arthur Andersen LLP, Sunbeam's auditor. At that time, the Andersen settlement was one of the largest amounts ever paid by a public accounting firm to settle federal securities claims. The settlement with the individuals was achieved on the eve of trial, and ended almost four years of litigation against Andersen and Sunbeam's insiders, including Albert Dunlap, Sunbeam's former Chairman and CEO. The settlement included a personal contribution from Dunlap of $15 million.

- ***In re Triton Energy Limited Securities Litigation***, No. 98-256 (E.D. Tex.). Plaintiffs alleged that defendants misrepresented, among other things, the nature, quality, classification, and quantity of Triton's Southeast Asia oil and gas reserves during the period March 30, 1998 through July 17, 1998. The case settled for $42 million.

- In ***In re Thomas & Betts Securities Litigation***, No. 00-2127 (W.D. Tenn.), the plaintiffs, represented by Milberg as co-lead counsel, alleged that Thomas & Betts engaged in a series of accounting improprieties while publicly representing that its financial statements were in compliance with GAAP, and failed to disclose known trends and uncertainties regarding its internal control system and computer and information systems. The case settled for $46.5 million dollars in cash from the company and $4.65 in cash from its outside auditor, KPMG.

- ***In re MTC Electronic Technologies Shareholder Litigation***, No. 93-0876 (E.D.N.Y.). Plaintiffs alleged that defendants issued false and misleading statements concerning, among other things, purported joint venture agreements to establish telecommunications systems and manufacture telecommunications equipment in China. The court approved a settlement of $70 million, including $65 million in cash and $5 million worth of MTC Class A shares with "put" rights.

- In ***In re PaineWebber Limited Partnerships Litigation***, No. 94-8547 (S.D.N.Y.). Milberg represented investors alleging that PaineWebber developed, marketed, and operated numerous investment partnerships as part of an ongoing conspiracy to defraud investors and enrich itself through excessive fees and commissions over a twelve-year period. On March 20, 1997, Judge Sidney Stein approved a $200 million settlement, consisting of $125 million in cash and $75 million worth of guarantees and fee waivers.

- In ***Andrews v. AT&T***, No. 91-175 (S.D. Ga.) the Firm represented a class of persons who paid for premium-billed "900-number" calls that involved allegedly deceptive games of chance, starting in 1993. Defendants included major long-distance companies, which approved the call programs and billed for the calls. Defendant MCI settled for $60 million in benefits. The class against AT&T was decertified on appeal and the Firm prosecuted the individual plaintiffs' claims, obtaining a jury verdict in 2003 for compensatory and punitive damages.

In the context of shareholder derivative actions, Milberg has protected shareholder investments by effectuating important changes in corporate governance as part of the global settlement of such cases. Cases in which such changes were made include:

- ***In re Comverse Technology, Inc. Derivative Litigation***, No. 601272/2006 (N.Y. Sup. Ct. N.Y. Cnty.). On December 28, 2009, Milberg announced a $62 million settlement for the derivative plaintiffs, which was approved by the Court on June 23, 2010. The settlement also resulted in significant corporate governance reforms, including the replacement of the offending directors and officers with new independent directors and officers; the amendment of the company's bylaws to permit certain long-term substantial shareholders to propose, in the Company's own proxy materials, nominees for election as directors (proxy access); and the requirement that all equity grants be approved by both the

 **MILBERG** LLP

Compensation Committee and a majority of the non-employee members of the Board.

- *In re Topps Co., Inc. Shareholder Litig.*, No. 600715/2007 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 17, 2007). Milberg served as co-lead counsel in this transactional case, which led to a 2007 decision vindicating the rights of shareholders under the rules of comity and the doctrine of *forum non conveniens* to pursue claims in the most relevant forum, notwithstanding the fact that jurisdiction might also exist in the state of incorporation. This case was settled in late 2007 in exchange for a number of valuable disclosures for the class.

- *In re Marketspan Corporate Shareholder Litigation*, No. 15884/98 (N.Y. Sup. Ct. Nassau Cnty.). The settlement agreement in this derivative case required modifications of corporate governance structure, changes to the audit committee, and changes in compensation awards and to the nominating committee.

- *In re Trump Hotels Shareholder Derivative Litigation*, No. 96-7820 (S.D.N.Y.). In this case, the plaintiff shareholders asserted various derivative claims on behalf of the company against certain Trump entities and senior Trump executives in connection with the self-serving sale of a failing casino to the company in which the plaintiffs held stock. Milberg negotiated a settlement on behalf of the plaintiffs that required Donald Trump to contribute a substantial portion of his personal interest in a pageant he co-owned. In addition, the settlement required the company to increase the number of directors on its board, and certain future transactions had to be reviewed by a special committee.

 **MILBERG**LLP

# PRECEDENT-SETTING DECISIONS

Milberg has consistently been a leader in developing the federal securities, antitrust, and consumer protection laws for the benefit of investors and consumers. The Firm has represented individual and institutional plaintiffs in hundreds of class action litigations in federal and state courts throughout the country. In most of those cases, Milberg has served as lead or co-lead counsel. The Firm has also been responsible for establishing many important precedents, including the following:

- ***Platinum Partners v. Chicago Board Options Exchange, Inc.***, No. 1-11-2903 (Ill. App. Ct. 2012). Milberg represented an investment management group in a case against the Chicago Board Options Exchange, Inc. ("CBOE") and Options Clearing Corp. ("OCC"). The plaintiff investment management group alleged that it was injured when the CBOE and OCC privately disclosed strike price information to certain insiders prior to the information being made public. In the interim between the private disclosure and the public announcements, the plaintiff purchased tens of thousands of affected options. The lower court dismissed the complaint on the grounds that the CBOE and OCC, as self-regulatory organizations, were immune from suit. However, the Appellate Court reversed, holding that a private disclosure to insiders served no regulatory purpose and should not be protected from suit. The Illinois Supreme Court declined the defendants' petition for leave to appeal.

- In ***Merck & Co., Inc. v. Reynolds*** 130 S. Ct. 1784 (2010), Milberg, along with other co-lead counsel, won a significant victory before the U.S. Supreme Court, which issued a decision addressing when an investor is placed on "inquiry notice" of a securities fraud violation sufficient to trigger the statute of limitations under 28 U.S.C. § 1658(b). The Court unanimously ruled that the two-year statute of limitations was not triggered because plaintiffs did not have actual or constructive knowledge of "the facts constituting the violation," and as such, the case was not time-barred. Importantly, the Court held that the plaintiff must be on actual or constructive notice of facts concerning the defendants' scienter in order to trigger the statute of limitations. This decision is significant in that it potentially enables plaintiffs to bring claims based on misstatements that are more than two years old.

- ***In re Lord Abbett Mutual Funds Fee Litigation***, 553 F.3d 248 (3d Cir. 2009). This important decision set significant precedent regarding the scope of preemption under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). In reversing the District Court's dismissal of the plaintiffs' claims, the Third Circuit held that "SLUSA does not mandate dismissal of an action in its entirety where the action includes only some pre-empted claims." In so holding, the court explained that "nothing in the language, legislative history, or relevant case law mandates the dismissal of an entire action that includes both claims that do not offend SLUSA's prohibition on state law securities class actions and claims that do . . . ."

- ***Abdullahi v. Pfizer, Inc.***, 562 F.3d 163, 170 (2d Cir. 2009). In this matter, the plaintiffs, Nigerian children and their families, asserted claims under the Alien Tort Statute ("ATS") in connection with Pfizer's clinical trial of the drug, Trovan, without their knowledge. In January 2009, the Second Circuit reversed the District Court's dismissal for lack of jurisdiction. The court held that the plaintiffs pled facts sufficient to state a cause of action under the ATS for a violation of international law prohibiting medical experimentation on human subjects without their consent.

- ***In re Comverse Technology, Inc. Derivative Litigation***, 866 N.Y.S.2d 10 (App. Div. 1st Dep't 2008). In this derivative case in which Milberg serves as co-lead counsel, plaintiff shareholders sued certain of the company's officers and directors based on allegations of illegal options backdating. The lower court dismissed the plaintiffs' claims, holding that the plaintiffs failed to make a pre-suit demand on the company's board, and that in any event, the board had already formed a special committee to investigate the misconduct. In this significant



opinion reversing the lower court's dismissal, the Appellate Division clarified the standards of demand futility and held that a board of directors loses the protection of the business judgment rule where there is evidence of the directors' self-dealing and poor judgment. The court noted that the mere creation of a special committee did not justify a stay of the action and did not demonstrate that the board took appropriate steps. Rather, "the picture presented in the complaint is that of a special committee taking a tepid rather than a vigorous approach to the misconduct and the resultant harm. Under such circumstances, the board should not be provided with any special protection."

- *South Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). The important opinion issued by the Ninth Circuit in this securities fraud class action clarified, in the post-*Tellabs* environment, whether a theory of scienter based on the "core operations" inference satisfies the PSLRA's heightened pleading standard. In siding with the plaintiffs, represented by Milberg, the Ninth Circuit held that "[a]llegations that rely on the core operations inference are among the allegations that may be considered in the complete PSLRA analysis." The court explained that under the "holistic" approach required by *Tellabs*, all allegations must be "read as a whole" in considering whether plaintiffs adequately plead scienter. After remand, the District Court found that the plaintiffs sufficiently alleged scienter under the Ninth Circuit's analysis.

- *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049 (9th Cir. 2008). In this securities fraud class action in which Milberg represents the plaintiffs, the Ninth Circuit reversed the District Court's dismissal of the complaint in this opinion clarifying loss causation pleading requirements. In ruling that the plaintiffs adequately pled loss causation, the Ninth Circuit held that the plaintiffs' complaint identified a "specific economic loss" following the issuance of a specific press release, along with allegations of misrepresentations that were described in "abundant detail." The opinion established that plaintiffs in a securities fraud action adequately plead loss causation where

they provide sufficient detail of their loss causation theory and some assurance that the theory has a basis in fact. Based on this analysis, the dismissal was reversed, and the case was remanded to the District Court for further proceedings.

- In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), in which Milberg is lead counsel for the class, the United States Supreme Court announced a uniform standard for evaluating the sufficiency of a complaint under the PSLRA. The court held that on a motion to dismiss, a court "must consider the complaint in its entirety," accepting "all factual allegations in the complaint as true," as well as "tak[ing] into account plausible opposing inferences." On remand, the Seventh Circuit concluded that "the plaintiffs have succeeded, with regard to the statements identified in our previous opinion as having been adequately alleged to be false and material, in pleading scienter in conformity with the requirements of the PSLRA. We therefore adhere to our decision to reverse the judgment of the district court dismissing the suit." The unanimous decision was written by Judge Richard A. Posner.

- *Asher v. Baxter International, Inc.*, 377 F.3d 727 (7th Cir. 2004). In reversing and remanding the District Court's dismissal, the Seventh Circuit resolved in plaintiffs' favor an important issue involving the PSLRA's "safe harbor" for forward-looking statements. The court held that whether a cautionary statement is meaningful is an issue of fact, because whether a statement is meaningful or not depends in part on what the defendant knew when the statement was made as well as other issues of fact. Thus, this issue is not appropriately resolved on a motion to dismiss.

- *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003). This important decision strongly reaffirmed the principle that whether an undisclosed fact would have been material to investors cannot ordinarily be decided on a motion to dismiss. The Eighth Circuit, stressing that "[t]he question of materiality hinges on the particular circumstances of the company in question," observed that even relatively small errors in financial statements might be material if they concern areas of particular importance to



investors and raise questions about management integrity.

- *In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002). In this opinion, the First Circuit joined the Second Circuit in allowing a complaint to be based on confidential sources. The court also accepted the argument made by plaintiffs, represented by Milberg, that courts should consider the amount of discovery taken place prior to deciding a motion to dismiss, with a lack of discovery resulting in a correspondingly less stringent standard for pleading securities fraud claims with particularity.

- In *Puckett v. Sony Music Entertainment*, No. 108802/98 (N.Y. Sup. Ct. N.Y. Cnty. 2002), a class action was certified against Sony Music Entertainment on behalf of a class of recording artists who were parties to standard Sony recording or production agreements entered into during the class period. The complaint alleged that Sony had a policy of treating the value added tax on foreign sales of recordings improperly thereby impermissibly reducing the royalties paid or credited to the class members. Justice DeGrasse of the New York State Supreme Court determined that class certification was appropriate and that Gary Puckett (of Gary Puckett & the Union Gap) and jazz musician and composer Robert Watson were appropriate class representatives to represent the class of artists and producers to whom Sony accounts for foreign record royalties.

- *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). The Firm was lead counsel in this seminal securities fraud case in which the Second Circuit undertook an extensive analysis of the statutory text and the legislative history of the PSLRA and pre-existing Second Circuit case law. Among other things, the Second Circuit held that the PSLRA's pleading standard for scienter was largely equivalent to the pre-existing Second Circuit standard and vacated the District Court's dismissal which sought to impose a higher standard for pleading scienter under the PSLRA. The Second Circuit also rejected any general requirement that plaintiffs' confidential sources must be disclosed to satisfy

the PSLRA's newly-enacted particularity requirements.

- *In re Advanta Corp. Securities Litigation*, 180 F.3d 525 (3d Cir. 1999). Here, the plaintiffs, represented by Milberg, successfully argued that under the PSLRA, scienter is sufficiently pled by making an adequate showing that the defendants acted knowingly or with reckless disregard for the consequences of their actions. The Third Circuit specifically adopted the Second Circuit's scienter pleading standard for pleading fraud under the PSLRA.

- In *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), the Second Circuit reversed the District Court's ruling, which denied plaintiffs leave to amend to assert a cause of action against defendants for failing to disclose that the defendant Trust was unable to utilize proper "hedging" techniques to insure against risk of loss. In the court's view, taken together and in context, the Trust's representations would have misled a reasonable investor.

- In *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996), the First Circuit remanded plaintiffs' action after affirming, in part, Milbergs' position that in association with the filing of a prospectus related to the issuance of securities, a corporate-issuer must disclose intra-quarter, materially adverse changes in its business, if such adverse changes constitute "material changes" the disclosure of which is required pursuant to the Securities Act of 1933.

- *In re Salomon, Inc. Shareholders Derivative Litigation*, 68 F.3d 554 (2d Cir. 1995). The Second Circuit affirmed the District Court's holding that derivative federal securities claims against defendants would not be referred to arbitration pursuant to the arbitration provisions of the Rules of the New York Stock Exchange, but would be tried in District Court. Shortly thereafter, the case settled for $40 million.

- *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991). The Supreme Court upheld the right of a stockholder of a mutual fund to bring a derivative suit without first making a pre-suit demand. Specifically, the Court held that "where a gap in the federal securities laws must be bridged by a rule that bears on the allocation

 **MILBERG** LLP

NEW YORK
LOS ANGELES
DETROIT

of governing powers within the corporation, federal courts should incorporate state law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute. . . . Because a futility exception to demand does not impede the regulatory objectives of the [Investment Company Act], a court that is entertaining a derivative action under that statute must apply the demand futility exception as it is defined by the law of the State of incorporation."

- ***Mosesian v. Peat, Marwick, Mitchell & Co.***, 727 F.2d 873 (9th Cir. 1984), *cert. denied*, 469 U.S. 932 (1984). The Ninth Circuit upheld an investor's right to pursue a class action against an accounting firm, adopting statute of limitation rules for Section 10(b) suits that are favorable to investors.

- ***Hasan v. CleveTrust Realty Investors***, 729 F.2d 372 (6th Cir. 1984). The Sixth Circuit very strictly construed, and thus narrowed, the ability of a "special litigation committee" of the board of a public company to terminate a derivative action brought by a shareholder.

- ***Fox v. Reich & Tang, Inc.***, 692 F.2d 250 (2d Cir. 1982), *aff'd sub nom*, ***Daily Income Fund, Inc. v. Fox***, 464 U.S. 523 (1984). The court held that a Rule 23.1 demand is not required in a shareholder suit brought pursuant to Section 36(b) of the Investment Company Act.

- ***Rifkin v. Crow***, 574 F.2d 256 (5th Cir. 1978). The Fifth Circuit reversed an order granting

summary judgment for defendants in a Section 10(b) case, paving the way for future acceptance of the "fraud-on-the-market" rationale in the Fifth Circuit.

- ***Blackie v. Barrack***, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976). This is the seminal appellate decision on the use of the "fraud-on-the-market" theory of reliance, allowing investors who purchase stock at artificially inflated prices to recover even if they were personally unaware of the false and misleading statements reflected in the stock's price. In so holding, the court noted that class actions are necessary to protect the rights of defrauded purchasers of securities.

- ***Bershad v. McDonough***, 300 F. Supp. 1051 (N.D. Ill. 1969), *aff'd*, 428 F.2d 693 (7th Cir. 1970). In this case, the plaintiff, represented by Milberg, obtained summary judgment on a claim for violation of Section 16(b) of the Securities Exchange Act, where the transaction at issue was structured by the defendants to look like a lawful option. The decision has been cited frequently in discussions as to the scope and purpose of Section 16(b).

- ***Heit v. Weitzen***, 402 F.2d 909 (2d Cir. 1968). The court held that liability under Section 10(b) of the Securities Exchange Act extends to defendants, such as auditors, who were not in privity with the named plaintiffs or the class represented by the named plaintiffs.

 **MILBERG**LLP

NEW YORK
LOS ANGELES
DETROIT

*Partners*

**MICHAEL C. SPENCER** graduated from Yale University in 1973 with a B.A. degree, *magna cum laude*, with distinction, in philosophy. While at Yale, he was elected to Phi Beta Kappa. Mr. Spencer received a J.D. degree from Harvard Law School, *cum laude*, in 1976.

Mr. Spencer has prosecuted a broad range of cases at Milberg LLP, with an emphasis on representing plaintiffs in class and other representative actions involving complex financial issues.

He was one of the principal trial counsel for plaintiffs in *In re Vivendi Universal, S.A. Securities Litigation* (S.D.N.Y.), a securities fraud class action in which the jury returned a verdict for the plaintiffs in January 2010. He is presently handling post-trial motions and defendant's anticipated appeal. The case is notable for the size of the verdict and for inclusion of investors from France, England, and the Netherlands, as well as the United States, in the certified class.

Mr. Spencer has handled many other securities cases at the Firm, including those against defendants in the fields of technology, real estate, finance, leasing, manufacturing, and pharmaceuticals. His first exposure to this type of case was in the precedent-setting *"WPPSS"* litigation in the late 1980s, which involved bond defaults on nuclear power plants in the Pacific Northwest and established the blueprint for prosecuting many complex securities class actions that followed.

Mr. Spencer has also led the Firm's prosecution of other cases in diverse fields. He was one of two principal trial counsel representing the FDIC in its year-long trial against a major accounting firm involving failed-bank audits, which led to a global settlement covering all government claims just before closing arguments to the jury. He has prosecuted consumer and securities claims against companies that sold deferred annuities unsuitable for retirement plan investors. He has taken appraisal and breach of fiduciary duty cases to trial in Delaware and Pennsylvania. He had extensive involvement in representing a coalition of union health care funds seeking to recover costs for treating smoking-related illnesses from the tobacco industry, pursuing the cases through several appeals. He has also represented plaintiffs in cases involving accounting malpractice, limited partnership investments, real estate closing fees and mortgage insurance, contract disputes, defamation, unlawful lotteries, and consumer deception.

Mr. Spencer began his legal career as a law clerk to U.S. District Judge Wm. Matthew Byrne Jr. in Los Angeles (1976-77). He then returned to New York and joined Cravath, Swaine & Moore as an associate, where he worked until 1986, when he joined Milberg as an associate and became a partner later that year.

**ROBERT A. WALLNER** received his B.A. degree from the University of Pennsylvania in 1976 graduating *magna cum laude*. He attended New York University School of Law, earning his J.D. degree in 1979. He was elected to the law school's Order of the Coif and served as an editor of the *New York University Law Review*.

Mr. Wallner has litigated complex securities, consumer and antitrust class actions throughout the country. He currently represents plaintiffs in lawsuits arising out of the Madoff Ponzi scheme. He has also represented investors in *In re Initial Public Offering Securities Litigation* (S.D.N.Y), *In re CMS Energy Corporation Securities Litigation* (E.D. Mich.), and *In re Deutsche Telekom AG Securities Litigation* (S.D.N.Y.), and consumers in *In re Synthroid Marketing Litigation* (N.D. Ill.) and the *Mercedes-Benz Tire Litigation* (D.N.J.).

Mr. Wallner is a frequent lecturer on securities and complex litigation issues. He has served on the editorial board of *Securities Litigation Report*, as a faculty member of the American Bar Association's First Annual National Institute on Securities Litigation and Arbitration, and as a member of the Federal Courts Committee of the Association of the Bar of the City of New York. He was recently recognized in Lawdragon's "100 Lawyers You Need to Know in Securities Litigation."

**SANFORD P. DUMAIN** attended Columbia University where he received his B.A. degree in 1978. He graduated *cum laude* from Benjamin N. Cardozo School of Law of Yeshiva University in 1981.

Mr. Dumain represents plaintiffs in cases involving securities fraud, consumer fraud, insurance fraud, and violations of the antitrust laws.

Mr. Dumain was co-lead counsel in *In re Tyco International Ltd., Securities Litigation* in which $3.2 billion was recovered for investors. Mr. Dumain also served as lead counsel in the securities class actions against Nortel and Biovail, which are the highest and third highest recoveries ever in cases involving Canadian companies. The *Nortel* settlement was valued at over $1 billion and *Biovail* settled for over $138 million in cash. Mr. Dumain successfully represented the City of San Jose, California against 13 of the City's broker-dealers and its outside accountants in connection with major losses in unauthorized bond trading.

Mr. Dumain began his career as a law clerk to Judge Warren W. Eginton, United States District Court for the District of Connecticut 1981-1982. During the early years of his practice, he also served as an Adjunct Instructor in Legal Writing and Moot Court at Benjamin N. Cardozo School of Law.

Mr. Dumain has lectured for ALI-ABA concerning accountants' liability and has prosecuted several actions against accounting firms.

Judge Janet C. Hall of the District of Connecticut made the following comment in *In re Fine Host Corporation Securities Litigation* No. 97-2619 (D.Conn.): "The court also finds that the plaintiff class received excellent counseling, particularly from the Chair of the Plaintiffs' Executive Committee, Attorney Dumain."

Mr. Dumain is admitted to practice in the State of New York, United States District Court for the Southern, Eastern, and Western Districts of New York, District of Colorado, and District of Connecticut, and United States Courts of Appeals for the First, Second, Third, Sixth, Seventh, and Eighth Circuits.

Mr. Dumain is the Chair of the Firm's Executive Committee.

**BARRY A. WEPRIN** graduated from Harvard College in 1974. He received a J.D. degree from the New York University School of Law in 1978, and a master of public affairs from the Woodrow Wilson School of Princeton University in 1978. While in law school, Mr. Weprin was notes and comments editor of the *New York University Law Review*.

Since joining Milberg, Mr. Weprin has specialized in securities and insurance litigation. He has served as lead or co-lead counsel in a number of complex securities class action litigations. He was one of the principal attorneys in the sales practice litigations against The New York Life Insurance Company, The New England Life Insurance Service Company, The Massachusetts Mutual Life Insurance Company, The John Hancock Mutual Life Insurance Company, and The Prudential Life Insurance Company which recovered billions of dollars for policyholders. Mr. Weprin is a frequent lecturer on complex litigation issues.

Previously, Mr. Weprin served as law clerk to Judge Charles P. Sifton of the United States District Court for the Eastern District of New York and was associated with the law firm of Wachtell Lipton Rosen & Katz where he specialized in commercial and securities litigation. He also served as general counsel to the New York State Housing Finance Agency and the New York State Medical Care Facilities Finance Agency, two agencies that issue tax exempt bonds for financing nonprofit medical facilities and qualified housing projects.

Mr. Weprin is very active in his community of Mamaroneck, New York, having served as a Town Councilman and a member of the Zoning Board of Appeals. He is President of the National Association of Shareholder and Consumer Attorneys (NASCAT) as well as Vice President of the Institute for Law and Economic Policy (ILEP).

Mr. Weprin is a member of the American Bar Association, the Association of the Bar of the City of New York, the New York County Lawyers Association, and the New York State Bar Association. Mr. Weprin is admitted to practice in New York, the United States District Court for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second Circuit, and the United States Supreme Court.

**BRAD N. FRIEDMAN** focuses his practice on various complex commercial matters, including securities, bankruptcy, consumer, and life insurance class actions.

Mr. Friedman has recovered billions of dollars on behalf of injured plaintiffs, including as lead counsel in numerous "vanishing premium" and "churning" life insurance sales practice class actions (including cases against Prudential and Metropolitan Life).

In 2009, after eight years of arduous litigation, Mr. Friedman recovered $750 million for shareholders in *Carlson v. Xerox*, one of the 10 largest securities class-action settlements in U.S. history. Judge Thompson noted the complexity of the international accounting case and complimented Milberg's legal work, saying, "The class received high-quality legal representation and obtained a very large settlement in the face of vigorous opposition by highly experienced and skilled defense counsel."

In 2002, Mr. Friedman acted as lead counsel on behalf of various asbestos committees in the *W.R. Grace* bankruptcy and successfully recovered approximately $1 billion through a fraudulent conveyance litigation that settled on the eve of trial.

Mr. Friedman is currently representing numerous individuals and organizations victimized by the Bernard Madoff Ponzi scheme.

Mr. Friedman began his legal career as a clerk to the Honorable Max Rosenn, United States Court of Appeals for the Third Circuit. Following his clerkship, Mr. Friedman was associated with Simpson Thacher & Bartlett LLP, where he worked until 1994. Mr. Friedman became a Milberg partner in 1996.

He is a member of the American Constitution Society, the Federal Bar Council, the American Bar Association, the American Association for Justice, the New York State Bar Association, and the New York City Bar Association.

**KIRK E. CHAPMAN** graduated *cum laude* from Harvard University in 1985 with a B.A. degree in biochemistry. He received his J.D. in 1989 from the University of Chicago where he was a member of the *Legal Forum* publication.

Mr. Chapman has over 18 years of experience litigating class and complex matters in a wide range of practice areas. He began his career at Milberg LLP focusing on securities fraud and employment discrimination class actions. Recently, he was one of the Partners at Milberg who successfully prosecuted and settled the *In re Tyco International Ltd., Securities Litigation* for over $3.2 billion in 2007.

Mr. Chapman practices extensively in the False Claims Act "Whistleblower" area as well as Mass Tort litigation. He is the head of Milberg's False Claims Act and Mass Tort practice groups.

Mr. Chapman has been counsel in cases generating some of the largest recoveries under the Federal False Claims Act, including representation of one of the whistleblowers in the FCA case brought against Bristol-Myers Squibb that resulted in the United States Government recovering over $515 million for the Medicare and Medicaid program. He is also counsel in numerous other False Claims Act cases currently under seal.

Mr. Chapman is a member of the Plaintiffs' Steering Committee in the *Bextra* mass tort proceedings and is a member of the Plaintiffs' Executive Committee in the *Rezulin* mass tort litigation.

Mr. Chapman is a member of Taxpayers Against Fraud and the American Association for Justice. He is admitted to practice in the Courts of the State of New York as well as the United States District Courts for the Southern and Eastern Districts of New York.

**ARIANA J. TADLER** is a partner at Milberg LLP and is an elected member of the Firm's Executive Committee. She has extensive experience litigating complex securities and consumer class actions, including high profile, fast-paced cases. Ms. Tadler is widely recognized as one of the nation's leading authorities on electronic discovery and Chairs Milberg's E-Discovery Committee.

Ms. Tadler's accomplishments include litigation of three cases in the Eastern District of Virginia (a/k/a the "Rocket Docket") in less than four years, including *In re MicroStrategy Securities Litigation*, in which plaintiffs' counsel negotiated settlements valued at more than $150 million. Ms. Tadler is one of the court appointed plaintiffs' liaison counsel in the *Initial Public Offering Securities Litigation*, in which the court approved a

$586 million cash settlement in October 2009. Among the thousands of defendants in this coordinated action were 55 prominent investment banks and more than 300 corporate issuers. Ms. Tadler has also been retained in complex litigation as Special Discovery Counsel.

Ms. Tadler is the Chair of The Sedona Conference®'s Steering Committee for Working Group I on Electronic Document Retention and Production, the preeminent "think tank" on E Discovery. In addition, she is on the Advisory Board of Georgetown University Law Center's Advanced E Discovery Institute where she has helped educate federal judges and lawyers on E Discovery issues. Ms. Tadler has served on the Attorney Advisory Committee of the Judicial Improvements Committee of the Southern District of New York. She is actively involved in the reformulation of applicable E Discovery rules and best practices.

Ms. Tadler is AV Preeminent rated (*Martindale Hubbell*'s highest rating) and has been recognized by several prominent legal industry ratings organizations, including: Lawdragon's top 500 lawyers in America (2010–present); Legal 500 in its list of recommended securities litigators in the country; Benchmark Plaintiffs Litigation as a New York securities litigation star; and New York Super Lawyers (2010–present). Ms. Tadler was a recipient of the Women's Venture Fund's 2011 Highest Leaf Award, an honor given annually to women who are exemplary leaders in the business world.

Ms. Tadler is frequently sought to speak on a variety of litigation and discovery–related topics and has also authored or co–authored several publications on E Discovery. Her recent speaking engagements include: HarrisMartin's National Conference of Mass Tort Dialogues (June 2012); PLI's Pretrial Practice 2012 Program (May 2012); ABA 6th National Institute on E Discovery (May 2012); 14th Annual Sedona Conference on Complex Litigation (May 2012); ABA Section of Litigation – Annual CLE Conference (April 2012); New York State Bar Association – Commercial and Federal Litigation Section (January 2012); Georgetown Law's Annual Advanced E Discovery Institute (November 2011); Thomson Reuters – 15th Annual Electronic Discovery & Records Retention Conference (November 2011); Federal Bar Council – 12th Annual Fall Bench and Bar Retreat (October 2011).

Ms. Tadler co chairs Milberg's Client Development Committee and is a member of the Hiring, Diversity, Technology, and Women's Committees. Ms. Tadler is a member of various organizations including: American Bar Association, American Bar Foundation (*Fellow*), American Bar Association for Justice, Federal Bar Council, New York State Bar Association, New York County Lawyers Association, National Association of Women Judges (*Resource Board*), National Association of Women Lawyers, and The New York Inn of Court (*Vice President*). She is also involved in various community and not for profit organizations and currently serves on the boards of MFY Legal Services, Inc. and Women's Venture Fund.

Ms. Tadler graduated from Hamilton College in 1989. In 1992, she received her J.D. from Fordham University School of Law, where she was the Articles and Commentary Editor of the *Fordham Urban Law Journal*, a member of the Moot Court Board, and the 1990 recipient of the American Jurisprudence Award in Criminal Law.

**LORI G. FELDMAN** is a daughter of retired public employees and understands the importance of protecting the investments of employees, as well as the general public, against corporate fraud and breaches of fiduciary duty.

In addition to lecturing on class action practice, Ms. Feldman has served as co-chair of the Continuing Legal Education Committee of the Federal Bar Association for the Western District of Washington. Ms. Feldman has participated as panel faculty in national continuing legal education programs on ERISA and securities fraud class actions arising from the subprime and liquidity crisis. She was named a "Rising Star of Washington Law" by practitioners in Seattle and named a Super Lawyer in 2011 and 2012 by practitioners in the New York Metro area.

Ms. Feldman's representative recoveries exceed $150 million. Recently, she recovered $41.5 million for class members in litigation involving Washington Mutual, Inc. (W.D. Wash.), where plaintiffs received favorable appellate court opinions on the issues of scienter (*South Ferry LP, #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008)) and

class certification.   Ms. Feldman also recovered millions of dollars for class members in litigation involving General Electric Co. (N.D.N.Y.), Rhythms Net Connections (D. Colo.), Gilead Sciences, Inc. (N.D. Cal.), and Boston Scientific Corp., among others.  She is currently representing participants of defined contribution retirement plans in ERISA litigation involving, among others, British Petroleum (BP) (MDL), Morgan Stanley & Co., Inc. (S.D.N.Y.), Macy's, Inc. (S.D. Ohio), Textron, Inc. (D.R.I.), and AIG (S.D.N.Y.).

Ms. Feldman graduated from Albany Law School in 1990, where she served as an Executive Editor of the *Albany Law Review*.  She has interned at the Civil Division of the United States Attorney's Office in Brooklyn, New York.  She is admitted to the bars of the States of Washington and New York and federal district and appellate courts throughout the country.

Ms. Feldman is a member of the Firm's Executive Committee.

MATTHEW GLUCK was a litigation partner for over 30 years at Fried, Frank, Harris, Shriver & Jacobson LLP prior to joining Milberg.   He frequently represented U.S. and foreign businesses and individuals in major litigation and other complex matters.  He has also assisted clients in both formal bankruptcies and out-of-court restructurings of financially troubled companies.

Mr. Gluck twice served as adviser to the court in the restructuring of the Manville Trust in *In re Johns-Manville Corp.*, No. 85-8922 (S.D.N.Y.) and was the legal representative for future claimants in the Chapter 11 filing of Keene Corporation in *In re Keene Corp.*, No. 93-46090 (Bankr. S.D.N.Y.). He also serves as a local judge in Muttontown, New York.  He was one of the lead attorneys for the plaintiffs in the trial against Vivendi which resulted in what may be the largest jury verdict for plaintiffs in a securities class action.  He conducted the examination of Vivendi's former CEO, CFO, and their accounting expert.

Mr. Gluck is admitted to the bar of the State of New York.

MATTHEW A. KUPILLAS graduated from the State University of New York at Albany in 1990 with a B.A. degree in philosophy.  In 1994, Mr. Kupillas received his J.D. degree from New York University School of Law.  Mr. Kupillas focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation.  He is a member of the bar of the State of New York and is admitted to practice before the United States District Court for the Southern and Eastern Districts of New York, the District of Colorado, the Eastern District of Wisconsin, and the United States Court of Appeals for the Tenth Circuit.

PAUL J. ANDREJKOVICS graduated from Union College in 1992, *Phi Beta Kappa*, *magna cum laude*, with a B.A. degree in political science. In 1995, Mr. Andrejkovics received his J.D. degree from Albany Law School.

Mr. Andrejkovics's practice concentrates on class action settlements and settlement administration.  He was admitted as a member of the New York bar in 1996 and is admitted to practice before the United States District Court for the Northern, Southern, and Eastern Districts of New York.

KENT A. BRONSON received a B.A. from State University of New York at Binghamton in 1994. He graduated *cum laude* from University of Pittsburgh School of Law in 1998.  During law school, Mr. Bronson was a research editor on the Law Review and a recipient of the Dean's Scholarship.

Mr. Bronson's practice is focused on securities, consumer and class action litigation.  Prior to joining Milberg, while associated with another law firm, Mr. Bronson was part of a team of attorneys representing New York homeowners in *In re Coordinated Title Insurance Litigation*, Index No. 009600/2003 (N.Y. Sup. Ct. Nassau Cnty.) who alleged that eight insurance companies doing business in New York state overcharged them for title insurance in refinance transactions.   The litigation resulted in complete recovery to homeowners submitting valid claims, and reportedly the largest settlement of a consumer class action in Nassau County.   The presiding Justice, in approving the $31.5 million settlement of that litigation, described the prosecution of the case as reflecting "lawyering of the highest quality." Also, in *In re Providian Financial Securities Litigation*, MDL 1301 (E.D. Pa.), Mr. Bronson was one of the attorneys representing the Xerox (GB) Pension Scheme (which reportedly oversees approximately $2.5 billion in employee retirement

funds for the British affiliate of Xerox Corp.) in a securities fraud class action lawsuit alleging that a major credit card company inflated its profits with illegal charges to consumers. The Court commented, in approving the $38 million settlement of that case, on the "extremely high quality" and "skill and efficiency" of plaintiffs' counsel's work.

Mr. Bronson has litigated numerous complex class action and shareholder derivative cases in various state and federal courts, including, among others, *In re Biovail Corp. Securities Litigation*, No. 03-8917 (S.D.N.Y.) (in which Milberg LLP served as co-lead counsel on behalf of the Local 282 Welfare Trust Fund, and which was settled for $138 million and corporate governance modifications); *City of Miami Police Relief & Pension Fund v. Ryland Group, Inc.*, No. BC411143 (Cal. Super. Ct. Los Angeles Cnty.); *New Jersey Carpenters Annuity Fund v. Meridian Diversified Fund Management, LLC*, No. 10-5738 (S.D.N.Y.); New Jersey Carpenters Pension Fund v. infoGroup, Inc., No. 5334-VCN (Del. Ch.); and *In re Massey Energy Co. Derivative & Class Action Litigation*, No. 5430-VCS (Del. Ch.).

During law school, Mr. Bronson was a research editor of the University of Pittsburgh Law Review and a recipient of the University of Pittsburgh School of Law Dean's Scholarship.

Mr. Bronson is admitted to practice in New York State courts, the United States District Courts for the Southern, Eastern and Northern Districts of New York, and the United States Courts of Appeals for the Second and Tenth Circuits.

**LEIGH SMITH** received a B.A. degree, with high honors, and an M.A. degree from Rutgers University. Ms. Smith received a J.D. degree from Cornell Law School in 1999.

Ms. Smith focuses her practice primarily on class actions on behalf of defrauded investors. She also has significant experience with complex commercial litigation and consumer class actions. Her involvement in *In re Tyco International Ltd. Securities Litigation*, No. 02-1335, helped recover an aggregate settlement of $3.2 billion.

While at Rutgers University, Ms. Smith majored in French and was elected to *Phi Beta Kappa* and *Phi Sigma Iota*. As a graduate student, she studied French literature and film and spent a year in France working as an assistant English teacher. Ms. Smith taught French at Rutgers and at the University of Iowa before going to law school. During law school, Ms. Smith served as the Acquisitions Editor for the *Cornell Journal of Law and Public Policy* and was a member of the Cornell Moot Court Board. She also was active in a number of student organizations.

Prior to joining Milberg, Ms. Smith worked at large law firms in New York and New Jersey. She is admitted to practice in the United States District Courts for the Southern District of New York, the Eastern District of New York, the District of New Jersey, the District of Massachusetts, and the United States Courts of Appeals for the First, Second, Third, and Ninth Circuits.

**ARVIND B. KHURANA** received his B.A. from State University of New York at Albany in 1993, and a J.D. from St. John's University School of Law in 1999, *Dean's List Graduate*. While in law school, Mr. Khurana was on the Dean's List from 1995-1999 and a member of the *American Bankruptcy Institute Law Review*.

Mr. Khurana focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation. Prior to joining Milberg in August 2005, Mr. Khurana worked as an associate with a major international law firm in New York, concentrating in the area of complex commercial litigation.

Mr. Khurana is a member of the Federal Bar Council and admitted to practice in the state and federal courts of New York. He is also a member of the Firm's Diversity Committee.

**KRISTI STAHNKE MCGREGOR** received her B.A. degree in political science, *Phi Beta Kappa*, from the University of Florida in 1995. In 1999, Ms. McGregor received her J.D. degree from Emory University School of Law, where she was the Research Editor of the *Emory International Law Review* and student law clerk to Justice Norman Fletcher of the Georgia Supreme Court. In 2001, Ms. McGregor received her LL.M. degree from the Westfaelische Wilhelms-Universitaet Muenster, in Munester, Germany, where she was a Federal Chancellor Scholar through the Alexander von Humboldt Foundation.

For over a decade now, Ms. McGregor has focused her practice primarily on securities fraud class actions and derivative actions on behalf of

investors, as well as other complex litigation involving allegations of fraud and/or breach of fiduciary duty. Working together with her colleagues at Milberg, Ms. McGregor's work has contributed to over $300 million in recoveries for investors.

Ms. McGregor has particular experience in international litigation, primarily involving European companies. She has used her German language skills and knowledge of the German legal system to represent investors in cases involving German companies, including In re Deutsche Telekom AG Securities Litigation, which resulted in a $120 million settlement for U.S. holders of American Depository Shares, and In re NYSE Euronext Shareholders Litigation challenging the proposed merger of the NYSE with the Deutsche Boerse.

Prior to joining Milberg's New York office in 2002, Ms. McGregor practiced in the international corporate law section of a large Atlanta law firm advising German companies on their business in the U.S. Ms. McGregor was admitted to the Georgia bar in 1999, the New York bar in 2003, and the Florida bar in 2004.

**ANDREI RADO** focuses his practice on securities litigation, consumer class actions, and SEC whistleblower matters. Since the passage of the Dodd-Frank Act in 2010, Mr. Rado has represented numerous whistleblowers before the commission under a program that rewards and protects whistleblowers that report violations of securities laws to the Securities and Exchange Commission.

Mr. Rado's securities practice has included numerous complex litigations nationwide, including In re Initial Public Offering Securities Litigation, which alleges, in hundreds of consolidated cases pending in the Southern District of New York, that investment banks manipulated the initial public offerings of hundreds of companies, and mutual fund timing cases alleging that mutual fund managers allowed select investors to profit by improperly timing their trading in fund shares.

Mr. Rado has also litigated consumer class actions, including a case against jewelry company Zales for improperly denying credit-insurance claims made by unemployed and retired consumers, and a class action against computer maker Gateway

for improperly understating in advertising the costs of internet access to consumers, some of whom incurred internet-access fees of hundreds of dollars.

Prior to joining Milberg, Mr. Rado worked as an attorney at a New York City-based investment bank focusing on compliance, with rules and regulations relating to resales of control and restricted securities under the Securities Act of 1933. Mr. Rado also worked at another prominent New York City law firm specializing in plaintiffs' securities class action litigation.

Mr. Rado received his Juris Doctor degree from St. John's University School of Law, cum laude, in 1999, and is admitted to practice in the courts of the State of New York, as well as the United States District Court for the Southern District of New York. Mr. Rado was born in Bucharest Romania.

**ANNA C. DOVER** received a B.A. degree from Wesleyan University, with honors in Psychology, in 1995, and a J.D. degree from the University of California at Davis School of Law in 2001. While in law school, Ms. Dover was a member of the *UC Davis Law Review*.

Ms. Dover currently focuses her practice on representing whistleblowers in litigation under the False Claims Act. In addition, Ms. Dover has extensive experience litigating claims brought under Section 36(b) of the Investment Company Act of 1940, including taking such cases to trial. As an active member of the New York Inn of Court, she has spoken at several CLE seminars.

Prior to joining Milberg, Ms. Dover was an associate at Robie & Matthai, P.C. in Los Angeles where her practice was focused on insurance and legal malpractice claims. While in law school, Ms. Dover was a member of the UC Davis Law Review.

Ms. Dover is admitted to practice before the United States District Courts for the Southern District of New York and the Central and Southern Districts of California, the United States Court of Appeals for the Ninth Circuit, and the United States Supreme Court.

**JEFFREY R. MESSINGER** received his B.A. from the State University of New York at Stony Brook in 1980, and his J.D., from Boston University School of Law in 1985. Mr. Messinger has over 15 years experience litigating class and complex matters. Recently he was part of the

Milberg team that successfully prosecuted and settled the *In re Tyco International Ltd., Securities Litigation* for $3.2 billion in 2007.

Mr. Messinger currently focuses his practice on plaintiffs' mass torts in pharmaceutical and medical device cases, and he has worked with Plaintiffs' Steering Committees in several litigations, including *Kugel Mesh*, *Avandia*, *Yaz/Yasmin*, and *Bextra*.

Mr. Messinger has also obtained significant settlements on behalf of victims of employment discrimination.

**PAUL F. NOVAK** received his B.A. and M.A. degrees from Michigan State University in 1983, and J.D. from Emory University School of Law in 1986. Mr. Novak is the head of Milberg's antitrust practice group and the managing partner of the Firm's Detroit office. He is active in a host of antitrust, securities, and consumer protection class action matters, and currently serves as interim co-lead counsel in multiple antitrust cases.

Paul F. Novak is the head of Milberg's antitrust practice group and the managing partner of the Firm's Detroit office. He is active in a host of antitrust, securities, and consumer protection class action matters, and currently serves as interim co-lead counsel in multiple antitrust cases.

Prior to joining Milberg, Mr. Novak practiced law in both the public sector, as an Assistant Attorney General for the State of Michigan and as the City Attorney of Lansing, and in the private sector consulting with clients on antitrust, environmental, and regulatory matters. As an assistant attorney general, Mr. Novak served as the Division Head of the Special Litigation Division with responsibility for antitrust enforcement, public utility matters, and securities litigation. He emerged as a national leader in multistate litigation involving pricing practices in the pharmaceuticals industry, and served as lead counsel on behalf of all fifty state attorneys general in the *In re Cardizem CD Antitrust Litigation*. He also served as lead counsel on behalf of the State of Michigan in several price fixing, monopolization, and merger cases in a broad spectrum of industries including health care, pharmaceuticals, and in cases involving Microsoft and Oracle Corporation.

Mr. Novak is the former Chair of the Michigan Bar Association's Antitrust, Franchising, and Trade Regulation Section and is a contributing editor of the American Bar Association's Antitrust and Health Care Newsletter. He is also a member of the State Bar of Michigan United States Court Committee. He was awarded the Frank J. Kelley Excellence in Trial Advocacy Award for his work in antitrust enforcement. He has lectured on antitrust issues in the pharmaceuticals and insurance industries for the Practicing Law Institute. He served as chair of the National Association of Attorneys General ("NAAG") Midwest Antitrust Enforcement Task Force and as a member of the NAAG Airlines Industry Working Group and Prescription Drug Pricing Task Force.

**JAMES M. SHAUGHNESSY** joined Milberg in 2001. He started his legal career as a litigation associate at Casey, Lane & Mittendorf in 1969 and became a litigation partner at the firm in 1976. In 1982, Mr. Shaughnessy co-founded the firm of Haythe & Curley (now the New York office of Torys LLP) and was the firm's original litigation partner. He was the managing partner of Haythe & Curley for two years. In 1987, Mr. Shaughnessy joined the firm of Windels, Marx, Davies & Ives (now known as Windels, Marx, Lane & Mittendorf, LLP) as a litigation partner. He was the chairman of the Windels, Marx Litigation Department from 1988 through 1998, and was a member of the firm's Executive Committee from 1990 to 1992.

Over the course of his career, Mr. Shaughnessy has specialized in securities, insurance, aviation, bankruptcy, mass tort, and *qui tam* litigation. Mr. Shaughnessy was lead defense counsel for Pan American World Airways, Inc. in *In re Air Disaster at Lockerbie Scotland on December 21, 1988*, M.D.L. 799 (E.D.N.Y.), and tried the liability issues in that case on behalf of Pan Am to a jury for three months. More recently, Mr. Shaughnessy was Plaintiffs' Liaison Counsel in the Zyprexa mass tort litigation and was a member of the Plaintiffs' Steering Committee in the *Avandia* mass tort litigation.

Mr. Shaughnessy is a 1969 *cum laude* graduate of New York University School of Law where he was a member of the Order of the Coif, the Managing Director of the Moot Court Board, and a recipient of the Benjamin F. Butler Award upon graduation. Mr. Shaughnessy is admitted to practice in the States of New York, California, and

New Jersey, as well as the United States Supreme Court and numerous other federal jurisdictions.

**JENNIFER L. YOUNG** represents defrauded investors and consumers. She recently litigated cases arising from misrepresentations in the sales of annuities and violations of the Real Estate Settlement Procedures Act, achieving favorable settlements in both. Her practice currently includes representing victims of the Madoff Ponzi scheme.

Ms. Young is a member of Public Justice, and she serves on the organization's Case Development/Special Projects and Class Action Preservation Project Committees.

She is also active in the New York Inn of Court, serving on the Membership and Awards Committees.

Ms. Young has served on several drafting committees created by The Sedona Conference® Working Group on Electronic Document Retention and Production, and she was a senior editor of *The Sedona Conference® Commentary on Proportionality in Electronic Discovery*.

Ms. Young received a B.A. degree from University of South Carolina in 1996. She graduated *cum laude* from the University of South Carolina School of Law in 2002. While in law school, Ms. Young was associate editor in chief of the *South Carolina Law Review* and she was a member of the Moot Court Bar.

She is admitted to practice law the States of South Carolina and New York.

**TODD KAMMERMAN** focuses his practice on securities class action litigation, shareholder derivative litigation and commercial litigation. Mr. Kammerman's successful litigations include *In re CMS Energy Securities Litigation*, No. 02-72004 (E.D. Mich.) ($200 million recovery); *In re Royal Dutch/Shell Transport ERISA Litigation*, No. 04-1398 (D.N.J.) ($90 million recovery); *Scheiner v. i2 Technologies*, No. 01-0418 (N.D. Tex.) ($87.8 million recovery); *In re Collins & Aikman Corporation Securities Litigation*, No. 03-71173 (E.D. Mich.) ($10.8 million recovery); and *Mich II Holdings LLC v. Schron*, No. 600736/10 (Sup. Ct. N.Y. Cnty.) (represented certain defendants in connection with real estate dispute and successfully litigated motion to dismiss all claims against those defendants).

Mr. Kammerman played a pivotal role in the *In re Comverse Technology, Inc. Derivative Litigation*, No. 601272/06 (Sup. Ct. N.Y. Cnty.) ($62 million recovery), particularly in drafting the appellate briefs which led to the seminal New York Appellate Division opinion, reported at 56 A.D.3d 49 (1st Dept 2008), clarifying the standards of demand futility, and holding that a board of directors loses the protection of the business judgment rule where there is evidence of self-dealing and poor judgment by the directors. He was also a member of the team that litigated the appeal in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* before the United States Supreme Court, in which the Supreme Court issued an opinion defining the pleading standard for scienter in all federal securities fraud cases, and is reported at 551 U.S. 308 (2007).

While at Cardozo, Mr. Kammerman was named an Alexander Fellow, through which he worked as a judicial intern in the chambers of the Honorable Joseph A. Greenaway, Jr., United States District Judge in Newark, New Jersey. Mr. Kammerman is a member of the bars of the States of New York and New Jersey and is admitted to practice before the United States Courts of Appeals for the Third and Eleventh Circuits and the United States District Courts for the District of New Jersey, Southern and Eastern Districts of New York, and Eastern District of Michigan.

**DAVID AZAR** received his B.S. in Finance from Indiana University School of Business in 1991. He graduated from Duke University School of Law, *magna cum laude*, in 1999, where he was a member of the Order of the Coif (top 10% of the class). While in law school, he served as a senior editor of *Law and Contemporary Problems*, and was a member of the Moot Court Board. After law school, he clerked for Chief Justice Veasey of the Delaware Supreme Court.

Mr. Azar focuses his practice on antitrust, corporate governance, securities fraud class actions, and selected general business litigation matters. Mr. Azar has significant litigation experience, including first-chair trial and appellate work. He is also a contributing author of the forthcoming *Antitrust Law Developments* (7th Edition), scheduled for publication by the ABA Section of Antitrust Law in April 2012.

Mr. Azar's current representative matters include: serving as co-lead counsel in multi-district

litigation against Korean Air and Asiana Airlines for allegedly conspiring for more than six years to set prices for passenger airfares between the United States and Korea; serving as co-lead counsel in a class action against Wells Fargo Bank and Bank of New York Mellon for their alleged roles, as trustees, in causing more than $1 billion in losses by investors in Medical Capital Holdings, Inc.; serving as co-lead counsel in a shareholder class action against the board of directors of International Rectifier Corporation for allegedly breaching their fiduciary duties by, among other things, blocking shareholders from accepting a premium tender offer for their shares; and representing a financial institution seeking to recover for breaches of contract and mortgage fraud against various individuals and entities.

Mr. Azar serves as a volunteer prosecutor through the Los Angeles Bar Association's Trial Advocacy Project, and he has been named by *Los Angeles Magazine* as a Southern California Super Lawyers Rising Star. He serves on the pro bono panel of the Harriett Buhai Center for Family Law, and he was awarded a Distinguished Service Award in 2009 for his continuing representation of a disabled father in a complex family law matter. Mr. Azar's pro bono work has also included: prevailing at trial in a case on behalf of a learning disabled student asserting claims under the American with Disabilities Act; successfully persuading the Ninth Circuit Court of Appeals to allow a disabled prisoner's federal civil rights case to proceed, resulting in a published decision on a matter of first impression; and assisting tenants in disputes with their landlords.

Mr. Azar has extensive knowledge of dispute resolution, having served as a mediator in more than 160 cases, and he has trained and reviewed other mediators. He served for five years as the editor of the quarterly publication of the Society of Professionals in Dispute Resolution, and was honored with the association's Presidential Recognition award.

**PEGGY J. WEDGWORTH** received a B.A. degree, in 1982 from Auburn University, and her J.D. degree from University of Alabama Law School in 1986. Ms. Wedgworth was an Assistant District Attorney in Brooklyn, New York from 1986 to 1989. Since leaving the public sector in 1989, she has handled various securities, commodities, and antitrust matters. She has litigated antitrust and commodities class actions on behalf of plaintiffs including extensive experience in all aspects of pre-trial and discovery in, among other cases, *In re Brand Name Prescription Drugs Antitrust Litigation*, No. 94-0897, 1996 WL 351180 (N.D. Ill. June 24, 1996) (approving $351 million settlement); *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465 (S.D.N.Y. 1998) ($1,027,000,000 settlement); *In re Microsoft Corp. Litigation*, MDL 1332 (D. Md.) (consolidated class actions alleging long term unlawful maintenance of a monopoly and other anticompetitive conduct by Microsoft resulting favorable partial settlements); *In re Soybean Futures Litigation*, No. 89-7009 (N.D. Ill.) ($21,500,000 class settlement providing claiming class members/soybean futures traders a full recovery under plaintiffs' expert's formula); *In re Sumitomo Copper Litigation*, 74 F. Supp. 2d 393, 395 (S.D.N.Y. 1999) ("The recovery is the largest class action recovery in the 75 plus year history of the Commodity Exchange Act."); *Kohen v. Pacific Investment Management Company, LLC*, No. 05-4681 (N.D. Ill.) (certified class of treasury bond futures purchasers alleging manipulation of the futures market); *Leider v. Ralfe*, No. 01-3137 (D.N.J.) (alleging price-fixing and monopolization in the diamond market by DeBeers resulting in a settlement of $250,000,000 and extensive injunctive relief), and *In re Natural Gas Commodities Litigation*, 03-6186 (S.D.N.Y.) ($101 million settlement). While a partner at her previous firm, she was involved in numerous antitrust cases including, *Air Cargo Shipping Services Antitrust Litigation*, *In re Digital Music Antitrust Litigation*, *In Re Chocolate Confectionary Antitrust Litigation*, *In re Aftermarket Filters Antitrust Litigation*, *In Re Rambus Antitrust Litigation*, and *In re Flash Memory Antitrust Litigation*. Ms. Wedgworth speaks on topics relating to antitrust litigation, most recently speaking to the New York State Bar, Antitrust Division in January 2008. She also has extensive experience in securities litigation including most recently *In re Initial Public Offering Securities Litigation*, which recently settled for $586 million.

While in law school, Ms. Wedgworth was a member of the Moot Court Board and served as Manager of the National Moot Court Team.

**ROLAND RIGGS** focuses his practice on representing whistleblowers under the False Claims Act and the Dodd-Frank Act. He has represented whistleblowers in a number of industries, including the health care, banking, pharmaceutical, finance, construction, and defense industries. Mr. Riggs also represents defrauded investors and consumers. Among other cases, he currently represents investors in *In re Merck & Co. Securities Litigation*, and *In re Oppenheimer Rochester Funds Group Securities Litigation*, and consumers in *The NVIDIA GPU Litigation*. Prior to joining Milberg LLP, Mr. Riggs worked at a boutique firm in New York practicing securities litigation. During law school, Mr. Riggs served as a clerk for one summer for the Honorable Alfred V. Covello of the United States District Court for the District of Connecticut. He later worked at McLaughlin & McCaffrey, LLP in Cleveland, Ohio in the areas of commercial litigation and white collar criminal defense, and did pro bono corporate work representing charities at the Milton A. Kramer Law Clinic.

**NICOLE DUCKETT FRICKE** received her B.A. in English from Georgetown University in 1995, where she was on the Dean's List. She graduated from UCLA School of Law in 1998.

Ms. Fricke focuses her practice on securities fraud, antitrust, and consumer class actions. She joined the firm from Mayer Brown LLP where she practiced complex business litigation, white collar criminal defense, and corporate internal investigations. Ms. Fricke has vast trial experience as well as a wide-ranging appellate practice.

Ms. Fricke's recent representative matters include: serving as co-lead counsel in the antitrust class action against Sirius XM for raising prices after creating a monopoly of the satellite radio market; serving as lead counsel in the consumer fraud class action against NVIDIA Corporation for placing allegedly defective computer chips in the market; serving as co-lead counsel in the shareholder derivative action against The Ryland Group, Inc. for fostering egregious lending practices despite reprimands from the U.S. Department of Housing and Urban Development; and serving as co-lead counsel in a securities and shareholder derivative and class action against Beckman Coulter, Inc. Prior representative matters include defending Avon Products, Inc. in a civil and criminal Foreign Corrupt Practices Act investigation conducted by the Department of Justice and the Securities and Exchange Commission; and defending Broadcom Corporation in a civil and criminal options backdating investigation conducted by the U.S. Attorneys' Office and the Securities and Exchange Commission.

Ms. Fricke is a City Commissioner for the Los Angeles Convention Center and related entities including L.A. Live, the Staple Center, and the Los Angeles Visitors Bureau, serving as an advisor to Mayor Villaraigosa.

Ms. Fricke is also a Lawyer Representative for the Central District of California Attorney Delegation to the United States Ninth Circuit Judicial Conference.

Ms. Fricke is on the Leadership Council Board for the Fulfillment Fund, and she is active in the National Association of Securities Professionals, the Association of Business Trial Lawyers, and the Los Angeles County Bar Association.

*Los Angeles Magazine* named Ms. Fricke a Southern California Super Lawyers Rising Star each year since 2006.

While in law school, Ms. Fricke was an editor of the *UCLA National Black Law Journal* and a recipient of the Joseph Drowne Fellowship Award.

## Of Counsel

**PETER A. LENNON** earned his B.S. and M.B.A. at West Chester University and received his J.D. from Widener University School of Law in 1993.

Mr. Lennon has specialized in the prosecution of complex civil cases involving tax fraud and violations of SEC Rules and Regulations with a particular emphasis on accounting and auditing issues for over fifteen years.

In addition to being an attorney, Mr. Lennon is also a Certified Public Accountant or C.P.A. with considerable auditing experience and has an M.B.A.

in Economics/Finance. Mr. Lennon also works as a Professor of Economics on an adjunct basis.

Mr. Lennon has been involved in numerous high profile cases against large public companies arising from accounting improprieties and disclosure violations, including cases involving the restatement of financial statements at Tyco, Xerox, Cendant, Waste Management, and Nortel Networks.

Peter Lennon is admitted to practice in New York and Pennsylvania.

## Senior Counsel

**JENNIFER S. CZEISLER** graduated from Hofstra University in 1994 with a B.A. degree in psychology. After completing graduate degree work at Hunter School of Social Work (1994-95), she pursued a J.D. degree, which she earned in 1999 from the University of Miami School of Law, where she graduated *cum laude*. Ms. Czeisler was on the editorial board of the *Law Review of Psychology, Public Policy & Law* and earned numerous awards, including the CALI excellence for the Future Award, Dean's Certificate of Achievement Award, and membership in the Phi Delta Phi National Honor Society.

Ms. Czeisler is admitted to practice in the State of New York and is a member of the American Bar Association, where she is committed to her *pro bono* work with the American Bar Association Commission on Legal Problems of the Elderly.

**HENRY KELSTON** received a B.S. degree, *cum laude*, from Tufts University in 1975, and a J.D. degree from New York University School of Law in 1978, where he was a member of the *Annual Survey of American Law*.

Mr. Kelston's practice is concentrated in the areas of complex litigation and electronic discovery. He has extensive experience in state and federal court litigation, administrative proceedings, and

arbitrations. Mr. Kelston is a regular speaker and CLE presenter on electronic discovery. He is a member of The Sedona Conference® Working Group 1 on Electronic Document Retention and Production. Prior to joining Milberg, he practiced at Proskauer Rose in New York and Siegel, O'Connor & Kainen in Connecticut.

Mr. Kelston is admitted in the United States District Courts for the Southern and Eastern Districts of New York and the District of Connecticut.

**ELIZABETH MCKENNA** focuses her practice primarily on antitrust litigation as well as on securities class action litigation on behalf of defrauded individuals and institutional investors. Prior to joining Milberg, Ms. McKenna was an associate in the New York office of Healy & Baillie, LLP (now part of Blank Rome LLP), where she practiced general commercial litigation. Ms. McKenna graduated from Fordham Law School in 1998. While at Fordham, she was a Stein Scholar in Public Interest Law & Ethics, a member of the *Fordham Environmental Law Journal*, and a Co-Director of the Fordham Student Sponsored Fellowship. Ms. McKenna is admitted to practice in the state courts of New York and in the United States District Courts for the Southern and Eastern Districts of New York.

*Associates*

**ADAM BOBKIN** received his B.B.A., *magna cum laude*, from Baruch College in 2004. In 2010, he earned his J.D. from Hofstra University School of Law.

Mr. Bobkin's practice includes representing a municipal pension fund in a complex FINRA arbitration; representing consumers misled by electronics manufacturers; and litigating internet privacy cases.

Prior to law school, Mr. Bobkin worked as an analyst at a boutique investment bank. During law school, Mr. Bobkin served as an Associate Editor of the *Journal of International Business and Law* and competed in the Willem C. Vis International Commercial Arbitration Moot held in Vienna, Austria.

Mr. Bobkin is admitted to practice in the courts of the State of New York.

**ANGELA G. BONGIORNO** received her J.D. from Catholic University of Milan Law School in 2004 and her L.L.M. from Fordham University School of Law in 2008.

Ms. Bongiorno focuses her practice on mass torts, antitrust litigation, and institutional investor and client outreach. Prior to joining Milberg, she worked for an Italian law firm specializing in consumer law. Ms. Bongiorno also has conducted various research projects concerning the implementation of European Union regulations in Member States for the Italian Embassy of Malta and for Fondazione Rosselli, a think tank for Italian and European governmental bodies.

While in law school, Ms. Bongiorno interned with the Italian Embassy of Malta during Malta's accession to the European Union. She is fluent in Italian and conversant in Spanish.

Ms. Bongiorno is admitted to practice in the courts of the State of New York.

**MELISSA R. CLARK** focuses her practice on securities class actions and shareholder derivative and privacy litigation.

Prior to joining Milberg, Ms. Clark was an associate at a boutique firm in New York, where she was part of a securities litigation team that recovered several multimillion-dollar settlements on behalf of investors.

Her legal work experience also includes judicial externships with the Honorable Jerry Brown, Chief Judge of the United States Bankruptcy Court, Eastern District of Louisiana and the Honorable Jay C. Zainey of the United States District Court, Eastern District of Louisiana. In addition, Ms. Clark clerked for the San Francisco District Attorney's Office.

While at Tulane Law, Ms. Clark was a Senior Justice and Chairperson for the Moot Court Board and a Legal Research & Writing Senior Fellow. Ms. Clark also studied for one semester at UC Berkeley - Boalt Hall, where she received high honors in Securities & Class Action Litigation and was a visiting member of the *California Law Review*.

Ms. Clark is admitted to practice in the state of New York, as well as the United States District Courts for the Southern and Eastern Districts of New York. She is an active member of the New York City Bar Association, the Federal Bar Council, and the New York State Bar Association, where she serves on the Law, Youth & Citizenship Committee and Mock Trial subcommittee. Ms. Clark was recently recognized as a New York Super Lawyers "Rising Star."

**ALASTAIR FINDEIS** received his B.S. degree from the Virginia Military Institute in 1996 and his M.S. from the University of Virginia in 2000. In 2003, he earned his J.D. from Georgetown University.

Mr. Findeis focuses his practice on the representation of whistleblowers, public and private payors, and injured consumers in litigation involving healthcare fraud and abuse, including False Claims Act, mass tort, class action, and other complex litigation. Prior to joining Milberg, he gained extensive experience in pharmaceutical litigation. Prior to attending graduate school, Mr. Findeis was a Sub-Lieutenant in Britain's Royal Navy, graduating from the Britannia Royal Naval College and serving on HMS London. Mr. Findeis was admitted to the New York State bar in 2004 and is a member of Taxpayers Against Fraud.

**MICHELLE FURUKAWA** focuses her practice on securities, consumer, and antitrust litigation. While in law school, Ms. Furukawa served as co-editor-in-chief of the *UCLA Asian Pacific American Law Journal*, clerked for the United States Securities & Exchange Commission, Division of Enforcement,

and was a judicial extern for the Honorable Sheri Bluebond, United States Bankruptcy Court, Central District of California. Ms. Furukawa is on the Board of Governors of the Japanese American Bar Association of Greater Los Angeles, and is a member of the Association of Business Trial Lawyers and Consumer Attorneys Association of Los Angeles. She sits on the Firm's Diversity Committee.

**DIANA GJONAJ** focuses her practice primarily on antitrust litigation, targeting illegal and anti-competitive practices on behalf of consumers and investors. She received her Bachelor Degree, *cum laude*, from the University of Michigan and her Juris Doctor from Wayne State University Law School. During law school, Ms. Gjonaj clerked for Milberg LLP in the Firm's Detroit office.

Ms. Gjonaj is admitted to practice in the state courts of Michigan, the United States District Court for the Eastern District of Michigan and the United States Court of Appeals for the Sixth Circuit. She is a member of the American Bar Association, Women's Lawyer Association of Michigan, and Michigan Association for Justice.

**JOSHUA KELLER** graduated from the University of North Carolina in 1998 and from Albany Law School of Union University in 2004.

Mr. Keller focuses his practice on securities and consumer fraud litigation. He has litigated class actions in both federal and state courts, including *In re Biovail Corp. Securities Litigation*, No. 03-8917 (S.D.N.Y.) (settling for $138 million and certain corporate governance modifications) and *In re Sears, Roebuck & Co. Securities Litigation*, No. 02-7527 (N.D. Ill.) (settling for $215 million). Currently, Mr. Keller represents numerous victims of the Madoff Ponzi scheme.

Mr. Keller is admitted to practice in the courts of the States of New York and Colorado, the United States District Court for the Southern District of New York, and the United States Court of Appeals for the Second Circuit.

**GLORIA KUI MELWANI** litigates shareholder derivative cases and securities class actions in state and federal courts. Prior to joining Milberg, Ms. Melwani was associated with other plaintiffs' law firms, where she litigated shareholder derivative cases.

Ms. Melwani is a graduate of Benjamin N. Cardozo School of Law, where she was a Notes Editor of the Cardozo *Public Law, Policy, and Ethics Journal*. She is admitted to practice in New York, New Jersey, and the United States District Courts for the Eastern and Southern Districts of New York and the District of New Jersey, as well as the United States Court of Appeals for the Second Circuit.

**MELISSA H. NAFASH** focuses her practice in the area of medical device and pharmaceutical litigation. She was actively involved in the bellwether trials for the *In re Kugel Mesh Hernia Patch Products Liability Litigation*, MDL-1842. She litigated the Composix Kugel cases pending in the Superior Court of the State of Rhode Island. Ms. Nafash also represents people who have been injured by Avandia. Currently, Ms. Nafash is litigating cases against the tobacco industry in Florida state court.

Ms. Nafash is a graduate of Roger Williams University School of Law, where she earned the school's highest distinction in trial advocacy and certificates of distinction in mediation. Ms. Nafash represented her law school nationally in mediation competitions and was a member of the Rhode Island Family Inns of Court. Ms. Nafash is admitted to the bars of New York, New Jersey, Massachusetts, and Rhode Island, as well as the United States District Court for the Districts of Rhode Island, Massachusetts, and New Jersey.

**BIRT REYNOLDS** represents defrauded consumers and investors in class actions. He also represents whistleblowers in False Claims Act litigation. Before joining Milberg, Mr. Reynolds clerked for a magistrate judge in the Middle District of Florida, as well as Florida appellate and trial court judges.

Mr. Reynolds graduated with a B.A. from the University of South Florida in 2000. In 2004, he earned his J.D. from Case Western Reserve University School of Law. Mr. Reynolds is admitted to practice in the state courts of Florida and New York.

**JOHN SEREDYNSKI** received a B.A. from Villanova University in 2003 and a J.D. from New York Law School in 2010. John Seredynski's practice focuses on class action litigation involving defrauded investors and consumers in federal and state courts. Before joining Milberg LLP, Mr. Seredynski worked at a boutique firm in New York practicing securities litigation. During law school, Mr. Seredynski was named to the Dean's List, and served as a research assistant for the Center for New York City Law. Prior to law school, Mr. Seredynski

worked on a presidential campaign, and served as Judiciary Committee Staff Intern to a member of the United States Senate.

Mr. Seredynski is admitted to practice in the courts of the State of New York, as well as the United States District Courts for the Southern and Eastern Districts of New York, and the United States Court of Appeals for the Second Circuit.

**JESSICA SLEATER** received a B.A. from Truman State University in 2002, and a J.D. from Saint Louis University School of Law in 2007. Ms. Sleater's practice focuses on class action litigation involving defrauded investors and consumers in federal and state courts. Ms. Sleater also has experience in shareholder litigation and has represented the rights of public shareholders of companies, whose management had agreed to a corporate buyout, merger, or other corporate transaction.

Prior to joining the Firm, Ms. Sleater most recently practiced at a boutique firm in New York specializing in securities litigation. She also previously worked for the Metropolitan Transportation Authority-New York City Transit and was an Assistant Attorney General for the State of Missouri. During law school, Ms. Sleater served as a law clerk for the Equal Employment Opportunity Commission, the U.S. Department of Agriculture, and the Missouri Attorney General's Office. Also while in law school, Ms. Sleater was selected as the Editor-in-Chief of the *Saint Louis University Public Law Review*.

Ms. Sleater is admitted to practice in the courts of the States of New York and Missouri, as well as the United States District Courts for the Southern and Eastern Districts of New York.

**CHARLES SLIDDERS** received his L.L.B., from Melbourne University in 1994, with honors, and his L.L.M, from Monash University in 2002. Mr. Slidders is an experienced commercial litigator with almost fifteen years of litigation experience. Prior to joining Milberg in 2008, Mr. Slidders was the principal and founding partner of one of Melbourne, Australia's premier boutique commercial litigation firms. He has frequently appeared in Australia's mainstream media in relation to his legal work.

Mr. Slidders has significant experience in plaintiffs' and class action litigation. He has acted in a variety of matters involving Australia's antitrust (trade practices) laws, corporations law, and general business and property law.

Mr. Slidders has been influential in shaping the law in Australia. He precipitated the retrospective amendment of Victoria's domestic building laws after finding a loophole in the legislation that he successfully litigated before the Supreme Court of Victoria. He also initiated one of Australia's largest multiparty claims alleging breach of fiduciary duties by property developers.

Mr. Slidders' firm was preferred counsel for Victoria's farming community through the Victorian Farmers Federation - the body representing more than 20,000 Victorian farmers. He has acted in agribusiness matters involving trade practices issues against multinational grain trade companies (disputes involving hundreds of millions of dollars of derivative contracts on the CBOT). He has also advised shareholders in a derivative dispute with the management of one of Australia's leading egg wholesalers.

Mr. Slidders is admitted to the bar of New York and is admitted to practice law in Victoria, Australia.

**JENNIFER J. SOSA** graduated from Northeastern University with a B.S. degree in Chemical Engineering, *cum laude*, in 2002. In 2005, she earned her J.D. degree from Temple University Beasley School of Law. During law school, she was a member of the Environmental Moot Court Team and was awarded the David Sive Award for Best Brief overall in the 2004 Pace National Environmental Law Moot Court Competition.

Ms. Sosa focuses her practice on ERISA litigation and is actively involved in a number of matters including *In re Boston Scientific Corp. ERISA Litigation* (D. Mass.), *In re Morgan Stanley ERISA Litigation* (S.D.N.Y.), and *In re First American Corp. ERISA Litigation* (C.D. Cal.). Ms. Sosa has also concentrated part of her practice on class actions against defrauded stockholders in cases such as *South Ferry LP # 2 v. Killinger, et al.* (W.D. Wash.), as well as the investigation and prosecution of antitrust and consumer protection actions.

Ms. Sosa is admitted to practice law in the Eastern and Southern Districts of New York and the District of New Jersey, as well as New York and New Jersey state courts. Prior to law school, Ms. Sosa worked as a Chemical Engineer.

**GREGORY STAMATOPOULOS** focuses his practice on antitrust litigation, consumer protection, and e-discovery.

Mr. Stamatopoulos graduated from Michigan State University with a B.A., *with honors,* in 2006. In 2010, he earned his J.D. degree from Wayne State University School of Law.

During law school, Mr. Stamatopoulos served as Chairperson of The Free Legal Aid Clinic in Detroit, managing a facility that specializes in providing family and elder law services to city residents. As an undergraduate, Mr. Stamatopoulos double-majored in International Relations and Russian.

Mr. Stamatopoulos is admitted to practice in the state courts of Michigan and New York.

**NATHANIEL TARNOR** graduated from the University of Illinois with a B.A. degree in 2000. In 2004, he earned his J.D. degree from Chicago-Kent College of Law.

Mr. Tarnor concentrates his practice on complex litigation and corporate accountability. He has represented clients before the U.S. Supreme Court, various federal courts of appeals, and numerous trial courts on a wide variety of issues. Mr. Tarnor's practice areas have included antitrust, civil rights, consumer protection, securities, and shareholder derivative litigation, among others. Additionally, Mr. Tarnor has extensive experience in international litigation and international human rights law. In this regard, he has devoted substantial amounts of pro bono time to assisting human rights victims and their families, and his prior legal work has included representing human rights victims pursuant to the Torture Victim Protection Act, Alien Tort Statute, and Foreign Sovereign Immunities Act.

While in law school, Mr. Tarnor was captain of his law school's international law moot court team, inducted into the International Law Moot Court Honor Society, and focused his academic studies and was awarded a certificate in international and comparative law. Mr. Tarnor is a member of the American Bar Association, American Association for Justice, New York State Bar Association, New York City Bar Association, Federal Bar Council, and the American Society of International Law.

Mr. Tarnor is admitted to practice before the U.S. Supreme Court, U.S. Courts of Appeals for the Second, Seventh, and D.C. Circuits, the U.S. District Courts for the Southern and Eastern Districts of New York, the Northern and Central Districts of Illinois, the District of Columbia, and the District of Colorado. Mr. Tarnor is also admitted to practice in New York, Illinois, and Washington, D.C.

### *Staff Attorney*

**CHRISTOPHER SCHUYLER** focuses his practice on False Claims Act litigation, consumer class actions, and e-discovery.

Before joining Milberg, Mr. Schuyler clerked with the Fortune Society, a New York City non-profit organization focused on providing an alternative to incarceration for non-violent offenders. While in law school, he co-chaired a student organization promoting pro bono legal assistance to indigent members of the community, a role for which he was awarded a university scholarship for public service.

Mr. Schuyler graduated from Temple University, *cum laude,* with a B.A. degree in 2007. In 2011 he earned his J.D. degree from the University of Dayton School of Law. Mr. Schuyler is a member of the bar of the State of New York and is admitted to practice before the United States District Court for the Southern and Eastern Districts of New York.