# In The Matter Of:

*The Shane Group v.*
*Blue Cross Blue Shield of MI*

---

*Motions Hearing*
*November 12, 2014*

---

*Cheryl E. Daniel, Official Federal Court Reporter*
*313.961.9082*

Original File ShaneGRPvBCBS.txt
Min-U-Script®

1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4    THE SHANE GROUP, INC.,

5         Class Plaintiffs,

6         V                        Case No. 10-14360

7

8    BLUE CROSS BLUE SHIELD OF MICHIGAN,

9         Defendant.

10   _____/

11               MOTIONS HEARING

12          Before the Honorable Denise Page Hood, U.S.

13   District Judge, 231 W. Lafayette, Courtroom 251,

14   Detroit, Michigan.

15             Wednesday, November 12, 2014

16   APPEARANCES:

17   FOR THE CLASS PLAINTIFFS:       E. POWELL MILLER

18                                   THE MILLER LAW FIRM

19                                   950 UNIVERSITY DRIVE

20                                     SUITE 300

21                                   ROCHESTER, MI 48307

22                                        And

23

24

25

2

```
 1              (APPEARANCES CONTINUED)
 2   FOR THE CLASS PLAINTIFFS:        DANIEL SMALL
 3                                    COHEN MILSTEIN
 4                                    1100 NEW YORK AVE.
 5                                    500 WEST TOWER
 6                                    WASHINGTON, DC 20005
 7                                          And
 8                                    DANIEL E. GUSTAFSON,
 9                                    GUSTAFSON GLUEK PLLC
10                                    CANADIAN PACIFIC PLAZA
11                                    120 SOUTH 6TH STREET
12                                       SUITE 2600
13                                    MINNEAPOLIS, MN 55402
14                                          And
15                                    ALYSON L. OLIVER
16                                    950 W. UNIVERSITY DR.
17                                       SUITE 200
18                                    ROCHESTER, MI 48307
19   FOR THE DEFENDANT:              DONALD BRUCE HOFFMAN,
20                                    TODD M. STENERSON,
21                                    HUNTON, WILLIAMS LLP
22                                    2200 PENNSYLVANIA NW
23                                    WASHINGTON, DC 20037
24
25
```

3

1              (APPEARANCES CONTINUED)

2

3   FOR THE DEFENDANT:              ALAN N. HARRIS,

4                                   BODMAN

5                                   201 S. DIVISION ST.,

6                                      STE. 400

7                                   ANN ARBOR, MI 48104

8                                        And

9                                   ROBERT A. PHILLIPS,

10                                  ASS'T. GENERAL COUNSEL

11                                  BCBS

12                                  600 E. LAFAYETTE, 1925

13                                  DETROIT,MI 48226

14  FOR GRATIOT COMMUNITY:          DAVID A. ETTINGER,

15                                  HONIGMAN

16                                  2290 FIRST NATIONAL

17                                  DETROIT, MI 48226

18  FOR ASCENSION HEALTH:           JONATHAN JORISSEN,

19                                  BROOKS WILKINS

20                                  401 S. OLD WOODWARD

21                                  BIRMINGHAM, MI 48009

22

23

24

25

4

```
1                (APPEARANCES CONTINUED)
2   FOR ADAC AND CERTAIN OBJECTORS:   BRYAN R. WALTERS,
3                                     VARNUM RIDDERING
4                                     BRIDGEWATER PLAC
5                                     P.O. BOX 352
6                                     GRAND RAPIDS, MI 49501
7   FOR OBJECTOR ANDREWS:            CHRISTOPHER ANDREWS,
8                                     PRO SE
9                                     P.O. BOX 530394
10                                    LIVONIA, MI 48152
11  FOR PRIORITY HEALTH:             BRIAN J. MASTERNAK,
12                                    WARNER, NORCROSS
13                                    111 LYON ST., N.W.
14                                       SUITE 900
15                                    GRAND RAPIDS, MI 49503
16  ALSO PRESENT OBJECTORS:          SONYA DANCY
17                                    DARRELL THOMPSON
18
19
20
21
22
23
24
25
```

5

1                    I N D E X                    PAGE

2    PRELIMINARY MATTERS                            6

3    MOTION TO INTERVENE

4        BY MR. WALTERS                            13

5        RESPONSE BY MR. HOFFMAN                   27

6        RESPONSE BY MR. SMALL                     35

7    OBJECTORS' STATEMENTS

8        BY MR. CHRIS ANDREWS                      38

9        BY MR. DARRELL THOMPSON                   44

10        BY MR. WALTERS                           48

11    `   BY MR. MILLER                            58

12        BY MR. SMALL                             66

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1          Wednesday, November 12, 2014

2          Detroit, Michigan

3          At approximately 2:00 p.m.

4          THE CLERK:   Calling case number 10-14360,

5    The Shane Group and others versus Blue Cross Blue Shield

6    of Michigan.

7          THE COURT:  Good afternoon, everyone.   You

8    may be seated.

9          We're here on --  well, why don't I do this.

10   Why don't the Class Plaintiffs and the Defendant Blue

11   Cross Blue Shield put their appearances on, and then I

12   will note the objectors who are present.   And then I

13   will ask the other parties related to the motion to

14   intervene for purposes of unsealing to note who they

15   are.   And then I don't know if we need other interested

16   parties or Counsel on the docket, if they want to put

17   their names on, but they're welcome to do so.

18          But let's start with the Class Plaintiffs.

19          MR. MILLER:  Good afternoon, Your Honor.

20   Powell Miller on behalf of Class Plaintiffs.

21          MR. SMALL:  Good afternoon, Your Honor,

22   Daniel Small with Cohen Milstein on behalf of the Class

23   Plaintiffs.

24          MR. GUSTAFSON:  Good afternoon, Dan

25   Gustafson from Gustafson Gluek on behalf of the

7

1    Plaintiffs.

2              MS. OLIVER:  Alyson Oliver on behalf of the

3    Class Plaintiffs.

4              MR. ISQUITH:  Good afternoon, Your Honor,

5    Fred Isquith from New York on behalf of the Class

6    Plaintiffs.

7              THE COURT:  I don't know if I have your name

8    on here at all.

9              MR. ISQUITH:  I S Q U I T H; Fred.

10             THE COURT:  Okay.  Blue Cross Blue Shield.

11             MR. HOFFMAN:  Your Honor, Bruce Hoffman from

12   Hunton Williams here for Blue Cross Blue Shield.

13             MR. STENERSON:  Good afternoon, Judge, Todd

14   Stenerson on behalf of Blue Cross Blue Shield of

15   Michigan.

16             MR. HARRIS:  Your Honor, Alan Harris from

17   the Bodman firm on behalf Blue Cross Blue Shield.

18             MR. PHILLIPS:  Robert Phillips, in-house

19   Counsel for Blue Cross.

20             THE COURT:  And who else is at counsel

21   table?

22             MR. WALTERS:  Good afternoon, Your Honor.

23   Bryan Walters from the Varnum law firm.  We're here

24   representing the self-insured objectors, ADAC and that

25   group.

8

1              MR. ANDREWS:  Chris Andrews, objector, pro
2    se.
3              MR. THOMPSON:  Darrell Thompson, Blue Care
4    Advantage member.
5              THE COURT:  I have also from ADAC Bryan
6    Walters.
7              MR. WALTERS:  Yes, Your Honor.
8              THE COURT:  And then I have from Warner
9    Norcross for Priority Spectrum, Brian Masternak.
10             MR. MASTERNAK:  Yes, Your Honor.  I will
11   also be representing Holland Hospital at this time.
12             THE COURT:  Anybody else want to be
13   recognized?
14             MR. JORISSEN:  Jonathan Jorissen on behalf
15   of Ascension Health and on behalf of Borgess Health.
16             COURT REPORTER:  May I have the spelling of
17   your last name?
18             MR. JORISSEN:  J O R I S S E N.
19             THE COURT:  And you're representing?
20             MR. JORISSEN:  Ascension Health and Borgess
21   Health.  We filed an objection.
22             THE COURT:  Right, okay.
23             And who else?  Anybody else want to have
24   their name on the record?
25             MS. OLIVER:  Judge, if I may, I have a young

9

1   lady here telling me she is here on behalf of her mom,

2   so she might want to address the Court.

3           THE COURT:  You're here on behalf of

4   Margaret Schubert?

5           MS. DANCY:  No, Elaine Trawick.

6           THE COURT:  Did you file anything?

7           MS. DANCY:  No, it was filed under the Shane

8   Group is what I'm told.

9           COURT REPORTER:  And your name is?

10          MS. DANCY:  Sonya Dancy; S O N Y A, D A N C

11   Y.  And my sister Ronya Ferguson; R O N Y A, F E R G U S

12   O N.  And our brother, De'Angelo Trawick; T R A W I C K.

13          THE COURT:  And you're here for Elaine

14   Trawick?

15          MS. DANCY:  Yes.

16          THE COURT:  Who else?

17          MR. ETTINGER:  David Ettinger from Honigman

18   on behalf of Mid-Michigan Health and eight others who

19   are objecting to the unsealing.

20          THE COURT:  Okay.  Anyone else?

21          MR. ANDREWS:  Yes, I'm Michael Andrews.  I'm

22   an objector to the Class.

23          THE COURT:  Did you file a writing?

24          MR. ANDREWS:  I did, Your Honor.  My

25   representative is here.

10

```
 1              THE COURT:  When did you file something.
 2   Did you file a writing?
 3              MR. ANDREWS:  Yes.
 4              THE COURT:  Did you file it with the Court
 5   or with a party?
 6              MR. ANDREWS:  With a party.  My agent is
 7   right there.
 8              THE COURT:  And what is your name?
 9              MR. ANDREWS:  Michael Andrews, pro se
10   objector.  I filed on behalf of all of us.  They're not
11   going to speak today.
12              THE COURT:  I will just put them all under
13   one.
14              Very good.  We're here on a couple of
15   motions.  One is a motion to intervene for the limited
16   purpose of unsealing records and adjourn the fairness
17   hearing filed by ADAC and others.  And then the class
18   action fairness hearing to which objections and letters
19   were filed.  Then there is a class counsel's motion for
20   attorney's fees, a motion for final approval of the
21   class action settlement, and a motion to strike objector
22   Andrews' surreply, which I will take on the briefs.
23   And also recently filed, which I'll also take on the
24   briefs, are responses and motions to intervene for the
25   limited purpose to respond opposing motion to unseal by
```

11

1   26 objectors filed by Mid-Michigan Health, Alpena

2   Regional, Priority Health and Spectrum, Holland

3   Community Hospital and Ascension Health.  And they're

4   all filed -- well, three of them -- well, Mid-Michigan

5   was filed on November 6th; Alpena on November 7th;

6   Priority Health on November 10th.  And then two were

7   just filed yesterday.

8           And I would note that yesterday, the Court

9   was closed for the national holiday of Veterans Day and

10  those are the Holland Community Hospital and Ascension

11  Health.

12          I would propose the following:  That on the

13  motion to intervene, there be 10 minutes for the movant

14  and 15 minutes combined response by the parties.  And

15  then on the class action fairness hearing that there be

16  two minutes for those filing pro se and 15 minutes for

17  the 26 objectors, ADAC, and others, which is

18  approximately -- well, not quite.  And then 20 minutes

19  for the response by Class Counsel and 15 minutes

20  response by Blue Cross.

21          And then I would suggest that we see where

22  we are because some of the objections include an

23  objection that involves the motion for attorneys' fees

24  and I think everyone is probably going to incorporate in

25  their arguments something relative to the final approval

12

1  of the class action settlement.

2            Do you have a different proposal?  Not

3  hearing one.

4            MR. MILLER:  Just to clarify, Your Honor,

5  we're allocated 20 minutes to the Defendant's settlement

6  and 20 minutes to respond to the objections.  Are 20

7  minutes allocated to the argument because Mr. Small will

8  be defending the settlement and me responding to the

9  objections.

10            THE COURT:  And you need more than 20 or 25

11  minutes to do that?

12            MR. MILLER:  Twenty each would cover it,

13  Your Honor.

14            THE COURT:  You know that is a lot.

15            MR. MILLER:  I'll cut it down.

16            THE COURT:  Yes, sir?

17            MR. ANDREWS:  Instead of two minutes, I

18  would like five minutes, please.

19            THE COURT:  That is Mr. Andrews, right?

20            MR. ANDREWS:  Yes, Judge.

21            THE COURT:  That is agreeable to everyone?

22            MR. WALTERS:  Yes, Your Honor.

23            THE COURT:  Thank you for someone

24  responding.

25            This is the motion to intervene for the

13

1    limited purpose of unsealing the record.  Mr. Walters,

2    you're doing that?

3                    MR. WALTERS:  Yes, Your Honor.

4                    THE COURT:  That's why you were ready to go.

5                    MR. WALTERS:  I know we're on a tight

6    schedule, so I do appreciate you even giving me 10

7    minutes to argue this.  I will try to get to the point

8    on this issue.

9                    THE COURT:  I have read everything except

10   the two items filed yesterday.  One of them I'm not

11   complete on and that is because I'm in a jury trial and

12   so I just got it this morning.

13                   MR. WALTERS:  Thank you, Your Honor.

14                   Unfortunately, Counsel for the named

15   Plaintiffs and for Blue Cross have put the class members

16   and the third party hospitals who produced documents in

17   a very difficult situation with regard to the upcoming

18   fairness hearing.

19                   Our clients are objectors to the proposed

20   settlement and have a right to fully and meaningfully

21   participate in the fairness hearing.

22                   The crux of the decision this Court is going

23   to make in the fairness hearing involves a balancing of

24   the likelihood of success on the merits of the case and

25   the amount of potential damages versus the relief that

14

1   the class members would receive in a proposed

2   settlement.   That is the core issue that the Court needs

3   to weigh in deciding whether or not this settlement is

4   fair.

5           A fundamental part of investigating that

6   likelihood of success and the amount of potential

7   damages here is some understanding and some public

8   vetting of what the underlying facts of the case are and

9   what the basis for damages in this case are.

10          Class actions, as you know, Your Honor, are

11  different from regular cases where the Court can

12  normally rely on the adversarial process to sort out

13  whether or not a settlement is fair and reasonable.

14          Class action cases are different because of

15  the possibility of the risk that Plaintiff's Counsel

16  will put its own interest ahead of the class's interest

17  in the settlement.

18          So there are two different ways the court

19  addresses this in the class action context.   The first

20  is that the court is under its own obligation to

21  carefully scrutinize the proposed settlement.   And I'm

22  very confident the Court will do so.

23          But the second mechanism for this is that

24  the Court calls a fairness hearing and allows for the

25  adversarial process to take place by allowing objections

1    by class members.  But for that to work, class members

2    have to be able to present meaningful information to the

3    Court about the likelihood of success of the case, the

4    potential for damages in the case, so that there can be

5    that weighing as to whether or not the settlement is

6    fair, reasonable or adequate.

7              The problem we have here is that all of the

8    documents, all of the documents submitted by both the

9    Plaintiff's Counsel and Defense Counsel with regard to

10   approval of the proposed settlement were filed under

11   seal.  In their entirety with the Court.

12             So the motion for approval of the class

13   settlement that was filed in the spring and early summer

14   before the Court approved it, and the 90 exhibits that

15   the Plaintiffs attached to justify why this settlement

16   was fair, reasonable and adequate, the entirety of that

17   information was filed under seal and is not available to

18   the class members to review, not available to the class

19   members to look at to help advocate to the Court about

20   whether or not the settlement is fair, reasonable and

21   adequate.

22             The same can be said of Blue Cross's

23   submission.  Blue Cross's entire brief with regard to

24   the proposed settlement and the 42 exhibits to that were

25   also filed under seal.

16

1          In addition, the Daubert motion challenging

2     the damages report was also filed in its entirety under

3     seal, which means that the objectors have no ability to

4     assess whether or not this 120 million dollar damages

5     report that Dr. Leitzinger has relied upon so heavily

6     upon as the basis for settlement has any underlying

7     validity at all.  Whether or not that is a credible

8     report or not.  Whether that number should be bigger,

9     whether that number should be smaller.  There is no

10    ability for the parties to meaningful advocate with

11    regards to that.

12         We have laid out in our brief, Your Honor,

13    there is a very, very strong public right to access to

14    judicial documents.

15         We're not looking to uncover every single

16    document that was produced in discovery, we are looking

17    to have access to the documents that the parties

18    presented to the Court to justify the settlement in this

19    case.

20         The Sixth Circuit has held that only the

21    most compelling reasons can justify non-disclosure of

22    judicial records.

23         Now, of course, ultimately the Court is

24    responsible for supervising its own docket and can make

25    the decision to seal records.  Of course we're not

1   saying that is not possible.  But, it has to happen in a

2   way, and the precedence is very clear on this, the Court

3   is making specific findings that the sealing of these

4   particular records is necessary; that the sealing of

5   these records is essential to preserve some higher

6   value, some confidentiality higher value than the

7   class's access to this information; and that the sealing

8   of records is narrowly tailored to meet that interest.

9              That clearly hasn't happened here, Your

10   Honor; the exact opposite has happened here.

11              We have had essentially a lump and dump.  A

12   black box of documents that were filed with the Court

13   under seal justifying the settlement and none of that

14   has been made available to the public.  Not even a

15   redacted version of that information has been made

16   available to the objectors or the class members.

17              Even the hospitals who are here objecting

18   don't know for sure what is in there in terms of whether

19   any of their records and what of their records are

20   included and what was filed under seal with the Court.

21              Now, it is not the hospitals' fault that all

22   this information was just filed under seal with the

23   Court, I understand why they're here and why they're

24   concerned with regard to that information.  We don't

25   know what is there.  We literally have no way, Your

18

1  Honor, to know what is included in this black box of

2  documents that was filed under seal by both parties in

3  this case.

4        What we are looking for here, Your Honor, is

5  some ability to access those records, and there are a

6  couple of different ways the Court can do that, but what

7  we -- but the easiest way to do so would be to unseal

8  the records because of the public's strong interest in

9  having access to this information.

10        A couple of objections were raised that I

11  want to respond to with regards to our motion.

12        First of all, the question was made as

13  regard to the timeliness of our motion to unseal the

14  records.

15        Your Honor, the motion here was clearly

16  timely.  My clients did not even receive notice of the

17  settlement here until August and they acted promptly

18  upon receiving that notice to move forward with the

19  process in terms of contacting my law firm for advice

20  and we investigated and gave them options for what to

21  do:  You've got a class action settlement notice, you

22  can object, you can opt out, you can file a claim.

23        Our clients decided in mid-September that

24  they were going to object and attempt to seek access to

25  these records.

19

1         We filed our objection on a timely basis on

2    September 24th.  We tried to work things out with

3    Counsel for the Plaintiffs and Counsel for Blue Cross

4    with regards to the records.  We spent almost two weeks

5    trying to work things out.  We narrowed the list of what

6    we were seeking access to to only four documents,

7    documents filed with the Court that were most directly

8    relevant to the settlement in this case, and we tried to

9    see if we could work out a way to get redacted

10   information to us.  To get the guts of the information

11   to us while sealing the confidential information.

12         The problem, Your Honor, and we attached as

13   exhibits some examples of this, the redactions came back

14   like this, Your Honor, (Indicating to document) where

15   the whole page is blacked out and we're left with titles

16   or case citations.

17         All of the relevant information was redacted

18   in what was shared with us in that voluntary process to

19   try to see if we could work this out.

20         So we have clearly filed a timely motion

21   here, Your Honor.

22         We're not on a fishing expedition, Your

23   Honor, we're here because our clients have a direct

24   interest in this case.

25         There has been essentially ad hominem

20

1    attack against my firm and my clients saying we're

2    fishing for information for another case and that is

3    absolutely not true at all, Your Honor.

4              It is absolutely true that we have

5    relationships with these clients because of prior work

6    we have done for them with regard to issues that they

7    had with Blue Cross.  And there is also no doubt that my

8    clients have some skepticism with regards to their

9    dealings with Blue Cross because of those prior

10   relationships.  But our clients have a perfectly

11   legitimate and reasonable interest in obtaining access

12   to this information.

13             We can't count on Plaintiff's Counsel here

14   to represent our interests.  That is the whole reason

15   you have a fairness hearing is to get the view of third

16   parties of class members who may have a different

17   perspective from Plaintiff's Counsel with regards to the

18   settlement.

19             We meet the factors for this very limited

20   purpose, Your Honor.

21             There are seven million class members

22   estimated in this case.  That is the estimate that

23   Plaintiff's Counsel have made.  Individuals,

24   self-insured plans, insurance companies.  There is a

25   very compelling public interest in those class members

21

1    having access to this information.

2              Now, what do we do with the fact that this

3    information has been identified as confidential?  We

4    know under the Court's precedence from the Sixth Circuit

5    and the Supreme Court that only the most compelling

6    reasons can justify non-disclosure of judicial records.

7              We also know that we haven't had that

8    specific finding, that narrow tailoring of looking at

9    document by document, piece by piece to see what is so

10   confidential that it should be hidden from the public

11   view with regard to this settlement and what should not.

12             That process has not happened.  It was a

13   lump and dump, a black box of thousands and thousands of

14   pages that were filed with the Court entirely under

15   seal.

16             There are a couple different ways that we

17   can tackle that.  One would be to unseal the records

18   entirely.

19             Under the current record before the Court,

20   the Court could very easily do that because there has

21   not been sufficient information presented to the Court

22   to overcome the strong interest the public has in access

23   to this information.

24             But I understand why the Court might be

25   reluctant to do so.  I mean, there are third parties

22

1   that produced this information and why should they be

2   punished for the tactical decisions of Plaintiff's

3   Counsel and Defense Counsel in filing this information

4   en masse with the Court.

5           A couple other ways that we might tackle

6   this.  One way would be the way that it happens in most

7   cases to require a redacted version to be filed for

8   public consumption and then an unredacted version on

9   file with the court.  That is what typically happens

10  when cases are filed under seal.

11          Our problem here with that, Your Honor, is

12  that we tried to do that voluntarily with Counsel for

13  the parties already and we ended up with pages and pages

14  of redactions that basically gutted any of the relevant

15  information in the factual record that would be relevant

16  to the Court's assessment as to whether or not this is a

17  fair and reasonable settlement or not.

18          For example, Blue Cross, in its briefs, has

19  generically said over and over again that there is a

20  bunch of testimony from hospitals saying that the MFN

21  agreements did not result in any cost increases.

22          Well, I would sure like to see and

23  understand that to be able to assess whether or not that

24  testimony is strong or not, whether or not that

25  testimony really says what Blue Cross's Counsel says it

1  says in terms of how it is being represented.  There is

2  a public interest in having access to that information.

3  However, that information is filed completely under seal

4  and we don't have the ability to look at that.

5            So doing a redaction here, Your Honor, I

6  would submit is not going to work out because we're

7  going to end up with pages that look like this and we're

8  just going to be back before you or the magistrate judge

9  again dealing with the redactions and why the redactions

10  didn't happen.

11            Another option, Your Honor, would be to do

12  the grind, which is what is typically required.  An in

13  camera review of each document that is filed under seal

14  in order to identify whether or not it was properly

15  sealed in its entirety, whether there is certain parts

16  of it that should be sealed and other parts that should

17  be unsealed.  We could work through that with the

18  magistrate judge or with Your Honor.

19            And the significance of this issue would

20  justify that.  That would take some work, no doubt about

21  that, but this is a big case.  This is a big deal.  And

22  it affects the rights of seven million potential class

23  members.  To give them the time to do that would be

24  justified.

25            But there is another alternative, at least

24

1    another alternative that I've identified, although I'm

2    certainly open to the Court's direction to where else we

3    might go with this, because there are very few objectors

4    here and we're the only party that has asked to see

5    these documents, the Court could give us attorneys

6    eyes-only access to this information and then allow us

7    to come to the Court with any particular information

8    that we think is critical to the Court's analysis on the

9    fairness.  And then we would narrow down the field of

10   what is really at issue, which documents and how many

11   documents are at issue to something that is a lot

12   smaller than 90 exhibits to one brief or 40 or 50 to

13   another brief.

14            It might be that once the attorneys see the

15   90 exhibits attached to the Plaintiff's motion for class

16   certification that only three of four of them really

17   matter.  And if we could narrow that down to three or

18   four, then we could work with Plaintiff's Counsel, Blue

19   Cross's Counsel and with the Counsel for the hospitals

20   or whatever third party it was that produced the

21   documents to see if we could work through a way to

22   redact or narrow that information.  If we can't , we

23   come back to the court, come back to the magistrate

24   judge or to Your Honor to deal with that.

25            So this is a way that we could try to tackle

1  this.

2           Your Honor, I want to very quickly say, Your

3  Honor, because I sense that Blue Cross may respond on

4  this, Blue Cross's brief makes mention of the fact that

5  they offered us attorneys' eyes only view of documents

6  and we rejected.

7           What was discussed with Blue Cross's Counsel

8  in that regard was attorneys' eyes only review of

9  redacted documents.  And our response to that was why do

10  we need attorneys eyes only review of redacted

11  documents, if it is redacted and the confident

12  information is gone, anybody should be able to look at

13  it.

14           So we haven't had a discussion about an

15  attorneys eyes only review of the information and I

16  think under the circumstances that would be the best way

17  to deal with this.

18           In conclusion, Your Honor, because I know

19  I'm probably over --

20           THE COURT:  You are over, yes.

21           MR. WALTERS:  It would be unfair and

22  unreasonable for the Court to keep all documents that

23  were submitted in support of the settlement under seal.

24           The Plaintiff's Counsel and Blue Cross made

25  strategic decisions about what information does the

26

1   Court need access to in order to understand the proposed

2   settlement.  They submitted that information as part of

3   their motions.  That information should be available at

4   some level for review by the public so that we can

5   assist the Court in its role of carefully scrutinizing

6   the settlement.

7              That's the whole reason why you have a

8   fairness hearing is so that objectors can stand up and

9   meaningfully participate.

10             But when the substantive information about

11  the case, about what were the affects of these MFN

12  agreements, what were the potential damages from these

13  MFN agreements, when that substantive information is

14  sealed from the other class members, the class members

15  don't have the ability to meaningful participate in the

16  settlement.  Or at least it's certainly hindered, Your

17  Honor.

18             So we would ask the Court to either unseal

19  the records in their entirety because of the strong

20  public interest in this information or at least adopt

21  some sort of process that would allow the objectors to

22  access this information and present relevant information

23  to the Court as part of its objections.

24             And we would ask that our objections to the

25  fairness hearing be postponed until we have the

27

1  opportunity to review those documents and argue to the

2  Court.

3         We're not asking for the whole fairness

4  hearing, everyone here has taken the time to get here,

5  but as it relates to our clients' objections, we would

6  ask that the Court allow us a time to be heard at a

7  later date on our specific objections based on our

8  review of those currently sealed documents.  Thank you,

9  Your Honor.

10         THE COURT:  Thank you.

11         MR. HOFFMAN:  We'll try to be quicker than

12  that, Your Honor.

13         Your Honor, Bruce Hoffman on behalf of Blue

14  Cross.

15         I'm going to respond I think relatively

16  briefly with a number of points, not too many.

17         But the first thing I want to say, and I

18  think this is a theme that will run throughout a couple

19  of the remarks to be made, is there are a number of

20  statements made by the objectors in connection with the

21  unsealing issue which really aren't accurate.  And I'm

22  going to come back to this particular one, but it is not

23  correct that the filings in connection with the

24  settlement were filed under seal.

25         The filings in support of preliminary

28

1   approval were public.  They were available for review.

2   They have been reviewed.  That, Your Honor, is the

3   information to which objectors are normally entitled.

4             This hearing, the fairness hearing, is not a

5   redo of the entire litigation.  It is not a place for an

6   objector to come in and go back through the entire

7   litigation record and revisit all the decisions that

8   were made and all the issues that arose.

9             The issue for this hearing is:  Is the

10  settlement fair and adequate as measured against the

11  case at the time the settlement occurred and is there

12  evidence of fraud or collusion?

13            The materials relevant to that were filed

14  publicly.

15            So this notion or this statement that

16  everything is filed under seal is simply inaccurate.

17            Another inaccuracy that I want to call on

18  quickly before I turn to my main points is this notion

19  that there is a tactical decision by the parties to file

20  every single document under seal.

21            These cases have been going on a very long

22  time.  As you know, Your Honor, there is a number of

23  them.  They are all related and they involve a

24  stupendous amount of discovery and a stupendous amount

25  of extremely confidential information.

29

1          There are protective orders in this case and
2    all the related cases which Your Honor entered after due
3    consideration.
4          Filing all the materials that were filed
5    under those protective orders, as you may recall, Your
6    Honor, was a very burdensome process because the parties
7    initially were filing redacted copies of all the
8    hundreds of documents with all these hundreds of
9    thousands of cites in them, and the Court directed the
10   parties to file documents under seal presumptively as
11   opposed to going through the individual
12   document-by-document redaction process because of the
13   huge burden redaction would impose on the Court, the
14   parties and the nonparties.
15         So this argument that there is a tactically
16   decision by Class Counsel and Blue Cross's Counsel to
17   file things under seal simply is untrue.
18         The Department of Justice filed documents
19   under seal.  Aetna filed documents under seal.
20   Nonparties responding to discovery filed things under
21   seal.  All per the Court's instructions to alleviate the
22   burden.
23         And those instructions, Your Honor, were
24   appropriate because this case touched on critical
25   confidential financial strategic price and other cost

30

1    information of all the major insurance companies in

2    Michigan and dealing in Michigan, including national

3    insurers, all of the hospitals in Michigan and many

4    other entities none of whom benefitted and all of whom

5    would be hurt and the public would be hurt by the public

6    disclosure of that information.  So those things were

7    appropriate.

8              Let me turn to a couple legal points in

9    response to unsealing and this will touch tangentially

10   on the notion of postponing this part of the hearing.

11             First, this request to unseal and intervene

12   is clearly untimely.

13             Counsel for the objectors didn't say

14   anything about the Sixth Circuit test.

15             As we explained in our brief, and this is at

16   docket number 178, pages 4 to 5 of our brief, there is a

17   test in the Sixth Circuit for whether an intervenor or

18   intervention on behalf of an objector is timely and they

19   didn't meet a single element of it.

20             Let me just highlight without replicating

21   all of that, let me highlight a couple of reasons why.

22             The objectors knew about this months ago.

23   In their objection, Exhibit 5 to their objection, this

24   is docket number 161, Exhibit 5, there is an email from

25   one of their clients specifically pointing out, and this

1  is a document they filed with the Court, that as of

2  September 22nd -- September 22nd -- and I will quote,

3  they, that is our Counsel, the Varnum Firm, will be

4  filing an objection on our behalf along with a dozen

5  other companies.

6          Part of the objections we have heard, the

7  burdensome process for filing the claim and so forth,

8  September 22nd, they were already planning their

9  objection.  And yet, there is no attempt, no attempt to

10 reach out to the settlement administrator, to Blue

11 Cross, to Class Counsel or to the Court to obtain any of

12 the information that the objectors suddenly decided

13 under the very deadline they were objecting is critical.

14 That is too late.

15         And let me add this.  The protective order,

16 Your Honor, has a procedure in it whereby anyone who

17 chooses to can request relief from the order.

18         That procedure could have been invoked at

19 any time.  The protective order is not confidential.

20 It's not filed under seal.

21         There is absolutely no reason why the

22 objectors could not have done months ago what they have

23 belatedly attempted to do now.

24         Now, as the cases we cited point out, Your

25 Honor, objections, interventions, attempts to open

32

1   discovery that are tardy and that jeopardize the ability
2   to complete the fairness hearing in a timely fashion are
3   routinely overruled.  They are not permitted.  That
4   should be the result here.

5           Let me turn to my second point.  The
6   information that the objectors seek is unnecessary.  It
7   is irrelevant to the issue before the Court.

8           This comes back, Your Honor, to the point I
9   made at the beginning about what is it that's public and
10  what is it that they're trying to get.

11          The test, Your Honor, for the sufficiency of
12  information to prove the settlement is whether the Court
13  has before it sufficient information to evaluate
14  fairness.

15          And I will cite, we cite a number of cases,
16  Your Honor, in our briefs, Plaintiff cites a number of
17  cases on this, but I will just cite the In Re General
18  Tire and Rubber case, 726 F.2d 1075 at page 1084, note 6
19  from the Sixth Circuit, 1984, and what it points out is
20  the focus is not on the information available to the
21  objectors, the focus is on the information available to
22  the Court.

23          The Court has more than enough information I
24  suspect that the Court would ever want and certainly
25  more than the Court would need to evaluate the fairness

33

1  of the settlement after these years of litigation and

2  the enormous discovery record this case has entailed.

3          Additionally, Your Honor, the objectors have

4  all the information that class members normally get.

5  There are lots of antitrust class action settlements.

6  In virtually every one of those cases, most of the

7  records are drastically redacted or filed under seal for

8  the reasons they're redacted or filed under seal in this

9  case, because by their nature antitrust cases probe into

10  the innermost thinking of companies, about how they

11  conduct their businesses.

12          Objector discovery for that reason, Your

13  Honor, is normally limited to the settlement, not going

14  back and revisiting the entire discovery record of the

15  case.

16          And here, the preliminary approval papers

17  are not filed under seal, they are public.

18          The objectors' proper role to the extent

19  they have one is to evaluate the settlement as against

20  the litigation outcome at the time the settlement

21  occurred.

22          The question, frankly, Your Honor, is a

23  pretty simple one:  Is 29 point 9 million dollars a

24  reasonable recovery out of an absolute outside dollar

25  limit of 118 million?  Is that fair and reasonable?

34

1          We think the answer to that is clearly yes,

2     but Plaintiff's Counsel can say more about that.

3          And then the second question is simply is

4     there evidence of fraud or collusion.  And frankly, Your

5     Honor, you know the history of this case.  There is not

6     the slightest chance of fraud or collusion between class

7     Plaintiffs and Blue Cross Counsel.  We have fought these

8     cases tooth and nail from day one and continue to do so.

9          The purpose for the objecting is not to

10    relitigate the case, it's not to second-guess class

11    counsel's judgment, and more specifically, as the Sixth

12    Circuit says in the Geyer versus Alexander case, 801 F.2

13    799 at page 809, I will offer a quote again, and they

14    quote at the end, the objectors don't get to, and then

15    the quote from the Sixth Circuit, replace counsel for

16    the class and start the case anew, closed quote.

17         That is not what this is about.  They have the

18    information they need.  Their request for more is

19    unnecessary.

20              And then third, I have said probably enough

21    on this but I want to emphasize it, sealing the records

22    here was appropriate.  This room is full of Counsel for

23    the third parties who produced confidential information

24    in reliance on protective orders entered in multiple

25    cases, this and its companion cases, guarding their

35

1    innermost strategic decisions and secrets from public

2    disclosure to their customers, to their competitors, to

3    their suppliers, to everyone else with whom they did

4    business.  And so too for Blue Cross.

5              There is no reason why any portion of that

6    should now be overruled at this belated date for no

7    proper purpose.

8              THE COURT:  Thank you.

9              MR. SMALL:  Thank you.  Daniel Small for the

10   Class Plaintiffs.

11             Really two brief points.  Mr. Hoffman, I

12   think, covered the important points, but I want to add

13   that Mr. Hoffman is absolutely correct that the role of

14   the objectors at a fairness hearing is limited.  It is

15   not an effort to redo the litigation that we have all

16   worked so hard on for years.

17             And one of the reasons, Your Honor, that the

18   role of an objector is limited at a fairness hearing is

19   because the class is represented by Class Counsel, who

20   in this case, Your Honor, have been appointed twice by

21   the Court as adequate Counsel to represent the class;

22   once early in the litigation as interim co-lead counsel

23   and again when the Court certified the settlement class

24   here.

25             The Court has determined that Class Counsel

36

1    are adequate to represent the case, and that is true,

2    Your Honor, I would submit in spades in this case where

3    we have spent three years engaging in a tremendous

4    amount of discovery, investing 3.5 million dollars

5    out-of-pocket and over 15 million dollars in our time to

6    develop this case.

7              We looked at damages very hard with an

8    expert who we paid over two and a half million dollars

9    to look at the damages issue.

10              The Class Counsel, Your Honor, are attorneys

11   who have worked on precisely this type of litigation for

12   years spanning 25, 30 year careers doing exactly this.

13              And Your Honor, I believe given that effort,

14   and given the total lack of any evidence to support the

15   assertion that this settlement is collusive, that the

16   Court has plenty of information in the record in which

17   to determine whether this settlement is fair, reasonable

18   and adequate.

19              The only other point I would make, Your

20   Honor, is that there are many large sophisticated

21   entities in this Class.  If it were the case that there

22   was not a sufficient basis upon which to evaluate this

23   settlement, where are all these large companies?  None

24   of them have objected, Your Honor.  None of them are

25   demanding access to further records.  Many of them are

37

1    filing claims to participate in this settlement.

2              This is not an issue that has been of

3    concern to any of the many very large members of the

4    Class who are very sophisticated and have access to

5    outside counsel, in many cases in-house Counsel, and

6    have a strong basis on which to evaluate the settlement.

7    Thank you.

8              THE COURT:  Let's go next to the fairness

9    hearing.

10             I would allow you a time to reply but you

11   exceeded your time on your motion to intervene.

12             Now I'm going to start with the objectors,

13   then you can respond to everybody.

14             So I have Mr. Andrews who wants five

15   minutes; is that right?

16             MR. ANDREWS:  But I would like Plaintiff's

17   Counsel to go first.

18             THE COURT:  I would normally do that, but if

19   I let them go first, they're going to make their

20   presentation about why they should prevail and then

21   they're going to want to respond to your objections.  So

22   I know that is not the normal order, Mr. Andrews, but I

23   would like you to go first so that when they make their

24   presentation, they can include in their presentation

25   their objections.  And while I don't expect that you

38

1   will raise anything new, you might cast a different

2   light on our reading of the papers that you have

3   presented to the Court which are numerous you would

4   agree, right?

5              MR. ANDREWS:  I would say yes based on what

6   I felt wrong.

7              THE COURT:  Yes, and that is fine, but I'm

8   just saying that if I am going to let them make their

9   presentation and they don't respond to not one

10  objection, they're going to want time to do that.

11             So if you don't mind, I think under the

12  court rules I have the right to say how the proceedings

13  will proceed and have a lot of discretion in that

14  regard.  So I would ask you to go first.

15             MR. ANDREWS:  Yes, Judge.

16             THE COURT:  Okay.  Thank you.

17             MR. ANDREWS:  My name is Chris Andrews, pro

18  se objector and I'm not an attorney.

19             I'm going to keep my comments to five

20  minutes.

21             Let's start, we're going to go down this

22  really quick.

23             Mr. Hoffman brought up a point, one really

24  good point that this fairness hearing is basically not a

25  redo.  That is a 100 percent accurate.

39

1          Based on all the documents we submitted,

2   there is no way in the world this fairness hearing

3   should conclude that the settlement is fair and

4   reasonable and adequate, absolutely no way.

5          We don't have the ability to rewrite the

6   settlement.  At this stage.  No one does.  You have to

7   give it a thumbs up or thumbs down.

8          Right now, I see thumbs down unless it is a

9   reality show, but that is not going to happen.

10          A couple of things I would like to point

11   out.  They keep bringing up the fact that the 29 million

12   dollars, 30 million dollars is fair and reasonable.

13          We have not seen any evidence in all this

14   paperwork justifying the 118 million dollars.

15          We would also like to be included, if the

16   Court unseals some of the records, we would like to see

17   the records that apply proving on paper in writing that

18   there is 118 million dollars worth of damages.

19          No one has seen it.  Maybe you have seen it,

20   I haven't seen it.  But someone outside the Court and

21   the parties should be able to look at it, because we

22   might find there is something wrong just like we found

23   what was wrong in the whole settlement which was

24   everything.

25          So we would like to be included in those

40

1    eyes-only, and you have to make an exception.  I am not

2    an attorney but I will sign a protective order.

3              Assuming that 118 million dollars was

4    legitimate, we have a proposal to make and maybe the

5    Plaintiff's Counsel can be given a 10 minute recess to

6    talk it over.

7              Here is what we would like to do.  Assuming

8    the 118 million is legitimate, and we haven't seen proof

9    of that.  One, obviously we have to see the evidence.

10   Number two, we pointed out over 18 different material

11   errors in the settlement hearing that encompassed 290

12   pages.  It is not made up of all verifiable, it is all

13   in writing.  It is there, I'm not going to repeat it.

14   It would take four hours of reading to do it.

15             We have made suggestions to rewrite the

16   whole settlement.  We put together the presentation

17   what it should have been written and what should have

18   been done.  The issue is it should have been done by

19   these people.  It hasn't been done.

20             They're coming in here wanting --  it is

21   mind boggling.

22             We're looking for Counsel to add additional

23   information to the wrong notice.  We also want the wrong

24   notice to be remailed to every person that's a class

25   member who has not sent in a claim.

41

1          At this point, there is three million

2     Michiganders who have been supposedly overcharged on

3     medical services.  That includes everybody in this room

4     who is from Michigan.

5               Right now, there is a rate of two percent,

6     25,000 people have filed claims out of three million.

7     That is a failure in the notice.

8               In fact, when you go back and read through

9     one of the class members who commented on Facebook this

10    week, 1100 members who said we think it is a joke,

11    talked about the fact when you call the administrator,

12    they were told they had to file one form for each child.

13    So out of those 25,000 claims that have been filed, they

14    could represent 8,000 households and there's three

15    people in each household.  That is 25,000 right there.

16    So it is a failure.

17              The Court should not be able to approve this

18    based on how bad the notice that went out to the

19    classes.  Those notices should be remailed out.

20              A second opt-out period also should be

21    included in that bail out.  If we somehow come up with

22    the 118 million dollars worth of damages as evidence,

23    those opt-outs can then go to small claims court or

24    district court.  At this point, no one can do anything.

25    We're all hamstrung here.

42

1          Next, the non-effective information on the

2    Web site which includes the claim forms obviously needs

3    to be replaced.

4          We don't think the 30 million dollars is

5    sufficient.  The 30 million dollars represents 25

6    percent of 120 million dollars.  The attorneys have

7    falsely claimed they have incurred 15 point five million

8    dollars in fees.  It would take 25 percent of 15 point 5

9    million.  That is really the true lotus star in this

10   case.

11         Maybe we should just call it a day if the

12   118 is legitimate, if we know that is a fact.  We would

13   like them to get 25 percent of what they want.

14         Why should we get 25 percent, we want 50

15   million.  If it is more than 118 million dollars, uh-uh,

16   we want 50 percent of that amount over and above that.

17         Next, Mr. Hoffman -- well, Mr. Walters

18   brought up one particular point that hits home here.

19   They engaged in two weeks negotiations trying to get

20   redacted information so we could see it.  We were also

21   stalled for two weeks by Class Counsel.  They had us put

22   together a document under false pretenses that they then

23   disclosed in their final settlement papers to impeach

24   our credibility.  They got on the call, they used

25   interstate phone lines, they crossed state lines in the

43

1    phone call having to use the computer to create
2    documents for their false pretenses and they're now
3    going to try to impeach us with it.

4              Judge, a lot of this stuff goes on you might
5    not see.  It is trench warfare down here.  You should
6    see what goes on.  You've only seen part of it.  It goes
7    on in almost every single class action case.

8              I would like to reserve one minute.  I would
9    like to call Mr. Miller to the stand when all is said
10   and done and I have one question to ask him about that
11   secret phone call that turned out not to be secret.

12             Do you have any questions for me, Judge?

13             THE COURT:  Maybe you should just say what
14   your question is going to be and they could address it.

15             MR. ANDREWS:  Sure.  I would like to ask him
16   one question.  As I stated in the supplement, I was the
17   only speaker on our end.  I did not say whether or not
18   there was any other speakers on the call or any other
19   listeners on the call on my end.

20             I would like Mr. Miller to answer the
21   following question:  Did he specifically, as the
22   chairman of Class Counsel, ask the question to me the
23   second time, do you want the contents of this call to
24   remain secret?  I answered, yes.  Did he ask that
25   question.

44

1          If he denies it, I will take a truth

2     detector test and come back.  Okay, thanks.

3          THE COURT:  I also received a letter from

4     John Kuntizer, document number 158, by way of objection.

5     And I received an objection by Scott Mancinelli who

6     indicated in his objection that he was not going to

7     appear, but I have noted it.

8          I received a letter from Darrell Thompson

9     and Margaret Schubert.  And neither one of those people

10    are here, right?

11         You're here for -- are you Mr. Thompson?

12         MR. THOMPSON:  Yes.

13         THE COURT:  You know, I know there is an

14    issue about whether or not Mr. Thompson's objection is

15    timely, but I would like to give him two minutes to

16    speak anyway.  Does anyone object to that?

17         MR. MILLER:  No, Your Honor.

18         MR. HOFFMAN:  No, Your Honor.

19         THE COURT:  You may.

20         MR. THOMPSON:  I'll try and shorten this.

21    My name is Darrell Thompson, I'm a Michigan senior

22    citizen and Blue Care Network Advantage member.  I'm

23    going to skip over my first issue of a United States

24    Court of Appeals case of Hileck versus Blue Cross, but I

25    think that is a fiduciary responsibility issue.

45

1            The second issue I think is this case which

2    I think is a fiduciary responsibility issue.  And

3    according to my understanding, the United States

4    Department of Labor health plans and benefits fiduciary

5    responsibilities, the primary responsibility of the

6    fiduciary is to run the plan solely for making

7    provisions for the beneficiaries.

8            Skipping to my third issue, Blue Care

9    Network is specifically health care fraud and its

10   elements.  The do not report proper products.  The

11   health care false claim act says that false means wholly

12   or partially untrue.

13           Does Blue Shield of Michigan have fiduciary

14   responsibility to enforce all health care laws?  Is

15   there a conflict of interest?  I believe enforcement of

16   partial untruths would result in a decrease in claims

17   and a decrease administrative compensation.

18           Fourth, in 9-11, many people died so the

19   response was to improve airport security.  When credit

20   card is reported, a bank issues new credit cards.  When

21   I called Blue Care Network to ask them what they do,

22   they said we just pay whatever your doctor says.

23           So 60 Minutes report 167 people died and

24   hundred more received unnecessary surgeries.  A doctor

25   performs thousands of unnecessary surgeries.  Detroit

46

1    Free Press article, September 17th, 2014, cancer doctor

2    hits scam giving patients unneeded chemo.  FBI, U.S.

3    Attorney's Office, January 28, 2014, several doctors

4    working at the hospitals -- I repeat, several doctors

5    working at the hospitals performed numerous evasive

6    heart procedures on Medicare patients who did not need

7    them.

8                I'm a Blue Care Advantage member.  Four

9    doctors informed to me before surgery I need to be

10   treated for three vessel coronary artery device despite

11   the fact my heart cath doesn't report I have three

12   vessel coronary arteries.  Blue Care Network informed my

13   doctor that I need a flu shot or I'm scheduled for a

14   physical.

15               I think Blue Care Network has a fiduciary

16   managerial responsibility to have my primary care doctor

17   verify that I either have three vessels -- if they're

18   going to treat me for three vessel coronary disease,

19   have my primary doctor verify that my heart cath reports

20   I have three vessels coronary disease.

21               The other cases involve people being treated

22   for cancer.  Have the primary care doctor check the test

23   results of these people to make sure that they actually

24   have cancer before you get treated.

25               So my suggestion, my conclusion here --

47

1    well, Blue Care Network, how we fright fraud.  I would

2    like the chance to show how do you proactively fight

3    fraud and reactive strategy to fight fraud.  People

4    should be safe from having their chest sternum bone cut

5    out to treat significant significant blocked arteries

6    they do not have.  People should be safe from being sick

7    or having their hair fall out from chemotherapy due to

8    cancer they don't have.  People should be safe from

9    dying from unclear medical procedures.

10           Speaking on behalf of future patients, I'm

11   requesting to include the comments by objectors, to

12   include the law enforcement and implement effective

13   health care laws strategies.

14           Speaking on behalf of the dead and the

15   living suffering victims of medically suffering I am

16   requesting information be given to the patients become

17   part of dead.

18           THE COURT:  Mr. Walters, we're back to you.

19           MR. WALTERS:  Your Honor, my clients object

20   to the proposed settlement for five reasons.

21           First, the amount of the proposed settlement

22   is completely inadequate and that is where I will spend

23   most of my time.

24           Second, the settlement gives preferential

25   treatment to the named Plaintiffs in terms of the

48

1    incentive rewards that are proposed.

2           Third, the proposed settlement gives

3    preferential treatment to Plaintiff's Counsel in terms

4    of the amount of money proposed to be paid to Counsel as

5    a percentage of the overall settlement fund.

6           Fourth, the claims process is unnecessarily

7    burdensome particularly with regards to the millions of

8    class members whose health care is managed by Blue

9    Cross.  Those people should not have to file a claim at

10   all.

11          And finally, fifth, the documents necessary

12   to wholly assess the proposed settlement are under seal.

13   I won't rehash those arguments, but it is one reason why

14   the proposed settlement is unfair and cannot be fully

15   evaluated at this point in time.

16          Turning to the first and primary point.

17   The amount of the proposed settlement here is completely

18   inadequate.

19          Hospital care is massive business in

20   Michigan.  And everywhere.  It is estimated that over

21   seven million class members paid Michigan hospitals over

22   85 billion -- with a B -- dollars since 2006.  That is

23   the time period that this proposed settlement would

24   reach back to is 2006.

25          These calculations that were laid out in our

49

1    objections, that have not been reputed or challenged in

2    any way, are based on publicly available data.

3           This would be an average for each class

4    member, the average class member has spent $12,000 on

5    hospital care since 2006.  Over the last eight years.

6           Of course some class members have spent

7    millions to their insurance companies and self-insured

8    plans and some individuals have spent little.  But if

9    you average it out over the whole class, the average

10   class member has spent $12,000 on hospital care since

11   2006.

12          Now, the allegations in the Complaint are

13   that Blue Cross, as part of these most favored nation

14   agreements, agreed they would pay an average of a 16

15   percent higher reimbursement rate if the hospital agreed

16   to an MFN agreement versus if the hospital would not

17   accept a most favored nation agreement.  Essentially

18   agreeing to a price fixing scheme to increase hospital

19   costs for everyone in Michigan.  That is the underlying

20   allegations of the Complaint.

21          The city of Pontiac case even alleged higher

22   percentages.  I believe it was between 23 and 39 percent

23   were the allegations in that Complaint.

24          If the allegations are true that Plaintiffs

25   have made and that they're able to prove those

50

1    allegations at trial, these most favored nation
2    agreements caused billions of dollars in damages to
3    class members since 2006.  Billions.
4              Moreover, this is an antitrust case.
5    Damages are automatically trebled under federal
6    antitrust law if the Plaintiffs are successful here.
7    Plus, the federal antitrust law entitles those
8    plaintiffs' their attorneys fees if they win.
9              Aetna, in one of the opt-out cases, is
10   alleging two billion dollars worth of damages to it by
11   itself.
12             This is a bet-the-company type of a case for
13   Blue Cross.  It is no wonder that they're eager to push
14   this settlement through.
15             Now, in the notice for the proposed
16   settlement agreement, it provides that class members who
17   submit claims would be paid up to one percent of their
18   hospital expenditures at most hospitals for the Category
19   II hospitals.  For the Category I hospitals, they could
20   be reimbursed up to three and a half percent of their
21   hospital expenditures.
22             That sounds like a fair settlement on its
23   face.  The Complaint alleges 16 percent overcharges on
24   average, we'll settle for reimbursement of between one
25   to three and a half percent given its litigation risks,

51

1   the costs of going forward.  That on its face sounds
2   like a reasonable settlement.
3           The problem is when you do the math because
4   reimbursement of even one percent of the class members'
5   hospital expenditures since 2006 would require 850
6   million dollars to be set aside in the settlement.  That
7   is one percent of the 85 billion that has been spent by
8   class members since 2006.
9           The actual settlement fund that is in the
10  proposal is just under 30 million dollars, but the net
11  is really what matters to the class members.
12          Once you deduct attorneys fees, once you
13  deduct costs, once you deduct class administration
14  expenses, and the net, if this Court were to award
15  attorneys fees to the level that is being sought by
16  Plaintiff's Counsel and to which is not being objected
17  to by Blue Cross, the net would be closer to 15 million
18  dollars in terms of what would be disbursed to the seven
19  million class members here in terms of the potential
20  claims in this case.
21          Fifteen million dollars spread over seven
22  million potential class members, an average net recovery
23  to potential class members of about $2.00 a piece.
24          Keep in mind, Your Honor, the average class
25  member has spent $12,000 on hospital expenses since 2006

52

1  and they're going to recover an average of $2.00 under

2  the proposed settlement.

3          Your Honor, it is not a reasonable

4  settlement.

5          Put another way, the class members would be

6  reimbursed a dollar for every $5,681.00 they spent at a

7  Michigan hospital since 2006.

8          It is a nuisance value settlement, Your

9  Honor.  Thirty million dollars sounds like a lot, but

10  when you break it down over 70 million potential class

11  members, it is a nuisance value.  And the only way it

12  makes sense, the only way it is fair is if this Court

13  has already essentially decided that it is nearly

14  certain that the case is going to get kicked on summary

15  judgment, on Daubert motions, kicking a damage expert

16  and not allowing the Plaintiffs to try to put in a new

17  expert.  That is the only way this settlement makes

18  sense.  Because you could say, well, a $2.00 average

19  recovering the seven million class members is better

20  than zero.  That is the only why this makes sense, Your

21  Honor.  Otherwise, the interest of the class members is

22  clearly put forward with the case.

23          Now, there haven't been a lot of opt-outs,

24  but there have been some very notable ones.

25          Aetna has opted-out and is seeking two

53

1   billion dollars worth of damages on its own.  Health
2   Alliance Plan, the other largest competitor to Blue
3   Cross, has also opted-out and is pursuing its own claim.
4           Now, the incentive of the class is to go
5   forward with the lawsuit and the incentive of Plaintiffs
6   and its Counsel are not in alignment and I will you get
7   to that in just a minute.
8           So in order to assess the settlement, we
9   have to look at what is the likelihood of success of the
10  claim, because the settlement only makes sense if the
11  Court concludes that the settlement has no likelihood of
12  success.
13          Well, what do we know in the public record?
14  We know the Department of Justice thought enough of this
15  claim to bring its own complaint against Blue Cross
16  after more than a year of investigation and over 75
17  witness interviews.
18          We know that the Michigan legislature was
19  concerned enough about the anticompetitive effect of
20  this practice to ban MFN agreements by passing
21  legislation to do so.
22          We know that no court has granted summary
23  judgment in favor of Blue Cross in any of these cases;
24  in the DOJ case, the Aetna case or in this case.  In
25  fact, there isn't even a summary judgment motion on file

54

1   before the Court currently in this case, at least the

2   way that I saw the docket.

3            The city of Pontiac case is the only one

4   that was dismissed and that was only because the

5   Plaintiff in that case insisted on pleading it as a per

6   se violation rather than a rules reason.  So it was a

7   legal issue.

8            We also know that there was no class

9   certification motion to file in this case other than to

10  approve the settlement class.

11           So when Blue Cross says, oh, this class has

12  never been certified as it went forward, we don't know

13  that, we haven't had any motion practice with regard to

14  that.

15           And then what else do we know about

16  likelihood of success besides all these things?  Well,

17  the objectors know nothing, but apparently in the black

18  box of documents filed under seal, there is all kinds of

19  information that was submitted to the Court with regard

20  to the request that the Court certify the settlement

21  class that relates to the likelihood of success on the

22  merits, the proposed damages, because of course, the

23  parties had to get this Court to certify the settlement

24  class.  It filed the documents under seal to do so.  And

25  there are apparently documents in there that might

1   relate to that.  We have been able to glean only a tiny

2   bit out of that.

3           We know that there is sealed expert damages

4   report that is the basis of the settlement.  It is a 120

5   million dollar report.  We haven't been able to look at

6   it, but what we do know about it is it only analyzes

7   damages at 13 of the 130 hospitals in the state.

8           That report does not include any damages for

9   the other 117 hospitals in the state.  So it is not at

10  all conclusive.

11          The second thing that we know from Blue

12  Cross's brief is that class certification expert

13  discovery is still open and that merit expert discovery

14  hasn't even started.

15          This expert report deals with class

16  certification issues.  The merits, the final damages

17  that would be proved on a merits case at trial, the

18  expert discovery on that hasn't even started yet, Your

19  Honor.

20          The damages analysis in this case is not

21  final, it is not even close to final.

22          Dr. Leitzinger was preparing a report for

23  class recertification purposes, not for merit purposes.

24          Under those circumstances, we can't say with

25  any difinity that 118 million dollars is the ceiling of

56

1   the potential discovery in this case.

2           And even if it was, it is still subject to

3   treble damages under federal antitrust law.

4           So if we're looking at this as a 118 million

5   maximum recovery, it's disingenuous.  Even under Dr.

6   Leitzinger's analysis, the maximum recovery is actually

7   over 350 million dollars, Your Honor.

8           The claims rate, the take rate in this case

9   tells you all you need to know about this settlement.

10  It is not even worth people's time to bother filing a

11  claim.

12          As of October 23rd, three months after class

13  notices were sent out, there have been less than $25,000

14  people who have filed claims out of the seven million

15  potential class members.  That tells you all you need to

16  know about this claim.

17          Last minute, Your Honor, relating to the

18  burdensomeness on the class process.  I want to talk on

19  that very briefly.

20          There is no reason why for Blue Cross

21  members, for people whose claims are managed by Blue

22  Cross, whose health care is managed by Blue Cross, why

23  those people should have to file a claim at all.

24  Because what is happening, for example, in our objection

25  we mention Petoskey Plastics.  Petoskey Plastics is one

57

1    of our clients.  They have spent hours and hours dealing

2    with Blue Cross trying to get the data necessary to file

3    a claim.  And so they finally got the data from Blue

4    Cross after spending a total of about six hours fighting

5    over getting that, and then they submit that data to the

6    class administrator.  All Petoskey Plastics is doing is

7    being the middleman, taking Blue Cross's data and

8    submitting it to the claims administrator.

9            For the millions of class members of health

10   care advantage being managed by Blue Cross, there is no

11   reason whatsoever that they should be filing a claim.

12   Those claims should be flowing directly through Blue

13   Cross in this case.

14           Your Honor, proposed settlement should be

15   rejected for five reasons.  Most importantly, it is way

16   too small, preferential treatment to the named

17   Plaintiffs.  They get thousands of dollars in incentive

18   payments when the average class member gets $2.00 a

19   piece.  Unduly preference to Plaintiff's Counsel in

20   terms of the amount that is paid to Plaintiff's Counsel.

21   They have no objection to a 10 million dollar field work

22   to the Plaintiff's Counsel in this case if they had

23   secured an appropriate settlement amount.  But they did

24   not.

25           The claims process is unduly burdensome and

58

1   not necessary for Blue Cross customers.  And the

2   substantive documents that are relied upon by the

3   parties have not been subjected to sufficient public

4   scrutiny.  Thank you.

5               THE COURT:  You do need to include your

6   argument on attorneys fees.

7               MR. MILLER:  To put the objections in

8   context, what we're talking about is less than point

9   zero zero zero zero one zero 67 percent of the Class.

10   About 32 out of more than three million and virtually

11   all of those 32 are conflicted.

12               The Varnum objection is conflicted.  The

13   Varnum objections do not even disclose in their papers

14   that they had an interest different from other class

15   members.

16               Twenty five of 26 of those objectors are

17   embroiled in different litigation, contentious and

18   protracted litigation against Blue Cross regarding

19   allegedly misrepresented fees.

20               Crain's recently reported that Varnum has

21   brought this fee litigation 50 times.  It is being hotly

22   litigated between Varnum and Mr. Horton in trials, in

23   Michigan Court of Appeals, Sixth Circuit and U.S.

24   Supreme Court.

25               They have a different interest than the

59

1   Class.  Their interest is leverage against Blue Cross

2   and we are caught in the middle.

3             In contrast, Your Honor, more than 30,000

4   people have already made claims.  That is a lot in a

5   case like this when put in context.  Because the heart

6   of these cases, Category I, where 78 percent of the

7   damages are and the money is allocated -- excuse me,

8   where the money is allocated.  Lots of people are in

9   Category III, but those are very weak claims and we

10  agreed to a broad release and we made it a broad Class.

11  But those are where the claims are weakest.

12            There are 122 sophisticated insurers and

13  self-insured entities that have made claims with active

14  in-house Counsel, outside Counsel and experts.  That

15  should be entitled to great weight.

16            In order to offset the settlement, they

17  really have to prove fraud or collusion.  Those

18  allegations are offensive.

19            We have 18 firms and 118 Plaintiff attorneys

20  that worked on this case.  It is implausible that we did

21  anything like that.  Never have, never would.

22            Those are scurrilous words that shouldn't even be

23  put on a piece of paper, but they have no evidence

24  whatsoever to support it.  And without that, Your Honor,

25  they have no basis to second-guess the judgment of Class

60

1   Counsel.

2           We had no conflicts.  We had every incentive

3   to maximize the recovery.

4           If this was really a multibillion case, we

5   never would have settled it for about 30 million.

6           I just settled a case against AIG for 971

7   million because it was a big case.

8           We're not going to leave real money on the

9   table, we use our judgment about what was the best we

10  could get for this Class.

11          If they really believed it was a

12  multibillion dollar settlement, they never would have

13  opted out, and they would have -- excuse me, they would

14  have opted-out, not objected, and they would have

15  brought their own case.

16          This is nowhere near a multibillion dollar

17  case.

18          We investigated two and a half million

19  dollars in the expert Dr. Leitzinger.  We wanted him to

20  have the highest credible number he could.  That was 118

21  million dollars.

22          To stretch that into a multibillion dollar

23  case would have killed this case.  We would have lost

24  it.  That is the worst thing you could ever do as a

25  plaintiff.

61

1          They wildly exaggerate the likelihood of

2    success.  The Government stopped litigating.  The

3    Government didn't have the major obstacles we do:  Class

4    certs, causation between MFN clauses and overcharges and

5    winning the case.

6          He talks about treble damages, but we have

7    cited uncontradicted cases in our brief that you don't

8    consider treble damages in evaluating settlements.

9          As to the amount of attorneys fees and

10   expenses, that is right in the heart of the claim.  What

11   we asked for is well within Sixth Circuit precedence.

12   And the expenses that we paid had to be paid.

13          We didn't delight in paying 2.5 million

14   dollars at risk and incurring two and a half million

15   dollars for an expert, we should get credit for that.

16   That was evidence of our commitment to the case.

17          And to compare our aggregate attorney fee

18   request to what an individual Class member will receive

19   with the smallest claims is nonsense.  It is apples to

20   oranges.

21          Our fee request is in the aggregate as a

22   percentage of the aggregate recovery, and we will

23   demonstrate on our fees in a brief that our fee request

24   of a third is right down the heart of the plain for

25   cases of this type in this District and in this Court.

62

1          He says Aetna opted out.  No, it didn't, it

2     brought its own case from day one.  HAP did opt out but

3     that was wonderful news because one of the great

4     features of the settlement is there is no reduction for

5     opt-outs and HAP was one of the largest Class members.

6     So that increased the value of the settlement for Class

7     members quite frankly at least 20 percent, maybe more.

8          There is no dispute that this case is

9     complex, that we did a lot in discovery.  The likelihood

10     of success, we obtained 25 percent of the Class members

11     for damages when the standard for antitrust is 5.35

12     percent to 28 percent.  That is excellent.  Especially

13     since we faced class certification fight, a 23(f) fight,

14     a Daubert challenge and defeating the inevitable Rule 56

15     opinion.

16          As it relates to Mr. Andrews, Mr. Andrews'

17     objection reveals itself as malicious.  All you have to

18     do is see what he has written.  Its mudslinging, it is

19     bullying.  He is upset because we wouldn't pay him

20     $153,000.  We wouldn't pay him because he didn't bring

21     any benefit to the Class.  And we followed the rules

22     that you don't share attorney fees with non-lawyers and

23     we will never break that rule.

24          There is no dispute that even though he

25     calls this the worst settlement ever, he was willing to

63

1   give up all the objections to the settlement if we

2   reduced our request for fees by 990,000 and paid him

3   153,000 for 50.

4           He says we abused confidentiality.

5   Absolutely false.  There was no attorney/client

6   privilege once he announced his intention to object.

7           We had one telephone call with him, led by

8   Mr. Gustafson, who did a great job, and he said in the

9   call that this is a four-way call.  Because he is not a

10  lawyer, I pinned him to explain what that means and to

11  make clear it is only what is in that call, nothing

12  before, nothing after.

13          And we didn't use anything in that call in

14  any of our submissions.

15          While he filed hundreds of pages, you only

16  need to look at one e-mail, Your Honor, and that is what

17  he sent to me on September 22nd, 2014, which is docket

18  169-16.  And it says, quote:

19              "No call means no I guess.  After reviewing

20              the 380 pages in this objection it will be

21              posted to describe in an email news release

22              sent out to 125 news organizations,

23              congressional committees, public interest

24              groups directing them to this objection.  I

25              will also send a letter to all judges in

64

1              this District referring them to this
2              objection so everyone will be able to see
3              what a poster child of abuse this entire
4              settlement is so no other class members will
5              be victimized in future class action
6              settlements.
7              "The goal is to get Plaintiff's Counsel
8              dismissed as we already know.   The demands
9              have now changed and have substantially
10             increased.   This won't be a slam dunk like
11             it was for your last two settlements in the
12             Detroit Federal Court.   Bar complaints will
13             also be filed.   You can also include this
14             for the Judge to see with all the other
15             e-mails sent your way".
16             This type of malice and bullying has no
17    place in this process whatsoever.
18             He is a serial objector.   He is in the
19    business of objecting.   He wants to make money.   And he
20    is conflicted.
21             And that is the fundamental problem with
22    both of these objections.   They are conflicted and
23    they're going to do damage if successful to 30,000
24    people who have made claims.   Sophisticated
25    organizations who have made claims.

65

1           And if they didn't like the settlement, that

2     is something that Your Honor should give some weight to.

3     Because they're sophisticated and they have no conflict

4     of interest.

5           As to notice and administration, we laid it

6     out in our brief.  Dr. Wheatman and attorney Charles

7     Marr gave a very detailed affidavit as to the adequacy

8     of our notice.

9           Certainly we should not engage in trial by

10    Facebook.  The fact that a thousand or so people posted

11    nasty comments on Facebook is not to be surprised.  In

12    fact, Dr. Wheatman talks about a significant percentage

13    of people don't like short notice, but they're better

14    than the long notice.  More people look at them.  And in

15    the aggregate, we have reached 82.9 percent of adults in

16    Michigan, on average, two point times per person.  A

17    hundred thousand people visited the Web site.  There

18    were 200,000 minutes of calls with a live operator

19    trained to respond.

20          We can't do anything about apathy, Your

21    Honor, but we're proud that we got 30,000 people to

22    actually make claims.

23          And, the money is real money that is going

24    to get distributed to Class Members.  Some of them will

25    get six-figure recovery.  The people who get very little

66

1    are mostly those who had very doubtful claims that are

2    only included within the settlement because Blue Cross

3    understands we wanted final peace.  But better they get

4    something than nothing.

5              But the people who were really damaged, who

6    are identified by Dr. Leitzinger as damaged, get very

7    significant recovery shares.

8              We're proud of this settlement, Your Honor,

9    and believe you should approve it.

10             THE COURT:  Mr. Small.

11             MR. SMALL:  Thank you, Your Honor.  I'm

12   going to try to not be repetitive in anything Mr. Miller

13   said, but there are some important points to be made

14   here, Your Honor, and let me start by saying you've

15   heard a lot of numbers today, but really, three numbers

16   stand out from all of the others as critical to the

17   Court's consideration of this settlement.

18             The first number, of course, is the amount

19   of the settlement, 30 million dollars.

20             The second number which you've heard is the

21   118 million dollars that Dr. Leitzinger estimated

22   through very detailed analysis is the damages that could

23   be proved of the Class in this case.

24             And the third number, Your Honor, is 25

25   percent.

67

1          This settlement, Your Honor, 30 million

2    dollars, is 25 percent of the provable damages in this

3    case.  That right there puts this easily in the

4    mainstream of approved settlements.

5          We cited several cases, Your Honor,

6    including the Stop and Shop in which the Court held that

7    the 11.4 percent recovery compares favorably with

8    settlements reached in other complex class action

9    lawsuits.

10          And we cited the Liner Board, Your Honor,

11    where the Court surveyed what settlements had been

12    approved in antitrust class actions and found that the

13    range was 5.35 percent of damages up to about 28 percent

14    of damages.

15          So Your Honor, we're not only comfortably

16    within that range, but we're on the high end.

17          Now, there is a presumption that a

18    settlement should be approved if it doesn't have any

19    indicia of fraud or collusion.  Of course, that

20    allegation has been made, but it has not been backed up.

21          We spent, Your Honor, well over a year,

22    about a year and a half, in on and off settlement

23    negotiations with Blue Cross.  And what was notable

24    about them, in addition to their being hard fought and

25    contentious, was that they broke off twice for a period

68

1   of months.  The parties were absolutely willing to walk
2   away from settlement if they couldn't get a deal that
3   they thought was reasonable.  And it happened twice for
4   months.

5           There are no separate deals in this
6   settlement.  We have heard about incentive awards, we've
7   heard about expenses.  Your Honor, the settlement
8   provides for none of those.  There is absolutely no
9   guarantee, no provision in the settlement for fees,
10  expenses or incentive awards.  All of those are left to
11  the Court's discretion.  The Court is absolutely free to
12  determine what a reasonable attorney fee is, what a
13  reasonable disbursement of expenses is, and what
14  reasonable incentive awards are.  And whatever the Court
15  determines on that will not affect the settlement.  The
16  settlement goes forward whatever the Court rules on
17  those issues.

18          And I will say that far from Class Counsel
19  profiting from this case in some way that should give
20  the Court concern, the fee that we're asking for, if the
21  Court awards what we're asking for, we view that a
22  negative multiplier, less than the value of our time
23  that we put into the case.

24          And finally, Your Honor, on the issue of
25  whether there is any fraud or collusion here, Your

69

1    Honor, I can say certainly for myself, for my firm, for
2    my Co-Counsel, we have never engaged in a fraudulent
3    settlement and never will.  We care too much about the
4    job that we do.  We take it seriously and we care about
5    our reputation, Your Honor.  We would never engage in a
6    fraudulent settlement.
7              Now, there is only one estimate, Your Honor,
8    in the Class's damages and that was done by Dr.
9    Leitzinger.  No one else has done an estimate.  There is
10   no competing estimate out there that would somehow
11   undercut what Dr. Leitzinger has done.
12             Dr. Leitzinger is a Ph.D. economist who has
13   had a long and distinguished career over 33 years.  He
14   has testified for Plaintiffs, he has testified for
15   Defendants, he has testified for major companies and
16   Government entities.  He has testified at depositions,
17   in hearings and trials repeatedly throughout his career.
18   He is one of the more experienced and accomplished
19   economists who has evolved in estimating class damages.
20             And that estimate that he prepared, Your
21   Honor, was not done for this settlement, as seems like
22   was suggested, it was done for litigation purposes, Your
23   Honor.  It was done in support of our motion for class
24   certification at a time when we absolutely had the
25   incentive to prove the maximum damages we could prove.

1           We had every reason to do that on behalf of

2    the Class and on behalf of Class Counsel.

3           And Dr. Leitzinger, Your Honor, did over two

4    and a half million dollars worth of work mostly on

5    impact and damages issues.  He analyzed parabytes of

6    data.  He did serious analysis involving differences and

7    differences in regression analysis.  He produced a 61

8    page expert report with exhibits.

9           That issue of damages was fully and

10   carefully explored by Dr. Leitzinger, and no one else in

11   this case has done it.

12          And so, Your Honor, you may ask if there are

13   billions and billions of dollars of health care

14   purchases involved in this case, why are damages only

15   118 million dollars?  The most important answer to that

16   question, Your Honor, is that is what the data said.

17          Of course, we would have loved it if the

18   data had produced many, many more millions of dollars

19   worth of damages, but the data, our data, and careful

20   analysis showed 118 million dollars.

21          And it is not implausible at all, Your

22   Honor, when you look at what the underlying conduct was

23   by Blue Cross that was challenged in the case.  It is an

24   MFN scheme in which Blue Cross was, in many instances,

25   setting a floor on the discount advantage that it would

71

1    retain against its competitors over time so that some

2    day in the future it would not find itself losing that

3    discount advantage.

4            And it happened to be the case, Your Honor,

5    for many of the hospitals that the rainy day that Blue

6    Cross worried about didn't come by the time the damages

7    period ended.  So in fact, we were not able to measure

8    damages at many of the hospitals that have MFN

9    provisions.

10            And to really get to a final important

11   point, Your Honor, which is the standard for approval,

12   which I think is an appropriate note to end on here, of

13   course the general standard, Your Honor, is the

14   settlement must be fair, reasonable and adequate to be

15   approved.  And we think it clearly is here.

16            But Your Honor, in another case that I know

17   you're familiar with, IUE-CWA versus General Motors

18   Corporation, the Court said, quote, the Court must

19   determine whether the settlement falls within this range

20   of reasonableness and not whether it is the most

21   favorable possible result in the litigation.

22            That is a very important point, Your Honor.

23   It's not whether this is exactly the result that is

24   perfection, the absolute best that could be done, it is

25   a question of whether this is in the range of

72

1    reasonableness.  And it clearly is.

2              Your Honor should also take note that there

3    is a federal policy favoring the settling of class

4    actions which Your Honor noted in the IUE-CWA case that

5    I just mentioned.

6              And finally, Your Honor, similarly, there is

7    a strong presumption in favor of voluntary settlements

8    which is especially strong in class action cases.  And

9    that is the Kinder versus Northwest Bank case, 213 West

10   Law 1914519 at 3, a Western District of Michigan, April

11   15th, 2013 decision.

12             So the question, Your Honor, is not is this

13   perfect, could it be better, but is it reasonable.  Is

14   it within the range of reason.  And it clearly is.

15   Thank you.

16             THE COURT:  Do you want your five minutes

17   now?  You have a couple of minutes left on the expenses,

18   and I'll give you that opportunity to do that now.

19             MR. MILLER:  Yes, Your Honor.  I just want

20   to start with expenses, because if I run out of time, I

21   don't want to rush through that, because there has been

22   some talk about that already.

23             We seek $3,499,839 total in expenses.  Your

24   Honor should know that due to unexpected increases in

25   notice expenses, because we were able to obtain several

73

1    hundred thousand additional names for direct notice --

2    we always do direct notice whenever we can -- that is an

3    additional 146,000, which we will assume.  We will not

4    seek reimbursement for that.

5             So even if there was some quibble about some

6    of our expenses, which are all supported by declaration,

7    they are all right down the heart of the plain, that

8    $146,000 should give Your Honor a comfort that we are

9    being generous to the Class, which has been my mission

10   from day one ever since I got into this business.

11            The 2.5 million spent on Dr. Leitzinger was

12   absolutely necessary.  With no expert, there is no case.

13   It was not that long after his deposition that we got

14   the settlement.  That deposition and Dr. Leitzinger's

15   work was very, very important.

16            But what should not get lost here and one of

17   the reasons why this case was so tough, Dr. Leitzinger

18   could only find damages for about 13 of the 200

19   hospitals with MFNs.  So this case was hardly a lay-up

20   and it is nowhere where the Eubert case or the

21   multibillion dollar case that the conflicted Varnum

22   objectors would like it to be.

23            As to our attorneys fees, they're right down

24   the heart of the plain.  One-third is standard.

25   Percentage of benefits is standard.  It aligns with

74

1    interests of the lawyers with the Class.

2                Had we used the antiquated lone star method

3    which invited the kind of fight that Mr. Andrews wants

4    to get into, it would have cost the Class five million

5    more dollars.  But we don't think that is right.

6                We consistently apply percentage of the

7    benefits when it helps us and when it hurts us.

8                And as Mr. Small pointed out, it's only

9    point 645 of our hourly rate.  It's not a great result

10   for the lawyers when you consider the size of the

11   lawyers involved in this Class case and the number of

12   lawyers.

13               It is uncontradicted, our briefing at pages

14   eight to 10, many cases awarding a third.  That is

15   particularly appropriate where the multiple is point

16   645.

17               The value to the Class is 25 percent of the

18   overcharges, above the standard in the Liner Board case.

19               Risk of litigation is underestimated.  Class

20   actions have gotten a lot harder since the Supreme

21   Court's decision in Duke v Wal-Mart.

22               We knew from day one we had a very tough

23   opponent with Blue Cross, which is, I think, one of the

24   reasons why we've got these Varnum objectors here.  They

25   fight very, very hard, but they were very professional

1    in our case, and I give them that.

2              Lots of these cases lose, Your Honor.  Every

3    single law firm in this state I'm sure has had seven

4    figure losses in class actions.  There are lots of dry

5    holes in the class action business.  I had what I

6    thought was a great case against Onstar and the

7    Honorable Judge Cox denied class cert and we lost

8    millions in that case.

9              Public policy supports this litigation.

10   Without it, there is no meaningful enforcement of

11   antitrust law as in the Hardison case.

12             The value of services on an hourly basis, we

13   had to do a huge amount of work, 169 depositions.  I

14   have never been in a case with that many depositions and

15   that factor is not rebutted.

16             The quality of representation, I leave that

17   to Your Honor's judgment and discretion.  You have seen

18   us, you will make your own opinion there.

19             The complexity of litigation, antitrust

20   litigation is among the most difficult in the country

21   as Judge Borman recently held in the In re Packaged Ice.

22   And for the first time in my career, I'm sitting down in

23   less than five minutes.

24             Oh, incentive awards, but I want to add one

25   thing that's not in our brief.  These people are brave.

76

1    They put their name on a complaint against an insurer
2    that they depend upon.  That they depend upon for
3    coverage for their families.  They should get some
4    credit for that.  And they did a lot of work other class
5    members didn't.  That's why they should get it.
6              I think I misspoke, there are 70 MFN
7    hospitals, and if I misspoke, I apologize and I stand
8    corrected.  And I will sit down.  Thank you.
9              THE COURT:  Mr. Hoffman, you're already
10   standing.  You may proceed.
11             MR. HOFFMAN:  Your Honor, I expect to use
12   less than the time you have allotted Blue Cross.
13             THE COURT:  And include in this your
14   argument about fees and approval.
15             MR. HOFFMAN:  Correct.
16             And in part, Your Honor, let me start by
17   saying that I'm not planning to address the claims
18   approval process or any of those things, I'm going to
19   talk just solely about one aspect of the settlement.  If
20   Your Honor has any questions about the claim approval
21   process, the notice process or anything like that, we
22   would be happy to answer those.  My colleague, Mr.
23   Stenerson, is prepared to address questions, and I'm
24   sure the Class Plaintiffs are as well, but I don't plan
25   to speak about those unless you would like to hear it.

77

1          Let me start by clearing up one inaccuracy

2     from the objectors' presentation, and then just frankly

3     say a few things about the adequacy of the settlement.

4          The inaccuracy is that the only class

5     certification report and motion and expert work that was

6     done here was done for settlement.  The Varnum objectors

7     made that point.  That is just simply wrong as Your

8     Honor knows.

9          The class certification motions were

10    prepared and Dr. Leitzinger's report was prepared and

11    our response to it was prepared and Dr. Sibley's report

12    in response was prepared all prior to any settlement.

13    There is no settlement there, those were papers that

14    were fighting as hard as possible on the Plaintiff's

15    side, I'm certain, to maximize the results they could

16    get, as you heard a minute ago, and from our side, to

17    point out what we thought were overwhelming flaws with

18    this case.  With class certification and with every

19    aspect of the Plaintiff's ability to proceed with their

20    claims.  And that, Your Honor, is where I want to turn

21    next.

22          Because, the objectors, I think, don't

23    fundamentally understand what this case about, and that

24    is illustrated by the very large numbers that they keep

25    throwing around.

78

1          So we're at a point, Your Honor, at this
2   late time in the day where you're hearing 118 million
3   dollars as if that is small, as if that is a subset of
4   the potential claims here.  And, also as if somehow that
5   118 million dollars was relatively guaranteed or almost
6   a sure thing.
7          Now, Class Counsel said some things
8   explaining why it is not, but I want to touch on that a
9   little bit more.
10          The reality is that that 118 million dollars
11   was the Plaintiff's absolute best case on the merits.
12   In light of the risks the Plaintiffs face, I'm going to
13   talk about now, the amount of the settlement, 25 give or
14   take percent of the 118 million, is not only adequate,
15   but it is actually quite generous, and let me say why.
16          The objectors seem to have the idea that
17   this case is about how much the class members paid or
18   even possibly paid to hospitals.  That is why you hear
19   these numbers that are in the billions.  Or even perhaps
20   about how much overcharges they paid or something like
21   that.  That is not what any of these cases are about.
22          The liability theory in this case, as Your
23   Honor knows, depends on a long hard chain of causation
24   in which the Plaintiffs have to prove that the MFNs,
25   number one, raised hospital costs so much.  Number two,

1  at such a large percentage of Michigan's hospitals.

2  Number three, to such a large share of Michigan's

3  insurers.  That, number four, those insurers across the

4  board were unable to compete with Blue Cross.

5           That is a very hard path.  It takes a lot of

6  steps, and among other things, it requires showing a

7  pervasive effect that the MFNs has had across the state,

8  across hospitals on insurers all over the place.  And on

9  all the insurers close to home.

10          What was absolutely clear by the time the

11  class certification issue was filed, and the class

12  certification issue is very forthright about this, and

13  the Plaintiff's Class when the evidence was done, and as

14  Mr. Small put it, when the data spoke, that claim was

15  unprovable.

16          Why was it unprovable?  Because at the

17  overwhelmingly majority of Michigan hospitals, the MFNs

18  had no effect at all.

19          The class certification motion postulates as

20  Plaintiff's best case scenario that less than 10 percent

21  of Michigan hospitals were affected by the MFNs.

22  Thirteen hospitals out of those 130.

23          But it is much smaller than that, Your

24  Honor, because in the class certification motion, what

25  it also points out very forthrightly, and I think

1    Plaintiff's Counsel deserve a lot of credit for this, is

2    that not even all the insurers or all the claims at that

3    tiny subset of Michigan hospitals, it is only particular

4    insurers for particular products at some of those

5    hospitals.

6              And there is nothing in the class

7    certification motion about any effect of that on the

8    ability of insurers across Michigan to compete with Blue

9    Cross.

10             That is a long hard way away from creating

11   harm from competition.  It underscores why the 118

12   million dollar number that Dr. Leitzinger proposed as

13   his damages number, and which Dr. Sibley pointed out he

14   thought was extremely vulnerable to attack, was almost a

15   Hail Mary, certainly a very aggressive hope-for best

16   case by the Plaintiffs.

17             So a settlement, Your Honor, and Your Honor

18   might say, well, if Blue Cross's case is so good, why is

19   Blue Cross settling?  But of course Your Honor knows the

20   answer to that.  These cases are very costly.  They're

21   very distracting.  We have been at this since the 2010,

22   incredibly.  It has affected Blue Cross's executives,

23   and we, frankly, don't like to be in a situation where

24   we are at cross purposes with people who are members of

25   Blue Cross or potential members of Blue Cross.

81

 1           So the Company wants to get these cases

 2      behind it.

 3           Paying 25 percent of Plaintiff's maximum

 4      possible recovery, even though we thought we would

 5      defeat that, either at the class certification stage or

 6      at summary judgment or at trial, but paying 25 percent

 7      of it is worth it for us.

 8           But I don't want the magnitude of that

 9      number to be lost to the Court or drowned out in these

10      huge irrelevant numbers that are being thrown out.

11           It is a great recovery for the Class because

12      the claim turned out to be so weak.  Thank you.

13           THE COURT:  I think Mr. Andrews reserved a

14      minute; is that right?

15           MR. ANDREWS:  Yes, I asked a question to you

16      and maybe you can ask Mr. Miller, or I can bring or I

17      could bring Mr. Miller to the stand.

18           THE COURT:  Oh, I don't think that is

19      probably necessary, do you?  Or maybe you do, but I

20      don't think it is really necessary.

21           MR. ANDREWS:  I pass.

22           THE COURT:  You're passing your one minute?

23           MR. ANDREWS:  Yes.

24           THE COURT:  So we're not hearing anything

25      further, everyone has argued all they want to argue on

1    the attorney fees and final approval; is that right?

2              MR. MILLER:  Yes, Your Honor.

3              MR. HOFFMAN:  Yes, Your Honor.

4              THE COURT:  So we're finished.

5              I'm taking on briefs the motion to strike

6    the surreply of Mr. Andrews and on brief the responses

7    and motion to intervene for a limited purpose to respond

8    to the opposing motion to unseal by 26 objectors that is

9    filed by -- those are filed by Mid-Michigan, Alpena,

10   Priority Health, Holland Community and Ascension Health;

11   is that correct?

12             Very good.  Anything else?

13             MR. MILLER:  No, Your Honor.

14             MR. HOFFMAN:  No, Your Honor.

15             THE COURT:  I do have one question, I don't

16   know who this goes to, but in one of the objections

17   there was a concern about the fact that they had and

18   what they believed to be, this was not their word, but

19   cumbersome application claim form.  And that they made

20   some telephone calls to someone and they had not gotten,

21   for lack of a better word, a response that satisfied

22   them.  Those are much kinder words --

23             MR. WALTERS:  I don't know if that was us,

24   but I did reference Petoskey Plastics, one of our

25   clients, that went through a fairly extensive process to

83

1   try to get claims information from Blue Cross.  They did

2   ultimately submit a claim just within the last couple of

3   days, but it took my clients about six hours worth of

4   time to overall get the information from Blue Cross

5   necessary to file the claim.  I'm not sure if that is

6   what you're referring to or not.

7           THE COURT:  I thought it was in the

8   objection letters.

9           Anybody else recalls it or responding to it?

10          It's in Mr. Mancinelli's objection.  He is

11  the gentleman who wrote an objection but did not appear.

12  Do you recall that?

13          MR. STENERSON:  Your Honor, Todd Stenerson

14  on behalf of Blue Cross.

15          THE COURT:  You want to respond to that?

16          MR. STENERSON:  Your Honor, I can respond

17  generally.  I did not speak to Mr. Mancinelli, but

18  generally I can represent to the Court that Blue Cross

19  Counsel has worked with Class Counsel and the settlement

20  administrator since the beginning of the settlement to

21  simplify the claims process and to provide less

22  information to make a claim in order to maximize the

23  claims.  And that Blue Cross, the company, has responded

24  to over 225 inquiries from corporate entities and

25  provided information so they could participate in the

84

1   settlement, including Mr. Walters's clients.

2          And our incentives and directions to the

3   Class Counsel and to the settlement administrator has

4   been and will continue to be that people should be able

5   to make claims and maximize the recovery.  And there is

6   a deficiency process in the claims administration where

7   if the claims administration does not have enough

8   information, Class members will have the opportunity to

9   cure any issues and that the parties' goal is to

10   maximize claims.

11          THE COURT:  So how will that person get that

12   information?  How will that be monitored?

13          MR. STENERSON:  Well, anything that comes to

14   my attention personally, Your Honor, is handled and I

15   have handled it.  And the settlement administrator, I

16   believe, has had 140 days worth of live phone calls with

17   Class members.

18          So the class administrator has been

19   conveying that information and will continue to do so

20   throughout the process.

21          But that is a process that's more directly

22   managed by Class Counsel, so they may have some

23   information to add.

24          THE COURT:  Do you want to respond to that?

25          MR. SMALL:  Yes, Your Honor.

1          Obviously, this is a very big Class, and

2     we've, I think, we engaged in very extensive efforts to

3     assist those who asked for information.  So we will just

4     give you some information about the ways we have done

5     that.

6          As you know, we set up a Web site to provide

7     information about the settlement.  That has had five

8     million plus hits by over a hundred thousand unique

9     visitors.

10          We have a phone call center that the

11    settlement administrator operates, as Mr. Stenerson just

12    said, has provided over 200,000 minutes of live operator

13    time assisting class members with their inquiries.  And

14    that does translate into about 140 days worth of

15    conversations with class members or potential class

16    members.

17          Your Honor, we also relaxed the filing

18    requirements for individual consumers who wanted to file

19    a claim.  Originally we had required that they provide

20    documentation of their purchases, but when we got

21    feedback from class members that that could be onerous

22    in situations where they did not have their own records

23    or could not obtain records readily, we put aside the

24    requirement to submit any supporting documentation with

25    their claim and allowed them simply to fill out the

86

1    claim form and sign it under oath with the only

2    reservation being that the settlement administrator

3    believes that there is fraud involved with the claim,

4    the settlement administrator reserves its right to ask

5    for documentation later to determine whether there, in

6    fact, has been fraud.

7                With respect to self-insured and insurer

8    claimants, we have been very explicit with them that if

9    the most convenient way to provide their supporting

10   documentation is by simply doing a data extract from

11   their database, that they may do that, and provide a

12   declaration simply attesting that the information they

13   are providing is authentic, and that seems to have

14   streamlined the claims process both for consumers and

15   for insurers and self-insured entities.

16               And it is, as Mr. Stenerson said, our goal

17   is to get the best claims rate possible.  We want as

18   many class members to share in this recovery as possible

19   and we're attempting our best to assist everyone.

20               I know my firm has received calls or had

21   calls referred to us by the settlement administrator and

22   we dealt with every one we received and will continue to

23   do that, Your Honor.

24               THE COURT:  How do people know about this

25   process relative to documentation that they have to

87

1    produce?

2              MR. SMALL:  The claim form itself states

3    what the documentation is that they're required to

4    provide.  In addition, the Web site says that.  In

5    addition, the telephone voice system that the settlement

6    administrator set up will provide that information.

7    And in addition, Class Counsel will provide that

8    information if asked.

9              MR. GUSTAFSON:  Your Honor, Dan Gustafson.

10   I just want to make one more point.  If a class member

11   submits a claim and it is missing something, the notice

12   administrator will contact them and give them a chance

13   to fix it.

14             So if they do something and it isn't right,

15   it's not going to bar their claim, they're going to get

16   a chance to fix it, and that is part of the ongoing

17   claims process that we're undertaking now.

18             THE COURT:  So that doesn't take care of a

19   person who says I can't provide the documentation so I'm

20   not filing it.  That is somebody who filed, they have

21   included everything and have an opportunity to cure,

22   right, but what about the person who looked at it and

23   said I can't support it because I can't find all of

24   this?

25             MR. GUSTAFSON:  The opportunity to cure

88

1    doesn't solve the problem that you raise, but when

2    people contact the claims administrator and say I can't

3    get my records, we say to them file a claim and we'll

4    work through with you.

5              THE COURT:  But what about the people who

6    are chilled, how do they know that will happen?

7              MR. GUSTAFSON:  Your Honor, there may very

8    well be some people who look at it and say I'm not going

9    to bother, but we can't stop the apathy.

10             There is certainly the notion that some

11   people are going to say I don't want to go through this

12   trouble, but to the extent that they call and say it is

13   too much trouble, we say file a claim, we will help you.

14   To the extent that they file a claim and they don't get

15   it right, we try to fix it for them.

16             THE COURT:  Anybody else want to be heard on

17   this side?  No.

18             MR. HOFFMAN:  No, Your Honor.

19             THE COURT:  Very good, thank you all for

20   your arguments and I will give you a written order.

21             (Proceedings concluded at 3:55 p.m.)

22             * * * * * * * *

23

24

25

89

1          C E R T I F I C A T I O N

2              I, CHERYL E. DANIEL, Official Federal Court

3    Reporter, after being first duly sworn, say that I

4    stenographically reported for foregoing proceedings held

5    on the day, date, time and place indicated.  That I

6    caused those stenotype notes to be translated through

7    Computer Assisted Transcription and that these pages

8    constitute a true, full and complete transcription of

9    those stenotype notes to the best of my knowledge and

10   belief.

11             I further certify that I am not of counsel

12   nor have any interest in the foregoing proceedings.

13

14             /S/

15             CHERYL E. DANIEL,

16             FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25