*79*

January 06, 2014

Hand Delivery

Clerk of Court

The United States District Court

For The Eastern District of Michigan

Southern Division

U.S. Courthouse

231 W. Lafayette Blvd.

Detroit, Michigan 48226

FILED
2015 JAN -6 A 9: 14
U.S. DIST. COURT CLERK
EAST DIST. MICH.
DETROIT

Courtroom of Judge Denise Page Hood

Case No. 2:10-cv-14360-DPH- MKM

The Shane Group, Inc. etc. al      **MOTION FOR SANCTIONS**

Plaintiffs,

v. Blue Cross Blue Shield of Michigan,

Defendant,

**OBJECTOR'S MERITORIOUS MOTION FOR SANCTIONS, HOLD AN EVIDENTIARY HEARING AND CONTEMP HEARING IF NECESSARY AND AWARD REIMBURSEMENT OF TIME AND EXPENSES INCURRED BY OBJECTOR UNDER:**

1. Rule 11 of the <u>Federal Rules of Civil Procedure</u>

2. <u>28 U.S.C. § 1927</u>

3. The inherent power of the court.

**FED. R. Civ. P. 11 (c)(1)(A).**

The Safe Harbor Provision unlike the case of court-initiated sanctions, a party seeking to impose sanctions must first serve the opposing party with a Rule 11 motion at least twenty-one days before presenting the motion to the court.

This was done on December 08, 2014 with a second request made on December 13, 2014 to remove the supplemental submission dated December 9, 2014 and December 10, 2014. (21 days from December 13, 2014 plus the full day not landing on a weekend is Monday so Tuesday January 6, 2015 should be the first available day to file this motion.) The submission by class counsel on December 09, 2014 was directly related to the Rule 11 sanction motion safe harbor preview received by class counsel the previous day on December 08, 2014. The objector

requested all the poisoned documents below be withdrawn prior to the Court ruling on the settlement with the option of withdrawing only two of the most obvious documents that were filed as will be shown below. The documents were unreasonably and vexatiously filed for inappropriate purposes to waste time and money and unfairly impeach the credibility of the merits of the objection papers and to mislead the court into approving an atrocious settlement all for the $13.5 million in proven inflated fees and expenses. No documents have been withdrawn, hence this motion.

\

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO HOLD AN EVIDENTIARY AND CONTEMP HEARING IF NECESSARY, IMPOSE SANCTIONS, AND AWARD REIMBURSEMENT OF TIME WASTED AND EXPENSES INCURRED BY THE OBJECTOR**

*Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991)……………………………….6

Cristini vs. City of Warren "Opinion and Order On Motions To Determine Attorney Fees."………………………………………………………...…..19

*United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) (*citing United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) (per curiam)); *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994)………………………………….20

*United States v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994)………………...20

*United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994)………………...21

*United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993)………………………21

*United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990)…………...21

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997 (1944))……………………………………………………………………..25

Demjanjuk v. Petrovsky, 10 F.3d 338, 352-53 (6th Cir. 1993) (quoting Moore's Federal Practice § 60.33, omission in Demjanjuk)……………………………25

Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215

(1963))..............................................................................26

Johnson v. Bell, 605 F.3d 333, 339 (6th Cir. 2010); (quoting Carter v. Anderson,

585 F.3d 1007, 1011-12 (6th Cir. 2009))........................................26

**Statutes, Rules and Misc.**

FED. R. Civ. P. 11 (c)(1)(A)........................................................2

Rule 11 of the <u>Federal Rules of Civil Procedure</u>..................................5

**28 U.S.C. § 1927..........................................................5,30**

Civ. P. 16 (f)........................................................................11

18 U.S.C. 1343......................................................................19

Manual of Model Criminal Jury Instructions for the District Courts of the Eighth

Circuit 6.18.1341 (West 1994)), *cert. denied*, 115 S.Ct. 2289 (1995)............ 20

Civility Principles..................................................................23

Michigan Rules of Professional Conduct.................  ........................24

11 Charles Alan Wright et al., Federal Practice & Procedure § 2870 (West 2011)

(collecting cases).................................................................25

Id. § 2870; Moore's Federal Practice § 60.21[4][a].................................25

Federal Rule of Civil Procedure 11(c)..............................................29

Federal 8 Rule of Civil Procedure 11(b)............................................30

**TABLE OF CONTENTS:**

APPLICABLE LAWS, RULES AND REGULATIONS…………………………..6

*DOCUMENTS CLASS COUNSEL FAILED TO WITHDRAW……………………9*

FAILURE TO OBEY COURT ORDER…………………………………………..11

FALSE STATEMENTS, SECRECY VIOLATIONS AND THE CONTINUED

CONSPIRACY AT THE FAIRNESS HEARNESS……………………………14

INTENTIONAL BAD FAITH FAILURE TO SEND COPIES OF FILINGS

TWICE AND DELAYED TRANMSISSION OF A THIRD FILING TO

OBJECTOR IN VIOLATION OF COURT RULES, THEY DON'T CARE…..18

CLASS COUNSEL ENGAGED IN THE FOLLOWING ACTIONS DIRECTED

AT THE OBJECTORS, CLASS AND COURT……………………………...…..20

ELEMENTS OF WIRE FRAUD 18 U.S.C. 1343………………...………...…24

VIOLATION OF CIVILITY PRINCIPLES BY CLASS COUNSEL………...…26

CLASS COUNSELS' VIOLATION MICHIGAN RULES OF

PROFESSIONAL CONDUCT…………………………………………….…..27

FRAUD ON THE COURT………………………………………………..…..28

OBJECTOR'S BILLING RATE…………………………………………………31

CONCLUSION…………………………………   ..   ……………………..…35

EXHIBITS A-G..……………………………………………………………..end

**ISSUE:**
Should class counsel be sanctioned based on their actions directed at the objector's

class and court?

**Answer:** Yes, without a doubt based on all the irrefutable evidence in this case.


**APPLICABLE LAWS, RULES AND REGULATIONS**

1.  Rule 11 of the <u>Federal Rules of Civil Procedure</u>

2.  <u>28 U.S.C. § 1927</u>


3.  The inherent power of the court.


4. Contempt of court for knowingly misstating the truth to the Court at the

Fairness Hearing multiple times, in their fee papers and in Mr. Miller's last filing.


5. Failing to obey a court's Order in this case.


**28 U.S.C. § 1927.** A lawyer who "so multiplies the proceedings in any case

unreasonably and vexatiously" is subject to sanctions under 28 U.S.C. § 1927. This

phrase covers a broad range of dilatory litigation tactics, from the filing of

duplicative complaints and baseless motions, to serving needless discovery, to

persisting in a meritless argument or position, to making frivolous appeals—

basically any conduct that prolongs the case and causes additional expense and delay. Section 1927 sanctions are only available against lawyers, not litigants, and the high "unreasonably and vexatiously" standard, in some circuits, requires a showing of bad faith. (No problem showing that in this case.)

Inherent power sanctions are the quintessential gap filler of sanctions law. In the leading modern decision, *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991), the Supreme Court made clear that the existence of a sanctioning scheme in statutes and rules does not displace the court's inherent power to impose sanctions for bad faith conduct. Whereas rules-based sanctions "reach only certain individuals or conduct, the inherent power extends to a full range of litigation abuses" and, "at the very least . . . must continue to exist to fill in the interstices." *Id.* at 46.

Class counsel could have and should have withdrawn the motion to approve, cancelled the Fairness Hearing and fixed the eighteen issues first but chose to force through a materially flawed settlement. Class Counsel is also angry and decided to retaliate at objector for accurately calling out counsel on the error strewn, fee driven proposed settlement.

This motion is required because of an unconscionable, egregious, deliberate, willful, bad faith and fraudulent conspiracy and the overwhelming evidence on the part of class counsel to interfere with the fair adjudication of the case by

misrepresentation and committing fraud against the objectors, class and the Court along with failing to send copies of court filing to the objector when required, per court rules. The scheme, statements and actions undertaken by class counsel absolutely rise to the level of sanctionable conduct under the Federal Rules of Civil Procedure and other applicable statutes beyond a reasonable doubt let alone preponderance of evidence, which was passed by a long time ago. They have filed frivolous pleadings for improper purposes that the objector was forced to respond to causing objector to waste time and money without just cause responding to class counsel's desperateness in seeking approval of this $30 million settlement and thus their ultimate goal, the unjustified $13.5 million fee and expenses. The objector, class and the Court being treated like unaware targets in a Ponzi scheme. Objector is asking for sanctions to deter this type of conduct from occurring in the future by these lawyers and their firms along with sending a message to other firms that this type of behavior is unacceptable in this arena.

## *DOCUMENTS CLASS COUNSEL FAILED TO WITHDRAW*

Objector ordered and mailed a check for the transcript of the Fairness Hearing on November 25, 2014 and received the transcript on December 08, 2014, the same day class counsel received their initial sanction motion. The twenty one day free look response period started on December 08, 2014 but got pushed forward and

started on December 13, 2014 which is the date of the last removal request as the objector calculates it under Rule 5.

Objector requested class counsel remove all of the papers identified below due to Class Counsel intentionally breaching the secrecy agreement made with the objector and/or attorney client privilege thus poisoning those documents. In addition the fraudulently created fee document in their papers and disclosing the information in its papers filed with the Court and statements at the Fairness Hearing have also poisoned this settlement in its filings with Court. Class Counsel even misstated the truth at the fairness hearing multiple times as will be shown below. The information disclosed in that call was just too good for class counsel to keep secret and not use in their final papers and at the Fairness Hearing. Since the disclosed information was obtained through fraud, all documents poisoned should be struck. The multiple false statements made at the hearing to the Court that referenced the contents in that secret call should also be struck in the transcript and applicable lawyers and their firms sanctioned. Class Counsel was asked to strike these documents on December 08 and 13, 2014 during the twenty one day free look time period and before the Court rules on the motions and the settlement itself but has chosen not to do so. Counsel did not:

- Strike Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, And Payment of Incentive Awards to Class Representatives.

- Strike Reply to Objectors' Opposition To Class Counsel's Motion For Award Of Attorneys' Fees, Reimbursement Of Expenses And Payment of Incentive Awards To Class Representatives.

- Strike Declaration Of Daniel C. Hedlund In Support Of Reply To Objectors' Opposition To Class Counsel's Motion For Award Of Attorneys' Fees, Reimbursement Of Expenses, and payment Of Incentive Awards To Class Representatives. (Mr. Daniel C. Hedlund who as the creator of the above document and filed it with the Court is NOT even sworn in this district as of December 08 2014 and should he be?)

- Strike Plaintiffs' Motion For Final Approval Of Settlement And Plan Of Allocation

- Strike Exhibits B, H, L, M and N.

- Strike counsel's Notice of Motion and Motion to Strike Sur-reply Of Objector Christopher Andrews.

- Strike Blue Cross Blue Shield of Michigan's Memorandum In Support Of Motion for Final Approval of Class Action Settlement.

- Strike the latest Supplemental Motion dated December 09, and 10, 2014

In the alternative, objector requested that class counsel remove the following two documents because they were clearly filed for no valid reason other than to hide evidence of class counsel's wrongdoing and errors in the settlement (the sur-reply) and look oops we negligently forgot to dig deep enough about another past objection filed by the objector we failed to uncover, which is the desperate supplement submission dated December 09, and 10, 2014. The first half of the supplement should have been filed a few days after the hearing on November 12, 2014 if it was that important to file, not twenty seven days after the Fairness Hearing when they got nervous when no decision had been made by the Court as of that date. The supplement motion relating to the one issue they stated was used as a pretext to bring up the objector once again, wasting his time and money responding to that document as it pertains to the objector. If Class Counsel spent as much time working to resolve the eighteen major, material, meritorious unresolved errors in the current proposed settlement rather than attacking the messenger delivering the undeniable truth, this motion would be unnecessary. Class Counsels' actions are similar to "The Stomp Step" that multiple Detroit Lions like to use on the football field against their opponents. Its way out over the line so penalties are a given. The question is how severe should they be? Applicable Class Counsels' actions call for draconian sanctions.

Objector sent class counsel the sanction motion which was received by them on November 08, 2014. It's not a coincidence they filed that supplement submission to the Court the very next day on November 09, 2014 forcing the objector to waste time and money by filing a response to it because of the issue that addressed the objector. Class Counsel could have struck the following but refused to:

- Strike Motion to Strike Sur-reply Of Objector Christopher Andrews.
- Strike the latest Supplemental Motion dated December 09, and 10, 2014 which was never sent to objector per court rules unless sending it to objector via email five days after they filed in electronically counts, which it shouldn't.

## FAILURE TO OBEY COURT ORDER

When a party fails to obey an order, courts have the authority to order the party, its attorney, or both to pay reasonable expenses-including attorneys' fees of the party's adversary, unless the non compliance was substantially justified or other circumstances make an award of expense Civ. P. 16 (f) in deciding whether a sanction is merited, the court need not find that a party acted in bad faith, (which they did in this case numerous times from September 19, 2014 forward.) The fact a pretrial order was violated is sufficient to allow a sanction.

That order was the following which the objectors wrote about on pages 34 and 35

of the Supplement to Objection dated October 06, 2014.

## 15. Notice Declaration

"No later than 75 days after the entry of this Order, Plaintiffs shall file with the

Court and serve a declaration of the person(s) under whose general direction the

Notice was disseminated showing that the Notice Plan was effectuated according

to its terms and this Order."

**Response:** Deadline not met. June 26, 2014 plus 75 days is September 07, 2014.

As of September 24, 2014 the last day for objectors to file an objection there was

still no evidence on the docket showing and proving that the Notice Plan was

effectuated under the terms of the order. (The order was fulfilled almost a month

late on October 02, 2014 causing objectors to again waste time and money

responding to something that should have been included in our September 24, 2014

submission.)

## FALSE STATEMENTS, SECRECY VIOLATIONS AND THE CONTINUED LAWYERGATE CONSPIRACY AT THE FAIRNESS HEARNESS

It is a proven undisputed fact that class counsel used some of the secret privileged

information obtained in that conference call in their papers, briefs, motions and did

in fact disclose the confidential information verbally along with misstating the truth to the Court in multiple instances at the Fairness Hearing as follows:

Mr. Miller (Chairman of Class Counsel) stated on page 63 at 4 "He says we abused confidentiality. Absolutely false." And page 63 at 13 "and we didn't use anything in that call in any of our submissions." (See attached Exhibit A)

**Response:** False statements. They used the family connection disclosed in that call and also information gathered from it in their final papers specifically Reply To Objectors' Opposition To Class Counsel's Motion For Award of Attorneys' Fees, Reimbursement of Expenses, And Payment Of Incentive Awards To Class Representatives Document #170 page 1 bottom of page. (See attached Exhibit B)

The second secret disclosure was the fee petition information class counsel disclosed that instructed the objector to create it for class counsels own fraudulent purposes. That document is #169-15, Exhibit L Page 6-11 dated October 24, 2014. (See attached Exhibit C) This document was caused to be created at class counsels' instruction on the call, disclosed in the finals papers for approval and verbally disclosed again at the Fairness Hearing to get around the fact that the information was not supposed to be disclosed on the call because the contents were privileged and "secret", per Mr. Miller, (see attached transcript page 63 at 7-12.) Three of class counsel concocted the scheme to obtain and include the fee petition in their

final papers that could be used to support their final approval of the flawed settlement and walk away with $13.5 million in illegal funds. Fraud and trickery should not be used in the same sentence with the word lawyer in it, but it is throughout this case.

Mr. Miller stated at the Fairness Hearing page 64 18-20 (See attached Exhibit D) that "He is a serial objector. He is in the business of objecting. He wants money. And he is conflicted."

**Response:** False statement. The statement above, "He is in the business of objecting." This statement made by Mr. Miller was based on the contents of the conversation in that "secret attorney client privileged" conference call made to class counsel that this objector does objecting full time! That is additional proof of violating the secrecy pledge. Mr. Miller misconstrued what the objector said. Objector was speaking about the business this objector has been in for twenty plus years, not objecting full time! This is the third confirmed instance of class counsel intentionally breaching the conference call secrecy privilege in their conspiracy by using fraud and wire fraud to illegally obtain and disclose the information for the approval of the illicit settlement and primarily for the $13.5 million in proven inflated fees and expenses by unethically influencing the Court in this case.

Note: In the objector's response to supplement submission dated December 12,

2014 objector attributed a comment to Mr. Miller on page 5 middle of page, "no

provision in the settlement for fees, expenses and awards."

**Response:** That incredible comment was made instead by Mr. Small. Doesn't the

word "provision" as it pertains to this class action settlement mean to request

something in advance to the Court in the hope of having it allocated?


Mr. Miller stated at the Fairness Hearing that "I pinned him to explain what that

means and to make it clear it is only what is in that call, nothing before, nothing

after." Transcript page 63 at 7-12.

**Response:** False statement, counsel did not "pin" anyone other than themselves in

the end. That is NOT what he said. We should call this cover-up by the lawyers in

this case "Lawyergate." Had he said that sentence above objector would NOT

have created the fee submission to begin with and would had Mr. Miller himself

create it himself and sign it before emailing it over to the objector's to sign. (Since

when does a lawyer have a non lawyer create a motion so they can "be clear"

about just one sentence?) Objector learned from another case and the Nutella case

(which counsel graciously brought up in their last filing, thanks and you missed

the other one) always assume a double cross when dealing with lawyers and

prepare for it, which is exactly what happened again in that phone call and this

case.

Those class counsel all of whom are officers of the court who were on that conference call and at the Fairness Hearing on November 12, 2014, heard Mr. Miller misstated the truth multiple times to the Court and should have objected and corrected Mr. Miller's inaccurate statements that he made at that time, but intentionally chose to remain silent instead. By remaining silent even to this day they effectively endorsed the falsehoods. Those lawyers and firms should be sanctioned by being thrown off the case, period.  Since fraud on the court was used to try and gain approval of this settlement, the settlement can be voided at any time. Objector believes that the evidence also shows criminal conduct violations, wire fraud and conspiracy to be exact. Maybe the FBI and U.S. Attorney should be shown this scheme.

Sanctions should be imposed to deter this kind of conduct in the future with class counsel and to send a message to other firms considering wasting other's time and money which needlessly drives up the cost of justice unnecessarily.

## FAILURE TO SEND AND DELAYED TRANSMISSION OF COPIES OF TWO FILINGS TO OBJECTOR IN VIOLATION OF COURT RULES

Class counsel in concert has intentionally failed to provide copies of their filings to the objector in violation of court rules and should be sanctioned. The first time was the Notice Declaration as described a few pages above. Class counsel had the

objector's mailing address as of September 08, 2014 and mailed that document way after that date on October 02, 2014, thirty days over the Court deadline but no copy was ever sent.

The second time was the filing dated December 09, 2014 and a corrected version dated December 10, 2014.  Objector happened to look at Pacer on 12-11-14, assuming class counsel might file something and not send the objectors a copy per court rules. Objector noticed class counsel's filing from a few days earlier, assembled a reply and filed it the very next day on December 12, 2014 at 9:15 am at the courthouse with copies in the mail to counsel that same day, per court rules. Objector than sent an email to Mr. Miller that day advising him that a response to their supplemental filing response was made that day with the Court.

Upon arriving at the office on December 13, 2014 objector accessed email and found a email copy of Plaintiffs' Counsel's filing of December 10, 2014 in the inbox dated the previous night, December 12, 2014 which was sent at 6:20 pm by the Fink Firm. Evidently the email objector sent to Mr. Miller brought about their email copy of their submission made **four days after** it was filed with the court. Had objector not viewed Pacer and sent the email, no email copy of the filing would have been sent to the objector.

The third time was the Corrected Fee Declaration of Mr. Miller which is contains intentional factual information which is designed to mislead the Court and maybe

used as a false flag. Counsel was expecting the objector to file this motion on that day but did not. What would be the purpose of giving up $146,000.00 but yet request another $3,000.000 in fees fifty days after the hearing? A diversion or pure simple greed. This document that was filed on December 29, 2014 with the Court and as of January 05, 2014 no copies have been received by the objector. The objector happened to look at PACER Saturday evening January 03, 2014 and saw Mr. Miller's had filed his filing from **five days earlier which is why this motion is a week late.**

Mr. Miller brought up at the Fairness Hearing he just settled the AIG case for $970 million with his firm set to walk away with a large percentage of the $120 million fee. He doesn't care anymore and can do what he wants, he is all set. Severe sanctions should be imposed on Class Counsel because of a repeated pattern of deception causing the objector's to waste time and money responding to a motion to strike the sur-reply and the last two submissions of class counsel. In fact every hour spent by objector's since the fraudulent phone call on September 19, 2014 was all wasted and not needed had fraudulent tactics not been imposed on the objector and introduced to the proposed settlement, necessitating all the extra work by the objector from that point forward. Objector requests sanctions, that being reimbursed of all the time and expenses wasted from the date the fraud

occurred, September 24, 2014 to the present, and/or a penalty involving forfeiture of all class counsel's fees and expenses.

## CLASS COUNSEL ENGAGED IN THE FOLLOWING ACTIONS DIRECTED AT THE OBJECTORS, THE CLASS AND COURT

- Conspiracy amongst the call participants by falsely impeaching the credibility of the objector in the eyes of the Court. Successfully accomplishing this goal would overcome the biggest obstacle to obtaining approval of the error strewn settlement and obtain their unjust $13,500,000.00 in fees and expenses even if false pretenses and fraud had to be employed against the objector's and the Court to reach their objective. As Mr. Miller stated at the fairness hearing "Mr. Gustafson did a good job…" (Page 63 at 8) No, based on what the objector heard on that wasted RICO call, the only "good job" Mr. Gustafson did was convincing the objector to create and send them a legal document through the use of fraud and trickery. That information in the fee motion contained the same exact secret information disclosed on the phone to be solely used in a double cross in writing. They had no intention of ever following through, per the statement of Mr. Miller above but intended to and did use it unethically and fraudulently in their final papers and at the Fairness Hearing.

- Use of the telephone system (wire fraud) that crossed state lines for the conference call to complete their scheme which resulted in counsel obtaining the information required and included it in their papers to fraudulently obtain the $13.5 million fee.

- Using computers in four states that cross state lines in this conspiracy to commit these violations and scheme to defraud the objector's, class and the Court.

- Misleading the objectors by having the objectors create a fee motion and email it back to the conspirators (wire fraud for second time) and Class Counsel included that in their final papers (that were sent to the Federal District Court in Detroit via computer (wire fraud for third time) and used the court's ECF system to post them to the docket.(Fraud again because they knew the information was obtained through misrepresentation and fraud.)

- Objectors hired an attorney and needlessly incurred fees based on class counsel's fraud scheme related to the document class counsel coerced objector's to create in a waste objectors time and money, which counsel had no intention of fulfilling and to further their approval and fee scheme.

- Preparing a response to the sur-reply an the last supplemental motion for approval which should not have been filed but was done simply to cost the

objectors time, money and not designed to move the case along with the class's best interests at heart.

- Making a false declaration in their fee petition that the petition itself was accurate and met requirements for rates in the district where the settlement took place.  All counsel in all arenas use that survey not just those making will's counsel. The District Court in Detroit and the judges who have used that survey in their own rulings might disagree with class counsel. Mr. Feiger didn't like his rate being calculated using that survey but it had to be just like in this case. See attached Exhibit E page 12 second paragraph Cristini vs. City of Warren "Opinion and Order On Motions To Determine Attorney Fees." from July 7, 2014 and there are other decisions objector has read over as well in this district using that survey.

- . Guilty of willful dishonesty by inflating the hourly rates by 34% or $5,000,000.00 overcharge to the class.

- Guilty of fraud by omission.

- Guilty of fraud, a mortal sin in defendant's profession.

- Guilty of fraud by misrepresentation.

- Guilty of enabling a wire fraud through the use of the phone system in the conference call and use of the computer systems crossing state lines because

defendant knew the statements were false before, while and after they were made and when filing the documents electronically.

- They all crossed state lines to get to the Fairness hearing and continued their conspiracy by lying to the Court multiple times in an attempt to obtain fraudulent approval for the $13.5 million theft of class funds, the ultimate goal of the scheme. Approving this settlement is the equivalent of a builder demanding payment in full without allowing the buyers to even see the inside of the house which is far from finished.

- Guilty of willful gross negligence.

- Guilty of willful misconduct.

- Guilty of wrongful conduct.

- Violation duty of candor.

- Guilty of reckless conduct.

- Guilty of willful misrepresentation.

- Guilty of legal malpractice.

- Guilty of willful breach of legal duty.

- Guilty of willful bad faith.

- Guilty of willful bad faith fiduciary conduct.

- Guilty of obstruction in that class counsel is deceiving the objector's, class and the Court with their scheme.

- Guilty of a RICO scheme.

## ELEMENTS OF WIRE FRAUD 18 U.S.C. 1343

The elements of wire fraud under Section 1343 directly parallel those of

the mail fraud statute, but require the use of an interstate telephone call

or electronic communication made in furtherance of the scheme. *United*

*States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) (*citing United States*

*v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) (per curiam));

*United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994) (wire fraud is

identical to mail fraud statute except that it speaks of communications

transmitted by wire); *see also, e.g., United States v. Briscoe*, 65 F.3d

576, 583 (7th Cir. 1995) (*citing United States v. Ames Sintering Co.*,

927 F.2d 232, 234 (6th Cir. 1990) (per curiam)); *United States v. Frey*,

42 F.3d 795, 797 (3d Cir. 1994) (the four essential elements of the crime

of wire fraud are: (1) that the defendant voluntarily and intentionally

devised or participated in a scheme to defraud another out of money; (2)

that the defendant did so with the intent to defraud; (3) that it was

reasonably foreseeable that interstate wire communications would be

used; and (4) that interstate wire communications were in fact used)

(*citing* Manual of Model Criminal Jury Instructions for the District

Courts of the Eighth Circuit 6.18.1341 (West 1994)), *cert denied*, 115 S.Ct. 2289 (1995); *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994) (two elements comprise the crime of wire fraud: (1) a scheme or artifice to defraud; and (2) use of interstate wire communication to facilitate that scheme); *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994) (essential elements of wire fraud are: (1) a scheme to defraud and (2) the use of, or causing the use of, interstate wire communications to execute the scheme), *cert. denied,* 115 S.Ct. 193 (1995); *United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993) (to prove wire fraud government must show (1) scheme to defraud by means of false pretenses, (2) defendant's knowing and willful participation in scheme with intent to defraud, and (3) use of interstate wire communications in furtherance of scheme); *United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990) ("Wire fraud requires proof of (1) a scheme to defraud; and (2) the use of an interstate wire communication to further the scheme.").

[cited in USAM 9-43.100]

**VIOLATION OF CIVILITY PRINCIPLES BY CLASS COUNSEL**

Four lawyers working for three of class counsel violated the following Civility

Principles based on the evidence in this case. Those lawyers are Mr. Miller, Mr.

Small, Mr. Gustafson and Mr. Hedlund.

**Attorneys' Responsibilities to Other Counsel** (see attached Exhibit F and should

include pro se litigants, objectors and members of the public.) The following items

were violated some or all of applicable class counsel:

1,2,3,4,6,7,9,11,23,24,27 and 28.

**Attorneys' Responsibilities to the Court**

The following items were violated by applicable class counsel:

5

**Lawyer's Commitment to Professional Civility**

The entire page was violated by applicable class counsel


**CLASS COUNSELS' VIOLATION OF MICHIGAN RULES OF**

**PROFESSIONAL CONDUCT**

The following items were violated by applicable counsel based on the evidence.

(Exhibit G all applicable pages attached)

Rule 1.5 (a)

Rule 1.6 Confidentiality of Information

(a), (b)1,(b)2,(b)3

Rule 3.3 Candor Toward The Tribunal

(a)1,

 Rule 3.4 Fairness to Opposing Party and Counsel

(a), (b)

Rule 3.6 Trial Publicity

(a)

Both counsel for the Crain's Article and not correcting the inaccuracies in it.

Rule 4.1 Truthfulness in Statements to Others

Rule 8.3 Reporting Professional Misconduct

(a)

Rule 8.4 Misconduct

(a), (b), (c)

 Rule 8.5 Disciplinary Authority; Choice of Law

## FRAUD ON THE COURT

"The fabrication of evidence by a party in which an attorney is implicated, will

constitute a fraud on the court." Id. at 1338 (citing to *Hazel-Atlas Glass Co. v.*

*Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997 (1944)).

The standard for the Sixth Circuit: Fraud on the court:

Fraud on the court refers to "the most egregious conduct involving a corruption of the judicial process itself." 11 Charles Alan Wright et al., Federal Practice & Procedure § 2870 (West 2011) (collecting cases). Treatises speak of such flagrant abuses as bribing a judge, employing counsel to exert improper influence on the court, and jury tampering. Id. § 2870; Moore's Federal Practice § 60.21[4][a]. Although not doctrinally limited to such criminal acts, courts recognize the extraordinary nature of the remedy and cautioned against expansive use of the doctrine. In Demjanjuk v. Petrovsky, we observed that [f]raud upon the court should . . . embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct." 10 F.3d 338, 352-53 (6th Cir. 1993) (quoting Moore's Federal Practice § 60.33, omission in Demjanjuk) (setting aside an extradition order for fraud on the court because government attorneys failed to disclose exculpatory evidence in violation of the duty recognized in Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)).

Accordingly, cases require a party seeking to show fraud on the court to present clear and convincing evidence of the following elements: "1) [conduct] on the part of an officer of the court; that 2) is directed to the judicial machinery itself; 3) is

intentionally false, willfully blind to the truth or reckless disregard of the truth; 4) is a positive averment or a concealment when one is under a duty to disclose; and 5) deceives the court." Johnson v. Bell, 605 F.3d 333, 339 (6th Cir. 2010); (quoting Carter v. Anderson, 585 F.3d 1007, 1011-12 (6th Cir. 2009)).

This standard recognizes that fraud upon the court, unlike perjury, need not be based on affirmative misstatements, but may be based on nondisclosures as well and need not be based on proof of subjective knowledge of falsity, but may be founded on a showing of willful blindness or reckless disregard of the truth.

Objector has proven all elements of fraud above were committed by class counsel and directed at the objector, the class and the Court itself.  Based on all the evidence that has surfaced in this case since the September 19, 2014 conference call, class counsels that were on that call should be kicked off the case. Mr. Iquith's and his firm, Wolf, Hammerstein should remain since they were not on the call so proof is lacking of their knowledge of this scheme and consent to include the information in the settlement papers and that was also disclosed at the Fairness Hearing. Mr. Miller of the Miller Firm, Mr. Small of Cohen Milstein Firm, Mr.Gustafson of the Gustafson Gluek Firm and Mr. Hedlund of the Gustafson Gluek Firm were on the call and at the Fairness Hearing so they and their firms should all be dismissed. As of December 08, 2014 Mr. Hedlund who has filed

papers with the Court in this case may not be ad......... ...... not even sworn. Shouldn't he be if he signs papers that are filed with the court under sworn declaration? If not admitted to practice here his submission of 10-24-14 document # 170-1 should be struck by the Court.

All of class counsel signed the last supplement submission dated December 09 and 10th 2014 along with the Fink firm who appears composed and filed it so all are responsible for the all time wasted responding to the last frivolous pleading submission objector had to respond to. (The Fink firm was not noticed under Rule 11 by the way.) They all choose to live by the legal sword they should suffer the consequences of meeting the legal sword.

## OBJECTOR'S BILLING RATE

Objector's hourly rate historically has been $180 an hour for the past seven years working with lawyers as a consultant to them or against lawyers (For example the D&O Lehman $99 million settlement which class counsel pointed out in its settlement papers that saved the class millions was paid for his time at $180 an hour.) After reading all of counsel's papers and comparing them to objector's own papers, this objector now realizes he is undercharging compared to how class

counsel is billing out their non-lawyers in this case based on the quality of the work product. For example:

The Gustafson Gluek firm billed out non lawyer law clerks at $280.00 an hour and paralegals at $200 an hour.

Cohen Milstein firm billed out non lawyer law clerks at $250.00 an hour and paralegals at $250.00 per hour.

Miller Firm billed out non lawyer paralegals at $175.00 per hour.

Wolf Haldenstein firm  billed out non lawyer paralegals at $320.00 to $265.00 per hour.

The average for the paralegal rate is $250.00 per hour.

Taking the average for the law clerk rate is $265.00 per hour.

Averaging the two rates above is $257.00 per hour.

Objector claims that the law clerk that was billed out at the highest rate of $280.00 per hour could NOT assemble an objection and its related filings like has been presented in this case by this objector.

Objector states that the paralegal rate that was billed out at the highest rate of $320.00 per hour could NOT assemble an objection and its related filings like has been assembled in this case by this objector.

So objector's rate by comparison should not be $180.00 an hour but rather a blended rate combined of the highest paralegal rate and the highest law clerk rate $257.00 and $320.00 is $577.00 divided by two is a billing rate of $288.00 per hour for the objector. That does not include any bonus for a job well done so far in saving the class $146,000.00 with a minimum of $5,000,000.00 more to go.

Class Counsel was told the hours below, but not the hourly rate in their copy of a few weeks ago so the dollar amount can't be used as an excuse for not removing the requested documents.

Attorney fees incurred wasted because of class counsel's fraudulent negotiation that really never was legitimate. Maximum owed is $2,800.00 based on the hour's incurred and hourly rate. Class counsel, specifically Mr. Miller, personally knows this lawyer; she is the best in her field and in the 95% on the Michigan Bar Rate Chart.

All work from the date after the fraudulent conference call through today, 240 hours wasted at $288.00 per hour $69,120.00 or

For the answer to motion to strike sur-reply, 9 hours wasted at $288 per hour or $2,592.00.

For answer to the Supplemental Submission dated December 09 and 10th 2014, 10 hours wasted at $288.00 hour is $2,880.00.

For the sanction motion itself, 41 hours by $288.00 hour is $11,808.00.  (Class counsel was told 30 hours but additions and deletions of evidence and Mr. Miller's revised artificially inflated no detail fee petition caused that number to rise slightly.}

## EXPENSES DUE TO THE SCHEME STARTING ON SEPTEMBER 19, 2014

Copy costs 2345 sheets at .10 a page is $234.50

High quality copy paper for court copy submissions $15.00

Postage $48.00

Parking $10.00

Pacer charges $21.00

Total: $327.50

The Court should award or assess penalties that flow to the objector first, for cost of time and expenses. Second option is to award the objector and with a portion, say 50%, flowing into the class fund second. Third option is a portion paid to the objectors and court/class fund.  If the Court for any reason and/or imposes other sanctions or penalties like forfeiture of class counsels fees for example, any money recovered or penalties assessed against the individual lawyers as well as their firms for counsels on both sides that does not go to the objectors it should go to the class fund.

Class counsels' conduct has multiplied the proceedings in an unreasonable and vexatious manner, and that the conduct was both intentional and in bad faith. Obviously, too, the conduct has taxed the objector's resourses enormously as well as the court's and without good reason. Objector asserts that this filing of December 09 and 10 2014 is nothing more than an improper and sanctionable attempt to harass the objector, increase the objector's costs of objecting to this awful proposed settlement and to impose economic loss and pressure on him.  The December 29, 2014 greed drive fee request of $3000.00 more was unnecessary and is an attempt to rip the class off so a response was needed to show class counsel's true colors.

CONCLUSION

Objector respectfully request that, pursuant to 28 U.S.C. § 1927, the inherent power

of the court and Federal Rule of Civil Procedure 11(c), this Court order

appropriate monetary and nonmonetary sanctions against Class Counsel to deter

their violation of Federal 8 Rule of Civil Procedure 11(b), because of their

presentation to the Court of their misleading conference call fraud conspiracy

filings that started back on September 19, 2014 and all the wasted work that

occurred after that point, the Motion to Strike Sur-reply dated October 31, 2014,

their Supplemental Submission dated December 09, and 10, 2014 and the

corrected declaration of Mr. Miller dated December 29, 2015. The Court should

dole out sanctions, severe one's like firing them. Class counsel's conduct towards

the objectors, class and the Court was and continues to be intentionally false,

willfully blind to the truth, and/or reckless disregard for the truth and done in bad

faith.


Thank you for your time and consideration.

Respectfully submitted,

Christopher Andrews

Case No. Case No. 2:10-cv-14360-DPH-MKM

Dated: January 06, 2015

*Christopher Andrews, Pro se objector*

P.O. Box 530394

*Lixonia, MI 48152-0394 E-mail caaloa@gmail.com Phone 1-248-635-3810*

*Christopher Andrews*

*I certify under penalty of perjury that the above and below information is true and accurate to the best of my knowledge, information and belief.*

Christopher Andrews

I hereby certify that on this day I hand delivered foregoing to the Clerk of the Court, and served true and correct copies upon class counsel via email at the addresses below. Clerk of Court, the United States District Court for the Eastern District of Michigan Southern Division, U.S. Courthouse 231 W. Lafayette Blvd. Detroit, Michigan 48226 Telephone number (313) 234-5005.

COHEN MILSTEIN SELLERS & TOLL PLLC 202-408-4600 Daniel A. Small Daniel Small <dsmall@cohenmilstein.com>,

Brent W. Johnson

1100 New York Avenue, NW

Suite 500

Washington, DC 20005

Gustafson Gluek Pllc

Canadian Pacific Plaza

120 South Sixth Street, Suite 2600

Minneapolis, MN 55402

Attention Daniel Gustafson <DGustafson@gustafsongluek.com>,

dhedlund@gustafsongluek.com,

The Miller Law Firm

950 West University Avenue, Suite 300

Rochester, MI 48307

Attention Mr. Miller E. Powell Miller" <epm@millerlawpc.com>

Wolf Haldenstein Adler Freeman & Herz, LLC

270 Madison Avenue

New York, New York 10016

Attention Fred Isquith isquith@whafh.com

Fink & Associates Law

100 West Long Lake Road, Suite 111

Bloomfield Hills, MI 48304

Attention D. Fink dfink@finkandassociateslaw.com The Shane Group etc. al v

Blue Cross Blue Shield of Michigan Case No. 2:10-cv-14360-DPH-MKM

EXHIBIT "A"

63

1   give up all the objections to the settlement if we

2   reduced our request for fees by 990,000 and paid him

3   153,000 for 50.

4           He says we abused confidentiality.

5   Absolutely false.   There was no attorney/client

6   privilege once he announced his intention to object.

7           We had one telephone call with him, led by

8   Mr. Gustafson, who did a great job, and he said in the

9   call that this is a four-way call.   Because he is not a

10  lawyer, I pinned him to explain what that means and to

11  make clear it is only what is in that call, nothing

12  before, nothing after.

13          And we didn't use anything in that call in

14  any of our submissions.

15          While he filed hundreds of pages, you only

16  need to look at one e-mail, Your Honor, and that is what

17  he sent to me on September 22nd, 2014, which is docket

18  169-16.   And it says, quote:

19              "No call means no I guess.   After reviewing

20              the 380 pages in this objection it will be

21              posted to describe in an email news release

22              sent out to 125 news organizations,

23              congressional committees, public interest

24              groups directing them to this objection.   I

25              will also send a letter to all judges in

*EXHIBIT "B"*

Since that time, four comments or objections have been received in opposition to Class Counsel's request for an award of attorney's fees, reimbursement of expenses, and award of incentive awards to the class representatives.

Cynthia S. Rock mailed a letter to Class Counsel on September 24, 2014.[4] Ms. Rock supported the settlement as a whole, but objected to Class Counsel's request for one-third of the Settlement Fund as attorneys' fees. She also objected to the amount Class Counsel requested in incentive awards to the class representatives. Ms. Rock voiced a preference that class members receive a larger portion of the settlement fund, reasoning that there would be no case were it not for the class members.

Nicholas and Coralin Davelaar mailed a letter to Class Counsel on August 19, 2014.[5] The Davelaars stated that they had requested to be excluded from the settlement, but also objected on the basis that Class members were receiving insufficient compensation in light of the fees and expenses requested by Class Counsel.

Christopher Andrews filed an objection on September 24, 2014[6] purporting to represent not only himself but also three family members, Michael Andrews, Cathy Waltz (individually and as executor of the estate of Eileen Greenia and

---

[4] Final Approval Brief, Ex. D ("Rock Objection").
[5] Final Approval Brief, Ex. G ("Davelaar Objection").
[6] Objection to Proposed Class Action Settlement, Dkt. No. 159 ("Andrews Objection").

EXHIBIT "C"

The United States District Court

For The Eastern District of Michigan

Southern Division

**This Document Applies To:**

The Shane Group, Inc. etc. al

Plaintiffs,

v. Blue Cross Blue Shield of Michigan,

Defendant .

| | |
|---|---|
| Case No. 2:10-cv-14360-DPH-MKM | Case No. 2:10-cv-14360-DPH-MKM |
| | **ECF CASE** |

### STIPULATION WITHDRAWING OBJECTION

WHEREAS,  as set forth in Lead Plaintiffs' papers supporting the Blue Cross Blue Shield of Michigan (BCBSM) Settlement, Lead Plaintiffs obtained a $30 million settlement after nearly four years of litigation and negotiations;

WHEREAS, Lead Plaintiffs and Lead Counsel believe that the BCBSM Settlement is a favorable outcome for the BCBSM Settlement Class and has recommended its approval to the Court;

- WHEREAS, Christopher Andrews, Pro se non attorney, also acting as representative under Power of Attorney for Objector Cathy Waltz as executor of the estate of Eileen Greenia and Emily Byrne and as representative for Objector Ronald Waltz and Objector Michael Andrews (the Andrews's Objectors) all BCBSM Class Member's by virtue of all objectors have records that show they paid for healthcare services at a general acute care hospital in Michigan between January 1, 2006 and June 23, 2014 during the class period, are members of the settlement class in Category 1, 2 and 3; therefore have standing to object to the settlement, have filed an objection to the BCBSM Settlement, the application for an award of attorney's fees, reimbursement of expenses and claims process, plan of allocation in connection with the BCBSM Settlement in the above-captioned matter, a copy of which is docketed with the Court as Docket No. _____ (the "Andrews's Objection");

WHEREAS, as reflected in the Andrews's Objection, Andrews objected to, among other things, the fee amount and the $25 and $15 minimum distribution per Authorized Claimant:

WHEREAS Andrews objected to the attorney fee amount and requested a reduction in their fee request. and that the claims administration process should reduce the $25 & $15 to $ 10 threshold for minimum distribution among other things;

WHEREAS, Andrews acknowledges that the objections that he had set forth in his Objection have been appropriately and fully addressed in Lead Plaintiffs' settlement submission of October _____2014 submission, Docket No. _____

WHEREAS, Andrews has provided Co-Lead Counsel with an estimate of his commission rate for revenue generated the past 18 years is 28% and he also performs consulting work for attorneys for the past 30 years;

WHEREAS after negotiations with Andrews, Plaintiffs' Counsel has agreed to reduce its request for attorney fees in the amount of $990,000.00

WHEREAS, this Stipulation is contingent upon the BCBSM Settlement being approved by the Court and the Court awarding attorney's fees to Plaintiffs' Counsel from the BSBSM Settlement Fund; and

WHEREAS, the consideration to be paid by virtue of this Stipulation shall be paid entirely out of any Court-awarded attorney's fees and shall not, in any way, diminish the amount due to the BSBSM Settlement Class in the event that the BCBSM Settlement shall be approved by the Court;

1.      In recognition of the time and negotiation experience expended by Andrews and the results achieved by the class in increasing the settlement funds available to compensate all class members and in order to avoid any appeals, Plaintiffs' Counsel hereby agrees, subject to Court approval, to pay a 15.5% fee on the $990,000.00 revenue he generated back into the settlement fund of $153,450.00 to Andrews out of any award of attorney's fees granted by the Court in connection with the BCBSM Settlement in the event that the BCBSM Settlement is approved by the Court;

WHEREAS, Co-Lead Counsel have agreed not to contest the Andrews' Application in the amount of $153,450.00;

NOW THEREFORE, the parties to this Stipulation hereby agree as follows:

1.              Acknowledging that Andrews has created a $990,000.00 benefit for the

                BCBSM Settlement Class by increasing the settlement fund,  Plaintiffs'

3

Counsel hereby agree not to contest the Andrews' Application in an amount of $153,450.00, to be paid to Andrews within five days of Plaintiffs' Counsel receiving the Court Order of it's attorney fee award; and

2.      Andrews will hereby withdraw the objection and agrees that he shall not appeal any orders in connection with the Settlement, Plan of Allocation or award of attorneys' fees and reimbursement of expenses.

Said amount, upon approval of the Court, shall be paid out of the attorney fees that are ultimately awarded to Plaintiffs' Counsel by the Court in connection with the BCBSM Settlement and shall be paid to Mr. Andrews within five calendar days after Plaintiffs' Counsel receives its award of attorney's fees and expenses in the BCBSM Settlement in connection with the above-captioned matter; and

Andrews hereby withdraws his Objection with prejudice and shall not appeal any issues with respect to the BCBSM Settlement.

_____

/s/ Daniel E. Gustafson
Daniel E. Gustafson
Daniel C. Hedlund
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

_____

4

*EXHIBIT "D"*

64

1            this District referring them to this

2            objection so everyone will be able to see

3            what a poster child of abuse this entire

4            settlement is so no other class members will

5            be victimized in future class action

6            settlements.

7            "The goal is to get Plaintiff's Counsel

8            dismissed as we already know.   The demands

9            have now changed and have substantially

10           increased.   This won't be a slam dunk like

11           it was for your last two settlements in the

12           Detroit Federal Court.   Bar complaints will

13           also be filed.   You can also include this

14           for the Judge to see with all the other

15           e-mails sent your way".

16           This type of malice and bullying has no

17  place in this process whatsoever.

18           He is a serial objector.   He is in the

19  business of objecting.   He wants to make money.   And he

20  is conflicted.

21           And that is the fundamental problem with

22  both of these objections.   They are conflicted and

23  they're going to do damage if successful to 30,000

24  people who have made claims.   Sophisticated

25  organizations who have made claims.

*EXHIBIT "E"*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL LOUIS CRISTINI,

        Plaintiff,

v.

        Case No. 07-11141
        Honorable David M. Lawson

CITY OF WARREN, WARREN POLICE
DEPARTMENT, MACOMB COUNTY,
MACOMB COUNTY PROSECUTOR, ALAN
WARNICK, and ALICE INGLES, Guardian for
Donald Ingles, in his Individual and Official
Capacities,

        Defendants.

_____/

## OPINION AND ORDER ON MOTIONS TO DETERMINE ATTORNEY'S LIEN

Before the Court are cross motions filed by lawyers who represented plaintiff Michael

Cristini at one time or another seeking a share of the attorney's fee generated by the settlement in

this civil rights case. Cristini brought this lawsuit against the City of Warren, certain police

detectives, and others after he was wrongfully convicted of rape. The issues raised by the motions

parallel those in the related case involving Jeffrey Moldowan, who was charged in state court,

convicted, and later exonerated along with Cristini. As in the Moldowan case, Cristini hired

attorney Dennis Detmer to represent him. Detmer filed the case and conducted extensive work for

about two-and-a-half years before he retired — temporarily, as it turns out. Detmer referred the

Moldowan and Cristini cases to attorney Thomas Lizza, who was working at the time at the firm of

Fieger, Fieger, Kenney & Giroux, P.C. ("the Fieger Firm"). The Fieger Firm signed a contingent

fee agreement with Cristini, and in a separate agreement promised to pay Detmer a one-third referral

fee. And as in the Moldowan case, Cristini fired the Feiger Firm and rehired Detmer to finish his

case, along with attorneys Lizza, Paul Broschay, and Michael Deszi, who by then had left the Feiger Firm. Feiger was substituted out of the case and asserted a lien for fees and costs. It appears that the coasts have been reimbursed.

The Feiger Firm argues here, as it did in the Moldowan case, that it is entitled to the lion's share of the attorney's fee from the $1.5 million settlement. It repeats the arguments made in *Moldowan* and rejected earlier by this Court in that case, which was affirmed by the Sixth Circuit. *Moldowan v. City of Warren*, --- F. App'x ---, 2014 WL 959532 (6th Cir. Mar. 14, 2014). Predictably, the outcome here will be the same: the Feiger Firm will received a share of the fee based on *quantum meruit*, calculated using the lodestar method approved by the applicable Michigan cases. Presumably anticipating this outcome, the Feiger Firm has come up with an "estimate" of the amount of work performed on the Cristini file while it was at that firm. The Court heard testimony on that calculation from the Feiger Firm's witness and finds it unreliable. The better evidence of the work performed on that file while it was essentially parked at the Feiger Firm comes from the attorneys who actually did the work, who are the same lawyers who finished the job: Dettmer and the lawyers who worked on the case after they left the Feiger Firm.

I.

The case arises out of Jeffrey Moldowan's and Michael Cristini's convictions for rape and kidnaping. Both convictions were overturned and both Moldowan and Cristini were subsequently retried and acquitted of all charges. In approximately May 2004, Moldowan and Cristini retained Dennis Dettmer to file a civil rights lawsuit and signed a contingent fee agreement with him. Dettmer filed a complaint against the City of Warren and Detective Ingles on March 15, 2007,

-2-

among others, alleging that the defendants withheld exculpatory evidence and engaged in malicious prosecution.

Dettmer represented Cristini from approximately May 2004 until January 2009 when he (temporarily) retired from the practice of law. During that time, Dettmer handled all of the discovery in the Moldowan and Cristini cases, which were conducted jointly for a period of time. Dettmer also resisted the defendants' motions for summary judgment in *Moldowan* and filed appellate briefs in the Sixth Circuit after the Warren defendants and defendant Alan Warnick sought interlocutory review on their qualified immunity claims. Discovery, pleadings, correspondence, and research in the two cases filled 35 banker boxes. Dettmer says he spent more than $50,000 in expenses litigating *Cristini* and *Moldowan* during that period.

Before retiring, Dettmer referred the *Cristini* and *Moldowan* cases to Thomas Lizza, an attorney then employed by the Fieger Firm. Dettmer and Lizza signed a referral agreement in which Dettmer agreed to a twenty-five percent referral fee for the Cristini case and reimbursement of all his costs. Dettmer confirmed the referral in a January 17, 2009 letter to Cristini and informed Cristini that the Fieger Firm would ask him to sign a new fee agreement. Cristini signed a contingency fee contract with the Fieger Firm on April 24, 2009, in which he agreed that the Fieger Firm would receive one-third of the net recovery. Paragraph 11 of the contingency fee agreement included this language:

> In the event the Firm is discharged by the Client(s) without cause or in the event that the Firm terminates its services due to some occurrence which is not the fault of the Firm's [sic], the contingency fee portion of ths [sic] agreement will be held for naught and that the Firm will be entitled to a fee based on quantum meruit. It is specifically agreed by the Client(s) that the Firm shall have a lien against any sum recovered to the extent of said costs or expenses as indicated in Paragraph 4 herein which are incurred by the Firm, and that said lien is to be granted a preference, to the

-3-

extent permitted by law, over any other liens or obligations which may be satisfied from said recovery.

Contract for Legal Representation, dkt. #203-6, at 2.

In January 2009, Lizza replaced Dettmer as counsel of record, and on February 19, 2009, Paul Broschay filed a notice of appearance. Soon thereafter, the City of Warren defendants filed a motion to stay *Cristini* pending the Sixth Circuit decision on the interlocutory appeals in *Moldowan*. Judge Anna Diggs Taylor, to whom the case was assigned originally, granted the defendants' motion to stay the case on February 24, 2009.

On October 25, 2010, Lizza filed a motion to lift the stay after the Sixth Circuit issued its decision in *Moldowan*, which Judge Taylor granted on November 18, 2010. On November 22, 2010, the case was reassigned to the undersigned after Judge Taylor retired. The Court held a status conference on January 11, 2011, which Lizza and Broschay attended on behalf of Cristini. There was no activity in the case between January and May 2011 (except for a stipulation dismissing defendant Maureen Fournier), because Cristini was being prosecuted in another criminal case, and the parties wanted to await the outcome, which could have shed light on whether the present case was worth pursuing. Cristini was acquitted in that case, and this lawsuit emerged from its dormancy when the Court held a status conference on May 12, 2011.

In that same month, Cristini discharged the Fieger Firm after many of their litigation attorneys (including Lizza, Broschay, and Michael Deszi) decided to leave the firm. Cristini then re-engaged the services of Dettmer, who agreed to come out of retirement to assist with the Cristini litigation. Dettmer retained the assistance of Broschay, Lizza, and Dezsi, who had all left the Fieger Firm by that time. The Court substituted Dennis Dettmer and the law firm Dennis A. Dettmer,

-4-

PLLC as counsel of record in the place of the Fieger Firm on June 9, 2011; Broschay and Dezsi filed notices of appearance on behalf of Cristini on June 29, 2011.

The Fieger Firm filed its notice of lien on June 20, 2011.

The activity for the plaintiff in this file after the Fieger Firm's exit included responses to the defendants' motions for summary judgment, appellate briefs in the Sixth Circuit in response to the defendants' interlocutory appeals, retention of experts, further discovery, preparation for trial, and participation in mediation and settlement conferences with the Court.

On June 11, 2012, plaintiff settled his claims against defendants Macomb County and the Macomb County Prosecutor, and the Court entered an order dismissing the case against them with prejudice. Likewise, the plaintiff reached a settlement with defendant Warnick, reflected in a consent judgment entered on December 7, 2012.

On December 27, 2013, the parties settled the case with the Warren defendants. The Court dismissed the case with prejudice, and retained jurisdiction to adjudicate the disputed over the amount of the attorney's lien filed by the Fieger Firm.

On January 10, 2014, the plaintiff filed a motion to determine the lien [dkt. #183] and, on February 6, 2014, the Fieger Firm filed its own motion to determine the lien [dkt. #203]. The Court took testimony and heard argument on those motions on May 15, 2014.

## II.

The law on attorney fees is well-settled in contingent fee cases in which an attorney is discharged before completing his services. "[T]he law creates a lien of an attorney upon the judgment or fund resulting from his services." *Ambrose v. Detroit Edison Co.*, 65 Mich. App. 484, 487-88, 237 N.W.2d 520 (1975). If "an attorney's employment is prematurely terminated before

-5-

completing services contracted for under a contingency fee agreement, the attorney is entitled to compensation for the reasonable value of his services on the basis of quantum meruit, and not on the basis of the contract, provided that his discharge was wrongful or his withdrawal was for good cause." *Plunkett & Cooney, P.C. v. Capitol Bancorp Ltd.*, 212 Mich. App. 325, 329-30, 536 N.W.2d 886, 889 (1995) (citing *Morris v. Detroit*, 189 Mich. App. 271, 278, 472 N.W.2d 43 (1991)). The phrase *quantum meruit* means "'as much as deserved.'" *Keywell & Rosenfeld v. Bithell*, 254 Mich. App. 300, 359, 657 N.W.2d 759, 792 (2002) (quoting Black's Law Dictionary 1243 (6th ed. 1990)).

The Supreme Court has held that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensely v. Eckerhart*, 461 U.S. 424, 433 (1983). Likewise, the Sixth Circuit has recognized that "[a]n attorney who has been wrongfully discharged by his client in Michigan is entitled to *quantum meruit* recovery, based on the number of hours worked multiplied by a reasonable hourly rate." *Dean v. Holiday Inns, Inc.*, 860 F.2d 670, 672 (6th Cir. 1988) (citing *Ambrose v. Detroit Edison Co.*, 65 Mich. App. 484, 237 N.W.2d 520 (1975)). This approach, "also known as the 'lodestar' approach, includes most, if not all, of the factors relevant to determining a reasonable attorney's fee." *Glass v. Secretary of HHS*, 822 F.2d 19, 21 (6th Cir. 1987) (citing *Coulter v. State of Tennessee*, 805 F.2d 146, 149 (6th Cir. 1986)).

After the lodestar is calculated, the fee may be adjusted in consideration of a number of factors, including "(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client." *Crowley v. Schick*, 48 Mich. App. 728, 737, 211 N.W.2d 217 (1973). A "trial court may

-6-

also properly consider that the attorney originally agreed to render services on a contingency basis" because "[s]uch a consideration would allow the court to consider the degree of risk undertaken by an attorney who was prematurely discharged." *Reynolds v. Polen*, 222 Mich. App. 20, 29, 564 N.W.2d 467, 472 (1997). Those factors are not exclusive and "there is no precise formula for assessing the reasonableness of an attorney's fee." *Morris v. City of Detroit*, 189 Mich. App. 271, 278, 472 N.W.2d 43, 47 (1991). A "federal district judge has broad equity power to supervise the collection of attorneys' fees under contingent fee contracts." *Krause v. Rhodes*, 640 F.2d 214, 218 (6th Cir. 1981). Similarly, Michigan courts have held that "a trial court is in the best position to assess an attorney's contribution to a case because trial courts are aware of the strengths and weaknesses of cases before them, the time and effort expended by the attorneys, and changes in the parties' leverage resulting from changes in counsel (e.g., due to attorneys' skill or reputation)." *Polen*, 189 Mich. App. at 472. The Sixth Circuit will "usually sustain a district court's award and division of attorneys' fees absent an abuse of discretion." *Dean*, 860 F.2d at 672 (citing *Krause v. Rhodes*, 640 F.2d at 218).

The attorney's fee resulting from the various settlements and after payment of expenses is about $480,000. The Feiger Firm advances several theories to support its belief that it deserves forty-percent of the net one-third attorney fee from the settlement in this case, but most of them have been rejected by this Court and the court of appeals in the parallel *Moldowan* litigation. First, the Feiger Firm argues that the Court should not look to the lodestar method for calculating its fractional share of the fee, insisting that the Feiger Firm should have the option of electing a fixed dollar amount based on a percentage of its work. But the authority it cites for that method of distribution is thin at best, consisting of a footnote reference in *Ambrose* to *Paolillo v. American Export*

-7-

*Isbrandtsen Lines, Inc.*, 305 F. Supp. 250 (S.D.N.Y. 1969), a readily distinguishable case. Moreover, as the Sixth Circuit noted, "neither *Ambrose* nor any other Michigan case cited by Fieger adopts this standard . . . ." *Moldowan*, 2014 WL 959532, at *1. There is simply no support for the proposition that the Fieger Firm is entitled to choose how the Court calculates attorney fees. That decision "rests in the sound discretion of the trial court" and the trial court alone. *Jones v. Continental Corp.*, 789 F.2d 1125, 1229 (6th Cir. 1986); *Chisnell v. Chisnell*, 99 Mich. App. 311, 316, 297 N.W.2d 909 (1980).

Second, the Fieger Firm's argument that "extraordinary circumstances" exist in this case is based on a faulty premise. The Fieger Firm urges the Court to adopt the approach used in *Morris v. City of Detroit*, where the state court determined that the discharged attorney was entitled to the "lion's share" of the one-third contingent fee recovered by the successor attorney because the discharged attorney performed nearly all of the work for which he had been retained. *Id.* at 189 Mich. App. at 279, 472 N.W.2d at 48. But Feiger's argument assumes that he is the beneficiary of all of Dettmer's work in the file before the initial referral, which is simply not the case. The referral contract does not contain language assigning the value of Dettmer's pre-referral work to the Fieger Firm. It states only that Dettmer "agreed to a 1/3 referral fee," meaning that Mr. Dettmer would have been entitled to one-third of the Fieger Firm's contingent fee if the Fieger Firm fulfilled its responsibilities in the case. *Ibid.*; *see also Moldowan*, 2014 WL 959532, at *4 ("Contrary to the firm's suggestion, the Dettmer-Fieger Referral lacks language assigning the value of Dettmer's pre-referral work."). Feiger is not entitled to credit for Dettmer's work.

Third, the Fieger Firm's argument based on calendar days ignores the actual activity in the case. Feiger believes that it would be appropriate to compensate it with forty percent of the net one-

third attorney fee from the settlement in this case because it represented Cristini for more than forty percent of the total calendar days dedicated to litigating the dispute. But calculating *quantum meruit* based on calendar days fails to account for the attorneys' substantive efforts in the case. Current counsel for Cristini conducted nearly all of the discovery and investigation in the case, filed responses to the defendants' motions for summary judgment, filed appellate briefs in the Sixth Circuit in response to the defendants' interlocutory appeals, retained experts, prepared for trial, and participated in facilitation and settlement conferences with the Court. No dispositive motions were filed during the entire period that the Fieger Firm represented Cristini and the Court did not hold any hearings, except for two status conferences. Nor has the Fieger Firm identified any substantive work completed on the case when it was lodged at that firm, except for correspondence with Cristini's lawyer on his criminal case and Lawsuit Financial, the institution funding his criminal trial. The sum of the Fieger Firm's participation in the case consisted of attending two status conferences, exchanging emails, and corresponding with Cristini's criminal attorney.

The Fieger Firm argues that *Bailey v. Nyloncraft, Inc.*, Case No. 11-14199, 2013 WL 2149144 (E.D. Mich. May 16, 2013), provides support for a percentage-based approach. It does not. The district court applied a percentage-based approach to calculating *quantum meruit* in that case for two reasons. *First*, the court found that an hours-worked-times-hourly-rate approach was inappropriate because it would represent only a fraction of the total hours worked for either side. *Id.* at *2. *Second*, the court found that relying on the hours worked would be inaccurate because both sides failed to keep track of their hours, leaving both parties to "reconstruct" the hours they worked. *Ibid.* Those concerns are not present here.

-9-

Although neither party contemporaneously documented the number of hours they worked, current counsel for the plaintiff accurately reconstructed the activity in the case during the time period that the Fieger Firm represented Cristini. Such reconstruction is made easier because the case was stayed from February 2009, a month after the Fieger Firm agreed to represent Cristini, until November 2010, after which it remained essentially dormant until Cristini discharged the Fieger Firm. Because the Fieger Firm performed only limited work on the case during the two years it represented Cristini, there is no serious concern that the hours-worked-times-hourly-rate approach would underestimate the total number of hours that the Fieger Firm dedicated to the case.

None of the Fieger Firm's proposed alternate approaches for calculating its fair share makes sense or is supported by applicable law. That brings us back to the lodestar. Both sides submitted affidavits, but the Fieger Firm insisted on an evidentiary hearing to explicate the ciphering. The Court granted the request, and two witnesses testified: Thomas Lizza and Michaelene Sowinski, a paralegal-turned-attorney at the Fieger Firm. Ms. Sowinski testified that she was assigned the task of searching the firm's records to attempt a reconstruction of the time spent on the file by the departed lawyers while the case was at the firm. She asserted that she found work performed by Lizza on the file that was not reflected in his affidavit, although she admitted that her reconstruction was based on estimations, application of minimum time charges, and ultimately speculation. Her approach was shambolic at best, and her estimates are bloated.

Lizza explained, as he stated in his affidavit, that over the 30 months that the *Moldowan* and *Cristini* files were at the Fieger Firm, *Moldowan* was pending on appeal for 20 months and *Cristini* was stayed for most of that time.

-10-

The Court must concluded that the Feiger Firm's offerings are not credible; it wildly inflates the amount of time dedicated to litigating the Cristini case. For instance, the Feiger Firm indicates that it spent two hours preparing and filing its January 30, 2009 notice of substitution of attorneys and Thomas Lizza's appearance. Such routine filings do not require hours of effort. The Fieger Firm also documents over twelve hours spent reviewing the Court's notices to appear (e.g., one hour on January 12, 2011), minute entries (e.g., one hour on May 12, 2011), parties' notices of appearance (e.g., one-half hour reviewing Peter W. Peackock's notice of appearance on May 12, 2011), emails from the Court (e.g, half-hour January 10, 2011), and two-sentence Court orders (e.g., one hour reviewing the Court's two-sentence order lifting the stay on November 18, 2010 and one hour reviewing the Court's two-sentence order reassigning the case on November 22, 2010). It is one thing to claim credit for all the work attributable to the law firm, but it is quite another to rely on a chimerical invention. On February 24, 2009, the Fieger Firm even maintains that it spent twenty-five minutes reviewing the Court's order staying the case even though the Court entered the order over a year later. Because these inflated time estimates undermine the Fieger Firm's credibility, the Court ascribes little weight to them.

Moreover, as mentioned above, the Fieger Firm's affidavits and time estimates are not based on first-hand knowledge. Instead, Fieger directed Sowinski, an associate attorney who never worked on the case, to review the physical file, the Court's docket, the firm's computer files, and emails to estimate the work performed on the case when the Fieger Firm represented Cristini. Her reconstruction contains tasks that Lizza asserts never occurred, such as seven hours reviewing the Cristini file. Because Lizza and Broschay actually represented Cristini when they worked at the Fieger Firm, they are in a better position to reconstruct their activities and to estimate the hours they

-11-

spent working on the case than Sowinski. Based on Lizza's and Broschay's affidavits, the Court credits the Fieger Firm with fifteen hours.

The second component of the *quantum meruit* formula is the hourly rate. *Dean*, 860 F.2d at 672. Generally, a reasonable hourly rate is calculated by reference to the prevailing market rates in the relevant community. *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 618 (6th Cir. 2007). The plaintiff's current lawyers originally asked the Court to calculate the Fieger Firm's lien based on a rate of $600 per hour. Pl.'s Mot, dkt. #183, at 12. However, after reviewing the Fieger Firm's motion, the current lawyers suggested that a rate of $425 per hour would be more appropriate and consistent with the Michigan State Bar Association's survey of practitioners. According to that survey, a rate of $425 per hour is equivalent to an attorney in the 95th percentile of hourly billing rates with 26 to 30 years of experience.

By contrast, the Fieger Firm argues that the Court should use the $600 hourly rate because that is what was used in *Moldowan* and there is no good reason for the Court to deviate from the rate it applied there. The Court applied a $600 hourly rate in *Moldowan* because the parties agreed to it, which is not the case here. Nonetheless, that rate can be justified, and the current lawyers originally suggested it. Therefore, that is the rate the Court will use.

The lodestar formula yields the amount of $9,000.

But the lodestar could be adjusted based on the *Crowley* factors and other relevant information. The Fieger Firm argues that the Court should consider that it agreed to represent Cristini on a contingent fee basis. That is relevant because "[s]uch a consideration [allows] the court to consider the degree of risk undertaken by an attorney who was prematurely discharged." *Polen*, 222 Mich. App. at 29, 564 N.W.2d at 472. The Fieger Firm argues that the Court should adjust its

-12-

fees upward based on Dettmer's labor, efforts, and risk, not its own. But as discussed already, the referral agreement does not contain language assigning the value of Dettmer's pre-referral work to the Fieger Firm.

Nor do any other factors favor adjusting the Fieger Firm's fees upwards. The docket entries show only twelve activities during the entire period that the Fieger Firm represented Mr. Cristini. Dkt. #67-79. The nature of the work performed during that period was neither novel nor difficult: two status conferences were scheduled, emails were exchanged, and Mr. Lizza corresponded with Mr. Cristini's criminal attorney. Instead, the plaintiff's current attorneys expended the "lion's share" of the skill, time, and labor litigating the case and reaching a settlement. Although the Fieger Firm represented Cristini for more than two years based on the calendar, not much occurred on the file during that time. An accurate apportionment of the attorney fees must reflect the Fieger Firm's limited contribution toward the settlement.

III.

Based on the foregoing, the Court finds that the Feiger Firm is entitled to the sum of $9,000 to discharge its attorney's lien, which is "as much as deserved," *Keywell & Rosenfeld*, 254 Mich. App. at 359, 657 N.W.2d at 792, for the work it performed on the case.

Accordingly, it is **ORDERED** that the motions to determine the attorney's lien [dkt. #183, 203] are **GRANTED IN PART**.

-13-

It is further **ORDERED** that the attorney's lien is determined in favor of the law firm of Fieger, Fieger, Kenney & Giroux, P.C. in the amount of $9,000, which will be paid from the trust account of attorney Dennis Dettmer in full satisfaction of the attorney's lien.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 7, 2014

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 7, 2014.

s/Shawntel Jackson
SHAWNTEL JACKSON

---

-14-



*EXHIBIT "F"*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

In re:  Civility Principles

Administrative Order

No. 08-AO- *009*

## ADMINISTRATIVE ORDER

This Administrative Order supersedes Administrative Order 07-AO-011, in re: Civility Plan.

A.      Introduction

On October 4, 1993, the United States District Court for the Eastern District of Michigan approved a Plan for the Reduction of Expense and Delay in Civil Cases as provided in 28 U.S.C. § 471, et seq.  Section VII(C) of that Plan stated that the Court would request that the Federal Bar Association/Detroit Chapter (FBA) and the State Bar of Michigan propose a civility plan to the Court.  The FBA and the U.S. Courts Committee of the State Bar of Michigan made recommendations which were considered by the Court.

B.      Adoption of Civility Principles

On February 5, 1996, the Court adopted the attached Civility Principles.

On November 5, 2007, on the recommendation of the Joint Standing Committee on Civility, the Court approved a "Lawyer's Commitment of Professional Civility" to be included with the Civility Principles.

The Civility Principles are included as an Appendix to the Local Rules of the United States District Court for the Eastern District of Michigan.

C.      Distribution of Principles and New Member Certification

The Clerk of the Court will distribute a copy of the Civility Principles to any attorney who applies for admission to practice before the Court.  The application for admission to practice before the Court also includes a certification that the applicant has read and will abide by the Civility Principles.

D.      Joint Standing Committee

A Joint Standing Committee shall be selected/designated by the Chief Judge and will consist of two judicial officers, one representative of the FBA, one representataive of the State Bar of Michigan, and at least two other members as designated by the Chief

Administrative Order
in re: Civility Principles                                        Page 2

Judge.        The Joint Standing Committee will meet as needed to consider civility issues
and further measures to promote civility and collegiality between attorneys and judicial
officers.

FOR THE COURT:

Bernard A. Friedman
Chief Judge

Attachments

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

CIVILITY PRINCIPLES

Preamble

An attorney's conduct should be characterized at all times by personal courtesy and professional integrity in the fullest sense of those terms.  In fulfilling our duty to represent a client vigorously as attorneys, we will be mindful of our obligations to the administration of justice, which is a truth-seeking process designed to resolve human and societal problems in a rational, peaceful and efficient manner.

A judge's conduct should be characterized at all times by courtesy and patience toward all participants.  As judges we owe all participants in a legal proceeding respect, diligence, punctuality and protection against unjust and improper criticism or attack.

Conduct that may be characterized as uncivil, abrasive, abusive, hostile or obstructive impedes the fundamental goal of resolving disputes rationally, peacefully and efficiently.  Such conduct tends to delay, and often deny, justice.

The following standards are designed to encourage us, judges and attorneys, to meet our obligations to each other, to litigants and to the system of justice, and thereby achieve the twin goals of civility and professionalism, both of which are hallmarks of a learned profession dedicated to public service.

We expect judges and attorneys will make a mutual and firm commitment to these standards.  Voluntary adherence is expected as part of a commitment by all participants to improve the administration of justice throughout the Eastern District.

These standards shall not be used alone as a basis for litigation, sanctions or penalties.  However, nothing in these standards supersedes or detracts from existing disciplinary codes or alters existing standards of conduct against which attorney negligence or misconduct may be determined.

These standards should be reviewed and followed by all judges and attorneys participating in any proceeding in the Eastern District.  Copies may be made available to clients to reinforce our obligation to maintain and foster these standards.

Approved February 5, 1996

United States District Court                                  Civility Principles
Eastern District of Michigan                                         Page 2

## Attorneys' Responsibilities to Other Counsel

1) We will practice our profession with a continuing awareness that our role is to advance the legitimate interest of our clients. In our dealings with others, we will not reflect the ill feelings of our clients. We will treat all other counsel, parties and witnesses in a civil and courteous manner, not only in court, but also in all other written and oral communications.

2) We will not, even when called upon by a client to do so, abuse or indulge in offensive conduct directed to other counsel, parties or witnesses. We will abstain from disparaging personal remarks or acrimony toward other counsel, parties, or witnesses. We will treat adverse witnesses and parties with fair consideration.

3) We will not encourage or knowingly authorize any person under our control to engage in conduct that would be improper if we were to engage in such conduct.

4) We will not, absent good cause, attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety.

5) We will not seek court sanctions without first conducting a reasonable investigation and unless fully justified by the circumstances and necessary to protect our client's lawful interests.

6) We will adhere to all express promises and agreements with other counsel, whether oral or in writing, and will adhere in good faith to all agreements implied by the circumstances or local customs.

7) When we reach an oral understanding on a proposed agreement or stipulation and decide to commit it to writing, the drafter will endeavor in good faith to state the oral understanding accurately and completely. The drafter will provide other counsel the opportunity to review the writing. As drafts are exchanged between or among counsel, changes from prior drafts will be identified in the draft or otherwise explicitly brought to the attention of other counsel. We will not include in a draft matters to which there has been no agreement without explicitly advising other counsel in writing of the addition.

8) We will endeavor to confer early with other counsel to assess settlement possibilities. We will not falsely hold out the possibility of settlement as a means to adjourn discovery or to delay trial.

9) In civil actions, we will stipulate to relevant matters if they are undisputed and if no good-faith advocacy basis exists for not stipulating.

Approved February 5, 1996

United States District Court                                    Civility Principles
Eastern District of Michigan                                              Page 3

10)     We will not use any form of discovery or discovery scheduling as a means of harassment.

11)     We will make good faith efforts to resolve by agreement our objections to matters contained in pleadings, discovery requests and objections.

12)     We will not time the filing or service of motions or pleadings in any way that unfairly limits another party's opportunity to respond.

13)     We will not request an extension of time solely for the purpose of unjustified delay or to obtain tactical advantage.

14)     We will consult other counsel regarding scheduling matters in a good-faith effort to avoid scheduling conflicts.

15)     We will endeavor to accommodate previously-scheduled dates for hearings, depositions, meetings, conferences, vacations, seminars or other functions that produce good-faith calendar conflicts on the part of other counsel. If we have been given an accommodation because of a calendar conflict, we will notify those who have accommodated us as soon as the conflict has been removed.

16)     We will notify other counsel and, if appropriate, the Court or other persons, at the earliest possible time when hearings, depositions, meetings or conferences are to be canceled or postponed. Early notice avoids unnecessary travel and expense of counsel and may enable the Court to use the previously-reserved time for other matters.

17)     We will agree to reasonable requests for extensions of time and for waiver of procedural formalities, recognizing that it is the attorney, and not the client, who has the sole discretion to determine the accommodations to be granted opposing counsel in all matters not materially or adversely affecting the client's legitimate rights. We will affirm that in such matters no client has a right to demand that his or her counsel shall be illiberal or that we do anything therein repugnant to our own sense of honor and propriety.

18)     We will not cause any default or dismissal to be entered without first notifying opposing counsel, when we know his or her identity.

19)     We will take depositions only when actually needed to ascertain facts or information or to perpetuate testimony. We will not take depositions for the purposes of harassment or to increase litigation expenses.

20)     We will not engage in any conduct during a deposition that would not be

Approved February 5, 1996

United States District Court                                    Civility Principles
Eastern District of Michigan                                              Page 4

appropriate in the presence of a judge.

21)   We will not obstruct questioning during a deposition or object to deposition questions unless appropriate under the applicable rules.

22)   During depositions, we will ask only those questions we reasonably believe are necessary for the prosecution or defense of an action.

23)   We will carefully craft document production requests and/or interrogatories so they are limited to those documents we reasonably believe are necessary for the prosecution or defense of an action.  We will not design production requests to place an undue burden or expense on a party.

24)   We will respond to document requests and interrogatories reasonably and not strain to interpret the requests or interrogatories in an artificially restrictive manner to avoid disclosure of relevant and non-privileged documents and information fairly within the scope of the requests or interrogatories.  We will not produce documents or answer interrogatories in a manner designed to hide or obscure the existence of particular documents or information.

25)   We will base our discovery objections on a good-faith belief in their merit and will not object solely for the purpose of withholding or delaying the disclosure of relevant information.

26)   When a draft order is to be prepared by counsel to reflect a court ruling, we will draft an order that accurately and completely reflects the Court's ruling.  We will promptly prepare and submit a proposed order to other counsel and attempt to reconcile any differences before the draft order is presented to the Court.

27)   We will not ascribe a position to another counsel that counsel has not taken or otherwise seek to create an unjustified inference based on counsel's statements or conduct.

28)   Unless specifically permitted or invited by the Court, or unless otherwise necessary, we will not send copies of correspondence between counsel to the Court.

### Attorneys' Responsibilities to the Court

1)   We will speak and write civilly and respectfully in all communications with the Court.

2)   We will be punctual and prepared for all Court appearances so that all hearings, conferences and trials may commence on time; if delayed, we will notify the Court and counsel, if possible.

Approved February 5, 1996

United States District Court                                    Civility Principles
Eastern District of Michigan                                             Page 5

3) We will be considerate of the time constraints and pressures on the Court and Court staff inherent in their efforts to administer justice.

4) We will not engage in conduct that brings disorder or disruption to the courtroom. We will advise our clients and witnesses appearing in Court of the proper conduct expected and required there and, to the best of our ability, prevent our clients and witnesses from creating disorder or disruption.

5) We will not knowingly misrepresent, mischaracterize, misquote, or miscite facts or authorities in any oral or written communication.

6) We will not send letters to the Court (whether addressed to the Court or copies of letters to opposing counsel) that contain argument or criticize counsel in connection with a pending action, unless invited or permitted by the Court or as appropriate exhibits to Court filings, in which event a copy shall be provided to opposing counsel in such a manner as to insure delivery to opposing counsel on that same day that it is delivered to the Court.

7) Before dates for hearings or trials are set, or if that is not feasible, immediately after such date has been set, we will attempt to verify the availability of necessary participants and witnesses so we can promptly notify the Court of any likely problems.

8) We will act and speak civilly to marshals, clerks, court reporters, secretaries and law clerks with an awareness that they, too, are an integral part of the judicial system.

<u>Court's Responsibilities to Attorneys</u>

1) We will endeavor to be courteous, respectful and civil to attorneys, parties and witnesses. We will maintain control of the proceedings, recognizing that judges have both the obligation and the authority to insure that all litigation proceedings are conducted in a civil manner.

2) We will not employ hostile, demeaning or humiliating words in opinions or in written or oral communications with attorneys, parties or witnesses.

3) We will be punctual in convening hearings, meetings and conferences; if delayed, we will notify counsel, if possible.

4) The Court, recognizing the existence of family and business obligations of parties, witnesses and attorneys, will attempt, in scheduling all hearings, meetings and conferences, to be considerate of time schedules of attorneys, parties and

Approved February 5, 1996

United States District Court                                          Civility Principles
Eastern District of Michigan                                                    Page 6

witnesses.

5)      We will make reasonable efforts to decide promptly matters presented to us for
        decision.

6)      While endeavoring to resolve disputes efficiently, we will be considerate of the time
        constraints and pressures imposed on attorneys.

7)      We recognize that an attorney has a right and a duty to present a cause fully and
        properly, and that a litigant has a right to fair and impartial consideration.

8)      We will not impugn the integrity or professionalism of any attorney on the basis of
        the clients whom, or the causes which, an attorney represents.

9)      We will do our best to insure that Court personnel act civilly toward attorneys,
        parties and witnesses.

10)     We will not adopt procedures that needlessly increase litigation expense.

11)     We will bring to an attorney's attention uncivil conduct which we observe.

### Judges' Responsibilities to Each Other

1)      We will be courteous, respectful and civil in opinions, ever mindful that a position
        articulated by another judge is the result of that judge's earnest effort to interpret
        the law and the facts correctly.

2)      In all written and oral communications, we will abstain from disparaging personal
        remarks or criticisms, or sarcastic or demeaning comments about another judge.

3)      We will endeavor to work with other judges in an effort to foster a spirit of
        cooperation in our mutual goal of enhancing the administration of justice.

Approved February 5, 1996

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

## **Lawyer's Commitment of Professional Civility**

A lawyer shall conduct him/herself in accordance with the standards of
professional integrity and personal courtesy set forth in the Civility Principles of
the United States District Court for the Eastern District of Michigan.

A lawyer shall honor and respect the Constitution of the United States, the judicial
system, the legal profession and will strive to uphold the dignity of each.

A lawyer shall be guided by a fundamental sense of integrity,
candor and fair play.

A lawyer shall abstain from disrespectful, disruptive and/or abusive behavior, and
will at all times act with dignity, decency and courtesy.

A lawyer shall seek to resolve and not prolong legal disputes, without lessening
your obligations to client interests.

A lawyer shall respect the time and commitments of others and will be diligent
and punctual in communicating with others and fulfilling in your own
responsibilities.

A lawyer shall exercise independent judgment and will not be guided by ill will,
deceit or avarice.

As a lawyer you shall further your profession's dedication
to public service.

A lawyer shall strive to do honor to the search for truth and justice.

As a lawyer your word is your bond.

Incorporated into Civility Principles - December 3, 2007



**Rule: 1.5  Fees**

(a) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee. A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. The factors to be considered in determining the reasonableness of a fee include the following:

    (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

    (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

    (3) the fee customarily charged in the locality for similar legal services;

    (4) the amount involved and the results obtained;

    (5) the time limitations imposed by the client or by the circumstances;

    (6) the nature and length of the professional relationship with the client;

    (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

    (8) whether the fee is fixed or contingent.

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or by other law. A contingent-fee agreement shall be in writing and shall state the method by which the fee is to be determined. Upon conclusion of a contingent-fee matter, the lawyer shall provide the client with a written statement of the outcome of the matter and, if there is a recovery, show the remittance to the client and the method of its determination. See also MCR 8.121 for additional requirements applicable to some contingent-fee agreements.

(d) A lawyer shall not enter into an arrangement for, charge, or collect a contingent fee in a domestic relations matter or in a criminal matter.

(e) A division of a fee between lawyers who are not in the same firm may be made only if:

    (1) the client is advised of and does not object to the participation of all the lawyers involved; and

    (2) the total fee is reasonable.

*Comment:*

*BASIS OR RATE OF FEE*

When the lawyer has regularly represented a client, they ordinarily will have evolved an understanding concerning the basis or rate of the fee. In a new client-lawyer relationship, however, an understanding as to the fee should be promptly

determining a lawyer's fee, for example, in representation of an executor or administrator, of a class, or of a person entitled to a reasonable fee as part of the measure of damages. The lawyer entitled to such a fee and a lawyer representing another party concerned with the fee should comply with the prescribed procedure.

## Rule: 1.6  Confidentiality of Information

(a) "Confidence" refers to information protected by the client-lawyer privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

(b) Except when permitted under paragraph (c), a lawyer shall not knowingly:

(1) reveal a confidence or secret of a client;

(2) use a confidence or secret of a client to the disadvantage of the client; or

(3) use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

(c) A lawyer may reveal:

(1) confidences or secrets with the consent of the client or clients affected, but only after full disclosure to them;

(2) confidences or secrets when permitted or required by these rules, or when required by law or by court order;

(3) confidences and secrets to the extent reasonably necessary to rectify the consequences of a client's illegal or fraudulent act in the furtherance of which the lawyer's services have been used;

(4) the intention of a client to commit a crime and the information necessary to prevent the crime; and

(5) confidences or secrets necessary to establish or collect a fee, or to defend the lawyer or the lawyer's employees or associates against an accusation of wrongful conduct.

(d) A lawyer shall exercise reasonable care to prevent employees, associates, and others whose services are utilized by the lawyer from disclosing or using confidences or secrets of a client, except that a lawyer may reveal the information allowed by paragraph (c) through an employee.

*Comment:* The lawyer is part of a judicial system charged with upholding the law. One of the lawyer's functions is to advise clients so that they avoid any violation of the law in the proper exercise of their rights.

The observance of the ethical obligation of a lawyer to hold inviolate confidential information of the client not only facilitates the full development of facts essential to proper representation of the client, but also encourages people to seek early legal assistance.

Almost without exception, clients come to lawyers in order to determine what their rights are and what is, in the maze of laws and regulations, deemed to be legal and

benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

### Rule: 3.3  Candor Toward the Tribunal

(a) A lawyer shall not knowingly:

> (1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

> (2) fail to disclose to a tribunal controlling legal authority in the jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

> (3) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal

(b) If a lawyer knows that the lawyer's client or other person intends to engage, is engaging, or has engaged in criminal or fraudulent conduct related to an adjudicative proceeding involving the client, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts that are known to the lawyer and that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

(e) When false evidence is offered, a conflict may arise between the lawyer's duty to keep the client's revelations confidential and the duty of candor to the court. Upon ascertaining that material evidence is false, the lawyer should seek to persuade the client that the evidence should not be offered or, if it has been offered, that its false character should immediately be disclosed. If the persuasion is ineffective, the lawyer must take reasonable remedial measures. The advocate should seek to withdraw if that will remedy the situation. If withdrawal from the representation is not permitted or will not remedy the effect of the false evidence, the lawyer must make such disclosure to the tribunal as is reasonably necessary to remedy the situation, even if doing so requires the lawyer to reveal information that otherwise would be protected by Rule 1.6.

*Comment:* This rule governs the conduct of a lawyer who is representing a client in a tribunal. It also applies when the lawyer is representing a client in an ancillary proceeding conducted pursuant to the tribunal's adjudicative authority, such as a deposition. Thus, subrule (a) requires a lawyer to take reasonable remedial measures if the lawyer comes to know that a client who is testifying in a deposition has offered evidence that is false.

As officers of the court, lawyers have special duties to avoid conduct that undermines the integrity of the adjudicative process. A lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client is qualified, however, by the advocate's duty of candor to the tribunal. . Consequently, although a lawyer in an adversary proceeding is not required to present an impartial exposition of the law or to vouch for the evidence submitted in a cause, the lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false.

REPRESENTATIONS BY A LAWYER

An advocate is responsible for pleadings and other documents prepared for litigation, but is usually not required to have personal knowledge of matters asserted therein, because litigation documents ordinarily present assertions by the client or by someone on the client's behalf and not assertions by the lawyer. Compare Rule 3.1. However, an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation. The obligation prescribed in Rule 1.2(c) not to counsel a client to commit or assist the client in committing a fraud applies in litigation. Regarding compliance with Rule 1.2(c), see the comment to that rule. See also the comment to Rule 8.4(b).

LEGAL ARGUMENT

Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose directly controlling adverse authority that has not been disclosed by the opposing party. The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case.

OFFERING EVIDENCE

Paragraph (a)(3) requires that a lawyer refuse to offer evidence that the lawyer knows to be false, regardless of the client's wishes. This duty is premised on the lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence. A lawyer does not violate this rule if the lawyer offers the evidence for the purpose of establishing its falsity.

If a lawyer knows that the client intends to testify falsely or wants the lawyer to introduce false evidence, the lawyer should seek to persuade the client that the evidence should not be offered. If the persuasion is ineffective and the lawyer continues to represent the client, the lawyer must refuse to offer the false evidence. If only a portion of a witness' testimony will be false, the lawyer may call the witness to testify but may not elicit or otherwise permit the witness to present the testimony that the lawyer knows is false. A lawyer's knowledge that evidence is false can be inferred from the circumstances. Thus, although a lawyer should

for the represented party has the correlative duty to make disclosures of material facts that are known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision.

WITHDRAWAL.

Normally, a lawyer's compliance with the duty of candor imposed by this rule does not require that the lawyer withdraw from the representation of a client whose interests will be or have been adversely affected by the lawyer's disclosure.  The lawyer may, however, be required by Rule 1.16(a) to seek permission of the tribunal to withdraw if the lawyer's compliance with this rule's duty of candor results in such an extreme deterioration of the client-lawyer relationship that the lawyer can no longer competently represent the client.  Also see Rule 1.16(b) for the circumstances in which a lawyer will be permitted to seek a tribunal's permission to withdraw.  In connection with a request for permission to withdraw that is premised on a client's misconduct, a lawyer may reveal information relating to the representation only to the extent reasonably necessary to comply with this rule or as otherwise permitted by Rule 1.6.

## Rule: 3.4  Fairness to Opposing Party and Counsel

A lawyer shall not:

(a) unlawfully obstruct another party's access to evidence; unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value; or counsel or assist another person to do any such act;

(b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;

(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;

(d) in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent efforts to comply with a legally proper discovery request by an opposing party;

(e) during trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused; or

(f) request a person other than a client to refrain from voluntarily giving relevant information to another party, unless:

(1) the person is an employee or other agent of a client for purposes of MRE 801(d)(2)(D); and

(2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.

the juror not to talk with the lawyer.  The lawyer may not engage in improper conduct during the communication.

The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from undignified or discourteous conduct is a corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge, but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.

### Rule: 3.6  Trial Publicity

(a) A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter  A statement is likely to have a substantial likelihood of materially prejudicing an adjudicative proceeding when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration, and the statement relates to:

(1) the character, credibility, reputation, or criminal record of a party, of a suspect in a criminal investigation or of a witness, or the identity of a witness, or the expected testimony of a party or witness;

(2) in a criminal case or proceeding that could result in incarceration, the possibility of a plea of guilty to the offense or the existence or contents of any confession, admission, or statement given by a defendant or suspect, or that person's refusal or failure to make a statement;

(3) the performance or results of any examination or test, or the refusal or failure of a person to submit to an examination or test, or the identity or nature of physical evidence expected to be presented;

(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration;

(5) information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial; or

(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.


(b) Notwithstanding paragraph (a), a lawyer who is participating or has participated in the investigation or litigation of a matter may state without elaboration:

(1) the nature of the claim, offense, or defense involved;

(2) information contained in a public record;

reasonable and appropriate steps to assure that the defendant's rights are protected.

### Rule: 3.9  Advocate in Nonadjudicative Proceedings

A lawyer representing a client before a legislative or administrative tribunal in a nonadjudicative proceeding shall disclose that the appearance is in a representative capacity and shall conform to the provisions of Rules 3.3(a) through (c), 3.4(a) through (c), and 3.5.

*Comment:* In representation before bodies such as legislatures, municipal councils, and executive and administrative agencies acting in a rule-making or policy-making capacity, lawyers present facts, formulate issues, and advance argument in the matters under consideration. The decision-making body, like a court, should be able to rely on the integrity of the submissions made to it. A lawyer appearing before such a body should deal with the tribunal honestly and in conformity with applicable rules of procedure.

Lawyers have no exclusive right to appear before nonadjudicative bodies, as they do before a court. The requirements of this rule therefore may subject lawyers to regulations inapplicable to advocates who are not lawyers. However, legislatures and administrative agencies have a right to expect lawyers to deal with them as they deal with courts.

This rule does not apply to representation of a client in a negotiation or other bilateral transaction with a governmental agency; representation in such a transaction is governed by Rules 4.1 through 4.4.

## Rules 4.1 - 4.4 Transactions With Persons Other Than Clients

### Rule: 4.1  Truthfulness in Statements to Others

In the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person.

*Comment:*

*MISREPRESENTATION*

A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false.

*STATEMENTS OF FACT*

This rule refers to statements of fact. Whether a particular statement should be regarded as one of fact can depend on the circumstances. Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of material fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud.

*FRAUD BY CLIENT*

Making a false statement may include the failure to make a statement in circumstances in which silence is equivalent to making such a statement. Thus, where the lawyer has made a statement that the lawyer believed to be true when made but later discovers that the statement was not true, in some circumstances failure to correct the statement may be equivalent to making a statement that is false. When the falsity of the original statement by the lawyer resulted from reliance upon what was told to the lawyer by the client and if the original statement if left uncorrected may further a criminal or fraudulent act by the client, the provisions of Rule 1.6(c)(3) give the lawyer discretion to make the disclosure necessary to rectify the consequences.

## Rule: 4.2  Communication With a Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party whom the lawyer knows to be represented in the matter by another lawyer, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

*Comment:* This rule does not prohibit communication with a party, or an employee or agent of a party, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party, or between two organizations, does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter. Also, parties to a matter may communicate directly with each other and a lawyer having independent justification for communicating with the other party is permitted to do so. Communications authorized by law include, for example, the right of a party to a controversy with a government agency to speak with government officials about the matter.

In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by separate counsel, the consent by that counsel to a communication will be sufficient for purposes of this rule. Compare Rule 3.4(f).

This rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.

## Rule: 4.3  Dealing With an Unrepresented Person

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

A lawyer representing an applicant for admission to the bar, or representing a lawyer who is the subject of a disciplinary inquiry or proceeding, is governed by the rules applicable to the client-lawyer relationship.

## Rule: 8.2  Judicial and Legal Officials

(a) A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal officer, or of a candidate for election or appointment to judicial or legal office.

(b) A lawyer who is a candidate for judicial office shall comply with the applicable provisions of the Code of Judicial Conduct as provided under Canon 5.

*Comment:* Assessments by lawyers are relied on in evaluating the professional or personal fitness of persons being considered for election or appointment to judicial office and to public legal offices, such as attorney general, prosecuting attorney and public defender. Expressing honest and candid opinions on such matters contributes to improving the administration of justice. Conversely, false statements by a lawyer can unfairly undermine public confidence in the administration of justice.

To maintain the fair and independent administration of justice, lawyers are encouraged to continue traditional efforts to defend judges and courts unjustly criticized.

## Rule: 8.3  Reporting Professional Misconduct

(a) A lawyer having knowledge that another lawyer has committed a significant violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer shall inform the Attorney Grievance Commission.

(b) A lawyer having knowledge that a judge has committed a significant violation of the Code of Judicial Conduct that raises a substantial question as to the judge's honesty, trustworthiness, or fitness for office shall inform the Judicial Tenure Commission.

(c) This rule does not require disclosure of:

    (1) information otherwise protected by Rule 1.6; or

    (2) information gained by a lawyer while serving as an employee or volunteer of the substance abuse counseling program of the State Bar of Michigan, to the extent the information would be protected under Rule 1.6 from disclosure if it were a communication between lawyer and client.

*Comment:* Self-regulation of the legal profession requires that members of the profession initiate disciplinary investigation when they know of a violation of the Rules of Professional Conduct. Lawyers have a similar obligation with respect to judicial misconduct. An apparently isolated violation may indicate a pattern of misconduct that only a disciplinary investigation can uncover. Reporting a violation is especially important where the victim is unlikely to discover the offense.

A report about misconduct is not required where it would involve violation of Rule 1.6. However, a lawyer should encourage a client to consent to disclosure where prosecution would not substantially prejudice the client's interests. Because confidentiality is essential to encourage lawyers and judges to seek treatment, information received in the course of providing counseling services in the State Bar's lawyers and judges assistance program is exempt from the reporting requirement to the extent it would be protected under Rule 1.6 if it were a communication between lawyer and client.

If a lawyer were obliged to report every violation of the rules, the failure to report any violation would itself be a professional offense. Such a requirement existed in many jurisdictions but proved to be unenforceable. This rule limits the reporting obligation to those offenses that a self-regulating profession must vigorously endeavor to prevent. A measure of judgment is, therefore, required in complying with the provisions of this rule. The term "substantial" refers to the seriousness of the possible offense and not the quantum of evidence of which the lawyer is aware.

The duty to report professional misconduct does not apply to a lawyer retained to represent a lawyer whose professional conduct is in question. Such a situation is governed by the rules applicable to the client-lawyer relationship.

### Rule: 8.4  Misconduct

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer;

(c) engage in conduct that is prejudicial to the administration of justice;

(d) state or imply an ability to influence improperly a government agency or official; or

(e) knowingly assist a judge or judicial officer in conduct that is a violation of the Code of Judicial Conduct or other law.

*Comment:* Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of wilful failure to file an income tax return. However, some kinds of offenses carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

A lawyer may refuse to comply with an obligation imposed by law upon a good-faith belief that no valid obligation exists. The provisions of Rule 1.2(c) concerning a good-faith challenge to the validity, scope, meaning, or application of the law apply to challenges of legal regulation of the practice of law. See also Rule 3.4(c).

Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of attorney. The same is true of abuse of positions of private trust such as trustee, executor, administrator, guardian, agent, and such as officer, director, or manager of a corporation or other organization.

### Rule: 8.5  Disciplinary Authority; Choice of Law

(a) Disciplinary Authority.  A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless where the lawyer's conduct occurs.  A lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the lawyer provides or offers to provide any legal services in this jurisdiction.  A lawyer may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction for the same conduct.

(b) Choice of Law.  In any exercise of the disciplinary authority of this jurisdiction, the rules of professional conduct to be applied shall be as follows:

(1) for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise; and

(2) for any other conduct, the rules of the jurisdiction in which the conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct; a lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction in which the lawyer reasonably believes the predominant effect of the lawyer's conduct will occur.


*Comment:*

DISCIPLINARY AUTHORITY.

It is longstanding law that the conduct of a lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction. Extension of the disciplinary authority of this jurisdiction to other lawyers who provide or offer to provide legal services in this jurisdiction is for the protection of the citizens of this jurisdiction.  Reciprocal enforcement of a jurisdiction's disciplinary findings and sanctions will further advance the purposes of this rule.  The fact that a lawyer is subject to the disciplinary authority of this jurisdiction may be a factor in determining whether personal jurisdiction may be asserted over the lawyer in civil matters.

CHOICE OF LAW.