# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

THE SHANE GROUP, INC. *ET AL.*,

    Plaintiffs, on behalf of themselves and all others similarly situated,

             vs.

BLUE CROSS BLUE SHIELD OF MICHIGAN,

    Defendant.

Civil Action No. 2:10-cv-14360-DPH-MKM

Judge Denise Page Hood
Magistrate Judge Mona K. Majzoub

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND RELATED RELIEF

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  PROCEDURAL HISTORY .............................................................................. 3
     A.   Proceedings Prior to Settlement ............................................................. 3
     B.   Settlement Negotiations .......................................................................... 7
     C.   Settlement Agreement ............................................................................. 8
     D.   First Settlement Approval Process .......................................................... 9
     E.   Appeal ................................................................................................... 10
     F.   Post-Remand Unsealing ........................................................................ 11
     G.   Amended Settlement Agreement .......................................................... 12

III. LEGAL STANDARD ..................................................................................... 12

IV.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ........................... 13
     A.   The Settlement Is Within the Range of Possible Approval ................... 14
     B.   The Settlement Does Not Disclose Grounds to Doubt Its Fairness or
          Obvious Deficiencies ............................................................................ 20

V.   THE CLASS NOTICES AND THE NOTICE PLAN SHOULD BE APPROVED ........ 22

VI.  THIS COURT SHOULD PRELIMINARILY APPROVE THE PLAN OF
     ALLOCATION AND APPROVE THE CLAIM FORM ................................................. 23

VII. CONCLUSION ................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Art Materials Antitrust Litig.*,
  100 F.R.D. 367 (N.D. Ohio 1983) ..................................................................15

*In re Black Farmers Discrimination Litig.*,
  953 F. Supp. 2d 82 (D.D.C. 2013) ..................................................................21

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)..........................................................................................15

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979)..............................................................................................18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)..........................................................................................18

*Cason-Merenda v. Detroit Med. Ctr.*,
  No. 06-cv-15601 ...............................................................................................18

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) .........................................................................17

*In re CRT Antitrust Litig.*,
  No. 07-cv-5944, 2016 WL 3648478 (N.D. Cal. July 7, 2016), *appeal filed sub
  nom. Indirect Purchaser Plaintiffs v. Toshiba Corp.*, No. 16-cv-16427 (9th
  Cir. Aug. 12, 2016) ...........................................................................................14

*Dallas v. Alcatel-Lucent USA, Inc.*,
  No. 09-cv-14596, 2013 WL 2197624 (E.D. Mich. May 20, 2013) ..................13

*Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*,
  3 F.3d 1568 (D.C. Cir. 1993) ...........................................................................21

*Frank v. Eastman Kodak Co.*,
  228 F.R.D. 174 (W.D.N.Y. 2005)......................................................................17

*In re Heritage Bond Litig.*,
  No. 02-md-1475, 2005 WL 1594403 (N.D. Cal. June 10, 2005) ......................23

*In re High-Tech Emp. Antitrust Litig.*,
  No. 11-cv-2509, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015)........................14

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Ford Motor Co.*,
No. 07-cv-14845, 2009 WL 3757040 (E.D. Mich. Nov. 9, 2009)...........................................22

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*,
497 F.3d 615 (6th Cir. 2007) .............................................................................................12, 22

*In re Inter-Op Hip Prosthesis Liab. Litig.*,
204 F.R.D. 330 (N.D. Ohio 2001) ...........................................................................................13

*IUE-CWA v. Gen. Motors Corp.*,
238 F.R.D. 583 (E.D. Mich. 2006) .....................................................................................17, 19

*Kimble v. Marvel Entm't., LLC*,
135 S.Ct. 2401 (2015) ...............................................................................................................17

*Kinder v. Meredith Corp.*,
No. 14-cr-11284, 2016 WL 454441 (E.D. Mich. Feb. 5, 2016) ...............................................12

*In re Linerboard Antitrust Litig.*,
No. MDL 1261, 2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) ..................................14

*In re Linerboard Antitrust Litig.*,
No. MDL 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ...................................................17

*Laguna v. Coverall N. Am., Inc.*
753 F.3d 918 (9th Cir. 2014), *vac'd as moot*, 772 F.3d 608.....................................................21

*Leegin Creative Leather Prods v. PSKS, Inc.*,
551 U.S. 877 (2007)...................................................................................................................17

*Lonardo v. Travelers Indem. Co.*,
706 F. Supp. 2d 766 (N.D. Ohio 2010)..............................................................................14, 23

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ......................................................................................................6

*Ohio Pub. Interest Campaign v. Fisher Foods, Inc.*,
546 F. Supp. 1 (N.D. Ohio 1982)..............................................................................................15

*Olden v. Gardner*,
294 F. App'x 210 (6th Cir. 2008) (unpub. op.)..........................................................................18

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2nd Cir. 1997)....................................23

*In re Polyurethane Foam Antitrust Litig.*,
    168 F. Supp. 3d at 1009 ........................................................................23

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................15

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ...................................................23

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ..................................................................5

*Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*,
    825 F.3d 299 (6th Cir. 2016) ..................................................................1

*Smith v. Ajax Magnethermic Corp.*,
    No. 02-cv-980, 2007 WL 3355080 (N.D. Ohio Nov. 7, 2007).............13

*Spine & Sports Chiropractic, Inc. v. ZirMed, Inc.*,
    No. 13-cv-00489, 2015 WL 1976398 (W.D. Ky. May 4, 2015) .......2, 13

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
    No. 03-cv-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005).............14

*Sullivan v. DB Inv., Inc.*,
    667 F.3d 273 (3d Cir. 2011)..................................................................15

*Sullivan v. DB Inv., Inc.*,
    No. 04-cv-2819, 2008 WL 8717721 (D.N.J. May 22, 2008), *aff'd*, 667 F.3d
    273..........................................................................................................15

*Taft v. Ackermans*,
    No. 02-cv-7951, 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) ..............24

*United States v. Blue Cross Blue Shield of Mich.*,
    No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010), Dkt. No. 1 .....................3,

*In re Urethane Antitrust Litig.*,
    No. 04-md-1616, 2016 WL 4060156 (D. Kan. July 29, 2016)....14, 20, 23

*In re Vitamin C Antitrust Litig.*,
    --- F.3d ----, 2016 WL 5017312 (2d Cir. Sept. 20, 2016).....................17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).....................................................................21

*In re Wellbutrin XL Antitrust Litig.*,
    No. 08-2431, 2011 WL 3563385 (E.D. Pa. Aug. 11, 2011), *appeal filed*, No.
    15-cv-3682 (3d Cir. Nov. 19, 2015) .............................................................................5

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ...........................................................................19, 20

**RULES**

Federal Rule of Civil Procedure 23(e) .............................................................1, 2, 22

**OTHER AUTHORITIES**

7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice
    and Procedure § 1797.6 (3d ed.2005) .................................................................22

## I.    INTRODUCTION

On June 26, 2014, this Court preliminarily approved a settlement resolving three-and-a-half years of contentious litigation between Plaintiffs and Blue Cross Blue Shield of Michigan ("BCBSM"). After considering lengthy objections from a small group of objectors and conducting an extensive fairness hearing, the Court denied the objections and approved the settlement in full on March 31, 2015.

The Court of Appeals for the Sixth Circuit vacated approval and remanded because of the inadequacy of the parties' filings to support the sealing of certain documents. The Sixth Circuit held that objectors' lack of access to sealed pleadings prevented their meaningful participation in the Rule 23(e) objection process. *Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 309 (6th Cir. 2016). To inform proceedings on remand, the Sixth Circuit also discussed certain "omissions" in the settlement approval process. *Id.* at 309-11.

Guided by the Sixth Circuit's opinion, the parties have contacted 70 third parties to ensure that they have no objections to the public filing of previously sealed documents. Plaintiffs anticipate that by the end of this week, a substantial portion of the sealed record will be publicly filed by consent of the producing parties, and that before notice of the Settlement is disseminated, much or all of the remainder will be unsealed by consent or Court order. Meanwhile, the parties revised their original settlement agreement slightly to address the Sixth Circuit's opinion, the need to re-notice the Settlement Class, and Aetna's separate settlement. Now the parties are

ready to begin the Rule 23(e) process "anew," as directed by the Sixth Circuit.

Nothing has changed that would warrant the Court reversing its conclusion two years ago that the settlement is a fair, reasonable, and adequate resolution of Plaintiffs' claims. Significantly, the Sixth Circuit did not criticize the settlement. Rather, it addressed collateral issues such as sealing, attorneys' fees, incentive awards, the claims process, and the amount of analysis in this Court's final approval order. Thus, it remains true today that the settlement, entered into after full fact discovery on merits and class certification and nearly complete briefing and expert discovery on class certification, provides an excellent recovery in light of the possible damages and the challenges and years that stand between the class and a final litigated judgment.

Moreover, the question presently before the Court is *preliminary* approval, not final approval. If the Court grants preliminary approval, any objectors will have an opportunity to present any issues they see in briefing and at a fairness hearing for the Court's consideration before final approval. At this stage, the Court need only "make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of certification, proposed settlement, and date of the final fairness hearing." *Spine & Sports Chiropractic, Inc. v. ZirMed, Inc.*, No. 13-cv-00489, 2015 WL 1976398, at *1 (W.D. Ky. May 4, 2015) (quoting Manual for Complex Litigation § 21.632 (4th ed. 2004)). Given that the Court has already considered hundreds of pages of objections, as well as the material sealed from the public record, and found this settlement adequate, there should be no

real question that the settlement at least warrants *preliminary* approval.

Accordingly, Plaintiffs respectfully request that the Court enter an order substantially in the form of Exhibit H to the Amended Settlement Agreement.[1]

## II.    PROCEDURAL HISTORY

### A.    Proceedings Prior to Settlement

1.    *Proceedings Prior to Legislative Change Mooting Injunctive Relief*

In October 2010, the Department of Justice ("DOJ") and the State of Michigan ("State") filed a complaint alleging that BCBSM had market power in the market for "the sale of commercial health insurance" in 17 geographic markets in Michigan and inserted Most Favored Nation ("MFN") provisions in its contracts with at least 70 Michigan hospitals, resulting in anticompetitive effects in those specific markets. Compl. ¶¶ 28, 33, 86, *United States v. Blue Cross Blue Shield of Mich.*, No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010) ("Gov't Case"), Dkt. No. 1. The Government Case did not seek damages or certification of a class.

That same month, the first class action lawsuit related to BCBSM's MFNs was filed. *See* Dkt. No. 1. Unlike the Government Case, this complaint (and all successive class action complaints) sought overcharge damages on purchases of hospital healthcare services and certification of a class of direct purchasers. The Consolidated

---

[1] Because no objector opposed certification of the Settlement Class, and the Sixth Circuit voiced no concern with class certification, Plaintiffs rely on their prior arguments in again requesting certification of the same Settlement Class and appointment of the eight named plaintiffs and their counsel. *See* Dkt. No. 148 at 12-20. If the Court desires further briefing on this issue, Plaintiffs will provide it.

Amended Complaint ("CAC") alleged that the MFN provisions were intended to entrench Blue Cross's dominant position in Michigan by raising its rivals' costs of providing health insurance—specifically their hospital healthcare costs. CAC, Dkt. No. 78 ¶ 4. The MFN scheme did not just raise Blue Cross's rivals' hospital costs. The inflated hospital prices paid by the rivals were also paid by individual insureds and self-insured entities who, along with the rivals, constitute the Settlement Class. The CAC did not attempt to quantify the amount of these overcharges.[2]

Thereafter, Plaintiffs participated in extensive fact discovery in coordination with the Government Case and a competitor suit brought by Aetna. This discovery comprised millions of pages of documents, 169 depositions, and years of hospital payment data. *See* Pls.' Unopposed Mot. for Preliminary Approval of Sett., Cert. of Sett. Class, & Related Relief ("First PA Mot."), June 23, 2014, Dkt. No. 148, at 4. While discovery was ongoing, the State legislature banned any payors' use of MFNs in contracts with health care providers, leading the DOJ and the State to stay and then dismiss their case. *See* Gov't Case, Dkt. No. 240, 245, 246. At that time, class-related fact discovery was incomplete, expert discovery had not begun, summary judgment

---

[2] In their appellate brief, the Varnum Group claimed for the first time that the CAC estimated damages at more than 13 billion dollars. Brief of Appellants, No. 15-1551 (6th Cir. July 10, 2015), Dkt. No. 20, at 3, 8. Although the Sixth Circuit repeated this description of the complaint in passing, *Shane*, 825 F.3d at 303, it is incorrect. The objectors misunderstood an allegation regarding the penalty that a subset of hospitals would face for refusing to agree to the MFN provision. *See* Am. Compl., Dkt. No. 72 ¶ 5. This penalty clause has no connection to any calculation of overcharges.

had not been briefed, and the case had not been tried. *See* Gov't Case, Dkt. No. 120.

2.  *Plaintiffs' Expert Report and Class Certification Briefing*

Plaintiffs continued to litigate after the DOJ and the State dismissed their case, proceeding with discovery, expert analysis, and class certification briefing. Plaintiffs worked closely with Ph.D. economist Jeffrey J. Leitzinger—an industrial relations expert with decades of antitrust experience, whose work has been found reliable by numerous courts—to develop and implement a damages model. *See, e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008) (affirming finding that Dr. Leitzinger's testimony was reliable); *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2011 WL 3563385, at *2 n.1 (E.D. Pa. Aug. 11, 2011), *appeal filed*, No. 15-cv-3682 (3d Cir. Nov. 19, 2015) (describing Dr. Leitzinger as "highly qualified"). Dr. Leitzinger performed a sophisticated econometric analysis to determine whether common economic evidence could show damages for contracts where reimbursement rates changed to comply with an MFN or MFN-Plus provision or where Blue Cross accepted higher reimbursement rates in exchange for an MFN provision. See Report of Jeffrey Leitzinger ("Leitzinger Report"), Oct. 21, 2013, Dkt. No. 133-1, ¶¶ 45-74.[3]

Dr. Leitzinger's analysis—together with fact discovery, particularly documents and deposition testimony about how the MFN agreements did or did not affect

---

[3] Dr. Leitzinger's report was previously filed under seal. Although the parties are working to address third parties' confidentiality designations and will file an unredacted or minimally redacted version as soon as possible, the report cannot yet be publicly filed. Plaintiffs will post it on the settlement website as soon as possible.

reimbursement rates—revealed that, despite their pre-discovery hopes, Plaintiffs could not prove damages for every provider agreement at every MFN hospital. Rather, it became clear that damages could only be measured for 23 hospital/insurer pairs (the "Affected Combinations" in Dr. Leitzinger's parlance).[4] For each such pair, Dr. Leitzinger found that "economic evidence shows that MFN agreements led to higher payments for hospital services" *Id.* Table 1 & ¶ 11.

Dr. Leitzinger's analysis proceeded as follows. For each Affected Combination he examined how reimbursement rates changed after the MFN went into effect. *Id.* at ¶¶ 47-50 & Dkt. No. 133 Ex. 6 He then compared each non-BCBSM insurer's new, post-MFN reimbursement rates to BCBSM's reimbursement rates to see whether the new rates increased to comply with the MFN. *Id.*

Dr. Leitzinger then used a difference-in-differences regression analysis[5] to compare the change in actual reimbursement rates at affected hospitals with the

---

[4] The Affected Combinations excluded hospital/insurer pairs where reimbursement rates did not change after an MFN was imposed, or did not change enough to substantially comply; pairs where the rival's reimbursement rates increased substantially more than required by the MFN, suggesting that the MFN did not cause the increase; pairs where there was no support in the discovery record that the MFN was considered in the negotiation of the reimbursement rate; pairs where there was no support in the discovery record that BCBSM accepted a higher reimbursement rate in exchange for the MFN provision; pairs where the regression model showed de minimis damages; and pairs where the reimbursement methodology was too individualized to permit class-wide analysis.

[5] Difference-in-differences analysis is a common form of econometric analysis that has repeatedly been approved for use in class actions. *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 810 (7th Cir. 2012); Leitzinger Report ¶¶ 51-53.

change in actual reimbursement rates paid by the same insurers at similar hospitals in Michigan under contracts without an MFN provision. *Id.* ¶¶ 51-57. In his regression, he included variables to control for differences among hospitals such as complexity of care, costs, insurers' billed amounts, and location. *Id.* ¶ 55. His regression used terabytes of data from BCBSM, Priority, HAP, and Aetna that covered over 60 million claims spanning seven years of medical treatment throughout Michigan—one of the largest datasets ever assembled in a health care antitrust case. His regression results showed higher reimbursement rates at the Affected Combinations after accounting for the experience of the control group and the other variables in the model. *Id.* ¶ 57. He analyzed each insurer's reimbursement methodology to determine whether all or virtually all purchasers from the Affected Combinations would feel the effects of elevated reimbursement rates. *Id.* ¶¶ 58-74.  Based on his difference-in-differences regression analysis, Dr. Leitzinger estimated overcharges at the Affected Combinations at a total of $118 million. *Id.* ¶¶ 75-76.

After Plaintiffs filed their class certification brief and expert report, BCBSM opposed certification on numerous grounds, filed its own expert report, and moved to exclude Dr. Leitzinger's opinions. Both experts were deposed. *See* First PA Mot. at 5.

## B.    Settlement Negotiations

While Plaintiffs were drafting their reply brief in support of their motion for class certification, the parties reached a settlement in principle. As outlined in the October 24, 2014 Declaration of Daniel A. Small ("Small Decl."), settlement

discussions had occurred intermittently for over a year, with BCBSM refusing even to make an offer for nearly a year and then making a "nuisance value" offer that was unworthy of consideration. *See* Small Decl., Dkt. No. 169-3 ¶¶ 6–8. At all times, the parties negotiated aggressively and at arm's length. *Id.* ¶ 12.

### C.   Settlement Agreement

The Settlement created a common fund of $29,990,000 for the benefit of the Settlement Class. This represented more than 25% of the overcharges Dr. Leitzinger estimated. The Settlement did not guarantee attorneys' fees or incentive awards and was not conditioned on any award to either Class Counsel or named Plaintiffs; rather, it provided only that Plaintiffs would petition the Court.[6] Class Action Settlement Agreement ("Orig. Settlement"), June 23, 2014, Dkt. No. 148-1, at ¶ 71.

The Settlement included a Plan of Allocation that reflected Class Counsel's and Dr. Leitzinger's best estimate of the relative likelihood that purchasers of a given hospital's services would be able to show measurable damages at trial. *See* First PA Mot. at 23-25. Class members who made purchases subject to the 23 provider agreements for which Dr. Leitzinger measured damages would receive the largest proportion of the recovery. *Id.* at 22-23. Class members who made purchases under agreements subject to an MFN clause, but where the evidence did not show

---

[6] In the original settlement, BCBSM agreed not to oppose Plaintiffs' fee application, up to a certain percentage. Because the Sixth Circuit questioned this provision, Plaintiffs did not seek it in the Amended Settlement Agreement.

measurable damages, would receive a smaller share. *Id.* at 23. And class members who made purchases from hospitals not subject to an MFN clause received the smallest share of damages, to reflect the de minimis possibility that they could prove damages. *Id.* If awards in the third category would be too small to justify distribution as an administrative matter, the amounts that would have gone to those class members would be distributed to the health care charity Free Clinics of Michigan. *Id.* at 24.

### D.     First Settlement Approval Process

The Court certified the Settlement Class, approved the Notice Plan and the Claim Forms, and preliminarily approved the Settlement, including the Plan of Allocation, on June 26, 2014. Dkt. No. 151. After extensive notice, 43,550 individuals and 566 insurers and self-insured entities filed claims, including some of the largest employers and insurers in Michigan. Approximately 1500 class members requested exclusion[7] and four objections were filed with the Court, one of which was subsequently withdrawn. Pls.' Mot. for Final Approval of Sett. & Plan of Allocation ("First FA Mot."), Oct. 24, 2014, Dkt. No. 169, at 27. A month after filing their objection, the Varnum Group filed their motion to intervene for purpose of accessing certain sealed documents to inform their objection. Dkt. No. 166. Plaintiffs and BCBSM opposed the motion to intervene, as did 29 third-party hospitals and other

---

[7] Some corporate families filed separate requests for exclusion for each subsidiary. For example, Aetna, which had had its own suit pending against BCBSM for two years, filed 179 requests for exclusion. First FA Mot. at 19.

organizations. Dkt. Nos. 181, 183, 185, 186, 189, 192.

The Court held a fairness hearing on November 12, 2014, at which objectors appeared and argued at length. In a 49-page opinion issued on March 31, 2015, the Court considered and rejected the written and in-court objections and the motion to intervene. Dkt. No. 213. The Court applied the Sixth Circuit's seven-factor test for determining whether a settlement is fair, reasonable, and adequate, concluding that every factor weighed in favor of approving the Settlement. *Id.*

### E. Appeal

The three objectors who had not withdrawn their objections appealed the Court's order approving the Settlement. The Sixth Circuit declined to hear oral argument from two of the objectors, but did request oral argument from the Varnum Group. Notice, No. 15-1544 (6th Cir. Nov. 5, 2015), Dkt. No. 32.

After hearing argument, the Sixth Circuit concluded that "every document that was sealed in the district court was sealed improperly" because the parties failed to provide the necessary justification. *Shane*, 825 F.3d at 307. The Sixth Circuit was unable to "say in any realistic sense that the [sealing] error was harmless" to the approval process. *Id.* at 308. To "participate meaningfully in the process contemplated by Federal Rule of Civil Procedure 23(e)," the court held, class members needed the ability to "review the bases of the proposed settlement and the other documents in the court record." *Id.* at 309. Because they could not do so, the court vacated approval. *Id.*

The panel also offered some comments on certain "omission[s]" "[t]o guide the proceedings on remand." *Id.* The most significant omission was that the March 31 opinion needed to "specifically examine what the unnamed class members would give up in the proposed settlement, and then explain why—given their likelihood of success on the merits—the tradeoff embodied in the settlement is fair to unnamed members of the class." *Id.* The panel did not suggest that this Court's analysis was incorrect, only that it needed to be explained in more detail.

The panel also noted three "lesser" omissions. *Id.* First, it noted that the March 31 opinion did not "explain why" the Court found Class Counsel's rates and hours reasonable, and did not consider any "backup" of Class Counsel's total lodestar figures. *Id.* at 310.[8] Second, it noted that the incentive awards sought for the named plaintiffs were not supported by "specific documentation . . . of the time actually spent on the case by each recipient of an award." *Id.* at 311. Third, it noted that the March 31 opinion did not specifically address the Varnum Group's objection "that the claims process is unduly burdensome." *Id.* The panel did not hold that any of these "omissions" required that the Court change the rulings in its March 31 opinion.

## F.    Post-Remand Unsealing

After remand, the parties identified for 70 third parties each sealed document

---

[8] The Sixth Circuit opinion did not acknowledge the Declaration of Andrew McGuinness, which Class Counsel submitted in support of their fee request. Dkt. No. 170-1. The McGuinness Declaration extensively analyzed the reasonableness of Class Counsel's hourly rates.

that implicated that third party's confidential information. To date, 26 third parties have agreed that their information may be unsealed and three, plus BCBSM, have indicated their intention to seek to seal portions of their documents. Two more are currently engaged in a meet-and-confer process and four had no documents presently under seal, while the remainder have not responded.

### G.    Amended Settlement Agreement

After remand, the parties negotiated a few revisions to their original settlement agreement. The most significant changes are the deletion of the "clear sailing" provision on attorneys' fees, Orig. Settlement ¶ 71; Blue Cross's agreement, subject to Court approval, to pay another installment of the Settlement Amount promptly after Preliminary Approval to cover the estimated cost of the second round of class notice; and an additional exclusion from the Settlement Class to address Aetna's separate settlement. See Ex. 1 ("Amended Settlement Agreement") ¶¶ 30, 35.[9]

## III.   LEGAL STANDARD

"There is a strong 'federal policy favoring settlement of class actions.'" *Kinder v. Meredith Corp.*, No. 14-cr-11284, 2016 WL 454441, at *2 (E.D. Mich. Feb. 5, 2016) (quoting *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007)). At the preliminary approval stage, a district court's responsibility is to "make a preliminary determination on the fairness,

---

[9] This exclusion applies to any person or entity who released BCBSM from liability for any or all claims arising out of or related to the MFNs that were at issue in this action." Am. Settlement Agreement ¶ 35.

reasonableness, and adequacy of the settlement terms and . . . direct the preparation of notice of certification, proposed settlement, and date of the final fairness hearing." *Spine & Sports*, 2015 WL 1976398, at *1 (quoting Manual for Complex Litigation § 21.632 (4th ed. 2004)). Approval should be granted if the settlement (i) "appears to fall within the range of possible approval," and (ii) "does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment to class representatives or of segments of the class, or excessive compensation for attorneys." *Dallas v. Alcatel-Lucent USA, Inc.*, No. 09-cv-14596, 2013 WL 2197624, at *8 (E.D. Mich. May 20, 2013) (quoting *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350 (N.D. Ohio 2001)). At this stage, the Court's task is "not to intrude upon the private settlement negotiations of the parties any more than is necessary to determine that the agreement is not the result of fraud or collusion, and that it is fair and adequate in light of the potential outcome and costs of litigation." *Spine & Sports*, 2015 WL 1976398 at *2 (quoting *Smith v. Ajax Magnethermic Corp.*, No. 02-cv-980, 2007 WL 3355080, at *5 (N.D. Ohio Nov. 7, 2007)).

## IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

As the Court previously determined, this settlement meets the standard for preliminary approval. It recovers approximately $30 million on behalf of the Settlement Class, a substantial sum of money in light of the potential damages and the real risks faced by Plaintiffs on class certification, at summary judgment, in proving their case to the satisfaction of a jury, and given the inevitable delay and expense in

obtaining a recovery through trial and appeal. The settlement presents no "obvious deficiencies" or any "grounds to doubt its fairness." *Dallas*, 2013 WL 2197624, at *8. It guarantees no compensation to Class Counsel or the class representatives, placing the amount of their compensation in the discretion of this Court. It easily meets all of the factors for preliminary approval.

### A. The Settlement Is Within the Range of Possible Approval

The Amended Settlement Agreement recovers more than 25% of the overcharges that Dr. Leitzinger estimated had been paid by members of the proposed litigation class.[10] This is an excellent recovery that compares favorably to many other class action antitrust settlements. *See, e.g., In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-2509, 2015 WL 5158730, at *4 & n.5 (N.D. Cal. Sept. 2, 2015) (approving settlement recovering 14% of single damages a month before trial; citing cases recovering between 1 and 5%); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005) (recovery of 11.4%

---

[10] The Settlement Class includes purchases from a broader time period and broader set of Michigan hospitals than Plaintiffs sought to include in the litigation class. It is not unusual to settle a class action for a broader class given the defendant's desire for total peace. *See, e.g., Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 772 n.5 (N.D. Ohio 2010); *In re Urethane Antitrust Litig.*, No. 04-md-1616, 2016 WL 4060156, at *2 (D. Kan. July 29, 2016) ("A reasonable defendant . . . would naturally desire to obtain a release from all class members, whether or not some of those members still have viable claims . . . ."); *In re CRT Antitrust Litig.*, No. 07-cv-5944, 2016 WL 3648478, at *14 (N.D. Cal. July 7, 2016), *appeal filed sub nom. Indirect Purchaser Plaintiffs v. Toshiba Corp.*, No. 16-cv-16427 (9th Cir. Aug. 12, 2016) ("That Defendants insisted on a global release does not change this analysis, since defendants typically insist on a global release in *every* case.").

of damages "compares favorably with the settlements reached in other complex class action lawsuits"); *In re Linerboard Antitrust Litig.,* No. MDL 1261, 2004 U.S. Dist. LEXIS 10532, at *15 (E.D. Pa. June 2, 2004) (collecting cases in which courts have approved settlements of 5.35% to 28% of estimated damages in complex antitrust actions.[11]

Although Plaintiffs had every incentive to prove as high damages as possible, Plaintiffs and their economic expert determined that damages could be reliably and manageably measured only for purchasers covered by 23 provider agreements (out of hundreds of provider agreements with MFN hospitals) at 13 hospitals (out of 70

---

[11] In dicta, the Sixth Circuit noted that the portion of the settlement remaining after deducting attorneys' fees, expenses, and incentive awards was 4% of treble damages, and requested that the Court explain why this recovery is fair. The panel did not suggest that it was reversing the uniform practice of assessing a settlement's adequacy on the basis of the total amount of the settlement fund, including any portion awarded for fees and expenses. *See, e.g., Sullivan v. DB Inv., Inc.,* No. 04-cv-2819, 2008 WL 8717721, at *22 (D.N.J. May 22, 2008), *aff'd,* 667 F.3d 273 ("[O]bjectors improperly compare the settlement amount to treble damages and subtract both expenses and attorneys' fees."). This rule is necessary for a fair assessment of any settlement, as the provision of legal services is part of the benefit received by class members. *See, e.g., Boeing Co. v. Van Gemert,* 444 U.S. 472, 477 (1980).

Similarly, the panel did not purport to reverse the well-established rule that "courts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value." *Rodriguez v. W. Publ'g Corp.,* 563 F.3d 948, 964 (9th Cir. 2009); *see also, e.g., Sullivan v. DB Inv., Inc.,* 667 F.3d 273, 324-25 (3d Cir. 2011) (collecting cases); *In re Art Materials Antitrust Litig.,* 100 F.R.D. 367 (N.D. Ohio 1983); *Ohio Pub. Interest Campaign v. Fisher Foods, Inc.,* 546 F. Supp. 1, 9 (N.D. Ohio 1982). This is especially true for a case that settled well before trial, when treble damages relief (if it would ever be obtained) was a distant glimmer. In any event, if this settlement were to be assessed against treble damages rather than single damages, then so would every previous antitrust settlement—and by simple arithmetic, it compares just as favorably from that perspective.

MFN hospitals), and measured their total damages at $118 million. Even if a jury were to fully accept Dr. Leitzinger's testimony—and Plaintiffs' liability case—much of the Settlement Class would receive nothing at trial. And, of course, BCBSM would present its own expert at trial, who assuredly would tell the jury that there are no damages. This conflicting and complex damages testimony created significant risk that the Class would recover nothing or substantially less than $118 million at trial.

Of course, these damages issues would only arise if Plaintiffs proved the other elements of their claim: the relevant product and geographic markets, BCBSM's market power in them, and the anticompetitive effects of the MFNs in them. Each of these liability issues would be the subject of complex testimony by dueling experts. BCBSM argued strenuously that the challenged MFNs are procompetitive, that they did not cause reimbursement rates to increase, and that any increases in reimbursement rates were too small to affect competition among sellers of health insurance. The uncertainty of how a jury would resolve these complex issues injects further risk into the case, even if Plaintiffs firmly believe their expert is right.

Furthermore, these liability and damages issues implicate dozens of contracts between numerous hospitals and providers in Michigan and two different markets (one for commercial health insurance and one for hospital services), each with scores of relevant participants. The sheer number of contracts and market participants creates significant potential for jury confusion and fatigue, which rarely works in Plaintiffs' favor.

Even if this Court and a jury found that BCBSM's practices were illegal and caused significant damages, Plaintiffs would still face a substantial risk of reversal by a Sixth Circuit panel or the Supreme Court. The history of antitrust litigation is littered with cases that won substantial verdicts at trial only to be reversed on appeal.[12] Even a victory on completely settled law would not guarantee maintaining success through appeal, because the Supreme Court "has viewed *stare decisis* as having less-than-usual force in cases involving the Sherman Act." *Kimble v. Marvel Entm't., LLC*, 135 S.Ct. 2401, 2412 (2015). It is impossible to overstate "the uncertainties of law and fact . . . and the concomitant risks and costs necessarily inherent in taking [this] litigation to completion." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 594 (E.D. Mich. 2006) (quoting *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005)).

Courts widely recognize that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) (internal quotation marks omitted). As even the Varnum Group recognizes, "[t]here is no question that antitrust litigation of this size and scope is a complex and expensive process that can take several years to resolve." Varnum Obj., Dkt. No. 161, at 17. And this case presents an unusually high

---

[12] *See, e.g., Leegin Creative Leather Prods v. PSKS, Inc.*, 551 U.S. 877 (2007) (reversing century-old precedent to vacate favorable jury verdict); *In re Vitamin C Antitrust Litig.*, --- F.3d ----, 2016 WL 5017312 (2d Cir. Sept. 20, 2016) (reversing $147 million jury verdict); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) (reversing $44 million jury verdict).

degree of complexity, even for an antitrust class action.

On top of this complexity and associated risk is the inescapable delay in recovery were the litigation to continue. Consider the most recent antitrust class action to approach trial in this district, *Cason-Merenda v. Detroit Med. Ctr.*, No. 06-cv-15601. *Cason-Merenda* was filed in 2006 and settled a month before trial in 2015—nearly 10 years after filing. Countless antitrust cases have taken a decade or more to complete, whether successful or unsuccessful.[13]

Not only were the risks in this case unusually high, so was the parties' knowledge of them at the time of settlement. Plaintiffs and the Court had far more information about the amount of damages and the likelihood that various portions of the Settlement Class could prove any damages than exists for many settlements. Many class action settlements have been approved before discovery had even taken place, let alone expert analysis. *See, e.g., Olden v. Gardner*, 294 F. App'x 210, 218 (6th Cir. 2008) (unpub. op.) (affirming final approval even though "class counsel negotiated the settlement agreement without first obtaining any expert opinions or engaging in formal discovery"). Here, by contrast, Plaintiffs completed extensive discovery and commissioned a detailed analysis by a reputed economist using comprehensive data and a well-accepted methodology.

---

[13] *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) (ten years, including two trials, a remand for a third trial, and Supreme Court reversal); *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) (ten years, ending when the Supreme Court changed the law and reversed Plaintiffs' victory below).

As already explained, this case involved millions of pages of documents and multiple terabytes of data, 169 depositions, and months and millions of dollars of expert analysis. Even the Varnum Group concedes that "Plaintiffs engaged in a very significant amount of discovery in this case." Varnum Obj. at 18. Because "the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered," *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983), the "very significant amount of discovery in this case," Varnum Obj. at 18, counsels a "very significant amount" of deference.

Moreover, in deciding whether a proposed settlement warrants approval, "[t]he judgment of the parties' counsel that the settlement is in the best interest of the settling parties is entitled to significant weight." *IUE-CWA*, 238 F.R.D. at 597. Class Counsel include some of the most experienced and respected firms in the antitrust and class action bar, who have a record of zealously advocating for their clients, astutely judging the prospects of a given case, and obtaining the best possible recovery. They have shown no hesitation in litigating cases through trial where they believe it to be in the class's best interest.[14] Their considered judgment after

---

[14] For example, Class Counsel Cohen Milstein Sellers & Toll recently concluded *In re Urethane Antitrust Litigation*, a case where the DOJ had dropped its investigation—yet Cohen Milstein litigated the case for more than a decade, ultimately winning the largest antitrust class action verdict in U.S. history. Commenting on the ten years of litigation over and the six-week trial over which he presided, the trial judge wrote: "In almost 25 years of service on the bench, this Court has not experienced a more remarkable result. . . . [P]laintiffs' attorneys . . . had great experience and superior

voluminous discovery, expert analysis, and extensive motions practice that the Settlement is the Class's best course of action is entitled to considerable deference. *See Williams*, 720 F.2d at 922-23 ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of [their] proofs.").

## B. The Settlement Does Not Disclose Grounds to Doubt Its Fairness or Obvious Deficiencies

Courts "presum[e] that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands" absent "evidence of improper incentives." *UAW*, 497 F.3d at 628. The history of this hard-fought litigation and the settlement negotiations bear out the presumption here. This Court had ample opportunity to observe the intensely adversarial nature of this litigation during the nearly four years the parties were before the Court prior to settlement. BCBSM fought the class action at every turn, and Class Counsel fought back vigorously. The drawn-out settlement negotiations similarly demonstrate the arm's-length, adversarial nature of the parties' relations. *See* Small Decl.

The terms of the Settlement themselves refute the idea that this Settlement was the product of fraud or collusion. The Settlement guarantees *nothing at all* to Class Counsel or any of the named Plaintiffs; all awards are placed in the sole discretion of the District Court. *See* Am. Settlement Agreement ¶ 71. Indeed, Class Counsel had every incentive to obtain (and have vigorously pursued) as large a settlement as

national reputations, [and] demonstrated great skill throughout." *In re Urethane*, 2016 WL 4060156, at *5.

possible for the Settlement Class, because a larger common fund would likely mean a larger award to Class Counsel. Class Counsel's interests are thus fully aligned with the Settlement Class's interests, and there is no reason to fear self-dealing, let alone fraud or collusion.[15] The terms of the settlement lack any of the hallmarks of a potentially collusive deal such as "*a promise* of excessive attorney fees," *UAW*, 497 F.3d at 628 (emphasis added), or an agreement to pay attorneys' fees separate from class funds or return unclaimed amounts of a settlement fund to defendant. *See, e.g.*, *Laguna v. Coverall N. Am., Inc.* 753 F.3d 918, 924-25 (9th Cir. 2014), *vac'd as moot*, 772 F.3d 608.

Similarly, the Settlement does not provide for any guarantee to the class representatives, leaving incentive awards entirely up to the Court's discretion. Moreover, following the Sixth Circuit's guidance, Plaintiffs will demonstrate the efforts expended by the class representatives, and other supporting grounds, when they apply for incentive awards.

Finally, as already noted, Class Counsel are highly competent antitrust class action experts, whose record of zealous and successful representation belies any claim that they would sell out their clients for a quick deal. Class Counsel's wealth of

---

[15] *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (percentage method "directly aligns the interests of the class and its counsel") (internal quotation marks omitted); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 88 (D.D.C. 2013) ("This percentage-of-the-fund approach 'helps to align more closely the interests of the attorneys with the interests of the parties . . . .'") (quoting *Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993)).

experience shows both their aptitude at assessing antitrust cases' value and their commitment to vigorously advancing their clients' interests. In this case in particular, Class Counsel's commitment cannot be seriously questioned. They invested $3.5 million of their money and over $15 million of their time, despite facing substantial risks and a formidable opponent.

## V.   THE CLASS NOTICES AND THE NOTICE PLAN SHOULD BE APPROVED

"This court has 'virtually complete discretion' in determining what constitutes reasonable notice of a class settlement under Rule 23(e), in form as well as method." *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Ford Motor Co.*, No. 07-cv-14845, 2009 WL 3757040, at *15 (E.D. Mich. Nov. 9, 2009) (quoting 7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1797.6 (3d ed.2005)). In furtherance of the Sixth Circuit's opinion, Plaintiffs drafted the notice to inform Class members, among other things, that the previously sealed information is publicly available, and will be posted on the settlement website.[16]

Notably, this supplemental notice will come entirely at Class Counsel's expense. Class Counsel will lower their attorney fee request by an amount equal to the cost of notice. This effectively adds a $1.2 million benefit to the Settlement Fund, as class

---

[16] Plaintiffs request that notice not issue until after any sealing motions are resolved, so that all previously sealed information (except any documents that the Court finds should remain sealed after proper motions) will be available when Class members first receive notice.

members will pay nothing for this additional notice.[17] And, as discussed in the Declaration of Shannon R. Wheatman, the notice "represents the best notice practicable under the circumstances." Ex. 2 at ¶ 10.

Accordingly, Plaintiffs request approval of the attached forms of class notice.

## VI. THIS COURT SHOULD PRELIMINARILY APPROVE THE PLAN OF ALLOCATION AND APPROVE THE CLAIM FORM

The Plan of Allocation is essentially unchanged from the original settlement,[18] and should be approved for the same reasons the Court found it adequate in the first place. Dkt. No. 213 at 33-34; First FA Mot. at 24-26. As previously explained, it allocates the largest portion of the settlement fund to Class members with the strongest claims, allocating progressively smaller amounts as the likelihood of proving damages diminishes. This method has been repeatedly been approved by courts.[19]

---

[17] *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d at 1009 (considering administrative expenses as part of settlement fund); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 803 (N.D. Ohio 2010) (including "Notice and Administration Costs" as part of the "Total Class Benefit").

[18] A small change has been made to remove a conflict between the minimum recovery and percentage caps for Category 1 and Category 2 claimants. This was resolved in favor of ensuring that each Category 1 and Category 2 claimant gets at least the minimum recovery.

[19] *See, e.g.*, *See, e.g.*, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill. 2011) ("[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed.") (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2nd Cir. 1997)); *In re Heritage Bond Litig.*, No. 02-md-1475, 2005 WL 1594403, at *11 (N.D. Cal. June 10, 2005) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.

Plaintiffs also propose that the Court use a substantially similar claim form as previously used for insurers and self-insured entities, attached to the Amended Settlement Agreement as Exhibits E-2. Plaintiffs propose a modified claim form for individuals, attached to the Amended Settlement Agreement as Exhibit E-1. The revised form would give individuals an additional choice. Like before, they can provide the actual amount they paid for each hospital visit. Or, at their election, they can accept a "default" payment amount per hospital visit.[20] The default payment amount—one for outpatient visits ($50) and one for inpatient visits ($414)—is set at the median amount of individuals' hospital payments, as reflected in the claims paid data produced in this case by HAP, Priority and Aetna.[21] This alternative permits

---

It is also reasonable to allocate more of the settlement to class members with stronger claims on the merits.") (internal quotation marks omitted); *cf. In re Urethane*, 2016 WL 4060156, at *3 (approving settlement that allocated *no* recovery to some purchases); *Taft v. Ackermans*, No. 02-cv-7951, 2007 WL 414493, at *9 (S.D.N.Y. Jan. 31, 2007) ("If the plan of allocation is formulated by competent and experienced class counsel, an allocation plan need only have a reasonable, rational basis.") (internal quotation marks omitted).

[20] Individuals who submitted claims for the original settlement will be credited with the default amount if the actual amount claimed is less.

[21] Note that claimants who opt for the default will have these amounts of payments credited to them in calculating their pro rata share of the Settlement. These are not the amounts that they will recover from the Settlement. BCBSM data could not be used in the calculation of the median amounts because such data were not broken out by inpatient and outpatient services, but the median payment by individuals for all hospital services (inpatient and outpatient) was similar with and without BCBSM's data included. The default option is not offered to insurers and self-insured entities because their hospital payments are much larger, and they keep or have access to their payments in electronic databases, which are readily queried to provide their purchase information

24

individuals who choose it to avoid the need to find records of their hospital visits. They only need to identify the hospital, year, insurer, and inpatient/outpatient status, which they very likely can do from memory. The convenience justifies accepting some imprecision, which would be minor given the small size generally of individuals' claims, and which would likely average out across claimants.

The Court previously considered and rejected the objectors' concerns with the claims forms, and nothing has changed to make them less appropriate. Most of the previous objections were based on misstatements or misunderstandings, as previously briefed at length. Contrary to what objectors have argued, the claims process requires only that institutional class members submit *some* record (such as excerpts from a claims database) to show their claims—which they must use anyway to determine the amount of their qualifying purchases. Individual claims are now even easier; individual class members need only state their purchases to the best of their ability, subject to verification if the settlement administrator observes reasons for concern, or simply accept the default amount. This strikes an appropriate balance between concerns for fraud and concerns for ease of claims.

## VII. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed preliminary approval order attached to the Amended Settlement Agreement as Exhibit H.

Dated: October 11, 2016                    Respectfully submitted,

                                           /s/ Daniel A. Small
                                           Daniel A. Small
                                           Brent W. Johnson
                                           **COHEN MILSTEIN SELLERS**
                                               **& TOLL PLLC**
                                           1100 New York Avenue, NW, Suite 500
                                           Washington, DC 20005
                                           Telephone: (202) 408-4600
                                           dsmall@cohenmilstein.com
                                           bjohnson@cohenmilstein.com

                                           Daniel E. Gustafson
                                           Daniel C. Hedlund
                                           Daniel J. Nordin
                                           **GUSTAFSON GLUEK PLLC**
                                           Canadian Pacific Plaza
                                           120 South Sixth Street, Suite 2600
                                           Minneapolis, MN 55402
                                           Telephone: (612) 333-8844
                                           dgustafson@gustafsongluek.com
                                           dhedlund@gustafsongluek.com
                                           dnordin@gustafsongluek.com

                                           E. Powell Miller
                                           **THE MILLER LAW FIRM, P.C.**
                                           950 West University Drive, Suite 300
                                           Rochester, Michigan  48307
                                           Telephone: (248) 841-2200
                                           epm@millerlawpc.com

                                           Fred T. Isquith
                                           **WOLF HALDENSTEIN ADLER**
                                               **FREEMAN & HERZ LLC**
                                           270 Madison Avenue
                                           New York, New York, 10016
                                           Telephone: (212) 545-4690
                                           isquith@whafh.com

Theodore B. Bell
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Telephone: (312) 984-0000
tbell@whafh.com

*Interim Class Counsel*

David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Rd, Suite 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com

*Interim Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2016, I electronically filed the *Plaintiffs' Motion for Preliminary Approval of Settlement, Certification of Settlement Class, and Related Relief* with the Clerk of the Court using ECF, who in turn sent notice to all counsel of record. Pursuant to the Court's August 25, 2016 Order, the Gustafson Firm is serving a copy on Christopher Andrews.

Dated: October 11, 2016          /s/ Daniel A. Small
                                      Daniel A. Small