## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THE SHANE GROUP, INC. ET AL.,<br><br>    Plaintiffs, on behalf of themselves and all others similarly situated<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>    Defendant. | Civil Action No. 2:10-cv-14360-DPH-MKM<br><br>Judge Denise Page Hood<br>Magistrate Judge Mona K. Majzoub<br><br>**FILED UNDER SEAL** |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

Plaintiff Michigan Regional Council of Carpenters Employee Benefits Fund, and proposed plaintiffs Patrice Noah and Susan Baynard, by their undersigned counsel, submit this Motion for Class Certification and Appointment of Class Counsel.  In support of this motion, Plaintiffs rely upon the authorities and arguments set forth in the incorporated memorandum.  Defendant does not consent to the relief sought.

Dated: October 21, 2013                         Respectfully submitted,


                                                /s/ Daniel A. Small_____
Daniel E. Gustafson                             Daniel A. Small
Daniel C. Hedlund                               Brent W. Johnson
Daniel J. Nordin                                Meghan M. Boone
**GUSTAFSON GLUEK PLLC**                         **COHEN MILSTEIN SELLERS**
Canadian Pacific Plaza                          **& TOLL PLLC**
120 South Sixth Street, Suite 2600              1100 New York Ave., NW, Suite 500
Minneapolis, MN 55402                           Washington, DC 20005
Telephone:  (612) 333-8844                      Telephone: (202) 408-4600
dgustafson@gustafsongluek.com                   dsmall@cohenmilstein.com
dhedlund@gustafsongluek.com                     bjohnson@cohenmilstein.com
dnordin@gustafsongluek.com                      mboone@cohenmilstein.com


Fred Isquith                                    E. Powell Miller (P39487)
Theodore B. Bell (P47987)                       **THE MILLER LAW FIRM, P.C.**
**WOLF HALDENSTEIN ADLER**                       950 West University Drive, Suite 300
**FREEMAN & HERZ LLC**                           Rochester, Michigan  48307
55 West Monroe Street, Suite 1111               Telephone: (248) 841-2200
Chicago, Illinois  60603                        epm@millerlawpc.com
Tel: (312) 984-0000
isquith@whafh.com
tbell@whafh.com


*Interim Co-Lead Counsel for the Proposed Class*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THE SHANE GROUP, INC. ET AL., <br><br>     Plaintiffs, on behalf of themselves and all others similarly situated <br><br> vs. <br><br> BLUE CROSS BLUE SHIELD OF MICHIGAN, <br><br>     Defendant. | Civil Action No. 2:10-cv-14360-DPH-MKM <br><br><br> Judge Denise Page Hood <br> Magistrate Judge Mona K. Majzoub <br><br> **FILED UNDER SEAL** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

## STATEMENT OF ISSUES PRESENTED

1.  Should the Court certify the proposed class under Federal Rule of Civil Procedure 23 and appoint co-lead counsel for the proposed class?

    Plaintiffs' Answer: Yes.

## <u>CONTROLLING OR APPROPRIATE</u><br><u>AUTHORITY FOR RELIEF SOUGHT</u>

Fed. R. Civ. P. 23

*Amchem Prods., Inc. v. Windsor*
> 521 U.S. 591 (1997)

*Amgen, Inc. v. Conn. Retirement Plans and Trust Funds*
> 133 S. Ct. 1184 (2013)

*In re Cardizem CD Antitrust Litig.*
> 200 F.R.D. 326 (E.D. Mich. 2001)

*In re Foundry Resins Antitrust Litig.*
> 242 F.R.D. 393 (S.D. Ohio 2007)

*In re Scrap Metal Antitrust Litig.*
> 527 F.3d 517 (6th Cir. 2008)

*Messner v. Northshore Univ. HealthSystem*
> 669 F.3d 802 (7th Cir. 2012)

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 6

I.      BCBSM is the Dominant Seller in the Michigan Commercial Health Insurance
        Market ........................................................................................................... 6

II.     BCBSM's Competitive Advantage Over Other Insurers in Discounts at Hospitals
        Began to Erode in the Mid-2000s .............................................................. 8

III.    Blue Cross Used Its Market Power to Impose Equal-To MFN and MFN-Plus
        Agreements in its Hospital Contracts Despite Hospitals' Resistance.............. 10

IV.     BCBSM Frequently Traded Higher Reimbursement Costs for Itself and its
        Insureds and Self-Insureds to Obtain MFNs that Protected BCBSM from
        Competition.................................................................................................. 13

V.      BCBSM Harmed Its Own Insureds and Self-Insureds as They Paid More for
        Hospital Services So BCBSM Could Avoid Competition through MFNs ...................... 15

VI.     BCBSM's MFNs Harmed Other Insurers and their Insureds and Self-Insureds by
        Forcing Them to Pay Higher Prices for Hospital Services ................................ 17

ARGUMENT ........................................................................................................... 23

I.      The Court Should Certify the Proposed Class of Purchasers of Hospital
        Healthcare Services........................................................................................ 23
        A.      The Proposed Class Meets the Standards of the Supreme Court and the
                Sixth Circuit ........................................................................................ 23
        B.      Antitrust Claims Are Well-Suited for Class Treatment ........................................ 25
        C.      The Class Satisfies the Requirements of Federal Rule of Civil Procedure
                23(a) .................................................................................................... 26
                i.      The Class Easily Meets the Numerosity Requirement ............................. 26
                ii.     The Existence and Effects of Blue Cross's MFN Clauses Create
                        Factual and Legal Questions Common to the Class ................................. 26
                iii.    As Purchasers of Hospital Services, Plaintiffs' Claims are Typical
                        of the Claims of the Class ....................................................................... 28
                iv.     Named Plaintiffs Will Fairly and Adequately Protect the Interests
                        of the Class............................................................................................. 30

i

D.      The Class Satisfies the Requirements of Federal Rule of Civil Procedure
        23(b)(3) ............................................................................................................. 32

        i.      Common Questions of Proof Predominate Over Individual Ones............ 32

        ii.     Class Action Treatment is Superior to Other Methods of
                Adjudication............................................................................................ 48

CONCLUSION.................................................................................................................... 50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna v. Blue Cross Blue Shield of Mich.*,
    No. 11-cv-15346 ...................................................................................................9

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
    276 F.R.D. 364 (C.D. Cal. 2011) ......................................................................26

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) ......................................................................28, 32

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................................ *passim*

*Amgen, Inc. v. Conn. Retirement Plans and Trust Funds*,
    133 S.Ct. 1184 (2013)............................................................................. *passim*

*Beattie v. CenturyTel, Inc.*,
    234 F.R.D. 160 (E.D. Mich. 2006) ...............................................................30, 46

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ...........................................................................37

*In re Bulk (Extruded) Graphite Products Antitrust Liig.*,
    2006 WL 891362 (D.N.J. April 4, 2006) ..........................................................47

*Calloway v. Caraco Pharm. Labs, Ltd.*,
    287 F.R.D. 402 (E.D. Mich. 2012) ..................................................................33

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ...............................................25, 37, 49, 50

*Cason-Merenda v. VHS of Michigan, Inc.*,
    No. 06-cv-15601, 2013 WL 5106520 (E.D. Mich. Sept. 13, 2013) ........25, 29, 36, 37

*In re Chocolate Confectionary Antitrust Litig.*,
    289 F.R.D. 200 (M.D. Pa. 2012)..................................................................35, 47

*In re Control Data Corp. Sec. Litig.*,
    116 F.R.D. 216 (D. Minn. 1986)......................................................................24

*In re Domestic Air Transp. Antitrust Litig.*,
    137 F.R.D. 677 (N.D. Ga. 1991)........................................................................5

*Eastman Kodak Co. v. Southern Photo Materials Co.*,
273 U.S. 359 (1927)..................................................................................47, 48

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179 (2011).......................................................................................34

*In re Foundry Resins Antitrust Litig.*,
242 F.R.D. 393 (S.D. Ohio 2007)................................................... *passim*

*Hanover Shoe, Inc. v. United Machinery Corp.*,
392 U.S. 481 (1968).........................................................................................36

*Hawaii v. Standard Oil Co. of Cal.*,
405 U.S. 251 (1972).........................................................................................25

*Hyland v. Homeservices of Am., Inc.*,
2008 U.S. Dist. LEXIS 90892 (W.D. Ky. Nov. 6, 2008) ......................................24

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*,
225 F.R.D. 208 (S.D. Ohio 2003) .........................................................................37

*Jackson's Five Star Catering, Inc. v. Beason*,
No. 10-CV-10010, 2012 WL 3205526 (E.D. Mich. July 26, 2012) ....................31

*In re K-Dur Antitrust Litig.*,
686 F.3d 197 (3d Cir. 2012).................................................................................37

*Kinder v. United Bancorp, Inc.*,
No. 11-cv-10440, 2012 U.S. Dist. LEXIS 140567 (E.D. Mich. 2012)..................49

*In re Linerboard Antitrust Litig.*,
305 F.2d 145 (3d Cir. 2002)................................................................................38

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, LTD.*,
246 F.R.D. 293 (D.D.C. 2007)..............................................................................37

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .........................................................  *passim*

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ..................................................................36, 49

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
247 F.R.D. 253 (D. Mass. 2008)..........................................................................28

*National Constructors Ass'n v. National Electrical Contractors Ass'n*,
498 F. Supp. 510 (D. Md. 1980).............................................................................28

*Olden v. LaFarge Corp.*,
   383 F.3d 495 (6th Cir. 2004) ........................................................................46

*Paper Systems, Inc. v. Mitsubishi*,
   193 F.R.D. 601 (E.D. Wis. 2000) ..................................................................50

*In re Playmobil Antitrust Litig.*,
   35 F. Supp. 2d 231 (E.D.N.Y. 1998) .............................................................24

*Powers v. Hamilton County Pub. Defender Comm'n*,
   501 F.3d 592 (6th Cir. 2007) ...................................................................28, 33

*Riordan v. Smith Barney*,
   113 F.R.D. 60 (N.D. Ill. 1986) ......................................................................50

*Rossi v. Standard Roofing, Inc.*,
   156 F.3d 452 (3d Cir. 1998) ..........................................................................47

*In re: Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) .................................................................. *passim*

*Sprague v. General Motors Corp.*,
   133 F.3d 388 (6th Cir. 1998) .........................................................................27

*Sterling v. Velsicol Chem.*,
   855 F.2d 1188 (6th Cir. 1988). ................................................................49, 33

*Stout v. Byrider*,
   228 F.3d 709 (6th Cir. 2000) .........................................................................30

*In re Sugar Indus. Antitrust Litig.*,
   73 F.R.D. 322 (E.D. Pa. 1976) ......................................................................37

*In re Sulfuric Acid Antitrust Litig.*,
   No. 03-C-4576, 2007 WL 898600 (N.D. Ill. March 21, 2007)......................47

*In re Telectronics Pacing Sys., Inc.*,
   172 F.R.D. 271 (S.D. Ohio 1997) ..................................................................33

*Texaco, Inc. v. Hasbrouck*,
   496 U.S. 543 (1990)........................................................................................47

*In re Titanium Dioxide Antitrust Litig.*,
   284 F.R.D. 328 (D. Md. 2012)........................................................................35

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002)........................................................................28

*Wal-Mart v. Dukes*,
   131 S.Ct. 2541 (2011) ..................................................................................24

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
   280 F.R.D. 332 (E.D. Mich. 2012) ...............................................................24

*Young v. Nationwide Mut. Ins. Co.*,
   693 F.3d 532 (6th Cir. 2012) .................................................................26, 27

*Zenith Radio Corp. v. Hazeltine Research*,
   395 U.S. 100 (1969) ......................................................................................36

**STATUTES**

Section 1 of the Sherman Act, 15 U.S.C. § 1 ................................................34, 35, 36

Section 2 of the Michigan Antitrust Reform Act .....................................................34

**OTHER AUTHORITIES**

American Medical Association, *Competition in Health Insurance: A Comprehensive Study of U.S. Markets, 2012 Update* (2012) ...........................................................6

## INTRODUCTION

By the mid-2000's, Blue Cross Blue Shield of Michigan ("BCBSM" or "Blue Cross") had been by far the dominant insurer in Michigan for years. However, its cost advantage over rival insurers that derived from the deeper discounts it received from hospitals had begun to erode.  Instead of competing on the merits, BCBSM sought to halt the adverse trend by using its still powerful market clout to rig the rules of the game in its favor.  Pursuant to an overarching scheme to protect its market dominance in Michigan, BCBSM began inserting anti-competitive "Most Favored Nation" ("MFN") provisions into its contracts with numerous hospitals.  The MFNs kept rivals' costs for hospital care artificially high, thereby inflating the premiums they charged for health insurance, lowering their margins on health insurance sales, and diminishing their profits and resources to invest in aggressive competition with Blue Cross.  In some cases, an MFN excluded a Blue Cross rival from a hospital altogether.  Thus, the MFN scheme allowed BCBSM to maintain, if not enlarge, its dominance in Michigan.  Plaintiffs seek certification of a class of those directly harmed by this practice, which is now banned by the State of Michigan in response to BCBSM's unlawful actions.

Insurers in Michigan negotiate formulas that determine the amount they will pay, or reimburse, hospitals for the healthcare services used by their insureds and self-insureds.  BCBSM's "equal-to" MFNs forced hospitals to set the overall

annual reimbursement rate for the services covered by other commercial insurers as high or higher than BCBSM's overall annual reimbursement rate, and BCBSM's "MFN-plus" agreements required hospitals to set that rate a certain number of percentage points above BCBSM's rate. Thus the MFN scheme caused the reimbursement rates of BCBSM's rivals, including Priority Health, Health Alliance Plan ("HAP") and Aetna, to be artificially inflated, raising their costs, diminishing their competitive vigor and eliminating their ability to compete at certain hospitals.

The MFN scheme harmed these insurers as direct purchasers of hospital services, but they also harmed their insured and self-insured customers. Many of these customers were injured because they paid a portion of the price set by the insurer's reimbursement rate. Both the insurers and their insureds and self-insured entities paid higher prices for hospital healthcare services than they would have absent the MFN agreements. ████████████████████

████████████████████████████████████████

████████████████

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
██████████

███████████████████████   ███████████████████████

███████████████████ Plaintiffs agree. Other insurers should have been able to compete without the anticompetitive constraint of BCBSM's MFN scheme.

In addition to harming other insurers and their insureds and self-insureds, BCBSM also protected itself from competition at the expense of its own customers. BCBSM frequently agreed to pay higher reimbursement rates to hospitals in Michigan as a quid pro quo for their agreement to the MFNs. For example, a BCBSM executive described a "strategic alliance" with the Beaumont hospitals "concerning their willingness to shut out competing plans that approach them for a greater discount, in exchange for an increase from BCBSM… I can't imagine this wouldn't be a fantastic long-term competitive advantage for us…" Ex. RR - M. Johnson Dep., DOJ Ex. 6 (BLUECROSSMI-99-051863 at -863).

As is plain, BCBSM benefitted from its practice of paying hospitals for MFNs. Even though BCBSM's costs increased, the scheme ensured that its rival insurers' costs were even higher and gave BCBSM an anti-competitive advantage over them. Instead of using its power to negotiate with hospitals for the best possible prices for the benefit of its own insureds, BCBSM offered increased reimbursement rates to obtain MFN provisions. The scheme protected BCBSM from competing insurers, but increased costs for its own customers.

In sum, BCBSM used its MFN scheme to raise its rivals' costs, and thereby unlawfully maintain, if not enhance, its position as the dominant commercial health insurer in Michigan. Its actions caused members of the proposed class to pay inflated prices for hospital services.

Plaintiff Michigan Regional Council of Carpenters Employee Benefits Fund ("Carpenters"), and proposed plaintiffs Patrice Noah and Susan Baynard[1] move the Court for certification of a class under Federal Rule of Civil Procedure 23 defined as all persons and entities who during the relevant time period (as listed below), alone or with a co-payor, directly paid a Michigan hospital (as listed below) for hospital healthcare services at the price provided in the provider agreement (as listed below).

**Affected Provider Agreements, Hospitals and Purchase Dates:**

| Provider Agreement | Hospital | Dates of Affected Purchases |
|---|---|---|
| Aetna PPO Agreement | Bronson LakeView Hospital<br>Three Rivers Health | 01/01/08 – 05/18/12<br>01/01/10 – 05/24/12 |
| BCBSM Non-HMO Agreement (inpatient claims only) | Beaumont Hospital - Gross Pointe<br>Beaumont Hospital - Royal Oak<br>Beaumont Hospital - Troy<br>Providence Park Hospital<br>St. John Hospital and Medical Center | 01/01/09 – 01/01/12<br>02/07/06 – 01/01/12<br>02/07/06 – 01/01/12<br>07/01/07 – 07/01/10<br>07/01/07 – 07/01/10 |

---

[1] The Court has not ruled on the motion to add and drop plaintiffs. If the Court denies the motion to add Patrice Noah and Susan Baynard as named plaintiffs, Plaintiffs request that the Court construe this motion for class certification as being filed solely by named plaintiff Carpenters.

| HAP HMO Agreement (inpatient claims only) | Beaumont Hospital - Royal Oak | 07/15/06 – 01/18/13 |
|---|---|---|
| HAP PPO Agreement | Beaumont Hospital - Gross Pointe<br>Beaumont Hospital - Royal Oak<br>Beaumont Hospital – Troy | 01/01/10 – 01/09/13<br>05/01/08 – 02/01/13<br>05/01/08 – 01/15/13 |
| Priority PPO Agreement | Allegan General Hospital<br>Charlevoix Area Hospital<br>Kalkaska Memorial Health Center<br>Mercy Health Partners - Lakeshore<br>Paul Oliver Memorial Hospital | 01/01/09 – 10/04/12<br>01/01/09 – 10/07/12<br>07/01/09 – 10/05/12<br>01/01/09 – 10/02/12<br>07/01/09 – 10/04/12 |
| Priority HMO Agreement | Allegan General Hospital<br>Mercy Health Partners - Lakeshore<br>Paul Oliver Memorial Hospital<br>Sparrow Ionia Hospital | 01/01/09 – 10/05/12<br>01/01/09 – 10/04/12<br>07/01/09 – 10/04/12<br>12/01/08 – 10/02/12 |

Excluded from the proposed class are (1) BCBSM, its officers and directors, and its present and former parents, predecessors, subsidiaries and affiliates, and (2) insureds whose only payments were (a) co-payments that do not vary with the size of the allowed amount, and/or (b) deductible payments where the hospital charge was larger than the deductible payment.[2]

---

[2] Plaintiffs have been able to simplify and narrow the class definition alleged in the Consolidated Amended Complaint. (Consolidated Amended Compl. ("Compl.") (Dkt. 78), ¶ 26). The above definition conservatively targets the purchasers of hospital healthcare services most clearly harmed by BCBSM's unlawful scheme, as revealed by the discovery evidence and the impact and damages analyses performed by Plaintiffs' economics expert. Specifically, the class is defined to include the persons and entities that directly paid for hospital healthcare services at prices set by certain provider agreements at thirteen Michigan hospitals (the "affected hospitals"). *See In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, at 402-403 & n.6 (S.D. Ohio 2007) (approving class definition that was "a reply-memorandum modification of the definition presented in [plaintiffs'] actual motion" and noting that it "moots some of Defendants' objections"); *see also In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677,

This proposed Class satisfies the requirements of Rule 23(a) and (b)(3).  In that regard, this antitrust case is no different from many others. "[I]n antitrust cases, Rule 23, when applied vigorously, will frequently lead to certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815-16 (7th Cir. 2012) (alleging inflated prices for hospital healthcare services). The Court should grant Plaintiffs' motion and certify the proposed class.

## STATEMENT OF FACTS

### I.    BCBSM is the Dominant Seller in the Michigan Commercial Health Insurance Market

Clearly, BCBSM is the dominant seller in the commercial health insurance market in Michigan. The most recent data shows Blue Cross controlling 69% of that market. Ex. D - *See* American Medical Association, *Competition in Health Insurance: A Comprehensive Study of U.S. Markets, 2012 Update* (2012).  Blue Cross was unquestionably aware of its dominant market share vis-à-vis its

---

683 n.5 (N.D. Ga. 1991) ("[t]he act of refining a class definition is a natural outcome of federal class action practice.").  The definition excludes certain insureds—those who escaped injury because the amount they paid for their hospital services was unaffected by the overcharge (i.e., the additional amount charged due to an antitrust violation). An example of how an insured can escape injury is provided by the following hypothetical.  Suppose the "allowed amount" for the hospital's services (i.e., the amount due under the reimbursement formula negotiated by the hospital and insurer) is $2,000, but would have been $1,600 absent the overcharge caused by the MFN scheme, and the insurance policy requires the insured to pay a flat co-pay of $200.  The insurer would pay $200 whether the hospital charged the inflated amount ($2,000) or the proper amount ($1,600).

competitors. Ex. E - *See* Brown Dep., DOJ Ex. 25 (BLUECROSSMI-E-0126960) (BCBSM executive David Brown saying that "we [BCBSM] are the dominant carrier and just need to keep blocking and tackling and keep our eye on the ball"); Ex. F - Andreshak Dep. 197:5–9 (10/29/12) (BCBSM is the market leader in Michigan for group healthcare); Ex. G - 208:18–22 ("The market is dominated by Blue Cross/Blue Shield . . . with over 70% of commercial market share.").

BCBSM understood how its market dominance gave it negotiating power against the hospitals in its provider network. Ex. H - *See* Darland Dep. at 60:8–18 ("the bigger you are, the more leverage you have"); 60:24–61:12 ("hospitals, for all intents and purposes, couldn't survive . . . without Blue Cross . . . so being 50 percent of their commercial book of business, gave us leverage to say, you need us . . . . And so, that very need translates into them,… in many cases close to literally, having to take what we offer"); Ex. I - 124:25–125:14 ("We were, by far, for [PG 5] hospitals, especially even more so the largest commercial payor. And so, we had a lot of leverage that we could have imposed."); Ex. J - Milewksi Dep. 49:3–24 (10/11/12) (testifying that BCBSM had leverage because of its size).

████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████  ████████

██████████████████████████████████████████

████████████   Ex. L - *see also* McGuire Dep. 65:18-69:20 (08/14/12) (CFO of St. John Providence Health System discussing internal Providence strategy document that states BCBSM has "ultimate leverage in our community," and interpreting that statement to refer to "the fact that Blue Cross has a significant percentage of the market and has significant market power when dealing with [the] hospital community."); Ex. M - Felbinger Dep. 33:14–21 (8/29/12) (CFO of Borgess Health stating that BCBSM has "a significant amount of power on rates and how they apply their rules and regulations."); Ex. N - AETNA-00575835 (hospital required an increase in Aetna's reimbursement rate because size of BCBSM's "business" and "the penalties for non-compliance [with the MFN agreement] are extensive to the point where we cannot afford to be out of compliance." ).

## II.  BCBSM's Competitive Advantage Over Other Insurers in Discounts at Hospitals Began to Erode in the Mid-2000s

In the years before BCBSM introduced its MFNs, it believed its market share had begun to erode along with its advantage over competitors in terms of the large discounts that it could historically extract from hospitals. Ex. O - *See* Darland Dep., Ex. 44 (BLUECROSSMI-99-02467917) (email between BCBSM executives stating that it is likely that BCBSM's discount differential will erode, with Doug Darland stating that BCBSM could not "compete in the market if we had to pay what our competitors pay for hospital services"); Ex. P - Noxon Dep. 68:12 –

8

69:15 (BCBSM executive testifying that BCBSM's hospital discount advantage had been eroding over time); Ex. Q - *id.* at 234:1-8 (BCBSM's discount differential was eroding in part because other insurers were seeking better discounts); Ex. R - BLUECROSSMI-99-0317577 (internal BCBSM email stating that BCBSM's "absolute discounts slipped in 2008," and "discounts vs. competitors dropped in 2007"); Ex. S - BLUECROSSMI-99-01404334 (2007 BCBSM document stating that "[d]iscount advantage on inpatient has been eroded by other payors."); Ex. T - *see also* Expert Report of Dr. Christopher A. Vellturo ("Vellturo Report"), *Aetna v. Blue Cross Blue Shield of Mich.*, No. 11-cv-15346, at ¶ 594 (MFNs halted BCBSM's market share decline in the mid-2000s and stopped share gains by BCBSM's competitors).[3]

To shore up its dominance and hamstring the threat from stronger competition, Blue Cross adopted a practice of inserting MFN agreements in its hospital contracts as described above. This course of conduct sometimes even expressly sought to turn back the clock by mandating that hospitals revert back to the discount differential that Blue Cross had enjoyed over its competitors in an earlier period. Ex. U - *See, e.g.*, BLUECROSSMI-99-388498 at -500, -503 (2009

---

[3] Dr. Vellturo is Aetna's expert on "whether BCBSM's contracting conduct significantly reduced competition among suppliers of health insurance and related administrative services," in its parallel case against BCBSM. Dr. Vellturo is President and Founder of Quantitative Economic Solutions, LLC, and received his Ph.D. in economics from MIT, where he was a Bradley Fellow in public economics. Dr. Vellturo prepared a 244-page report in the Aetna case.

contract between BCBSM and Beaumont required Beaumont to attest that "the discount represented in the BCBSM/BCN payment rates exceed the discount offered to other non-governmental payors to the same degree as existed in February 2006").

### III.   Blue Cross Used Its Market Power to Impose Equal-To MFN and MFN-Plus Agreements in its Hospital Contracts Despite Hospitals' Resistance

BCBSM used its market power to impose MFNs on many Michigan hospitals through the contracting process even when hospitals protested. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████  ██████████████████████  Blue Cross intended for the PHA to govern its relationship with all hospitals in its network.[4]  For its MFN scheme to succeed in materially raising its rivals' costs, BCBSM needed to secure MFN provisions at several, not just a few, of the hospitals in its network.

The PHA contains a "Most Favored Discount" section, which provides:

> Hospital will attest and commit that the payment rates which it has provided to BCBSM under this Agreement for non-Medicare members are at least as favorable as the rates which it has established

---

[4] The PHA did govern the relationship between BCBSM and its PG 5 hospitals, while PG 1-4 hospitals used the PHA as the starting point for further negotiations. Ex. W - *See* Schaal Dep. 69:6-9; Ex. X - 276:10-17 (10/08/12) (stating that the PHA binds all hospitals in Michigan, such that the PHA applied to a PG 1-4 hospital if the hospital's negotiated provider agreement expired and was not renegotiated).

with all other non-governmental PPOs, non-governmental HMOs or other non-governmental commercial insurers.

Blue Cross was able to unilaterally impose this provision on the smallest hospitals in its network, the PG 5 hospitals.[5] ████████████████████

████████████████████████████████████████████

████████████████████████████████████

These smaller hospitals were essentially at the mercy of BCBSM's market power. Larger hospitals did resist BCBSM's pursuit of MFNs—both individually and through their trade association—but did so without much success. The Michigan Hospital Association, a statewide association of nearly all of the hospitals in Michigan, resisted the insertion of the MFN into the PHA. Ex. Y - *See* Felbinger Dep. 146:19–149:17 (08/29/12) (hospital CFO stating that the MHA did not want the MFN agreement in PHA; the MHA did not want BCBSM to have more bargaining power than they already had, because that would "tie[] [hospital's] hands even tighter than they're already tied.").

Hospitals tried to resist because they and the medical community in general were concerned the MFN scheme would further entrench the dominance of

---

[5] Blue Cross organizes hospitals in Michigan into "peer groups" numbered one through five. These peer groups, often referred to with the short hand "PG," are comprised of hospitals of similar sizes (taking into account the number of licensed beds and number of admissions). PG 1-4 hospitals are larger hospitals; █████ ████████████████████████████████████████████ ██████████████████████

BCBSM in the Michigan health insurance market. Ex. Z - *See* Share Dep., Aetna Ex. 16 (BLUECROSSMI-99-03029350 at -351 (BCBSM email stating many physicians "do not want BCBSM to have more power. They very much fear that we abuse our already excessive market share.")); Ex. AA - Lantzy-Talpos Dep. 55:6–57:6 (11/13/12) (testifying that Michigan hospital told Aetna the hospital did not want to sign an MFN-plus with BCBSM).  Many hospitals indicated that the MFNs would unfairly restrict their ability to contract with other providers, and heighten the competitive problems caused by Blue Cross's dominant market position. Ex. BB - *See* McGuire Dep., DOJ Ex. 3 (AHT-000443 at -445) (Ascension's "[g]oal should be to remove from contract language because MFN clause effectively neutralizes our ability to create leverage by developing other payer relationships."); Ex. CC - Longbrake Dep., DOJ Ex. 2 (BX-HRV-000069 at -070) (hospital requesting removal of MFN due to its "reluctance to be contractually obligated for an unspecified amount of time, to terms that constrain our strategic growth and may threaten our very survival in the market.").  For some hospitals, the MFNs thwarted plans to move business away from BCBSM to other payors.  For instance, Ascension Health wanted to diversify its payors to "reduce . . . long term dependence on BCBSM Michigan and create additional leverage with BCBS during the negotiating process." Ex. DD - *See* AH-000036 at -038

("Commercial Payer Diversification Strategy"). But hospitals' resistance often failed given BCBSM's market power.

## IV. BCBSM Frequently Traded Higher Reimbursement Costs for Itself and its Insureds and Self-Insureds to Obtain MFNs that Protected BCBSM from Competition

Despite these concerns, Blue Cross aggressively inserted MFNs into hospital contracts in Michigan. If BCBSM was unable to insert the MFNs unilaterally, it made them the focal point of its contract negotiations with hospitals. Blue Cross executives repeatedly described the MFN agreements as "key" "required," "important" and "a cornerstone." *See* Ex. EE - BLUECROSSMI-02-001189; Ex. FF - Smith Dep., DOJ Ex.13 (BLUECROSSMI-99-407857 at -857, -858); Ex. GG - Longbrake Dep., DOJ Ex. 3 (BLUECROSSMI-99-01053141 at -141).

And Blue Cross was willing to pay the hospitals more through increased reimbursement rates (and sometimes lump sums) to implement its MFN scheme. BCBSM often specifically tied its willingness to increase rates to the hospital's acceptance of the MFN. *Id.*, Ex. EE (Blue Cross executive Doug Darland indicating in his contract negotiations with Allegan General Hospital that an MFN was "required" to consider a variance to the Peer Group 5 reimbursement model, and that a MFN with a differential was preferred); Ex. HH - BLUECROSSMI-99-176762 at -764; Ex. II - CIVLIT-BCBSM-00270479 at -481, -482, -483, -486

(BCBSM agreed to increase hospital's reimbursement rate for the 2009 fiscal year in part "in recognition of [hospital's] favored discount commitment)").

Frequently Blue Cross even made it clear that the larger the discount differential the hospital was willing to agree to, the larger the increase in reimbursement rates that BCBSM would provide. Ex. JJ- *See* Darland Dep. 47:1-16 (BCBSM should be able to afford "a more generous rate increase" if Beaumont kept discount differential at current levels); Ex. KK - Noxon Dep., DOJ Ex. 8 (BLUECROSSMI-10-009368 at -371) (BCBSM email to hospital chain stating that "BCBSM would be willing to consider a larger add on [i.e., higher reimbursement rate] if [Ascension Health] were willing to provide a larger point spread [i.e., a greater percentage point MFN differential]").

And there is no mystery to why BCBSM sought the MFNs so forcefully—it wanted to protect its advantage in hospital discounts and restrain other insurers' ability to compete.  Blue Cross executives testified that the MFNs did nothing to reduce costs for their own customers or otherwise benefit them. Ex. LL - *See* Dallafior Dep. 305:6-8 (10/24/12) ("Q.  Are you aware of Blue Cross's use of MFN clauses saving its customers any money?  A. No."); Ex. MM - Schaal Dep. 222:1-4 (testifying that he could not think of any way that the MFN has benefited patients at hospitals with MFNs); Ex. NN - Sorget Dep. 37:24-38:14 (10/16/12). Indeed BCBSM executives confirmed that the MFNs led to higher rates for their

14

own customers. Ex. OO - Dallafior Dep., 183:18-186:18 (10/24/12) (paying Beaumont additional dollars would drive up BCN's rates to customers because "if we were to pay [Beaumont] more, that means those costs would be passed on, that portion, to the customer in either premium increases or in claims expense that they would incur for those claims that were - those claims that were incurred at the Beaumont Health System."). BCBSM's Douglas Darland confessed that he was not comfortable "pay[ing] more in exchange for an MFN or MFN plus" because it would not be "protecting the assets of our customers." Ex. PP - Darland Dep. 323:6 -324:18. But BCBSM did that very thing, at the expense of its customers who are members of the proposed class.

## V.  BCBSM Harmed Its Own Insureds and Self-Insureds as They Paid More for Hospital Services So BCBSM Could Avoid Competition through MFNs

Because BCBSM agreed to pay higher reimbursement rates to hospitals in exchange for MFN provisions, BCBSM increased its reimbursement rates at those hospitals above what they would have been absent the MFNs. These agreements to increase reimbursement rates also increased the cost of hospital services for many of BCBSM's insureds who pay a portion of the allowed amount. The higher reimbursement rates also increased the costs of employers and other organizations that self-insure and contract with BCBSM for access to BCBSM's provider

network at the rates negotiated by BCBSM, and that directly pay hospitals for much of the cost of their employees' or members' hospital healthcare services.

Examples of BCBSM reimbursement rate increases occurring as a quid pro quo for an MFN provision follow:

### *Beaumont Hospitals - Grosse Pointe, Troy, Royal Oak*

- Blue Cross proposed to Beaumont a quid pro quo exchange of increased reimbursement rates for an MFN clause — with larger increases in reimbursement rates for larger discount differentials. Ex. QQ - Darland Dep., DOJ Ex. 5 (BLUECROSSMI-08-022036) (BCBSM should be able to afford "a more generous rate increase" if Beaumont kept discount differential at its current level); Ex. RR - M. Johnson Dep., DOJ Ex. 6 (BLUECROSSMI-99-051863 at -863) (discussing Beaumont "strategic alliance" wherein Beaumont would "shut out competing plans that approach them for a greater discount" in exchange for a substantial 7-8% rate increase from BCBSM). BCBSM estimated that its "upfront" cost of this rate increase would be $25 million. It thought this was "a fantastic long-term competitive advantage for us." Ex. U - *See* BLUECROSSMI-99-388498 at -498, -503; Ex. SS - BLUECROSSMI-99-194458 at -458, -459.

- Blue Cross called the MFN-plus it succeeded in buying from Beaumont a "mega most favored nation clause." Ex. TT - CIVLIT-BCBSM-00187609 at -610. The MFN-plus guaranteed Blue Cross a rate that was 10 percentage points better than any of its competitors. Ex. U - *See* BLUECROSSMI-99-388498 at -498, -503; Ex. UU - BLUECROSSMI-99-194458 at -458, -459.

### *St. John Hospital and Medical Center and Providence Park Hospital*

- St. John Hospital and Medical Center and Providence Park Hospital, both part of the Ascension hospital system, entered into a MFN-plus agreement with BCBSM, effective no later than July 1, 2008, which guaranteed that BCBSM would have a 10% better discount than other insurers. Ex. GG - *See* CIVLIT-BCBSM-00270479 at -480, -483, -486. Additionally, Blue Cross paid $7,519,400.00 in lump sum payments to the Ascension hospitals for the contracts with MFN-plus clauses. Ex. II - Noxon Dep., DOJ Ex. 8 (BLUECROSSMI-10-009368 at -371).

- As it states in the contract, BCBSM agreed to increase the hospitals' reimbursement rate over and above the standard update "in recognition of [Ascension Health's] favored discount commitment." Ex. FF - BLUECROSSMI-99-176762 at -764; Ex. GG - CIVLIT-BCBSM-00270479 at - 481, -482, -483, -486; Ex. VV - *see also* Sorget Dep. 178:13-179:10 (Sorget understood offer to Ascension to mean that increase in reimbursement was "dependent" on a commitment to provide a 10 percent most favored nation clause).

- Blue Cross was willing to pay even higher reimbursement rates in exchange for an MFN with a larger discount differential. Ex. WW - *See* Smith Dep., DOJ Ex. 9 (AHSJP-037045 at -045) (Blue Cross executive Gerald Noxon stating BCBSM's "willingness to pay a premium for a commitment on this. BCBSM is looking for a significant spread." ). Blue Cross believed an MFN point spread greater than 20 points was worth a 1.5% rate increase, valued at "up to $7M" in additional revenue for Ascension. Ex. XX - Noxon Dep., DOJ Ex. 7 (BLUECROSSMI-10-009207 at -208) (BCBSM proposal for Ascension meeting including a $5 million one-time signing bonus payment and an MFN clause-related increase which BCBSM estimated would yield up to $7 million in additional payments to Ascension); Ex. II - *see also* Noxon Dep., DOJ Ex. 8 (BLUECROSSMI-10-009368 at -371) ("BCBSM would be willing to consider a larger add on [in rates] if AH were willing to provide a larger point spread").[6]

## VI.  BCBSM's MFNs Harmed Other Insurers and their Insureds and Self-Insureds by Forcing Them to Pay Higher Prices for Hospital Services

Blue Cross did not only harm its own customers through its use of the anticompetitive MFN scheme. Other insurers such as Priority, HAP and Aetna, were forced to increase their reimbursement rates or forego rate decreases they could have negotiated, due to hospitals' MFN obligations to BCBSM. The result

---

[6] Blue Cross occasionally internally estimated how much the MFN was worth to itself. Here Blue Cross estimated that the most favored nation discount advantage of 10 percentage points was "worth about 2.5 million a year" to it. Ex. YY - *See* Darland Dep. 418:15-419:10 (11/15/12); Ex. ZZ - Darland Dep., Ex. 45 (BLUECROSSMI-08-003819).

was that these insurers, their insureds and self-insureds paid more for hospital services than they would have absent the MFN agreements.[7]   Ex. A - *See* Leitzinger Expert Report at ¶11, 45-46, 59, 65, 67, 72, 74; Ex. AAA - Darland Dep. 405:4-23 (MFNs maintain a "floor" differential—hospitals could not negotiate lower rates for other insurers).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[7] Plaintiffs have obtained and their expert, Dr. Jeffrey Leitzinger, has analyzed the claims data from BCBSM, Priority, HAP and Aetna, which collectively constitutes approximately 80 percent of the commercial health insurance market in Michigan. Ex. A - Leitzinger Rpt. at ¶ 25. These companies are four of the top six commercial health insurers in the state.  Ex. A - *Id*. at Ex. 4.  Other commercial health insurers each have a market share of three percent or less. Ex. A - *Id*.

Dr. Leitzinger is an economist and President of Econ One Research, Inc., an economic research and consulting firm.  He has masters and doctoral degrees in economics from the University of California at Los Angeles and a bachelor's degree in economics from Santa Clara University.  His doctoral work concentrated on the field within economics known as industrial organization, which involves the study of markets, competition and antitrust. Ex. A - See *Id*. at ¶ 1.

██████████████████████████████████████ Ex. CCC

- Andreshak Dep. 160:12–161:4 (testifying that Aetna would not even approach PG 5 hospitals to negotiate better discounts due to effects of MFN).

Examples of the adverse effect that BCBSM's MFNs had on other insurers and their insureds and self-insureds abound:

**<u>PRIORITY HEALTH</u>**





Ex. KKK - *See also* Root Dep., DOJ Ex. 16 (BLUECROSSMI-99-03093188 at -189) (series of emails regarding the possible business that BCBSM could gain if the BCBSM MFN agreement caused Charlevoix to terminate Priority Health).

- Charlevoix CFO William Jackson testified that the hospital increased Priority's rates in order to make the insurer compliant with the Blue Cross MFN. Ex. LLL - *See* Jackson Dep. 79:1-80:6 (03/02/12)



- Priority knew that the MFN at Lakeshore would require them to increase their rates when negotiating the new contract and was willing to comply. Ex. QQQ - *See* HLH001685 ("Priority agrees we can adjust to assist Lakeshore with favored nation clause.").



## HEALTH ALLIANCE PLAN (HAP)

### *Beaumont Hospitals – Royal Oak, Grosse Pointe, and Troy*

- Beaumont Hospitals' MFNs with BCBSM (discussed *supra* at 16) required Beaumont to give Blue Cross at least a 10-percentage point advantage over other insurers.



- Laura Eory, a provider and hospital contracting executive at HAP, stated that it is fair to say that MFNs were harmful to HAP's ability to be competitive in the marketplace. Ex. WWW - Eory Dep. 180:6-181:1 (11/12/12).  (i.e., Garden City Hospital, Ex. XXX - *See* Jodway Dep. 50:15-51:22 (09/07/12);

## AETNA

### *Bronson LakeView Hospital*

-  Ex. CCCC - Hughes Dep., DOJ Ex. 11 (AETNA- 00071584 at -585).

- Helen Hughes, Director of Managed Care for Bronson Healthcare Group, testified that allowing Aetna's reimbursement rate to remain at 70%, where it was in 2007, would have violated the MFN and that she would "not do anything that specifically violates the agreement." Ex. DDDD - Hughes Dep. 294:5–295:1.

### *Three Rivers Health*

- Three Rivers Health pursued reimbursement rate increases from Aetna in order to make its contract with Aetna compliant with the BCBSM MFN. Ex. EEEE - *See* Andrews Dep. 68:9–70:4 (11/02/11); Ex. FFFF - *see also* Andrews Dep., Ex. 11 (AE-0003311) (letter from Three Rivers to Cofinity (a health insurer) stating that the "Blue Cross contract is presenting challenges regarding the most favored nation clause" and that was one reason that Three Rivers needed "to get all of our payors near or at Blue Cross levels by the end of 2009.").

- Three Rivers Health and Aetna subsequently executed an amendment to the existing hospital agreement, effective January 1, 2009, which increased Aetna's reimbursement rate from 65% to 75% of charges beginning in 2010, when the MFN became effective. Ex. GGGG - *See* TRC-HC-0003777 at -778.

- The BCBSM MFN was the only reason Three Rivers Health gave to Aetna for refusing a lower reimbursement rate. Ex. HHHH - Winters Dep. 46:9–48:16 (10/09/12).

## ARGUMENT

## I.   The Court Should Certify the Proposed Class of Purchasers of Hospital Healthcare Services.

Plaintiffs satisfy the applicable test for class certification, which requires meeting the four prongs of Federal Rule of Civil Procedure Rule 23(a) and at least one prong of Rule 23(b). As described below, Plaintiffs can use class-wide evidence to show that: BCBSM included MFN provisions in its provider agreements with the relevant hospitals; those provisions were anticompetitive; they resulted in artificially high reimbursement rates at those hospitals; Plaintiffs and the Class therefore paid artificially inflated prices for hospital healthcare services; and the amount of the overcharge on the payments made by Plaintiffs and the Class for hospital healthcare services.

### A.   The Proposed Class Meets the Standards of the Supreme Court and the Sixth Circuit

Courts are required to conduct a "rigorous analysis" at class certification. *Amgen, Inc. v. Conn. Retirement Plans and Trust Funds*, 133 S.Ct. 1184, 1194 (2013). "The proposed class must be 'sufficiently cohesive to warrant adjudication by representation.'" *In re: Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

The analysis at this stage is focused on the Rule 23 requirements, not the

merits.  The Supreme Court recently counseled in *Amgen*:

> Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

133 S.Ct. at 1194-1195.[8]  An inquiry into the merits is often not necessary to determine whether a class should be certified. *See Wilkof v. Caraco Pharm. Labs., Ltd.*, 280 F.R.D. 332, 338 (E.D. Mich. 2012).  Plaintiffs are not required to prove their case at the class certification stage. *See Messner*, 669 F.3d at 811 ("[T]he court should not turn the class certification proceedings into a dress rehearsal for trial on the merits.")

"The Court should err in favor of certification when there is some doubt whether to certify the class." *Hyland v. Homeservices of Am., Inc*., 2008 U.S. Dist. LEXIS 90892, 30 (W.D. Ky. Nov. 6, 2008) (quoting *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 402 (S.D. Ohio 2007)); *see In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998) (citing *In re Control Data Corp. Sec. Litig.*, 116 F.R.D. 216, 219 (D. Minn. 1986)) ("Because of the

---

[8] *Amgen* also cited *Wal-Mart v. Dukes*, 131 S.Ct. 2541, 2552, n.6 (2011): "(a district court has no ''authority to conduct a preliminary inquiry into the merits of a suit'' at class certification unless it is necessary 'to determine the propriety of certification' (quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, … (1974)))" as well as the "Advisory Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S.C. App., p. 144 ('[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision.')."

important role that class actions play in the private enforcement of antitrust actions, courts resolve doubts in favor of certifying the class.").

## B. Antitrust Claims Are Well-Suited for Class Treatment

The Supreme Court has recognized that private antitrust actions critically complement public enforcement of the antitrust laws, and that class actions enhance the effectiveness of such private actions. *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972) ("Congress has given private citizens rights of action for … damages for antitrust violations …. Rule 23 … provides for class actions that may enhance the efficacy of [such] private [antitrust] actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture."). The Supreme Court has also made clear that the Rule 23(b)(3) predominance requirement is "*readily met* in certain cases alleging . . . violations of the antitrust laws." *Amchem*, 521 U.S. at 625 (emphasis added). Courts have also found class actions to be particularly appropriate in antitrust cases challenging anticompetitive agreements. *See Cason-Merenda v. VHS of Michigan, Inc.*, No. 06-cv-15601, 2013 WL 5106520, *9 (E.D. Mich. Sept. 13, 2013) ("the Sixth Circuit has expressed a favorable view of class certification in antitrust conspiracy cases"). This Court, as well as others within the Sixth Circuit, have certified numerous classes in antitrust cases. *See, e.g., In re: Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008); *Foundry Resins*, 242 F.R.D. 393; *In re*

*Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001).

## C.   The Class Satisfies the Requirements of Federal Rule of Civil Procedure 23(a)

Rule 23(a) requires that plaintiffs comply with four prerequisites: (1) numerosity of parties; (2) commonality of a factual or legal issue; (3) typicality of claims; and (4) adequacy of representation. Each is satisfied here.

### i.   The Class Easily Meets the Numerosity Requirement

To maintain a class action, "the class must be so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While no strict numerical test exists, 'substantial' numbers of affected consumers are sufficient to satisfy this requirement." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012). In a case such as this, where the class is made up of thousands of individuals and entities that made purchases from several hospitals over a multi-year time period, Ex. A - see Leitzinger Rpt. at ¶ 25, courts have not hesitated to find numerosity. Ex. A - *See id.* (numerosity satisfied when there were thousands of potential class members); *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 375 (C.D. Cal. 2011) (finding numerosity satisfied when the class numbered "at least in the hundreds").

### ii.   The Existence and Effects of Blue Cross's MFN Clauses Create Factual and Legal Questions Common to the Class

The second requirement of Federal Rule of Civil Procedure 23(a) is that there is a factual or legal question common to the class. The Sixth Circuit has held

that "there need only be one question common to the class." *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir. 1998). Plaintiffs demonstrate commonality if "resolution of [plaintiffs'] common conspiratorial allegations will advance this litigation." *Foundry Resins*, 242 F.R.D. at 405.

Among the factual and legal issues common to each class member's claim are:

- Whether BCBSM agreed to MFNs in its contracts with hospitals;

- Whether the use of MFNs by BCBSM is anticompetitive;

- Whether Defendant violated the Sherman Act through use of MFN contracts;

- Whether Defendant violated the Michigan Antitrust Reform Act through use of MFN contracts;

- Whether Defendant's actions caused injury to Plaintiffs and the Class in the form of inflated prices for hospital healthcare services; and

- The appropriate measure of damages.

Courts in this Circuit have repeatedly found such common questions sufficient to satisfy the commonality requirement. *See supra*; *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (plaintiffs satisfied the commonality requirement as there would be common proof of causation concerning whether the Defendant's actions caused the harms alleged).

Class members here all base their claims on Blue Cross's anticompetitive MFN scheme and thus their claims will all succeed or fail based on the

determination of whether this scheme existed, violated the antitrust laws and impacted the plaintiff class. Any of the legal and factual issues that underlie this central determination is enough to satisfy commonality.

### iii. As Purchasers of Hospital Services, Plaintiffs' Claims are Typical of the Claims of the Class

"[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082). The typicality requirement does not require that plaintiffs' claims be identical to or co-extensive with those of the class. *See National Constructors Ass'n v. National Electrical Contractors Ass'n*, 498 F. Supp. 510, 545 (D. Md. 1980). For example, plaintiff's claims are typical even if the plaintiff did not purchase all of the same price-fixed products as the class, *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 261 (D.D.C. 2002) ("The typicality requirement does not mandate that products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members."), or even if the plaintiff was only directly affected by one of multiple acts making up an anticompetitive scheme. *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 264-65 (D. Mass. 2008) (finding typicality where plaintiffs alleged defendant's anticompetitive scheme involved a number of agreements and

where named plaintiffs were not parties to all of the agreements). Courts tend to "liberally construe the typicality requirement." *Foundry Resins*, 242 F.R.D. at 405. In antitrust cases, "typicality is established when the named plaintiffs and all class members allege[] the same antitrust violation by defendants." *Cason-Merenda,* 2013 WL 5106520 at *8 (quoting *Foundry Resins*, 242 F.R.D. at 405).

The class representatives here all challenge the same course of conduct: the anticompetitive MFN scheme that Blue Cross implemented to maintain and enhance its domination of the Michigan commercial health insurance market by raising the hospital healthcare costs of its rivals and in some instances, excluding its rivals from a Michigan hospital. This practice inflated the reimbursement rates for healthcare services negotiated by both Blue Cross and its rivals at the affected hospitals and thus caused the class to pay inflated prices for those services.

Blue Cross employed this scheme as broadly as possible with the hospitals in its network, to maximize the scheme's impact on its rivals. BCBSM's succeeded in executing its plan in large part, with BCBSM imposing MFN provisions on all of its PG 5 hospitals and several of its larger hospitals. The scheme allowed BCBSM to maintain and enhance its market dominance.

This claim alleges exactly the same antitrust violation as the other class members advance and is based in the same facts and legal theory – Blue Cross's MFN scheme violates state and federal antitrust law and caused purchasers to pay

inflated prices for healthcare services at the affected hospitals. Thus the representatives' claims are typical of the class's claims.

### iv.    Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)'s fourth requirement is that Plaintiffs will "fairly and adequately protect the interests of the class." "Adequate representation invokes two inquiries: (1) whether the class counsel are qualified, experienced and generally able to conduct the litigation and (2) whether the class members have interests that are antagonistic to the other class members." *Beattie v. CenturyTel, Inc.*, 234 F.R.D. 160, 169 (E.D. Mich. 2006) (quoting *Stout v. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (internal quotations omitted)).

### (1)    Named Plaintiffs Have the Same Interests as the Class

In evaluating adequacy of representation, courts seek to uncover any potential conflicts of interest between Class members. *See Amchem Prods. v. Windsor,* 521 U.S. 591, 625-26 (1997). Here, Plaintiffs have no conflicts with other class members. Rather, Plaintiffs' interests are aligned because they, like all other class members, have been injured by the same alleged conduct, and they, like other class members, "have the same interest in establishing liability, and that they all seek damages for overpayment." *Foundry Resins*, 242 F.R.D. at 407.

The named plaintiffs, just like the absent class members, were injured when they overpaid for hospital healthcare services as a result of BCBSM's MFN

scheme.    Plaintiff Carpenters is a union health and welfare fund that self-insures its union members.    It had a contract with both BCBSM and HAP during the relevant period to obtain access to their network of hospitals at the prices they negotiated. Carpenters paid for healthcare services received by its members at the artificially inflated prices determined by PPO and HMO provider agreements at *all* of the BCBSM and HAP affected hospitals.[9]  Proposed plaintiffs Susan Baynard and Patrice Noah are individuals insured under Priority Health's HMO plan.  They paid artificially inflated prices for healthcare services at Paul Oliver Memorial Hospital that were set by Priority's provider agreement with Paul Oliver.[10] These plaintiffs, no different from absent class members, were injured when they paid the inflated hospital healthcare prices caused by BCBSM's MFN scheme.  They have the same interest as other class members in proving the unlawfulness of Blue Cross's scheme and recovering the damages caused thereby.

(2)    Class Counsel Will Fairly and Adequately Represent the Class

To  satisfy  the  adequacy  requirement,  class  counsel  must  be  able  to vigorously prosecute the interests of a class. *Jackson's Five Star Catering, Inc. v. Beason*, No. 10-CV-10010, 2012 WL 3205526,  *2 n.2 (E.D. Mich. July 26, 2012)

---

[9] Ex. A - *See* Leitzinger Rpt. at ¶ 76 n.160.

[10] If the Court grants Plaintiff's motion to add Noah and Baynard as named plaintiffs, Plaintiffs will immediately produce documents for them that will show their purchases at Paul Oliver Memorial Hospital during the class period while insured by Priority Health, and thus establish their standing.

(quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996)). This Court has already determined that the four undersigned firms it appointed as interim class counsel have the experience, knowledge and resources to adequately represent the class. Dkt. 69, Order for Appointment of Interim Class and Liaison Counsel (finding that the four firms "will fairly and adequately represent the interests of the putative class."); *see* Fed. R. Civ. P. 23(g)(1)(A). Class counsel's zealous prosecution of this case since their appointment by, for example, opposing the motion to dismiss, actively participating in a very full period of fact discovery, and now preparing this motion, confirms their adequacy. Accordingly, the Court should find the four firms adequate under Rule 23(a)(4), and appoint them class counsel under Rule 23(g)(1), to represent the proposed class.

### D. The Class Satisfies the Requirements of Federal Rule of Civil Procedure 23(b)(3)

Rule 23(b)(3) requires that: (1) common questions of law or fact predominate over individual questions; and (2) a class action is superior to other available methods of adjudication. Both requirements are easily satisfied here.

### i. *Common Questions of Proof Predominate Over Individual Ones*

The Supreme Court has made clear that the predominance requirement is "*readily met* in certain cases alleging . . . violations of the antitrust laws." *Amchem*, 521 U.S. at 625 (emphasis added). In *Amgen*, the Supreme Court recently

emphasized that "Rule 23(b)(3). . . does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to class-wide proof" but rather that "common questions *predominate* over any questions affecting only individual [class] members." 133 S.Ct. 1184, 1196 (2013) (emphasis in original); *see also Scrap Metal* 527 F.3d at 535 (proof of an antitrust "conspiracy is a common question that is thought to predominate over the other issues of the case.").

Predominance is found when "common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 815. "Or, to put it another way, common questions can predominate if a 'common nucleus of operative facts and issues' underlines the claims brought by the proposed class." *Id*. The standard is "met if a single factual or legal question is 'at the heart of the litigation.'" *Calloway v. Caraco Pharm. Labs, Ltd.*, 287 F.R.D. 402, 407 (E.D. Mich. 2012) (quoting *Powers*, 501 F.3d at 619). As long as common issues and evidence have central significance, the presence of some peripheral individual issues or evidence will not defeat a finding of predominance. *Scrap Metal*, 527 F.3d at 535; *Sterling*, 855 F.2d at 1196; *In re Telectronics Pacing Sys., Inc*., 172 F.R.D. 271, 287 (S.D. Ohio 1997) ("That common issues predominate over individual issues does not require that the class members' claims be proven by identical evidence or that

individualized proof cannot be introduced on some issues.").

The major factual issues in this case —the existence, scope and terms of BCBSM's MFN scheme, the scheme's effect on competition, whether the scheme inflated prices for healthcare services at the 13 affected hospitals, and the methodology to estimate the class's damages—are all common to the class. As is typical in antitrust class actions, the focus of the evidence will be squarely on BCBSM's conduct and its effect on the market and the class as a whole — not on matters pertaining to any individual class member. Thus, this is one of the many antitrust cases where, as the Supreme Court's has observed, the predominance requirement is "readily met." *Amchem*, 521 U.S. at 625.

"Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying causes of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S. Ct. 2179, 2184 (2011). Here, Plaintiffs allege a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 2 of the Michigan Antitrust Reform Act. See Dkt. 78, CAC ¶ 117-127. To establish an antitrust claim for damages, a plaintiff must prove "(1) a violation of the anti-trust law, (2) direct injury (or impact) from the violation, and (3) damages." *Foundry Resins*, 242 F.R.D. at 408–09. As shown below, common

issues predominate for each of the elements[11] and Plaintiffs will introduce common evidence to establish each element at trial.

(1) Common Evidence Can Establish Blue Cross's Antitrust Violation

There can be no dispute that the first element of Plaintiff's Section 1 antitrust claim presents an entirely common issue[12] – and one that predominates over any individual issues regarding impact and damages. "[C]onspiracy is a common question that is thought to predominate over the other issues of the case." *Scrap Metal*, 527 F.3d at 535. In antitrust cases, "courts have consistently found that common issues regarding the existence and scope of the conspiracy predominate over questions affecting only individual members." *Foundry Resins*, 242 F.R.D. at 408). Significantly, therefore, proof of Blue Cross's conspiracy with the hospitals in its network is an issue of sufficient importance and magnitude that

---

[11] While common issues predominate for each element here, all that is required is that common issues predominate for the claim overall. *Amgen*, 133 S. Ct. at 1196 ("Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." (emphasis in original) (internal citations and quotations omitted)). And indeed, in this Circuit, not only is the conspiracy issue common, it "is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite of Rule 23(b)(3)." *Scrap Metal*, 527 F.3d at 535.

[12] *See In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 344 (D. Md. 2012) (holding conspiracy capable of common proof because plaintiffs' allegations will focus on the actions of the defendants, and thus will not vary among class members); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 219 n.23 (M.D. Pa. 2012) ("There is little doubt that the conspiracy element of the antitrust claims *sub judice* will be provable with evidence common to the class.").

it alone causes common issues to predominate under clear Sixth Circuit precedent.

The central issues for that element are the existence, scope and anticompetitive effect of BCBSM's MFN scheme. This scheme includes a series of anticompetitive MFN agreements between BCBSM and its network hospitals. Proof of this conspiracy and its effect on competition plainly "will not vary among class members." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996).[13]

> (2)   Antitrust Impact Can Be Established Through Evidence Common to the Class.

The second element of Plaintiffs' Section 1 claim is "antitrust impact, sometimes referred to as 'fact of damage,' which results from a violation of the antitrust laws. *Cason-Merenda,* 2013 WL 5106520at *9 (quoting *Messner*, 669 F.3d 802at 816). Antitrust injury requires a showing of "some damage" due to a defendant's antitrust violations. *See Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114 n.9 (1969). An overcharge, the additional amount paid for a product or service due to an antitrust violation, which is the type of harm the class suffered here, is a classic form of antitrust injury. *See Hanover Shoe, Inc. v. United Machinery Corp.*, 392 U.S. 481, 489 (1968) (proof of an overcharge "ma[k]e[s] out a prima facie case of injury and damage within the meaning of §

---

[13] Dr. Leitzinger found that economic issues associated with proof of violation will involve evidence that is common to class members. Ex. A - Leitzinger Rpt. at Sec. VI.

4"); *Cardizem CD*, 200 F.R.D. at 309 (proof of overcharges is "most common method for determining damages").

"Plaintiffs are not required to show that the fact of injury actually exists for each class member." *Cardizem CD*, 200 F.R.D. at 340; *see also In re K-Dur Antitrust Litig.*, 686 F.3d 197, 222 (3d Cir. 2012) ("For certification plaintiff need not prove antitrust injury actually occurred." ). They only need to show that they are capable of establishing injury to the class with common proof at trial; unsurprisingly, courts have long held that in antitrust conspiracy cases like this one, causation can be established on a class-wide basis at trial. *Foundry Resins*, 242 F.R.D. at 409. Further, plaintiffs need not show that every class member was injured; certification is appropriate if the injury to the class was widespread, i.e., "most" class members were harmed. *Messner*, 669 F.3d at 818. This Court and others in the Sixth Circuit agree that the possible inclusion of some uninjured members in the class does not "transform the common [impact] question into a multitude of individual ones." *Cardizem CD*, 200 F.R.D. at 320-21; *Cason-Merenda,* 2013 WL 5106520at *13, *21 (court certified class when plaintiffs' expert showed "*almost* all of the members of the class" were harmed); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.,* 225 F.R.D. 208, 218 (S.D. Ohio 2003).[14]

---

[14] *See also Blackie v. Barrack*, 524 F.2d 891, 906 n.22 (9th Cir. 1975); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, LTD.*, 246 F.R.D. 293, 309-10 (D.D.C. 2007); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 347 (E.D. Pa. 1976). "[A]

Plaintiffs can submit two types of common proof at trial showing that the class was injured by Blue Cross's MFN scheme: (1) testimony and documents from Defendant's executives and those of hospitals and other insurers; and (2) expert testimony concerning accepted economic and econometric analyses.  The availability of this common evidence satisfies Rule 23's predominance requirement.  *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153 (3rd Cir. 2002) (lesser showing was "belt and suspenders" proof under Rule 23).

Discovery has revealed testimony and documents, all of which are part of the proof of the MFN scheme's impact on the class, in which BCBSM's executives themselves noted that the MFNs would impact all of the prices class members paid for hospital services.  For example, BCBSM executives have confirmed that the inflation in reimbursement rates negotiated by BCBSM to get the MFNs inflated the charges paid by all its insureds and self-insureds in the same manner.[15] When asked "is it the case, sir, that when hospital reimbursement rates increase, that self-funded customers pay those increases," a BCBSM hospital contracting executive

---

class will often include persons who have not been injured by the [defendants'] conduct," but that does not defeat certification.  *Id*. at 823 (quoting *Kohen*, 571 F.3d at 677).  Only when it is apparent that a great many persons have not been impacted should a court deny class certification.  *Kohen*, 571 F.3d at 677.

[15] Ex. IIII - Schaal Dep. 42:2-16; Ex. JJJJ - 75:7-18 ("Q: [D]oes that [model reimbursement] rate differ for inpatient or outpatient? A: No. Q: So the model sets out one reimbursement rate for traditional, TRUST, and BCN at a Peer Group 5 hospital? A: Yes.")

stated: "Somebody is going to pay for it," and then clarified that those paying for it "would be *all customers* in some shape or form or other."  Ex. KKKK - Sorget Dep. 28:20-29:4 (emphasis added). He also stated that BCBSM's "level of discounts" in terms of their reimbursement rates would affect "the cost factor to what customers have to pay." Ex. LLLL - Sorget Dep. 246:7-8.  Admissions like these are strong proof of causation that all or nearly all class members were injured.  *See Blood Reagents*, 283 F.R.D. at 238-39 (evidence stating price increases affected all customers "lend support to a finding of predominance"); *Urethane*, 251 F.R.D. at 638-39 (crediting "documents from the defendants showing that the defendants viewed their price increase … to be successful").

Blue Cross's admissions that inflated reimbursement rates affected all purchasers of hospital services is not the only common evidence that class members were harmed by the MFN scheme.  In addition, common evidence, much of it detailed in Sections V and VI of the Statement of Facts above, provides consistent, clear and direct proof that BCBSM's MFN scheme inflated reimbursement rates at the 13 affected hospitals.  Numerous hospital and insurer executives, along with BCBSM's own personnel, ascribe increased reimbursement rates for Priority, HAP and Aetna directly to the requirements of BCBSM's MFN agreements. ████████████████████████████

████████ ██████ ████ ██████████ ██ █ █ ██ ████████ ████ ████ █████

███████████████████████████████████

█████████████████████████████ BCBSM executives described how BCBSM increased its own reimbursement rates to obtain MFNs from hospitals. For example, BCBSM formed a "strategic alliance" with Beaumont wherein Beaumont would "shut out competing plans that approach them for a greater discount" in exchange for a substantial reimbursement rate increase from BCBSM. Ex. PP - M. Johnson Dep., DOJ Ex. 6 (BLUECROSSMI-99-051863 at -863). This evidence, common to the class, shows how BCBSM MFNs injured class members.

Moreover, Plaintiffs can present class-wide economic expert testimony at trial that corroborates what the lay evidence shows—all or nearly all of the class members were impacted by the MFN scheme. Plaintiffs retained Dr. Leitzinger to evaluate whether economic evidence that is common to members of the proposed class can be used at trial to corroborate the evidence in the discovery record that shows that class members were impacted at the 13 affected hospitals. Dr. Leitzinger has concluded that such economic evidence is available in the form of the analysis described below. Ex. A - *Id.* at Sec. VI.

Dr. Leitzinger statistically examined impact upon purchasers of healthcare services at the 13 hospitals where documents and testimony show that the MFN scheme inflated their payments to the hospital by raising the reimbursement rate of their insurer (or provider of their administrative services contract, if self-insured) .

Ex. A - *Id.* at Sec. VI(B).   First, Dr. Leitzinger examined how the applicable reimbursement rate at the 13 hospitals changed after the MFN went into effect (or, in the case of Priority, HAP and Aetna, how the reimbursement rate changed after both the MFN became effective and these insurers then negotiated new reimbursement rates). Ex. A - Leitzinger Rpt. at ¶ 47-50.

Second, for Priority, HAP and Aetna, he compared their new, post-MFN reimbursement rates to Blue Cross's reimbursement rate to see whether their new rates brought them into compliance with the MFN. Ex. A - *Id.*

Third, he used a difference-in-differences (DID) regression analysis, which compared the actual annual reimbursement rate resulting from the applicable reimbursement formula in the provider agreement at the 13 hospitals with the actual reimbursement rates paid by the same insurance companies at similar hospitals in Michigan (the "benchmark" hospitals) under contracts without an MFN provision using the same "before and after" time periods as for the 13 hospitals.[16]   In his regression, he included variables to control for variation among

---

[16] Courts have approved the use of DID regression analyses to assess antitrust impact and damages. *Messner, 669 F.3d at 810*; *In re Reformulated Gasoline (RFG) Antitrust & Patent Litig.*, No. CV-05-01671, 2007 WL 8056980, *8–10 (C.D. Cal. Mar. 27, 2007) (granting plaintiffs' motion for class certification where plaintiffs' expert offered difference-in-differences regression as one method to measure impact); *see also* authority crediting regression analyses for common proof of antitrust impact and damages: *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) (describing regression analysis as a "generally accepted method[] of proving antitrust damages"); *Foundry Resins*, 242 F.R.D. at

hospitals in such characteristics as complexity of care, costs, insurers' billed amounts, and location. Ex. A - *Id.* at ¶ 51-57.

With DID regression analysis, he compared the change in reimbursement rates at the 13 hospitals with the change in reimbursement rates at the benchmark hospitals to see whether the MFN caused any of the 13 hospitals to have greater increases (or smaller decreases) in reimbursement rates than the benchmark hospitals experienced.  The specific comparison was between a given MFN hospital (i.e., one of the 13) and the benchmark hospitals in Michigan within the same Peer Group.  For example, if the MFN hospital was a PG 1 hospital, Dr. Leitzinger used all PG 1 hospitals in Michigan with no MFN agreement with claims present in both the pre- and post-MFN time periods as the benchmark.[17]  He

---

411 ("[C]ourts have recognized that [regression] analyses are acceptable, generalized methods for assessing damages on a class-wide basis."); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 660-61 (7th Cir. 2002) (same); *TFT-LCD*, 265 F.R.D. at 313 (N.D. Cal. 2010) ("courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis"); *see also Scrap Metal*, 527 F.3d at 532-34 (approving multiple regression as a standard acceptable scientific method); *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 834 (6th Cir. 2011) (finding that an expert's "benchmark, and statistical-regression analyses thus provide substantial evidence in support of . . . anticompetitive effects"); *Chocolate Confectionary*, 289 F.R.D. at 220 (regression analysis "is the comparing of variables to determine the influence that one variable, the independent or explanatory variable, has on another variable, the dependent variable."); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 95 (D Conn. 2009) (plaintiffs commonly use regression analyses in antitrust cases).

[17] The exception was for PG 5 hospitals.  Because all such hospitals in Michigan had MFN agreements, there obviously were no PG 5 hospitals that could

concluded that the MFN scheme inflated the reimbursement rate at any MFN hospital that had greater increases or smaller decreases in reimbursement rates compared to the benchmark hospitals. Ex. A – *Id.* at ¶ 57. Using this methodology, which is common to the class, Dr. Leitzinger's analysis shows that reimbursement rates were inflated at the 13 hospitals due to the MFN scheme.

After determining that such reimbursement rates were inflated, Dr. Leitzinger next examined whether these inflated rates caused the payments by class members for the covered healthcare services also to be inflated.[18]  He used another

---

serve as a benchmark.  Dr. Leitzinger thus used the most comparable benchmark hospitals available:  PG 4 hospitals in Michigan without an MFN agreement. Differences between PG 4 and PG 5 hospitals are generally limited to the number of beds. Ex. A - Leitzinger Rpt. at ¶ 54.

[18] Dr. Leitzinger described the process in this manner, Ex. A - *id* at ¶ 58-59:

Having established that MFNs led to higher reimbursement rates and payments, the question then becomes whether or not those overcharges were born (at least in some part) by all or virtually all Class members.  Here again, there is evidence, common to members of the proposed Class, which indicates that the answer to this question is yes.  That evidence derives from the reimbursement methodologies used by Priority, HAP, Aetna and BCBSM at the Affected Hospitals.  In particular, the Provider Agreements that exist between each insurance company and each hospital (as applicable to each of the insurer's networks) set forth procedures by which the amount of reimbursement as to each eligible claim for coverage in regards to a particular hospital service is to be determined.

My analysis of those methodologies is capable of showing that higher reimbursement rates implemented as a result of the MFN agreements would have caused payments made for all (or virtually all) claims at the Affected combinations to increase, which means that all or virtually all of the payors of those claims (the Class members in this case) would all have paid at least some overcharge due to the MFNs.  And, of course, the terms of

set of common evidence to discern that all such payments contained an overcharge: the reimbursement methodologies contained in Priority, HAP, Aetna and BCBSM's contracts with the affected hospitals and other relevant documents.  Ex. A - *Id.* at Sec. VI(C).  All four insurers utilized reimbursement formulas that. if reimbursement rates were inflated, then the reimbursement rates for all claims employing that formula would be inflated, or resulted in the same degree of rate inflation from pre- to post-MFN across all covered services whether the insurer had a single reimbursement formula for all services or different formulas for different types of services (e.g., inpatient v. outpatient). Ex. A - *Id.* at Sec. VI(C)(1)-(4).  These methodologies thus confirm that inflation in the overall reimbursement rate caused inflation in the payments made by class members to the affected hospitals. Ex. A - *Id.* Thus the analysis is additional common evidence that is available to prove at trial that the MFN scheme injured all or nearly all class members.  The second element of plaintiffs' case, antitrust injury, can be proved with common evidence.

In *Messner*, an antitrust damages class action claiming that a hospital merger resulted in inflated prices for hospital healthcare services, the Seventh Circuit explained why the same type of DID regression analysis used here can be applied to show common impact.  The plaintiff's expert, Dr. Dranove, proposed using a

---

insurer/hospital Provider Agreements constitutes evidence that is common to Class members.

"differences-in-differences" method whereby he would compare "the percentage change in [defendant's] prices between the pre- and post-merger periods . . . to the percent change in prices at a control group of local hospitals during the same period." *Id.* at 810.  The difference in magnitude between the price changes of the merged hospital and the price changes of the control group would estimate the overcharge imposed on the defendant's patients due to its exercise of increased market power after the merger.  *Id.* at 817.

The district court denied class certification, finding fault with Dranove's methodology.  *Id.*  The Seventh Circuit, however, vacated, stating:

> Dranove claimed that he could use common evidence—the post-merger price increases Northshore negotiated with insurers—to show that *all or most* of the insurers and individuals who received coverage through those insurers *suffered some antitrust injury* as a result of the merger.  That was *all that was necessary to show predominance* for purposes of Rule 23(b)(3).

*Id*. at 818 (citing *Hydrogen Peroxide*, 552 F.3d at 311-12) (internal cites omitted; emphasis added).  The Seventh Circuit also concluded that although uniform price increases would simplify the analysis:

> [A] lack of uniformity would only require [Dranove] to do more [differences-in-differences] analyses for each contract—one analysis for each individual non-uniform price increase imposed in the contract being analyzed. . . . In a more complex world, multiple analyses would be needed to show more accurately a contract's precise impact on class members.  That need does not change the fact that those analyses all rely on common evidence—the contract setting out the non-uniform price increases—and a common methodology to show that impact. *Id.* at 819.

45

Here, Dr. Leitzinger likewise can use common evidence—the inflated reimbursement rates and the resulting inflated prices for hospital healthcare services caused by the MFN scheme, as well as his common methodology—to show that all or nearly all purchasers of those services paid some overcharge and thus suffered some antitrust injury.   Applying the same methodology multiple times for the different provider agreements at issue does not change the fact that the methodology is common to all class members.   A finding of predominance is as warranted here as it was in *Messner*.

> (3)   A Reliable Method of Proving Class-wide Damages Exists

"[P]laintiffs meet their burden if they show that they can use recognized and reliable methodologies to prove damages on a class-wide basis."[19] *Foundry Resins*, 242 F.R.D. at 410 (citing *Carbon Black*, 2005 WL 102966 at *19-20 (D. Mass. 2005)).   The Sixth Circuit has "never required a precise mathematical calculation of damages before deeming a class worthy of certification." *Scrap Metal*, 527 F.3d

---

[19] Of course, even if there were a need to determine damages individually, that would not pose an obstacle to class certification.  *See Scrap Metal*, 527 F.3d at 535 ("the court found that the 'fact of damages' was a question common to the class even if the amount of damages sustained by each individual class member varied.") (citing *CenturyTel, Inc*., 511 F.3d at 564); *Olden v. LaFarge Corp*., 383 F.3d 495, 508 (6th Cir. 2004) ("individual *damage* determinations might be necessary, but the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole") (emphasis in original).

at 535 (citation omitted).[20]   This relaxed standard is due to the long-standing antitrust doctrine that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." *Eastman Kodak Co.v. Southern Photo Materials Co.,* 273 U.S. 359, 379 (1927).[21]

In this case, Dr. Leitzinger has concluded that there is a workable, formulaic approach to estimating the amount of the class's damages in the form of overcharges paid for hospital healthcare services. Ex. A - Leitzinger Rpt. at ¶ 11, 75.  He used the same DID regression methodology described above that has been commonly used by economists analyzing the impact of competition on hospital reimbursement and adopted by courts analyzing damages in antitrust class actions.[22]  Dr. Leitzinger concluded that the percent of inflation in reimbursement

---

[20]   *See also Blood Reagents*, 283 F.R.D. at 240 (as to the expert's methodology for measuring damages at trial, the court noted that at the class certification stage, it need only "find that the model 'could evolve to become admissible evidence,' but the model need not be 'perfect.'" (citations omitted)).

[21]   *See also Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 573, n. 31 (1990) (standard not rigorous); *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 484 (3d Cir. 1998) (a "reasonable estimate" sufficient).

[22]   *See supra*; *Conwood*, 290 F.3d  at 793; *Foundry Resins*, 242 F.R.D. at 411 (recognizing that multiple regression models are "reasonable damages methodologies"); *Chocolate Confectionary*, 289 F.R.D. at 212 n.14 (noting multiple regression analyses "have been accepted by many courts as reasonable and reliable methods of proving class-wide damages"); *Flat Glass*, 191 F.R.D. at

revealed through the DID regression analysis can be applied to the total reimbursement dollars received by the hospital under the applicable provider agreement and during the applicable time period – totals that are readily calculable from the data provided through discovery in this case – in order to determine the aggregate overcharge for the class.   Ex. A - *Id.*  at ¶ 11, 65, 75.  Dr. Leitzinger's standard, reliable formulaic calculation would provide the amount by which class members overpaid for hospital services as a result of Blue Cross's MFN scheme. Ex. A - *Id.* at ¶ 75.  As this damages analysis is common to the class, there can be no doubt that plaintiffs can prove their antitrust claims with common evidence that predominates over any individual evidence.

ii.    *Class Action Treatment is Superior to Other Methods of Adjudication*

The "superiority" requirement ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote … uniformity of

---

475-87 (holding that multiple regression analysis is one of most common ways to estimate damages in antitrust cases; "There is no dispute that when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation."); *In re Sulfuric Acid Antitrust Litig.*, No. 03-C-4576,  2007 WL 898600, at *7 (N.D. Ill. March 21, 2007) (noting multiple regression analysis has "been found to be [an] acceptable mechanism[] on which to base a class action"); *DRAM*, 2006 WL 1530166, at *10 ("other courts have already upheld" multiple regression models "as valid means for proving damages on a class-wide basis, and this court has found no reason to reject them at this stage of the proceedings"); *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, 2006 WL 891362, at *15 (D.N.J. April 4, 2006) (noting multiple regression "methods are widely accepted").

decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.[23] "If common questions are found to predominate," then courts also generally have found the superiority requirement satisfied. *Carbon Black,* 2005 WL 102966 at *21. "Courts are generally loath to deny class certification based on speculative problems with case management." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 528 (S.D.N.Y. 1996). Courts have noted that "[a]ntitrust class actions are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case." *Carbon Black*, 2005 WL 102966, *22.

Trying this case as a class action would be "superior to other available methods." A class action here would avoid repetitive adjudications; prevent possible inconsistent results; and allow class members an opportunity for redress they would otherwise be denied. Class members' individual recoveries would not warrant their own suits. *See Kinder v. United Bancorp, Inc.*, No. 11-cv-10440, 2012 U.S. Dist. LEXIS 140567, at *16 (E.D. Mich. 2012) (finding superiority; as"[i]ndividual recovery [wa]s limited to $1000," it was "unlikely that prospective

---

[23] *See also Sterling v. Velsicol Chem.*, 855 F.2d 1188, 1196 (6th Cir. 1988)("The procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense.") (citations omitted); *Cardizem*, 200 F.R.D. at 351 ("proceeding with this consolidated multi-district litigation as a class action will achieve economies of both the litigants' and the Court's time, efforts and expense").

plaintiffs would take on the expense of counsel"). The presence of large claimants, like businesses and unions, does not militate against certification. *Paper Systems, Inc. v. Mitsubishi*, 193 F.R.D. 601, 605 (E.D. Wis. 2000).[24]  In sum, a single class-wide adjudication would be more efficient than thousands of individual actions litigating the same issues with the same proof, and more fair than the more likely alternative—no individual suits at all.  *See, e.g.*, *Cardizem*, 200 F.R.D. at 350 - 351; *Urethane*, 237 F.R.D. at 453.

## CONCLUSION

In sum, the Court should grant the motion, certify the proposed class and appoint the undersigned firms as co-lead counsel for the proposed class.

---

[24] There are currently no individual cases pending against Blue Cross seeking recovery of overcharges despite the fact that the Department of Justice and the State of Michigan publicly challenged the lawfulness of the MFN agreements in a lawsuit in this Court.  This supports the conclusion that individual actions are not a viable alternative to a class action. *See Riordan v. Smith Barney*, 113 F.R.D. 60, 66 (N.D. Ill. 1986) (finding superiority in part because "no other actions against defendants arising out of the transaction at issue are currently pending").

Dated: October 21, 2013

Daniel E. Gustafson
Daniel C. Hedlund
Dan Nordin
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone:  (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

Fred Isquith
Theodore B. Bell (P47987)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Tel: (312) 984-0000
isquith@whafh.com
tbell@whafh.com

Respectfully submitted,

/s/ Daniel A. Small
Daniel A. Small
Brent W. Johnson
Meghan M. Boone
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
dsmall@cohenmilstein.com
bjohnson@cohenmilstein.com
mboone@cohenmilstein.com

E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan  48307
Telephone: (248) 841-2200
epm@millerlawpc.com

*Interim Co-Lead Counsel for the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2013, I electronically filed *under seal* Plaintiffs' Motion for Class Certification and Appointment of Class Counsel and Supporting Memorandum with the Clerk of the Court using the ECF, who in turn sent notice to the following:

**Attorneys for Defendant - Blue Cross Blue Shield of Michigan:**

Todd Stenerson: tstenerson@hunton.com
Bruce Hoffman: bhoffman@hunton.com
Ashley Cummings: acummings@hunton.com
Neil Gilman: ngilman@hunton.com
Jack Martin: martinj@hunton.com
Jonathan Lasken: jlasken@hunton.com

Carl T. Rashid:
crashid@bodmanlaw.com
Jason R. Gourley:
jgourley@bodmanlaw.com

**Attorneys for Aetna Inc.:**

Joshua Lipton: jlipton@gibsondunn.com
Dan Matheson:
DMatheson@gibsondunn.com
Veronica Lewis: vlewis@gibsondunn.com
Sarah Wilson: sawilson@gibsondunn.com
Cara Fitzgerald:
CFitzgerald@gibsondunn.com

/s/ Brent W. Johnson_____
Brent W. Johnson