# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE SHANE GROUP, INC., et al.    )
    )
Plaintiffs, on behalf of themselves    )
And all others similarly situated,    )    Case No. 2:10-cv-14360-DPH-MKM
    )
    v.    )
BLUE CROSS BLUE SHIELD OF    )
MICHIGAN,    )
    )
Defendant.    )

## BLUE CROSS BLUE SHIELD OF MICHIGAN'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

Todd M. Stenerson (P51953)
D. Bruce Hoffman
(Adm. E.D. MI, DC Bar 495395)
Neil K. Gilman
(Adm. E.D. MI, DC Bar 449226)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
202-955-1500
tstenerson@hunton.com

Thomas Van Dusen (P30602)
Jason R. Gourley (P69065)
Thomas J. Rheaume, Jr. (P74422)
BODMAN PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, MI 48226
303-259-7777
trheaume@bodmanlaw.com

Robert A. Phillips (P58496)
BLUE CROSS BLUE SHIELD
OF MICHIGAN
600 Lafayette East, MC 1925
Detroit, MI 48226
313-225-0536
rphillips@bcbsm.com

# **TABLE OF CONTENTS**

TABLE OF CONTENTS......................................................................................i

CONTROLLING AUTHORITY........................................................................ ii

I.      INTRODUCTION .................................................................................1

II.     BACKGROUND ....................................................................................2

III.    ARGUMENT..........................................................................................4

  A.    Plaintiffs Faced Significant Hurdles and a Lengthy Road to Recovery in the Litigation ..............................................................................5

  B.    Plaintiffs' Likelihood of Success is Low, at Best.........................................6

    1.    The Robust Factual Record Negated Plaintiffs' Claims ...........................8

    2.    There was No "Scheme" to Obtain MFNs ................................................9

      a.    Differential MFNs Never Caused Any Hospital to Raise Or Refuse To Lower A Competitor's Prices.............................................14

      b.    The PG 5 Equal-To MFN was Part of a Contract that Reduced BCBSM's Costs While Stabilizing Rural Hospitals' Finances, Maintaining Hospital Access .............................................15

      c.    The Equal-To MFNs at Small Hospitals Had No Anticompetitive Effect .............................................................................18

      d.    There is No Evidence that the MFNs Prevented Competitors from Growing, Raised or Maintained BCBSM's Market Share, or Raised Prices ......................................................................20

    3.    Plaintiffs' Drastic Downsizing of their Case Did Not Improve their Chances of Success......................................................................22

      a.    MFNs Did Not Harm Competition ...................................................23

      b.    Plaintiffs Could Not Prove Injury in Fact .......................................24

        i.    Priority Health ..............................................................................24

        ii.    Aetna ............................................................................................26

        iii.    HAP ...........................................................................................26

        iv.    BCBSM .......................................................................................29

      c.    Plaintiffs Have Not Grappled With BCBSM's Other Defenses ........31

IV.    CONCLUSION......................................................................................34

## <u>CONTROLLING AUTHORITY</u>

*UAW v. Gen. Motors Corp.,*
    497 F.3d 615 (6th Cir. 2007)

*Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n,*
    388 F.3d 955 (6th Cir. 2004)

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.,*
    427 F.3d 1008 (6th Cir. 2005)

*Indeck Energy Servs., Inc. v. Consumers Energy Co.,*
    250 F.3d 972 (6th Cir. 2000)

*UAW v. Ford Motor Co.,*
    No. 05-74730, 2006 WL 1984363 (E.D. Mich. July 13, 2006)

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
    65 F.3d 1406 (7th Cir. 1995)

*CBC Cos. v. Equifax, Inc.,*
    561 F.3d 569 (6th Cir. 2009)

*HyPoint Tech., Inc. v. Hewlett-Packard Corp.,*
    949 F.2d 874 (6th Cir. 1991)

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Aetna Inc. v. Blue Cross Blue Shield of Mich.,* No. 2:11-cv-15346,
Stipulation and Order of Dismissal With Prejudice (E.D. Mich. May 22,
2015) ............................................................................................................3

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990)..................................................................................23

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
65 F.3d 1406 (7th Cir. 1995) ...................................................................19

*Blue Cross and Blue Shield of Mich. v. Mich. Ass'n of Psychotherapy
Clinics,*
No. 9-71014, 1980 WL 1848 (E.D. Mich. Mar. 14, 1980)................................19

*Brantley v. NBC Universal, Inc.,*
675 F.3d 1192 (9th Cir. 2012) .................................................................24

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.,*
427 F.3d 1008 (6th Cir. 2005) ........................................................7, 8, 23

*CBC Cos. v. Equifax, Inc.,*
561 F.3d 569 (6th Cir. 2009) ...................................................................23

*Concord Boat Corp. v. Brunswick Corp.,*
207 F.3d 1039 (8th Cir. 2000) ...................................................................8

*Ehredt Underground, Inc. v. Commonwealth Edison Co.,*
90 F.3d 238 (7th Cir. 1996) .....................................................................24

*Found. For Interior Design Educ. Research v. Savannah College of Art &
Design,*
244 F.3d 521 (6th Cir. 2001) .....................................................................8

*HyPoint Tech., Inc. v. Hewlett-Packard Co.,*
949 F.2d 874 (6th Cir. 1991) .....................................................................7

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
   250 F.3d 972 (6th Cir. 2000) ..............................................................8, 24

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ...................................................................................31

*Lewis v. Philip Morris Inc.*,
   355 F.3d 515 (6th Cir. 2004) ....................................................................7

*McElhinney v. Med. Protective Co.*,
   738 F.2d 439 (6th Cir. 1984) ....................................................................7

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) ...........................................................7, 8, 24

*N.Y. State Teachers' Retirement Sys. v. Gen. Motors Co.*,
   315 F.R.D. 226 (E.D. Mich. 2016) ...........................................................6

*NicSand, Inc. v. 3M Co.*,
   507 F.3d 442 (6th Cir. 2007) ..............................................................31, 32

*Ocean State Physicians Health Plan v. Blue Cross & Blue Shield of R.I.*,
   883 F.2d 1101 (1st Cir. 1989)..................................................................19

*Shane Group v. Blue Cross Blue Shield of Mich.*,
   Nos. 15-1544/1551/1552, slip op. (6th Cir. June 7, 2016) ..............................3, 4

*Shreve Equip., Inc. v. Clay Equip. Corp.*,
   650 F.2d 101 (6th Cir. 1981) ....................................................................7

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993).................................................................................23

*Stone v. William Beaumont Hosp.*,
   782 F.2d 609 (6th Cir. 1986) ....................................................................7

*Tunis Bros. v. Ford Motor Co.*,
   952 F.2d 715 (3d Cir. 1992) .....................................................................7

*UAW v. Ford Motor Co.*,
   No. 05-74730, 2006 WL 1984363 (E.D. Mich. July 13, 2006)..........................5

*UAW v. Gen. Motors Corp.*,
  497 F.3d 615 (6th Cir. 2007) ...........................................................4, 5

*United States v. Blue Cross Blue Shield of Mich.*,
  No. 2:10-cv-14155, Order of Dismissal Without Prejudice (E.D. Mich.
  March 28, 2013) ..............................................................................2

*Whitford v. First Nationwide Bank*,
  147 F.R.D. 135 (W.D. Ky. 1992) ....................................................5, 6

*Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic
  Ass'n.*,
  388 F.3d 955 (6th Cir. 2004) ...............................................................7

## STATUTES

M.C.L. §§ 550.1101 to 550.1704 (2013) ..................................................33

M.C.L. § 550.1102(1) ..............................................................................11

Sherman Act § 1 .................................................................3, 7, 8, 23

# I.   INTRODUCTION

The question before the Court is whether to grant preliminary approval of the proposed settlement.  To do so, the Court need only conclude that the proposed settlement is within the range of possible approval.  Plaintiffs' brief amply demonstrates that the settlement is not only within the range of possible approval, but also that it is more than fair, reasonable and adequate.  However, because the prior objectors have attempted to turn preliminary approval into a full-blown final approval process, Blue Cross Blue Shield of Michigan (BCBSM) files this brief to address two points:  (1) the many hurdles Plaintiffs would face before any possible litigation recovery, and (2) Plaintiffs' low likelihood of success on the merits.

These issues matter because, in evaluating the settlement's fairness, the relevant question is not what Plaintiffs sought in their Complaint—it is what Plaintiffs would likely obtain after litigation, factoring in the risks and time it would take to achieve a final result.  The extensive factual record establishes that, absent settlement, Plaintiffs would face a long and uncertain litigation path with a perilously high risk that, at the end, they would recover nothing at all.

## II.    BACKGROUND

In October 2010, the U.S. Department of Justice and the State of Michigan filed an antitrust suit against BCBSM.[1]  Shortly thereafter, a series of class actions were filed and later consolidated into the present action.[2]  After discovery commenced in those two actions, Aetna filed a separate action.[3]  The Court ordered the parties to coordinate discovery.[4]  The parties spent three-and-a-half years conducting extensive discovery, including over 165 depositions and the production of millions of pages of documents and terabytes of data from dozens of party and non-party witnesses.[5]

A change in Michigan law mooted the DOJ action and the case was dismissed.[6]  Shortly after BCBSM filed its opposition to the *Shane* Plaintiffs'

---

[1] *United States v. Blue Cross Blue Shield of Mich.*, No. 2:10-cv-14155, Compl. (E.D. Mich. Oct. 18, 2010) [Doc. #1] (the DOJ action).

[2] Order Consolidating Cases (May 16, 2012) [Doc. #65].

[3] *Aetna Inc. v. Blue Cross Blue Shield of Mich.,* No. 2:11-cv-15346, Compl. (E.D. Mich. Dec. 6, 2011) [Doc. #1] (the Aetna action).

[4] Order Granting In Part and Den. In Part Def.'s Mot. for Protective Order (May 17, 2012) [Doc. #67].

[5] Plaintiffs have detailed the enormous discovery record compiled in this case, and so we do not further describe it here.  *See* Pls.' Mot. for Prelim. Approval of Settlement at 4 [Doc. #269].

[6] *United States v. Blue Cross Blue Shield of Mich.*, No. 2:10-cv-14155, Order of Dismissal Without Prejudice (E.D. Mich. March 28, 2013) [Doc. #247].

motion for class certification and its *Daubert* motion seeking to exclude Plaintiffs' expert, the *Shane* Plaintiffs agreed to settle.[7]

The amount of the settlement here, just under $30 million, is less than Plaintiffs' expert's $118 million damages calculation.[8]  Objectors challenged the settlement agreement, arguing that the settlement "is a bad deal for the class members, who would receive a pittance . . . and would be much better served if their antitrust claims were tried."[9]  This Court, intimately familiar with the factual record in this and related cases litigated before it for years, agreed with the parties that the settlement was fair, reasonable and adequate.  The Court correctly concluded after careful scrutiny that there was a "significant risk that the class members could receive nothing or some negligible amount in damages at trial or

---

[7] Def.'s Resp. to Pls.' Mot. for Class Certification (Feb. 3, 2014) [Doc. #139]; Def.'s Mot. to Exclude the Expert Test. of Dr. Jeffrey Leitzinger (Feb. 3, 2014) [Doc. #140].  And, on the eve of trial, Aetna agreed to settle.  *Aetna Inc. v. Blue Cross Blue Shield of Mich.,* No. 2:11-cv-15346, Stipulation and Order of Dismissal With Prejudice (E.D. Mich. May 22, 2015) [Doc. #431].

[8] *See* Expert Report of Jeffrey Leitzinger, Ph.D. ("Leitzinger Report") ¶ 76, Ex. A (App. 1).  According to the Sixth Circuit, "[t]he amended complaint alleged damages of more than $13.7 billion, and sought an award of treble damages under the Sherman Act."  *Shane Group v. Blue Cross Blue Shield of Mich.*, Nos. 15-1544/1551/1552, Op. 3 (6th Cir. June 7, 2016) [Doc. #38-2] ("Sixth Circuit Opinion").  That $13.7 billion figure does not appear in Plaintiffs' demand, and we have been unable to locate any support for it anywhere in the record.

[9] Joint Objection to Proposed Settlement at 2 [Doc. #161].

on appeal."[10]   The Sixth Circuit remanded the case for, among other things, further "explanation as to whether—in light of the merits of this case specifically—the settlement is fair."[11]   The only possible answer to this question is yes.

### III.   ARGUMENT

Courts in the Sixth Circuit evaluating whether a settlement is fair, reasonable and adequate consider, among other things:  "the complexity, expense and likely duration of the litigation," the extent of discovery taken, and the "likelihood of success on the merits."[12]   Courts do not decide the merits of the case, but they do "weigh[ ] the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in settlement."[13]   The allegations in a Complaint do not dictate the likelihood of success on the merits; instead, that evaluation is based on the record developed in discovery.[14]

Courts testing the fairness of a settlement at final approval assess whether it "'falls within the range of reasonableness, not whether it is the most favorable

---

[10] Op. and Order Regarding Fairness Hr'g … Granting Mot. for Final Approval of Settlement at 27 (March 31, 2015) [Doc. #213].

[11] Sixth Circuit Op. at 13.

[12] *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

[13] *Id.* (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)).

[14] *See id.* at 631.

possible result in the litigation.'"[15]  "An appropriate range of reasonableness 'recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'"[16]  Indeed, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."[17]

## A.    Plaintiffs Faced Significant Hurdles and a Lengthy Road to Recovery in the Litigation

As noted, the "complexity, expense and likely duration of the litigation" informs whether a class action settlement is fair, adequate and reasonable.[18]  Here, as described by Plaintiffs, much was accomplished in this multi-year litigation. Yet, Plaintiffs still faced time-consuming hurdles, including:  class certification; a likely Rule 23(f) appeal from any order granting or denying class certification; the completion of merits and expert discovery; merits expert reports, depositions and *Daubert* challenges; summary judgment (at which Plaintiffs faced serious risks, as

---

[15] *UAW v. Ford Motor Co.*, No. 05-74730, 2006 WL 1984363, at *21 (E.D. Mich. July 13, 2006) (quoting *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993)).

[16] *Id.* (quoting *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005)).

[17] *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 142 (W.D. Ky. 1992) (citation omitted).

[18] *UAW v. Gen. Motors Corp.*, 497 F.3d at 631.

described below);[19] motions in limine; a weeks-long jury trial; a motion for judgment at trial; and likely appeal from any judgment entered.

No matter how diligently and aggressively pursued, no doubt exists that many years of litigation remained for Plaintiffs to overcome each of these obstacles. And at each stage, Plaintiffs would face the risk of losing all or part of their claims. This long and winding path to a highly uncertain and already-dwindling recovery strongly supports the fairness of the settlement.[20]

## B.    Plaintiffs' Likelihood of Success is Low, at Best

Plaintiffs spent millions of dollars in discovery and analyzing the relevant data, yet admitted that they could not prove the claims stated in their Complaint. Despite "investing immense resources in this case," discovery simply did not support their allegations.[21] Thus Plaintiffs proposed a drastically narrowed class, proceeding with a shell of the case they originally envisioned. And even the

---

[19] This Court has never rejected BCBSM's merits defenses to any MFN claims. The DOJ action was dismissed before summary judgment motions were filed, and Aetna settled before the Court ruled on the summary judgment motion.

[20] *See*, *e.g.*, *N.Y. State Teachers' Retirement Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 236 (E.D. Mich. 2016) (finding that litigating the action "would have required substantial additional time and expense," including additional fact discovery, merits expert discovery, class certification argument, summary judgment and pre-trial evidentiary motions, a protracted trial, and appeals); *Whitford v. First Nationwide Bank*, 147 F.R.D. at 140 (finding that, where an action was pending for more than a year, "'[i]n the absence of the proposed settlement, pretrial proceedings and trial of the issues would require substantial additional time and would delay relief for class members'").

[21] Tr. of July 31, 2013 Mot. Hr'g at 39 (App. 2).

remaining case—the best Plaintiffs could do once the factual record was established—was unlikely to succeed on the merits.

To establish a claim under Sherman Act § 1, Plaintiffs must prove that BCBSM "(1) participated in an agreement that (2) unreasonably restrained trade in the relevant market."[22]  Because Plaintiffs' claim is subject to a rule-of-reason analysis, it is Plaintiffs' burden to establish "that the conduct complained of 'produces significant anticompetitive effects within the relevant product and geographic markets.'"[23]  Showing a *de minimis* effect will not suffice.[24]

To meet this burden, Plaintiffs (among other things) must prove that the proposed class members suffered an injury,[25] and that the injury was directly caused by the alleged anticompetitive conduct, i.e., the MFNs.[26]  If Plaintiffs

---

[22] *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.*, 388 F.3d 955, 959 (6th Cir. 2004) (quoting *Nat'l Hockey League Players' Ass'n. v. Plymouth Whalers Hockey Club*, 325 F.3d 712,718 (6th Cir. 2003)).

[23] *Id.* (quoting *Nat'l Hockey League Players' Ass'n*, 325 F.3d at 718).  *See also Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005).

[24] *Tunis Bros. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1992); *McElhinney v. Med. Protective Co.*, 738 F.2d 439, at *5 (6th Cir. 1984); *Stone v. William Beaumont Hosp.*, 782 F.2d 609, 614 (6th Cir. 1986).

[25] *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 525 n.13 (6th Cir. 2004).

[26] *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("It is a requirement that an antitrust plaintiff must prove that his damages were caused by the *unlawful* acts of the defendant."); *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877-78 (6th Cir. 1991); *Shreve Equip., Inc.*

cannot prove that their alleged injury was not the result of other causes, their antitrust claim fails as a matter of law.[27]  And because this is a putative class action, Plaintiffs must prove a methodology for demonstrating that all class members suffered injury caused by the alleged conduct.

Plaintiffs must also prove antitrust injury (that is, the type of injury the antitrust laws were intended to prevent) and injury to competition (i.e., that overall market competition was harmed).[28]  Thus, Plaintiffs would be required to show not just that some hospital prices were changed by the MFNs, but that the cumulative effect of those changes "suppress[ed] or even destroy[ed] competition" in the relevant market—the sale of health insurance. [29]

Under this legal framework, in light of the record developed in discovery, Plaintiffs had little likelihood of success on the merits.

### 1.    The Robust Factual Record Negated Plaintiffs' Claims

Plaintiffs' original Complaint and their Consolidated Amended Complaint— like the October 2010 Complaint that the U.S. Department of Justice and the State

---

*v. Clay Equip. Corp.*, 650 F.2d 101, 105 (6th Cir. 1981); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000).

[27] *MCI Commc'ns*, 708 F.2d at 1161.

[28] *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000); *see also Care Heating*, 427 F.3d at 1014 ("[T]he Sherman Act was intended to protect competition and the market as a whole, not individual competitors.").

[29] *Found. For Interior Design Educ. Research v. Savannah College of Art & Design*, 244 F.3d 521, 530 (6th Cir. 2001).

of Michigan filed against BCBSM—alleged a sweeping theory of harm to insurance competition based on the idea that MFNs significantly raised hospital costs across the entire state of Michigan, to all of BCBSM's insurance competitors.[30]  However, the factual record developed in discovery negated the allegations central to Plaintiffs' original case.

### 2.    There was No "Scheme" to Obtain MFNs

Far from being systematically pursued by BCBSM as part of a scheme or plan, the MFNs (particularly the Differential MFNs) were agreed to haphazardly in the give-and-take of negotiations.  This is why the MFNs were so randomly distributed around the state and never existed at more than half of Michigan's hospitals.

At the time, hospitals across Michigan were grappling with significant revenue shortfalls and the Great Recession.[31]  Medicare and Medicaid reimbursement rates—frequently comprising as much as half or more of hospitals'

_____

[30] *Compare* Class Action Compl. (Oct. 29, 2010) [Doc #1] and Consolidated Am. Compl. [Doc. #78] *with United States v. Blue Cross and Blue Shield of Mich.*, No. 2:10-cv-14155, Compl. (E.D. Mich. Oct. 18, 2010) [Doc. #1].  *See* Tr. of July 31, 2013 Mot. Hr'g at 7 (Plaintiffs' counsel stated, "When the case began, the Class Plaintiffs alleged that all purchasers of possible services at all the hospitals in Michigan that had an MFN clause with [BCBSM] were damaged and paid prices that were too high.") (App. 2).

[31] Falatko (Hills & Dales) Dep. 35 ("[I]t's called a recession, you know. People just lost their insurance.  Others didn't have the ability to pay their deductibles and co-pays", and employers were "moving to high-deductible plans . . . where . . . individuals had more responsibility.") (App. 3).

revenues—often failed to cover the actual cost of hospital services.[32]  In fact, in 2004, Michigan hospitals provided $1.029 billion in uncompensated or unreimbursed care resulting from charity care, bad debt and government shortfalls;[33] by 2007, that number had increased to $1.7 billion.[34]  Large and small hospitals alike sought to make up for these shortfalls by seeking greater reimbursement from commercial payors and BCBSM.[35]

Due to its longstanding presence in Michigan and its statutory obligations to deliver affordable access to healthcare to Michigan residents and to serve as insurer of last resort, BCBSM had the largest network of hospitals in Michigan,

---

[32] *See*, *e.g.*, Longbrake (Huron Medical Center) Dep. 48-50 (stating that Medicare reimburses the hospital "[a]bout 48 cents on the dollar" and Medicaid reimburses the hospital "between 20 and 30 cents on the dollar") (App. 4); Susterich (Metro Health Hospital) Dep. 26-27 (stating that government reimbursement shortfalls are "a burden that we have to bear") (App. 5); Schonfeld (MHA) Dep. 164-68 & BCBSM Exs. 1450-1455 (discussing Michigan Hospital Association reports regarding the impact of Medicare and Medicaid reimbursements, bad debt and charity care over the relevant period) (App. 6-12); BCBSM Ex. 33 (App. 13); *see also* Falatko (Hills & Dales) Dep. 35, 41-47 (explaining bad debt and government shortfalls) (App. 3); Fifer (Spectrum) Dep. 187-91 (discussing government shortfalls, charity care and bad debt) (App. 14); Nelson (Memorial Medical Center of West Michigan) Dep. 43 (government shortfalls reduce hospital's operating income) (App. 15).

[33] Schonfeld (MHA) Dep. 178 & BCBSM Ex. 1451 at 387 (App. 6 & 8).

[34] Schonfeld (MHA) Dep. 179-80 & BCBSM Ex. 1452 at 403 (App. 6 & 9).

[35] *See*, *e.g.*, Schonfeld (MHA) Dep. 214 (App. 6); Winters (Aetna) Dep. 293-95 (App. 16); Marks (University of Michigan) Dep. 32-33 (App. 17); Plaskey (Oakwood) Dep. 35, 66-67 (App. 18); Johnson (Eaton Rapids) Dep. 172 (App. 19).

contracting with every hospital including those in rural areas.[36]  To maintain
universal access, BCBSM was required to balance helping Michigan hospitals
sustain their financial health with negotiating favorable reimbursement rates for its
members.[37]  BCBSM, as the third-largest payor for healthcare services in Michigan
(behind Medicare and Medicaid),[38] has historically been able to obtain hospital
rates lower than those charged most other insurers due to its large number of
members.[39]  But that same size and relatively low rate structure made BCBSM a
target for hospitals seeking more money to offset government shortfalls.[40]  The
hospitals' quest for more money provides the backdrop for the MFNs.

During the relevant period, BCBSM proposed a model contract to Michigan
Peer Group 1-4 hospitals.[41]  That contract was available to any Michigan hospital

---

[36] "Largest Network," http://www.bcbsm.com/index/about-us/why-choose-
us/largest-network.html.

[37] *See* M.C.L. § 550.1102(1).

[38] Consolidated Am. Compl. ¶ 9 [Doc. #78].

[39] *See*, *e.g.*, Reichle (Sparrow) Dep. 98 ("Blue Cross is going to get the
biggest discount because they're the biggest payor, and everybody else is going to
get in line behind based on the volume of business they can bring us.") (App. 20);
Bjella (Alpena) Dep. 261-62 (BCBSM has more volume than other commercial
payors at Alpena by many multiples, and that volume disparity explains BCBSM's
rate advantage) (App. 21); Jackson (Charlevoix) Dep. 171-72 (volume influences
discount, and BCBSM has the most volume) (App. 22).

[40] Matzick (Beaumont) Dep. 31-32 (App. 23); Felbinger (Ascension) Dep.
214-15 (App. 24).

[41] BCBSM categorizes hospitals as belonging to various Peer Groups (PG),
with 1 representing the largest hospitals, and 5 the smallest, rural hospitals.  *See*

except a set of small rural hospitals (for which, as discussed below, there was a

different model contract).[42]  The model contract did not contain an MFN.

MFNs were agreed to with some hospitals only when the hospitals asked

that BCBSM change the model contract's terms.  Many of those hospitals claimed

financial hardship due to economic conditions or reductions in reimbursement

levels from government programs.[43]  In some—but not the majority[44]—of

situations when these larger hospitals or hospital systems sought to vary the model

---

Def.'s Resp. to Pls.' Mot. for Class Certification, App. 30 (Feb. 3, 2014) [Doc. #139-31].  The majority of Michigan hospital beds are at PG 1-4 hospitals. Leitzinger Report Corrected Ex. 5 (App. 1).  Seventy-five hospitals never had an MFN with BCBSM.  *See id.* at Ex. 3 (App. 1).

[42] *See* Expert Report of Professor David. S. Sibley ¶ 37 (Feb. 3, 2014) ("Sibley Report") (App. 25).

[43] *See, e.g.*, ARMC00068-0068.001 (Alpena finances so bad it only had ten days cash on hand) (App. 26); Gronda (Covenant) Dep. 138, 153-54 & BCBSM Ex. 1301 (citing government shortfalls and financial troubles brought on by the recession) (App. 27 & 28); Worden (Marquette) Dep. 152-53 (hospital "financially distressed" and defaulted on bond covenants in 2008) (App. 29).  *See also* Sibley Report ¶ 35 (citing study conducted by Hal Cohen, Inc. from 2005-2007 showing that many Michigan hospitals had negative margins on net patient income) (App. 25).

[44] Two hospitals or systems in Grand Rapids, Spectrum and Trinity St. Mary's, have a total of 1,410 beds and no Differential MFNs.  Leitzinger Report at Fig. 1 & Fig. 3 (App. 1).  Many of the largest hospitals in other regions, such as Trinity (concentrated in Southeast Michigan, but with several hundred beds in both Grand Rapids and Muskegon); McLaren (with almost 2,000 beds from Lansing to Flint); and Bronson (with 621 beds in Kalamazoo and Battle Creek) did not have Differential MFN provisions.  *Id.*  Moreover, some hospitals rejected Differential MFNs.  *See, e.g.*, Plaskey (Oakwood) Dep. 243 & Isenstein (Oakwood) Dep. 110 (hospital rejected BCBSM's request for Differential MFN, and contract included no MFN) (App. 18 & 30).

contract terms, an MFN was included in the ultimate contract.  This took place

over a nearly four-year period; and in some cases an MFN was suggested by the

hospital, while in other cases by BCBSM.[45]  For the most part, these MFNs stated

either that BCBSM's rate would be better than the rates of other payors by defining

a fixed differential amount or simply using the word "less."  Ultimately,

Differential MFNs applied to a patchwork of 23 hospitals scattered around

Michigan (in contrast, 75 hospitals never had MFNs with BCBSM at all).[46]  And,

at the time of contracting BCBSM's rates were better than any non-governmental

competitor's rates by more than any required differential.[47]

---

[45] Hospital contracts with Differential MFNs went into effect at different times over the period February 7, 2006 to January 1, 2010.  *See* Sorget (BCBSM) Dep. 118-19 (BCBSM practices generally) (App. 31); Darland (BCBSM) Dep. 186 (same) (App. 32).  *See*, *e.g.*, Sibley Report ¶ 142 ("Allegan unilaterally offered BCBSM an MFN provision.") (App. 25).

[46] Consistent with common sense, negotiators at No-MFN hospitals testified that MFNs at other Michigan hospitals had no effect on their negotiations or pricing.  *See*, *e.g.*, Downs (Pennock) Dep. 107-09, 115 (App. 33); Whitbread (Henry Ford) Dep. 156-57, 159-60 (App. 34); Isenstein (Oakwood) Dep. 111, 119 (App. 30); Sahney (Trinity Health) Dep. 103-04 (App. 35); Marks (University of Michigan) Dep. 106 (App. 17); Wisniewski (Hurley) Dep. 29-34 (App. 36).

[47] Matzick (Beaumont) Dep. 123-24 (BCBSM's discount advantage at Beaumont persisted throughout Matzick's entire tenure at Beaumont, which began in 1983) (App. 23); Rodgers (MidMichigan) Dep. 151 (hospital not reluctant to agree to MFN-differential because the pre-existing spread was so wide that the MFN obligation "didn't matter") and 164-65 (large differential had existed for at least 20 years, starting well before MFN, and had widened over time) (App. 37); McGuire (Ascension) Dep. 221-22 (BCBSM had a pre-existing discount advantage at St. John Providence that exceeded the 10% differential in the MFN clause) (App. 38); Susterich (Metro Health) Dep. 59 (the discount gap between BCBSM

### a.   Differential MFNs Never Caused Any Hospital to Raise Or Refuse To Lower A Competitor's Prices

The undisputed evidence established that no Differential MFN ever caused a change in a competitor's prices:[48]

- Hospital executives who negotiate prices with health insurers—unanimously in over 65 hours of testimony—were unequivocal on this point:  **no Differential MFN ever caused a hospital to raise, or refuse to lower, another health insurer's prices**.[49]

- PG 1-4 hospitals with Differential MFNs produced over 250,000 documents related to their payment strategies and internal considerations of insurers' requests for deeper discounts.  These internal hospital documents corroborate the hospitals' testimony.

---

and other commercial payors was greater prior to implementation of the MFN than after) (App. 5); Gronda (Covenant) Dep. 64-66, 92, 149 (the MFN-required 15% point differential was less than the pre-existing gap, except for risk-based agreements to which the MFN clause did not apply) (App. 27).

[48] This is not to say that the Differential MFNs served no purpose at all. They facilitated negotiating by enabling BCBSM to address the hospitals' financial needs while validating the hospitals' claims that BCBSM should increase reimbursements because (in part) it was not paying as much as other insurers. Seitz (BCBSM) Dep. 242-43 (App. 39); Sibley Report ¶¶ 8, 63 (App. 25); *see also* Fifer (Spectrum) Dep. 265-66 (regarding system's PG 5 facilities) (App. 14).  That is consistent with well-known procompetitive purposes of MFNs.  Sibley Report ¶¶ 66-67 (App. 25).

[49] McGuire (Ascension) Dep. 186-88 (App. 38); Felbinger (Ascension) Dep. 231-36 (App. 24); Smith (Ascension) Dep. 160-61 (App. 40); Matzick (Beaumont) Dep. 141 (App. 23); Vitale (Beaumont) Dep. 65-66 (App. 41); Reichle (Sparrow) Dep. 157-58, 163 (App. 20); Bjella (Alpena) Dep. 204 (App. 21); Marcellino (Botsford) Dep. 76-78 (App. 42); Leach (Munson) Dep. 163-64, 264, 269, 297-302, 318-19 (App. 43); Rodgers (MidMichigan) Dep. 172-74, 177-84, 215-16 (App. 37); Worden (Marquette) Dep. 186-87 (App. 29); Susterich (Metro Health) Dep. 60-61, 187, 190-92, 195, 210 (App. 5); Gronda (Covenant) Dep. 147-50 (App. 27).

- The Differential MFNs did not cause any existing prices to change. When hospitals and BCBSM agreed to the Differential MFNs, the hospitals had ample room to lower competitors' prices without implicating any agreement with BCBSM because the preexisting margin was more than the required differential.[50]

- Hospitals had little incentive to decrease competitors' rates, irrespective of any Differential MFN, because doing so would dramatically decrease the hospitals' revenues.[51]

Moreover, even if BCBSM paid more after the MFNs than it paid before, its competitors' rates did not change. As a result, BCBSM's cost advantage over its competitors shrank in the wake of the MFNs. Reducing BCBSM's hospital cost advantage would boost competing insurers' competitive position—exactly the opposite of the outcome Plaintiffs alleged.

> **b.    The PG 5 Equal-To MFN was Part of a Contract that Reduced BCBSM's Costs While Stabilizing Rural Hospitals' Finances, Maintaining Hospital Access**

Nearly all of the Equal-To MFNs were at rural hospitals BCBSM designates as PG 5—generally, the smallest hospitals in the state. PG 5 hospitals contract with BCBSM through a single model contract called the Participating Hospital Agreement or "PHA." These rural hospitals were severely affected by the economic and cost issues described above. They experienced low use, with some

---

[50] *See* n. 47, *supra*.

[51] *See, e.g.*, Sahney (Trinity Health) Dep. 100-108 (Trinity charges BCBSM one rate and other "Tier 2" payors a different rate by design, unrelated to any MFN) (App. 35).

hospitals admitting less than a handful of patients each day.[52]  Some were

operating under the constant threat of being forced to close.[53]

These hospitals asked BCBSM to help them meet their financial

commitments and survive.[54]  But BCBSM was concerned that in some cases it was

overpaying some PG 5 hospitals, or that the hospitals were not using BCBSM's

---

[52] *See*, *e.g.*, Johnson (Eaton Rapids) Dep. 28-29 (stating that the hospital was utilizing two and a half beds a day in 2012) (App. 19); Lutz (Scheurer) Dep. 163 (stating that only one to two of its acute care beds are occupied on a daily basis) (App. 44).

[53] *See*, *e.g.*, Ruedisueli (McKenzie) Dep. 19-20 (stating that McKenzie Health System's financial condition has gotten "significantly worse" since 2005 and the hospital suffered a million dollar loss in 2010) & 83 (McKenzie hospital relying on American Express reward money for finances) (App. 45); Sibley Report ¶ 88 & n.260 (quoting Cawley (Sheridan) Dep.) ("Unless I have a game changing event . . . there's no question that this hospital will in fact eventually close.") (App. 25).

[54] Jackson (Charlevoix) Dep. 48-49 (App. 22); Sorget (BCBSM) Dep. 55-56 ("The hospital industry was very frustrated with the situation that was occurring in the Michigan marketplace relative to the inflationary increases weren't keeping up with the payment updates, government payment shortfalls was an issue, and product migration of customers moving to lower-cost products, such as the PPO. And it was creating a concern that they were all demanding more money.  And that was the premise for this whole revision of the PHA, is they were demanding more money….") (App. 31); *id.* at 100 ("we had – staff had received comments from hospitals who were seeking more money as Peer Group 5s, that then they wanted more money from us because they weren't meeting their revenue …"); *id.* at 402 ("I recall my staff being approached by some Peer Group 5 hospitals before we ended up with the new model reimbursement arrangement, why they needed more money from Blue Cross to remain financially viable.") (App. 31).

payments to improve healthcare.[55]  Thus in 2007, with the input of the Michigan Hospital Association (MHA), BCBSM developed a PG 5 payment methodology that was designed to stabilize small rural hospitals' financial health by guaranteeing an operating margin on BCBSM business.[56]  The hospitals could achieve an operating margin to invest in necessary improvements, and BCBSM's reimbursement rate would be based on each hospital's actual financial performance.  This provided the hospitals greater financial certainty and some insulation from fluctuations in government payments.[57]

Because BCBSM was guaranteeing the hospitals a margin, BCBSM sought to protect its investment in these hospitals from being exploited by competing insurers, who might seek to shift the hospitals' costs to BCBSM or free-ride on BCBSM's payments.  Thus, the PHA contained an Equal-To MFN, under which a hospital could lower BCBSM's prices to the levels provided to other insurers, but did not have to charge any competitor any more than it charged BCBSM.[58]  As

---

[55] Noxon (BCBSM) Dep. 210-11 (App. 46); Darland (BCBSM) Dep. 186 (App. 32).

[56] *See* Pls.' Mot. for Class Certification, Ex. V [Doc. #133-22] at AGH 04-00067 to 74 (PHA Ex. B, § V). *See also* Sibley Report ¶ 38 (App. 25).

[57] Falatko (Hills & Dales) Dep. 153-56 (App. 3).

[58] *See* Pls.' Mot. for Class Certification, Ex. V [Doc. #133-22] at AGH 04-00071 to 72 (PHA Ex. B, § V(F)) (the MFN provision stated that "Hospital will attest and commit that the payment rates which it has provided to BCBSM under this Agreement . . . are at least as favorable as the rates which it has established

BCBSM had hoped, the PHA's net effect was to reduce BCBSM's expenditures at the PG 5 hospitals.[59]

### c.  The Equal-To MFNs at Small Hospitals Had No Anticompetitive Effect

The Equal-To MFNs did not harm competition for several reasons:

- One after another, BCBSM's competitors conceded that they could compete effectively against BCBSM with the same price.[60] Aetna, CIGNA, HealthPlus, Priority, PHP and United even testified that they could compete at a rate that was higher than BCBSM's.[61]

- Even though the PG 5 model stabilized the financial health of rural hospitals, it lowered BCBSM's total payments to this group of

---

with all other non-governmental PPOs, non-governmental HMOs or other non-governmental commercial insurers.").

[59] Darland (BCBSM) Dep. 106-07 (App. 32); Sibley Report ¶ 38 (The thrust of the Peer Group 5 model was to lower reimbursement to hospitals.") (App. 25). *See also id.* ¶ 18 ("Dr. Leitzinger did not conduct a statistical analysis of BCBSM's rates (or the rates of more than a single BCBSM competitor) at any of the eight Peer Group 5 hospitals he considered. When I applied his methods to BCBSM rates at those hospitals, I found that BCBSM's rates often declined.").

[60] Winters (Aetna) Dep. 148 (App. 16); Tracy (CIGNA) Dep. 59 (App. 47); Koziara (Priority) Dep. 110-11, 126, 150-51, 167 (App. 48); Kline (United) Dep. 60-61, 137, 153, 247-51 (App. 49); Petrovic (United) Dep. 81-82, 141-42, 194-95 (App. 50).

[61] Andreshak (Aetna) Dep. 80 (App. 51); Bertolini (Aetna) Dep. 49 (App. 52); Connolly (Aetna) Dep. 247 (App. 53); Tracy (CIGNA) Dep. 109-11 (App. 47); O'Neil (HealthPlus) Dep. 98 (App. 54); Koziara (Priority) Dep. 57-59 (App. 48); Wilkerson (PHP) Dep. 89, 294 (App. 55); Kline (United) Dep. 249, 252 (App. 49); Petrovic (United) Dep. 82-83 (App. 50). *See also* Smith (Kearny Street Advisors) Dep. 33 (consultant testifying as to same) (App. 56).

hospitals as a whole.[62]  Antitrust challenges to MFNs that help reduce the contracting party's costs are routinely rejected.[63]

▪ Equal-To MFNs at hospitals in the Thumb allowed Priority to secure five new hospital contracts that, previously, it could not obtain; and in at least eight other instances involving HealthPlus, HAP, United and others, Equal-To MFNs actually facilitated an agreement with a PG 5 hospital.[64]

▪ Although 44 rural hospitals in Michigan agreed to an Equal-To MFN, those hospitals only account for a small fraction of BCBSM's and other insurers' hospital business statewide.   PG 5 hospitals

---

[62] Darland (BCBSM) Dep. 106-07 (PHA model drove down PG 5 reimbursements rates) (App. 32).

[63] As Judge Posner explained, MFN clauses are "standard devices by which buyers try to bargain for low prices" and that is "the sort of conduct that the antitrust laws seek to encourage." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (Posner, J.).  *See also*, *e.g., Ocean State Physicians Health Plan v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110-1111 (1st Cir. 1989) (finding that an MFN pricing policy "tends to further competition on the merits and, as a matter of law, is not exclusionary"); *Blue Cross and Blue Shield of Mich. v. Mich. Ass'n of Psychotherapy Clinics*, No. 9-71014, 1980 WL 1848, at *3 (E.D. Mich. Mar. 14, 1980) (rejecting the idea that MFNs have "a chilling effect upon the rate structure of mental health care clinics," or that these contracts compel medical service providers to charge a specific rate). In fact, no fully litigated case has ever held an MFN itself to be an antitrust violation.

[64] Harbor Beach reached such agreements with Priority and HealthPlus. Wehner (Harbor Beach) Dep. 146-48 (Priority) & 184 (HealthPlus) (App. 57). Hills & Dales reached such agreements with Priority and Multiplan.  Falatko (Hills & Dales) Dep. 83-85, 130-31, 166-69 (Priority) & 170-71 (Multiplan) (App. 3). Marlette reached such agreements with HealthPlus and Priority.  Babcock (Marlette) Dep. 215-16 (HealthPlus) & 217 (Priority) (App. 58).  McKenzie reached such agreements with HAP, United, and Priority.  Ruedisueli (McKenzie) Dep. 99-101, 112-19, 155 (App. 45).  Scheurer reached such agreements with Priority, HealthPlus, Coventry, and Three Rivers Health Care.  Lutz (Scheurer) Dep. 22-23, 113, 122, 245-48 (App. 44).

collectively account for 6.3% of Michigan hospital beds.[65]  These hospitals are in more isolated areas of Michigan where competing insurers have fewer members and consequently less hospital use.[66]

Moreover, any alleged effect would be *de minimis* and certainly insufficient to warrant a finding of market-wide harm to competition.

### d.   There is No Evidence that the MFNs Prevented Competitors from Growing, Raised or Maintained BCBSM's Market Share, or Raised Prices

BCBSM's competitors grew while the MFNs were in effect.  The Michigan Office of Financial and Insurance Regulation (OFIR) released reports in 2008 and 2010 finding that the small group market in Michigan was competitive.[67]  Other competitors obtained favorable contracts from providers during this period.[68] Priority, HAP, HealthPlus and Cigna all increased market share, sales or revenues

---

[65] Leitzinger Expert Report Corrected Ex. 5 (App. 1).

[66] Andreshak (BCBSM) Dep. 157-58 (App. 51).

[67] *E.g.*, Ken Ross, Insurance Commissioner, The State of Competition in the Small Employer Carrier Health Insurance Market in the State of Michigan, BLUECROSSMI-99-03563381 at 3 (May 2008) (finding there is "a reasonable degree of competition" in the market for the sale of small group insurance) (App. 59); Ken Ross, Insurance Commissioner, The State of Competition in the Small Employer Carrier Health Insurance Market in the State of Michigan, BLUECROSSMI-99-02462148 at 3 (May 2010) (finding there is "a reasonable degree of competition" in the market for the sale of small group insurance) (App. 60).

[68] *See*, *e.g.*, PH-DOJ-0002997, PH-DOJ-0002995 (Beaumont providing Priority with in-network rates below the MFN "barrier") (App. 61 & App. 62).

while the MFN clauses were in effect.[69]  For example, between 2008 and 2010,

Priority's membership "grew a hundred thousand members."[70]  Between 2008 and

2012, HealthPlus grew membership in its new PPO product by 800%, winning

business from BCBSM.[71]  Aetna recognized that competition was strong

throughout Michigan, as national payors like Humana and United Health Care

were expanding their networks,[72] regional competitors like HAP were growing,[73]

---

[69] Jenkins (HealthPlus) Dep. 57, 61-62 and BCBSM Ex. 1609, HP-DOJ-0000409 at 410 (Between 2008 and 2012, HealthPlus's PPO membership grew by 40,000 members) (App. 63 & 64); Hall (HAP) Dep. 62-63 & BCBSM Ex. 1173 at HAP-DOJ-004163 (in 2010, HAP reached a new high for sales since at least 2004 and improved its customer retention rate from 85% in 2009 to 90% in 2010) (App. 65 & 66); BCBSM Ex. 1162, AETNA-00226835 at 836 (January 9, 2007 Michigan Market presentation deck stating that Cigna and HAP were doing better than expected) (App. 67); Dallafior (BCBSM) Dep. 171-72 (BCBSM lost approximately two-thirds of its small group membership from 2006 to 2012 due in part to Priority Health, HealthPlus, and McLaren Health's aggressive pricing strategies in the small group market) (App. 68).

[70] Budden (Priority) Dep. 16-17 (Priority had improved "top line growth" since July of 2009 and "grew a hundred thousand members" from 2009 to 2010 across all product segments) (App. 69).  *See also* Scoggin (Great Lakes Employee Benefit Services) Dep. 82 (Priority "made a major move into…southeastern Michigan" and "became a bigger player in our market."), 98-101 ("Priority Health has made a major dent in HAP's and Blue Cross's enrollment" at Oakland University by taking roughly a 50% share) (App. 70).

[71] Jenkins (HealthPlus) Dep. 57, 61-62 & BCBSM Ex. 1609, HP-DOJ-0000409 at 410 (Between 2008 and 2012, HealthPlus's PPO membership grew by 40,000 members) (App. 63 & 64).

[72] BCBSM Ex. 1162, AETNA-00226835 at 837, 840 (App. 67).

[73] *Id.* at 836.

there were three to four strong competitors in each major city,[74] and insurers'
competitive strategies reflected this robust competition.[75]

### 3.   Plaintiffs' Drastic Downsizing of their Case Did Not Improve their Chances of Success

After discovery, admitting that "it may not be possible to prove damages at
all the MFN hospitals," Plaintiffs sought to certify a significantly narrower class
involving:

- MFN agreements at only 13 "affected" Michigan hospitals;

- Only three competing commercial payors (Aetna, Priority and HAP),
  and Plaintiffs could not even say these three payors were impacted at
  any of the same "affected hospitals"; and

- According to Plaintiffs' expert, 23 "affected combinations" composed
  of an "affected hospital" and one of four "affected" payors (Aetna,
  Priority, HAP or BCBSM).[76]

That is, rather than MFNs harming everyone everywhere, after discovery Plaintiffs
conceded they could not prove that MFNs caused harm at most hospitals—in fact,
they narrowed their allegations to 13 hospitals, roughly 10% of all Michigan
hospitals.  Moreover, under Plaintiffs' narrowed theory, the MFNs did not even
cause harm to more than a single BCBSM competitor at any one hospital, or even
to all of an insurer's customers at a given hospital.

---

[74] *Id.* at 838.

[75] *Id.* at 839.

[76] Leitzinger Report Ex. 9 (App. 1).

While narrower than Plaintiffs' original allegations, this stripped-down case did not stand any better chance of ultimate success.

### a.    MFNs Did Not Harm Competition

Plaintiffs' new case alleged cost increases to only three competitors—Aetna, Priority and HAP—at only 11 of Michigan's 144 hospitals, specifically:

- ▪ Aetna at two Equal-To MFN hospitals;

- ▪ Priority at six Equal-To MFN hospitals;

- ▪ HAP at one Differential MFN hospital system (three hospitals).

And for each of these 11 hospitals, only one competitor at any given hospital allegedly was affected by an MFN—that is, Plaintiffs claim that an MFN affected a single competitor but not others.  But even assuming this "harm" was caused by MFNs, "the Sherman Act was intended to protect competition and the market as a whole, not individual competitors."[77]  Thus, "the key inquiry is whether *competition*—not necessarily a competitor—suffered as a result of the challenged business practice."[78]

---

[77] *Care Heating*, 427 F.3d at 1014; *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) ("The antitrust laws were enacted for the protection of *competition*, not *competitors*.").

[78] *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 572 (6th Cir. 2009); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *Care Heating*, 427 F.3d at 1014-15 (holding that where a plaintiff's proof shows "only adverse effects suffered by an individual competitor[, it] cannot establish an antitrust injury").

Merely showing changed prices to a single competitor at isolated hospitals without harm to competition does not establish an antitrust violation.[79]  Nor does the mere fact that some competitors might pay more suffice, even where a defendant sought to cause that very result.[80]  Instead, Plaintiffs would have to show a substantial price increase to a substantial number of competitors that resulted in BCBSM increasing the cost gap between its prices and its competitors' prices in such a way that competition for the sale of insurance was materially harmed.[81]  It would be impossible for Plaintiffs to make any such showing based on these small and scattered MFN effects (if they even existed at all, which is doubtful).

### b.    Plaintiffs Could Not Prove Injury in Fact

Not only did Plaintiffs lack evidence showing harm to competition, but they also would have struggled even to establish that the MFNs, and not some other causes, actually harmed any competitor.[82]

### i.    Priority Health

---

[79] *See, e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (that some purchasers pay higher prices is not alone sufficient to show antitrust injury, or indeed an antitrust violation).

[80] *Indeck Energy Servs.*, 250 F.3d at 977; *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 239-41 (7th Cir. 1996) (finding no antitrust injury where defendant "set about to raise its rival's costs" and succeeded in doing so).

[81] *Brantley*, 675 F.3d at 1198 ("Plaintiffs must plead an injury to competition beyond the impact on the plaintiffs themselves.").

[82] *MCI Commc'ns*, 708 F.2d at 1161; s*ee also* discussion at III.B, *supra*.

Under Plaintiffs' analysis, Priority allegedly was affected at six PG 5 hospitals with Equal-To MFNs.[83]  As noted above, Equal-To MFNs, at worst, created a level playing field.  Indeed, Priority (and others) admitted that it could compete at or near the same rate as BCBSM.[84]  Priority would also be hard-pressed to complain about MFNs because Priority itself—like its other Michigan competitors—used MFNs in hospital contracting.[85]

Moreover, as discussed above, Priority grew significantly while the Equal-To MFNs were in place at these hospitals,[86] including securing a number of new hospital contracts.[87] Among others, Priority agreed to a contract with Beaumont that included rates that were at or near BCBSM's rates, despite the Differential

---

[83] *See* Leitzinger Report Ex. 9 (App. 1).

[84] Koziara (Priority) Dep. 57-59 (even 5% over may be competitive), 167 (within a point at a PG 5) (App. 48).  *See* notes 60-61 *supra*.

[85] Priority had MFNs in many of its contracts with Michigan hospitals. Bjella (Alpena) Dep. 232-35 (Alpena) (App. 21); Jackson (Charlevoix) Dep. 206-08 (Charlevoix) (App. 22); Johnson (Eaton Rapids) Dep. 21-22, 220-21, 249-50 (Eaton Rapids) (App. 19); Leach (Munson) Dep. 156-59, 289-91 (Munson) (App. 43); Andrews (Three Rivers) Dep. 254-56 (Three Rivers) (App. 71). Other Michigan competitors used MFNs as well, *see* note 113 *infra*.

[86] *See* Section III.B.2.d *supra*.

[87] *See, e.g.*,  Hughes (Bronson) Dep. 209 (App. 72); Falatko (Hills & Dales) Dep. 83-85, 130-31, 166-69 (App. 3); Ruedisueli (McKenzie) Dep. 101, 112-15 (App. 45); Leach (Munson) Dep. 99 (App. 43); Lutz (Scheurer) Dep. 22-23 (App. 44). *See also* Sahney (Trinity Health) Dep. 210-13 (Priority responded to the Lakeshore MFN by agreeing to exchange increased rates at Lakeshore for reduced rates at other Trinity Michigan facilities) (App. 35).

MFN in BCBSM's contract with Beaumont.[88]   And Alpena agreed to a

Differential MFN with BCBSM, then disregarded that MFN the following day in

the agreement it signed with Priority.[89]

### ii.   Aetna

Under Dr. Leitzinger's analysis, Aetna only faced increases at two Equal-To

MFN hospitals resulting in only $2 million in rate increases, which—even if that

were true—would not be sufficient to establish competitive harm to Aetna, much

less harm to competition.  Aetna, like others, conceded that it could compete with

BCBSM at the same price.[90]

### iii.   HAP

HAP was one of the three commercial payors that remained a part of

Plaintiffs' class definition when, after discovery, Plaintiffs moved to certify their

---

[88] *Compare* Johnson (Beaumont) Dep. 160-64 (MFN clause provided that BCBSM have a rate at about 10% points better than other payors) (App. 73) *with* Johnson (Beaumont) Ex. 17 (US-DOJ-018543) (Priority within 0.31% points in 2008 and 2.61% points in 2009) (App. 74).

[89] Bjella (Alpena) Dep. 221-22 (Priority rate improved), 232-35 (Priority secured MFN at Alpena) (App. 21).  *See also* Bjella (Alpena) DOJ Ex. 8 (ARMC00074) (App. 75); Bjella (Alpena) DOJ Ex. 9 at 1484 (PH-DOJ-0001480) (December 2009 Alpena/Priority HMO contract containing MFN) (App. 76); ARMC00014 at 018 (December 2009 Alpena /Priority PPO contract containing MFN) (App. 77).

[90] Sanders (Aetna) Dep. 216 (App. 78); Winters (Aetna) 2012 Dep. 148 (App. 16).

narrowed class.[91]  Dr. Leitzinger opined that the class was overcharged a total of

$118 million due to MFNs.[92]  Of that estimated $118 million, HAP was allegedly

overcharged $58 million at a single hospital system:  Beaumont.[93]  In other words,

HAP's estimated damages were almost 50% of all class damages.

But discovery established that the MFN in the Beaumont-BCBSM contract

did ***not*** increase HAP's rates at Beaumont hospitals.  Rather, HAP's prices at

Beaumont increased due to contractual inflationary increases,[94] adjustments due to

Cigna membership migration,[95] or were budget-neutral conversions from per diem

---

[91] Pls.' Mot. For Class Certification [Doc. #133] 4-5.

[92] Leitzinger Report Ex. 9 (App. 1).

[93] *Id.*

[94] HAP-DOJ-002966 at 967-68 (Dec. 1, 2005 Letter of Understanding between HAP and Beaumont stating "subsequent year increases for …Inpatient and Outpatient services will be tied to the first half average of the Medical Consumer Price Index") (App. 79); HAP-DOJ-003114 at 150, 152 (Jan. 1, 2006 Participating Hospital Agreement between HAP and Beaumont) (App. 80); HAP-DOJ-001478 (June 2008 letter from Beaumont to HAP discussing "increasing rates by the contractual obligation of 7%") (App. 81).

[95] In April 2005, Beaumont's planned proposal to HAP included accepting a 4.1% rate increase and "[n]eutralizing CIGNA business move, if any."  Beaumont email re: HAP Response (April 18, 2005) (App. 82).  In other words, HAP agreed to give Beaumont a higher reimbursement on PHP products due to the Cigna "co-marketing" affiliation with HAP in 2006.  HAP-DOJ-002114-116 (PHP effective rate for 2006 included a 6.2% increase associated with the Cigna business, and methodology for 6.2% increase associated with Cigna business.) (App. 83).  The parties entered into Letter of Agreement ("LOA") and then hospital service agreement effective January 1, 2006, each stating that "[b]oth parties agree that the PHP rates contemplate an adjustment for CIGNA related business."  HAP-DOJ-002966 at 967 (App. 79); HAP-DOJ-003114 at 152 (App. 80).

to DRG base rates.[96]  Moreover, Dr. Leitzinger admitted that he did not review the

negotiation documents, and thus failed to identify or consider these actual causes.[97]

And, what is more, HAP itself secured an MFN at Beaumont.[98]

HAP's own witnesses testified they had no basis to conclude that an MFN

had any effect on HAP's hospital rates.[99]  Other surrounding hospitals testified

similarly:

- **St. John** — Patrick McGuire, CFO of St. John Providence Health
  System testified that no payor's prices at St. John were increased due

---

[96] HAP-DOJ-002872 (July 15, 2006 Second Amendment to HAP/Beaumont
agreement converting the inpatient reimbursement rates from per diem to DRG
base rates, and including a budget neutrality clause at 875) (App. 84); HAP-DOJ-
003072 at 74, 77 (May 1, 2008 First Amendment to Beaumont/HAP Participating
Hospital Agreement converting reimbursement rates at Royal Oak and Troy from
per diem to a DRG base rate) (App. 85).

[97] *See* Def.'s Mot. to Exclude the Expert Test. of Dr. Jeffrey Leitzinger at 5-
6 & n.7 [Doc. #140].

[98] HAP-DOJ-003114 at 152-53 (App. 80).

[99] Laura Eory, HAP's former associate Vice President for Provider
Contracting, testified that no hospital has ever "said anything to [her] about that
hospital having an MFN contract with Blue Cross and some effect on the rates that
that hospital could offer HAP."  Eory (HAP) Dep. 44 (App. 86).  She is not "aware
of any effects of MFNs on HAP's hospital rates [or] . . . HAP's hospital
negotiations."  *Id.* at 56.  HAP Vice President of Commercial Sales and Service
Mark Hall, likewise had no knowledge of impact on HAP of any Blue Cross MFN
contract.  Although Mr. Hall read of MFN contracts in the newspaper and the DOJ
suit, MFN "contracts between Blue Cross and hospitals have not come up in the
course of [Mr. Hall] doing [his] job at HAP."  Hall (HAP) Dep. 33 (App. 65).  Mr.
Hall has no "factual information that some MFN between Blue Cross and some
hospital was a factor in some specific attempt by HAP to negotiate a contract with
that hospital."  *Id.* at 161.

to the MFN.[100]  Nor did St. John refuse to decrease any payor's price due to the MFN.[101]  St. John did not terminate any contract or refuse to contract with any payor due to the MFN.[102]

- ▪ **Botsford** (now part of the Beaumont system) — David Marcellino, former Botsford CFO, testified the MFN had no effect on the rate Botsford was willing to agree to with HAP or any commercial payor.[103]

### iv.    BCBSM

Plaintiffs limited their class to BCBSM customers who received care at hospitals within the Beaumont and St. John Providence/Ascension systems.[104]  Yet the evidence contradicts any conclusion that the negotiations were anything but hard-fought, or resulted in BCBSM failing to obtain the best possible price.

Both Beaumont and Ascension demanded significant rate increases, but BCBSM agreed to only a small fraction of these hospitals' demands.[105]  In fact, one day after the DOJ filed its Complaint, an internal Beaumont document

---

[100] McGuire (Ascension) Dep. 186-87 (App. 38).

[101] McGuire (Ascension) Dep. 187-88 (App. 38).

[102] McGuire (Ascension) Dep. 188-89 (App.38).

[103] Marcellino (Botsford) Dep. 76-78 (App. 42).

[104] Leitzinger Report Ex. 9 (App. 1).

[105] Sorget (BCBSM) Dep. 173 (Ascension demanded a 20% rate increase, but BCBSM agreed to an increase of only about 4%) (App. 31); Sibley Report ¶ 131 (BCBSM agreed to a limited rate increase at Beaumont, recognizing Beaumont's bargaining power) (App. 25).

ridiculed the DOJ's allegation that BCBSM "paid" Beaumont for its MFN.[106]  And

both Beaumont and Ascension executives testified that the MFNs had no effect. [107]

Dr. Leitzinger admitted that he conducted no analysis of the actual

negotiations at Beaumont or Ascension.[108]  BCBSM's expert, Dr. Sibley, analyzed

those negotiations and determined that BCBSM's rates went up because these

systems wielded their considerable bargaining power to extract higher prices from

BCBSM—not because of the MFNs.[109]

Moreover, even if BCBSM actually paid more to Beaumont and Ascension,

that does not create an antitrust harm unless competition was harmed by other

competitors paying even more and being unable to offset those higher costs—

which, as shown above, did not happen.

---

[106] BCBSM Ex. 690 (BEAU-DOJ-00002272) (App. 87).  What is more, BCBSM's rate at Beaumont actually increased in its 2012 agreement, which did ***not*** include an MFN.  Vitale (Beaumont) Dep. 32-33, 81 (parties entered an LOU with higher updates but no MFN) (App. 41); Johnson (BCBSM) Dep. 26 (LOU provided more funds) (App. 73).

[107] Vitale (Beaumont) Dep. 65 (MFN with BCBSM didn't impact any business decision) (App. 41); McGuire (Ascension) Dep. 185-89 ("we have not made any changes to any contracts because of the MFN") (App. 38).

[108] Leitzinger Dep. 76 (Q So you as the expert economist did not do any analysis of the negotiation files between any affected payer and any hospital in any of the affected combinations, correct? A That's right. That was done by the legal team, as I understand it.) (App. 88).

[109] Sibley Report ¶¶ 130-138 (App. 25); McGuire (Ascension) Dep. 94-97, 184-185, 195 (detailing Ascension's aggressive negotiating strategy) (App. 38)

### c.   Plaintiffs Have Not Grappled With BCBSM's Other Defenses

The above analysis shows that Plaintiffs were unlikely to establish their affirmative case, which of course would have precluded any recovery.  But the facts also show that Plaintiffs would have faced daunting defenses by BCBSM, rendering any meaningful recovery improbable.  We provide only a brief discussion of some of these defenses here.[110]

**First**, as recognized by widely-accepted economic theory and case law, MFNs have many procompetitive benefits, and provided many such benefits here, such as helping BCBSM invest in Michigan hospitals and facilitating contracting between BCBSM and hospitals (and also between other competitors and hospitals).[111]

**Second**, a rule-of-reason antitrust inquiry requires considering the extent to which the challenged practice is used, particularly in the industry at issue.[112]

---

[110] As the Court is aware, there were other serious issues that we do not discuss here, such as disputes over Plaintiffs' market definition and calculation of market shares.

[111] Sibley Report ¶ 8 (App. 25); s*ee* note 48 *supra*.

[112] *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (stating that package sales cannot be condemned as illegal tying because "buyers often find package sales attractive" and it is a common way for sellers to compete effectively), *abrogated on other grounds by Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 42 (2006)*. See id.* at 44 (Brennan, J., concurring) (finding the widespread use of ties in rendering hospital services indicated a lack of anticompetitive harm); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442,

Discovery revealed that at least six other health insurers—Aetna, CIGNA, HAP, PHP, Priority and McLaren—all sought and obtained MFNs (including Differential MFNs) at Michigan hospitals.[113]  A widespread practice is unlikely to be anticompetitive.[114]

**Third**, there was a pending *Daubert* motion arguing that there were numerous flaws in Dr. Leitzinger's $118 million damages calculation, including

---

452-53 (6th Cir. 2007) (holding that up-front payments from suppliers, multi-year contracts, and exclusivity agreements that were common in the industry were a form of competition, not a source of anticompetitive harm).  *See also* Sibley Report ¶¶ 50, 55-56 (App. 25).

[113] Aetna had MFNs in many of its Michigan hospital contracts.  *See*, *e.g.*, Bertolini (Aetna) Dep. 231-32 (App. 52); Spencer (Aetna) Dep. 204-06 (Marlette), 261 (Harbor Beach) (App. 89); AETNA-00072679 at 689 (Beaumont, since 2001 via PPOM contract) (App. 90); Ruedisueli (McKenzie) Dep. 157-61, 208-09 (McKenzie) (App. 45).  CIGNA also used MFNs in Michigan.  Tracy (CIGNA) Dep. 117-19, 241-44 (Huron) (App. 47); Rodgers (MidMichigan) Dep. 185-89, 250-52 (MidMichigan) (App. 37).  HAP had an MFN in its contract with Beaumont.  HAP-DOJ-003114 at 152-53 (App. 80).  McLaren had a MFN in its contract with Eaton Rapids, Johnson (Eaton Rapids) Dep. 214-16, 249-50, and sought – unsuccessfully – MFNs in its contracts with Harbor Beach and McKenzie (App. 19).  Wehner (Harbor Beach) Dep. 186-87 (Harbor Beach) (App. 57); Ruedisueli (McKenzie) Dep. 150-51, 153 (McKenzie) (App. 45).  PHP used MFNs in several of its Michigan hospital contracts.  Johnson (Eaton Rapids) Dep. 21-22, 80, 249-50 (Eaton Rapids) (App. 19); Wilkerson (PHP) Dep. 47 (Sparrow Ionia) (App. 55); Priority had MFNs in many of its contracts with Michigan hospitals. Bjella (Alpena) Dep. 232-35 (Alpena) (App. 21); Jackson (Charlevoix) Dep. 206-08 (Charlevoix) (App. 22); Johnson (Eaton Rapids) Dep. 21-22, 220-21, 249-50 (Eaton Rapids) (App. 19); Leach (Munson) Dep. 156-59, 289-91 (Munson) (App. 43); Andrews (Three Rivers) Dep. 254-56 (Three Rivers) (App. 71).

[114] *NicSand*, 507 F.3d 452-53.  *See also* Sibley Report ¶¶ 50, 55-56 (App. 25).

that it was untethered to the facts and produced statistically insignificant results.[115]
This posed another threat to Plaintiffs' likelihood of success and to the amount of
any potential recovery.

**Fourth**, there are many reasons for BCBSM's success, unrelated to MFNs.
At the relevant times, BCBSM was a nonprofit healthcare corporation organized
under and regulated by the Nonprofit Health Care Corporation Reform Act.[116]
BCBSM is the oldest and largest provider of healthcare financing in Michigan. As
part of its social mission and commitment to improve the quality of care for
Michigan citizens, BCBSM annually spends millions of dollars on charitable and
quality initiatives to improve healthcare in Michigan.[117] And, BCBSM has long
nurtured relationships with Michigan providers, for example:

> I have long-standing relationships with the people at Blue
> Cross, the people that negotiate our contracts. And, you
> know, they are based on trust and mutual respect, and
> assistance when we need help. . . . Blue Cross is

---

[115] BCBSM's Motion to Exclude the Expert Testimony of Dr. Jeffrey
Leitzinger [Doc. #140].

[116] M.C.L. §§ 550.1101 to 550.1704 (2013).

[117] *See* Avalere Health, LLC, "Valuing the Social Mission Activities of Blue
Cross Blue Shield of Michigan," at 4 (Jan. 2008), BLUECROSSMI-99-01051756
("Avalere Value Report") (App. 91); BCBSM 2015 Annual Report Consolidated
Financial Statements 33, 55 (http://www.bcbsm.com/content/dam/public
/Consumer/Documents/about-us/annual-report-2015-financials.pdf); 2015 Hospital
Pay-For-Performance Program, http://www.bcbsm.com/content/dam/public
/Providers/Documents/value/2015-hospital-pay-performance-program.pdf.

> committed [to quality care in Michigan]. They have put
> money behind it.[118]

For 75 years, BCBSM has made a long-term commitment to, and investment in,

Michigan communities.[119] That is the foundation of BCBSM's success, not

isolated contract clauses.

## IV.   CONCLUSION

On this record, it was an uphill battle for Plaintiffs, who faced class

certification as well as *Daubert* and merits challenges, even on their narrowed class

definition. BCBSM believes that it would have prevailed and that Plaintiffs and

class members ultimately would have recovered little or nothing. Nevertheless,

BCBSM, which faced considerable costs and business disruption, saw a benefit to

"settlement"—to be free of the years of litigation over the unfounded allegations

against it.

For the reasons described above, as well as in BCBSM's October 2014

Memorandum in Support of  Motion for Final Approval of Class Settlement [Doc.

#171], the settlement is fair, reasonable, adequate and should be approved.

---

[118] Reichle (Sparrow) Dep. 245-46 (App. 20).

[119] *See* http://www.bcbsm.com/index/about-us/our-company.html.

This 28th day of October 2016.

/s/  Todd M. Stenerson
Todd M. Stenerson (P51953)
D. Bruce Hoffman
(Adm. E.D. MI, DC Bar 495385)
Neil K. Gilman
(Adm. E.D. MI, DC Bar 449226)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave, N.W.
Washington, D.C. 20037
(202) 955-1500
tstenerson@hunton.com
bhoffman@hunton.com
ngilman@hunton.com

Thomas Van Dusen (P30602)
Jason R. Gourley (P69065)
Thomas Rheaume, Jr. (P74422)
BODMAN PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
(313) 259-7777
tvandusen@bodmanlaw.com

Robert A. Phillips (P58496)
BLUE CROSS BLUE SHIELD OF
MICHIGAN
600 Lafayette East, MC 1925
Detroit, MI  48226
(313) 225-0536
rphillips@bcbsm.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2016  I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all parties of record.  I further certify that I have caused the foregoing document to be sent by email or U.S. Mail to all individuals or entities who filed objections to the previous Settlement Agreement or, for those individuals or entities represented by counsel, their counsel.

/s/  Todd M. Stenerson
Todd M. Stenerson
2200 Pennsylvania Ave, N.W.
Washington, D.C. 20037
(202) 955-1500
tstenerson@hunton.com

October 28, 2016                    *Attorney for Defendant*