UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

THE SHANE GROUP INC.; BRADLEY
A. VENEBERG; SCOTT STEELE;
MICHIGAN REGIONAL COUNCIL OF
CARPENTERS EMPLOYEE BENEFITS
FUND; ABATEMENT WORKERS
NATIONAL HEALTH AND WELFARE
FUND; and MONROE PLUMBERS AND
PIPEFITTERS LOCAL 671 WELFARE
FUND,

     Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF
MICHIGAN,

     Defendant.

Case No. 2:10-cv-14360

Honorable Denise Page Hood

---

**<u>JOINT OBJECTION TO PROPOSED SETTLEMENT BY ADAC
AUTOMOTIVE, BAKER COLLEGE, BORROUGHS CORPORATION,
EAGLE ALLOY, INC., FLORACRAFT CORPORATION, FOUR WINDS
CASINO RESORT, FRANKENMUTH BAVARIAN INN, INC., GEMINI
GROUP, INC., GILL-ROY'S HARDWARE/MORGAN PROPERTIES,
LLC., GRAND TRAVERSE BAND OF OTTAWA AND CHIPPEWA
INDIANS, HUIZENGA GROUP, KENT COMPANIES, INC., MAGNA
INTERNATIONAL OF AMERICA, INC., MASTER AUTOMATIC
MACHINE COMPANY, INC. PETOSKEY PLASTICS, INC., SAF-
HOLLAND USA, INC., TERRYBERRY COMPANY, LLC., THELEN, INC.,
TRILLIUM STAFFING SOLUTIONS, TRUSS TECHNOLOGIES AND
WADE TRIM GROUP, INC.</u>**

**ORAL ARGUMENT REQUESTED**

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION..................................................................................... 1

II.  LEGAL STANDARD............................................................................. 3

III.  LAW AND ARGUMENT ....................................................................... 3

    A.  The Proposed Settlement Amount Is Grossly Inadequate.................... 3

        1.  Plaintiffs Have a High Likelihood of Success on the Merits................................................................................... 3

            a.  The Sixth Circuit noted the substantial evidence in the record supporting the merits of Plaintiffs' claims. ................................................................. 3

            b.  The Department of Justice's decision to sue Blue Cross for antitrust violations is, in itself, significant evidence that Plaintiffs have a substantial likelihood of success on the merits. ............... 4

            c.  The Michigan Legislature's decision to ban MFN agreements is also strong evidence of the merits of Plaintiffs' claims. ............................................... 5

            d.  Evidence unsealed from the record also demonstrates that Plaintiffs have a high likelihood of success on their claims.................................. 5

                i.  Dr. Jeffrey Leitzinger............................................. 6

                ii.  Dr. Christopher Vellturo......................................... 8

            e.  The failure of BCBSM's dispositive motions in the antitrust cases is further evidence that Plaintiffs have a substantial likelihood of success on their claims. ........................................................................ 11

       f.     Plaintiffs' motion for approval of the proposed settlement has not presented evidence demonstrating that Plaintiffs' claims are weaker than this evidence indicates............................................ 11

    2.   The Potential Damages to the Class are Far in Excess of $118 Million. ......................................................................... 12

    3.   Given the Substantial Likelihood of Success and the Large Amount of Damages Recoverable if Plaintiffs Prevail, the Net Settlement Amount of Less than $15 Million is Grossly Inadequate. ................................................. 15

  B.   The Amount Of Attorney's Fees Requested By Class Counsel Is Excessive And Not Supported By The Record. ................................ 18

  C.   The Incentive Awards To Be Paid to the Named Plaintiffs Are An Inappropriate Bounty. ................................................................. 20

  D.   The Claims Process Is Unduly Burdensome And Will Likely Exclude Millions Of Class Members From Any Recovery................ 22

IV.  Conclusion.................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**<u>Cases</u>**

*Greenberg v. Procter & Gamble Co.,*
   724 F.3d 713 (6th Cir. 2013)..............................................................3, 20, 21, 22

*Shane Group, Inc. v. Blue Cross Blue Shield of Mich.,*
   825 F.3d 299 (6th Cir. 2016)..................................................................passim

*United States v. Blue Cross Blue Shield of Michigan,*
   No. 2:10-cv-14155 (E.D. Mich. Oct. 18, 2010)................................................5

*Vassalle v Midland Funding LLC,*
   708 F.3d 747 (6th Cir. 2013)..................................................................20, 22

**<u>Statutes</u>**

15 U.S.C. § 15 ....................................................................................................13

Mich. Comp. Laws § 500.3405a ...........................................................................5

**<u>Rules</u>**

Fed. R. Civ. P. 23 ...........................................................................................1, 12

# I.    **<u>INTRODUCTION</u>**

"It's déjà vu all over again" – Yogi Berra

The renewed settlement proposal before the Court has the same problems as the last proposal from four years ago – problems that are even more apparent now that the Self-Insured Objectors have been able to review most of the court record.[1]

The objections of the Self-Insured Objectors are as follows:

1.    **The proposed settlement amount is <u>woefully</u> inadequate.**  As the Sixth Circuit noted, Plaintiffs have made "credible allegations that Michigan's largest health insurer engaged in price-fixing to the detriment of millions of Michigan citizens."  The Consolidated Amended Complaint seeks <u>$13.7 billion</u> in damages from Blue Cross on the class members' claims.

Multiple experts have offered their opinions that there is substantial evidence in the record demonstrating that the MFN scheme resulted in millions of Michigan citizens paying more for hospital services.  This happened in several ways.  Individuals paid more for hospital care through higher deductibles and co-pays; employers paid more to cover their reimbursement obligations for the care of their employees under self-insured plans; and insurance companies paid more under fully-insured plans.  Significant evidence unearthed in discovery supports the conclusion that Plaintiffs have a high likelihood of success on their claims.

In addition, damages to the class have yet to be calculated but would certainly exceed $118 million.  Contrary to this Court's opinion approving the original settlement proposal, Plaintiffs' expert, Dr. Jeffrey Leitzinger, did <u>not</u> conclude that the class had suffered $118 million in damages. Dr. Leitzinger has not prepared an expert report reflecting his final damages calculation.  Rather, Dr. Leitzinger was explicit that the $118 million calculation was only intended to illustrate that damages to the class "can be calculated in a class-wide, formulaic fashion" for purposes of determining whether the "commonality" requirement of Fed. R. Civ. P. 23 has been met.

---

[1] There are still a significant number of redactions in the court record, including redactions in Dr. Leitzinger's expert report.  The Self-Insured Objectors reserve their right to appeal the Court's decisions allowing these redactions.

Moreover, Dr. Leitzinger explained that the $118 million figure did not include downstream damages resulting from the reduced competition in the health insurance marketplace caused by the MFN agreements. Nor did the $118 million figure include treble damages or attorney's fees recoverable under federal antitrust law. In short, damages to the class would far exceed $118 million if Plaintiffs obtained a favorable verdict on antitrust liability.

Despite having a substantial likelihood of success on a claim for hundreds of millions (if not billions) of dollars, class counsel agreed to a proposed settlement with BCBSM for less than $30 million. Class counsel proposes that <u>less than half</u> of the settlement fund be paid to class members. Under their proposal, over $8.5 million of the settlement amount would be paid to Plaintiffs' attorneys; another $3.5 million would be paid to Plaintiffs' experts; and several million dollars would be spent to provide notice of the settlement and for claims administration. At the end of the day, less than $15 million of the settlement fund will be left to distribute to upwards of 7 million potential class members. The settlement amount is <u>woefully</u> inadequate to the class, given the reasonable likelihood of success on claims that could involve hundreds of millions – if not billions – of dollars in damages.

2. **The attorney fees request of class counsel is excessive and not supported by the record.** As the Sixth Circuit noted, Plaintiffs' counsel's prior fee petition sought "Bentley rates" and "provided no backup whatsoever – no time records, no descriptions of work done – in support of their hours spent working on the case." The renewed fee petition suffers from these same defects.

3. **The proposed settlement gives an improper bounty to the named Plaintiffs.** The Sixth Circuit noted their concern that under the original settlement proposal, the Plaintiffs would obtain "a bounty for bringing suit or to compromise the interest of the class for personal gain." The renewed settlement proposal again suffers from these exact same concerns, as Plaintiffs have failed to "provide the district court with specific documentation – in the manner of attorney time sheets – of the time actually spent on the case by each recipient of an award."

4. **The claims process is unnecessarily burdensome.** The claims process is unnecessarily burdensome and will deter millions of class members from submitting claims and participating in the proposed settlement. For the self-insured plans whose hospital coverage was administered by Blue Cross, a claims form is <u>completely unnecessary</u>. Blue Cross has superior access to all of the information necessary to calculate those claims.

The renewed settlement proposal remains a good deal for Blue Cross, the named Plaintiffs, and Plaintiffs' counsel. It is an absolutely terrible deal for class members. The proposed settlement should be roundly rejected.

## II.   LEGAL STANDARD

Before the Court approves a class action settlement, it "must carefully scrutinize … whether the settlement itself is fair, reasonable, and adequate." *Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 309 (6th Cir. 2016)(quotations omitted).   "[T]he district court must specifically examine what the unnamed class members would give up in the proposed settlement, and then explain why – given their likelihood of success on the merits – the tradeoff embodied in the settlement is fair to the unnamed members of the class." *Id.* "The burden of proving the fairness of the settlement is on the proponents." *Greenberg v. Procter & Gamble Co. (In re Dry Max Pampers Litig.)*, 724 F.3d 713, 719 (6th Cir. 2013).

## III.   LAW AND ARGUMENT

### A.   THE PROPOSED SETTLEMENT AMOUNT IS GROSSLY INADEQUATE.

#### 1.   Plaintiffs Have a High Likelihood of Success on the Merits.

##### a.   The Sixth Circuit noted the substantial evidence in the record supporting the merits of Plaintiffs' claims.

As the Sixth Circuit noted, "Blue Cross Blue Shield of Michigan controls more than 60% of the commercial health insurance market in Michigan.... And

that means, for better or worse, that Blue Cross enjoys extraordinary market power in its negotiations with medical providers." *Shane Grp.*, 825 F.3d at 302.

Indeed, the Sixth Circuit noted that the evidence in the record demonstrated that BCBSM entered into roughly 70 MFN or "MFN-plus" agreements with Michigan hospitals, many of which involved BCBSM agreeing to pay higher rates in exchange for the hospital agreeing to charge other insurers even higher rates than Blue Cross:

> The record in this case also reflects that, the greater the spread between Blue Cross's rates and the minimum rates for other insurers, the higher the rates that Blue Cross was willing to pay. For example, Blue Cross would agree to pay a certain rate if a hospital agreed to charge other insurers 10% more than Blue Cross; but if the hospital agreed to charge other insurers even more – say 20% or 30% higher rates than Blue Cross – then Blue Cross would agree to pay even higher rates. **Thus, the effect of Blue Cross's market power was not to lower its customers' rates, as typically advertised. Instead the effect was to raise them, for Blue Cross's customers and everyone else – while preserving or expanding Blue Cross's market share.**

*Id.* at 303 (emphasis added).

      **b.**    **The Department of Justice's decision to sue Blue Cross for antitrust violations is, in itself, significant evidence that Plaintiffs have a substantial likelihood of success on the merits.**

Blue Cross's antitrust violations were significant enough that the United States Department of Justice ("DOJ") brought a complaint against Blue Cross alleging that the MFN Agreements violated federal antitrust law. *United States v.*

*Blue Cross Blue Shield of Michigan*, No. 2:10-cv-14155 (E.D. Mich. Oct. 18, 2010), Compl. [Dkt. #1]. The DOJ does not bring antitrust lawsuits lightly. The allegations in the DOJ complaint are thorough and specific, showing that the DOJ undertook a detailed investigation of the merits before deciding to bring its antitrust lawsuit against Blue Cross. This itself is strong evidence that Plaintiffs have a substantial likelihood of success on the merits of their claim.

> **c.     The Michigan Legislature's decision to ban MFN agreements is also strong evidence of the merits of Plaintiffs' claims.**

The Michigan legislature was concerned enough about the increase in hospital costs in Michigan resulting from Blue Cross's MFN scheme to explicitly ban MFN agreements in March 2013. *See* Mich. Comp. Laws § 500.3405a. This is very strong evidence of the anti-competitive nature of the MFN scheme.

> **d.     Evidence unsealed from the record also demonstrates that Plaintiffs have a high likelihood of success on their claims.**

There was also substantial evidence developed in discovery – and made available to the Self-Insured Objectors after the Sixth Circuit ordered the record unsealed – that demonstrates the anticompetitive intent and effect of Blue Cross's MFN scheme. This evidence was analyzed and summarized in the expert reports of two highly qualified experts who both concluded that the MFN scheme had

significant anticompetitive effects in Michigan: Dr. Jeffrey Leitzinger and Dr. Christopher Vellturo.

### i.     *Dr. Jeffrey Leitzinger*

Dr. Leitzinger prepared an expert report "in support of Plaintiffs' Motion for Class Certification." *See* Leitzinger Report, Doc. # 279-1, PgID 9406-9504 (**Ex. 1**). Dr. Leitzinger's report had four purposes, namely to:

- Analyze the impact of the MFN agreements on amounts paid for hospital services;
- Determine whether all (or virtually all) Class members likely paid at least some overcharge in connection with payments for hospital services as a result of the MFN agreements;
- Determine whether total overcharges incurred by the Class as a whole can be calculated on a Class-wide, formulaic basis; and
- Discuss whether economic issues associated with proof of the alleged antitrust violation will involve economic evidence that is common to the proposed Class members.

*Id.* at PgID 9412.[2]

Dr. Leitzinger reviewed an <u>extensive</u> amount of materials in the case in reaching his conclusions.   Ultimately, Dr. Leitzinger's opinion is that Class members did, in fact, pay more for hospital services as a result of the MFN agreements.   In particular for the Self-Insured Objectors, "Employer Class members paid increased amounts to cover their obligations under self-insured plans" as a result of the MFN agreements. *Id.* at 9413.

---

[2] Notably, Dr. Leitzinger was not tasked with calculating the total damages to the Class, as the case was only at the class certification stage.

In addition, the MFN agreements also drove up the cost of insurance for those who were insured by competitors of Blue Cross. *Id.* at 9414. As Dr. Leitzinger explained:

> By contractually guaranteeing that it would have the most favorable discount from hospitals … BCBSM forced those hospitals to set reimbursement rates with other insurers higher than they would have otherwise…. This resulted in turn in higher insurance premiums on the part of other insurers, giving BCBSM more room competitively to charge higher rates and maintain higher market share.

*Id.* at 9430.

Dr. Leitzinger also pointed to emails and deposition testimony from Blue Cross personnel in further support of his conclusion that BCBSM fully understood that the MFN scheme would increase hospital costs for Michigan consumers. For example, in its negotiations with small (Peer Group 5) hospitals, Blue Cross expressly agreed to increase the amount it paid to the hospital in exchange for the hospital agreeing to the MFN agreement. *See, e.g., id.* at PgID 9433 (citing email from BCBSM to Sparrow Ionia Hospital stating that by agreeing to the MFN provision, "BCBSM would increase your net revenue by over $1.5M"). Blue Cross in turn passes through these increase hospital costs to the self-insured clients, who foot the final bill for the hospital services provided to their employees. *Id.* at PgID 9413.

In its efforts to obtain MFN agreements from larger hospitals, BCBSM offered much larger increases in reimbursements to the hospital. That is, BCBSM

would offer to pay more for hospital services – exactly the <u>opposite</u> of what BCBSM is supposed to do in negotiating rates with hospitals – in exchange for the MFN agreement.  For example, with Ascension Health, Blue Cross was willing to pay the hospital an extra $7 million in exchange for an MFN-plus agreement that guaranteed BCBSM a 20% price advantage over competing insurers.  *Id.* at 9434 (citing Blue Cross deposition testimony).  For Beaumont Hospitals, BCBSM was willing to pay a whopping $25 million more to Beaumont in order to obtain MFN-plus pricing protection with Beaumont.  *Id.* (citing BCBSM internal emails).

This is only a very small sample of the evidence relied upon by Dr. Leitzinger to support his conclusions.  Dr. Leitzinger's report sets forth powerful evidence that Plaintiffs have a substantial likelihood of success on the merits.

### ii.     *Dr. Christopher Vellturo*

The evidence identified in the expert report of Dr. Christopher Vellturo in Aetna's antitrust lawsuit against BCBSM – which was also unsealed after the Sixth Circuit's decision in this matter – is even more compelling.  *See* Vellturo Report, Doc. # 333-3, PgID 16390-16638 **(Ex. 2)**.  Dr. Vellturo, who holds a PhD in economics from MIT and specializes in antitrust issues, prepared a 244 page report (with over 1100 footnotes) setting forth, in painstaking detail, the antitrust impact of BCBSM's MFN scheme.  There is not nearly enough room in this objection to

do justice to the thoroughness of Dr. Vellturo's analysis supporting the merits of Plaintiffs' antitrust claims against Blue Cross concerning the MFN scheme.

Dr. Vellturo ultimately shared Leitzinger's conclusion that the MFN "contracting program imposed on Michigan hospitals by [BCBSM] was anti-competitive in design, intent, and consequence." *Id.* at PgID 16397. Dr. Vellturo echoed Dr. Leitzinger's analysis regarding the antitrust harm to class members caused by Blue Cross's MFN contracting scheme with smaller (Peer 5) hospitals:

> BCBSM's contracting strategy with Peer Group 5 hospitals demonstrates that it was not concerned with obtaining low prices, but rather simply maintaining and expanding its *relative* discount advantage over rival payors, largely regardless of the price levels at which this was achieved. In this sense, BCBSM agreed to pay more to these hospitals (and it did), but only in return for corresponding price increases (or, in many cases greater increases) also inflicted on its rivals. **The result?  Higher reimbursement rates at all levels, passed on as higher prices to Michigan employers and residents.**

*Id.* at PgID 16491 (boldface added).

In addition to Peer Group 5 hospitals, Dr. Vellturo specifically analyzed the evidence concerning BCBSM's MFN- and MFN-plus agreements with over a dozen larger hospital groups, consistently finding evidence of BCBSM agreeing to pay more to the hospitals in exchange for MFN protections. *Id.* at PgID 16491-16522.

For example, for the Marquette General Hospital System, BCBSM tied its rate increase to an MFN-plus guarantee that its competitors would be charged at

least 15 percent more than BCBSM for hospital services. *Id.* at 16498-99 (noting that the 15 percent differential was "critical to having gained Blue Cross leadership to support to approve the increase we have on the table").  Dr. Vellturo also noted the additional $25 million BCBSM agreed to pay to Beaumont, citing a BCBSM email about MFN-plus deal with Beaumont Hospital which stated that "what is nice about this" MFN-plus agreement is that it made BCBSM's increase in reimbursement rates to Beaumont "contingent on them continuing to deal more harshly with our competitors").  *Id.* at PgID 16577.

Dr. Vellturo concluded that "BCBSM paid out amounts approaching **$100 million** and perhaps more to hospitals to secure consent to its MFN-Plus and MFN provisions."  *Id.* at PgID 16534 (emphasis added).  This $100 million (or perhaps more) was, in turn passed on by BCBSM to its customers:

> It is important to note that, in general, BCBSM is not the party that ultimately incurs the cost of payments in exchange for MFNs: BCBSM's self-insured customers directly bear any increases in reimbursement rates that BCBSM has agreed to pay for MFN-Plus and MFN commitments (provided these increases do not violate a rate guarantee given by BCBSM to its customer); other increases are ultimately passed downstream to customers in higher premiums.  The record demonstrates that BCBSM was ready and willing to use its customers' funds to trade for contracting benefits for BCBSM.

*Id.* at PgID 16530; (emphasis added); *see also id.* at PgID 16547 (citing BCBSM testimony that all of BCBSM's healthcare costs are ultimately passed on to its customers).

As Dr. Vellturo summarized in the very last paragraph of his report:

> Ultimately, the adverse effect of [BCBSM's] anti-competitive conduct is manifested in lower product quality and higher prices. Both are evident in Michigan. Michigan employers and employees continue to pay among the highest rates (adjusting for income) in the country for health insurance ... [due to] the continued domination of the Michigan healthcare marketplace by BCBSM, which has remained in place because of (in substantial part) its restrictive contracting program at issue in this action.

*Id.* at PgID 16637.

     **e.**    **The failure of BCBSM's dispositive motions in the antitrust cases is further evidence that Plaintiffs have a substantial likelihood of success on their claims.**

The Court has not granted a dispositive motion in favor of Blue Cross in this class action lawsuit, the related Aetna and Health Alliance Plan lawsuits against BCBSM, or the original DOJ lawsuit against BCBSM, despite each of these cases being filed many years ago.[3] If the antitrust claims concerning the MFN Agreements had no likelihood of success on the merits, these cases would have been resolved by dispositive motion long ago.

     **f.**    **Plaintiffs' motion for approval of the proposed settlement has not presented evidence demonstrating that Plaintiffs' claims are weaker than this evidence indicates.**

Finally, in Plaintiffs' motion for preliminary approval of the renewed settlement, Plaintiffs once again offered little more than generic statements about

---

[3] The Court did dismiss a portion of Health Alliance Plan's claims against BCBSM as untimely under the statute of limitations.

litigation risk, including the difficulty of prevailing on antitrust claims, to justify the settlement.  The Sixth Circuit strongly criticized this approach to assessing Plaintiffs' likelihood of success, noting that "platitudes about the risks of litigation generally" are insufficient, as what is relevant is "whether – in light of the merits of this case specifically – the settlement is fair." *Shane Grp.*, 825 F.3d at 309-310.

In conclusion, it would be a gross understatement to say that Plaintiffs merely have some likelihood of success on the merits.  Rather, the evidence in the record indicates that <u>Plaintiffs are likely to win if this case were to go to trial</u>.

### 2. The Potential Damages to the Class are Far in Excess of $118 Million.

Damages to the class have yet to be calculated but would certainly exceed $118 million.  Contrary to this Court's opinion approving the original settlement proposal, Plaintiffs' expert, Dr. Jeffrey Leitzinger, did <u>not</u> conclude that the class had suffered $118 million in damages. Dr. Leitzinger has not prepared (and were not asked to prepare) an expert report reflecting his final damages calculation.

Rather, Dr. Leitzinger was explicit that the $118 million calculation was only intended to illustrate that damages to the class "can be calculated in a class-wide, formulaic fashion" for purposes of determining whether the "commonality" requirement of Fed. R. Civ. P. 23 has been met.  Leitzinger Report, Doc. # 279-1, PgID 9412 **(Ex. 1)**.

Moreover, Dr. Leitzinger explained that the $118 million figure did not include downstream damages resulting from the reduced competition in the health insurance marketplace caused by BCBSM's increased monopoly power. *See id.* at PgID 9453. For example, Dr. Leitzinger cites deposition testimony and BCBSM emails where BCBSM discussed efforts to "shut out competing plans" by raising its rivals costs. *Id.* at PgID 9454.

Nor did Dr. Leitzinger's $118 million figure include treble damages or attorney's fees recoverable under federal antitrust law. Although the Sixth Circuit did not definitively rule on whether the treble damages and attorney's fees available under antitrust law <u>must</u> be considered in evaluating the reasonableness of the settlement, the Sixth Circuit did, note that the prior settlement was for "just over 12% of the damages calculated by Leitzinger, and less than 4% of the damages and fees the class would recover if successful at trial, *see* 15 U.S.C. § 15," strongly suggesting that the treble damages available to class should be considered in assessing the fairness of the settlement. *Shane Grp.*, 825 F.3d at 304; *see also id.* at 308 (noting that the class members must decide whether "to accept about 12 cents on the dollar of their damages as estimated in Leitzinger's report, or less than 4 cents on the dollar of the award they might obtain at trial").[4]

---

[4] The Sixth Circuit also mistakenly assumed that Dr. Leitzinger had offered an opinion on the amount of damages suffered by the class, presumably based on this Court's statements to this effect. As discussed above, Dr. Leitzinger did not

Although Dr. Vellturo's damage calculations focused on the damages to Aetna, his report also included estimates of the additional amounts Blue Cross paid to hospitals to secure MFN agreements. Dr. Vellturo estimated that Blue Cross paid Michigan hospitals over $100 million in additional compensation in exchange for MFN protection from competing insurers. *See* Vellturo Report, Doc. # 333-3, PgID 16534 **(Ex. 2).** This $100+ million was passed on by Blue Cross to its self-insured customers (like the Self-Insured Objectors) and to its individual insureds, such that class members were damaged by at least $100 million as a result. *Id.* at PgID 16530.

Again, this is only one component of the damages to the class. This does not included damages to class members who used insurers other than Blue Cross and whose premiums and costs for hospital care directly increased as a result of the MFN agreements. Nor does it include the overall anticompetitive effect of BCBSM being able to drive other insurers (such as Aetna) out of the insurance market in Michigan entirely through the MFN scheme.

It is apparent that, damages to the class would <u>far</u> exceed $118 million if Plaintiffs obtained a favorable verdict on antitrust liability. It would be clearly

---

calculate all of the class's damages, but rather performed partial damage calculations for <u>class certification purposes</u> to demonstrate that damages could be calculated on a class-wide basis.

erroneous for the district court to assess the fairness of the settlement based on a belief that damages to the class do not (or could not) exceed $118 million.

**3.   <u>Given the Substantial Likelihood of Success and the Large Amount of Damages Recoverable if Plaintiffs Prevail, the Net Settlement Amount of Less than $15 Million is Grossly Inadequate.</u>**

Despite having a substantial likelihood of success on a claim for hundreds of millions (if not billions) of dollars, class counsel agreed to a proposed settlement with BCBSM for less than $30 million.[5]  Class counsel proposes that <u>less than half</u> of the settlement fund be paid to class members.  Under their proposal, over $8.5 million of the settlement amount would be paid to Plaintiffs' attorneys; another $3.5 million would be paid to Plaintiffs' experts; and several million dollars would be spent to provide notice of the settlement and for claims administration.

At the end of the day, less than $15 million will be left to distribute to upwards of 7 million potential class members.  *See Shane Grp.*, 825 F.3d at 304 (calculating the net settlement amount as $14,661,560).  The settlement amount is <u>woefully</u> inadequate to the class, given the reasonable likelihood of success on claims that could involve hundreds of millions – if not billions – of dollars in damages.

---

[5] For ease of discussion in this objection, the Self-Insured Objectors will round the amount of the gross settlement fund up to $30 million.

A $15 million net settlement fund is wholly inadequate to provide even modest compensation to the class members.  In order to refund class members 1 percent of their hospital expenditures—the refund rate <u>agreed to by the parties</u> as the reimbursement rate in the proposed settlement (subject to the overall cap of $30 million)—the settlement fund should be at least **$850 million,** or more than 50 times the amount of the proposed net settlement fund available to the class members.[6]

Put another way, almost every adult resident of Michigan is a member of the proposed settlement class, as almost every Michigan resident has paid some hospital expenses since 2006.  As the Sixth Circuit noted, the parties estimate that there are between three and seven million class members.  *Shane Grp.*, 825 F.3d at 304.  The net settlement fund of less than $15 million, if divided between these three to seven million class members, would result in an average payment to each class member of between $2.00 and $5.00.[7]

---

[6] The proposed settlement covers <u>all</u> direct purchases of health care services between January 1, 2006, and June 23, 2014, from <u>all</u> Michigan hospitals by <u>all</u> individuals who paid Michigan hospitals, <u>all</u> insurers that paid Michigan hospitals, and <u>all</u> self-insured entities that paid Michigan hospitals.  The Self-Insured Objectors estimate that over the eight-and-a-half-year period covered by the proposed settlement, class members paid Michigan hospitals over $85 billion.  *See* Doc. # 161, PgID 4657 (explaining the basis for this calculation).

[7] Actual average payment rates to class members who file claims would, of course, be higher – but this is because the meager amount of the settlement fund and the burdensome claims process will deter most potential class members from even filing claims.  These are hardly reasons to consider the proposed settlement

The proposed settlement fund is wholly inadequate and represents nothing more than a nuisance-value settlement amount.  The implication in the proposed settlement that the settlement is based on a 1-percent refund of hospital expenditures to class members is completely misleading and illusory.  There is little doubt that this could be a billion-dollar case if Plaintiffs are successful at trial – particularly with treble damages and attorney's fees remedies under federal antitrust law.

Moreover, this is not a situation in which the class should accept an artificially low settlement because of collectability concerns with regard to the Defendant.  Blue Cross, despite nominally being a non-profit corporation, holds massive cash reserves that could be used to satisfy a settlement or judgment in this case.  Blue Cross (and its subsidiaries) collectively had over $15.4 billion in assets at the end of 2017, including nearly $1.4 billion in cash.  Blue Cross 2017 Annual Report, Financial Statement, **Ex. 3**.

The class members gain almost nothing in the proposed settlement, such that their interests would be far better served by a trial on the antitrust claims.  The inadequate settlement amount is, in itself, ample reason to reject the proposed settlement.

---

fair to the class.

**B.    THE AMOUNT OF ATTORNEY'S FEES REQUESTED BY CLASS
COUNSEL IS EXCESSIVE AND NOT SUPPORTED BY THE RECORD.**

As the Sixth Circuit noted, Plaintiffs' counsel's prior fee petition sought "Bentley rates, not Cadillac rates," such that it was incumbent on Plaintiffs to demonstrate why such rates were appropriate.  *Shane Grp.*, 825 F.3d at 310. Plaintiffs have failed to heed the Sixth Circuit's guidance.

The hourly rates in Plaintiffs' renewed request for attorney fees are <u>even higher</u> than the "Bentley rates" requested by Plaintiffs' counsel previously, with counsel reporting hourly rates of up to $1,050 per hour!  *See*, Doc. #336, PgID 17096.   The issues involved in this case, while complex, are not of such complexity to justify these rates – particularly where the DOJ had done much of the heavy lifting in investigating BCBSM's MFN scheme and filing a detailed complaint before Plaintiffs' counsel even became involved in this case.[8]

Moreover, the Sixth Circuit noted that Plaintiffs' counsel's prior fee petition "provided no backup whatsoever – no time records, no descriptions of work done – in support of their hours spent working on the case." *Shane Grp.*, 825 F.3d at 310. Their renewed fee petition suffers from this same defect.  Although a summary of hours worked by timekeeper by "task code" was provided for some of Plaintiffs'

---

[8] By way of contrast, in the Self-Insured Objectors' Motion for Attorney Fees and Costs being filed concurrently with this objection, counsel for the Self-Insured Objectors proposes an hourly rate for lodestar purposes of $427 per hour.

counsel, the detailed time records describing the actual work performed has not been presented to the Court. There is insufficient evidence in the record to support the award of attorney fees requested by Plaintiffs' counsel.[9]

Finally, the substantial amount Plaintiffs propose be paid to class counsel and its retained expert as part of the proposed settlement, when compared to the meager net amount to be paid to class members, is a further reason why the attorney fee request of Plaintiffs' counsel is excessive. "The reality is that this settlement benefits class counsel vastly more than it does the consumers who comprise the class. The conclusion is unavoidable: this settlement gives preferential treatment to class counsel while only perfunctory relief to unnamed class members." *Vassalle v Midland Funding LLC,* 708 F.3d 747, 755 (6th Cir. 2013) (quotations omitted); *see also Greenberg,* 724 F.3d at 721. The Sixth Circuit has clearly held that "such inequities in treatment make a settlement unfair." *Vassalle,* 708 F.3d at 755. This is an independent reason for rejecting the proposed settlement.

---

[9] Again by way of contrast, the Self-Insured Objectors' Motion for Attorney Fees and Costs includes the backup demonstrating the work performed by timekeeper, date, time spent, and hourly rate, with a narrative description of the work performed.

## C.   THE INCENTIVE AWARDS TO BE PAID TO THE NAMED PLAINTIFFS ARE AN INAPPROPRIATE BOUNTY.

As with their request for attorney fees, Plaintiffs and their counsel have not heeded the Sixth Circuit's guidance on the issue of incentive awards. The "new" settlement proposal renews the same incentive award request as the prior settlement proposal, asking for each of the four named Plaintiff organizations to receive an incentive payment of up to $50,000, and each of the four named individuals is entitled to an incentive payment of up to $10,000. These incentive amounts grossly exceed the amount that the Plaintiffs would otherwise recover as class members in the proposed settlement.

The Sixth Circuit has, on two other prior occasions, rejected settlements in which incentive payments to plaintiffs grossly exceeded the amount that class members would otherwise recover under the proposed settlement. Such an arrangement is unfair to the class and creates a conflict of interest, such that there is a "patent divergence of interest between the named representatives and the class." *Greenberg*, 724 F.3d at 722 (quotation omitted). "The incentive payments provide[ ] a *disincentive* for the class members to care about the adequacy of relief afforded unnamed class members, and instead encourage[ ] the class representatives to compromise the interest of the class for personal gain." *Id.*

(quotation omitted)(emphasis in original).[10]  "Such inequities in treatment make a settlement unfair." *Vassalle*, 708 F.3d at 755.

The Sixth Circuit warned Plaintiffs in this case that "we have concerns about a bounty here." *Shane Grp.*, 825 F.3d at 311.  The Sixth Circuit informed Plaintiffs that "to ensure that these amounts are not in fact a bounty, however, counsel must provide the district court with specific documentation – in the manner of attorney time sheets – of the time actually spent on the case by each recipient of an award." *Id.*

Plaintiffs have failed to do so.  There is no documentation demonstrating the time actually spent on the case by each recipient of an award.  As a result, "the district court has no basis for knowing whether the awards are in fact a *disincentive* for the named class members to care about the adequacy of relief afforded unnamed class members" and must reject the incentive awards as an improper bounty. *Id.* (emphasis in original)(quotation omitted).

---

[10]  "Thus, to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design. And we have expressed a sensible fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *Greenberg*, 725 F.3d at 722 (quotations omitted).

**D.    THE CLAIMS PROCESS IS UNDULY BURDENSOME AND WILL LIKELY EXCLUDE MILLIONS OF CLASS MEMBERS FROM ANY RECOVERY.**

The burdensome claims process for self-insured objectors is a massive deterrent to claims being filed. In order to submit a claim, self-insured plans are required to itemize in a claims table (1) the amount of healthcare services paid for; on (2) each date of service over an eight-and-a-half-year period; for (3) each of the approximately 130 hospitals in Michigan from which the class member purchased healthcare services. The claims tables from insurers and self-insured entities are likely to be <u>thousands</u> of pages long.

Moreover, insurers and self-insured plans also are <u>required</u> to submit copies of hospital bills supporting <u>all payments</u> that the claimant includes in their claim. In most cases, there will be numerous hospital bills supporting each entry on the claims table. This documentation requirement could easily result in self-insured plans and insurers having to submit hundreds of thousands, perhaps even millions, of pages of supporting documents with their claim.

There is no reason for the claims process to be this burdensome. Claimants should be able to submit a claim that aggregates their total payments to Michigan hospitals since 2006. Moreover, supporting documentation should not have to be submitted for every payment the class member made to a hospital since 2006.

Rather, self-insured plans should be treated the same way as individuals'; in that supporting documentation should only be required if a claim appears on its

22

face to be suspect.  All claimants are already required to certify under penalty of perjury in their claim form that the submitted claim amount is true and accurate to the best of their knowledge.  This should be sufficient to minimize the risk of false or inflated claims being submitted.

Moreover, for self-insured plans whose hospital claims were administered by Blue Cross, there is no reason why those plans should have to submit a claims form at all.  Blue Cross has far superior access to the hospital payment information concerning the self-insured plans whose claims it administers.[11]  Blue Cross can make the calculations concerning the amount paid to hospitals by the class members whose healthcare Blue Cross managed without needing to obtain any additional information from those class members.[12]

---

[11] Self-insured plans rely on their third-party administrators (such as Blue Cross) to maintain records and supporting documentation concerning health care expenses.  It is very likely that plans whose health care was managed by Blue Cross would need Blue Cross to obtain the detailed information dating back to 2006 needed to complete the claims form.

[12] Calculating the amount of class action claims on behalf of its participants is not a novel concept for Blue Cross.  Blue Cross offered to do so with regard to the settlement of a class action lawsuit concerning the marketing of the prescription drug Neurontin.  As plan administrator, Blue Cross had complete access to data concerning self-insured plans' purchases of Neurontin on behalf of plan participants.  Blue Cross had no difficulty calculating the claim on behalf of its self-insured plans.  *See* 8/22/14 BCBSM Ltr., **Ex. 4**.  Blue Cross could do so in this case as well.

Indeed, this is exactly what happened with regard to the claim submitted by one of the Self-Insured Objectors. Petoskey Plastics, Inc. ("Petoskey Plastics") is a self-insured plan administered by Blue Cross. Petoskey Plastics did not have access to the information necessary to fill out a claims form, and therefore asked Blue Cross for this information. E-mails between Petoskey Plastics and Blue Cross, **Ex. 5**. After waiting for several weeks for the information from Blue Cross, and after numerous telephone conversations and e-mails with Blue Cross representatives, Blue Cross ultimately provided Petoskey Plastics with the information necessary to fill out the claims form.

Petoskey Plastics then simply "regurgitated" this information provided by Blue Cross back to the claims administrator in its claims form, having wasted six hours of its time to do so. 11/12/14 Tr., Doc. #199, PgID 6417-6418. There is absolutely no reason why class members who are insured by Blue Cross, or self-insured plans administered by Blue Cross, should have been required to go through this process in order to submit a claim under the settlement.

The burdensome claims process established by the parties can only be seen as a cynical attempt to discourage most class members from submitting claims in order to justify the extremely low settlement fund amount. In fact, the history from the first claims process on the prior settlement proposal shows this is exactly what happened. Less than 0.4 percent of potential class members filed claims under the

prior proposed settlement. Put another way, over 99.6 percent of class members – potentially up to 6.9 million individuals, self-insured plans, and insurers – did not file claims under the prior settlement proposal. This is not acceptable and should not be countenanced by the Court.

## IV.   <u>CONCLUSION</u>

When the substantial evidence that Blue Cross violated federal antitrust laws is considered in conjunction with the massive amount of potential damages to the class, along with the possible recovery of treble damages and attorneys' fees, it is obvious that the proposed settlement is grossly unreasonable. Class members have nothing to lose—and everything to gain—by going forward with trial rather than accepting this minimal settlement. Plaintiffs have not come even remotely close to meeting their burden of demonstrating that the proposed settlement is fair, reasonable, and adequate to the millions of class members whose claims are at issue in this case.

For the foregoing reasons, the Self-Insured Objectors request that this Court reject the proposed settlement.[13]

VARNUM LLP
*Counsel for Objectors*

Dated: September 14, 2018        By:   s/ Bryan R. Walters
                                       Bryan R. Walters (P58050)

---

[13] The required client consent forms for this objection are attached as **Exhibit 6**.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

By: <u>s/ Bryan R. Walters</u>
   Bryan R. Walters (P58050)
   P.O. Box 352
   Grand Rapids, MI 49501-0352
   (616) 336/6000
   <u>brwalters@varnumlaw.com</u>

13970181

26