## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THE SHANE GROUP, INC., *et al*., <br><br> Plaintiffs, on behalf of themselves and all others similarly situated, <br><br> v. <br><br> BLUE CROSS BLUE SHIELD OF MICHIGAN, <br><br> Defendant. | Civil Action No. 2:10-cv-14360-DPH-MKM <br><br><br> Judge Denise Page Hood <br><br> Magistrate Judge Mona K. Majzoub |

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION

For the reasons set forth in the attached Memorandum of Law in support of this Motion, Plaintiffs The Shane Group, Inc., Bradley A. Veneberg, Michigan Regional Council of Carpenters Employee Benefits Fund, Abatement Workers National Health and Welfare Fund, Monroe Plumbers & Pipefitter Local 671 Welfare Fund, Scott Steele, Anne Patrice Noah, and Susan Baynard submit this Motion for Final Approval of Settlement and Plan of Allocation, and respectfully request that the Court enter the Proposed Final Approval Order, which was attached to the parties' Settlement Agreement and is attached here as Exhibit A.

Dated: October 16, 2018        Respectfully submitted,


/s/ *E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
epm@millerlawpc.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

Daniel A. Small
Brent W. Johnson
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
dsmall@cohenmilstein.com
bjohnson@cohenmilstein.com

Fred T. Isquith
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
270 Madison Avenue
New York, New York, 10016
Telephone: (212) 545-4690

isquith@whafh.com

Theodore B. Bell
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Telephone: (312) 984-0000
tbell@whafh.com

*Interim Class Counsel*

David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Rd, Suite 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com

*Interim Liaison Counsel*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THE SHANE GROUP, INC., *et al*., <br><br> Plaintiffs, on behalf of themselves and all others similarly situated, <br><br> v. <br><br> BLUE CROSS BLUE SHIELD OF MICHIGAN, <br><br> Defendant. | Civil Action No. 2:10-cv-14360-DPH-MKM <br><br><br> Judge Denise Page Hood <br><br> Magistrate Judge Mona K. Majzoub |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION

i

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES ........................................................ iv

MOST CONTROLLING OR APPROPRIATE AUTHORITIES .......................... vii

STATEMENT OF ISSUES PRESENTED ............................................ viii

I.      PROCEDURAL HISTORY .......................................................5

   A.   Proceedings Prior to Settlement ...........................................5

      1. Proceedings Prior to Legislative Change Mooting Injunctive Relief.........5

      2. Plaintiffs' Expert Report and Class Certification Briefing........................7

   B.   Settlement Negotiations ...................................................9

   C.   First Settlement Agreement................................................9

   D.   First Settlement Approval Process .........................................11

   E.   Appeal ...................................................................13

   F.   Post-Remand Unsealing .................................................14

   G.   Amended Settlement Agreement ...........................................14

   H.   Settlement Notice .......................................................15

II.     LEGAL STANDARD ...................................................16

III.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE .....17

   A.   The Likelihood of Success and the Potential Recovery...........................18

   B.   The Reaction of Absent Class Members...................................23

   C.    The Complexity, Expense, and Likely Duration of the Litigation .........25

   D.   The Amount of Discovery Engaged in by the Parties............................26

   E.   The Risk of Fraud or Collusion................................................27

   F.   The Opinions of Class Counsel and Class Representatives.....................30

   G.   The Public Interest .......................................................31

   H.   Whether the Settlement Gives Preferential Treatment to Named Plaintiffs but Only Perfunctory Relief to Unnamed Class Members.............................32

IV.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND........33

ADEQUATE ...................................................................33

V.   THE OBJECTORS' ARGUMENTS ARE WITHOUT MERIT ...............36

A.     Varnum Group.............................................................................................36

B.     Christopher Andrews...............................................................................42

VI. CONCLUSION .............................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ...................................................................................42

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981) ............................................................................ 17, 18

*Cason-Merendo v. Detroit Med. Ctr.*,
    No. 06-cv-15601 .....................................................................................26

*Churchill Vill., LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ...................................................................24

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) .................................................................22

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)........................................................................24

*Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*,
    3 F.3d 1568 (D.C. Cir. 1993) ...................................................................29

*Edwards v. Nat'l Milk Producers Federation*,
    No. 11-cv-04766, 2017 WL 3616638 (N.D. Cal. June 26, 2017) .....................44

*Garner v. State Farm Mut. Auto. Ins.*,
    No. 08-cv-1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .....................24

*Granada Inv., Inc. v. DWG Corp.*,
    962 F.2d 1203 (6th Cir. 1992) .................................................................31

*Health All. Plan of Mich. v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*,
    No. 14-cv-13788-LPZ (E.D. Mich.) ...................................................11

*In re Art Materials Antitrust Litig.*,
    100 F.R.D. 367 (N.D. Ohio 1983) ........................................................38

*In re Black Farmers Discrimination Litig.*,
    953 F. Supp. 2d 82 (D.D.C. 2013).........................................................29

*In re Cardizem CD Antitrust Litig.*,
    218 F.R.D. 508 (E.D. Mich. 2003) ........................................................31

*In re Dry Max Pampers Litigation*,
    724 F.3d 713 (6th Cir. 2013) ...................................................................33

*In re Heritage Bond Litig.*,
    No. 02-md-1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005) .....................34

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11-cv-2509, 2015 WL 5159441 (N.D. Cal. Sept. 2, 2015).........................20

*In re Linerboard Antitrust Litig.,*
   No. MDL 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ..................... 20, 25
*In re Lithium Ion Batteries Antitrust Litig.,*
   No. 13-md-02420, 2017 WL 4873500 (N.D. Cal. Oct. 27, 2017).....................44
*In re Optical Disk Drive Prods. Antitrust Litig.,*
   No. 3:10-md-2143, 2016 WL 7364803 (N.D. Cal. Dec. 19, 2016)...................44
*In re Packaged Ice Antitrust Litig.,*
   No. 17-2137, 2018 WL 4520931 (6th Cir. May 24, 2018)................................44
*In re PaineWebber Ltd. P'ships Litig.,*
   171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd,* 117 F.3d 721 (2nd Cir. 1997) ............34
*In re Polyurethane Foam Antitrust Litigation,*
   No. 10-md-02196, 2016 WL 6599969 (N.D. Ohio Oct. 24, 2016) ...................44
*In re Scrap Metal Antitrust Litig.,*
   527 F.3d 517 (6th Cir. 2008) ...............................................................................7
*In re Urethane Antitrust Litig.,*
   2016 WL 4060156 (D. Kan. July 29, 2016) ......................................................30
*In re Wellbutrin XL Antitrust Litig.,*
   No. 08-2431, 2011 WL 3563385 (E.D. Pa. Aug. 11, 2011),
   *appeal filed*, No. 15-cv-3682 (3d Cir. Nov. 19, 2015) ........................................7
*IUE-CWA v. Gen. Motors Corp.,*
   238 F.R.D. 583 (E.D. Mich. 2006) ....................................................................30
*Kimble v. Marvel Entm't., LLC,*
   135 S.Ct. 2401 (2015).........................................................................................23
*Kinder v. Nw. Bank,*
   No. 10-cv-405, 2013 WL 1914519 (W.D. Mich. Apr. 15, 2013)......................16
*Laguna v. Coverall N. Am., Inc.*
   753 F.3d 918 (9th Cir. 2014) ..............................................................................28
*Leegin Creative Leather Prods v. PSKS, Inc.,*
   551 U.S. 877 (2007)............................................................................................22
*N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.,*
   315 F.R.D. 226 (E.D. Mich. 2016),
   *aff'd*, 2017 WL 6398014 (6th Cir. Nov. 27, 2017)............................................26
*Olden v. Gardner,*
   294 F. App'x 210 (6th Cir. 2008) ............................................................... 18, 26
*Rankin v. Rots,*
   No. 02-cv-71045, 2006 WL 1876538 (E.D. Mich. June 27, 2006)...................16
*Robinson v. Shelby Cty. Bd. of Educ.,*
   566 F.3d 642 (6th Cir. 2009) ..............................................................................16
*Rodriguez v. W. Publ'g Corp.,*
   563 F.3d 948 (9th Cir. 2009) ..............................................................................38

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ...................................................34
*Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*,
    825 F.3d 299 (6th Cir. 2016). ................................................... 1, 2, 13
*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
    No. 03-cv-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ..........................20
*Sullivan v. DB Inv., Inc.*,
    667 F.3d 273 (3d Cir. 2011)............................................................38
*Sullivan v. DB Inv., Inc.*,
    No. 04-cv- 2819, 2008 WL 8747721 (D.N.J. May 22, 2008),
    *aff'd*, 667 F.3d 273 ...................................................................42
*UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6the Cir. 2007).................................................... passim
*United States v. Blue Cross Blue Shield of Mich.*,
    No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010)..........................................6
*Vassalle v. Midland Funding LLC*,
    708 F.3d 747 (6th Cir. 2013) ........................................................17
*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)...........................................................29
*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ............................................... 17, 27, 30

**Statutes**
Fed. R. Civ. P. 23(e)(1)(C) ...............................................................16
Federal Rule of Civil Procedure 23(e)....................................................13
Federal Rule of Civil ProcedureRule 23(f)........................................... 26, 41


**Other Authority**
Alba Conte & Herbert Newberg, Newberg on Class Actions § 11.41 (4th ed. 2002)
    ...............................................................................25

## MOST CONTROLLING OR APPROPRIATE AUTHORITIES

*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981)

*N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226 (E.D. Mich. 2016), *aff'd*, 2017 WL 6398014 (6th Cir. Nov. 27, 2017)

*Robinson v. Shelby Cty. Bd. of Educ.*, 566 F.3d 642 (6th Cir. 2009)

*Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299 (6th Cir. 2016)

*UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013)

*Williams v. Vukovich*, 720 F.2d 909, 925 (6th Cir. 1983)

Fed. R. Civ. P. 23(e)

## STATEMENT OF ISSUES PRESENTED

1.  Is the Settlement fair, reasonable, and adequate?

Class Counsel's answer: **Yes.**

2.  Is the Plan of Allocation fair, reasonable, and adequate?

Class Counsel's answer: **Yes.**

On June 23, 2014, Plaintiffs[1] and Blue Cross Blue Shield of Michigan ("BCBSM") entered into a settlement agreement ("Settlement") to resolve allegations that BCBSM violated antitrust laws and inflated prices for medical care at certain Michigan hospitals. On June 26, 2014, the Court preliminarily approved the Settlement, and Plaintiffs subsequently provided notice of the Settlement to millions of Class members. In response, three objections to the Settlement were filed. Those objections argued, among other things, that lack of access to sealed pleadings had materially impaired the ability of Class members to assess the Settlement's fairness. On March 31, 2015, after conducting an extensive fairness hearing, the Court denied those objections and finally approved the Settlement. However, the Court of Appeals for the Sixth Circuit vacated the approval, holding that Class members' lack of access to sealed pleadings prevented meaningful participation in the objection process.[2] *Shane Group, Inc. v. Blue Cross Blue Shield*

---

[1] Plaintiffs are The Shane Group, Inc., Michigan Regional Council of Carpenters Employee Benefits Fund, Abatement Workers National Health and Welfare Fund, Monroe Plumbers & Pipefitter Local 671 Welfare Fund, Susan Baynard, Anne Patrice Noah, Bradley Veneberg, and Scott Steele.

[2] In addition to vacating the approval due to the improper sealing of documents, the Sixth Circuit addressed certain "omissions" in order to "guide the proceedings on remand." *Shane Group*, 825 F.3d at 309-311. The particular "omissions" that relate to attorneys' fees and incentive awards are addressed in Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to Class Representatives, and the reply brief in support of that motion. *See* Dkt. Nos. 336 and 350.

1

*of Mich.*, 825 F.3d 299, 309 (6th Cir. 2016).

In response to the Sixth Circuit's opinion this Court unsealed nearly *all* of the sealed documents in the case. Following the unsealing of documents, on April 17, 2018, the Court again preliminary approved the Settlement and ordered the parties to distribute revised notices of the Settlement to Class members. Dkt. No. 323. Those revised notices specifically informed Class members that, among other things, previously sealed information is now publicly available and provided a new deadline for Class members to object or opt out.

Plaintiffs respectfully move for final approval of the Settlement again. Nothing has changed that would warrant the Court reversing its conclusion three and a half years ago that the settlement is fair, reasonable and adequate. On the contrary, the arguments in favor of final approval are now even stronger.

First, after the second notice, the number of opt-outs from the Settlement *substantially decreased*. After the first notice in 2014, 1,511 potential class members opted out of the Settlement. After the revised notices were distributed, only 308 potential class members opted out, an approximately 80% decrease.

Similarly, providing Class members access to previously sealed documents did not increase the number of objections to the Settlement. Whereas three objections were filed before documents were unsealed, only two objections have been filed since the unsealing of documents. Importantly, *there have been no new*

2

*objectors[3] since the documents were unsealed.*

Furthermore, the two objections that have been filed since the unsealing of documents are entirely without merit. Without any supporting expert analysis, both objections continue to grossly overstate the amount of recoverable damages and improperly discount the substantial risks of continued litigation. After insisting on the unsealing of documents, the objectors have failed to use the unsealed record to explain how Plaintiffs' damages estimate—the result of approximately $2.5 million of expert work -- can be credibly increased or how litigation risks can be overcome. Instead, the objectors assert a mixture of factual inaccuracies and unsupported platitudes.

Mr. Andrews and the Varnum Group have no further basis for objection notwithstanding the unsealing of the record. This is not surprising. An evaluation of the record substantiates what Plaintiffs have repeatedly asserted: that the Settlement provides an excellent recovery for the Class in light of the strengths and weaknesses of the case. That leaves Mr. Andrews and the Varnum Group no support for their positions in the record.

---

[3] To be sure, the group of objectors known as the Varnum Group changed from the first to the second settlement.  Seven of the Varnum objectors from the first settlement have dropped out, and two new ones have joined.  While it is worth noting that the Varnum Group is now smaller, the important point is that, for both settlements, the group filed its objection jointly represented by a single law firm.

The Settlement creates a common fund of almost $30,000,000 that constitutes *approximately 50 percent* of the estimated damages attributable to the Class.[4] Those damages were estimated by a highly qualified economist, Dr. Leitzinger, who conducted a sophisticated statistical analysis of millions of purchases of hospital services. No other expert has done any damages analysis in this case, much less 2.5 million dollars' worth. Indeed, the objectors offer no expert analysis at all.

The settlement amount is particularly impressive considering the significant risks that Plaintiffs faced in continuing litigation, including that the testimony of Dr. Leitzinger would be excluded and that the Class would not be certified. Recoveries of this magnitude—and much less—have been approved in countless antitrust class actions involving less challenging damages and certification issues.

Moreover, the Settlement was reached after three and a half years of contentious litigation between Plaintiffs and BCBSM. During the course of that litigation, the parties received millions of pages of documents in discovery, deposed 169 witnesses, analyzed terabytes of data, submitted detailed expert reports, briefed

---

[4] Plaintiffs have previously represented that the $30 million settlement equals approximately 25 percent of the total damages calculated by Dr. Leitzinger. That statement remains accurate. However, one of the opt-outs from the Class—Health Alliance Plan ("HAP")—incurred approximately 50 percent of the damages estimated by Dr. Leitzinger. Due to HAP's exclusion from the Class and the absence of a provision to reduce the settlement amount for opt outs -- another highly beneficial aspect of the Settlement--the settlement amount equals approximately 50 percent of the damages attributable to the remaining Class members.

multiple motions, and conducted extensive settlement negotiations. Accordingly, Class Counsel had a strong basis on which to evaluate the strengths and weaknesses of the case and negotiate a fair and adequate settlement.

Finally, there are *no* indicia of a premature settlement or other unfairness to Class members. Class Counsel are reputable and well-resourced firms that specialize in antitrust class actions and represent the Class on a contingency fee basis. The interests of Class Counsel are thus strongly aligned with the interests of the Class. If a larger settlement amount could have been secured without undue risk that Class members would have recovered nothing, Class Counsel would have eagerly invested further resources into the case and continued to vigorously prosecute Plaintiffs' claims.

In sum, it remains true that the Settlement provides an excellent recovery in light of the amount of potential damages and the substantial risks of continued litigation. Because the Settlement is fair, reasonable and adequate, it should be finally approved again pursuant to Federal Rule of Civil Procedure 23(e).

## PROCEDURAL HISTORY

## A.    Proceedings Prior to Settlement

### 1. Proceedings Prior to Legislative Change Mooting Injunctive Relief

In October 2010, the Department of Justice ("DOJ") and State of Michigan ("State") filed a complaint alleging that BCBSM had market power in the market for

5

"the sale of commercial health insurance" in 17 geographic markets in Michigan and had inserted Most Favored Nation ("MFN") provisions in contracts with at least 70 Michigan hospitals, resulting in anticompetitive effects in those specific markets. Compl. ¶¶ 28, 33, 86, *United States v. Blue Cross Blue Shield of Mich.*, No. 10-cv-14155 (E.D. Mich. Oct. 18, 2010) ("Gov't Case"), Dkt. No. 1. The Government Case did not seek damages or certification of a class.

The first class action lawsuit related to BCBSM's MFN provisions was filed. *See* Dkt. No. 1. Unlike the Government Case, this complaint (and all successive class action complaints) sought damages for purchasers of hospital healthcare services and certification of a class. The Consolidated Amended Complaint ("CAC") alleges that the MFN provisions were intended to entrench BCBSM's dominant position in Michigan by raising its rivals' costs of providing health insurance. CAC ¶ 4 (June 22, 2012), Dkt. No. 78. The CAC alleges that the MFN scheme did not just raise BCBSM's rivals' hospital costs, but also inflated hospital prices paid by individual insureds and self-insured entities who, along with the rivals, constitute the Class.

Thereafter, Plaintiffs participated in extensive fact discovery in coordination with the Government Case and a competitor suit brought by Aetna. This discovery comprised millions of pages of documents, 169 depositions, and years of hospital payment data. While discovery was ongoing, the State legislature banned payors from including MFNs in contracts with health care providers, leading the DOJ and

the State to dismiss their case. *See* Gov't Case, Dkts. No. 240, 245, 246. At that time, class-related fact discovery was incomplete, merits expert discovery had not begun, summary judgment had not been briefed, and the case had not been tried.

### 2. Plaintiffs' Expert Report and Class Certification Briefing

Plaintiffs continued to litigate after the DOJ and the State dismissed their case, proceeding with discovery, expert analysis, and class certification briefing. Plaintiffs worked closely with economist Jeffrey J. Leitzinger to develop and implement a damages model. Dr. Leitzinger is an industrial organization expert with decades of antitrust experience, and his work has previously been found reliable by numerous courts. *See, e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008) (affirming finding that Dr. Leitzinger's testimony was reliable); *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2011 WL 3563385, at *2 n.1 (E.D. Pa. Aug. 11, 2011), *appeal filed*, No. 15-cv-3682 (3d Cir. Nov. 19, 2015) (describing Dr. Leitzinger as "highly qualified").

Dr. Leitzinger performed a sophisticated econometric analysis to estimate any damages associated with provider contracts where reimbursement rates had changed to comply with an MFN provision or where BCBSM had accepted higher reimbursement rates in exchange for an MFN provision. See Report of Jeffrey Leitzinger ("Leitzinger Report"), ¶¶ 45-74 (Oct. 21, 2013), Dkt. No. 333-3. Dr. Leitzinger's analysis—based upon his review of fact discovery, particularly

documents and deposition testimony about how the MFN agreements did or did not affect the negotiation of reimbursement rates—revealed that, despite their pre-discovery hopes, Plaintiffs could not prove calculable damages for most provider agreements with most MFN hospitals. Rather, it became clear that material damages could only be measured for 23 provider agreements with 17 MFN hospitals (the "Affected Combinations" in Dr. Leitzinger's parlance), out of the hundreds of total provider agreements with 70 MFN hospitals. For each Affected Combination, Dr. Leitzinger found that "economic evidence shows that MFN agreements led to higher payments for hospital services" *Id.* Table 1 & ¶ 11.

For each Affected Combination, Dr. Leitzinger first examined how reimbursement rates changed after the MFN went into effect. *Id.* ¶¶ 47-50 & Dkt. No. 133 Ex. 6. He then compared each non-BCBSM insurer's new, post-MFN reimbursement rates to BCBSM's reimbursement rates to see whether the new rates increased to comply with the MFN. *Id.* He subsequently conducted a difference-in-differences regression analysis to compare the change in actual reimbursement rates at affected hospitals with the change in actual reimbursement rates paid by the same insurers at similar hospitals in Michigan under contracts without an MFN provision. *Id.* ¶¶ 51-57. In his regression, he included variables to control for differences among hospitals such as complexity of care, costs and location. *Id.* ¶ 55. His regression used terabytes of data that covered over 60 million claims spanning seven years of

8

medical treatment throughout Michigan—one of the largest datasets ever assembled in a health care antitrust case.

His regression results showed higher reimbursement rates at the Affected Combinations after accounting for the experience of the control group and the other variables in the model. *Id.* ¶ 57. Specifically, based on his difference-in-differences regression analysis, Dr. Leitzinger estimated total overcharges at the Affected Combinations of $118 million. *Id.* ¶¶ 75-76. After Plaintiffs filed their class certification motion and expert report, BCBSM opposed certification on numerous grounds, filed its own expert report, and moved to exclude Dr. Leitzinger's opinions. Both experts were deposed.

**B.    Settlement Negotiations**

While Plaintiffs were drafting their reply brief in support of their motion for class certification, the parties reached a settlement in principle. Settlement discussions had occurred intermittently for over a year, with BCBSM refusing even to make an offer for nearly a year and then making a "nuisance value" offer that was unworthy of consideration. *See* Declaration of Daniel A. Small, ¶¶ 6–8 (Oct. 24, 2014), Dkt. No. 169-3. At all times, the parties negotiated aggressively and at arm's length. *Id.* ¶ 12.

**C.    First Settlement Agreement**

The Settlement created a common fund of $29,990,000 for the benefit of the

Class. This represented more than 25% of the total overcharges that Dr. Leitzinger estimated resulted from BCBSM's misconduct. The Settlement did not guarantee attorneys' fees or incentive awards and was not conditioned on any award to either Class Counsel or named Plaintiffs; rather, it provided only that Plaintiffs would petition the Court. Class Action Settlement Agreement ¶ 71 (June 23, 2014), Dkt. No. 148-1.

The Settlement included a Plan of Allocation that reflected Class Counsel's and Dr. Leitzinger's best estimate of the relative likelihood that purchasers of a given hospital's services would be able to show measurable damages at trial. *See* Dkt. No. 148, at 23-25. Class members who made purchases subject to the 23 provider agreements for which Dr. Leitzinger measured damages would receive the largest proportion of the recovery. *Id.* at 22-23. Class members who made purchases under agreements subject to an MFN clause, but where the evidence did not show measurable damages, would receive a smaller share. *Id.* at 23. Class members who made purchases from hospitals not subject to an MFN clause received the smallest share of damages, to reflect the possibility that they could prove de minimis damages. *Id.* If awards in the third category would be too small to justify distribution as an administrative matter, the amounts that would have gone to those class members would be distributed to the health care charity Free Clinics of Michigan. *Id.* at 24.

**D.    First Settlement Approval Process**

On June 26, 2014, the Court preliminarily approved the Settlement and Plan of Allocation. Dkt. No. 151. The Court also certified a settlement class and approved the Notice Plan and Claim Forms. *Id.* The settlement administrator Epiq subsequently mailed out nearly three million notices to individuals insured by Michigan health plans and third-party payors.[5] Dkt. No. 162-1, ¶ 4. To reach Class Members outside this group, notification specialist Kinsella Media also ran advertisements in 24 print publications and websites providing 29 million impressions. Dkt. No. 162-2, ¶ 10. This distribution likely reached 82.9% of adults in Michigan an average of 2.2 times per person. *Id.* at ¶ 12.

After implementation of the Notice Plan, 1,511 potential class members requested exclusion from the Class. One of the entities that opted out of the Class was HAP.[6] As determined by Dr. Leitzinger's analysis, HAP was overcharged approximately $58 million due to BCBSM's misconduct. In other words, the damages attributable to HAP constituted almost 50% of the $118 million in total

---

[5] Plaintiffs estimate that the Class contains as many as 7 million members. The exact number is unknown because some purchasers of hospital services either owed nothing (because another payor paid the entire amount) or did not pay their obligated amount.

[6] HAP first opted out of the Class *before* documents were unsealed and any objections to the Settlement were filed. HAP is the only opt-out that has filed an individual action to try to recover more money. *See Health All. Plan of Mich. v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*, No. 14-cv-13788-LPZ (E.D. Mich.).

damages calculated by Dr. Leitzinger. For that reason, and the *absence of an opt out reduction provision* in the Settlement Agreement, the exclusion of HAP significantly benefitted the remaining members of the Class; it effectively *doubled* the amount each claimant would receive from the Settlement. Due to HAP's exclusion, the Settlement provided Class members approximately *50%* of their estimated damages. This substantial increase in the value of the Settlement to Class members is a direct consequence of one of Class Counsel's negotiating achievements: while many settlement agreements provide defendant a pro rata reduction to account for opt-outs, the Settlement gives BCBSM no such reduction.

In response to the dissemination of the Notice, four objections were filed with the Court, one of which was subsequently withdrawn. Pls.' Mot. for Final Approval of Sett. & Plan of Allocation at 27 (Oct. 24, 2014), Dkt. No. 169. The Varnum Group also filed a motion to intervene to seek to access certain sealed documents. Dkt. No. 166. Plaintiffs and BCBSM opposed the motion to intervene, as did 29 third-party hospitals and other organizations. Dkt. Nos. 181, 183, 185, 186, 189, 192.

The Court held a fairness hearing on November 12, 2014, at which objectors appeared and argued at length. In a 49-page opinion issued on March 31, 2015, the Court considered and rejected the written and in-court objections and the motion to intervene. Dkt. No. 213. The Court applied the Sixth Circuit's seven-factor test for determining whether a settlement is fair, reasonable, and adequate, concluding that

every factor weighed in favor of approving the Settlement. *Id.*

**E.     Appeal**

The three objectors appealed the Court's order approving the Settlement. The Sixth Circuit declined to hear oral argument from two of the objectors (one of whom is Andrews) but requested oral argument from the Varnum Group. Notice, No. 15-1544 (6th Cir. Nov. 5, 2015), Dkt. No. 32.

After hearing argument, the Sixth Circuit concluded that "every document that was sealed in the district court was sealed improperly" because the parties failed to provide the necessary justification. *Shane Group*, 825 F.3d at 307. The Sixth Circuit was unable to "say in any realistic sense that the [sealing] error was harmless" to the approval process. *Id.* at 308. To "participate meaningfully in the process contemplated by Federal Rule of Civil Procedure 23(e)," the court held, Class members needed the ability to "review the bases of the proposed settlement and the other documents in the court record." *Id.* at 309. Because they could not do so, the Sixth Circuit vacated approval. *Id.*

The panel also offered some comments on certain "omission[s]" "[t]o guide the proceedings on remand." *Id.* The most significant omission was that the March 31 opinion needed to "specifically examine what the unnamed class members would give up in the proposed settlement, and then explain why—given their likelihood of success on the merits—the tradeoff embodied in the settlement is fair to unnamed

members of the class." *Id.* The panel did not suggest that this Court's analysis was incorrect, only that it needed to be explained in more detail.

## F.   Post-Remand Unsealing

In response to the Sixth Circuit's opinion, this Court unsealed nearly *all* the sealed documents. The parties obtained permission from 70 third parties to publicly file previously sealed materials. As for the documents which BCBSM and non-parties did not agree to unseal, Class Counsel argued generally in favor of unsealing. *See* Dkt. Nos. 281, 296, 322.

## G.   Amended Settlement Agreement

After remand, the parties negotiated a few minor revisions to the original settlement agreement. The most significant changes are the deletion of the "clear sailing" provision on attorneys' fees[7]; BCBSM's agreement to pay an installment of the Settlement Amount to cover the estimated cost of the second round of class notice; and Aetna's exclusion from the Class in light of its separate settlement with BCBSM. *See* Amended Class Action Settlement Agreement ¶¶ 30, 35 (Oct. 11, 2016), Dkt. No. 269-2.

More important than what was changed is what was unchanged. The

---

[7] In the original settlement, BCBSM agreed not to oppose Plaintiffs' fee application, up to a certain percentage. Because the Sixth Circuit questioned this provision, Plaintiffs did not seek it in the amended Settlement Agreement.

Settlement Amount remained $29,990,000, and no opt out reduction provision was added—despite the fact that HAP had filed separate litigation and undoubtedly would opt out of the Settlement Class again. Class Counsel thus *doubled* the value of the Settlement to the remaining Class members and increased the recovery as a percentage of the Class's estimated damages to approximately *50%.*

## H.    Settlement Notice

On April 17, 2018, the Court preliminarily approved the amended Settlement and a Notice Plan for dissemination of revised Notices and Claim Forms. Dkt. No. 323. Settlement administrator Epiq mailed out nearly three million revised notices to Class members, notices ran in print publications and websites. The notices directed Class members to a website and toll-free phone number for additional information and copies of the Claims Forms.

In furtherance of the Sixth Circuit's opinion, the notices specifically informed Class members that, among other things, previously sealed documents were now publicly available, including on the Settlement website, and provided a new deadline for Class members to object or opt-out.

After implementation of the Notice Plan, only 308 class members requested exclusion from the Class, and two of the original objectors, Christopher Andrews and the Varnum Group (but no others) filed objections. *Id.* ¶ 17. The two original objectors who filed are the Varnum Group and Christopher Andrews. Meanwhile,

as of October 12, 2018, Epiq received a total of 4,650 paper Individual Claim Forms and 35 paper Insurer Claim Forms. Additionally, Epiq received 34,732 Individual Claims and 34 Insurer Claims via the claims website. As of October 12, 2018, Epiq has received a total of 84,094 claims through either the post office box or the website, inclusive of both the original Settlement and the Amended Settlement. *See* Epiq Declaration (Exhibit D).

## II.     LEGAL STANDARD

"Before approving a settlement, a district court must conclude that it is 'fair, reasonable, and adequate.'" *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting Fed. R. Civ. P. 23(e)(1)(C)). In applying this test, courts must be mindful of "the federal policy favoring settlement of class actions." *Id*. at 632. There is a "strong presumption in favor of voluntary settlements, which is especially strong in class action cases." *Kinder v. Nw. Bank*, No. 10-cv-405, 2013 WL 1914519, at \*3 (W.D. Mich. Apr. 15, 2013). "[P]ublic policy strongly favors settlement of disputes without litigation. . . . Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." *Robinson v. Shelby Cty. Bd. of Educ.*, 566 F.3d 642, 648 (6th Cir. 2009) (citation omitted). Thus, while the Court acts as a fiduciary for absent class members, it should not "substitute its business judgment for that of the parties." *Rankin v. Rots*, No. 02-cv-71045, 2006 WL 1876538, at \*3 (E.D. Mich. June 27, 2006).

The Court's main considerations are "the existence of serious questions of law and fact which place the ultimate outcome of the litigation in doubt" and "the vagaries of litigation," comparing "the significance of the immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Id.* Overall, "[c]ourts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also UAW*, 497 F.3d at 631.

The Sixth Circuit has identified seven factors that should be considered in assessing a settlement's propriety: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013) (quoting *UAW*, 497 F.3d at 631). It also asks "whether the settlement 'gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members.'" *Id.* at 755 (quoting *Williams v. Vukovich*, 720 F.2d 909, 925 n.11 (6th Cir. 1983)).

## III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

Every one of the relevant factors weighs strongly on the side of approval.

**A.**    **The Likelihood of Success and the Potential Recovery**

The overarching question before the Court is whether the Settlement is fair in light of "plaintiff's likelihood of success on the merits." *UAW*, 497 F.3d at 631 (quoting *Carson*, 450 U.S. at 88 n.14). On this front, the Settlement provides an excellent recovery given the strengths and weaknesses of the case and the Class's potential recovery.

Many class action settlements have been approved before plaintiffs' expert had even analyzed damages. *See, e.g.*, *Olden v. Gardner*, 294 F. App'x 210, 218 (6th Cir. 2008) (unpub. op.) (affirming final approval even though "class counsel negotiated the settlement agreement without first obtaining any expert opinions or engaging in formal discovery"). In contrast, here, Dr. Leitzinger performed a detailed and labor-intensive analysis of damages using very large databases and a well-accepted methodology.

That analysis exposed the limitations of Plaintiffs' claims. When Plaintiffs first filed this case, they had hoped to calculate damages resulting from each of the hundreds of provider agreements with all 70 MFN hospitals. However, although Plaintiffs had every incentive to prove as high damages as possible and engaged in extensive discovery and expensive analysis to do so, Dr. Leitzinger and Plaintiffs determined that damages could be reliably and manageably measured only for purchasers covered by 23 provider agreements at 13 MFN hospitals. The analyses

conducted by Dr. Leitzinger indicate that it likely would be impossible to develop a reliable economic model that would prove material damages under other provider agreements. Thus, even if a jury were to fully accept Dr. Leitzinger's testimony—and Plaintiffs' liability case—much of the Class would receive nothing at trial.[8]

Dr. Leitzinger calculated damages resulting from those 23 provider agreements at $118 million, and he calculated that one direct purchaser, HAP, had incurred damages of $58 million. This is far from the multi-billion dollar case hypothesized by the Varnum Group, which conducted *no* damages study at all.

Dr. Leitzinger's damages estimate provides a strong basis on which to evaluate the Settlement's adequacy. In light of HAP's exclusion from the Class, the Settlement recovers approximately 50% of the damages incurred by the Class. The outstanding result for the Class achieved here compares favorably to many other settlements approved in antitrust class actions. *See, e.g.*, *In re High-Tech Emp.*

---

[8] Plaintiffs originally defined a class that included purchasers of healthcare services at all MFN hospitals in Michigan during a five-and-a-half-year period. *See* CAC ¶ 26, Dkt. No. 78. When Plaintiffs moved for class certification following Dr. Leitzinger's analysis, Plaintiffs narrowed the proposed class to just purchasers covered by the 23 provider agreements. For settlement purposes, BCBSM insisted on a broader class that gives them litigation peace as to any purchaser of healthcare services from a Michigan general acute care hospital. The Sixth Circuit has expressly affirmed approval orders which, like the Preliminary Approval Order here, "redefin[ed] the class in connection with the Settlement . . . result[ing] in the addition of class members." *Lindsey v. Memphis-Shelby Cnty. Airport Auth.*, 229 F.3d 1150, *7 (6th Cir. 2000).

*Antitrust Litig.*, No. 11-cv-2509, 2015 WL 5159441, at *4 & n.5 (N.D. Cal. Sept. 2, 2015) (approving settlement recovering 14% of single damages a month before trial; citing cases recovering between 1 and 5%); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005) (recovery of 11.4% of damages "compares favorably with the settlements reached in other complex class action lawsuits"); *In re Linerboard Antitrust Litig.,* No. MDL 1261, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004) (collecting cases in which courts have approved settlements of 5.35% to 28% of estimated damages in complex antitrust actions).

The settlement amount is particularly impressive considering there is significant doubt whether Class members would receive *any* recovery if they continued to litigate their claims. If BCBSM had defeated Plaintiffs' class certification motion (either in the district court or on a Rule 23(f) appeal), excluded or substantially limited Dr. Leitzinger's testimony, or prevailed on summary judgment, the case would never have reached a jury.

Indeed, BCBSM has vigorously opposed Plaintiffs' pending class certification motion. In its opposition brief, BCBSM argues:

> The proposed class is composed of a disparate set of specific claims at specific hospitals. Thus, there are no common allegations across the market for the sale of health insurance. Class members' payments for hospital services were made at different hospitals, for different services, under different contracts, at different times. As a result, there is no common set of proof that can be used to prove the claims of any alleged

class members.

Def.'s Resp. to Pls.' Mot. for Class Certification at 1 (Feb. 3, 2014), ECF No. 139.

BCBSM has also aggressively sought to exclude Dr. Leitzinger's testimony.

In a pending *Daubert* motion, BCBSM asserts:

> Leitzinger's methodology is unreliable because it shows similar effects even when applied to hospitals without MFNs, is not based on a valid benchmark, and produces statistically insignificant results. The model's shortcomings aside, Leitzinger blindly attributes any and all differences in rates to the MFNs, ignoring the fact that hospitals uniformly testified that the MFNs had no effect on reimbursement rates. Leitzinger does not take into account, nor does he test for the effect of, the many other factors that affect reimbursement rates.

Def.'s Mot. To Exclude Expert Testimony at 1-2 (Feb. 3, 2014), ECF No. 140.

Moreover, even if Plaintiffs had prevailed on the pending class certification and *Daubert* motions and subsequently defeated summary judgment, a jury may not have credited Plaintiffs' evidence or may have awarded far less than Plaintiffs sought. At trial, Plaintiffs would have to prove the elements of their claim to establish liability: the relevant product and geographic markets, BCBSM's market power in them, and the anticompetitive effects of the MFNs in them. Each of these liability issues would be the subject of complex testimony by dueling experts. BCBSM has argued strenuously that the challenged MFNs are procompetitive, that they did not cause reimbursement rates to increase, and that any increases in reimbursement rates were too small to affect competition among sellers of health insurance. The Court has never rejected any of BCBSM's merits defenses. The

uncertainty of how a jury would resolve these complex issues injects further risk into the case, even though Plaintiffs firmly believe their expert is right.

If Plaintiffs persuaded the jury of BCBSM's liability, there would be yet another complex battle over the quantification of damages. Plaintiffs would present Dr. Leitzinger's testimony, and BCBSM would present its own expert at trial, who assuredly would tell the jury that there are no damages. This conflicting and complex damages testimony would create significant risk that the Class would recover nothing or substantially less than $118 million at trial.[9]

Finally, even if this Court and a jury found that BCBSM's practices were illegal and caused significant damages, Plaintiffs would still face a substantial risk of reversal by a Sixth Circuit panel or the Supreme Court. The history of antitrust litigation is littered with cases that won substantial verdicts at trial only to be reversed on appeal. *See, e.g.*, *Leegin Creative Leather Prods v. PSKS, Inc.*, 551 U.S. 877 (2007) (reversing century-old precedent to vacate favorable jury verdict); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) (reversing $44 million jury verdict). Even a victory on settled law would not guarantee success

---

[9] These liability and damages issues implicate dozens of contracts between numerous hospitals and payors in Michigan and two different markets (one for commercial health insurance and one for hospital services), each with scores of relevant market participants. The sheer number of contracts and market participants creates significant potential for jury confusion and fatigue, which rarely works in Plaintiffs' favor.

through appeal, as the Supreme Court "has viewed *stare decisis* as having less-than-usual force in cases involving the Sherman Act." *Kimble v. Marvel Entm't., LLC*, 135 S. Ct. 2401, 2412 (2015).

All told, there was a substantial risk that Class members would receive *nothing* without a settlement—and that Plaintiffs would be in a much weaker settlement position at a later stage, rather than a stronger one. Thus, the recovery of approximately $30 million, which reflects approximately 50% of the damages attributable to Class members, constitutes a substantial victory. Indeed, in its prior final approval order, this Court concluded that "although significant discovery has been performed in this case, the litigation is far from over. The Named-Plaintiffs face significant risk that the class members could receive nothing or some negligible amount in damages at trial or on appeal. The Court finds that the likelihood of success on the merits weighs in favor of approving the settlement." Dkt. No. 213 at 27.

## B.    The Reaction of Absent Class Members

The reaction of absent class members similarly weighs heavily in favor of approval. Following the remand by the Sixth Circuit, only two of the original (an no others) objected to the Settlement, and the number of opt outs decreased by 80%. objectors have maintained objections to the Settlement and the number of opt outs decreased 80%. Providing Class members access to the unsealed record thus did not

result in more challenges to the settlement. Quite to the contrary, the number of objectors and opt outs both decreased. Now the number of opt-outs only constitutes about 0.005% of the Class and 0.01% of those Class members directly notified. Courts routinely approve settlements involving far higher opt-out rates. *See, e.g.*, *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 at 577 (9th Cir. 2004) (opt-out rate of 0.55%); *Garner v. State Farm Mut. Auto. Ins.*, No. 08-cv-1365, 2010 WL 1687832, at *15 (N.D. Cal. Apr. 22, 2010) (0.4%).

Similarly, *fewer* objections have been submitted since the unsealing of documents. Whereas three objections were filed before documents were unsealed, only two objections have been filed since the unsealing of documents. And the two pending objections were filed by objectors—the Varnum Group[10] and Christopher Andrews—who filed similar objections to the original settlement. Settlements triggering much higher objection rates are routinely approved. *See, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (27,883 notices and 18 objections); *Churchill Vill.*, 361 F.3d at 577 (90,000 notices and 45 objections). *See generally* Alba Conte & Herbert Newberg, Newberg on Class Actions § 11.41, at 108 (4th ed. 2002) ("[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class

---

[10] *See* note 3 *infra*.

members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

Meanwhile, tens of thousands of injured Class members have filed claims. Specifically, a total of 84,094 Class members have filed claims, inclusive of both the original Settlement and the Amended Settlement. *See* Exhibit D. This includes many of the largest purchasers of hospital services in Michigan. In sum, the reaction of absent class members weighs heavily in favor of approval. The reaction substantiates Plaintiffs' assertion that the Settlement provides an excellent recovery for the Class in light of the strengths and weaknesses of the case.

## C. The Complexity, Expense, and Likely Duration of the Litigation

Courts widely recognize that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig*., 2004 WL 1221350, at *10. As even the Varnum Group recognizes, "[t]here is no question that antitrust litigation of this size and scope is a complex and expensive process that can take several years to resolve." First Varnum Obj. at 17 (Sept. 24, 2014), Dkt. No. 161.

On top of this complexity is the inescapable delay in recovery were the litigation to continue. Plaintiffs have several challenging, time-consuming and costly steps to complete before any litigated recovery could be obtained: not only the unfinished class certification briefing and expert discovery, including expert depositions and additional *Daubert* challenges, but also summary judgment, a

potential petition for interlocutory appeal under Rule 23(f), trial preparation and motions in limine, the trial itself, and post-judgment motions and appeals. Given these hurdles, any recovery outside of this Settlement likely would be several years away.[11] Indeed, in its prior final approval order, this Court held that "the antitrust MFN issues raised by the Plaintiffs are complex, very expensive to litigate and the litigation would continue for years, including any appeals." Dkt. No. 213 at 23-24. This long path to an uncertain recovery strongly supports the fairness of the settlement. *See*, *e.g.*, *N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 236 (E.D. Mich. 2016), *aff'd*, 2017 WL 6398014 (6th Cir. Nov. 27, 2017).

## D.    The Amount of Discovery Engaged in by the Parties

Many class action settlements have been approved before discovery had even taken place, let alone expert analysis. *Olden*, 294 F. App'x at 218. Here, by contrast, Plaintiffs completed extensive discovery and commissioned a detailed analysis by a reputed economist using comprehensive data and a well-accepted methodology. The Varnum Objectors concede that "Plaintiffs engaged in a very significant amount of discovery in this case." First Varnum Obj. at 18. Millions of pages of documents and multiple terabytes of data were produced; 169 depositions were taken; and

---

[11] Consider the most recent antitrust class action to approach trial in this district, *Cason-Merendo v. Detroit Med. Ctr.*, No. 06-cv-15601. *Cason-Merendo* was filed in 2006 and settled a month before trial in 2015—nearly 10 years after filing.

competing expert reports were prepared. It is hard to imagine parties in a better position to understand the strengths and weaknesses of this case.

Because "the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered," *Vukovich*, 720 F.2d at 923, the "very significant amount of discovery in this case" counsels a "very significant amount" of deference. Indeed, in its prior final approval order, this Court held, "There is no dispute that extensive discovery has been taken in this case, and the Objectors so concede. In light of this extensive discovery, the Court finds that the Named-Plaintiffs and Blue Cross have been able to evaluate the propriety and fair value of the settlement." Dkt. No. 213 at 25. This factor thus weighs heavily in favor of approval.

## E.    The Risk of Fraud or Collusion

Courts "presum[e] that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands" absent "evidence of improper incentives." *UAW*, 497 F.3d at 628. The history of this hard-fought litigation, including the settlement negotiations, bear out the presumption here.

This Court has had ample opportunity to observe the intensely adversarial nature of this litigation during the nearly eight years since the complaint was filed. In the prior final approval, this Court described that adversity:

> [T]he Court finds there is no indication of fraud or collusion in this case. … Each party vigorously advanced and defended their arguments and positions before the Court. … The parties engaged in extensive motion practice and discovery relating to the class certification issue and expert-related issues. … The Court did not observe any signs that the parties were engaged in pretense and posturing during the years in litigation before the Court to mask collusion in reaching a Settlement Agreement with Blue Cross.

Dkt. No. 213 at 21-22.

Moreover, the terms of the Settlement refute the notion that it was the product of fraud or collusion. The Settlement lacks any of the hallmarks of a potentially collusive deal such as "a promise of excessive attorney fees," an agreement to pay attorneys' fees separate from class funds, an agreement to return unclaimed settlement amounts to BCBMS, or a commitment to pay incentive fee awards to the named Plaintiffs. *UAW*, 497 F.3d at 628. *See also Laguna v. Coverall N. Am., Inc.* 753 F.3d 918, 924-25 (9th Cir. 2014). The Settlement guarantees *nothing at all* to Class Counsel or any of the named Plaintiffs; all awards are placed in the sole discretion of the District Court. *See* Settlement ¶ 71.

Indeed, Class Counsel had every incentive to obtain, and vigorously pursued, as large a settlement as possible for the Class, in part because a larger common fund would mean a larger fee award to Class Counsel. Class Counsel's interests are fully aligned with the Class's interests, and there is no reason to fear self-dealing, let alone fraud or collusion. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (percentage method "directly aligns the interests of the class and

its counsel"); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 88 (D.D.C. 2013) ("This percentage-of-the-fund approach 'helps to align more closely the interests of the attorneys with the interests of the parties . . . .'") (quoting *Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993)).

Because legislation was enacted by Michigan to ban hospital MFNs, there is not even the possibility of a conflict between class members seeking injunctive relief and class counsel seeking financial recovery. Both the Class and Class Counsel seek the same benefit from the case: the maximum financial recovery. In pursuit of that goal, Class Counsel has invested several years and more than $3 million in expenses in this case.

Finally, Class Counsel are reputable antitrust class action experts, whose record of zealous and successful representation belies any claim that they would sell out their clients for a quick deal. For example, Class Counsel Cohen Milstein Sellers & Toll tried *In re Urethane Antitrust Litigation* to verdict in 2013. This was a case where the DOJ had dropped its investigation—yet, Cohen Milstein litigated the case for more than a decade, ultimately winning the largest antitrust class action verdict in U.S. history of over one billion dollars after trebling. Commenting on the ten years of litigation over and the six-week trial over which he presided, the trial judge wrote: "In almost 25 years of service on the bench, this Court has not experienced a more

29

remarkable result. . . . [P]laintiffs' attorneys . . . had great experience and superior national reputations, [and] demonstrated great skill throughout." *In re Urethane*, 2016 WL 4060156, at *5 (D. Kan. July 29, 2016). In this case, Class Counsel's commitment cannot be seriously questioned.

## F.   The Opinions of Class Counsel and Class Representatives

In deciding whether a proposed settlement warrants approval, "[t]he judgment of the parties' counsel that the settlement is in the best interest of the settling parties is entitled to significant weight." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 597 (E.D. Mich. 2006) (internal quotation marks omitted). Class Counsel include some of the most experienced and respected firms in the antitrust and class action bars, who have a record of astutely judging the prospects of a given case and obtaining the best possible recovery for their clients. Their considered judgment here—after voluminous discovery, expert analysis, and extensive motion practice— that the Settlement is the Class's best course of action is entitled to considerable deference. *See Vukovich*, 720 F.2d at 922-23 ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs.").

Similarly, the named Plaintiffs have participated in this case for years. All produced documents, responded to BCBSM's interrogatories, and discussed the case with Class Counsel, and half of them testified in deposition. The named Plaintiffs

come from all segments of the Class: some are individual purchasers, some institutional payors; some made purchases in Category 1, some in Category 2, and some in Category 3. *See* Dkt. No. 124 at 4-5. Each named Plaintiff believes the Settlement serves the Class well, and each named Plaintiff has filed to be considered along with the rest of the Class.

Accordingly, this factor weighs heavily in favor of approval. Indeed, in its prior final approval order, this Court held, "Class Counsel and the Named-Plaintiffs in this action all support the settlement in this case. Deference is given to their opinions because they have had the opportunity to review discovery and an opinion by an expert in the evaluation of the case." Dkt. No. 213 at 28.

## G.   The Public Interest

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 580 (E.D. Mich. 2003) (quoting *Granada Inv., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)). The public interest particularly supports settlement in this case because of the likelihood that personnel from many Michigan hospitals would be called to testify at trial. The 169 depositions taken in this case included depositions of over 100 third parties, including employees from dozens of hospitals. BCBSM or Plaintiffs would presumably call many of these

witnesses at trial, placing a not insignificant burden on Michigan healthcare providers.

## H.   Whether the Settlement Gives Preferential Treatment to Named Plaintiffs but Only Perfunctory Relief to Unnamed Class Members

The Settlement neither gives preferential treatment to named Plaintiffs nor perfunctory relief to unnamed class members. Named Plaintiffs have applied for Court-awarded compensation for their service in pursuing this case. The requested incentive awards are reasonable given the time and resources that named Plaintiffs devoted to the case, including sizable document productions, responses to written discovery requests, and deposition testimony. Dkt. No. 155 at 19-23. Furthermore, the awards to the named Plaintiffs are not guaranteed; rather, the awards are wholly in the District Court's discretion.[12]

Nor do absent class members receive merely "perfunctory" relief. The Sixth Circuit has expressed concern about perfunctory relief where absent class members received only illusory injunctive relief or were put in a worse position. For example, in *In re Dry Max Pampers Litigation*, class members received zero monetary relief and only "illusory" injunctive relief while counsel received $2.73 million without

---

[12] Plaintiffs discuss the justification for the requested incentive awards in more detail in their Reply in Support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to Class Representatives, which is being filed concurrently with this brief.

"tak[ing] a single deposition, serv[ing] a single request for written discovery, or even fil[ing] a response to [defendant's] motion to dismiss." 724 F.3d 713, 718, 721 (6th Cir. 2013). Here, a recovery of approximately 50% of the damages to Class members can hardly be called "perfunctory."

Indeed, in its prior final approval order, this Court held that the Settlement "does not give preferential treatment to the Named-Plaintiffs, other than the incentives which are reasonable in light of their involvement in the case." ECF No. 213 at 33. The Court also found "that the relief to unnamed class members is not illusory or perfunctory." *Id.* There is no reason to alter those conclusions.

## IV.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

As discussed above, Plaintiffs' and their expert's analysis shows that the MFN agreements impacted only a small subset of MFN hospitals—and even then only a limited number of those hospitals' provider agreements. Class members who paid for services for which Plaintiffs were able to measure damages have stronger claims than those who purchased at other hospitals, or under other provider agreements, or in other time periods.

The proposed Plan of Allocation allocates the largest share of the settlement fund to Class members with the strongest claims, allocating progressively smaller

amounts as the likelihood of proving damages diminishes.[13] This method has repeatedly been approved by courts. *See, e.g.*, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 589 (N.D. Ill. 2011) ("[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed.") (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd,* 117 F.3d 721 (2nd Cir. 1997)); *In re Heritage Bond Litig.*, No. 02-md-1475, 2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable. It is also reasonable to allocate more of the settlement to class members with stronger claims on the merits."). Indeed, this Court previously found the Plan of Allocation to be "fair, reasonable and adequate." Dkt.

---

[13] The Plan of Allocation places claims in one of three categories. Category 1 purchases are those covered by the 23 provider agreements for which Plaintiffs were able to measure damages; they generated the $118 million in damages estimated by Dr. Leitzinger. Accordingly, most of the Net Settlement Fund (78 percent) will be distributed to Class members based on their Category 1 purchases. Category 2 includes purchases at hospitals when an MFN agreement was in effect, but for which Plaintiffs had no reliable evidence of harm or evidence of only de minimis damages. The Plan of Allocation assigns 20 percent of the Net Settlement Fund to these purchases. Category 3 purchases were made when no MFN agreement was in effect. Although BCBSM's conduct conceivably could have had some spillover effect on these purchases, Dr. Leitzinger was unable to measure material damages for these purchases. Thus, just two percent of the Net Settlement Fund is allocated to these purchases.

No. 213 at 33-34.

In addition, Plaintiffs propose a modified claim form for individuals. The revised form provides individual claimants with another choice. Instead of providing the actual amount they paid for each hospital visit, individuals can accept a "default" payment amount per hospital visit. This alternative permits individuals to avoid the need to find records of their hospital visits. They only need to identify the hospital, year, insurer, and inpatient/outpatient status, which they can likely do from memory.

The default option is not offered to insurers and self-insured entities because their hospital payments are much larger, and they keep or have access to their payments in electronic databases. The Varnum Group argues that the claims process is "unduly burdensome" for self-insured entities and insurers.[14] Joint Objection to Proposed Settlement ("Varnum Obj.") at 22 (Sept. 14, 2018), Dkt. No. 343. This complaint is based primarily on the erroneous assertion that self-insured entities and insurers "are required to submit copies of hospital bills." *Id.* However, the Claim Form is clear that self-funded entities and insurers may submit electronic claims

---

[14] The Varnum Group speculates that the parties have designed the claim forms in a manner to depress the number of filed claims. Varnum Obj. at 24-25. This is an illogical hypothesis. The Settlement does not contain a reversion that distributes unclaimed funds to either party. Accordingly, the parties have no interest in limiting the number of filed claims. To the contrary, the million-plus dollar notice program – implemented twice, once for each settlement – demonstrates a commitment to maximize claims.

data, which can simply be downloaded from a claims database.  There is no undue burden in doing so, and thus, the claims procedure strikes an appropriate balance between concerns for fraud and concerns for ease of claims.

## V.   THE OBJECTORS' ARGUMENTS ARE WITHOUT MERIT

Neither of the two objections have any merit.

## A.   Varnum Group

For the second time, a group of companies represented by Varnum LLP has filed a single objection, claiming the Settlement is not fair, reasonable or adequate. The objection is meritless. It grossly overstates the scope of recoverable damages and improperly discounts the substantial risks of continued litigation.

The Varnum Group's primary argument is that the settlement amount is insufficient. Without any evidence or expert analysis they assert that damages in this case are in the *billions* of dollars and that a reasonable settlement would create a common fund of *at least $850 million*. These assertions are pure fantasy. The Varnum Group has simply not accepted the critical distinction between what Plaintiffs initially alleged and what can now be proven in the wake of extensive discovery. While Plaintiffs originally alleged that hundreds of provider agreements involving 70 MFN hospitals caused financial harm to millions of Michigan residents, the stark truth is that Plaintiffs can only prove material damages resulting from 23 provider agreements that involve just 13 MFN hospitals. Only when that factual

reality is accepted can the Settlement be meaningfully evaluated.

In light of that factual reality, the Settlement provides an outstanding recovery to the Class. The settlement amount comprises approximately 50% of damages attributable to Class members. That damages figure was calculated by Dr. Leitzinger, an industrial relations economist with decades of antitrust experience whose work has been found reliable by numerous courts. After spending thousands of hours examining payment data related to hundreds of provider agreements, Dr. Leitzinger estimated that total damages resulting from BCBSM's misconduct was $118 million and, further, that damages to Class members totaled $60 million of that $118 million, with the remainder attributable to HAP.[15] Despite these calculations, which were fully made public following the unsealing of Dr. Leitzinger's report and other pleadings, the Varnum Group insists that the settlement amount should be at least $850 million—more than seven times the total damages calculated by Dr. Leitzinger and more than 14 times the damages incurred by Class members.

--------------------------------

[15] The Varnum Group argues that Dr. Leitzinger "did not conclude that the class had suffered $118 million in damages" but rather only made that calculation to "illustrate that damages to the class 'can be calculated in a class-wide, formulaic fashion.'" Varnum Obj. at 12. In reality, Dr. Leitzinger's calculation reflects the best calculation he could make, and there is no reason to believe that his number would change in the merits phase of expert discovery. While his expert report states that the calculation does not reflect his "final opinion" on damages, that disclaimer is routinely included in expert reports on class certification to permit the expert to respond to any new discovery or the defendant's expert report.

The Varnum Group's arguments that Plaintiffs underestimated damages are plainly inaccurate or inapposite:

- The objection asserts that the settlement fund is inadequate in comparison to the overall amount spent on hospital services in Michigan. Varnum Obj. 12-15. Yet, the litigation seeks to recover the *overcharges* attributable to BCBSM's misconduct, not total payments for hospital services.

- The objection references Aetna's estimate of substantial damages in its competitor case. *Id.* at 8-11. Yet, Aetna's damages estimate is based on the company's lost profits in the health insurance market and diminution of business value, not overcharges for purchases of hospital services.

- The objection relies on the assertion by Aetna's expert, Dr. Vellturo, that BCBSM paid over $100 million to Michigan hospitals in exchange for MFN protection. *Id.* at 10. But this is the amount, according to Dr. Vellturo, that BCBSM itself paid for MFN protection.  It does not reveal how much more BCBSM's self-insured customers (members of the Class) paid. *Id.*

- The objection argues that Dr. Leitzinger "did not include downstream damages resulting from the reduced competition in the health insurance marketplace caused by BCBSM's increased monopoly power." *Id.* at 13. Yet, Plaintiffs are representing a class of purchasers of hospital *services*, not purchasers of health *insurance*. Thus, "downstream damages" are irrelevant to *this* case.

- The objection argues that Plaintiffs fail to include treble damages in their valuation of the case. *Id.* Yet, "courts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009); *see also, e.g.*, *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 324-25 (3d Cir. 2011); *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367 (N.D. Ohio 1983).

While the Varnum Group points to irrelevant facts and theories in an attempt to support their wholly unrealistic damages estimate, they are do not address *the*

38

*record in this case* to substantiate their objection. The Varnum Group previously insisted that numerous pleadings be unsealed so that they and other Class members could effectively evaluate the Settlement. Yet, now that those documents have been unsealed, the Varnum Group has conspicuously failed to rely on that extensive unsealed record to support their objection. Specifically, the Varnum Group, which offers no expert testimony of its own, has not demonstrated that damages can be calculated from any more than 23 provider agreements, or that Dr. Leitzinger's methodology underestimates damages attributable to those 23 provider agreements.

The Varnum Group also claims that Plaintiffs can assuredly litigate this case to a successful and more lucrative conclusion. Varnum Obj. at 12. This is wishful thinking unmoored from the facts of this case. The objection asserts that the DOJ prosecution for injunctive relief rendered success in this private litigation a foregone conclusion. *Id.* at 4-5. Yet, unlike the DOJ, Plaintiffs must certify a litigation class, prove injury to that class, and reliably measure the amount of the class's damages— and those are the most challenging hurdles in this case. The objection also states that Plaintiffs have not yet lost a dispositive motion. *Id.* at 11. However, other than the initial motion to dismiss, no dispositive motion has been filed in this case. The parties have not yet briefed summary judgment.

The risks facing the Class from continued litigation are significant. There are critical *Daubert* and class certification motions now pending before the Court. In

each motion, BCBSM has made an array of detailed arguments, and a ruling in BCBSM's favor on either motion could prove fatal to Plaintiffs' case. Despite the import of these motions, the Varnum Group *fails to even mention them*, let alone address the arguments contained therein. Despite having access to the extensive unsealed record it claimed to so desperately need to evaluate the Settlement, the Varnum Group does not rebut, or address the viability of, BCBSM's multi-pronged attacks on Dr. Leitzinger's testimony and Plaintiffs' certification motion.

If Plaintiffs prevailed on the pending *Daubert* and certification motions, they would still face several difficult and time-consuming steps before any litigated recovery could be obtained, including summary judgment, a Rule 23(f) petition for interlocutory appeal, additional *Daubert* challenges, motions in limine and a jury trial. At trial, each element of Plaintiffs' claim would be the subject of complex testimony by dueling experts, and it is highly uncertain how a jury would resolve these disputes. Finally, even if a jury found that BCBSM's practices were illegal and caused significant damages, Plaintiffs would still face a risk of reversal by a Sixth Circuit panel or the Supreme Court. All these hurdles created significant risk that the Class would recover nothing if Plaintiffs continued to litigate their claims.

Unable to rely on the unsealed record to refute either Plaintiffs' damages analysis or Plaintiffs' account of the litigation risks, the Varnum Group resorts to disparaging the integrity of Class Counsel. Without support, the Varnum Group

40

asserts that Class Counsel entered into a "good deal" for themselves and a "terrible deal" for the Class and then engaged in a "cynical attempt to discourage most class members from submitting claims in order to justify the extremely low settlement fund." Varnum Obj. at 3, 24-25. Yet, this is not plausible because the interests of the Class and the interests of Class Counsel are fully aligned. A "terrible deal" for the Class would be a "terrible deal" for Class Counsel, as the amount of attorneys' fees that Class Counsel may receive from this case is proportional to the size of the recovery obtained for the Class. For that and other reasons, Class Counsel have consistently sought to maximize the dollar value of the recovery for the Class. Indeed, this Court has held that "there is no indication of fraud or collusion in this case." Dkt. No. 213 at 21.

Finally, in addition to criticizing the amount of the settlement, the Varnum Group attacks its distribution. The Varnum Group argues that only half of the settlement amount will ultimately be distributed to Class members after the deduction of litigation expenses and attorneys' fees[16] and, further, that the average payout to each Class member will only be $3 to $5, if the net settlement amount is divided by the number of Class members. This argument is fundamentally flawed.

---

[16] The Varnum Group's objection to the attorneys' fees and incentive awards requested by Class Counsel are addressed in the Reply in Support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to Class Representatives. Dkt. No. 350.

41

To begin, the net settlement fund will *not* be divided by the total number of Class members and, thus, the average payout will be substantially higher than $5. Because Plaintiffs were unable to calculate damages for the majority of Class members, the Plan of Allocation predominantly allocates settlement funds to the limited subset of Class members that were ascertainably harmed by 23 provider agreements with MFN hospitals. As a result, if half the total settlement amount is distributed to Class members, they will receive approximately 25% of their damages, which is an excellent recovery. In addition, the uniform rule is that courts assess a settlement's adequacy on the basis of the total amount of the settlement fund, including any portion awarded for fees and expenses. *See, e.g.*, *Sullivan v. DB Inv., Inc.*, No. 04-cv- 2819, 2008 WL 8747721, at *22 (D.N.J. May 22, 2008), *aff'd*, 667 F.3d 273. This rule is necessary for a fair assessment of any settlement because the provision of legal services is part of the benefit received by class members. *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 477 (1980).

## B.    Christopher Andrews

Another objection to the Settlement was filed by a serial and professional objector named Christopher Andrews, who has previously objected in this case and in multiple other class actions. Mr. Andrews filed an 85-page objection, with hundreds of pages of exhibits, that contains often unintelligible attacks on the Settlement and is devoid of any substantive analysis of the case. "Andrews Obj."

(Aug. 22, 2018), Dkt. No. 341.

Despite Mr. Andrews' supposed belief that the Class could recover "many multiples of $30 million in a better negotiated settlement," *id.* at 15, Mr. Andrews told Class Counsel before filing his initial objection in 2014 that he would drop his entire objection if Class Counsel merely reduced their fee request by $990,000—and paid $153,450 to Mr. Andrews. *See* September 19, 2014 Email and Attachment Sent by Christopher Andrews to Class Counsel Dan Gustafson, attached as Exhibit B. Otherwise, Mr. Andrews would "send a letter to all judges in this district," file "BAR complaints," and otherwise attempt to damage Class Counsel. *See* September 22, 2014 Emails sent by Christopher Andrews to Class Counsel Powell Miller, attached as Exhibit C. For that reason, this Court previously held that Mr. Andrews' objections "are not warranted by the law and facts of the case, were not filed in good faith and were filed to harass Class Counsel." Dkt. No. 213 at 46.

Mr. Andrews has a history of engaging in this type of extortion in class actions. His pattern of conduct was laid bare in *In re Polyurethane Foam Antitrust Litigation*, where the court imposed sanctions on Mr. Andrews, finding:

> If there were any doubt whether to order a sanction, and there is none, one need look no further than Andrews' most recent and unauthorized "supplement" filing. Beyond the improper filing, the substance—or lack thereof—once again reflects Andrews' unreasonableness: claiming as he does, without factual or legal support, that [Class] counsel, not he, deserves sanctions. Quite the opposite. Enough already with these repetitive, warmed-over, and meritless arguments.

43

> This Court agrees with the [Class] that Andrews continues his vexatious use of the judicial system and does so to either to extort a pay-off from the [Class] or as a delay tactic to prolong his coercion attempt. This Court further agrees that Andrews has delayed this case far too long and has ignored both this Court's Orders and rulings from the Sixth Circuit.

*In re Polyurethane Foam Antitrust Litigation*, No. 10-md-02196, 2016 WL 6599969, at *1 (N.D. Ohio Oct. 24, 2016) (citation omitted). There are numerous other recent examples of Andrews' pattern of vexatious, extortionate conduct.[17]  Leaving aside Mr. Andrews's motives, his objection addresses the same issues raised by the Varnum Group, with three exceptions. First, Mr. Andrews argues that named Plaintiffs "lack standing to litigate and settle this action." Andrews Obj. at 23-28. This is inaccurate.[18] The named Plaintiffs fall squarely within the class definition, and this Court previously rejected BCBSM's motion to dismiss on the basis of

---

[17] *See In re Packaged Ice Antitrust Litig.*, No. 17-2137, 2018 WL 4520931, at *8 (6th Cir. May 24, 2018) (noting that many of Mr. Andrews assertions are vague, conclusory, and made without legal support); *Edwards v. Nat'l Milk Producers Federation*, No. 11-cv-04766, 2017 WL 3616638 (N.D. Cal. June 26, 2017) (overruling all of Andrews' objections to settlement); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2017 WL 4873500, at *2–3 (N.D. Cal. Oct. 27, 2017) (overruling all objections raised by Mr. Andrews); *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 3:10-md-2143, 2016 WL 7364803, at *11 (N.D. Cal. Dec. 19, 2016) (noting that Andrews frequently files objections in class action proceedings and overruling all objections).

[18] This argument is also actively hostile to the Class as a whole. If Mr. Andrews' baseless claim were accepted, and Plaintiffs were dismissed on standing grounds, recent Supreme Court precedent casts doubt on whether there could be *any* class-wide recovery. *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 ("But *American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations.").

standing, holding that "Class Plaintiffs have stated sufficient facts to allege injury." Dkt. No. 102 at 7. Second, Mr. Andrews argues that the amended Settlement fails to define several terms, such as "Plaintiffs," "Party," and "Settlement Administration Expenses." Andrews Obj. at 46-47. This is false; the amended Settlement defines those terms. Amended Settlement Agreement ¶¶16-17, 28. Third, Mr. Andrews argues that the parties selected a cy pres beneficiary, Free Clinics of Michigan, that is a vehicle to funnel funds to BCBSM. Andrews Obj. at 59-63. This is incorrect. Free Clinics of Michigan is a volunteer nonprofit organization unrelated to BCBSM that provides free healthcare to uninsured families.

## VI. CONCLUSION

For the foregoing reasons, the Settlement and Plan of Allocation should be approved.

Dated: October 16, 2018       Respectfully submitted,

                    /s/ *E. Powell Miller*
                    E. Powell Miller (P39487)
                    **THE MILLER LAW FIRM, P.C.**
                    950 West University Drive, Suite 300
                    Rochester, Michigan  48307
                    Telephone: (248) 841-2200
                    epm@millerlawpc.com

                    Daniel E. Gustafson
                    Daniel C. Hedlund
                    Daniel J. Nordin
                    **GUSTAFSON GLUEK PLLC**
                    Canadian Pacific Plaza
                    120 South Sixth Street, Suite 2600

Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

Daniel A. Small
Brent W. Johnson
**COHEN MILSTEIN SELLERS**
    **& TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
dsmall@cohenmilstein.com
bjohnson@cohenmilstein.com

Fred T. Isquith
**WOLF HALDENSTEIN ADLER**
    **FREEMAN & HERZ LLC**
270 Madison Avenue
New York, New York, 10016
Telephone: (212) 545-4690
isquith@whafh.com

Theodore B. Bell
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
Telephone: (312) 984-0000
tbell@whafh.com

*Interim Class Counsel*

David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Rd, Suite 111
Bloomfield Hills, MI 48304

46

Telephone: (248) 971-2500
dfink@finkandassociateslaw.com

*Interim Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all filing users indicated on the Electronic Notice List through the Court's electronic filing system.

I further certify that I will serve copies via First Class U.S. Mail and e-mail upon all other parties indicated on the Manual Notice List.

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
epm@millerlawpc.com

48